UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

BENJAMIN WEY and
SEREF DOĞAN ERBEK,

           Defendants.

Crim. Action No.: 15-CR-00611 (AJN)

# DECLARATION OF DAVID SIEGAL

David Siegal hereby declares pursuant to 28 U.S.C. § 1746:

1.    I am a partner with the law firm of Haynes and Boone, LLP and counsel for Defendant Benjamin Wey in this case. Indeed, I have been Mr. Wey's lawyer in connection with the investigation that led to this Indictment since on or about January 27, 2012, immediately following the execution of the searches that are the subject of the Defendant Benjamin Wey's Motion to Suppress, to Dismiss the Indictment, and For Other Relief filed contemporaneously herewith (the "Motion to Suppress"). I am competent in all respects to make this declaration.

2.    I submit this declaration in support of the Motion to Suppress. I have personal knowledge of the facts stated herein, and each of them is true and correct.

3.    Annexed hereto as Exhibit 1 is a copy of an Order Granting Leave to Change Name regarding the Defendant, filed in Civil Court of the City of New York on February 4, 2004, previously produced by the Government.

4. Annexed hereto as Exhibit 2 is a printout of a webpage that describes that NYGG[1] focuses on, among other things, "complex funding, market entry, government relations and critical crisis management issues involving China and elsewhere."

5. Annexed hereto as Exhibit 3 are copies of Congressional Research Service reports dated October 21, 2015, demonstrating that between 2008 and 2011, China was, by almost every measure, the fastest growing economy in the world.

6. The below-referenced internet hyperlinks are to public Securities and Exchange Commission ("SEC") filings demonstrating that the underwriting firms, institutional investors, and law firms that participated in deals in which Mr. Wey was involved included some of the largest underwriters in the world: Barclays Capital, BMO Capital Markets Corp., Deutsche Bank Securities Inc., Carlyle Group, Cowen and Company (Asia) Limited, Goldman Sachs (Asia) LLC, HSBC Securities, JP Morgan, Morgan Stanley & Co., Inc., Oppenheimer & Co., Inc., and William Blair & Company, L.L.C.; some of the largest and most powerful institutional investors in the world, including Fidelity Investments, Janus Capital Group, Oppenheimer Funds, Inc., Wellington Management, Apollo Management, BlackRock, Guardian Insurance, AIG Insurance, State Street Global, Loomis Sayles, Legg Mason, JPMorgan Asset Management, Deutsche Bank Asset Management, UBS Asset Management, Morgan Stanley, Credit Suisse Asset Management, BlackStone, and Neuberger Berman, to name a few; and major "AmLaw 100" law firms including Davis Polk & Wardwell LLP, DLA Piper LLP, Gibson Dunn & Crutcher, LLP, Fried, Frank, Harris, Shriver & Jacobson LLP, Holland & Hart, LLP, Loeb & Loeb, LLP, Morrison & Foerster, LLP, O'Melveny and Myers LLP, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Ropes & Gray LLP, Skadden, Arps, Slate, Meagher & Flom LLP, Sullivan &

---

[1] Capitalized terms not otherwise defined herein are ascribed the definitions assigned in the Memorandum of Law in

Cromwell LLP, Orrick, Herrington & Sutcliffe LLP, Pillsbury, Winthrop, Shaw, Pittman, Reid Smith, and Winston & Strawn LLP.  *See, e.g:*

http://www.sec.gov/Archives/edgar/data/1266719/000114420411036574/v226400_ex99-1.htm (Harbin Electric);

http://www.sec.gov/Archives/edgar/data/1330017/000119312512351534/d396944dex991.htm (Focus Media Holdings);

http://www.sec.gov/Archives/edgar/data/1388855/000119312509251033/dex991.htm (Deer Consumer Products);

https://www.sec.gov/Archives/edgar/data/1384135/000119312509194092/dex991.htm and

https://www.sec.gov/Archives/edgar/data/1384135/000114420410062090/v202886_424b3.htm (SmartHeat);

http://www.sec.gov/Archives/edgar/data/789868/000101905612001084/ex99_1.htm (Feihe International).

7. Annexed hereto as Exhibit 4 is a compilation of publicly accessible market information available through, *e.g.*, Standard & Poor's "Capital IQ," which demonstrates that the stock of SmartHeat, Inc. ("SmartHeat"), was widely held by several of the world's most sophisticated institutional investors and mutual funds: by the end of September 2009, approximately 40% of its shares were owned by institutions such as Fidelity, Neuberger Berman, and Oppenheimer Funds ("Oppenheimer").

8. Annexed hereto as Exhibit 5 is a compilation of publicly accessible market information available through, *e.g.*, Standard & Poor's "Capital IQ," which demonstrates that sophisticated institutional investors and mutual funds held approximately 20% of Deer

Support of Mr. Wey's Motion to Suppress submitted herewith.

15718398_15

Consumer Products, Inc. ("Deer") stock, as of the end of December 2009, and that its shares were owned by, *e.g,*. Janus Capital Group and Oppenheimer.

9. Annexed hereto as Exhibit 6 is a copy of an e-mail previously produced by the Government dated June 9, 2011 between Federal Bureau of Investigation ("FBI") Special Agent Matthew Komar and Ray Phillips.

10. Annexed hereto as Exhibit 7 is a copy of NYG Capital, LLC's lease, dated as of May 23, 2010 and executed by Benjamin Wey, previously produced by the Government.

11. Annexed hereto as Exhibit 8 is a copy of the Search and Seizure Warrant for the Offices of New York Global Group, Inc., dated January 24, 2012, previously produced by the Government.

12. Annexed hereto as Exhibit 9 is a copy of the Application for a Search Warrant and Affidavit of Special Agent Matthew Komar submitted in support of the Government's application for a search warrant for the offices of New York Global Group, Inc. at 40 Wall Street, 38th Floor, Suite 3800, New York, New York (the "NYGG Office"), dated January 24, 2012, previously produced by the Government.

13. Annexed hereto as Exhibit 10 are copies of email correspondence dated between September 25, 2008 and October 6, 2008 between SmartHeat's listing counsel, William Uchimoto of Buchanan, Ingersoll & Rooney P.C. and NASDAQ official Keely J. Walter, previously produced by the Government.

14. Annexed hereto as Exhibit 11 are copies of research reports issued by Rodman & Renshaw Capital Group dated July 17, 2009 and August 13, 2009, previously produced by the Government, giving Deer a rating of "Market Outperform."

15. Annexed hereto as Exhibit 12 is a copy of a research report issued by William Blair & Company LLC ("William Blair") on December 21, 2009, previously produced by the Government, giving Deer a rating of "Outperform."

16. Annexed hereto as Exhibit 13 is a copy of a report dated September 28, 2009 from William Blair concerning SmartHeat, previously produced by the Government, which projected long term earnings per share growth of 30%.

17. Annexed hereto as Exhibit 14 is a copy of an equity research report dated September 28, 2009 by BMO Capital Markets concerning SmartHeat, previously produced by the Government, which gave SmartHeat an "outperform" rating and a target price of $15, when the price of the stock was then $11.65 and its 52-week high had been $13.

18. Annexed hereto as Exhibit 15 are copies of articles published on April 12, 2010 on TheStreet.com demonstrating that an initial rise in stock price is expected for newly listed NASDAQ stocks, and on March 10, 2016 on SeekingAlpha.com noting that "stocks that uplist tend to experience an upside spike exceeding 25%."

19. In August 2009 the SEC approved and in September 2009 completed the underwriting for $75 million secondary public offering of SmartHeat stock for Wall Street firms: William Blair and BMO Investments Inc. *See* https://www.sec.gov/Archives/edgar/data/1384135/000114420409040206/v156310_s-3a.htm; https://www.sec.gov/Archives/edgar/data/1384135/000119312509194098/d424b5.htm.

20. In October 2009, Fidelity Investments reported that it had acquired a 12.6% position in SmartHeat's stock. *See* https://www.sec.gov/Archives/edgar/data/315066/000031506609003742/filing.txt.

21.     In September 2009, Deer announced in an SEC filing that it had completed a $15 million PIPE financing . *See* [https://www.sec.gov/Archives/edgar/data/1384135/000114420409040206/ v156310_s-3a.htm](https://www.sec.gov/Archives/edgar/data/1384135/000114420409040206/ v156310_s-3a.htm).

22.     In November 2009, BMO and William Blair announced they would underwrite a $75 million offering of new shares of Deer. *See* [https://www.sec.gov/Archives/edgar/data/1388855/000119312509240811/d424b5.htm](https://www.sec.gov/Archives/edgar/data/1388855/000119312509240811/d424b5.htm).

23.     Annexed hereto as Exhibit 16 are copies of financial news articles demonstrating that Chinese equities were a hot investment product in 2009 to 2010, and that Deer and SmartHeat were among dozens of China-based equities that were simultaneously experiencing significant investor interest.

24.     Annexed hereto as Exhibit 17 is a copy of Bloomberg Terminal data demonstrating that SmartHeat's stock was highly liquid: on average, its daily trading volume on the NASDAQ was in the hundreds of thousands of shares.  Indeed, in 2009 and 2010, SmartHeat traded more than 270 million shares and reached a market capitalization of over $500 million.

25.     Annexed hereto as Exhibit 18 is a copy of Bloomberg Terminal data demonstrating that Deer's stock was also highly liquid, with an average daily trading volume on the NASDAQ in the hundreds of thousands of shares.  Deer traded more than 110 million shares and reached a market capitalization of over $400 million.

26.     Annexed hereto as Exhibit 19 is a copy of Bloomberg Terminal data demonstrating that the CSI 300 index experienced an approximate 26 percent rise between September 1, 2009 and December 31, 2009, and the S&P Asia 50 Index rose approximately 12 percent over that same period.

27. Annexed hereto as Exhibit 20(A) are spreadsheets of blue sheet data for three selected dates in the period between December 14, 2009 through December 16, 2010, as examples to illustrate the Scholander-Harris Brokers' buying activity was closely matched by its selling activity on a daily basis. Annexed hereto as Exhibit 20(B) and (C) are spreadsheets of the trading activity of alleged nominee York Capital Management Inc. ("York") in Deer and SmartHeat, respectively, that demonstrate all of the net sales of SmartHeat, and the vast majority of sales of Deer stock by York were completed *before* July 1, 2009.

28. Annexed hereto as Exhibit 21 is a copy of an excerpt from Chapter 13.6 of *Trading & Exchanges, Market Microstructure for Practitioners* by Larry Harris, Financial Management Association Survey and Synthesis Series, Oxford University Press.

29. Annexed hereto as Exhibit 22 is a copy of an SEC order dated July 11, 2013, ruling that NASDAQ's January 2011 delisting decision was baseless and not supported by the facts, and ordering CleanTech's stock be relisted for trading.

30. Annexed hereto as Exhibit 23 is a copy of the FBI Search Logs for the NYGG Office, dated January 25, 2012, previously produced by the Government.

31. Annexed hereto as Exhibit 24 is a copy of the Search and Seizure Warrant for the Weys' apartment located on West Street in New York, New York (the "Apartment"), dated January 25, 2012, previously produced by the Government.

32. Annexed hereto as Exhibit 25 is a copy of the Affidavit of Federal Bureau of Investigation Agent Keith Garwood submitted in support of the Government's application for a search warrant for the Apartment, dated January 25, 2012, previously produced by the Government.

33. Annexed hereto as Exhibit 26 is a copy of FBI Search Logs for the Apartment, dated January 25, 2012, previously produced by the Government.

34. I spoke with an attorney who was present at the January 25, 2012, search of the Apartment, who informed me that during the execution of the search, one of the FBI agents inquired: "Where are the stock certificates?"

35. Annexed hereto as Exhibit 27 are partially redacted copies of examples of non-responsive, personal or irrelevant material that FBI agents collected during the execution of the search warrant for the Apartment, previously produced by the Government.

36. Annexed hereto as Exhibit 28 are copies of news articles from The Financial Times dated January 27, 2012 and from NetNet@CNBC.com dated January 26, 2012.

37. Subsequent to the January 2012 searches, Mr. Wey and NYG Capital, LLC obtained legal counsel in connection with the FBI's investigation, and for a time thereafter, active communications took place between Mr. Wey's counsel (including the undersigned) and the Assistant United States Attorney ("AUSA") handling the investigation for the Government. By the end of 2012, however, communications from that AUSA to counsel for Mr. Wey and NYG Capital, LLC ceased. Almost three years passed with no communication from either the United States Attorney's Office ("USAO") or the FBI, up to the date of Mr. Wey's arrest on the Indictment in early September 2015. (Indeed, in March 2013, I emailed the AUSA twice for a non-substantive purpose – to inform him, as a courtesy, of anticipated international travel by members of the Wey family. I received no response to either of those emails.)

38. Annexed hereto as Exhibit 29 are copies of press releases issued on September 10, 2015 (the day the Indictment was unsealed) by the USAO for the Southern District of New York, the FBI, and the SEC.

39. Mr. Wey's arrest resulted in significant media coverage of the charges against him in several media outlets.

40. SmartHeat reported 2010 revenue of approximately $125 million and net income of approximately $23 million. *See* https://www.sec.gov/Archives/edgar/data/1384135/000114420411014722/v214538_ex99-99.htm.

41. Annexed hereto as Exhibit 31 is a copy of a Forbes Magazine article dated August 14, 2012 in which Deer was ranked a "top 200 growth company" in Asia.

42. Annexed hereto as Exhibit 32 is a copy of an Investor's Business Daily ("IBD") publication dated January 19, 2010, in which SmartHeat was listed as #2 in the IBD 100 list.

43. Deer reported 2011 revenue of $226 million, net income of about $40 million, earnings per share of $1.18 (a 31% increase from 2010), paid $0.20 per share in cash dividend, generated an annual dividend yield of 9%, $6 per share in net assets and was debt free. *See* https://www.sec.gov/Archives/edgar/data/1388855/000118518512000543/ex99-9.htm.

44. CleanTech reported 2010 revenue of $22 million and $4.3 million in net income, an increase of about 600% from 2009. *See* https://www.sec.gov/Archives/edgar/data/1382219/000118518511000196/ex99-99.htm.

45. CleanTech's shareholders included Apollo Global Management, LLC. *See* https://www.sec.gov/Archives/edgar/data/1382219/000114420410062323/ v203447_424b3.htm. Annexed hereto as Exhibit 30 is a copy of an April 27, 2011 letter from Barry J. Cohen, Senior Managing Director of Apollo Capital Management, L.P., to the Office of the General Counsel of NASDAQ, previously produced by the Government.

46.     Annexed hereto as Exhibit 33 is a copy of an article from Investopedia.com explaining that a reverse merger is a routine alternative method to an IPO (and sometimes a less costly and faster one) for a company to access the public financial markets.

47.     Annexed hereto as Exhibit 34 is a copy of a 2013 Stanford Graduate School of Business study that found that "Chinese reverse mergers performed much better than their reputation," and had performed better than other similar sized publicly traded companies in the same industrial sector.

48.     Annexed hereto as Exhibit 35 are partially redacted copies of certain records relating to Michaela Wey's bank account, dated November 21, 2011, previously produced by the Government.

49.     Annexed hereto as Exhibit 36 is a copy of a screenshot from Google Maps demonstrating that "An Bei Lu" refers to a street in China.

50.     On or about February 7, 2012, May 7, 2012, and May 8, 2012, counsel for NYG Capital, LLC and Mr. Wey each requested, in writing, the return of the seized materials. Copies of these letters are annexed hereto as Exhibit 37.

51.     Annexed hereto as Exhibit 38 is a copy of a letter dated June 4, 2012 from counsel for NYG Capital, LLC.

52.     On several occasions between October and December 2015, I asked the Government to explain its search process regarding how, if at all, it isolated responsive data related to the execution of the search warrants from nonresponsive data, and they declined to provide me with such details.

53.     On or about October 22, 2015, the Government informed me during a telephone call that it had identified certain privileged or potentially privileged materials within both

electronic and hard copy documents collected in response to the search warrants. During that telephone call, I objected to the Government reviewing any privileged or potentially privileged documents.

54. Annexed hereto as Exhibit 39 is a copy of an e-mail dated January 5, 2016 from the Defendant's counsel (the undersigned) to the Government.

55. Annexed hereto as Exhibit 40 is a copy of an e-mail dated February 24, 2016 from the Government to the Defendant's counsel (the undersigned).

56. Annexed hereto as Exhibit 41 is a copy of a letter dated March 8, 2016 from the Defendant's counsel (the undersigned) to the Government.

57. Annexed hereto as Exhibit 42 are redacted copies of privileged communications that were previously produced by the Government.

58. Annexed hereto as Exhibit 43 is a copy of the "FD-302" report of the January 14, 2016, proffer of Mr. Seref Doğan Erbek to the Government, provided by the Government to the defense on or about April 16, 2016.

59. Attached hereto as Exhibit 44 is a copy of an October 22, 2015, letter from the Government to the defense, describing, among other things, an October 20, 2015 attorney proffer to the Government by counsel for Mr. Erbek (Marc Litt, Esq.), along with a copy of what have been represented to the defense to be handwritten notes taken at that proffer by one of the AUSAs in attendance at that attorney proffer.

60. Annexed hereto as Exhibit 45 is a copy of a March 23, 2016 letter from the Government, along with a copy of what have been represented to the defense to be handwritten notes taken by one of the AUSAs in attendance at the January 14, 2016 proffer of Mr. Erbek to the Government.

61.     I have spoken with counsel for Mr. Erbek, in a good faith attempt to secure Mr. Erbek's testimony at Mr. Wey's trial, who has informed me that Mr. Erbek does not intend to travel to the United States to testify at Mr. Wey's trial.

62.     I recently spoke with a potential witness for the defense, a former director of SmartHeat, Deer, and CleanTech, who I understand is now more than 70 years old, who informed me that he suffered a stroke in or about late 2015. At the time we spoke, he was resident in a rehabilitation center.

63.     In addition, another important witness, a lawyer with intimate familiarity with Mr. Wey's business practices and operations, is in his 70s and may be suffering from failing health and unavailable to testify at trial.

****

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: May 27, 2016

s/David Siegal
David Siegal