AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### Southern District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Offices of New York Global Group, Inc., 40 Wall St.,
38th Floor, NY, NY, excluding office of James Baxter

)
)
)
)
)
)

Case No.

## 12 MAG 0182

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Offices of New York Global Group, Inc., 40 Wall St. 38th Fl., NY, NY, and any closed containers and any items therein, excluding the individual office of James Baxter, Esq.

located in the _____Southern_____ District of _____New York_____ , there is now concealed *(identify the person or describe the property to be seized):*

PLEASE SEE ATTACHED AFFIDAVIT AND EXHIBITS

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. 78j(b) & 78ff, and 18 U.S.C. 1341, 1343, 1346 | Securities fraud, mail and wire fraud. |

The application is based on these facts:

PLEASE SEE ATTACHED AFFIDAVIT AND RIDER.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew Komar, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/24/12

City and state: NY, NY

_____
*Judge's signature*

Michael H. Dolinger   USMJ
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION :
OF THE UNITED STATES OF AMERICA  :
FOR THE ISSUANCE OF A SEARCH     :
WARRANT FOR THE PREMISES DESCRIBED :
AS THE OFFICES OF NEW YORK GLOBAL :
GROUP, INC., 40 WALL STREET, 38TH :
FLOOR, SUITE 3800, NEW YORK,     :
NEW YORK, AND ANY CLOSED CONTAINERS:
AND ANY ITEMS THEREIN, EXCLUDING :
THE INDIVIDUAL OFFICE OF         :
JAMES BAXTER, ESQ.               :
                                 :
- - - - - - - - - - - - - - - - - x

**12 MAG 0182**

SEALED AFFIDAVIT

STATE OF NEW YORK          )
COUNTY OF NEW YORK         : ss:
SOUTHERN DISTRICT OF NEW YORK )

MATTHEW KOMAR, being duly sworn, deposes and says:

1.   I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 3 years.  Before that, I was a staff accountant at the Securities and Exchange Commission ("SEC") in Washington, D.C.  I am currently assigned to a squad within the FBI that investigates financial fraud, including securities fraud and related offenses.  As an SEC staff accountant and as an FBI Special Agent, I have received extensive training regarding the securities industry, accounting methods, and financial fraud.  I have participated in numerous financial fraud investigations and, in the course of those investigations, have participated in the execution of several search warrants.

2.   I am participating in an ongoing investigation of New York Global Group, Inc. ("NYGG-USA"), a Delaware corporation with

USAO_BW_USAO_BW_000105283

offices in New York, New York; NYGG-USA's chief executive
officer, a naturalized U.S. citizen named Benjamin Wey ("Wey");
Wey's sister, T        W    a/k/a "S        W  ," a/k/a "W   T   Y  ,"
a Chinese citizen whose current State Department visa record
lists her employer as "New York Global Capital, Inc.[1] Beijing
Representative Office" and her email as "S       @NYGCCAPITAL.COM";
various entities owned and/or controlled by Wey and/or T
W   ; and other entities and individuals.  The information
contained in this Affidavit is based on my own knowledge as well
as information obtained from other sources, including, among
other things, my conversations with staff members of the SEC and
the Financial Industry Regulatory Authority ("FINRA"), interviews
of various witnesses, conversations with law enforcement
officials, and my review of bank, securities, and transfer agent
records and other documents, as described in more detail below.
Because this affidavit is being submitted for the limited purpose
of establishing probable cause, I have not included details of
every aspect of this investigation or every fact that I know
about the investigation.  Moreover, where the contents of
documents and the actions, statements, and conversations of
others are reported herein, they are reported in substance and in
part.  To the extent that there are assertions herein concerning

---

[1]    I have obtained records from Federal Express and other sources
showing that "New York Global Capital" is sometimes used interchangeably with
"New York Global Group."

2

USAO_BW_USAO_BW_000105284

dates and numbers, they are approximations based upon information and evidence gathered to date.

3. This affidavit is respectfully submitted, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, in support of the Government's application for a search warrant for the offices of NYGG-USA at 40 Wall Street, 38th floor, Suite 3800, New York, New York ("the NYGG-USA Office"), and any closed or locked cabinets, briefcases, and other containers kept therein, including computers, internal and external hard drives, flash drives, diskettes and other magnetic storage media, and files, data and information contained thereon, used to store names, telephone numbers and addresses and other information, including but not limited to personal digital assistants such as iPhones, iPads, Blackberrys, smartphones, and cellphones, excluding the individual office of James Baxter, Esq. (collectively the "PREMISES"). There is probable cause to believe that there is located within the PREMISES, certain books, records, and other documents, which constitute evidence of the commission of, or are designed as a means of the violation of, or are contraband or the fruit of the violation of, the federal securities laws and mail and wire fraud laws, including Title 15, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud) and Title 18, United States Code, Sections 1341, 1343 and 1346 (mail and wire fraud).

3

USAO_BW_USAO_BW_000105285

I.  THE PREMISES

4.   The PREMISES consists of offices on the 38th Floor of a
large office building located at 40 Wall Street, New York, New
York.  I visited the PREMISES on or about July 7, 2011, and I
have interviewed a former employee of NYGG-USA ("CS-1") and a
current employee of NYGG-USA ("CS-2") concerning the floor plan
and other aspects of the PREMISES.  I have also spoken to another
law enforcement official who visited the PREMISES on or about
January 4, 2012.  From these and other sources, I know that:

5.   Number 40 Wall Street is well marked on the exterior of
the building with the number "40" and the words "The Trump
Building."  On the 38th floor of 40 Wall Street, near an elevator
bank, there are doors to two separate office suites.  One office
suite is marked by a sign that says "Oakwood."  The other office
suite, Suite 3800, is the PREMISES.  The PREMISES has a clear
glass door that is surrounded by a clear glass wall.  From the
hallway, through this clear door and clear wall, one can see a
reception area with a sign that says "New York Global Group."
Inside the reception area are a receptionist desk, a couch, and a
table.  Behind the reception area, through a translucent door, is
a suite of several individual offices.  The offices of Wey and
the other NYGG-USA employees are arranged in the shape of an "L",
with Wey's personal office at the fulcrum of the "L".  Inside
Wey's office, there is a desk with at least one computer.  On one

4

USAO_BW_USAO_BW_000105286

side of Wey's office is the office of NYGG-USA's General Counsel,
Chief Operating Officer, and Chairman of the Executive Committee,
James Baxter, Esq.  Because part of Baxter's job responsibilities
involve legal representation, Baxter's office, computer, and
other closed containers in his office are excluded from this
application and will not be searched.  Next to Baxter's office is
the office of at least one administrative assistant.  On the
other side of Wey's office are the offices of an NYGG-USA
employee named R      G   , CS-2, and an office that CS-1 shared
with another NYGG-USA employee, J       T   , in or about May or
about June, 2011.

     6.    There is probable cause to believe that each of these
individual offices contains a computer workstation and that the
office currently maintains a computer server.  From my interviews
of CS-1 and CS-2, the former and current NYGG-USA employees,
respectively, I have learned that Wey has instructed the staff of
NYGG-USA to maintain electronic records and information in an
unconventional and highly suspicious manner.  For example, in or
about May 2011, Wey instructed his employees to avoid saving any
electronic files to the hard drives of their computer
workstations at the PREMISES.  Instead, Wey ordered his staff
members to save electronic files only to flash drives (also known
as "thumb drives"), to remove their flash drives from their
computers at the end of each work day, and to leave the flash

5.

USAO_BW_USAO_BW_000105287

drives on their desks at the PREMISES when they leave each day. In addition, Wey requires his staff to avoid communicating with him by regular e-mail; instead, Wey requires his staff members to use the text message service embedded in Skype to send messages and attachments. With respect to any e-mails that staff members may send or receive between the computers on the PREMISES and third parties, Wey instructs staff members to purge e-mails that they do not need every thirty days, and to save pertinent emails only on their flash drives and not their hard drives. Wey and two other Chinese-speaking employees of NYGG-USA, R    G    and J    T   , use a Chinese-language e-mail program that resides entirely on flash drives maintained at the PREMISES. With regard to hard copies of documents, Wey insists that NYGG-USA staff members print as few documents as possible, and he sometimes questions employees when they print documents. CS-1 does not recall seeing any filing cabinets at the PREMISES, but he saw J    T    hide hard copy documents when Wey came into her office. With respect to the use of cellular telephones, CS-1 learned from J    T    that Wey instructs employees not to call or send text messages to Wey's Blackberry or other smartphone, but to send written messages only through the "PIN" function on Blackberrys or other smartphones.

7. In my investigation, I have learned that NYGG-USA has occupied the PREMISES since in or about May 2010. I have

6.

reviewed numerous documents, including Federal Express shipping records, listing the PREMISES as the address of NYGG-USA.  As of on or about December 22, 2011, NYGG-USA's public website lists Wey as its President and member of its executive committee, and lists its address as the PREMISES.

## II.   PROBABLE CAUSE TO BELIEVE THAT THE PREMISES CONTAINS EVIDENCE OF A FRAUD AND MARKET MANIPULATION SCHEME

### A.   Overview of the Scheme

8.    There is probable cause to believe that Wey, acting through NYGG-USA and other entities, and others, have committed securities fraud and manipulated the market for the securities of various small-capitalization issuers by, among other things (1) artificially inflating the number of round-lot (100 share) shareholders of such issuers for the purpose of creating an illusion of broad public interest in the issuers so that the issuers can satisfy the listing requirements of the NASDAQ; (2) retaining undisclosed beneficial ownership and/or control of large blocks of shares of the issuers that are held in the name of nominees; (3) creating artificial demand for the securities by working directly with a hand-picked team of retail stock brokers to aggressively solicit purchases of the issuers' securities on behalf of retail customers without disclosing, in the case of one issuer, a large kickback paid to the brokers; and (4) selling large blocks of nominee-held shares into the artificially created public demand.

7.

9.    Wey perpetrates this scheme through, among other
entities, NYGG-USA, which operates from the PREMISES.  Based on
my review of NYGG-USA's public website; public filings; a letter
that Wey submitted to the NASDAQ listing staff on or about June
30, 2011 ("Wey NASDAQ Letter"); and other documents, I have
learned that NYGG-USA offers a variety of services to China-based
operating companies wishing to raise funds in the U.S. capital
markets.  NYGG-USA introduces such companies to U.S.-based
lawyers, accountants, investment bankers, and investors, and
helps them become listed on the NASDAQ or another U.S.-based
exchange.  Wey is the founder and president of NYGG-USA.
According to an SEC filing dated July 20, 2005, NYGG-USA was,
least at that time, wholly owned by Wey's wife, M     W _, who
purportedly served as NYGG-USA's only other executive officer at
or about that time.

10.    NYGG-USA specializes in the raising of capital through
so-called "reverse mergers" or "reverse-takeovers" (hereinafter,
"RTOs") between China-based operating companies and United
States-based publicly-traded shell companies.  From my training
and experience, participation in this investigation,
conversations with SEC and FINRA staff members, my review of a
June 2011 SEC Investor Bulletin on RTOs, and other sources, I
know that, in a typical RTO transaction managed by Wey, a U.S.-
based shell company that has little or no operations and is

8

USAO_BW_USAO_BW_000105290

thinly traded in over-the-counter markets acquires a private
China-based operating company that is seeking capital.
Typically, the shareholders of the operating company exchange
their shares for a large majority of the shares of the public
company.  The public shell company survives the merger, becomes
the holding company of the operating company, and changes its
name accordingly.  Through this process, the original
shareholders of the operating company gain a controlling interest
in the voting power and outstanding shares of stock of the
publicly-traded holding company (hereinafter, the "RTO issuer")
and assumes control of its board of directors and management.
The assets and business operations of the RTO issuer are
primarily, if not solely, those of the former private operating
company.  Typically, after this process is completed, the RTO
issuer conducts a private placement offering to raise capital and
applies to list its stock on the NASDAQ or another major
exchange.

        11.  Benjamin Wey, acting through NYGG-USA's offices at the
PREMISES and at NYGG-USA's previous location, has spearheaded
this RTO process for several China-based operating companies
since in or about 2004.  Two RTO issuers that Wey promoted,
Bodisen Biotech, Inc. ("Bodisen Biotech") and CleanTech
Innovations, Inc. ("CleanTech"), were delisted from major U.S.
stock exchanges, in significant part because they failed to

USAO_BW_USAO_BW_000105291

disclose their relationships with Wey, as described in further detail below.  At least three Wey-promoted RTO issuers discussed in this affidavit, Smartheat, Inc. ("Smartheat"), Deer Consumer Products, Inc. ("Deer"), and CleanTech each had the same outside counsel, R        N      , Esq.; the same audit committee chair, A        S      ; and the same auditor, Goldman, Kurland and Mohidin, LLP, a small California-based firm.  In addition, there is probable cause to believe that, in the case of Smartheat and Deer, after the reverse mergers were completed, Wey participated in the artificial inflation of the shareholder base of Smartheat and Deer to fraudulently win a listing on the NASDAQ.  Once Smartheat and Deer were listed on the NASDAQ, trading records show the selling of large blocks of Smartheat and Deer shares in accounts held by entities that appear to be nominees controlled by Wey at or about the same time Wey helped to artificially stimulate demand by encouraging a hand-picked team of retail brokers to solicit purchases of Smartheat and Deer stock for their unsuspecting retail customers.  As described in more detail below, in the case of Deer, these brokers received an undisclosed $350,000 kickback from Deer at or about the same time they were aggressively buying Deer stock for their retail clients.

12.  Wey perpetrated this fraud and market manipulation scheme with respect to Deer and Smartheat in or about 2008 and 2009.  At that time, Wey and NYGG-USA's offices were located at

10

14 Wall Street, 12th Floor, New York, New York.  At that
location, NYGG-USA sub-leased part of its office suite to the
hand-picked team of retail brokers that Wey worked with to help
artificially inflate demand for Smartheat, Deer and other RTO
issuers.  The two lead brokers in this group were W
S        and T.     H    ; others included, at various times,
M    G    , A        V   , G  L     , S     M. E      ,
G    L. C      A  C]    , S    C            , F:
D.     , M      D    , J    C. F       . V      F    ,
J    B. G      , E    H     , E    I    , S    A.
J    , A  K:     , B  K.         , W     M , M  L.
M    , E    M      , A     N     , J    R.       , T:
R    , M    R:       , D     S!     , N      S        ,
J    J. S     , L    T:    . C    V    , F      V!        ,
and R    Z      (collectively, the "Scholander-Harris Brokers").

        13.  By coincidence, in or about 2008 and 2009, FINRA's
enforcement staff had offices in the same building, including
some space on the same floor as NYGG-USA and the Scholander-
Harris Brokers (14 Wall Street, 12th Floor).  On or about
September 15, 2009, FINRA staff members based at 14 Wall Street
conducted a surprise inspection of the Scholander-Harris Brokers,
who were then operating as the New York branch office of a New
Jersey-based broker-dealer called Seaboard Securities, Inc.
("Seaboard Securities").  (I learned from testimony taken in the

                              11

USAO_BW_USAO_BW_000105293

FINRA investigation of the Schlander-Harris Brokers that Wey offered a $50,000 bribe to A      D:         ,     , a key employee of Seaboard Securities, to keep Wey's name out of FINRA's investigation.)   Shortly thereafter, the Scholander-Harris Brokers began planning to move out of 14 Wall Street.   In or about February 2010, the Scholander-Harris brokers moved to 40 Wall Street.   Wey followed them to 40 Wall Street in or about May 2010, when he moved NYGG-USA's offices to the PREMISES (40 Wall Street, 38th Floor).   As described in more detail below, there is probable cause to believe that, when Wey and NYGG-USA moved from 14 Wall Street to the PREMISES, they brought with them documents and other evidence relating to the Smartheat and Deer market manipulation and fraud schemes.   In any event, there is probable cause to believe that, after Wey moved to the PREMISES in or about May 2010, he continued his unlawful scheme by, among other things, (1) defrauding NASDAQ during the listing application process for Cleantech; and (2) using nominees, including his sister, T      W  , to hold large blocks of shares of another RTO issuer, Nova Lifestyle, Inc. ("Nova Lifestyle").   There is probable cause to believe that, as recently as September 2011, the PREMISES contained evidence relating to T      W  , one of the nominees that Wey used in the Smartheat and Deer schemes.

14.   As described in more detail below, one of Wey's nominees, T      W  , has transferred large sums of money to

12

Wey's wife, M      W   , including wire transfers that were
divided into increments less than $10,000 to avoid raising
suspicion.  In addition, T      W    and other nominees (including
M      W 's father, M      P   ) have transferred large sums
of cash and securities to Swiss bank accounts in Geneva,
Switzerland.  Travel records that I have reviewed show that Wey
traveled to Geneva, Switzerland for three days in November 2009
and three days in December 2010.

B.    **Wey's History of Fraud and Other Misconduct**

15.  I have reviewed numerous documents relating to Wey's
personal history and career in the securities industry, including
his FINRA Brokercheck Report; his and his current wife's
(M      W  s) United States Citizenship and Immigration
Services files ("A-Files"); records from the Oklahoma Department
of Securities; records of FINRA's predecessor entity, the
National Association of Securities Dealers ("NASD"); public
filings relating to RTO issuers that Wey has promoted; and other
documents.  From these and other sources, I have learned:

a.  Benjamin Wey, a naturalized U.S. citizen, was born
in China as Tianbing Wei on or about September 12, 1971.  (He has
also used the name "Benjamin Wei".)  Wey first lived in the
United States in or about the 1990s to attend college in
Oklahoma.  While in college, Wey "sold fake Levi jeans from China
to the Russian markets," according to an interview of Wey

13

published on or about January 20, 2010 and titled, "An Interview with Benjamin Wey - The Human Bridge Between China & America" (hereinafter, "the January 2010 Wey Interview").

   b.   While in Oklahoma, from at least in or about 1999 to in or about 2001, Wey worked as a registered investment advisor.  On or about July 13, 2005, the Oklahoma Department of Securities ("ODS") censured and permanently barred Wey from conducting securities-related business in Oklahoma.  Wey's agreement with ODS (ODS File No. 02-166), included the following findings of the OSD, which Wey neither admitted nor denied:  From in or about December 1999 and September 2001, while Wey was registered in Oklahoma as an investment advisor representative of Elite Strong Growth Investment Inc. ("Elite Strong Growth"), a firm that he owned and operated, he recommended and sold to retail customers stock and warrants in two issuers without disclosing his financial relationship to the issuers, namely, the existence of consulting agreements between the issuers, on the one hand, and Wey and his firm, on the other hand.  In one case, Wey entered into the undisclosed consulting agreement in his capacity as the U.S. representative of a Chinese company purportedly owned by his sister, T    W  .  In addition, on or about April 17, 2000, the ODS barred Wey from acting in a supervisory capacity for another securities firm that he owned and operated, Benchmark Securities Group, Inc., as a result of

14

USAO_BW_USAO_BW_000105296

deficiencies uncovered in two on-site examinations of Elite
Strong Growth.

      c.  Based on my review of NASD disciplinary records, I
learned that, separate and apart from his ODS sanctions, on or
about May 29, 2002, without admitting or denying the allegations,
Wey consented to the entry of findings by NASD that he
"maintained accounts with a member firm over which he had
discretionary authority without providing written notification to
his member firm," then Wilbanks Securities, Inc., in Oklahoma
City, Oklahoma, where he worked from in or about April 1999 to on
or about November 30, 1999.  Wey was suspended from association
with any NASD member for 5 days and fined $5,000.  In addition,
Wey was fired by Wilbanks Securities on or about November 30,
1999 for failing to provide trading statements to Wilbanks
disclosing the identities of the clients of Wey's investment
advisory firm.

      d.  Based on my review of the A-Files relating to Wey
and his current wife, M      W  , I learned that Wey and his
first wife, a U.S. citizen, divorced after just over two years.[2]
In addition, I learned that Wey pressured his first wife and her

---

[2]    The information in this paragraph comes from two written
statements (one sworn and one unsworn) made by Wey's first wife to the
Immigration and Naturalization Service ("INS").  She has an obvious potential
bias against Wey; their divorce was acrimonious, according to records in Wey's
A-file.  It appears that the mother of Wey's first wife alerted the INS to the
possibility that Wey had married for the purpose of obtaining a green card.
An INS investigation followed.  Wey was later naturalized notwithstanding this
investigation.

USAO_BW_USAO_BW_000105297

mother to invest a total of $15,000 with the broker-dealer that
he founded and owned, Elite Strong Growth, promising one of them
that her would double in approximately one month.  They later
asked Wey to return the money, but he refused.  At various times,
Wey defrauded his broker-dealer customers by telling them that he
had bought a stock for a certain price when he actually bought it
at a lower price, and pocketed the difference.  In addition, Wey
used false names to set up telephone and electrical service; used
fictitious names to acquire credit cards; treated personal meals
and travel as business expenses for tax purposes; filed a false
personal income tax return in 1996 that declared no income and a
financial loss when he had substantial income; maintained bank
accounts in China and Thailand; and forged his first wife's
signature on a form transferring her IRA to a financial
institution in New York without her knowledge or permission.

16.  In or about October 2004, Wey founded NYGG-USA, a
corporate advisory firm that specializes in introducing middle-
market Chinese operating companies to the U.S. capital markets.
In the January 2010 Wey Interview, Wey further described the
activities of NYGG-USA and its China-based affiliate, New York
Global Group, Ltd. (hereinafter, "NYGG-Asia"), as follows:

> If you have a problem, we [New York Global Group] solve
> the problem. Government regulations, licenses, <u>how to
> pay someone a bribe – we do it.  We get over the
> hurdles</u>. We know who to go to. We have eight offices in
> China. We've been there since 1998 and we are the
> largest U.S. middle market banking firm in China.

USAO_BW_USAO_BW_000105298

Emphasis added.)   Significantly, Wey and NYGG-USA have repeatedly advised the NASDAQ that Wey receives compensation for his services only from NYGG-USA (and not in the form of shares of the common stock of the RTO issuers that he is advising), and that NYGG-USA's only source of revenue is regular flat fees paid by NYGG-Asia.

C.   **Wey's Role in the Delisting of Bodisen Biotech**

17.   In or about 2004 and 2005, Wey and NYGG-USA spearheaded the RTO and stock-exchange listing process with respect to Bodisen Biotech, a China-based manufacturer of organic fertilizers, pesticides, and agricultural raw materials.   I have reviewed public filings and other documents relating to Bodisen Biotech, including documents maintained by the American Stock Exchange concerning the company's delisting, and I have spoken to a staff member of the New York Stock Exchange (which now owns the American Stock Exchange).   From these and other sources, I learned:

a.   On or about August 26, 2005, Bodisen began trading on the American Stock Exchange.

b.   On or about March 22, 2007, the American Stock Exchange notified Bodisen that it intended to delist Bodisen for the following reasons:

[] The Company's SEC filings contained incomplete, misleading, and/or inaccurate disclosures regarding the beneficial ownership of its securities by certain officers and directors

17

> on several occasions, prior to and subsequent to
> its listing on the Amex.
>
> . . .
>
> [] The Company provided incomplete, in accurate
> and/or misleading information related to its
> relationship with, and payments to, a consultancy
> firm and its affiliates prior to and subsequent to
> its listing on the Amex in applicable registration
> statements and periodic financial filings.

Bodisen Biotech acknowledged in a public filing that the

consulting firm in question was New York Global Group:

> Since November 2003 and prior to becoming a U.S.
> public company in February 2004, the Company had a
> relationship with Mr. Ben Wey and the companies
> with which he is affiliated, including New York
> Global Group.  The Company terminated the
> relationship in September 2006.
>
> Over the course of its nearly three year
> relationship with New York Global Group and Mr.
> Wey, the Company made payments to Tianjin NYGC
> Investment Consulting Co., Ltd. ("Tianjin") – a
> China-based subsidiary of New York Global Group –
> and affiliated companies of approximately
> $6,100,000.  The majority of these payments were
> attributable to commissions and fees in connection
> with successful financings in March 2005, December
> 2005 & March 2006, and February 2006, and were
> supported by written agreements[.]

      c.    Bodisen Biotech did not appeal the delisting

decision.  Bodisen Biotech closed at approximately $.12 per share

on or about November 19, 2008, down approximately 99.5 percent

from its high of approximately $21.97 per share on or about

January 31, 2006.

USAO_BW_USAO_BW_000105300

D.   **Smartheat and the Artificial Generation**
     **of Round-Lot Shareholders**

18.   Smartheat is a China-based manufacturer of heat
exchangers that are used in the industrial and residential
markets in China to reduce the need for coal.  In or about 2008
and 2009, Wey spearheaded Smartheat's efforts to access the U.S.
capital markets, including its RTO transaction on or about April
14, 2008.  I have reviewed numerous documents relating to
Smartheat, including public filings, transfer agent records,
broker-dealer records, testimony taken by FINRA in its ongoing
investigation of the Scholander-Harris Brokers, and other
documents provided by FINRA and the SEC.  I have also interviewed
witnesses and spoken to SEC and FINRA staff members and other law
enforcement officials about Smartheat.  From these and other
sources, I have learned the following:

a.   On or about June 23, 2008, Smartheat filed an
application to be listed on the NASDAQ.  On or about September
24, 2008, Smartheat represented to the NASDAQ through counsel
that it had 308 "round-lot" shareholders, that is, shareholders
holding 100 or more shares of its stock, and that it therefore
met the NASDAQ listing requirement that the issuer have at least
300 round-lot shareholders.

b.   From my discussions with SEC and other law
enforcement officials, my review of the relevant NASDAQ listing
rules in effect in 2008 and 2009, and other sources, I have

19

learned that NASDAQ's 300 round-lot shareholder listing
requirement is intended to ensure that an issuer has sufficient
bona fide investor interest to sustain trading on the NASDAQ.
Indeed, in a June 17, 2008 order, the SEC found:

> Listing standards, among other things, serve as a
> means for an exchange to screen issuers and to
> provide listed status only to bona fide companies
> that have or, in the case of an IPO, will have
> sufficient public float, investor base, and
> trading interest to provide the depth and
> liquidity necessary to promote fair and orderly
> markets.  Adequate standards are especially
> important given the expectations of investors
> regarding exchange trading and the imprimatur of
> listing on a particular market.  Once a security
> has been approved for initial listing, maintenance
> criteria allow an exchange to monitor the status
> and trading characteristics of that issue to
> ensure that it continues to meet the exchange's
> standards for market depth and liquidity so that
> fair and orderly markets can be maintained.

        c.  Based on, among other things, Smartheat's
representation that it had 308 round-lot shareholders, NASDAQ
approved the listing of Smartheat on its NASDAQ Capital Market on
or about January 29, 2009.

        d.  I have learned from my review of the records of
Smartheat's transfer agent,[3] Interwest Stock Transfer

---

[3]  I know from my conversations with SEC and other law enforcement
officials, my review of transfer agent records, and other sources that
Smartheat and other publicly-traded companies typically use transfer agents
such as Interwest Stock Transfer to keep track of the individuals and entities
that own their stocks and bonds.  Among other services, transfer agents issue
and cancel stock certificates to reflect changes in ownership of an issuer.
For example, when a company declares a stock split, the transfer agent issues
new shares. Transfer agents keep records of who owns a company's stocks and
bonds and how those stocks and bonds are held — whether by the owner in
certificate form, by the company in book-entry form, or by the investor's
brokerage firm in "street name."

USAO_BW_USAO_BW_000105302

("Interwest"), among other sources, that, contrary to Smartheat's representation to the NASDAQ, Smartheat did not, in fact, have 308 bona fide round-lot shareholders on or about September 24, 2008.  Rather, there is probable cause to believe that, during the 35 days leading up to the filing of Smartheat's September 24, 2008 letter representing to NASDAQ that it had 308 round-lot shareholders, Wey and others participated in a fraudulent scheme to artificially generate approximately 120 new round-lot shareholders of Smartheat, each holding exactly 100 shares, by causing Interwest to issue 100 shares each to approximately 120 individuals.  As described in further detail below, there is probable cause to believe, given the circumstances, that many of these individuals did not make a bona fide investment in Smartheat.  In other words, Smartheat's shareholder base was, at least in part, a sham, rather than the result of genuine economic interest in the company.

        e.   There is probable cause to believe that Wey participated in this scheme through a series of six transactions that occurred on or about August 20, August 22, September 3, September 8, September 11, and September 17, 2008.  These transactions included the following steps:

            i.   Wey or a NYGG-USA staff member named T F   , who worked at his direction, used a Federal Express account in the name of NYG (New York Global) Capital, LLC to send

21

USAO_BW_USAO_BW_000105303

packages containing Smartheat stock certificates to Interwest, the transfer agent, from NYGG-USA's offices at 14 Wall Street. These packages included instructions to cancel the enclosed stock certificate or certificates and replace them with (a) dozens of new stock certificates for precisely 100 shares to be issued to individuals listed in the instructions, (b) other new stock certificates to be issued in certain other quantities, and (c) a large block of the remaining balance of shares to be issued to a nominee such as Wey's sister, T   W   (hereinafter, "the Residual Certificates").

  ii. The instructions from NYGG-USA further provided for Interwest to send the new 100-share certificates (as well as the Residual Certificates and other certificates), back to NYGG-USA's offices at 14 Wall Street by Federal Express. Federal Express records that I have reviewed confirm the sending of many of these packages between Interwest and NYGG-USA's offices at 14 Wall Street.

  iii. In at least four of these six transactions,[4] the instructions that were sent from NYGG-USA to Interwest were printed in a similar computer-generated format, included similar information, and contained similar language (hereinafter, the "Instruction Format"). There is probable cause to believe that an employee of NYGG-USA generated these instructions using a

---

  [4] In the case of two of these transactions, Interwest did not provide copies of the relevant instructions.

USAO_BW_USAO_BW_000105304

computer housed within NYGG-USA's offices (then at 14 Wall
Street), as described in further detail below.

      iv.   One or more days later, the pattern repeated,
such that, in some cases, a Residual Certificate that Interwest
had recently issued as part of this process was returned to
Interwest by Federal Express with new instructions to cancel the
Residual Certificate and replace it with new 100-share
certificates, other certificates, and a new Residual Certificate
in the name of T    W   or corporation associated with her,
such as York Capital Management, Ltd. ("York Capital Management")
or Advantage Consultants, Ltd. ("Advantage Consultants").   I know
that York Capital Management is associated with T      W
because in or about 2006, she opened a brokerage account for that
entity at Seaboard Securities in her capacity as its sole owner
and signatory.   I know that Advantage Consultants is associated
with T      W   because I have reviewed a corporation resolution
of Advantage Consultants (provided by Interwest) that T      W
signed as its sole shareholder and non-executive chairman.

      v.   Each time NYGG-USA sent certificates to
Interwest to be cancelled and redistributed in this manner,[5] the

---

[5]   As shown in the table below, one of the Smartheat certificates
(number 1044) sent to Interwest in this fashion was nominally owned by a man
named Z   C   .   According to New York State Division of Corporations
records, Z   C   of Beijing, is the Chairman or CEO of NYGG-USA as of on
or about January 13, 2012.   NYGG-USA corporate records on file in Delaware
show that Z   C   was an "Authorized Officer" of NYGG-USA as of February
2011, including a February 17, 2011 document purportedly signed by Z   C
(The signature on this February 17, 2011 document does not appear to match the
"Z   C   signature on the stock power attached to Smartheat stock

USAO_BW_USAO_BW_000105305

certificates and the instructions in the Instruction Format were accompanied by a standard-form stock power document empowering Interwest to transfer the stock on the books and records of Smartheat.  All but one of these stock power documents was signed in a similar upward tilting script that resembles the signature of T    W  .  (I am familiar with her signature based on my review of examples of her signature that were medallion-guaranteed with a passport by financial institutions.)   In addition, all were purportedly signature guaranteed in person by the Smartheat CEO, J     J   W  .  During this period, one of the purported signatories, T    W  3 son, Y    W   was a middle-school-age boy attending boarding school in New Hampshire.[6]

     f.  This pattern is shown in the following chart:

---------------------------

certificate 1044.)

[6]   I know this from visa application records on file with the State Department, Federal Express records, and the school's website.

USAO_BW_USAO_BW_000105306

| Nominal owner of share cert. sent from NYGG-USA to Interwest (cert. #) (# shares) | Stock Power signature similar to that of Tianyi Wei (signature guaranteed by CEO Ji W ) | Approx. date new shares issued | Approximate number of new round-lot (100-share) shareholders | Nominal owner of Residual Certificate (cert. #) (# shares) |
|---|---|---|---|---|
| Y H (#1048) (225,000) | Yes (yes) | 8/20/08 | 23 | York Capital Management (#1149) (220,100) |
| Y W (#1036) (225,000) | Yes (yes) | 8/22/08 | 10 | T W (#1198) (162,950) |
| Wolf Enterprises Ltd. (1039) (300,000)<br><br>Z C (#1044) (#225,000)<br><br>W J (#1046) (225,000) | Yes (yes) as to Wolf Enterp. and Wang J | 9/3/08 | 15 | Advantage Consultants, Ltd. (#1230) (734,500) |
| T W (#1198) (162,950) | Yes | 9/8/08 | 24 | T W (#1259) (153,250) |
| T W (#1259) (153,250) | Yes | 9/11/08 | 10 | T W (#1266) (139,450) |
| Ti W (#1266) (139,450) | Yes | 9/17/08 | 38 | T W (#1284) (135,150) |
| Total | | | 120 | |

g.    These approximately 120 new round-lot (100-share) shareholders included numerous business associates of Wey, including NYGG-USA staff members; the Scholander-Harris Brokers and their associates, and family members of these associates, including T H , M H K H , S

25

U      ,  N     U       ,  C          U:       .,  L     U              ,
G   D      E       S           lawyers who have represented
Smartheat and/or other Wey-advised RTO issuers, as well as
individuals who appear to be family members or business
associates of these lawyers, including R        N        E
N    ,  B    S:       ,  S      S        ,  W.      U       ,  and
M    U          individuals whom Wey has helped place on the
boards of Smartheat and other RTO issuers, as well as relatives
of these individuals, including A:       S       ,  S       S        ,
F      I          ,  R      R         ,  J        R:            and
A      F          .   Based on my training and experience and
participation in this investigation, it is unlikely that all of
these individuals made an independent economic decision to
purchase precisely 100 shares of Smartheat in the 35 days leading
up to Smartheat's September 24, 2008 letter to the NASDAQ,
particularly since many of these individuals were already earning
compensation from Smartheat or other Wey-affiliated issuers in
the form of legal fees, board of directors fees, or commissions
from the sale of Smartheat stock.   Rather, there is probable
cause to believe that Wey beneficially owned and/or controlled
the blocks of Smartheat stock certificates that were sent from
NYGG-USA's offices to Interwest with instructions to redistribute
the shares to these new 100-share shareholders, and that many or
all of these new 100-share shareholders did not make an

26

independent economic decision to invest in Smartheat.

     h.  The new 100-share shareholders also include a man named H    ("J  ) W    of Houston, Texas, and at least 12 other W    family members whom I have linked to each other through publicly available name and address information. According to a letter that H    W    submitted to the Immigration and Naturalization Service in support of Wey in or about 1999, F    W    met Wey as a 15-year old boy on a bus in Tianjin, China.  After that initial meeting, Wey became close to the W    family, and H    W    was instrumental in sponsoring Wey to the United States to attend Oklahoma Baptist University.  Based on my training and experience, it is unlikely that 13 members of the same family each made independent economic decisions to buy precisely 100 shares of Smartheat at the same time.  Rather, there is probable cause to believe that, in or about August and September 2008, Wey and others knew and understood that Smartheat needed more round-lot shareholders to satisfy NASDAQ's 300 round-lot-shareholder requirement.  To help meet that need, Wey turned to the W    family, and caused precisely 100 shares to be issued to approximately 13 of them. As described in more detail below, Wey turned to the W    family for the same purpose when Deer needed more round lot shareholders in 2009.  (See table at paragraph 19(g) below.)

     i.  The creation of a sham shareholder base in this

27

manner is a fraudulent technique that has been used before with respect to at least one other RTO issuer - China Energy.  From my review of court documents filed in the case SEC v. China Energy Savings Technology, Inc. et al., 06 Cv. 6402 (EDNY), I know that, in or about December 2004, China Energy represented to the NASDAQ, in connection with a listing application, that it had 467 round lot shareholders, and that it therefore met the NASDAQ requirement of 400 round lot shareholders for the particular listing status that it was seeking.  However, the SEC's investigation established that China Energy's representation was false because virtually all of its shareholders were insiders or consultants to China Energy who received 100 or more shares of China Energy stock at no cost.  Through the deceptive device of a stock giveaway, China Energy was able to create the appearance of a bona fide shareholder base and thereby obtain a NASDAQ listing. There is probable cause to believe the same fraudulent techniques were used to obtain NASDAQ listing status for Smartheat and Deer.

E.    **Deer and the Artificial Generation of
      Round-Lot Shareholders**

19.  Deer is a China-based manufacturer and seller of small kitchen appliances, such as blenders and soy milk makers, for the domestic Chinese market and export markets.  I have reviewed numerous records relating to Deer, including public filings, transfer agent records, trading records, and bank records.  I have also interviewed witnesses and spoken to SEC and FINRA staff

28

members and other law enforcement officials about Deer.  From
these and other sources, I have learned the following about Wey's
involvement in Deer's introduction to the U.S. capital markets:

a.  With the assistance of Wey, Deer became a publicly-
traded company in the United States through a reverse merger with
a Nevada shell corporation in or about September 2008.  On or
about May 4, 2009, Deer submitted an application to be listed on
the NASDAQ.  To win a listing, Deer had to establish to NASDAQ
that it had 300 round-lot shareholders.

b.  On or about June 10, 2009, Deer submitted a letter
to the NASDAQ claiming that it met this requirement with 316
round-lot shareholders of 100 or more shares.  Based on this and
other representations, the NASDAQ approved the listing of Deer on
or about July 16, 2009.

c.  However, as with Smartheat, there is probable cause
to believe that, but for a series of fraudulent transactions in
April 2009, Deer would not have met the 300 round-lot holder
requirement to achieve listing status on the NASDAQ.  To wit,
over a nine-day period from on or about April 6 to April 14,
2009, there is probable cause to believe that Wey and others
participated in an effort to artificially generate approximately
85 new round-lot shareholders, each of whom held precisely 100
shares <u>after</u> a 2.3 to 1 reverse split of Deer stock that was
announced on or about April 23, 2009, effective April 24, 2009.

29

USAO_BW_USAO_BW_000105311

That is, each of these approximately 85 new round-lot shareholders received precisely 230 shares in early to mid-April 2009, before it was publicly known that, on April 24, 2009, there would be a reverse split that converted 230 shares into precisely 100 shares.  Based on my training and experience and knowledge of this investigation, it is exceedingly unlikely that each of these approximately 85 individuals made an independent economic decision to buy 230 shares of Deer stock – an amount that, unbeknownst to the shareholder at the time of the "purchase," would later convert to 100 shares, the precise amount necessary to qualify them as round-lot shareholders for purposes of the NASDAQ listing requirements.

d.   There is probable cause to believe that Wey and others participated in this artificial generation of round-lot shareholders through the same modus operandi as the Smartheat transactions described above.  In a series of transactions that occurred on or about April 6, April 8, and April 14, 2009,  Wey used Federal Express to send packages containing Deer stock certificates in the name of his sister, T      W   . and his sister's son, Y      W   (the middle-school-age boy), from NYGG-USA's offices at 14 Wall Street to Interwest Stock Transfer. These packages contained computer-generated instructions that were similar to the Instruction Format used in the case of Smartheat.  The instructions called for Interwest to cancel the

30

stock certificates registered to T    W  or Y      W  and
replace them with dozens of 230-share certificates and
certificates of other increments.  As in the case of Smartheat,
the other increments included large residual balances (Residual
Certificates) to be allocated to Wey's sister, T      W .
Interwest thereafter sent the new certificates to Wey at his
apartment at 10 West Street, New York, New York.  One or more
days later, the pattern repeated, such that NYGG-USA sent to
Interwest a Residual Certificate that Interwest had recently
issued with instructions to cancel the Residual Certificate and
replace it with new 230-share certificates, other certificates,
and a new Residual Certificate in the name of T   W .

        e.  Furthermore, as in the case of Smartheat, each of
the certificates to be cancelled was accompanied by a standard-
form stock power empowering Interwest to transfer the stock on
the books and records of Deer.  Again, each of these stock power
documents was signed in an upward tilting script that resembles
T    W  s signature.  In addition, each stock power document
was purportedly signature guaranteed in person by the CEO of the
issuer, in this case Y   H , including the ones purportedly
signed by Y    W  who was then attending boarding school in
New Hampshire.

        f.  These transactions are summarized in the following
chart:

31

| Nominal owner of cert. Sent from NYGG-USA to Interwest (cert. #) (# shares) | Stock power signature similar to that of Tianyi Wei (signature guaranteed by CEO) | Approx. date new shares issued | Approximate number of new 230-share (later 100-share) shareholders | Residual Certificate Shareholder (cert. #) (# of shares) |
|---|---|---|---|---|
| Y   W (#1067) (250,000) | Yes (yes) | 4/6/09 | 33 | M   I (#1558) (123,000) <br><br> T   W (#1559) (219,410) |
| Y   W (#1038) (250,000) | Yes (yes) | 4/8/09 | 33 | T   W (#1593) (242,410) |
| T   W (#1559) (219,410) | Yes (yes) | 4/14/09 | 19 | T   W (#1613) (215,040) |
| Total | | | 85 | |

g.   The new round-lot shareholders of Deer also included H   W   , B   . W   and more than ten other W   family members.[4]  Almost all of these W   family members had also received 100 shares of Smartheat in or about 2008, as shown in the following chart.

---

[4]    In or about April and May 2009, Wey sent two Federal Express packages to two of the W   relatives (K   and J   W   ); it is likely that these packages included share certificates for some or all of the W   family members living in and around Houston, Texas.

32

USAO_BW_USAO_BW_000105314

| Name | Number of Smartheat shares received (date) | Number of split-adjusted Deer shares received (date) |
|------|------|------|
| H    J    W | 100 (8/20/08) | 100 (4/6/09) |
| K    W | 100 (8/20/08) | 100 (4/6/09) |
| B    W | 100 (8/20/08) | 100 (4/6/09) |
| G    W | none | 100 (4/6/09) |
| L    W | 100 (8/20/08) | 100 (4/6/09) |
| K    W | 100 (8/20/08) | 100 (4/6/09) |
| K    W | 100 (8/20/08) | 100 (4/6/09) |
| D    W | 100 (8/20/08) | 100 (4/6/09) |
| F    K | 100 (8/20/08) | 100 (4/6/09) |
| A    W | 100 (8/20/08) | 100 (4/6/09) |
| S    W | 100 (8/20/08) | 100 (4/6/09) |
| K    W | 100 (8/20/08) | 100 (4/6/09) |
| J    W | 100 (8/20/08) | 100 (4/6/09) |
| Total | 12 | 13 |

    i.  The new round-lot shareholders of Deer also included many of the same Wey business associates (and family members of these associates) who received 100 shares of Smartheat in 2008, including S  S    , R    N    , E    N    , A    S    ; S    S    , W    S    , E    , G    D    , and T    H    .  These individuals and others[5] who received 100 split-adjusted shares of Smartheat and/or Deer are shown in the following chart:

_____

     [5]    Some of these other individuals listed in the chart are also associated with Wey or the Scholander-Harris Brokers; I have not yet completed my investigation into all these connections.

USAO_BW_USAO_BW_000105315

| Name | Number of Smartheat shares received (date) | Number of split-adjusted Deer shares received (date) |
|---|---|---|
| R      N | 100 (8/20/08) | 100 (4/14/09) |
| E      N | 100 (9/8/08) | 100 (4/6/09) |
| A      S | 100 (9/8/08) | 100 (4/6/09) |
| S      S | 100 (9/3/08) | 100 (4/6/09) |
| E      S | 100 (9/17/08) | 0 |
| S      S | 100 (9/17/08) | 100 (4/6/09) |
| J.      A | 100 (9/8/08) | 100 (4/8/09) |
| A      N | 100 (9/17/08) | 100 (4/8/09) |
| N      A | 100 (9/17/08) | 100 (4/8/09) |
| P | 0 | 100 (4/8/09) |
| W      S | 100 (9/8/08) | 100 (4/6/09) |
| E      S | 100 (9/11/08) | 100 (4/8/09) |
| H      P | 100 (9/11/08) | 100 (4/8/09) |
| N      F | 100 (9/11/08) | 100 (4/8/09) |
| J      E | 100 (9/11/08) | 100 (4/8/09) |
| K      V | 100 (9/3/08) | 0 |
| T      F | 100 (9/8/08) | 0 |
| G      D | 100 (9/17/08) | 100 (4/14/09) |
| R      S | 0 | 100 (4/14/09) |
| T      M | 100 (9/17/08) | 0 |
| T      H | 100 (9/8/08) | 100 (4/6/09) |
| K      H | 100 (9/17/08) | 100 (4/14/09) |
| M      H | 100 (9/17/08) | 100 (4/14/09) |
| S      U | 100 (9/8/08) | 100 (4/14/09) |
| L      U | 100 (9/17/08) | 100 (4/14/09) |
| N      U | 100 (9/17/08) | 100 (4/14/09) |
| C      U | 100 (9/17/08) | 100 (4/14/09) |
| C      C | 100 (8/20/08) | 100 (4/6/09) |
| B      C | 100 (9/3/08) | 100 (4/6/09) |

34

USAO_BW_USAO_BW_000105316

| K   ⁚ | 100  (9/8/08) | 0 |
|---|---|---|
| C..... C | 100  (8/20/08) | 100  (4/6/09) |
| D       J | 100  (8/20/08) | 100  (4/6/09) |
| W       J | 100  (8/20/08) | 100  (4/6/09) |
| I       C       J | 0 | 100  (4/6/09) |
| I       A | 100  (9/3/08) | 100  (4/6/09) |
| J       A | 100  (9/3/08) | 100  (4/6/09) |
| K       R       D | 100  (9/3/08) | 100  (4/6/09) |
| S       D | 100  (9/3/08) | 100  (4/6/09) |
| N       N | 100  (9/17/08) | 100  (4/8/09) |
| E   (E   ) N | 100  (9/17/08) | 100  (4/8/09) |
| J       N | 100  (9/17/08) | 100  (4/8/09) |
| K   _  N | 100  (9/17/08) | 100  (4/8/09) |
| G       V | 100  (9/17/08) | 100  (4/8/09) |
| A       V | 0 | 100  (4/8/09) |
| J       S | 100  (9/17/08) | 100  (4/8/09) |
| C       S | 0 | 100  (4/8/09) |
| F       B | 100  (9/17/08) | 100  (4/14/09) |
| M..... R | 100  (9/17/08) | 100  (4/14/09) |
| M       R | 100  (9/17/08) | 0 |
| T       R | 0 | 100  (4/14/09) |
| J       V | 100  (9/17/08) | 100  (4/8/09) |
| C       V | 100  (9/17/08) | 100  (4/8/09) |
| A       V | 0 | 100  (4/8/09) |
| W       U | 100  (9/8/08) | 0 |
| M       U | 100  (9/8/08) | 0 |
| F       R | 100  (9/3/08) | 0 |
| A       R | 100  (8/20/08) | 0 |
| R       R | 100  (9/8/08) | 0 |
| J   _  R | 100  (9/17/08) | 0 |
| B       D | 100  (8/20/08) | 0 |
| G       D | 100  (9/3/08) | 0 |

35

USAO_BW_USAO_BW_000105317

| | | |
|---|---|---|
| M_____ A_ | 100 (9/3/08) | 0 |
| Y__ Z_ | 100 (9/3/08) | 0 |
| J____ S | 100 (9/3/08) | 0 |
| K_____ H | 100 (9/3/08) | 0 |
| E_ K_ | 100 (9/3/08) | 0 |
| B_ K_ | 100 (9/8/08) | 0 |
| I Y_ | 100 (8/22/08) | 0 |
| W__ N | 100 (8/22/08) | 0 |
| W Y | 100 (8/22/08) | 0 |
| E_ B | 100 (8/22/08) | 0 |
| Z_ G | 100 (8/22/08) | 0 |
| B W | 100 (8/22/08) | 0 |
| W Y | 100 (8/22/08) | 0 |
| D W | 100 (8/22/08) | 0 |
| S_ H | 100 (8/22/08) | 0 |
| L J | 100 (8/22/08) | 0 |
| E M_ | 100 (9/11/08) | 0 |
| Q____ J | 100 (9/11/08) | 0 |
| W Z_ | 100 (9/11/08) | 0 |
| W Y | 100 (9/11/08) | 0 |
| S_ P_ | 100 (9/11/08) | 0 |
| M_ K | 100 (9/11/08) | 0 |
| J_ G | 100 (9/8/08) | 0 |
| B M_ | 100 (9/8/08) | 0 |
| K P | 100 (9/8/08) | 0 |
| J_ G | 100 (9/8/08) | 0 |
| Z_ P | 100 (9/8/08) | 0 |
| A_ C | 100 (9/8/08) | 0 |
| G_ C | 100 (9/8/08) | 0 |
| P_ G_ | 100 (9/8/08) | 0 |
| A_ L | 100 (9/8/08) | 0 |
| P_ Q_ | 100 (9/8/08) | 0 |

36

| R        J  | 100 (9/8/08)    | 0            |
|-------------|-----------------|--------------|
| J    R      | 100 (8/20/08)   | 0            |
| N:    R:    | 100 (8/20/08)   | 0            |
| M.   : R    | 100 (8/20/08)   | 0            |
| D      R    | 100 (9/3/08)    | 0            |
| J      R    | 100 (9/8/08)    | 0            |
| J      W    | 100 (8/20/08)   | 0            |
| M:   A   W  | 100 (9/17/08)   | 0            |
| A     M     | 100 (9/17/08)   | 0            |
| R      B    | 100 (9/17/08)   | 0            |
| E.     S    | 100 (9/17/08)   | 0            |
| H:     A    | 100 (9/17/08)   | 0            |
| R      E:   | 100 (9/17/08)   | 0            |
| D:    M     | 100 (9/17/08)   | 0            |
| S        M  | 100 (9/17/08)   | 0            |
| S        M  | 100 (9/17/08)   | 0            |
| G      M    | 100 (9/17/08)   | 0            |
| C      A    | 100 (9/17/08)   | 0            |
| L    X      | 100 (9/17/08)   | 0            |
| J        H  | 100 (9/17/08)   | 0            |
| P      C    | 100 (9/17/08)   | 0            |
| J:     N    | 100 (9/17/08)   | 0            |
| J    S      | 0               | 100 (4/6/09) |
| F    S      | 0               | 100 (4/6/09) |
| G     S     | [500 (9/3/08)]  | 100 (4/6/09) |
| N:     S    | [500 (9/3/08)]  | 100 (4/6/09) |
| R      S    | 0               | 100 (4/8/09) |
| V      C    | 0               | 100 (4/8/09) |
| C    C:     | 0               | 100 (4/8/09) |
| T      C:   | 0               | 100 (4/8/09) |
| F        C  | 0               | 100 (4/8/09) |
| O    G:     | 0               | 100 (4/8/09) |

37

USAO_BW_USAO_BW_000105319

| L    T  | 0 | 100 (4/8/09)  |
|---------|---|---------------|
| J    H  | 0 | 100 (4/8/09)  |
| B    C  | 0 | 100 (4/8/09)  |
| Q    M  | 0 | 100 (4/14/09) |
| V    E  | 0 | 100 (4/14/09) |
| G    E  | 0 | 100 (4/14/09) |
| D    E  | 0 | 100 (4/14/09) |
| E    G  | 0 | 100 (4/14/09) |

j.  Based on my training and experience and participation in this investigation, it is very unlikely that each of these Wey business associates, family members of Wey business associates, and members of the W      family made an independent economic decision to buy precisely 100 shares of Smartheat in 2008 and 230 shares of Deer (split-adjusted to 100 shares of Deer) in 2009.  Accordingly, there is probable cause to believe that Wey and others caused Interwest to issue shares to these individuals to defraud NASDAQ into believing that both issuers had at least 300 bona fide shareholders, when in fact, they did not.

F.   **The Manipulation of Smartheat and Deer Stock**

20.  There is probable cause to believe that the artificial inflation of round-lot shareholders was only the first step in the market manipulation and fraud scheme with respect to Smartheat and Deer.  From my training and experience, I am familiar with the market manipulation tactic in which coordinated

38

USAO_BW_USAO_BW_000105320

action is taken to artificially inflate demand for the stock of a small-capitalization issuer to create liquidity and/or increase the share price so that large blocks of shares controlled by insiders and others can be sold into the market.  There is probable cause to believe that this is what happened with Smartheat and Deer after they began trading on the NASDAQ in or about 2009.  Under the influence of Wey, the Scholander-Harris brokers artificially inflated demand for Smartheat and Deer by aggressively soliciting their retail customers to buy shares of these issuers, by actively discouraging customers from selling shares of these issuers, and by failing to disclose to their customers, at least in the case of Deer, a kickback payment of $350,000 that the Scholander-Harris brokers used to pay startup expenses to start a new brokerage firm in or about late 2009 and early 2010.  Meanwhile, there is probable cause to believe that, at or about the time the demand for Smartheat and Deer was artificially inflated in this manner, nominee shareholders sold large blocks of shares of Smartheat and Deer.  Based on my training and experience, including my understanding of market manipulation schemes, I believe that Scholander-Harris Brokers' aggressive purchases of Smartheat and Deer on behalf of their retail customers helped stabilize the price of these securities while these nominee shareholders sold shares.  Specifically, based on my review trading records, bank records, sworn testimony

39

taken in FINRA's investigation of the Scholander-Harris Brokers
and documents provided by FINRA, the SEC, and other sources, and
from my interviews of witnesses and conversations with SEC and
FINRA staff members and other law enforcement officials, I have
learned the following:

### The Artificial Inflation of Demand for Smartheat and Deer Stock

a.   From at least in or about 2004 up to and including
in or about February 2010, the Scholander-Harris Brokers, led by
Wi     S        and T     H    , worked in sub-leased space
within Wey's NYGG-USA office suite at 14 Wall Street.  From in or
about December 2002 through in or about April 2011, the
Scholander-Harris Brokers operated under the banner of
approximately seven different broker-dealer firms.  From at least
in or about 2008 up through and including in or about 2010, a
significant portion of the commissions earned by the Scholander-
Harris Brokers have derived from their purchases of the shares of
Wey-advised RTO issuers on behalf of their retail clients.

21.  For example, from on or about July 1, 2009 up through
and including on or about July 1, 2010, the Scholander-Harris
Brokers bought approximately 1.3 million Smartheat shares for
approximately $11.5 million for their retail customers, and they
bought approximately 1.5 million Deer shares for $20.5 million
for their retail customers.  A significant percentage of these
purchases were solicited, and a significant percentage were on

40

USAO_BW_USAO_BW_000105322

margin.

22.   Although they lacked the necessary supervisory licenses, Scholander and Harris supervised other members of the Scholander-Harris Broker team.   In this de facto supervisory capacity, Scholander and Harris instructed other members of their team to buy Deer and Smartheat for their retail clients, and they actively discouraged them from selling these stocks.   At times, one or more of the Scholander-Harris brokers made improper representations to retail customers concerning the future value of these stocks.   In or about 2010, J      A      , the chief compliance officer of the New York branch office of First Merger Capital, twice overheard one of the Scholander-Harris Brokers make improper representations concerning the likely future share price of Deer.   In addition, after on-site compliance testing of the Scholander-Harris Brokers conducted on or about April 9, 2010, an independent compliance consultant reported that its examiners "saw at least one incident of high pressure sales being used in connection with the pitching of stock deals" and stated that "Registered Representatives have made false statements in connection with the offering of stock."

23.   Sworn testimony taken in the FINRA investigation of some of the Scholander-Harris Brokers has made clear that Wey worked closely with, and exercised influence over, the Scholander-Harris Brokers as they solicited purchases of

41

USAO_BW_USAO_BW_000105323

Smartheat and Deer in or about 2009 and 2010.  At various times in or about 2009, Wey personally met with the Scholander-Harris Brokers and encouraged them to buy Deer and Smartheat for their retail clients.

24.  The issue of Wey's influence with these brokers came to a head in or about 2009, when the Scholander-Harris Brokers operated as a branch of Seaboard Securities.  At or about that time, the owner of Seaboard Securities, A       D       ,    , became alarmed at (1) the large volume of Smartheat and Deer shares that the Scholander-Harris Brokers were purchasing for their retail customers, (2) the fact that many of these purchases were on margin, and (3) the fact that Wey was coming into the Seaboard Securities space at 14 Wall Street to encourage the purchases.  In response, the Seaboard Securities owner instructed the Scholander-Harris Brokers to diversify their clients' purchases, to stop buying these securities on margin, and he barred Wey from entering the Seaboard Securities office space at 14 Wall Street.  However, these instructions were ignored.  When A       V    , one of the Scholander-Harris Brokers, sold Deer for some of his clients (to realize gains as the share price rose), he was ostracized by Scholander and Harris.  Wey confronted V     and asked him why he was selling Deer.  When Wey did so, V     told Wey that he had sold Deer shares because the owner of Seaboard Securities had issued instructions to diversify

42

their clients' portfolios.  In response, Wey told the V      that
he should "diversify" by buying the stock of Smartheat or AgFeed
Industries, Inc. ("AgFeed"), another Wey-promoted RTO issuer
which is described in further detail below, for his clients.
Meanwhile, Scholander and Harris repeatedly lied to the owner of
Seaboard Securities when asked why Wey had entered the Seaboard
office space at 14 Wall Street:  S        and H      repeatedly
and falsely told the owner that Wey had entered the Seaboard
Securities space only to collect rent due under their sublease
with NYGG-USA.

     25.  I have reviewed market data reflecting the closing
prices of Smartheat and Deer in or about 2009 and 2010.  These
data show that the share prices of both stocks rose rapidly in
the second half of 2009, followed by a decline in the share
prices in late 2009 and early 2010.  Specifically, from on or
about July 17, 2009 to on or about November 27, 2009, the share
price of Deer rose from $6.24 per share to $18.07 per share, a
190 percent increase.  Similarly, from on or about July 16, 2009
to January 11, 2010, Smartheat's share price rose from $6.30 per
share to $18.03 per share, representing a 186 percent increase.
I have reviewed publicly available information concerning
Smartheat and Deer for the second half of 2009, and I am aware of
no public information that could explain such a significant rise
in the marketplace valuation of these stocks.  Based on my

USAO_BW_USAO_BW_000105325

training and experience, including my familiarity with market price swings that are caused by market manipulation, I believe that the share prices of Smartheat and Deer rose rapidly in the second half of 2009 at least in part because of the aggressive buying activity of the Scholander-Harris Brokers, working in concert with Wey.

.26.  At or about the same time the Scholander-Harris Brokers aggressively solicited purchases of Deer from their retail clients, the Scholander-Harris Brokers received an undisclosed $350,000 payment from Deer that was disguised as a consulting payment based on services purportedly provided by one of their newest members, M       G      , a former trading assistant. Based on my review of sworn testimony in the FINRA investigation of certain of the Scholander-Harris Brokers, other documents provided by FINRA and SEC staff, bank records, and other sources, I have learned the following about this undisclosed $350,000 payment:

a.  After FINRA staff conducted a surprise inspection of the Scholander-Harris Brokers at 14 Wall Street on or about September 15, 2009, the Scholander-Harris Brokers began preparations to move their business, which was then operating as the New York branch of Seaboard Securities, to another broker-dealer and to another building (and away from the FINRA staff, which occupied part of the same floor at 14 Wall Street).

44

USAO_BW_USAO_BW_000105326

Scholander, Harris, M    G    , and the new business partners
whom they recruited in connection with this move determined that
the move would cost approximately $300,000 in start-up expenses,
including the purchase price of First Merger Capital, Inc., a
defunct broker-dealer firm under whose name they would operate.
The new business partners, who operated under name of an entity
called RRZ Management, included a man named R    Z    ; his
wife, R   . S    ; and her brother, I   N   .

    b.  At or about the time the Scholander-Harris Brokers
faced these expenses, R    N    , Esq., corporate counsel for
Deer, made an extraordinary offer: Deer was ready to pay G
$350,000 to provide nominal consulting services to Deer.  G
accepted the offer.  Pursuant to this agreement, in or about
November 2009, G    and Scholander traveled to Deer's offices
in China and sampled certain of Deer's small kitchen appliance
products, including a soy milk maker.  G    , a long-time
trading assistant, has no product marketing experience and no
expertise relating to China.  After G    and S
returned from China, on or about December 17, 2009, Deer paid
$350,000 directly to a bank account in the name of First Merger
Capital (Delaware), over which G    was the sole authorized
signatory.  Thereafter, G    used a portion of these funds to
pay the start-up expenses associated with moving the Scholander-
Harris Brokers to 40 Wall Street, where they would begin working

45

USAO_BW_USAO_BW_000105327

in or about February 2010 as a branch of their newly-purchased
broker-dealer, First Merger Capital.  Although I have not yet
interviewed any of the retail customers who were persuaded by the
Scholander-Harris Brokers to buy Deer stock in or about 2009 and
2010, it is highly unlikely that Scholander-Harris Brokers
disclosed this $350,000 payment that was used to fund startup
expenses.  Accordingly, these payments constitute excessive,
undisclosed commissions to the Scholander-Harris Brokers for
their purchases of Deer stock on behalf of unsuspecting retail
customers.

### The Dumping of Nominee-Held Smartheat and Deer Shares

27.  There is probable cause to believe that, in or about
2009 and 2010, at the same time the Scholander-Harris Brokers
helped to artificially inflate the market demand for Smartheat
and Deer stock, nominee entities and individuals associated with
Wey sold large quantities of Smartheat and Deer stock.
Specifically, from my review of trading records, sworn testimony
and other documents provided by FINRA and the SEC, and from my
conversations with witnesses, FINRA and SEC staff members, and
other law enforcement officials, I have learned the following
about several of these entities and individuals:

### York Capital Management and Strong Growth Capital

a.  In or about 2006, based on a referral by Wey,
T  W  opened an account in the name of York Capital

46

USAO_BW_USAO_BW_000105328

Management, Ltd. at Seaboard Securities in her capacity its President and sole owner. From this account, from in or about January 2009 to in or about January 2010, York Capital Management sold Deer common stock worth approximately $4 million and HEAT common stock worth approximately $6 million. During the same period, approximately $8.8 million was wired from this account to an account held in the name of York Capital Management at Credit Suisse in Geneva, Switzerland.

b. In or about February 2009, at or about the time the Scholander-Harris Brokers began operating as the New York branch of Seaboard Securities, based on a referral from Wey, a Chinese citizen named M   L   opened an account at Seaboard Securities in the name of Strong Growth Capital, Ltd. M   L   was and is the chief executive officer of New York Global Group (Asia), Ltd. ("NYGG-Asia"). NYGG-Asia purports to be a Beijing-based private equity and consulting firm that is owned separately from, but "co-branded" with, NYGG-USA. From this account, from in or about January 2009 to January 2010, Strong Growth Capital sold Deer shares worth approximately $6 million and Smartheat shares worth approximately $8 million. During the same period, approximately $26.9 million was transferred from this account to accounts held in the name of Strong Growth Capital at Credit Suisse in Geneva (approximately $13.9 million) and HSBC in Hong Kong (approximately $13.0 million).

47

USAO_BW_USAO_BW_000105329

c.   York Capital Management and Strong Growth Capital sold these Smartheat and Deer shares through Seaboard Securities at or about the time that the Scholander-Harris Brokers, also working at Seaboard Securities, were actively purchasing shares of the same securities for their clients.   In fact, on approximately 36 trading days in 2009, the Scholander-Harris Brokers bought shares of Deer and/or Smartheat on the same day that York Capital Management and Strong Growth Capital sold these securities.

<u>The Four Smartheat Nominees</u>

28.   Beginning in or about February 2010, at or about the time the Scholander-Harris Brokers moved their operations to First Merger Capital at 40 Wall Street, up through and including in or about July 2010, the Scholander-Harris Brokers sold approximately 3,120,584 shares of Smartheat that were held in the name of four Chinese nationals for approximately $27,781,391. Based on my review of transfer agent records, records that FINRA obtained directly from First Merger Capital, and my conversations with FINRA staff, SEC staff attorneys, and other law enforcement officials, and other sources, I believe that these four account holders were nominees and that the shares were beneficially owned by another person or persons - most likely the CEO of Smartheat, J    J    W    , who was otherwise barred from selling Smartheat shares through January 2012 pursuant to a lock-up agreement that

48

USAO_BW_USAO_BW_000105330

was announced in or about July 2009 for the purpose of showing that his vested interest was with Smartheat's shareholders.[6] There is probable cause to believe that the selling of shares through these nominees enabled the Smartheat CEO to sell shares that he (or another person) beneficially owned notwithstanding the lock-up agreement.   The facts upon which I base these conclusions include the following:

a.   The names of the four Smartheat shareholders in question (hereinafter, the "Four Shareholders"), and the number of shares that they originally acquired in or about 2008, were the following: N   H   S   (approximately 1,110,000), X   Y   Y [7] (approximately 999,000), D   X   (approximately 999,000), and L   Y   (approximately 721,500).   The Four Shareholders owned a total of approximately 3,829,500 shares as of in or about February 2010, a figure that represented approximately 11 percent of Smartheat's outstanding shares at or about that time.   G testified to FINRA that these four individuals were Smartheat employees.   However, according to account applications for these

---

[6]    Based on my training and experience, I believe that the terms of these insider lock-up agreements were material to investors because, among other things, assuming the inside shareholders were bound by the lock-up agreements, then (1) for a substantial period of time, the supply of freely tradeable stock in the market place would not include the securities owned by the security holders, thereby reducing the supply of those securities in the market, and (2) for a substantial period of time, the security holders would be expected to remain investors and therefore maintain continued interest in the financial performance and stock price of the company.

[7]    State Department visa records show that Y    and S    were (1) issued visas on the same date in December 2010 for travel to the United States; (2) were scheduled to arrive in the United States on the same date in February 2011; and (3) had the same contact name in the United States.

49

USAO_BW_USAO_BW_000105331

accounts and State Department visa records, only approximately one of these individuals was in fact employed by Smartheat.

      b.  In or about February 2010, at or about the time the Scholander-Harris Brokers began working at First Merger Capital, each of the Four Shareholders purportedly decided to take a series of steps that would permit their shares to be sold into the marketplace.  Through a series of documents purportedly executed on or about February 4 and 5, 2010, each of the Four Shareholders (1) opened new accounts at First Merger Capital using account opening documents that were all completed in the same handwriting, (2) deposited their Smartheat shares in their respective accounts, (3) made certain representations to permit the restricted legend to be removed from their share certificates, (4) entered into lock-up agreements with Smartheat that permitted the sale of Smartheat shares up to a certain percentage of the trading volume on a given day, and (5) granted powers of attorney to the Smartheat CEO, J      J  W    , to order the selling of shares in their accounts pursuant to the lock-up agreement.  The Four Shareholders were referred to First Merger Capital by R       N    , Esq., counsel for Smartheat and other Wey-associated RTO issuers.

      c.  Thereafter, the shares held by these nominees were sold as follows.  From in or about February 2010 through July 2010, based on instructions that Newman conveyed to G       by

USAO_BW_USAO_BW_000105332

telephone, G     sold Smartheat shares in the Four Shareholders accounts pursuant to the volume restriction in the lock-up agreement.  G     never received contemporaneous written instructions for the trades or any written authorization to accept instructions from N     as opposed to J     J   W   , who had power of sole attorney with respect to the Four Shareholders' accounts at First Merger Capital.  Moreover, G     treated the orders differently from other accounts at First Merger in that she entered the sell orders directly into the order execution system without creating physical order tickets, and she maintained the files for these accounts at her desk, separate from First Merger Capital's other customer account files.  FINRA obtained these files when it conducted a surprise inspection of First Merger Capital in or about April 2010.

d.  As noted above, the First Merger Capital account opening documents for each of the Four Shareholders were completed in the same handwriting on or about February 4 and 5, 2010.  The account opening documents listed the account holders' annual income to be between approximately $25,001 and $100,000 and total net worth between approximately $50,001 and $100,000.

e.  As to three of the Four Shareholders' accounts, several critical forms were signed by the purported account holders in blank (that is, the forms were signed, but had not been completed) and provided to the Scholander-Harris Brokers in

51

that state.  With respect to three of the four accounts, one or
more of the following documents were submitted to the Scholander-
Harris Brokers in blank: notary acknowledgment certificates on
power of attorney documents; stock powers necessary to transfer
the stock certificates; transfer agent instruction forms; and
Rule 144 Seller's Representation Letters.  I know this because,
in three of the four First Merger Capital account files, as to
each of these categories of documents, one or more of the account
files contained two copies of a particular document: one signed
by the purported account holder in blank, and another signed copy
with the relevant information filled in to make it ready for
submission.  Based on my training, experience, and participation
in this investigation, I know that the signing of such critical
securities-related forms in blank is a strong indicator of fraud,
and it constitutes part of the probable cause to believe that the
Four Shareholders are nominees.

               <u>Sales of Smartheat and Deer by Wey Family Members</u>

     29.  In or about 2009, at or about the time the Scholander-
Harris brokers artificially inflated the demand for Smartheat and
Deer shares by aggressively buying them for their retail
customers, there is probable cause to believe that Wey ordered
the selling of millions of shares of Smartheat and Deer that he
beneficially owned and/or controlled but held in the names of
family members who served as nominees.  From my review of trading

52

records, account opening documents, transfer agent records, and
my conversations with other law enforcement officials, I have
learned that:

  a. As of in or about 2009, Wey had trading authority
over accounts held at Raymond James in the names of his sister,
T  W ; his wife, M   W ; and his father-in-law,
M  P  . In the account opening documents for the T
W  account, T  W is described as a retired accounting
executive (and as the sister of Benjamin Wey). By contrast,
T  W s State Department records for visas issued March 15,
2010, and February 25, 2011, list her employer as "New York
Global Capital, Inc. Beijing Representative Office" and list her
email as "  @NYGCCAPITAL.COM."

  b. From in or about October 1, 2009 up through and
including in or about November 30, 2009, substantial quantities
of Deer and Smartheat stock were sold in the T  W and
M  P  accounts at Raymond James, including approximately
435,468 shares of Smartheat for approximately $5.2 million, and
approximately 16.1 million shares of Deer for approximately $7.9
million.

  c. According to records provided to me by Raymond
James, in or about July 2010, Raymond James conducted an anti-
money laundering review of these accounts because of the heavy
trading in Deer stock, and had questions concerning the source of

USAO_BW_USAO_BW_000105335

the funds.  As part of this process, Raymond James asked Wey for

certain information.  Rather than provide the information, Wey

advised Raymond James staff that the T     W   account, which

then held Deer stock and other securities worth approximately $18

million, would be transferred to Morgan Stanley; and that the

M     P     account, which held securities worth approximately

$12 million, would be transferred to Credit Suisse in Geneva.  In

a telephone conversation with Raymond James personnel, Wey

threatened, "tell your firm I want this [the transfers of assets

to Morgan Stanley and Credit Suisse] to run smoothly - if there

are difficulties I will come after your firm."

     d.  I know from documents provided to me by Morgan

Stanley that, at or about this time (July 2010), T     W   did

open a new account at Morgan Stanley, and the Raymond James

assets described above were transferred to it.  Wey had trading

authorization over the new Morgan Stanley account.  In the

account opening documents for the Morgan Stanley account, T

W   was described as a retired homemaker with a net worth of $50

million who occasionally consults.  Again, this statement

conflicts with T    . W  's State Department records for visas

issued March 15, 2010, and February 25, 2011, which list her

employer as "New York Global Capital, Inc. Beijing Representative

Office" and list her email as "S     @NYGCCAPITAL.COM."

     e..  In or about August and September 2010, after the

54

price of Deer shares had declined considerably from a high of
$18.97 per share on or about November 23, 2009, additional shares
of Deer were purchased in the T      W   account at Morgan
Stanley.  On or about September 20, 2010, R      N    , counsel
for Deer, filed Schedule 13D with the SEC reporting that "
T      Y  , a self-employed citizen of the PRC living in HK, had
used personal funds (for investment purposes) to purchase 2.1
million shares of Deer for $16.9 million.  According to Deer's
most recent Form 10-K, as of March 10, 2011, T      W   owned 6.3
percent of the outstanding shares of Deer.

     f.  Based on my conversation with CS-1, the former
employee of NYGG-USA, and other sources, there is probable cause
to believe that T      W   s Deer shares are beneficially owned
by Wey.  CS-1 advised me that, in a conversation at the PREMISES,
he heard Wey refer to his sister T      W   s 6.3 percent
ownership of Deer as his own shares.

     g.  Further support for my belief that Wey is using his
sister as a nominee to hold securities that he beneficially owns
arises from a false statement that Wey made to NASDAQ listing
officials in or about November 2010, when he met with them
concerning the listing application submitted to NASDAQ by
CleanTech, another Wey-promoted RTO issuer.  From my
conversations with NASDAQ staff members, I know that, at this
November 2010 meeting, Wey told NASDAQ staff members that he did

55

USAO_BW_USAO_BW_000105337

not have knowledge about the investments of his sister, T

W   .  This statement was clearly false, as Wey was an authorized

signatory on T     s Raymond James and Morgan Stanley

accounts, as described above, and he communicated directly with,

and even threatened, Raymond James about her account.

      h.  I have reviewed bank records of HSBC-New York and

Bank of Communications in New York that further support my belief

that T    W  serves as Benjamin Wey's nominee.  These records

show substantial transfers of funds from T       W  s account at

HSBC-Hong Kong to an account held in the name of Wey's wife,

M      W  , at HSBC-New York.  (M       W  s HSBC-NY account

appears to be jointly used by M       and Ben Wey for business

and personal purposes.  For example, on or about August 20, 2009,

$268,157 was wired from this account to pay Benjamin Wey's

American Express card bill.)  These bank records show the

transfer of more than $6 million from T     W [8] to the M

W   account at HSBC-New York, including one large transfer in or

about June 2011, as follows:

_____

[8]     Certain of these transfers are listed in bank records as
originating from "MS W   T    ,AN BEI LU" (listed in summary chart in text as
"T      W /Bei Lu").  According to CleanTech's public filings, Bei Lu was one
of the founders of CleanTech's China-based operating company.  When the
CleanTech reverse merger was completed, Bei Lu became Chairman and CEO of
CleanTech.

USAO_BW_USAO_BW_000105338

| Originating Party | Receiving Party | | Approx. Date | Approx. Amount ($) |
|---|---|---|---|---|
| T___W___/Bei Lu | M | W | 12/05/08 | $99,000 |
| T___W___/Bei Lu | M | W | 3/27/09 | $700,000 |
| T___W___/Bei Lu | M | W | 8/13/09 | $750,000 |
| T___W | M | W | 11/03/09 | $800,000 |
| T___W___/Bei Lu | M | W | 12/16/09 | $3,300,000 |
| T___W | M | W | 06/08/11 | $500,000 |
| Total: | | | | $6,149,000 |

i.  HSBC-New York bank records also show other
transfers from T___W___ to the M___W___ account at HSBC-New
York that were deliberately broken into increments less than
$10,000 to avoid raising suspicion, given the United States
currency transaction reporting requirements with respect to cash
transactions over $10,000.  Specifically, in or about May 2006,
T___W___ ordered five fund transfers totaling approximately
$49,893 from Bank of Communications in Beijing to the M___
W___ account at HSBC-New York.  Each of the five transfers was in
an amount just less than $10,000, and some of the transfers took
place on back-to-back days:

| Originating Party | Receiving Party | | Approx. Date | Approx. Amount ($) |
|---|---|---|---|---|
| T___W | M | W | 5/10/06 | $9,975 |
| T___W | M | W | 5/11/06 | $9,975 |
| T___W | M | W | 5/15/06 | $9,975 |
| T___W | M | W | 5/16/06 | $9,984 |
| T___W | M | W | 5/17/06 | $9,984 |
| Total | | | | $49,893 |

57

USAO_BW_USAO_BW_000105339

G.   <u>Wey's Involvement In Accounting Fraud at AgFeed, Inc.</u>

30.   Nominees associated with Wey have also sold large quantities of shares of AgFeed Industries, Inc., another Wey-assisted RTO issuer.[9]  AgFeed is an agribusiness firm with interests in hog production farms, among other things, in China and the United States.

31.   I have learned from my conversations with SEC staff members, my review of trading records relating to AgFeed, AgFeed's public filings, internal AgFeed e-mails, and other sources that, that after Wey began assisting AgFeed, AgFeed filed materially misleading financial statements with the SEC, and that Wey exerted considerable influence over accounting practices that are now being investigated by a Special Committee of AgFeed's Board of Directors.   Specifically, I have learned:

a.   The issues under review by the Special Committee relate to (1) the accounting relating to certain of AgFeed's hog farm assets acquired in China in or about 2007 and 2008, and (2) the validity and collectability of accounts receivable relating to AgFeed's animal nutrition business in China.   On or about May 10, 2011, AgFeed announced through a public filing that, as to this second issue, it was changing its method of measuring

---

[9]   .According to a news article, "AgFeed Slips on its way to the Trough," <u>Barron's</u>, May 19, 2008, AgFeed disclosed in an SEC filing that it paid Wey and "New York Global Capital" to provide translation services and advice on private placements, public offerings, and international business practices.  However, I have searched and not located this public filing.

58

USAO_BW_USAO_BW_000105340

collectability of accounts receivable.  On or about August 2,
2011, AgFeed announced a net loss for the second quarter of 2011,
a substantial portion of which was an expense of $9.2 million
reflecting the change in its methods of calculating receivables.
Apparently in response to this disclosure, the price of AgFeed's
stock dropped approximately 33 percent to a closing price of
$1.34 on August 2, 2011.

     b.   In or about November 2010, AgFeed replaced the
audit firm that Wey-assisted RTO issuers Smartheat, Deer, and
CleanTech have used – Goldman Parks Kurland & Mohidin – with
another firm.

     c.   Based on my review of internal AgFeed e-mails
provided to me by the SEC, in or about September 2011,
accountants reviewing AgFeed's earlier accounting practices
discovered that AgFeed was maintaining two sets of books,
altering documents, fabricating results on a major scale, and
that Wey exercised improper influence over AgFeed's accounting
practices.  Specifically, from an email dated September 2, 2011
from E      L , Controller of AgFeed's Chinese hog production
operations to G      M        , then the COO of AgFeed, copied to
C      T. M        , the CFO of AgFeed, I learned that:

     i.   "Most Fixed assets addition [sic] in 2009 and
2010 were fabricated.  Most of them do not exist, or the amounts
were much smaller, [if] they were indeed fixed assets.  The

USAO_BW_USAO_BW_000105341

purposes of fabricating these Fixed Assets was to increase hog

sales and report a better earning[.] The cash was indeed paid out

to an individual and turn[ed] around back to the company, as it

was never a true purchase[.]

        ii.  "We were told that . . . another set of . . .

book[s] (the real one) was within Legacy's former accounting

system [referring to AgFeed's China-based hog production

business, which existed before AgFeed acquired a U.S.-based hog

production business]. . . . Mr. O⎯⎯, the current legacy

finance director, admitted that he knew [of] another set of GL

[general ledger], the real one, and that it was closed down at

the end of 2010 when the "Westerner" took over the company. He

said that the server for the real book was removed in the

beginning[] of 2011."

        iii.  A farm called ShunAn "was purchased for the

amount of ¥8.26 million, and never exist[ed]."

        iv.  Certain schedules - "Schedule C" - supporting

share purchase agreements "were altered, therefore there were two

sets of purchase lists (a schedule detailing the assets/items

purchased) bear[ing] the same company stamps and/or signatures. .

. . Significant value of Goodwill was created, and inventory

value was significantly reduced[,] when the schedule C was

modified. . . . Legacy Farm Purchase accounting was done by an

outside consultant firm, NYGG (New York Global Group?) According

60

to the second set of the schedule C (the altered one)."

     v. On or about March 5, 2009, an AgFeed board member, F R  , wrote the following e-mail with the subject line "Re: Business section of the 10k/ DISCONTINUE THE BW [referring to Benjamin Wey] EXTRAPOLATION METHODS IN REPORTING FARM CAPACITIES," to G D  , then the AgFeed COO:

> CONFIDENTIAL
> THIS IMPORTANT ..... BEN WEI EXERTED HIS INFLUENCE IN (the past) VARIOUS WAYS ON HOW AGFEED WOULD REPORT INFORMATION.
> The forensic work I have done with G and to some extent with Dr. L in the last 2 months while preparing for the 10k has revealed multiple inconsistencies .... .in the form of plausible extrapolation .... "guidance" "capacity" and other statements[.]
> 1. We must discontinue the statistically misleading information about the capacity by farm, immediately[.]
> 2. [T]he estimates were based on plausible extrapolation of a healthy sow birthing 2x a year with the average birth of 20 piglets ..... sheer nonsense and typical Ben Wei and the Company which was new and not familiar to hog production #s assumed this calculation was "okay" to report[.]
> 3. [W]e must shorten this report and stick to the facts....and use P info as the basis for reporting and G s milder suggestions[.]
> 4. [W]e have looked into a number of things and P. has been quite helpful because he wants the financial reporting to be on target and real.
>
> Please help us end this stuff once and forever... you guys change the format... make things much more concise ......I thank you in advance...FR

  32. I have also reviewed public filings and trading records relating to AgFeed's stockholders.  These records show that, as

USAO_BW_USAO_BW_000105343

of in or about 2008, AgFeed's shareholders included several nominees associated with Wey, including the following:

  a. Trading records show that Strong Growth Capital, which is controlled by M    L , the head of NYGG-Asia, sold approximately 95,473 shares of AgFeed for approximately $715,379 in or about 2008 and 2009.

  b. According to an SEC filing dated on or about October 18, 2007, as of in or about 2007, Finchley International Investments, Ltd. owned at least 570,000 shares of AgFeed, or 2.11 percent of AgFeed's outstanding common shares. I have obtained records from Seaboard Securities establishing that T    W  was the President of Finchley International Investments as of at least in or about 2005 and 2006.

  c. Trading records further show that Wey's sister-in-law, T    U    , sold 129,060 shares of AgFeed for approximately $1,739,069 in or about 2008 and 2009. I know from my review of State Department visa records and other documents that T    U      is the sister of Wey's wife, M      W  .

  d. Trading records show that York Capital Management, which T    . W   controlled as of in or about 2006, sold approximately 1,691,647 shares of AgFeed for approximately $14,687,711 during the period January 2008 to June 2009.

  33. As noted in paragraph 24 above, AgFeed was among the Wey-assisted issuers whom Wey encouraged at least one of the

62

Scholander-Harris Brokers to buy on behalf of his clients.

34.   Based on my review of these records relating to AgFeed, conversations with SEC officials, and my training and experience, there is probable cause to believe that Wey participated in an accounting fraud with respect to AgFeed and that, as in the case of Smartheat and Deer, he used nominees to conceal his beneficial ownership and/or control of large blocks of AgFeed stock, and the sale of that stock.

**H.   Evidence Relating to the Smartheat, Deer, and AgFeed Schemes Is Currently at the PREMISES**

35.   There is probable cause to believe that documents and other evidence relating to the Smartheat, Deer, and AgFeed schemes described above may be found at the PREMISES in January 2012.   Even though these schemes occurred while Wey and NYGG-USA's offices were located at 14 Wall Street, there is probable cause to believe that Wey and/or other NYGG-USA staff members brought documents and other evidence relating to the schemes with them to the PREMISES when they moved there in or about May 2010, and that such documents, as well as other relevant records concerning NYGG-USA's business - such as records reflecting its revenue and expenses - are currently maintained there.   The bases for my belief include the following:

a.   After it moved to the PREMISES, NYGG-USA has continued to use a computer-generated instruction form in

63

relation to another Wey-assisted issuer, Nova Lifestyle.  As
described in further detail below, there is probable cause to
believe that, in or about September 2011, instructions were sent
from the PREMISES to Interwest Stock Transfer instructing it to
issue Nova Lifestyle shares to a nominee, Han Hua, Ltd. ("Han
Hua") controlled by Wey's sister, T     W  .  These instructions
appear to have been generated from a computer.  I know from my
training and experience that when businesses generate form-like
documents from a computer, they typically do so using templates
or prior examples that are saved electronically in their computer
systems for the sake of convenience, so that the format does not
have to be re-created each time a similar document must be
generated.  Indeed, prior examples of a certain type of document
will often be maintained as references to ensure consistency when
new examples are created.  For this reason, there is probable
cause to believe that NYGG-USA has saved, and continues to
maintain at the PREMISES, such templates and prior examples,
including examples of the relevant Smartheat and Deer
instructions in the Instruction Format.  In addition, there is
probable cause to believe that NYGG-USA used the same computer
hardware and/or software to generate these September 2011
instructions to Interwest as it had used to instruct Interwest
with respect to Deer in or about April 2008.  The Nova Lifestyle
instructions of September 2011 resemble the first page of NYGG's

64

USAO_BW_USAO_BW_000105346

April 7, 2009 instructions to Interwest regarding Deer in terms
of content and format.  This is not surprising since, based on my
training and experience, small businesses such as NYGG-USA often
bring their existing computer hardware, software, and electronic
files with them when they move from one office space to another.
Accordingly, there is probable cause to believe that, when NYGG-
USA moved from 14 Wall Street to the PREMISES in or about May
2010, NYGG-USA brought with it to the PREMISES the computer
hardware, software, and/or electronic templates and examples that
were used to generate the Smartheat and Deer instructions in the
Instruction Format – as well as electronic copies of the
Smartheat and Deer instructions – and that that hardware,
software, templates, examples, and electronic copies remain on
the PREMISES today.[10]

     b.  In addition, separate and apart from the likelihood
that NYGG-USA retained electronic templates, examples, or copies
of its instructions to Interwest for the sake of convenience and
reference, there is probable cause to believe that NYGG-USA
retained these and other documents relating to the Smartheat,
Deer, and/or AgFeed schemes in any event – in hard copy and/or
electronic copy – for the purpose of keeping a record of the

---

[10]    The presence of templates and/or examples would be probative of
NYGG-USA's connection to the Smartheat-Deer fraud scheme even if exact copies
of the Smartheat and Deer instructions cannot be found at the PREMISES today,
because it would corroborate the Interwest Stock Transfer and Federal Express
records showing the mailing of Smartheat and Deer instructions from NYGG-USA's
offices at 14 Wall Street, where Wey worked at that time.

USAO_BW_USAO_BW_000105347

transactions.   From my training and experience, I know that
individuals who engage in ongoing financial fraud schemes often
retain records needed to perpetuate the fraud.   For example,
where, as here, an individual committing fraud knows that certain
documents relating to the scheme have been provided to third
parties (such as a transfer agent), that individual needs access
to copies of those documents in order to recall what documents
are in the hands of others.   In the event that an individual
fraud perpetrator needs to explain his actions to law enforcement
authorities, he needs copies of all documents that are in the
hands of others.   (Indeed, Wey wrote a just such a letter
explaining certain transactions to NASDAQ listing staff relating
to CleanTech on or about June 30, 2011; to do so, it was likely
necessary for Wey to refer to copies of documents relating to
CleanTech that were retained at the PREMISES.)   The need for an
individual engaged in fraud to keep copies of relevant records
may be especially strong with respect to documents that purport
to establish ownership of property by particular parties, such as
stock certificates that show purported ownership of securities by
nominees, because, as described in further detail below with
respect to CleanTech and Nova Lifestyle, there is probable cause
to believe that, after Wey and NYGG-USA moved to the PREMISES,
Wey has continued to use nominees to conceal his beneficial
ownership and/or control of the common stock of RTO issuers.   In

66

USAO_BW_USAO_BW_000105348

addition, like any small business, whether engaged in fraud or not, NYGG-USA needs to retain books, records, account statements, contracts, correspondence, personnel files, recent state and federal tax returns, invoices, receipts and other records in order to continue in operation as an orderly business, maintain its corporate status and its status to conduct business in a particular state, and to file state and federal income tax returns.[11]  These and other categories of NYGG-USA's business records are described in more detail in paragraph 40 and Exhibit A below.  These categories of NYGG-USA's business record will enable the Government to understand the full scope of NYGG-USA's business, and to determine what percentage of its revenue and profit is tied to RTO issuers.

c.  Records reflecting NYGG-USA's overall revenue and expenses from 2008 to the present are particularly important because Wey and NYGG-USA have repeatedly advised the NASDAQ that Wey receives compensation for his services only from NYGG-USA (and not in the form of shares of the common stock of the RTO issuers that he is advising), and that NYGG-USA's only source of revenue is regular flat fees paid by NYGG-Asia.  Wey's use of nominees to beneficially own and/or control large shareholdings

---

[11]     Even assuming many of these basic corporate documents primarily relate to legitimate aspects of NYGG-USA's business, they would provide background that is necessary to fully understand the nature and scope of the market manipulation and accounting fraud schemes compared to NYGG-USA's overall business, and are therefore relevant to this investigation.

USAO_BW_USAO_BW_000105349

of the RTO issuers suggests that this claim is false and that, in fact, he receives payment for his services in the form of RTO-issuer shares and then hides those shares through nominees. Documents reflecting NYGG-USA's revenue and expenses from 2008 are likely to be present at the PREMISES because, based on my training and experience, most small businesses like NYGG-USA will maintain financial statements for the past several years for a variety of reasons, including the possibility of a tax audit, or simply the need to compare a firm's current financial performance with its historical performance. This information will enable the Government to test Wey's claims to the NASDAQ concerning NYGG-USA's revenue and expenses by enabling it to see whether, for instance, the flat fees paid by NYGG-Asia to NYGG-USA are sufficient to sustain NYGG-USA's business in light of its expenses, including compensation paid to Wey.

d. Independently, I believe that certain original, uncancelled share certificates registered in the name of certain round-lot Smartheat shareholders are likely to be present at the PREMISES because these particular certificates were never transferred to street name. By way of background, most of the W       family members and other individuals associated with Wey (such as the lawyers and board members described above) who received Smartheat and Deer certificates for precisely 100 (split-adjusted) shares later transferred the shares to a broker-

68

dealer (i.e., placed the shares in street name), and sold them.[12]
Based on my training and experience, this behavior is typical for
individuals who receive paper stock certificates registered in
their name.  Most individuals choose to hold stock shares in
electronic form with a broker-dealer (that is, in street name)
because, among other things, if paper stock certificates
registered to an individual are lost, they can be expensive to
replace.  However, based on Interwest records, I know that, as of
on or about December 22, 2011, approximately 27 of the
approximately 120 artificially-generated Smartheat round-lot
shareholders never transferred their shares to street name or
otherwise disposed of them.  Because it would be so unusual for
so many (27) individuals to retain registered stock certificates
in paper form, there is probable cause to believe that these
individuals never knew that they "owned" 100 shares of Smartheat
and that, after NYGG-USA received these 100-share paper
certificates from Interwest in or about August and September
2008, NYGG-USA never distributed them to the approximately 27
individual "shareholders."  Instead, it is likely that NYGG-USA
retained the paper stock certificates, and, because they have
value and are expensive to replace, most likely maintained them
in a secure location (such as a safe), moved them to the PREMISES

---

[12]     Based on Federal Express records that I have reviewed, it appears
that Wey sent some or all of the W      ' share certificates to H      W
and another W      family member on or about September 8, 2008.

69

USAO_BW_USAO_BW_000105351

when NYGG-USA moved there in May 2010, and retain them to this
day.

e.  With respect to Deer, the likelihood that Wey has
retained documents relating to the fraud and market manipulation
schemes described above is increased by the fact that Wey
continued to actively advise Deer well into 2011, long after he
moved NYGG-USA's offices to the PREMISES.  Specifically, CS-1,
the former NYGG-USA employee, advised me that Wey continued to be
heavily involved in the day-to-day affairs of Deer in or about
May and June of 2011.  In or about May 2011, Wey hired CS-1 to
develop a presentation for potential investors concerning a new
private placement in Deer common stock.  Once employed, CS-1
prepared a financial model for Deer using publicly-available
information.  CS-1 asked Deer's management in China to provide
current, non-public information for inclusion in the model; Deer
did so, and CS-1 included it in the model.  CS-1 also advised me
that Wey and other NYGG-USA staff members, working from the
PREMISES, were heavily involved in the presentation of Deer's
first quarter 2011 earnings to investors.  For example, CS-1
advised me that CS-2 and another NYGG-USA employee, J      T
who speaks Chinese and directly communicates with Deer management
on behalf of Wey, drafted Deer's May 10, 2011 earnings press
release at the PREMISES.  In addition, in preparation for Deer's
first quarter earnings call with Wall Street analysts and others

70

USAO_BW_USAO_BW_000105352

on or about May 10, 2011, Wey prepared, and J        T    sent to
Deer management in China, a "Q & A" (question and answer)
document for Deer management to use during the earnings call.  At
the time of the call, CS-1 saw Wey and other NYGG-USA employees
at the PREMISES exercise control over the call.  That is, CS-1
saw R    G   , a NYGG-USA employee, communicate directly with the
conference call service provider to pre-screen those who were
allowed to speak on the call.  In addition, during the call, CS-1
saw J       T    send electronic messages over Skype to Deer
management to advise Deer management as to how to answer pending
questions.  During the call, Wey appeared to dictate (in Chinese)
to T   suggested answers for management to use in response to
questions, and T    appeared to type and send the answers to
Deer's management in China over Skype.

        f.  CS-1 also advised me that, as of May and early June
2011, Wey continued to work closely with the Scholander-Harris
Brokers.  (CS-1 noted that Wey's administrative assistant as of
May and June 2011, E        S        , was the sister of
W        S       ).  CS-1 stated that Wey continued, as of that
time, to help RTO issuers access the U.S. capital markets
through, among other things, secondary public offerings.  CS-1
stated that he understands that Wey typically takes a long
position in such offerings, and that the remaining shares are
sold by the Scholander-Harris Brokers working downstairs from the

71

PREMISES at 40 Wall Street.  CS-1 described the Scholander-Harris Brokers as a "boiler room" operation consisting of young brokers who make hundreds of telephone calls each day to promote stocks associated with Wey by giving only positive information about the issuers to potential customers.  (CS-1 further opined that, once the offerings are complete, Wey appears to be seeking long-term gains rather than creating artificial demand in the market.)  CS-1 noted that, in or about May and June 2011, some of the Scholander-Harris brokers would come to the PREMISES specifically to see Wey.  CS-1 correctly identified a photograph of W                s              .  When shown a photograph of T        H      , CS-1 did not recognize him.

g.   More generally, individuals who engage in fraud need to retain contact information for co-conspirators or other parties connected to the fraud in case they need to communicate with them to further advance the fraud, or to cover up the fraud if aspects of it begin to come to light.  For example, Wey would need to maintain contact information for his sister T       W  .  (As described above in paragraph 29(h), she wired approximately $500,000 to Wey's wife on or about June 8, 2011; and as described below, a company that she controls, Han Hua, received Nova Lifestyle shares based on instructions that emanated from the PREMISES in or about September 2011).  Indeed, I know from my review of bank records, transfer agent records, interviews, and

72

USAO_BW_USAO_BW_000105354

conversations with FINRA, SEC, and other law enforcement
officials that Wey has continued to communicate or engage in
transactions with many of the individuals who received 100
Smartheat shares well after NYGG-USA moved to the PREMISES in or
about May 2010.  For example, one of the W     family members
who received 100 shares of Smartheat and Deer (split-adjusted
shares as to Deer) was a man named B     W. W     .  Based on
publicly-available information available on the Internet, I have
learned that B     W. W     is a business consultant who worked
in and around Hong Kong from 2002 to 2006 and again from in or
about 2010 to the present.  On or about April 13, 2011, B     W.
W     received a $20,000 wire transfer from an HSBC-USA account
over which Wey exercises control.[13]  This transaction indicates
that Wey's financial relationship with B     W     continued
well into 2011, many months after Wey moved NYGG-USA to the
PREMISES in May 2010.  Accordingly, based on my training and
experience and participation in this investigation, there is
probable cause to believe that Wey has maintained, at the
PREMISES, documents and other evidence concerning his
relationship with B     W     and other individuals who are
connected to the Smartheat-Deer fraud scheme, including personal

_____

[13]    This account is held in the name of Wey's wife, M     W   , and
statements for the account are mailed to a post office box that Benjamin Wey
established in the name of Capital Properties, Inc. near his apartment in
Manhattan on or about June 6, 2003 (P.O. Box 663, New York, New York, 10274-
0663).  In addition, funds held in this account are routinely used to pay Wey's
credit card bills.

73

contact information, hard copy correspondence, faxes, e-mails,
text messages, telephone bills reflecting call details, and bank
statements and other records reflecting transactions with such
individuals, as described in further detail in Exhibit A.

h.  Accordingly, there is probable cause to believe
that any or all of the categories of documents described above,
as well as the categories described below in paragraph 40 and
Exhibit A to this affidavit, may currently be found at the
PREMISES.

I.  **Wey's Ongoing Use of Nominees: CleanTech and Nova Lifestyle**

36.  After moving to the PREMISES, Wey spearheaded the
reverse merger process for CleanTech, a China-based manufacturer
of wind turbine towers, and Nova Lifestyle, a China-based
manufacturer of modern home furnishings.  There is probable cause
to believe that, as in the case of Smartheat and Deer, Wey used
nominees, including his sister, T    W  , to hold shares of
CleanTech and Nova Lifestyle, and that evidence of Wey's
beneficial ownership and/or control of these shares may be found
at the PREMISES.  Part of my basis for this belief arises from my
review of records relating to the delisting of CleanTech by the
NASDAQ in 2011; this delisting was affirmed on or about July 22,
2011 by the NASDAQ Listing and Hearing Review Council, which held
that CleanTech deliberately concealed from NASDAQ listing staff
approximately 190 e-mails relating to, among other things, Wey's

74

USAO_BW_USAO_BW_000105356

role in a $20 million financing transaction.  In addition, there is probable cause to believe that Wey acted as an undisclosed control person of CleanTech while he worked at the PREMISES. With respect to CleanTech, I have reviewed trading records, transfer agent records, public filings, news reports, bank records, records provided by the SEC and the NASDAQ, and other documents, and I have spoken with SEC and NASDAQ staff members and other law enforcement officials.  From these and other sources, I have learned that:

**CleanTech**

a.  CleanTech is the product of a July 2, 2010 reverse merger between a China-based wind tower manufacturer and a Nevada shell corporation.  Wey and NYGG-USA advised CleanTech in its efforts to access U.S. capital markets, by, among other things, introducing CleanTech to U.S. law firms, investment banks, audit firms, listing exchanges, bridge lenders, suggesting potential merger and acquisition opportunities, and providing administrative assistance, according to a November 17, 2010 e-mail from CleanTech's NASDAQ listing counsel, W      U ("U      "), to NASDAQ staff members.

b.  From at least on or about November 30, 2010 up through and including on or about December 13, 2010, Wey also advised CleanTech with respect to a two-part $20 million bridge financing transaction that was funded by, among other parties,

75

USAO_BW_USAO_BW_000105357

NYGG-USA's "co-branded" affiliate, NYGG-Asia.  The first part of
the financing transaction was a $10 million loan from NYGG-Asia
to CleanTech at an interest rate of 10 percent.  (NYGG-Asia
received a transaction fee of $100,000 from CleanTech for
arranging this loan – a loan in which NYGG-Asia loaned money to
CleanTech.)  The second part was a $10 million private placement
of CleanTech shares to NYGG-Asia and four other parties: Han Hua,
Roosen Commercial Corp., Strong Growth Capital, and Wolf
Enterprises, Ltd.[14]

       c.  In the December 2010 private placement, Han Hua
received 750,000 shares of CleanTech common stock and warrants to
purchase additional shares.  Notably, stock power documents
maintained by Interwest Stock Transfer show that Han Hua is
controlled by Wey's sister, T     W  .  As described above, Wey
has a history of using T     W   as a nominee to hold shares of
Wey-advised RTO issuers such as Deer.[15]  Based in part on that
history, there is probable cause to believe that T     W  s

---

[14]    As set forth above in paragraph 18(f), as part of the September 3,
2008 distribution of Smartheat shares to round-lot shareholders, Wolf
Enterprises owned a share certificate for 300,000 shares that was cancelled at
the instruction of NYGG-USA.

[15]    Even before Wey moved NYGG-USA's offices to the PREMISES in May
2010, CleanTech issued shares to other entities that are likely nominees for
Wei because they are, or were, controlled by T     W .  Specifically, on or
about March 16, 2010, CleanTech issued 200,000 shares to York Capital
Management.  As described above, as of 2006, the President and sole owner of
York Capital Management was T     W .  In addition, on or about March 22.
2010, CleanTech issued 100,000 shares to Guo Sheng Ltd., of which T     W 
is the beneficial owner and sole signing officer.  I know this from my review
of a Guo Sheng Ltd. corporation resolution and stock power form provided to
Interwest in connection with the transfer of these 100,000 shares on or about
April 19, 2010.

USAO_BW_USAO_BW_000105358

company, Han Hua, is also a nominee for Wey, and therefore that,
after moving NYGG-USA's offices to the PREMISES in or about May
2010, Wey continued his practice of using nominees to conceal his
beneficial ownership and/or control of RTO issuer stock.

       d.   There is probable cause to believe that at least
two other investors in this $20 million financing transaction,
NYGG-Asia and Strong Growth Capital, are also nominees for Wey.
As discussed above, NYGG-Asia and Strong Growth Capital are
nominally controlled by a Chinese national named M    L .  In a
meeting with NASDAQ staff members in China in 2010, M    L
described himself as Wey's "partner" in China.[16]  Indeed, I have
reviewed transfer agent records showing that M    L is working
in concert with T    W  , including a corporate resolution of
Advantage Consultants in which T    W   as sole shareholder
and non-executive chairman of Advantage Consultants, granted
power of attorney and signatory authority to M    L with respect
to, among other things, a bank account held in Salzberg, Germany
in the name of Advantage Consultants.  In addition, I know from
my interviews of CS-1 that, in or about May and June 2011, within
NYGG-USA, Wey spoke of NYGG-Asia as though he has a financial
interest in it.  For example, on at least one occasion in or
about May 2011, CS-1 heard Wey refer to NYGG-Asia's December 2010

_____

[16]    M    L  presented NASDAQ staff with a business card that reads,
"NYGG, New York Global Group, New York-Beijing," and "Senior Managing
Director, chief China Representative of NYGG."

USAO_BW_USAO_BW_000105359

$10 million loan to CleanTech as his (Wey's) loan.  Given M
L  s likely status as Wey's nominee with respect to NYGG-Asia,
there is also probable cause to believe that M    L  also serves
as Wey's nominee through his (M    L: s) purported ownership of
Strong Growth Capital.  As described above, Strong Growth Capital
is one of the entities that sold large volumes of Deer and
Smartheat in or about 2009 at the same time the Scholander-Harris
Brokers were aggressively buying the stock for retail customers.

     e.  Part of the basis for my belief that Wey used
nominees to conceal his beneficial ownership of CleanTech stock
is the NASDAQ Listing and Hearing Review Council's July 22, 2011
finding that CleanTech "intentional[ly]" withheld documents from
NASDAQ relating to Wey's connection to CleanTech and his
involvement in this $20 million financing transaction.  I learned
from my review of this opinion and other NASDAQ records relating
to CleanTech that:

     i.  In or about July 2010, CleanTech applied to be
listed on the NASDAQ.  On or about August 28, 2010, <u>Barron's</u>
published a negative article titled "Beware This Chinese Export"
concerning Wey that mentioned his association with CleanTech.
Thereafter, NASDAQ staff asked CleanTech on several occasions to
produce all documents in its possession relating to Wey and any
of his associates or affiliates.  However, CleanTech withheld
certain documents relating to Wey, and it did not disclose the

78

pendency of the $20 million financing transaction even though it was obligated to do so under NASDAQ's rules.

      ii.  NASDAQ approved the listing of CleanTech on or about December 10, 2010.  CleanTech then closed the $20 million financing transaction on or about December 13, 2010 and announced it to the public (and the NASDAQ) for the first time on or about December 16, 2010.

      iii.  In response to this announcement, NASDAQ staff immediately requested the production of documents relating to the $20 million financing transaction.  Thereafter, CleanTech produced, for the first time, approximately 190 e-mails concerning the $20 million financing transaction and Wey's involvement in it, among other things.  In or about January 2011, NASDAQ initiated delisting proceedings based on CleanTech's failure to disclose the 190 e-mails.  On or about July 22, 2011, the NASDAQ Listing and Hearing Review Council affirmed the NASDAQ staff's delisting decision on the ground that CleanTech had "intentional[ly]" withheld documents relating to the financing transaction and Wey's involvement in it.[17]

      iv.  The fact that CleanTech deliberately

---

[17]    CleanTech's failure to produce responsive documents relating to Wey to the NASDAQ – at a time when Wey was actively advising the company – constitutes part of the Government's motivation to obtain evidence from the PREMISES by search and seizure rather than by subpoena.  Another part of this motivation arises from the highly unusual and suspicious document-retention instructions that Wey has given to the staff of NYGG-USA, as described above in paragraph 6.

USAO_BW_USAO_BW_000105361

concealed documents showing Wey's involvement in the $20 million financing transaction provides further evidence that NYGG-USA, Strong Growth Capital, and Han Hua are nominees through which Wey beneficially owned and/or controlled CleanTech stock.  Both CleanTech and Wey had every incentive, given the negative Barron's article (and other negative press) about Wey, to conceal Wey's involvement in the December 2010 financing transaction because further scrutiny of the transaction shows that Wey used nominees – NYGG-USA, Strong Growth Capital, Han Hua – to invest in it.

     f.  In addition, some of the e-mails that CleanTech intentionally withheld from the NASDAQ demonstrate Wey's undisclosed control of CleanTech through, among other things, his direct supervision of its outside counsel.  For example, on or about November 22, 2010, Wey, using his e-mail address, bwey@nygroup.com, wrote to CleanTech's outside lawyers, including W         U         , as follows:

       Subject: Cleantech Nasdaq good news

       B     , J     ,

       Nasdaq China head confirmed that as of last
       Thursday per a call apparently between Nasdaq
       China staff, M       E    [Nasdaq listing staff
       member] and the examiner, subject to the pipe
       financing related S-1 registration effectiveness,
       Nasdaq will immediately approve listing.  The S-1
       was effective last Friday, after the Nasdaq staff
       internal call.  Based on Nasdaq china staff advice
       today, pls do the following immediately:

USAO_BW_USAO_BW_000105362

1) U       : please immediately call and notify
[Nasdaq listing staff member M    ] W     by
phone or email that S-1 was effective.  Advise
them you want the first day available for listing,
regardless what the date is, confirm symbol: CTEK.
Ask Mike verbally if company wants global market,
would that be a separate application process?. . .

2) Jim: pls prepare the Nasdaq notification filing
with the SEC right away.  N       is ready to
process by wire the listing fee.  Let's get these
matters done immediately.

3) Jim: immediately start preparing listing
application for Nasdaq Global Market for
management to sign.  You should send that Global
Market application into M    W     the first day
[of] trading on Nasdaq capital market.  We have
reviewed and confirmed the company already
qualifies for Global Market.  Stop all work on
[listing application to] nyse.

Please confirm the above.

Ben

Shortly thereafter, U       responded to Wey (at the e-mail

address "bwey@nygroup.com") as follows:

Attorney-Client Privileged

Confirmed!

Bill

U       s use of "Attorney-Client Privileged" is noteworthy

because it shows that U       , a sophisticated securities lawyer

who represented CleanTech, viewed Wey as a controlling principal

of CleanTech – his client – when in fact, as a formal matter, Wey

and NYGG-USA were merely consultants to CleanTech, and do not

USAO_BW_USAO_BW_000105363

appear to have an attorney-client relationship with U          .[18]
However, CleanTech's public filings have never disclosed Wey as a
control person of the company, de facto or otherwise. I believe
that CleanTech did not wish to do so because of negative
publicity concerning Wey in the press, including the Barron's
article of August 28, 2010 cited above, as well as other
articles, including "Cashing In Wei Out: Chinese Insiders Dump
Stock Before Promoter Axed," New York Post, October 9, 2006
relating to Bodisen Biotech; and "What's in a Name? [] The
Curious Past of an Adviser to Emerging Chinese Companies,"
MarketWatch, September 29, 2006, also relating to Bodisen
Biotech. The precise nature of Wey's relationship to CleanTech
is one of the subjects of my investigation; the nature of their
relationship will be informed by any records reflecting his
involvement in, or communication with, CleanTech that may be
found on the PREMISES. There is probable cause to believe that
such records are maintained at the PREMISES because as recently
as June 30, 2011, on NYGG-USA letterhead addressed from the
PREMISES, Wey submitted a letter to the NASDAQ concerning his
relationship with CleanTech.[19]

---

[18]    U        wrote emails to Wey labeled "Attorney-Client Privileged"
on at least three other occasions on or about August 21 and October 25, 2010.

[19]    As recently as December 20, 2011, CleanTech escalated its dispute
with the NASDAQ by filing a civil action in New York State Supreme Court
alleging that NASDAQ's delisting of CleanTech was based on anti-Chinese
animus.

USAO_BW_USAO_BW_000105364

g.  Wey's status as an undisclosed control person of CleanTech is corroborated by information that I learned from CS-1, the former NYGG-USA employee.  CS-1 advised me that, in or about May 2011, Wey instructed him to prepare a financial model for CleanTech in advance of a presentation to the Toronto Stock Exchange.  To prepare the model, CS-1 requested revenue forecasts, among other things, directly from CleanTech's management.  In response, CleanTech's management provided non-public revenue forecast figures for 2012, including a projected figure of $61 million for a certain category of revenue.  After CS-1 completed the model, CS-1 submitted it to Wey for his review.  After reviewing it, Wey instructed CS-1 to inflate this revenue forecast figure to $85 million and advised CS-1 that CleanTech management would approve the change.[20]  Because this incident shows that Wey is willing to alter financial figures provided by a company's management before checking with management, it provides further basis to believe that, while working from the PREMISES in 2011, Wey has exercised undisclosed control of CleanTech, and that he engages in securities fraud. Just as "BEN WEI EXERTED HIS INFLUENCE IN (the past) VARIOUS WAYS ON HOW AGFEED WOULD REPORT INFORMATION" in or about 2008 and 2009 (see paragraph 31(c)(v) above), he continued to exert similar

---

[20]    CS-1 confronted Wey about this change, and Wey said that he was "not doing anything wrong" and that NYGG-USA "operates in the confines of the law."

83

USAO_BW_USAO_BW_000105365

influence over CleanTech well into 2011.

g.   As in the case of Smartheat and Deer, at the same time Wey controlled substantial quantities of CleanTech through these nominees, the Scholander-Harris brokers actively traded in CleanTech stock on behalf of their retail customers.  The following chart shows that, over a six-month period in 2010, trading in CleanTech by the Scholander-Harris brokers represented a significant percentage of the total trading volume in CleanTech stock:

| Month | Approximate Percentage of CleanTech total volume traded through Scholander-Harris Brokers |
|---|---|
| July 2010 | 28.5 |
| August 2010 | 52.8 |
| September 2010 | 56 |
| October 2010 | 62.8 |
| November 2010 | 47.5 |
| December 2010 | 49.2 |

### Nova Lifestyle

37.   There is probable cause to believe that Wey's ongoing use of nominees to conceal his ownership of RTO issuer shares has continued through September 2011 - this time with respect to Nova Lifestyle - long after NYGG-USA moved to the PREMISES.  With respect to Nova Lifestyle, I have reviewed trading records, transfer agent records, public filings, news reports, bank records, records provided by the SEC and the NASDAQ, and other

84

USAO_BW_USAO_BW_000105366

documents, and I have spoken with SEC and NASDAQ staff members, and other law enforcement officials.  From these and other sources, I have learned that:

a.  Wey spearheaded Nova Lifestyle's reverse merger, which closed on or about June 30, 2011.

b.  Records provided by Nova Lifestyle's transfer agent, Interwest Stock Transfer, show that on or about July 8, 2011 Nova Lifestyle issued approximately 49,400 shares to Guo Sheng Ltd.  T     W   is the beneficial owner and sole signing officer of G  S .  Indeed, T:     W   signed a stock power document with respect to these shares on or about July 21, 2011.

c.  Records from Interwest also show that, on or about September 15, 2011, Nova Lifestyle issued approximately 625,000 shares to Han Hua, which is also controlled by T      W   as described above.  Based on Federal Express records and Interwest records, there is probable cause to believe that the instructions to issue these shares to Han Hua were sent to Interwest on or about September 8, 2011 from NYGG-USA's offices at the PREMISES (under the name "R      N:      , NYG Capital LLC, 40 Wall Street, FL 38, New York, New York").  As described above in paragraph 35(a), this instruction package included a computer-generated instruction sheet that was similar in content and format to the first page of NYGG-USA's instructions sent to Interwest with respect to Deer on or about April 7, 2009.  The continued use of

85

computer-generated instruction sheets in connection with a scheme to hide Wey's ownership of shares through nominees through in or about September 2011 suggests that NYGG-USA currently uses one or more computers at the PREMISES in furtherance of the scheme.

d.  On or about October 26, 2011, Interwest transferred Han Hua's shares to street name based on T    W  s instruction in her capacity as a signatory for Han Hua.  T    W  s signature on this stock power for the 625,000 shares was signature guaranteed at the Credit Suisse Singapore branch on or about September 22, 2011.  Based on the Han Hua transactions in or about September and October 2011, as well as the $500,000 transfer from T    W  to M    W  in or about June 2011 (see paragraph 29(h) of this affidavit), there is probable cause to believe that the PREMISES presently contain contact information or other documents relating to T    W  , including evidence of recent communication between Wey and T    W  .

e.  CS-1 and CS-2, the former and current NYGG-USA employees respectively, provided information to me suggesting that, at least in or about May and June 2011, Wey acted as an undisclosed control person of Nova Lifestyle.  At or about that time, Wey advised CS-1 and CS-2 that NYGG-USA was arranging a secondary offering of Nova Lifestyle stock, 50 percent of which would be sold to institutional investors, and 50 percent of which would be sold to retail customers through the Scholander-Harris

86

Brokers.   In connection with this prospective offering, Wey asked CS-1 and CS-2 to reach out to their contacts at investment banks to solicit purchases of Nova Lifestyle stock.   On various occasions in or about May and June 2011, CS-1 advised Wey that NYGG-USA employees could not solicit the purchase or sale of a security in this manner because NYGG-USA was not a registered broker-dealer.   CS-1 raised other concerns to Wey about NYGG-USA's business practices.   In or about June 2011, Wey fired CS-1 from NYGG-USA.   At that time, Wey took back from CS-1 the flash drive on which Wey had instructed CS-1 to store electronic documents in lieu of storing them on the hard drive of CS-1's computer.   The fact that Wey gave instructions in 2011 to his staff showing that he wished for NYGG-USA to act as an unregistered broker-dealer with respect to this private placement provides further basis to believe that Wey continues to engage in securities fraud at the PREMISES.

38.   There probable cause to believe that the PREMISES currently contain evidence of Wey's use of nominees to conceal his ownership in CleanTech and Nova Lifestyle.   As discussed above in relation to the Smartheat-Deer fraud and market manipulation scheme, there are several reasons why Wey and NYGG-USA would be likely to retain records for several years reflecting NYGG's business operations.   Many of those reasons — such as the tendency of individuals engaged in fraud schemes to

USAO_BW_USAO_BW_000105369

maintain the contact information of, and correspondence with, their associates – apply with even greater force to CleanTech and Nova Lifestyle because the CleanTech and Nova Lifestyle nominee transactions described above occurred when NYGG-USA occupied the PREMISES.  Moreover, the fact that Wey continued to use nominees to conceal his ownership and/or control of CleanTech and Nova Lifestyle shares in 2010 and 2011 indicates that Wey is continuing to follow the modus operandi that he adopted with respect to Smartheat, Deer, and AgFeed, and that nominee transactions relating to each of these four issuers – the latest of which occurred in September 2011 – are part of the same ongoing scheme.  Indeed, nominee entities associated with Wey owned, at various times, at least the following approximate number of shares of the following Wey-assisted issuers:

| | Smartheat | Deer | CleanTech | Nova Lifestyle |
|---|---|---|---|---|
| York Capital Management | 220,100 | 530,000 | 200,000 | |
| Strong Growth Capital | 850,000 | 1,000,000 | 750,000 | |
| Wolf Enterprises, Ltd. | 300,000 | 500,000 | 750,000 | |
| Guo Sheng, Ltd. | | 351,610 | 100,000 | 49,400 |
| Han Hua, Ltd. | | 500,000 | 750,000 | 625,000 |

The existence of an ongoing scheme makes it even more likely that Wey brought Smartheat, Deer, and/or AgFeed records with him when he moved the offices of NYGG-USA from 14 Wall Street to the PREMISES in May 2010, and that those documents remain at the PREMISES to this day.

USAO_BW_USAO_BW_000105370

## IV.   MATERIALS TO BE SEARCHED AND SEIZED

39.   For the reasons set forth above, I submit that there is probable cause to believe that the PREMISES contains fruits, instrumentalities, and evidence related to the above described violations of federal law.

## A.   Categories of Records

40.   Based upon the facts set forth above, as well as my training and experience, I know that individuals involved in securities fraud and market manipulation schemes frequently maintain in their possession or within their places of business, for substantial periods of time, the following sorts of materials which evidence the operation of such schemes:

a.   Financial records, including banking and brokerage firm account statements, checks, and transaction records, wire transfer instructions and similar documents concerning or reflecting movements of funds, account and account holder information, check numbers, account numbers and Federal Reserve routing numbers;

b.   Personal financial records of individuals associated with NYGG-USA or a related entity, including banking and brokerage firm account statements, checks, and transaction records, wire transfer instructions and similar documents concerning or reflecting movements of funds, account and account holder information, check numbers, account numbers and Federal

89

USAO_BW_USAO_BW_000105371

Reserve routing numbers;

       c.  Telephone bills, telephone message pads, notes, memoranda and other records of internal and external communications;

       d.  Correspondence, audio tapes, and video tapes;

       e.  Hotel, airline and credit card receipts reflecting the dates and locations of meetings or travel to meetings;

       f.  Photographs, address books, Rolodexes, diaries, income tax returns and calendars;

       g.  Marketing materials, including offering materials, private placement memoranda, sales scripts, investor "lead" lists, investment agreements, financial statements, and other documents concerning, relating to, or describing securities used to entice potential buyers of securities;

       h.  Documents identifying owners of securities, including transfer agent records, stock certificates, investor lists, investor files, investment subscription agreements, copies of checks received from or sent to investors, copies of account statements sent to investors, copies of correspondence sent to and received from investors, Federal Express, DHL or other records reflecting mailings by private commercial carriers and the U.S. Postal Service, and other documents concerning or reflecting the identities and participation of investors in such schemes;

90

i.   Documents reflecting the ownership of properties that were purchased with the proceeds of the fraud, including but not limited to houses, apartments, cars, and jewelry, including purchase and sale agreements, deeds, mortgage documents, and other real estate closing documents;

j.   Identification documents and other documents which may reflect the identities of persons affiliated with the entities involved in the fraudulent scheme;

k.   Corporate documents reflecting the ownership, structure, and relationships among the entities involved in the fraudulent scheme, including incorporation documents, inter-company agreements, lists of partners and stockholders, organizational charts, and corporate resolutions and bylaws; and

l.   As described in further detail below, computers, flash drives, internal and external hard drives, compact discs, diskettes and other magnetic storage media, and files, data and information contained thereon, used to store names, telephone numbers and addresses, and other information, including but not limited to personal digital assistants such as iPhones, iPads, Blackberrys, smartphones, and cellphones, as well as drafts and final versions of documents and correspondence.[21]

41.  Based upon my training and experience I also know that

---

[21]    Assuming computers are found at THE PREMISES, the FBI plans to follow the methodology described in Exhibit C to this affidavit in connection with their search.

91

individuals involved in securities fraud and market manipulation schemes frequently maintain custody of documents and records of the sort described above, within closed and/or locked cabinets, briefcases and other containers kept within their places of business, as well as upon their persons.

**B.    Names of Relevant Individuals and Entities**

42.    Based on the facts set forth in this affidavit, there is probable cause to believe that one or more the categories of records described in paragraphs 35 and 40 and Exhibit A to this affidavit at the PREMISES will contain information relating to one or more of the following individuals and entities described in this affidavit, such as NYGG-USA, Wey, T    W  , and others listed in Exhibit B, which is incorporated by reference herein. In other words, I am seeking authorization to search the entirety of the PREMISES, for the categories of records described in paragraphs 35, 40, and Exhibit A that relate to the individuals and entities described in Exhibit B.

**C.    Searches and Seizures of Computer Systems**

43.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost.  Even when such files have been deleted, they can be

92

recovered months or years later using readily-available forensics
tools.  When a person "deletes" a file on a desktop computer, the
data contained in the file does not actually disappear; rather,
that data remains on the hard drive until it is overwritten by
new data.  Therefore, deleted files, or remnants of deleted
files, may reside in free space or slack space - that is, in
space on the hard drive that is not allocated to an active file
or that is unused after a file has been allocated to a set block
of storage space - for long periods of time before they are
overwritten.  In addition, a computer's operating system may also
keep a record of deleted data in a "swap" or "recovery" file.
Similarly, files that have been viewed via the Internet are
automatically downloaded into a temporary Internet directory or
"cache."  The browser typically maintains a fixed amount of hard
drive space devoted to these files, and the files are only
overwritten as they are replaced with more recently viewed
Internet pages.  Thus, the ability to retrieve residue of an
electronic file from a hard drive depends less on when the file
was downloaded or viewed than on a particular user's operating
system, storage capacity, and computer habits.  Thus,
notwithstanding Wey's instructions to his staff that they delete
electronic files from their hard drive and store relevant files
only on their flash drives, deleted electronic files may still
exist on individual desktop computers and/or any computer server

USAO_BW_USAO_BW_000105375

that may be in use.  In addition, the insertion of a flash drive itself results in a unique log entry on a desktop computer that identifies the specific flash drive that was inserted, and the use of a flash drive to house an e-mail program may leave residue on a hard drive.

44.  Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including internal and external hard disk drives, flash drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.  Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.  Searching computer systems requires the use of

94

USAO_BW_USAO_BW_000105376

precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

      c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high. Further, a 160 GB drive could contain as many as

USAO_BW_USAO_BW_000105377

approximately 150 full run movies or 150,000 songs.

d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

45.   In light of these concerns, I hereby request the Court's permission to search, copy, image and seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the image or hardware for the evidence described, in the manner described in Exhibit C to this

96

USAO_BW_USAO_BW_000105378

affidavit.

## V.   CONCLUSION

46.   Based upon the foregoing, I respectfully submit that there is probable cause to believe that there are currently concealed within the PREMISES, the records and articles described in paragraphs 35 and 40 and Exhibit A.   Moreover, there is probable cause to believe that the items described in paragraphs 35 and 40 and Exhibit A constitute evidence of securities fraud and wire fraud, in violation of Title 15, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18 United States Code, §§ 1341, 1343 and 1346, among other crimes.

47.   Based upon all of the foregoing, I respectfully request that a warrant be issued for the search of the PREMISES as set forth above, as further set forth in Exhibits A, B, and C to this Affidavit.

MATTHEW KOMAR
Special Agent
Federal Bureau of Investigation

Sworn to before me this
24th day of January 2012

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

97

USAO_BW_USAO_BW_000105379

## EXHIBIT A

PROPERTY TO BE SEIZED AT THE PREMISES KNOWN AND DESCRIBED AS THE OFFICE OF NEW YORK GLOBAL GROUP, INC. ("NYGG-USA") AT 40 WALL STREET, 38TH FLOOR, SUITE 3800, NEW YORK, NEW YORK, and any closed or locked cabinets, briefcases, and other containers kept therein, including computers and electronic storage devices, excluding the individual office of James Baxter, Esq. (collectively, "the PREMISES"):

1.    Financial records concerning the individuals and entities listed in Exhibit B, which is incorporated by reference herein, including banking and brokerage firm account statements, checks, and transaction records, wire transfer instructions and similar documents concerning or reflecting movements of funds, account and account holder information, check numbers, account numbers and Federal Reserve routing numbers;

2.    Personal financial records of any individuals named in Exhibit B or of any employees, agents, or shareholders of any of the entities listed in Exhibit B, including banking and brokerage firm account statements, checks, and transaction records, wire transfer instructions and similar documents concerning or reflecting movements of funds, account and account holder information, check numbers, account numbers and Federal Reserve routing numbers;

3.    Telephone bills, telephone message pads, notes, memoranda and other records of internal and external communications between, among, or relating to any of the individuals and entities listed in Exhibit B;

4.    Correspondence, audio tapes, and video tapes concerning any of the individuals and entities listed in Exhibit B;

5.    Hotel, airline and credit card receipts reflecting the dates and locations of meetings or travel to meetings concerning any of the individuals and entities listed in Exhibit B;

6.    Photographs, address books, Rolodexes, diaries, income tax returns and calendars concerning the operations and management of any of the individuals and entities listed in Exhibit B;

7.    Computers, flash drives, internal and external hard drives, diskettes and other magnetic storage media, and files, data and information contained thereon, used to store names, telephone numbers and addresses, and other information, including

1

but not limited to personal digital assistants such as iPhones, iPads, Blackberrys, smartphones, and cellphones; as well as drafts and final versions of documents and correspondence, used by, or used in connection with the individuals and entities listed in Exhibit B.  If computers, computer-related equipment, and other electronic devices are found on the PREMISES, the FBI will employ the methodology set forth in Exhibit C, which is incorporated by reference herein, with respect to their search;

8.   Marketing materials relating to any of the individuals and entities listed in Exhibit B, including offering materials, private placement memoranda, sales scripts, investor "lead" lists, investment agreements, financial statements, and other documents concerning, relating to, the purchase or sale of securities;

9.   Documents identifying shareholders or investors in the entities listed in Exhibit B, including transfer agent records, stock certificates, investor lists, investor files, investment subscription agreements, copies of checks received from or sent to investors, copies of account statements sent to investors, copies of correspondence sent to and received from investors, Federal Express, DHL or other records reflecting mailings by private commercial carriers and the U.S. Postal Service, and other documents concerning or reflecting the identities and participation of investors in such schemes;

10.   Documents reflecting the ownership by the individuals and entities listed in Exhibit B of real properties and personal property purchased with the proceeds of fraud, including but not limited to houses, apartments, cars, boats, and jewelry, including purchase and sale agreements, deeds, mortgage documents, and other real estate or other property closing documents;

11.   Identification documents and other documents which may reflect the identities of persons listed in Exhibit B or persons affiliated with the entities listed in Exhibit B; and

12.   Corporate documents reflecting the ownership or structure of, or relationship between and among, any of the entities listed in Exhibit B, including incorporation documents, inter-company agreements, lists of partners and stockholders, organizational charts, and corporate resolutions and bylaws.

2

USAO_BW_USAO_BW_000105381

**EXHIBIT B**

**INDIVIDUALS AND ENTITIES**

New York Global Group, Inc. ("NYGG-USA"),
a/k/a New York Global Capital

Benjamin Wey, a/k/a Benjamin Wei,
a/k/a Tianbing WEI, a/k/a WEI Tianbing

T        W   , a/k/a T     Y   W   , a/k/a S      W   , a/k/a W    T     Y

Y        W   , a/k/a W   Y

M          W   _ , a/k/a M       W   , a/k/a M        P

M      P     , a/k/a M       F

Bodisen Biotech, Inc.

AgFeed Industries, Inc.

Smartheat, Inc., f/d/b/a Pacific Goldrim Resources

J     J   W

Deer Consumer Products, Inc., f/d/b/a Tag Events Corporation

Y     H

CleanTech Innovations, Inc., f/d/b/a Everton Capital Corp.

Bei Lu, a/k/a Lu Bei

Nova Lifestyle, Inc.

Capital Properties, Inc.

P.O. Box 663, New York, New York, 10274-0663

Guo Sheng, Ltd.

Strong Growth Capital, Ltd.

York Capital Management, Ltd.

Han Hua, Ltd.

1

Wolf Enterprises, Ltd.

Advantage Consultants, Ltd.

Finchley International Investments

M    L , a/k/a M    L , a/k/a L  M

New York Global Group (Asia), Ltd.

Tianjin NYGC Investment Consulting Co., Ltd.

Y    H , a/k/a H  Y

Zl    C , a/k/a C    Z

W    J , a/k/a J    W

S    N    H , a/k/a N    H  S

D    X , a/k/a X   D

Y    X    Y , a/k/a X   Y   Y

L   Y , a/k/a Y    L

Seaboard Securities, Inc.

A        D

A        )           ,

First Merger Capital, Inc.

First Merger Capital (Delaware), Inc.

W        S

T        H

G    D

M        G

A            V

S        M. B

2

G       L. C

A       C

S         C

F       D

M         D

ᴊ       C. F

V         F

J       B. G

B       H

E       J

S       A. J

A       K

B       K

W         M

M       L. M

E         M

A         N

J       R. O

T       R

M       R

D         S

N         S

J       J. S

L       T

3

C        V

F        V

RRZ Management

R        Z

R        S

I    N

Interwest Stock Transfer

H        W        , a/k/a "J    W

K        W

B        W

G        W

I    W

N        W

F            I. W

D        W

F        W

A            W

S        W

K        W

J        W

R        N

E        N

A        S

S        S

4

USAO_BW_USAO_BW_000105385

E          (L  ) S

B       S

S       S

J          A

A       A

N       A

P          A

K    V

T          F

R       S

I       M

T       H

K       H

M          H

S    U

L    U

N     U

C          U

J    C

B    C

K    C

C    C

D    J

W    J

5

USAO_BW_USAO_BW_000105386

A          D      J

L          A

J      A

Ka       R        D

S      D

He      P

N      F

J      B

N      N

E          (E      ) N

J          N

K      N

G      V

A      V

J      S

C          S

P          B

M      F

M      F

T      R

Jc      V

C      V

A      _   V

W      U

6

USAO_BW_USAO_BW_000105387

M    U

F    R

A       R

R    :  R

J          R

B       D

G       D

M       A

Y   Z

J    S

K       H

E       K

E    .  K

L  .  Y

W       Y

W   N

H    B

Z    G

B    W

W    Y

D    W

S    H

L    J

E       M

7

Q          L

W                    Z

W          Y

S               F

M               K

J    G

Ba          M

Ke     P

J          G

Z     P

Ai    C

G      C

P      G

A          I

F      Q

R               J

J          R

N     R

M          R

D          R

J          R

J     W

M     A     W

A          M

8

R        B

E        S

H        A

R        E

D        M

S            M

S        M

C        A

L    X

J        H

Harban Capital

G    M

J        N

J    S

P    S

C    S

N    S

R    S

V        C

C    C

T        C

F        C

O    G

L    T

9

J          H

B          C

Q          M

V          E

G          E

D          E

E          G

10

USAO_BW_USAO_BW_000105391

EXHIBIT C

## METHODS TO BE USED TO SEIZE AND SEARCH
## COMPUTERS AND COMPUTER-RELATED EQUIPMENT

1.    In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Upon securing THE PREMISES, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items contain contraband and whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.    If the computer equipment and storage devices cannot be searched on-site within a reasonable amount of time and without jeopardizing the ability to preserve the data, and if the computer equipment and storage devices do not contain contraband, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data.

c.    If the computer personnel determine that these items contain contraband, or that it is not practical to perform an on-site search or make an on-site copy of the data, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d.    The analysis of electronically stored data, whether performed on-site or in a separate, controlled environment, may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to

1

USAO_BW_USAO_BW_000105392

discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

2.   Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above.

3.   In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.   In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.[1]

4.   If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items, upon request, within a reasonable period of time.

5.   In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

a.   Any computer equipment and storage device capable of being used to commit, further or store evidence of the offenses listed above;

b.   Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

---

[1]   Agents will have procedures in place to segregate any potentially privileged materials or files.

2

c.    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, flash drives, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.    Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

3

**SEALING ORDER** 12 MAG 0182

David B. Massey affirms as follows:

1.      I am an Assistant United States Attorney in the Office of Preet Bharara, United States Attorney for the Southern District of New York, and, as such, I am familiar with this matter and the instant application.

2.      In light of the confidential nature of the continuing criminal investigation, the Government respectfully requests that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, in order to avoid premature disclosure of the investigation which could inform potential criminal targets of law enforcement interest, resulting in their flight from justice and/or the destruction of evidence, except that the Government may without further Order of this Court provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and may disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated:      New York, New York
            January 23, 2011

                            PREET BHARARA
                            United States Attorney
                            Southern District of New York

                    By:     _David B. Massey_____
                            David B. Massey
                            Assistant United States Attorney
                            Southern District of New York

SO ORDERED: _1/24/12_

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

USAO_BW_USAO_BW_000105395