USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JAN 18 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

United States of America,

    -v-                                                                                    15-cr-611 (AJN)

Benjamin Wey,                                                                    OPINION & ORDER
               Defendant.

-------------------------------------------------------------------- X

ALISON J. NATHAN, District Judge:

      Before the Court are several pretrial motions filed by Defendant Benjamin Wey. Wey

seeks dismissal of all charges pending against him, a bill of particulars pursuant to Federal Rule

of Criminal Procedure 7(f), immediate disclosure and identification of *Brady* and *Giglio*

material, leave to depose co-Defendant Seref Dogan Erbek under Federal Rule of Criminal Rule

15(a), and removal from the indictment of references to Wey's alleged aliases.[1] For the reasons

set forth below, the Court resolves these motions as follows: the motion to dismiss is DENIED in

full; the motion for a bill of particulars is GRANTED in limited in part and otherwise DENIED;

the motion for immediate disclosure of *Brady/Giglio* material is DENIED; the motion for leave

to depose Erbek is GRANTED; and the motion to strike surplusage from the indictment is

DENIED.[2]

---

[1] Wey has also moved on various grounds to suppress evidence seized during Government searches of his residence and the offices of his consulting firm and to preclude the Government from conducting a review of certain potentially privileged documents identified among the seized material. The Court has scheduled a hearing to address several issues raised by these motions, *see* Dkt. No. 69, and will resolve them by separate order.

[2] Wey originally also sought an order requiring the Government to promptly disclose the documents on which it will rely at trial and to disclose its witness list and Jenks Act, 18 U.S.C. § 3500, material by a date certain. On reply, however, Wey advises the Court that the parties have reached agreement as to the timing of these disclosures and, accordingly, expressly withdraws the relevant motions. *See* Reply Memorandum of Law in Further Support of Defendant Benjamin Wey's First Discovery Motion, Dkt. No. 49, at 1 n.1.

I.      **Background**

Wey is charged in an eight-count indictment returned on September 8, 2015.  Dkt.  No. 2 (the "Indictment").  The Indictment alleges that between approximately 2007 and 2011 Wey, along with co-Defendant Seref Dogan Erbek (who remains at large) and unindicted co-conspirators known and unknown, orchestrated a scheme whereby Wey – through various non-party entities, family members, and associates (the "Nominees") – covertly amassed beneficial ownership of substantial portions of the equity stock of certain publicly traded companies (the "Issuers"), manipulated the market price of the Issuers' stock, liquidated his holdings at artificially inflated prices, and then laundered millions of dollars in ill-gotten proceeds.  *See, e.g.*, Indictment ¶¶ 7, 13, 18-22.

Specifically, according to the Indictment, Wey secretly caused the Nominees to acquire, on his behalf, substantial portions of the shares of certain U.S.-based over-the-counter-traded shell companies and then, through his consulting firm New York Global Group, Inc. ("NYGG") and its alleged affiliate in Beijing, China, facilitated so-called "reverse merger" transactions by which China-based operating companies merged into those shell companies, thus forming new publicly traded corporations – the Issuers.  *Id.* ¶¶ 8-12.  The Government alleges that the Nominees acquired and retained, for Wey's benefit, stock in the Issuers by virtue of their ownership of the target shell companies, and that these holdings together constituted more than five percent of the Issuers' outstanding shares.  *Id.* ¶¶ 7, 13.  Because Wey, among other things, purportedly exercised investment authority over the shares held by the Nominees, he was required to disclose his beneficial ownership under Section 13(d) of the Securities Exchange Act of 1934 and Rule 13d-1 promulgated thereunder within ten days of the acquisition of shares in excess of five percent.  *Id.* ¶ 13.  The Government alleges that Wey was "well aware" of this

reporting requirement but intentionally failed to file the required disclosures in order to conceal his ownership from the investing public. *Id.* ¶ 14. Moreover, the Indictment asserts, Wey purposefully caused the Nominees' holdings to be structured such that no individual Nominee ever held more than five percent of the stock of any given Issuer, thus avoiding triggering Rule 13d-1's disclosure mandate. Wey enlisted the assistance of Erbek on this front, the Government alleges, instructing him to allocate Issuer shares among the Nominees to avoid any one of them accumulating sufficient stock to incur a reporting obligation. *Id.* The Government maintains that as a result of these efforts, and with the stock held by the Issuers' management subject to lockup agreements preventing disposition, Wey at times effectively controlled – through the Nominees – a "substantial portion of a given Issuer's public stock float" unbeknownst to the investing public. *Id.* ¶¶ 11-14.

Wey also, according to the Indictment, caused several of the Issuers, including SmartHeat, Inc. ("SmartHeat"), Deer Consumer Products, Inc. ("Deer"), and CleanTech Innovations, Inc. ("CleanTech"), to apply for listings on the NASDAQ. *Id.* ¶ 15. In order to secure approval of these applications, Wey allegedly engaged in deception to artificially satisfy NASDAQ's so-called "round-lot" shareholder requirement – i.e., the requirement that every listed issuer has at least 300 shareholders each owning 100 or more shares of common stock. *Id.* ¶¶ 16-17. In particular, Wey purportedly facilitated deceptive transfers of shares of Issuer stock from Nominees to other Wey confederates, as well as issuances of round-lot blocks of shares in the names of individuals who never actually received such shares or were otherwise unaware of their ownership. *Id.* ¶¶ 15-17.

After successfully getting the Issuers listed on NASDAQ, the Government alleges, Wey proceeded to manipulate the demand for and price of Issuer stock. This was purportedly

accomplished by, among other things: (i) causing two Manhattan-based retail brokers to solicit their customers to purchase common stock of the Issuers, often on margin, while at the same time actively discouraging the sale of such stock; (ii) instructing Erbek to maintain the share prices of certain Issuers' stock held in various Nominees' accounts; and (iii) facilitating match trades in the Issuers' stock involving Nominees and/or other Wey confederates. *Id.* ¶¶ 18-19.

Contemporaneous with this market manipulation scheme, the Government alleges, Wey caused certain Nominees to sell shares of the Issuers' stock at artificially inflated prices. *Id.* ¶ 20. Wey then purportedly laundered the proceeds of these sales by causing them to be transferred from accounts located in the U.S. to Nominees' accounts located overseas, including in Switzerland and Hong Kong, before being repatriated back to the U.S. and into accounts controlled by Wey and his wife or otherwise held for Wey's benefit. *Id.* ¶¶ 20-22. At least some of these transfers were allegedly reported on tax returns filed in the name of Wey's wife as non-taxable gifts from foreign persons. *Id.* ¶ 22.

Wey is charged with one count of conspiracy to commit securities fraud and wire fraud under 18 U.S.C. § 371 ("Count One"); one count of securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5 ("Count Two"); one count of securities fraud under 18 U.S.C. § 1348 ("Count Three"); one count of wire fraud under 18 U.S.C. § 1343 ("Count Four"); two counts – concerning Deer and CleanTech stock, respectively – of failure to disclose ownership in excess of five percent of a covered class of equity securities under Section 13(d) of the Exchange Act and Rule 13d-1, 15 U.S.C. §§ 78m(d) & 78ff, 17 C.F.R. § 240.13d-1 (as to Deer, "Count 5," and as to CleanTech, "Count 6"); one count of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) ("Count 7"); and one count of money laundering under 18 U.S.C. § 1956(a)(2)(A) ("Count 8").

*See* Indictment ¶¶ 23-40.

## II.     Discussion

### A.     Dismissal

Wey seeks dismissal of the charges against him on several grounds. First, he contends that the conspiracy, securities fraud, wire fraud, and money laundering counts are impermissibly duplicitous. Second, he argues that, for various reasons, all counts fail to sufficiently allege offenses. And third, he urges that the nearly four-year gap between the Government's searches of Wey's residence and offices and the return of the Indictment constitutes prejudicial pre-indictment delay in violation of the Due Process Clause of the Fifth Amendment. The Court will address each argument in turn.

### 1.     Counts 1-4, 7, and 8 Are Not Duplicitous

Wey first argues that the conspiracy, securities fraud, wire fraud, and money laundering charges are duplicitous because each individual count actually contains multiple offenses.[3] In essence, Wey's position is that because the "the Government's case involves the alleged market manipulation of three separate securities" – SmartHeat, Deer, and CleanTech – it cannot charge any given offense (for example, securities fraud) in a single aggregate count that purports to cover all of the allegedly illegal conduct. Dismissal Br. at 64-66. Instead, Wey maintains, if the Government intends to implicate multiple securities, then it must charge multiple corresponding counts of any given offense (for example, three separate counts of securities fraud covering SmartHeat, Deer, and CleanTech, respectively). *Id.* The Court is not persuaded.

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of [Federal Rule of Criminal Procedure] 8(a)'s

---

[3] *See* Memorandum of Law in Support of Defendant Benjamin Wey's Motion to Suppress, to Dismiss the Indictment, and For Other Relief, Dkt. No. 45 ("Dismissal Br."), at 5, 63-66.

requirement that there be a separate count for each offense, and 2) the defendant is prejudiced

thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (internal quotation marks

omitted). The Court of Appeals has long recognized that for the doctrine of duplicity "'to be

more than an exercise in mere formalism, it must be invoked only when an indictment affects the

policy considerations' that underlie that doctrine." *United States v. Margiotta*, 646 F.2d 729,

732-33 (2d Cir. 1981), *cert. denied*, 461 U.S. 913 (1983) (quoting *United States v. Murray*, 618

F.2d 892, 897 (2d Cir. 1980)). These policy considerations include:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding
> of guilty as to one crime and a finding of not guilty as to another, avoiding the
> risk that the jurors may not have been unanimous as to any one of the crimes
> charged, assuring the defendant adequate notice, providing the basis for
> appropriate sentencing, and protecting against double jeopardy in a subsequent
> prosecution.

*Margiotta*, 646 F.2d at 733.

"A conspiracy indictment," of the sort at issue here, "presents 'unique issues' in

the duplicity analysis because 'a single agreement may encompass multiple illegal

objects.'" *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) (quoting *Murray*,

618 F.2d at 896). "As a result, an indictment is not duplicitous merely because it alleges

a conspiracy to commit multiple crimes." *United States v. Berger*, 22 F. Supp. 2d 145,

150 (S.D.N.Y. 1998); *see also Aracri*, 968 F.2d at 1518 ("In this Circuit, it is well

established that the allegation in a single count of a conspiracy to commit several crimes

is not duplicitous, for the conspiracy is the crime and that is one, however diverse its

objects.") (internal quotation marks and brackets omitted). Along similar lines, "acts that

could be charged as separate counts of an indictment may instead be charged in a single

count if those acts could be characterized as part of a single continuing scheme." *United*

*States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989), *cert. denied*, 493 U.S. 1081 (1990).

Indeed, "[a]s long as the essence of the alleged crime is carrying out a single scheme to defraud, then aggregation is permissible." *Id.* In general, "[w]hether the government has proven the existence of the conspiracy charged in the indictment . . . or, instead, has proven several independent conspiracies is a question of fact for a properly instructed jury." *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995).

In light of these principles, the Court is satisfied that the Counts 1-4, 7, and 8 are not impermissibly duplicitous. While the offenses charged may have targeted the securities of three distinct issuers, they are, as alleged by the Government, unmistakably part of and in furtherance of a single overarching scheme by Wey to amass substantial, undisclosed equity ownership of publicly traded companies and then manipulate the price of those companies' securities to his own economic benefit. *See, e.g., United States v. Rigas*, 281 F. Supp. 2d 660, 664-65 (S.D.N.Y. 2003) ("the pursuit of multiple illegal objects does not automatically divide a single conspiracy into multiple conspiracies"). Indeed, the Indictment alleges that Wey obtained beneficial ownership of the three Issuers, sought to inflate and support their stock prices, and then liquidated his positions and laundered his gains all through a "pattern" of substantially "similar and interwoven contrivances" and across roughly the same period of time. *See Berger*, 22 F. Supp. 2d at 151-52 (finding no duplicity despite allegations that defendants conspired to defraud multiple different federal agencies because indictment "sufficiently charge[d] defendants with a single integrated and continuing conspiracy").

For example, Wey allegedly pursued these objectives with respect to all three Issuers by discreetly arranging (often through Erbek) for the Nominees to acquire blocks of stock in over-the-counter-traded U.S.-based shell companies, orchestrating reverse

mergers by which Chinese operating companies acquired these shell companies, and facilitating the surviving companies' listing on NASDAQ through similarly deceptive circumvention of shareholder-base requirements. He then purportedly manipulated the prices of all three stocks by orchestrating match trades and causing the same two retail brokers to actively solicit purchases among their customers. After artificially inflating the stock prices, Wey allegedly caused the sell-off of shares held in Nominees' brokerage accounts and then transferred proceeds held in U.S.-based accounts to overseas accounts before facilitating their repatriation back into the U.S. and ultimately into Wey-controlled accounts.

These undeniable commonalities in purpose and execution across Wey's alleged offenses amply support the conclusion that the conspiracy, securities fraud, wire fraud, and money laundering counts each charge conduct that may be considered part of one integrated fraudulent scheme, notwithstanding the involvement of three different issuers. *See, e.g.*, *United States v. Walker*, 254 Fed App'x 60, 61-63 (2d Cir. 2007) (Summary Order) (single bank fraud charge not duplicitous despite allegations that defendant engaged in schemes "to defraud two banks" through "multiple executions" because indictment "on its face charged a single scheme and . . . the [G]overnment argued as such"); *United States v. Cuti*, 08-cr-972, 2009 WL 3154310, at *3-4 (S.D.N.Y. Sept. 24, 2009) (single conspiracy and securities fraud charges not duplicitous because properly charged jury could reasonably find "that a single conspiracy underlies the entire course of conduct of Defendants," regardless of whether "there were multiple schemes to accomplish the goals of the overall conspiracy"); *United States v. Vilar*, 5-cr-621, 2008 WL 4298545, at *1-2 (S.D.N.Y. Sept. 5, 2008) (singular conspiracy charge not

duplicitous because while "the Defendants employed a variety of means to carry out their conspiracy," the "overarching scheme alleged was a unified one: to defraud . . . clients by inducing them, on the basis of similar misrepresentations, to invest in a variety of investment products").

*United States v. Kearney*, the case on which Wey primarily relies, Dismissal Br. at 66, is not to the contrary.  In *Kearney*, a former FBI agent was charged with, among other things, aiding and abetting the obstruction of correspondence and unlawful wiretapping in connection with the interception of several individuals' mail and wire transmissions in an attempt to obtain leads as to the whereabouts of certain fugitives. *Kearney*, 451 F. Supp. 33, 34-37 (S.D.N.Y. 1978).  In concluding that the charges were duplicitous, Judge Duffy relied in large measure on the text of the statutes under which the defendant was charged, determining that neither "contemplate[d] that several separate transactions may form a single, continuing scheme" but instead targeted singular instances of prohibited conduct.  *Id.* at 36-37 (noting, for example, that the obstruction of correspondence statute supported a prosecutorial theory of "one letter one count" (internal quotation marks omitted)).  By contrast, each of the offenses with which Wey is charged "contemplates a prohibited scheme." *Cf. id.* at 36.  Indeed, the applicable securities fraud and wire fraud provisions expressly criminalize "scheme[s]" to "defraud." *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240 10b-5; 18 U.S.C. § 1343; 18 U.S.C. § 1348.  And, as the Government correctly notes, the Court of Appeals has squarely held that "a single money laundering count can encompass multiple acts provided that each act is part of a unified scheme," such as an "extended sequence[] of acts designed to obscure the provenance of dirty money." *United States v. Moloney*, 287 F.3d 236, 241 (2d Cir.

2002) (also noting the "Second Circuit's general rule allowing multiple acts that are part of a single scheme to be charged as a single count"), *abrogated on other grounds by United States v. Cotton*, 535 U.S. 625 (2002); *cf. United States v. Kurniawan*, 627 Fed. App'x 24, 27 (2d Cir. 2015) (Summary Order) (recognizing that a "string of mailings" forming basis of mail fraud charge "could be characterized as part of a single continuing scheme" for purposes of duplicity analysis) (internal quotation marks omitted).

Having concluded that Counts 1-4, 7, and 8 do not run afoul of Rule 8(a), the Court need not consider the issue of prejudice to Wey. Nevertheless, the Court notes that to the extent that Wey raises concerns that the Government's charging decisions may increase the risk of ambiguity in any eventual jury verdict, the parties will have a full opportunity to ameliorate any such risk through their proposed jury instructions and verdict forms.

For the foregoing reasons, Wey's motion to dismiss on duplicity grounds is DENIED.

### 2.    The Indictment Sufficiently Alleges All Charged Offenses

Wey next contends that the Indictment should be dismissed for failure to sufficiently allege the charged offenses. Principally, he argues: that Count 2 fails to allege a "deceptive act" because it purportedly relies on Wey's failure to file Rule 13d-1 disclosures; that Count 3 insufficiently alleges a "scheme or artifice to defraud" because the Indictment purportedly lacks allegations of fraudulent intent; that Count 4 is infirm for the same reason as Count 3 and, independently, because the Indictment fails to identify specific fraudulent wire transmissions; that Counts 5 and 6 fail to allege "willfulness"; and that Counts 1, 7, and 8 fail because the Indictment does not successfully allege underlying object and predicate offenses. For the

following reasons, the Court will DENY Wey's motion to dismiss on these grounds.

Federal Rule of Criminal Procedure Rule 7(c)(1) requires an indictment to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." In order to satisfy those requirements "[a]n indictment 'need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States v. Rajaratnam*, 13-cr-211, 2014 WL 1554078, at *1 (S.D.N.Y. Apr. 17, 2014) (quoting *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013)). Furthermore, "[t]he Supreme Court has 'identified two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions of the same offense.'" *United States v. Lee*, 833 F.3d 56, 69 (2d Cir. 2016) (internal quotation marks and brackets omitted) (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007)).

An indictment does *not*, however, "have to specify evidence or details of how the offense was committed." *United States v. Coffey*, 361 F. Supp. 2d 102, 111 (E.D.N.Y. 2005) (citing *United States v. Carrier*, 672 F.2d 300, 303-04 (2d Cir. 1982), *cert. denied*, 457 U.S. 1139 (1982)). That is because "the validity of an indictment is tested by its allegations, not by whether the Government can prove its case." *Id.* (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)). When considering a motion to dismiss, the Court must treat the indictment's allegations as true. *See, e.g.*, *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir.1999), *cert. denied*, 531 U.S. 823 (2000).

As a preliminary matter, the Court rejects Wey's suggestion, *see* Dismissal Br. at 68, that the Indictment must satisfy the arguably more stringent sufficiency standard set forth by the

Supreme Court in *Russell v. United States*, 369 U.S. 749, 765 (1962) – a "50 year-old precedent"
that "arose out of the controversial McCarthy-era hearings of the Committee on Un-American
Activities," *Stringer*, 730 F.3d at 125 (distinguishing *Russell*). It is true, as Wey highlights, that
the *Russell* Court deemed insufficient an indictment that tracked the pertinent statutory language
and furnished relevant dates, and concluded that due to the statute's inclusion of "generic terms,"
the indictment was required to "descend to particulars." *Russell*, 369 U.S. at 764-772 (internal
quotation marks omitted). But as the Court of Appeals has recently recognized at some length,
more recent Supreme Court precedent makes clear that the *Russell* decision is a "very rare" case
that "must be seen as addressed to the special nature of a charge of refusal to answer questions in
a congressional inquiry and *not as a broad requirement applicable to all criminal charges that
the indictment specify how each essential element is met.*" *Stringer*, 730 F.3d at 126 (emphasis
added) (citing *Resendiz-Ponce*, 549 U.S. at 107-10). In the Court of Appeals' view, *Russell*
today stands only for the proposition that "for certain statutes specification of how a particular
element of a criminal charge will be met (as opposed to categorical recitation of the element) is
of such importance to the fairness of the proceeding that it must be spelled out in the indictment,
*but there is no such universal requirement.*" *Stringer*, 730 F.3d at 126 (emphasis added) (citing
*Hamling v. United States*, 418 U.S. 87, 118 (1974)). Wey cites no authority – and the Court is
aware of none – to support application of *Russell* to the statutes under which Wey is charged.
*See Stringer*, 730 F.3d at 126-127 (collecting cases applying *Russell* to limited number of
specific statutes). Accordingly, the Court sees no basis to depart from the usual sufficiency
framework set forth above.

      The Court will now consider Wey's Count-specific contentions in turn.

a.     **Count 2: Securities Fraud Under Exchange Act Section 10(b) and Rule 10b-5**

Count 2 of the Indictment charges Wey with violations of Section 10(b) of the Exchange

Act and Rule 10b-5.  Section 10(b) makes it a crime to:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 in turn provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Indictment alleges that Wey's conduct violated all three prongs of Rule 10b-

5.  *See* Indictment ¶ 28.  "The three prongs are disjunctive, however, such that the

government can obtain a conviction by proving any one of them."  *United States v.

Bongiorno*, 05-cr-390, 2006 WL 1140864, at *5 (S.D.N.Y. May 1, 2006).

Wey makes essentially one argument with respect to Count 2.  Relying on the

Court of Appeals' decision in *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008), he

contends that Count 2 is infirm because "the Government must allege that [Wey]

committed a deceptive act" under Section 10(b) and Rule 10b-5, which it purportedly has

not done.  Dismissal Br. at 68-69; Reply Memorandum of Law in Further Support of

Defendant Benjamin Wey's Motion to Suppress, to Dismiss the Indictment, and for Other

Relief, Dkt. No. 62 ("Dismissal Reply"), at 47-48.  The Court disagrees.

In *Finnerty*, the defendant was a specialist on the floor of the New York Stock

Exchange ("NYSE") whose job was to match executable orders from public customers.

533 F.3d at 145.  He was accused of engaging in the practice of "'interpositioning' – the

arbitrage of the gap between customers' orders to buy and sell stock – to the benefit of

his firm's account and (via compensation) himself." *Id.*  The Government contended that

because this practice violated NYSE rules and the defendant's customers "would have

expected [him] to comply with the rules" and "refrain from interpositioning," the

defendant had implicitly deceived them in violation of Section 10(b). *Id.* at 149-50

(internal quotation marks omitted).  The Government having abandoned claims of market

manipulation or express misstatements, the "sole issue on appeal" was whether the

Government had proven at trial that Finnerty's conduct was "deceptive" within the

meaning of Section 10(b). *Id.* at 145, 148.  The Court of Appeals held that it had not,

reasoning that Finnerty, in engaging in interpositioning, had not "communicated anything

to his customers, let alone anything false" and that his customers' purported expectations

that he would not engage in the practice was not "based on a statement or conduct by

Finnerty." *Id.* at 149-50.  The Court emphasized that Section 10(b) prohibits only

conduct "involving manipulation or deception" and that to establish a violation "there

must be some proof of manipulation or a false statement, breach of a duty to disclose, or

deceptive communicative conduct." *Id.*  at 148, 150 (internal quotation marks omitted).

Wey extracts from *Finnerty*, by analogy, the principle that "a charge of securities fraud cannot be premised on . . . alleged violation of [Rule 13d-1's] disclosure requirements, without more, because that cannot constitute a deceptive or fraudulent act." Dismissal Br. at 69-70. Because, Wey continues, Count 2 relies exclusively on precisely such alleged violations, it fails to state an offense of securities fraud. *Id.* at 68-69. Even setting aside that *Finnerty* concerned the sufficiency of the Government's trial evidence and not the sufficiency of the indictment, Wey's argument fails for at least two reasons.

First, assuming *arguendo* that Wey were correct in reading *Finnerty* to preclude a violation of Rule 13d-1 from forming the basis of a Section 10(b) charge, Wey's assertion that Count 2 of the Indictment is premised entirely on his alleged 13d-1 violations is simply incorrect. To the contrary – unlike in *Finnerty* – Count 2 is expressly based in part on Wey's alleged manipulation of the market for SmartHeat, Deer, and CleanTech securities. *See* Indictment ¶ 28 (noting in "to wit" clause of charging paragraph that Wey violated Section 10(b) when he "secretly amassed and concealed a beneficial ownership interest in excess of five percent of the common stock of each of SmartHeat, Deer, and CleanTech, *and manipulated and caused to be manipulated the market price and demand for the common stock of those public companies*") (emphasis added); *cf. Finnerty*, 533 F.3d at 148 ("The government has abandoned on appeal any claim of market manipulation."). Because it is beyond dispute that market manipulation may form the basis of a violation of Section 10(b), that alone would be enough for Count 2 to survive. *See, e.g., United States v. Royer*, 549 F.3d 886, 899-900 (2d Cir. 2008) (affirming conviction under Section 10(b) when defendants "sought to artificially affect the prices of various securities" by directing others to "trade and to disclose the negative

information at times and in manners orchestrated by the defendants that were dictated not

by market forces, but by defendants' desire to manipulate the market for their own

benefit"); *see also Levy v. United States*, 626 Fed. App'x 319, 322 (2d Cir. 2015)

(Summary Order) (affirming convictions under Rule 10b-5 for market manipulation);

*United States v. Regan*, 937 F.3d 823, 829-39 (2d Cir. 1991) (same); *In re Initial Pub.*

*Offering Secs. Litig.*, 241 F. Supp. 2d 281, 297-98 & n.9 (S.D.N.Y. 2003) (among other

things, "Section 10(b) was designed to prohibit *any* intentional conduct that deceives or

defrauds investors by controlling or artificially affecting the price of securities")

(emphasis in original) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976))[4];

*id.* at 380-82 (explaining that market manipulation may give rise to liability under all

three subsections of Rule 10b-5).

More fundamentally, however, nothing in *Finnerty* suggests that violations of

Rule 13d-1 may not support criminal liability under Section 10(b) and Rule 10b-5. Rule

13d-1, promulgated under Section 13(d) of the Exchange Act, provides in pertinent part

that any person who becomes "directly or indirectly the beneficial owner of more than

five percent of [a covered class of equity security] shall, within 10 days after the

acquisition, file with the Commission, a statement containing the information required by

Schedule 13D." *See* 17 C.F.R. § 240.13d-1(a). As the Court of Appeals has recognized,

"Section 13(d)'s purpose is to alert investors to potential changes in corporate control so

that they can properly evaluate the company in which they had invested or were

investing." *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (internal

brackets omitted) (internal quotation marks omitted); *accord GAF Corp. v. Milstein*, 453

---

[4] It should be noted that "Rule 10b-5 is interpreted identically in the civil and criminal contexts." *In re Initial Pub. Offering*, 241 F. Supp. 2d at 387 n.164.

F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972)) ("the purpose of section 13(d) is to alert the marketplace to large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control").

Thus, in sharp contrast to the NYSE rules at issue in *Finnerty* – which only *prohibited* certain conduct (i.e., interpositioning) – Rule 13d-1 *imposes affirmative disclosure obligations*. *See, e.g.*, *Bilzerian*, 926 F.2d at 1298 ("A duty to file under § 13(d) creates the duty to file truthfully and completely"); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978) ("Because [S]ection 13(d) was designed, in part, to allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation, and because disclosure that is not accurate subverts this purpose, it is plain that [S]ection 13(d) requires the making of a completely truthful statement."). As such, while Finnerty's violation of the prohibition on interpositioning may not have "communicated" anything in particular to investors, Wey's purported intentional failure to disclose beneficial ownership information when disclosure was expressly required was, as alleged in the Indictment, both a communicative and deceptive act: it signaled falsely to investors that there was no such ownership to disclose.[5]

Although the Court of Appeals does not appear to have squarely addressed this issue, it has held, on similar reasoning, that a jury may reasonably find that a defendant

---

[5] All of this assumes that the pertinent portion of the *Finnerty* decision remains good law, which is itself a highly questionable proposition. As the Court of Appeals explained in a more recent opinion: "[W]e decided *Finnerty* before the SEC had issued any interpretation to which *Chevron* deference was required regarding the deceptive nature of interpositioning by an NYSE specialist. The Commission has since issued a formal adjudicatory decision on the subject, concluding that, *inter alia*, by becoming a specialist Finnerty expressly represented to the NYSE that he would comply with its rules and that by engaging in undisclosed interpositioning and trading ahead in contravention of his duties and representations Finnerty engaged in deceptive conduct. This later interpretation of Rule 10b–5 'trumps' our prior interpretation in *Finnerty*." *VanCook v. SEC*, 653 F.3d 130, 140 n.8 (2d Cir. 2011) (internal quotation marks, citations, brackets, and ellipsis omitted).

engaged in a "fraudulent scheme to avoid the disclosure requirements of § 13(d)" based

on mischaracterizations of sources of purchase funds made in Section 13(d) filings. *See*

*Bilzerian*, 926 F.2d at 1299 (upholding Section 10(b) conviction premised on defendant's

erroneous description of source of funds used to purchase blocks of shares). And several

courts outside of this Circuit have recognized more generally that failure to file required

Section 13(d) disclosures, or other similar forms, in the first place may be actionable

under Section 10(b). *See, e.g., Burt v. Maasberg*, No. 12-0464, 2013 WL 1314160, at

\*16 (D. Md. Mar. 31, 2013) ("[T]he failure to file or amend a Schedule 13D, as required,

serves as a predicate for liability under § 10(b) and Rule 10b-5(b). If a duty to disclose

was imposed . . . the failure to file or disclose information in a Schedule 13D is

actionable.") (internal citations omitted); *SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp.

705, 724 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989) (stock "parking

arrangement" in which defendant attempted to delay filing Section 13(d) disclosures by

beneficially holding shares through broker constituted "surreptitious effort to accumulate

a block of shares" in a public issuer – the "precise type of evil to which Section 13(d) was

directed to prevent"); *Cf. SEC v. Brown*, 740 F. Supp. 2d 148, 172 (D.D.C. 2010)

(concluding that allegations that corporate officer failed to file required stock ownership

disclosures under Section 16(a) of the Exchange Act stated claim for scheme liability

under Rule 10b-5(a) and (c)). The Court sees no basis to disagree.

Of course, the Government alleges that Wey did more than decline to file Rule

13d-1 disclosures. Notwithstanding Wey's focus on that issue, Count 2 incorporates by

reference allegations that Wey, among other things, engaged in substantial affirmative

conduct designed specifically to circumvent Rule 13d-1's reporting requirements and to

"obscure" his beneficial ownership and control of Deer, SmartHeat, and CleanTech from the investing public, including "purposefully caus[ing] the Nominees' holdings to be structured in such a way as to ensure that no single one of the Nominees held a greater-than-five percent beneficial ownership in any of the Issuers." *See* Indictment ¶ 14. The Indictment also alleges that Wey orchestrated a scheme to artificially inflate the Issuers' shareholder bases in order to satisfy NASDAQ listing requirements and gain access to more liquid markets. *Id.* ¶¶ 15-17. Such conduct may not constitute "garden variety" securities fraud, but it is well-settled that "[n]ovel or atypical methods should not provide immunity from the securities laws." *United States v. Russo*, 74 F.3d 1383, 1390 (2d Cir. 1996) (internal quotation marks omitted); *see also VanCook* 653 F.3d at 138 ("Section 10(b) was designed as a catch-all clause to prevent fraudulent practices, including not just garden type varieties of fraud but also unique forms of deception involving novel or atypical methods.") (internal quotation marks, citation, and brackets omitted); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474 n.37 (S.D.N.Y. 2005) ("[S]ubsections (a) and (c) of Rule 10b-5 encompass a wide range of activities and are not limited to the prohibition of market manipulation."). Especially given the Supreme Court's long-standing directive that courts should interpret "Section 10(b) and Rule 10b-5 flexibly and broadly, rather than technically or restrictively," the Court sees nothing that would preclude the Government from attempting to prove at trial that these additional acts were "deceptive" within the meaning of Section 10(b). *VanCook* 653 F.3d at 138 (internal quotation marks and brackets omitted).

Accordingly, Wey's argument that Count 2 should be dismissed on the basis of the Government's failure to allege a "deceptive act" is without merit and is hereby

DENIED.

### b.    Count 3: Securities Fraud under 18 U.S.C. § 1348

18 U.S.C. § 1348 makes it a crime to, in pertinent part, "knowingly execute[], or

attempt[] to execute, a scheme or artifice" to:

> (1) "defraud any person in connection with" the securities of a publicly traded company;
> or

> (2) "obtain, by means of false or fraudulent pretenses, representations, or promises, any
> money or property in connection with the purchase or sale of" the securities of a publicly
> traded company.

As with Rule 10b-5, the Government "need only prove a violation of subsection (1) or

subsection (2), but not both for there to be a violation of Section 1348." *United States v.*

*Mahaffy*, 05-cr-613, 2006 WL 2224518, at *11 (E.D.N.Y. Aug. 2, 2006). "In order to prove a

violation of 13 U.S.C. 1348, the Government must show: (1) fraudulent intent; (2) a scheme or

artifice to defraud; and (3) a nexus with a security." *United States v. Motz*, 652 F. Supp. 2d 284,

295 (E.D.N.Y. 2009).

Wey argues principally that Count 3 is infirm because the Indictment fails to allege that

he possessed fraudulent intent. Dismissal Br. at 70-71. More specifically, relying on case law

from the analogous mail fraud and wire fraud contexts,[6] Wey contends that to demonstrate

fraudulent intent, the Government must show that he "contemplated some actual harm or injury

to [his] victims." *Id.* at 71 (internal quotation marks omitted) (citing, *inter alia*, *United States v.*

*Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *United States v. D'Amato*, 39 F.3d 1249, 1256 2d Cir.

1994)). Because, Wey continues, "the Indictment is devoid of any allegation concerning how he

intended to cause harm to the investing public," it "fails to allege the essential elements of

---

[6] Several courts have recognized that "because the text and legislative history of 18 U.S.C. § 1348 clearly establish
that it was modeled on the mail and wire fraud statutes," analysis of Section 1348 "should be guided by the
caselaw construing those statutes." *Motz*, 652 F. Supp. 2d at 296 (internal quotation marks omitted); *see also*
*Mahaffy*, 2006 WL 2224518, at *11 (same).

securities fraud." *Id.* at 70-71.  This argument is unpersuasive.

First, in relying on *Starr* and its progeny, Wey conflates the standard for sufficiency of the Government's *proof at trial* with the categorically less demanding standard for sufficiency of the Indictment's *allegations*.  Wey may well be correct that the Government will need to introduce evidence of contemplated harm to carry its burden on Count 3 at trial.  But this is a pretrial motion to dismiss the Indictment, and the adequacy of the Government's evidentiary case is simply not at issue.  *See, e.g.*, *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998) (unless government has made "a full proffer of the evidence it intends to present at trial," the "sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment").  Indeed, recognizing as much, other courts in this Circuit have rejected arguments substantially identical to Wey's in the related context of the wire fraud statute.  *See, e.g.*, *United States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (rejecting argument that indictment failed to allege "intended harm," and thus the fraudulent intent element of the offense, because "the sufficiency of the government's evidence of . . . fraudulent intent is not considered on a motion to dismiss the indictment").  *United States v. Ashley*, 905 F. Supp. 1146, 1155-56 (E.D.N.Y. 1995) (while Government might need to "*prove*" at trial that defendants contemplated damage to victim in order to show fraudulent intent in support of wire fraud charge, "the indictment at issue [was] not insufficient for failure to specifically allege fraudulent intent on the part of [d]efendants") (emphasis in original).  The Court is aware of no authority suggesting that the Government is required to specifically allege contemplated harm in an indictment to sufficiently *state* a violation of Section 1348, and it will impose no such requirement here.

Rather, Count 3 is sufficient if the Government has charged a violation of Section 1348 by "track[ing] the language of the statute," "stat[ing] the time place (in approximate terms) of the

alleged crime," and including "a plain, concise, and definite written statement of the essential

facts constituting the offense charged." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir.

2008) (internal quotation marks and citations omitted). And that the Government has done.

With respect to the fraudulent intent element specifically, Count 3 itself alleges that Wey acted

"knowing and intentionally" in executing "a scheme and artifice to . . . defraud," and other

sections of the Indictment (incorporated into Count 3 by reference) repeatedly allege, for

example, that Wey sought to "defraud the investing public" and to "obscure from the investing

public" his ownership and control over the Issuers' stock. Indictment ¶¶ 7, 14, 30. At this stage,

such allegations are sufficient.

And even assuming that more were required, the Court of Appeals has recognized that

"[w]hen the necessary result of the actor's scheme is to injure others, fraudulent intent may be

inferred from the scheme itself." *D'Amato*, 39 F.3d at 1257 (internal quotation marks omitted);

*see also Motz*, 652 F. Supp. 2d at 296 (inferring fraudulent intent from nature of scheme

described in indictment); *Martin*, 411 F. Supp. 2d at 373 (same). The alleged "pump and dump"

scheme that the Government attributes to Wey purportedly involved, among other things,

encouraging investors to purchase Issuer stock on margin and then discouraging its disposition,

all with the aim of artificially inflating the price at which Wey could eventually liquidate his own

holdings. That sort of scheme is, by its very nature, designed to generate economic benefits "at

the expense of unwary consumers." *See, e.g., United States v. Ageloff*, 809 F. Supp. 2d 89, 91-92

(E.D.N.Y. 2011) (internal quotation marks and emphasis omitted); *see also Levy*, 626 Fed.

App'x at 322 ("The gravamen of [market] manipulation is deception of investors into believing

that prices at which they purchase and sell securities are determined by the natural interplay of

supply and demand, not rigged by manipulators") (internal quotation marks omitted). Based on

the Indictment's allegations as to this manipulation scheme, the Court has no difficulty inferring fraudulent intent.

What remains of Wey's argument as to Count 3 may fairly be characterized as an unvarnished attack on the Government's anticipated evidence.  Essentially, Wey contests the Indictment's characterizations of certain acts and statements as aimed at market manipulation and seeks to recast them in legitimate terms.  Such factual disputes are simply not matters that the Court may consider at this stage.  *See, e.g.*, *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985) (on motion to dismiss, "we accept as true all of the allegation of the indictment" and "[c]ontrary assertions of fact by the defendants will not be considered"); *see also United States v. Corbin*, 729 F. Supp. 2d 607, 611 (S.D.N.Y. 2010) ("fact questions raised by an Indictment are the province of the jury") (internal quotation marks omitted) (citing *United States v. Pirro*, 96 F. Supp. 2d 279, 283 (S.D.N.Y. 1999)).

For these reasons, Wey's motion to dismiss Count 3 is DENIED.

### c.      Count 4: Wire Fraud

The wire fraud statute proscribes the use of wire communications in interstate or foreign commerce "in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises.'"  *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (quoting 18 U.S.C. § 1343).  The Court of Appeals has summarized the "essential elements" of wire fraud as: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the . . . wires to further the scheme."  *Id.* at 255 (internal quotation marks and brackets omitted).  Wey avers that the Indictment does not allege a "scheme to defraud" because it fails to assert that "Wey intentionally deceived and contemplated some actual harm or injury to his alleged victims," and,

more fundamentally, that it "does not identify any allegedly fraudulent wires." Dismissal Br. at

73. Neither contention requires extended discussion.

The first argument, essentially recycled from Wey's challenge to Count 3, has already

been addressed above. To recap, the "sufficiency of the [G]overnment's evidence of . . .

fraudulent intent is not considered on a motion to dismiss," and the Indictment suffices if it

"track[s] the language of the statute alleged to have been violated," and alleges a scheme from

which the Court can infer "intent to injure" and thus fraudulent intent. *Martin*, 411 F. Supp. 2d

at 373. Count 4 of the Indictment alleges that Wey "willfully and knowingly" made or caused

to be made wire transmissions for the purpose of executing the alleged scheme to defraud and,

specifically, along with Erbek, "sent certain email communications between New York, New

York and, among other place, Switzerland, in furtherance of a scheme to manipulate the market

price and demand for the common stock of SmartHeat, Deer, and CleanTech." Indictment ¶ 32.

These allegations – along with the more broadly applicable allegations of intent to deceive and

defraud the investing public discussed above (which, again, are incorporated into Count 4 by

reference) – are sufficient to state fraudulent intent. And, in any event, such intent is readily

inferable from the nature of the alleged scheme. *See, e.g.*, *Martin*, 411 F. Supp. 2d at 373

(inferring fraudulent intent with regard to wire fraud count from nature of purported scheme); *see

also supra* Section II.A.2.b.

Wey's second argument, that Count 4 should be dismissed because the Indictment fails to

identify allegedly "fraudulent wire transmissions," is unsupported by either the law or the plain

terms of the Indictment. A "fraudulent wire transmission," whatever that might mean, is not a

required element of wire fraud. Rather, the statute criminalizes the use of the wires "*in

furtherance of*" a scheme or artifice to defraud. *Fountain*, 357 F.3d at 255 (emphasis added).

And it is clear from the face the Indictment that the Government has sufficiently alleged that conduct. Indeed, the Indictment includes references to at least two email communications purportedly sent by Wey to Erbek, identifying approximate transmission dates and alleging purposes such as "obscur[ing] from the investing public the extent to which he owned and exercised control over Issuers' stock" and "causing the market price and demand for the common stock of CleanTech to be manipulated artificially." Indictment ¶¶ 14, 18, 26(a). The Indictment further alleges that Wey used email "to tout to prospective investors" a certain "apparent" price increase in CleanTech's stock based on a purported match trade allegedly facilitated by Wey. *Id.* ¶ 19. Especially given that "[t]he use of the wires need not be an essential part of the scheme to defraud" so long as it is "'incident to an essential part of the scheme,'" *Martin*, 411 F. Supp. 2d at 374 (quoting *United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995)), the Court concludes that these allegations, in combination with the statutory charging language of Count 4, are sufficient to state a violation of Section 1343. *See, e.g.*, *United States v. Siembida*, 604 F. Supp. 2d 589, 596-97 (S.D.N.Y. 2008) (denying motion for acquittal after conviction of wire fraud base on single interstate email). Any contentions by Wey that these emails did not in fact have any fraudulent purpose are not appropriate grounds for pretrial dismissal of the Indictment, but, may, like similar arguments throughout Wey's moving papers, be renewed at trial.

Accordingly, Wey's motion to dismiss Count 4 is DENIED.

### d. Counts 5-6: Failure to Disclose Beneficial Ownership of Deer and CleanTech Stock Under Exchange Act Section 13(d) and Rule 13d-1

As noted above, Section 13(d) of the Exchange Act and Rule 13d-1 promulgated thereunder together require that "[a]ny person who, after acquiring directly or indirectly the beneficial ownership" of a covered class of equity security, is "directly or indirectly the

beneficial owner of more than 5 percentum of such class shall, within ten days after such acquisition," file statements with the SEC containing certain enumerated categories of information pertaining to that ownership. *See* 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1. Section 32(a) of the Exchange Act, in turn, authorizes criminal sanctions against any person who "willfully violates the Act or rules promulgated thereunder." *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 280 (1992) (O'Connor, J., concurring in part and concurring in the judgment); 15 U.S.C. § 78ff(a). Wey argues that Counts 5 and 6, which charge him under these provisions with failure to make required disclosures of his alleged ownership of Deer and CleanTech stock, respectively, should be dismissed because they fail to allege "willfulness." The Court disagrees.

Wey asserts that the presence of the word "willful" in Section 32(a) means that the Government must allege (and later prove) "specific intent" in order to charge (and later establish) a violation of that provision, and that Counts 5 and 6 fail to allege specific intent. Dismissal Br. at 73-76. The exact contours of Wey's argument are not entirely clear to the Court. As the Court of Appeals has recognized, "several different versions of specific intent have . . . been articulated in Supreme Court jurisprudence and in [its] own cases," and the appearance in a statute of the particular term "willfully" may, depending on the context, denote one or none of these. *United States v. George*, 386 F.3d 383, 389-90 (2d Cir. 2004) (also noting that the term "willfully" may indicate "general or specific intent"); *see also Bryan v. United States*, 524 U.S. 184, 191 (1998) ("willfully" may be "a word of many meanings, whose construction is often dependent on the context in which it appears") (internal quotation marks omitted). The precise level of "specific intent" for which Wey advocates is not readily apparent from his moving papers.

To the extent, however, that Wey contends that Section 32(a) cannot be offended without

a specific purpose to violate the law, that is flatly inconsistent with the Court of Appeals'

interpretation of the statute.   Indeed, the Court recently reemphasized in *United States v. Kaiser*

that "the government is not required to present '[p]roof of a specific intent to violate the law . . .

to uphold a conviction under § 32(a) of the [Exchange] Act, provided that satisfactory proof is

established that the defendant intended to commit the act prohibited.'" 609 F.3d 556, 568

(quoting *United States v. Schwartz*, 464 F.2d 499, 509 (2d Cir. 1972)).   Noting that Section 32(a)

instead establishes an affirmative defense against imprisonment for violation of any rule or

regulation if the defendant "proves that he had no knowledge of such rule or regulation," 15

U.S.C. § 78ff(a), the Court explained that, "[i]n view of this unique statutory language . . .

whatever 'willful' might mean for purposes of other statues, for the purposes of Section 32(a), it

does not encompass the requirement that a defendant knew he was violating the law." *Id.* at

568.[7]

    While the Court has not identified any controlling authority squarely articulating what

"willfully" *does* mean in the particular context of a defendant failing to file required disclosures,

the *Kaiser* court held, in the context of securities fraud charges premised on express

misrepresentations, that willfulness under Section 32(a) requires only that a defendant "had an

---

[7] Insofar as Wey maintains that passing language from then-Judge Sotomayor's decision in *George* suggests otherwise, his position is without merit.  In *George*, the Court of Appeals considered the *mens rea* requirement of 18 U.S.C. § 1542, a statute proscribing false statements in passport applications that also employs the adverb "willfully."  386 F.3d at 388-89.  The Court observed that "only in exceptional cases has the Supreme Court interpreted the term 'willfully' in criminal statutory *mens rea* provisions to require proof of the defendant's specific purpose to violate the law" – i.e., "only in those isolated circumstances where the obscurity or complexity of that particular criminal statute may prevent individuals from realizing that seemingly innocent acts are, in fact, criminal." *Id.* at 390-92 (identifying discrete and "atypical[]" examples of such a requirement being imposed).  Put slightly differently, the Supreme Court has read the term "willfully" to require proof of the defendant's specific purpose to violate the law "only when those activities classified as illegal do not on their own provide notice of their criminality, either because of the difficulty of comprehending the legally acceptable parameters of the activity or because the criminal *actus reus* can often be undertaken with a lawful purpose." *Id.* at 390.  Wey excerpts this last passage in his brief without further comment.  Nothing about *George* or the text of Section 32(a), however, suggests that the statute at issue here represents one such "exceptional" and "atypical" case.  Indeed, in an unreported decision, the Court of Appeals has recognized as much in the context of another prosecution under Section 32(a). *See United States v. Schlisser*, 168 Fed. App'x 483, 486 (2d Cir. 2006) (Summary Order) (noting that case did not fall into *George*'s "exceptional" category).

awareness of the general wrongfulness of his conduct." 609 F.3d at 569. Wey identifies no

compelling reason not to apply the standard articulated in *Kaiser* to the Indictment, and the Court

concludes that the standard is easily satisfied at this stage. The Indictment, as discussed, alleges

that Wey was "well aware" of the reporting requirements of Section 13(d) and Rule 13d-1 and

that he "intentionally" failed to comply with those requirements as part of a scheme to conceal

his control of substantial blocks of Issuer stock from the investing public. Indictment ¶¶ 14, 34,

36. Such allegations clearly state the element of willfulness under Section 32(a). *Cf. Kaiser*, 609

F.3d at 569-70 (jury instruction requiring finding that misstatements were made "'knowingly and

with intent to deceive' necessarily encompassed a finding of willfulness under Section 32(a)").

The balance of Wey's argument as to Counts 5 and 6 boils down to yet another challenge

to the sufficiency of the Government's anticipated evidence. Relying on case law of a post-trial

posture, Wey contends that a case built "solely" on his "alleged awareness of the existence of the

applicable securities laws is wholly insufficient to establish that Mr. Wey acted willfully in not

filing a Schedule 13D." Dismissal Br. at 75-76 (citing, *inter alia*, *United States v. Goyal*, 629

F.3d 912, 919 (9th Cir. 2010); *United States v. Mattice*, 186 F.3d 219, 225 (2d Cir. 1991); *United

States v. Stewart*, 305 F. Supp. 2d 368, 377 (S.D.N.Y. 2004)).

To the extent that this argument implicates the sufficiency of the Indictment at all – and

assuming that such sufficiency would be questionable if that instrument indeed alleged nothing

more than Wey's "awareness" of the relevant requirements – the Court simply notes that

Indictment goes substantially further than Wey's argument suggests. As just discussed, it asserts

that Wey's alleged failure to file was an intentional act undertaken specifically as part of a

broader scheme to deceive investors. Beyond that, and at the risk of repetition, Wey's argument

is a thinly veiled – and well premature – sufficiency challenge that must await the completion of

the Government's trial presentation.

Accordingly, Wey's motion to dismiss Counts 5 and 6 is DENIED.

### e.    Counts 1, 7, and 8: Conspiracy and Money Laundering

Wey's only argument with respect to the conspiracy and money laundering charges is

that they should be dismissed because the Indictment fails to allege the essential elements of the

underlying fraud charges on which they in part depend. Dismissal Br. at 77-78. Because, as set

forth above, Wey's contentions as to the elements of the object and predicate fraud charges are

unavailing, this contingent argument must also be rejected. Accordingly, Wey's motion to

dismiss Counts 1, 7, and 8 is DENIED.

### 3.    Dismissal for Pre-Indictment Delay is Unwarranted

Finally, Wey argues that the Indictment should be dismissed in its entirety because the

Government's delay in bringing charges against him violated his constitutional right to due

process under the Fifth Amendment. This argument, too, is without merit.

"The primary guarantee against bringing overly stale criminal charges remains the

applicable statute of limitations," and "[t]here is a strong presumption that an indictment filed

within the statute of limitations is valid." *United States v. Gonzalez*, 00-cr-447, 2000 WL

1721171, at *1 (S.D.N.Y. Nov. 17, 2000) (internal quotation marks and citations omitted). As a

result, "timely brought criminal prosecutions are only rarely dismissed." *United States v.*

*Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999). A defendant seeking dismissal based on pre-

indictment delay "bears the 'heavy burden' of proving both that he suffered actual prejudice

because of the alleged pre-indictment delay *and* that such delay was a course intentionally

pursued by the government for an improper purpose." *Cornielle*, 171 F.3d at 752 (emphasis in

original) (quoting *United States v. Scarpa*, 913 F.2d 993, 104 (2d Cir. 1990)).[8]

"Prejudice in this context has meant that sort of deprivation that impairs a defendant's

right to a fair trial," and it is "commonly demonstrated by the loss of documentary evidence or

the unavailability of a key witness." *Id.* Still, the "standard for actual prejudice is fairly

stringent." *Gonzalez*, 2000 WL 1721171, at *1 (internal quotation marks omitted). To satisfy

his burden of proof, a defendant "must demonstrate *how* (the loss of evidence) is prejudicial,"

and the proof offered "must be definite and not speculative." *United States v. Birney*, 686 F.2d

102, 105-06 (2d Cir. 1982) (internal quotations omitted) (emphasis added); *see also United*

*States v. Delacruz*, 970 F. Supp. 2d 199, 202 (S.D.N.Y. 2013) ("Faded memories or unavailable

witnesses are inherent in any delay, even if justifiable. To merit dismissal a defendant must

demonstrate a substantial, actual prejudice to his ability to defend himself.") (internal quotation

marks omitted). Applying this standard, courts have declined to find actual prejudice when, for

example, defendants have argued that delay caused them to suffer "the 'missed opportunity' to

explore whether a witness could offer testimony favorable to [their] defense." *See, e.g.*,

*Badoolah*, 2014 WL 4793787, at *3-4; *see also Gross*, 165 F. Supp. 2d at 380 ("faded

recollections and missing peripheral witnesses are insufficient") (internal quotation marks and

---

[8] There is some disagreement among the district courts in this Circuit as to whether *reckless* – as opposed to intentional – disregard of circumstances that would likely impede a defendant's ability to mount a defense may support a due process challenge based on pre-indictment delay. *Compare United States v. Santiago*, 987 F. Supp. 2d 465, 488-92, 498 (S.D.N.Y. 2013), *and United States v. Gross*, 165 F. Supp. 2d 372, 377-80, 383-85 (E.D.N.Y. 2001), *with Gonzalez*, 2000 WL 1721171, at *1 & n.1, *and United States v. Badoolah*, 12-cr-774, 2014 WL 4793787, at *3 (E.D.N.Y. Sept. 25, 2014). Recognizing, as have other district courts, that the Court of Appeals appears to have used several different formulations to "describe (in general terms) what sort of conduct would cause prejudicial pre-indictment delay to violate the Due Process clause," *see Santiago*, 987 F. Supp. 2d at 490 (collecting cases), this Court reads the pertinent decisions to, on balance, more plainly comport with a standard that requires a showing of intentionality. *See, e.g.*, *Cornielle*, 171 F.3d at 752 (defendant bears burden of showing that "delay was a course *intentionally* pursued by the government for an improper purpose") (emphasis added); *see also Gonzalez*, 2000 WL 1721171, at *1 & n.1 ("Neither the Supreme Court nor the Second Circuit . . . has adopted this alternative [recklessness] standard."). Still, the Court agrees with those district courts that have observed that the Court of Appeals has never squarely addressed the question of whether recklessness may suffice under certain circumstances and, accordingly, has not foreclosed that possibility. *See Santiago*, 987 F. Supp. 2d at 489-90; *Gross*, 165 F. Supp. 2d at 378-79. In any event, the instant case does not require this Court to pass on the issue. Because, as discussed further below, the Court concludes that Wey has not articulated actual and substantial prejudice, it need not address the Government's state of mind or purpose in delaying the filing of the charges at issue.

brackets omitted).

Guided by these principles, the Court concludes that Wey's attempt to demonstrate actual prejudice suffered during the four-year interval between the Government's searches and the return of the Indictment is unavailing and, accordingly, that dismissal on due process grounds must be denied.

Wey avers only that two *potential* defense witnesses have been rendered *possibly* unavailable by the Government's purported delay: first, a "former member of the board of directors for all three of SmartHeat, Deer, and CleanTech, now more than 70 years old, suffered a stroke in or about late 2015 and is living in a rehabilitation center"; and second, "a lawyer with intimate familiarity with Mr. Wey's business practices and operations is in his 70s and may be suffering from failing health." Dismissal Br. at 80-81. While the Court seeks in no way to minimize the misfortunes that appear to have befallen these individuals, it is plain from the face of Wey's moving papers that he is unable to state definitively whether either of these witnesses *will* be unavailable to testify at trial or even, at least with respect to the board member, whether they *would have been available* had the Government proceeded more speedily. *See, e.g., id.* at 80 (representing that the board member "*might* otherwise have been available to testify for the defense"); Dismissal Reply at 52 (conceding that it is "correct" as a "practical matter" that the two witnesses are not "currently precluded from testifying"); *see also Gonzalez*, 2000 WL 1721171, at *2 (defendant must demonstrate with "specificity" the "*actual* loss of witnesses" and the mere "possibility[y]" of such is insufficient).

Equally or more important, Wey offers no evidence whatsoever that these witnesses, were they to take the stand, would offer testimony substantially favorable to Wey. Instead, Wey submits only the unsubstantiated – and unsworn – representation of counsel that the board

member "would undoubtedly exculpate Mr. Wey by providing evidence concerning the *bona fides* of SmartHeat, Deer, and CleanTech as investment opportunities, and contradicting the Government's theories that Mr. Wey somehow controlled these companies and their stock," and that the lawyer possesses "intimate familiarity" with Wey's business.  Dismissal Br. at 80-81.

Such bare assertions do not satisfy the "definite and not speculative" requirements attendant on the defendant's "heavy burden" to show actual prejudice. *Cornielle*, 171 F.3d at 752 (internal quotation marks omitted); *Birney*, 686 F.2d at 105-06.  Indeed, courts have frequently found similar showings insufficient. *See, e.g.*, *Badoolah*, 2014 WL 4793787, at *4 (no prejudice from defendant's inability to "explor[e] whether the attorney who oversaw all four transactions discussed in the indictment has any exculpatory testimony") (internal quotation marks omitted); *United States v. Scala*, 388 F. Supp. 2d 396, 399-400 (S.D.N.Y. 2005) ("broad state[ments]" that unavailable witnesses "would have exculpated [defendant] entirely on Counts One and Two" and "[c]ounsel's unsworn assertions as to vague generalities" that witnesses, "if alive, would give testimony helpful to [defendant] do not show that [defendant]'s ability to present a defense has been substantially and actually prejudiced"); *United States v. Gotti*, 02-cr-743, 2004 WL 32858, at *4 (S.D.N.Y. Jan. 6, 2004) (defendants' suggestion that missing witness "might have testified that they were not involved in the . . . murder" was "utterly devoid of a factual or legal basis"); *Gonzalez*, 2000 WL 1721171, at *1-2 (relocation of some witnesses "who may have witnessed" the crime at issue was insufficient basis for due process challenge).

Even assuming that the board member were in fact unavailable to testify at trial, the Court is skeptical that the purported ability to confirm the economic *bona fides* of the Deer, CleanTech, and SmartHeat, necessarily makes the board member a "key witness." *Cornielle*, 171 F.3d at 752.  To the contrary, Wey's voluminous evidentiary submissions in support of his

dismissal and suppression motions underscore the public availability of information, including SEC filings, independent market analyses, research reports, and endorsements by Wall Street firms, that (at least according to Wey) go to substantially the same point. *See, e.g.*, Dismissal Br. at 12-13, 43-46 (citing exhibits to supporting declaration of counsel). As the Court of Appeals has recognized, "the availability of other evidence . . . diminishes, or even eliminates, the prejudicial effect of a witness's unavailability." *United States v. Baptiste*, 84 Fed. App'x 153, 155 (2d Cir. 2004) (Summary Order). Nor is it necessarily apparent, for that matter, how some evidence of the *bona fides* of these companies undermines the Government's case.

Finally, Wey's reliance on Judge McMahon's decision in *Santiago* is misplaced. There, the Government's delay had resulted in the defendant "irretrievably" losing the testimony "of the only person," other than the defendant and the victim, "who was present when the shooting [at issue] took place," and that person had "given several statements that the very least undermine[d] the Government's theory of the case and could well result in [defendant's] acquittal on the charge of reckless assault." 987 F. Supp. 2d at 485-86 (observing that the missing witness had made "no fewer than three" specific statements that "would appear to undermine the Government's ability to prove recklessness beyond a reasonable doubt," that such statements were "exonerative" and "critically important to the defense," and that the prejudice to the defendant from the witness's absence was "patent"). Wey's showing – which amounts to the suggestion that two *potential* witnesses *might* be unavailable to testify at trial where they would otherwise have offered *unspecified* exculpatory testimony – falls well short of the *Santiago* mark.

For of all these reasons, Wey's motion to dismiss the Indictment on the basis of pre-trial delay is DENIED.

### B.     Bill of Particulars

1.      **Wey's Requests**

Wey next moves for a bill of particulars pursuant to Federal Rule of Criminal Procedure
7(f). Wey seeks approximately twenty-one sets of particulars, many of which he breaks down
into several purportedly non-exhaustive subcomponents. These requests may be roughly divided
into three broad categories: information regarding the acts alleged in the substantive counts;
information pertaining specifically to the conspiracy count; and identities of individuals
referenced in the Indictment. With respect to the substantive counts, Wey requests the
following:

(1)    **Information sufficient to identify each allegedly false or misleading statement
       or representation referenced or alluded to in the Indictment, including but
       not limited to at least:**

       a.      **the content of the alleged factual statement or representation**
       b.      **when the statement or representation was made**
       c.      **who made the statement or representation**
       d.      **to whom the statement or representation was made**
       e.      **any other information necessary to identify the statement or
               representation sufficient for the defense to be on proper notice of the
               claim of misrepresentation.**

(2)    **Information sufficient to identify each allegedly manipulative trade affecting
       a stock price, including but not limited to at least:**

       a.      **the date and time of the alleged trade(s)**
       b.      **the identity of the trading party(ies)**
       c.      **the stock ticker symbol of the alleged trade(s)**
       d.      **the quantity of shares traded**
       e.      **how the trading activity allegedly artificially manipulated the share
               price.**

(3)    **Information sufficient to identify each act that allegedly manipulated the
       "demand for the stock of those companies," including but not limited to at
       least:**

       a.      **the date on which these alleged acts occurred**
       b.      **the manner in which these acts is alleged to have affected demand for
               the stock.**

(4)     Information sufficient to identify the wire transmissions that allegedly
        constitute wire fraud, including but not limited to at least:

     a.     the date and time of the alleged wire(s)
     b.     the nature or kind of wire transmission (fax, email, telephone call,
             fund wire, or other)
     c.     the sender, recipient, and location(s) for each.

(5)     Information sufficient to identify all acts of alleged money laundering,
        including but not limited to at least:

     a.     the date and time of each allegedly offending financial transaction
     b.     the sender, recipient and location(s) for each
     c.     the amount of money allegedly laundered, and currency type
     d.     the asserted basis that each constituted a prohibited financial
             transaction.

(6)     Information sufficient to identify each act or circumstance that allegedly
        constituted a failure by Mr. Wey to make a public filing required by Section
        13(d) of the Exchange Act (15 U.S.C. § 78m(d)) and/or Regulation 13d-1
        thereunder (C.F.R. § 240.13d-1), including but not limited to at least:

     a.     the date or date range
     b.     the identity of the issuer(s) involved
     c.     the identity (name and/or account information) of the relevant
             purported "nominee" holder(s).

(7)     Information sufficient to identify the alleged "match trades" discussed in the
        Indictment, including but not limited to at least:

     a.     the date and time of the alleged trade(s)
     b.     the stock ticker symbols of the alleged trade(s)
     c.     the number of shares traded
     d.     the price at which the shares traded
     e.     the identity of the trading parties.

(8)     Information sufficient to put the defense on notice of how Mr. Wey allegedly
        "*caused*" "Nominees" to hold money and/or securities for his personal
        benefit.

(9)     Information sufficient to put the defense on notice of how Mr. Wey allegedly
        "*caused*" "Operating Companies" to merge with "Shell Companies."

(10)    Information sufficient to put the defense on notice of how Mr. Wey allegedly
        "*caused*" the management of Deer Consumer Products, CleanTech
        Innovations, and SmartHeat to secure a listing on NASDAQ.

     (11)    **Information sufficient to put the defense on notice of how Mr. Wey allegedly "*caused*" these "two retail brokers" to "solicit their customers to buy shares of the common stock of the Issuers."**

     (12)    **Information sufficient to put the defense on notice of how Mr. Wey allegedly "deceptively *caused* shares of some of the Issuers to be transferred . . . as gifts or unsolicited bonuses."**

     (13)    **Information sufficient to put the defense on notice of the dates, quantity and price, and identity of the customers who purchased shares of CTEK, DEER, and/or HEAT through or from the "two retail brokers" as described in the Indictment.**

Memorandum of Law in Support of Defendant Benjamin Wey's First Discovery Motion, Dkt.

No. 41 ("Discovery Br."), at 24-26 (quoting Indictment) (emphases and alterations in original).

As for information concerning the conspiracy count, Wey seeks:

     (14)    **The time and date of each alleged overt act in furtherance of the alleged conspiracy.**

     (15)    **All information the Government intends to rely on to show the existence of an agreement between or among the alleged conspirators.**

     (16)    **All statements the Government intends to characterize as co-conspirator statements purportedly admissible pursuant to F.R.E. 801(d)(2).**

*Id.* at 25. Finally, Wey requests the following information pertaining to individuals referenced in the Indictment:

     (17)    **The identity of all alleged co-conspirators.**

     (18)    **The identity of the "two retail brokers" identified in the Indictment.**

     (19)    **The identity of all shareholders who were allegedly recipients of gifted shares.**

     (20)    **The identity of all shareholders who allegedly did not receive shares.**

     (21)    **The identity of all shareholders who allegedly did not know they owned shares.**

*Id.* at 29.

## 2.    Legal Principles

Rule 7(f) permits a defendant to move for a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). "'A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (additional internal quotation marks omitted) (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)).

"A bill of particulars is not a discovery device," *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010), and the question in determining whether to grant one "is not whether the information would be *useful* to the defense" but rather whether it is "*necessary* for the preparation of the defense," *United States v. Chalmers*, 410 F. Supp. 2d 278, 286-87 (S.D.N.Y. 2006) (emphasis added) (internal citation omitted).   "The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories." *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) (citing *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (collecting cases)). "Nor, given that a bill of particulars confines the Government's proof to particulars furnished, should a motion for a bill of particulars be granted where the consequence would be to restrict unduly the Government's ability to present its case, or permit the defendant to tailor her testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (internal citations omitted); *see also*

*United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

As a general matter, if "the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574. The Government, however, "does 'not fulfill its obligations merely by providing mountains of documents to defense counsel who were left unguided' as to the nature of the charges pending." *United States v. Lino*, 00-cr-632, 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (quoting *Bortnovsky*, 820 F.2d at 575). Along similar lines, courts have recognized that "in complex conspiracy cases . . . the potential for unfair surprise and the difficulty of preparing a defense are amplified," *United States v. Rajaratnam*, 09-cr-1184, 2010 WL 2788168, at *2 (S.D.N.Y. Jul. 13, 2010), and "[i]t is no solution to rely solely on the quantity of information disclosed by the government [because] sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars," *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000). Still, these general principles "do[] not allow Defendants to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government, when the Indictment, discovery, and other information provided by the government adequately notify Defendants of the charges against them." *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003) (citing *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984)); *see also Mandell*, 710 F. Supp. 2d at 385 ("the mere existence of 'mountains of documents' does not entitle [defendant] to a bill of particulars"). In short, courts "must examine the totality of the information available to the defendant, including the indictment

and general pre-trial discovery, and determine whether, in light of the charges that the defendant

is required to answer, the filing of a bill of particulars is warranted." *United States v. Gibson*,

175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001) (citing *Bin Laden*, 92 F. Supp. 2d at 233).

The decision whether to grant a bill of particulars is committed to the sound discretion of

the district court, and is reviewed only for abuse of that discretion. *See United States v. Cephas*,

937 F.2d 816, 823 (2d Cir. 1991); *see also United States v. Barnes*, 158 F.3d 662, 665-66 (2d

Cir. 1998).

### 3. Analysis

Wey argues principally that the Government should be required to furnish his requested

particulars in light of (i) the complexity and duration of the scheme that it alleges, (ii) the

Indictment's purported lack of specificity as to the discrete criminal activities ascribed to Wey,

and (iii) the sheer volume of discovery produced by the Government, which, Wey avers, has left

him to "locate needles in a virtual field of haystacks." *See, e.g.*, Discovery Br. at 1-3, 12-22.

The Government counters that Wey has already received sufficient particulars to

understand the charges against him and adequately prepare his defense.  It highlights the 24-page

Indictment, a 97-page search warrant affidavit completed by the Federal Bureau of Investigation,

and extensive discovery productions, which include, among other things, trading records, bank

records, transfer agent records, documents from investment banks concerning the Issuers, and

transcripts of testimony and other documents compiled by the Securities Exchange Commission

and Financial Industry Regulatory Authority during related investigations of Wey and/or the

Issuers.[9]  The Government readily acknowledges that its productions are "extremely

voluminous," and, indeed, it appears undisputed that as many as three million documents (if not

---

[9] *See, e.g.*, Government's Memorandum of Law in Opposition to Defendant Benjamin Wey's Motions for a Bill of Particulars, Production of *Brady* and *Giglio* Material, Immediate Identification of Government Trial Exhibits, and Other Early Trial-Related Disclosures, Dkt. No. 47 ("Discovery Opp."), at 1-8, 14-20.

more) may have been disclosed thus far.  Discovery Opp. at 6-8; Discovery Br. 35.  But the

Government represents that it has provided "detailed guidance" to facilitate Wey's review in the

form of accompanying descriptions, indices, and catalogs, as well as disclosures as to what it

considers "core discovery" and what it considers largely "immaterial."  Discovery Opp. at 6-8 &

n.5, 14-18.  In the Government's view, such guidance substantially ameliorates any logistical

hurdles posed by the volume of its productions.  *Id.*

The Government also urges that many of Wey's requests are improper, seeking

"exhaustive inventories" of the Government's evidence that are unavailable under Rule 7(f).

*Id.* at 21-22.

### a.    Many of Wey's Requests Impermissibly Seek Evidentiary Detail

As an initial matter, the Court agrees that the extraordinary level of detail sought in many

of Wey's requests demonstrates that they are "nothing more than . . . 'ill-disguised attempt[s] at

general pretrial discovery'" – an inappropriate object for a bill of particulars application.  *See*

*Mandell*, 710 F. Supp. 2d at 372 (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.

1990)).  The Court of Appeals has made clear that "[a]cquisition of evidentiary detail is not the

function of the bill of particulars."  *Torres*, 901 F.2d at 234 (internal quotation marks omitted).

Accordingly, Courts in this District "have routinely denied requests for bills of particulars

concerning the 'wheres, whens, and with whoms' of the crime."  *United States v. Ma*, 03-cr-734,

2006 WL 708559, at *14 (S.D.N.Y. Mar. 21, 2006); *see also United States v. Ferrarini*, 9 F.

Supp. 2d 284, 299-300 (S.D.N.Y. 1998) ("Rule 7(f) simply is not implicated by deficiencies on

such a minute scale as those cited by the defendants," including that the "indictment d[id] not

delineate the specific role played by [one defendant] in many of the counts," and failed to

"specify exactly what actions were taken by [the defendant] with respect to the mail fraud and

insurance fraud counts") (internal quotation marks omitted).  Several of Wey's requests target

just this sort of minutiae: information about the nuts and bolts of the Government's legal theories

and anticipated evidentiary presentation that would no doubt be *helpful* to Wey but cannot

credibly be characterized as *necessary* to the preparation of his defense.  Such requests may

easily be denied on that basis alone.

 For example, nearly a quarter of Wey's requested particulars concern precisely "*how*" the

Government alleges that Wey "*caused*" certain actions to be taken.  "It is well settled," however,

that "defendants need not know the *means* by which it is claimed they performed acts in

furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove

their criminal acts." *United States v. Martoma*, 12-cr-973, 2013 WL 2435082, at *5 (S.D.N.Y.

Jun. 5, 2013) (emphasis added) (internal quotation marks omitted) (citing *United States v. Feola*,

651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989)); *United States. v.

Guttenberg*, 07-cr-141, 2007 WL 4115810, at *5 (S.D.N.Y. Nov. 14, 2007) (same); *see also

Ferrarini*, 9 F. Supp. 2d at 299-300 (no bill of particulars warranted where defendant's

application "nitpicks at verbs and phrases in the indictment such as 'pressured' and 'causing to

be delivered'").

 Several more of Wey's requests seek disclosures detailing on an individualized basis

those trades and other acts that the Government claims manipulated the price of the Issuers'

stock.  These requests, too, aim to "compel the production of the very type of evidentiary

minutiae that is not appropriate in a bill of particulars." *United States v. Levy*, 11-cr-62, 2013

WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013) (internal quotation marks omitted).  Through at

least the Indictment, the search warrant affidavit, and even its briefing on the instant motion, the

Government has spelled out the types of actions purportedly taken by Wey to manipulate the

price of Issuer stock – such as pressuring retail brokers to solicit their customers to buy shares of the Issuers and then discourage sales thereof, and orchestrating "match trades" among Nominees – and has provided specific examples of such activities along with general timeframes. *See* Indictment ¶¶ 18-19; Discovery Opp. Ex. A (Affidavit of Matthew Komar In Support of Application for Search Warrant, Jan. 24, 2012) ("Search Warrant Affidavit" or "Search Aff.") ¶¶ 20-29, 36; Discovery Opp. at 20. To require the disclosure of further detail, including trade-level detail, would be to require the Government to advise Wey of the specific "manner in which it will attempt to prove the charges." *Rittweger*, 259 F. Supp. 2d at 291. And, indeed, courts in this District have found bills of particulars unwarranted under analogous circumstances. *See, e.g., Levy,* 2013 WL 664712, at *13 (no bill of particulars required where indictment alleged "pump-and-dump" stock manipulation scheme and described "the types of material misrepresentations and omissions that [defendant] allegedly made"; "the extent of [defendant's] financial commitment to the target companies"; and "[d]efendants' participation in the manipulation of the target companies' stock"); *United States v. Heredia*, 02-cr-1246, 2003 WL 21524008, at *1-2, 9 (S.D.N.Y. Jul. 3, 2003) (no further particulars warranted in pump-and-dump securities fraud case where indictment alleged that defendants caused brokers and confederates to engage in trades designed to manipulate stock price); *United States v. Bonventre*, 10-cr-228, 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013), *aff'd*, 646 Fed. App'x 73 (2d Cir. 2016) (denying request for bill of particulars "identifying the specific arbitrage trades in which [defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," and "all allegedly fake trades" referenced in particular portions of the indictment).[10]

---

[10] *Cf. Rajaratnam*, 2010 WL 2788168, at *9 (Government required to identify trades at issue in substantive insider trading counts but "defendants are not entitled to an itemization of the trades at issue in the conspiracy counts" and

Wey's requests for particulars on the Government's conspiracy allegations and supporting evidence fare no better. "As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars." *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006) (*citing United States v. Feola*, 651 F. Supp. at 1132); *see also United States v. Walker*, 922 F. Supp. 732, 739 (N.D.N.Y. 1996) ("[D]etailed evidence of a conspiracy is generally unavailable to defendants through a bill of particulars, and overt acts in furtherance of the conspiracy need not be disclosed."). Wey's conspiracy-related demands – which seek, for example, a description of "each alleged overt act" committed in furtherance of the charged conspiracy – would essentially "require[] the Government to lay out its proof . . . months before trial." *United States v. Nachamie*, 91 F. Supp. 2d 565, 575-76 (S.D.N.Y. 2000). That is a requirement that courts have consistently declined to impose. *See, e.g., id.* at 575-76 (denying request for identification of "all overt acts" committed in furtherance of conspiracy); *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993) ("disclosure of all the overt acts in furtherance of the conspiracy is not properly the function of a bill of particulars") (internal citation omitted). Along similar lines, "demands for particular information with respect to . . . with whom the Government will charge the defendant with conspiring are routinely denied." *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying request for "names of all co-conspirators and/or aidors and abettors . . . of the defendant") (internal quotation marks and brackets omitted); *see also Torres*, 901 F.2d at 233-34 (affirming denial of request for "the identity of those other persons 'known and unknown'" as alleged in the indictment's conspiracy count); *United States v. Kazarian*, 10-cr-895, 2012 WL

---

"cite no case in which a court has ordered such particularization"); *Lino*, 2001 WL 8356, at *7 (denying bill of particulars "regarding the acts of bribery alleged as part of the historical stock manipulation scheme" because "[p]laying brokers excessive commissions to promote or hold various securities is allegedly the means by which the enterprise operated on a day-to-day basis").

1810214, at *26 (S.D.N.Y. May 18, 2012) (noting that "the Government need not disclose . . .

the identities of all co-conspirators");  *Rittweger*, 259 F. Supp. 2d at 291-92 (denying request for

the "names of all presently unnamed co-conspirators" and the "identities of the customers who

were allegedly defrauded").

In sum, the bulk of Wey's requests may be denied for targeting evidentiary detail that is

plainly beyond the scope of a bill of particulars.

> **b.    Wey Has Already Received a Wealth of Evidentiary Detail
> Through the Indictment, the Search Warrant Affidavit, and
> Discovery**

The Government is also correct in its assertion that Wey has already received substantial

particulars.  Indeed, much of the information that Wey seeks – including a significant portion of

the evidentiary detail discussed above – is available in the Indictment and Search Warrant

Affidavit.  Accordingly, to the extent that Wey's requests seek conceptually appropriate types of

information, a bill of particulars is still unnecessary in light of the information that the

Government already furnished.

First, notwithstanding Wey's characterization of the Indictment as "hopelessly bare,"

Discovery Br. at 3, the 24-page document sets forth the alleged scheme in considerable detail.  It

recounts Wey's purported facilitation of the Nominees' purchase on his behalf of stock in U.S.

shell companies, identifying three such companies by name.  Indictment ¶¶ 8-9.  It describes

Wey's efforts during the 2007-2010 timeframe to parlay this beneficial ownership into

undisclosed control of significant portions of publicly traded corporations by helping to effect

specific mergers, securing the public listing of newly formed Issuers (three of whom, again, are

identified by name) by artificially inflating shareholder counts, and intentionally concealing his

holdings by failing to make required filings.  *Id.* ¶¶ 8-17.   The Indictment further charges that

Wey and his co-conspirators manipulated the price of Issuers stock to the Nominees' and (thus Wey's) financial benefit, specifying three discrete means for doing so. *Id.* ¶¶ 18-19. Finally, the Indictment traces Wey's purported money laundering activities, alleging that he caused proceeds from the Nominees' liquidation of Wey's beneficial stock holdings to be transferred to accounts located in Switzerland and Hong Kong before being repatriated back to the U.S. and deposited in accounts controlled by or for Wey or his wife. *Id.* ¶¶ 21-22. Overall, the Indictment alleges at least ten categories of overt acts by Wey in furtherance of the conspiracy, and identifies one or more specific example each of Wey's wire communications in furtherance of the alleged scheme, failures to disclose, manipulative match trades, and improper monetary transfers.

To the extent that the Indictment is short on specifics, many of those are filled in by the lengthy Search Warrant Affidavit. That document, among other things: identifies the lead retail brokers with whom Wey allegedly conspired, along with dozens of their colleagues and employees; names many of the additional co-conspirators unidentified in the Indictment, including numerous Nominees; provides granular detail on individual transactions by which certain of the Issuers' shareholder bases were artificially inflated and identifies by name numerous new round-lot shareholders created by those transactions; sets forth substantial additional detail on the alleged market manipulation scheme including, specific timeframes, exemplar stock price movements, and particular actions taken by Wey himself or at his direction; identifies specific sales of Issuer stock by alleged Nominees and individual transfers of purportedly ill-gotten funds between Wey-linked domestic and overseas accounts; sets forth purported evidence of Wey's involvement in certain relevant reverse mergers and Issuer listing applications and the bases for the Government's position that Wey was an undisclosed beneficial

owner of Issuer stock; and highlights at least one specific misstatement by Wey that allegedly constitutes securities fraud.  Search Aff. ¶¶ 9-12, 18(e)-(h), 19(c)-(j), 20-29, 36(a)-(g), Ex. B.

Supplementing these particulars is the voluminous discovery that Wey has received since his indictment more than fifteen months ago.  Indeed, the parties are in agreement that the Government has produced several million documents, including various categories of bank and trading records, witness transcripts and document databases compiled in connection with investigations undertaken by the SEC and FINRA, and copies of materials seized from Wey's home and the NYGG offices.  *See, e.g.*, Discovery Opp. at 6-8.  Most of these documents, the Government represents, have been – or are in the process of being – identified by source, categorized by type, and indexed by Bates number range.  *Id.* at 6-8.  Furthermore, the Government has provided guidance to defense counsel on certain sets of documents that constitute the "core" discovery pertinent to this matter, and has identified other sizable sets that are either largely duplicative of other documents produced or are substantially immaterial to the Government's case.  *Id.* and n.5.  Additional guidance to narrow the scope of Wey's review of the extensive trade data files produced by the Government – a primary focus of Wey's of moving papers – is set forth in the Government's opposition to Wey's discovery motion, which provides clarity as to the Government's theory of liability as concerns the alleged market manipulation scheme.  *See* Discovery Opp. at 20 (explaining that Wey "can confine his review to those [trading records] that coincide with the categories of manipulative acts specifically identified: actions by the Retail Brokers, at Wey's urging,  to push their customers to buy Issuer stock and discourage them from selling; large block purchases by Nominees of Issuer stock to support stock prices; and trades in which a Nominee is on one side of the transaction and either another Nominee or a Retail Broker customer is on the other"); *see also Bonventre*, 2013 WL 2303726,

at *7 ("The Government's opposition brief sufficiently alerts [defendant] as to its theories concerning the crimes with which he is charged.").

The Court notes that, even despite this guidance, it has no doubt that reviewing and analyzing the voluminous discovery is a laborious and time-consuming process. In fact, that was one of the central reasons why the Court – with agreement from the parties – entered an unusually long schedule for discovery and pretrial motion practice in the first instance and subsequently granted an extension. *See* Discovery Opp. Ex. B (Transcript of December 4, 2015 Status and Scheduling Conference) at 3-4, 11-13; Dkt. No. 74. Pursuant to the revised schedule, trial now set to begin more than two years after Wey was indicted. Especially in view of that schedule, and the particulars provided by the Indictment and the Search Warrant Affidavit, the discovery volume alone simply does not necessitate a bill of particulars. *See, e.g.*, *Levy*, 2013 WL 664712, at *13 (denying request for bill of particulars based on amount of discovery and noting that "[w]hile the Court may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced by the Government, the applicable Indictment was filed almost eight months ago, and counsel has had the opportunity to review discovery materials as the Government has produced them"); *Kazarian*, 2012 WL 1810214, at *25-26 (bill of particulars unnecessary because defendant had "received an enormous amount of discovery material, including the wiretap and search warrant affidavits" that provided defendant "with much of the information sought in the request" and defendant "had these materials for more than a year, giving him ample time to analyze them and prepare for trial"); *United States v. Earls*, 03-cr-364, 2004 WL 350725, at *4-5 (S.D.N.Y. Feb. 25, 2004) (denying bill of particulars request in part because Government had "furnished the defendant with voluminous discovery, as well as many of the names of individuals and entities left unnamed in the Indictment").

The Court concludes that the combination of the materials available to Wey is sufficient to provide notice of the crimes with which he is charged and to allow him to prepare his defense. Accordingly, Wey's requested bill of particulars is unwarranted, and this motion is DENIED.

Still, the Court recognizes, as noted above, that in "complex conspiracy cases like this one, the potential for unfair surprise and the difficulty of preparing a defense are amplified." *Rajaratnam*, 2010 WL 2788168, at *2. The Government alleges a sprawling scheme running four years or more and implicating three publicly traded stocks and dozens of co-conspirators on at least three continents. It has produced millions of documents of potential relevance to that scheme. Under the circumstances, the Court finds that while no bill of particulars is necessary, early identification of certain subsets of the Government's trial exhibits is appropriate. In particular, in light of the relative scarcity of specific allegedly fraudulent misstatements, omissions, and wire communications ascribed to Wey in the Indictment and the Search Warrant Affidavit, the Government shall, no later than 60 days before trial, produce and identify to Wey all documents which it intends to introduce at trial to demonstrate a misstatement, omission, or wire communication in support of the substantive securities fraud and wire fraud charges. *See, e.g., Bonventre*, 2013 WL 2303726, at *7 (declining to order disclosure of all particulars sought but requiring early disclosure of Government's trial exhibits in light of "the particular circumstances of this case"); *see also United States v. Bonventre*, 646 Fed. App'x 73, 79 (2d Cir. 2016) (Summary Order) (endorsing on appeal early disclosure of exhibits as "adequately address[ing]" concerns regarding volume of discovery). To the extent that any agreement reached by the parties provides for an earlier disclosure date, that earlier date shall control. The Government may supplement such disclosure, in good faith, at any time prior to trial.

C.    *Brady/Giglio* **Material**

Wey also seeks an order directing the Government to "immediately" produce any and all outstanding *Brady* and *Giglio* material, and to identify any such material among those documents that it has already produced.  Discovery Br. at 29-32.  As a subcomponent to that application, Wey specifically urges that the "Government must review and produce notes and memoranda prepared by FBI agents and AUSAs, as well as notes of SEC personnel, when conducting interviews or meetings with individuals or entities during the course of the investigation, to the extent they contain any *Brady/Giglio* material."  *Id.* at 31-32.

The Government responds that it fully recognizes its obligations under *Brady* and *Giglio*.  It represents that: it (i) has already produced certain *Brady* material to Wey, (ii) is "actively continuing its review," both of documents already produced to the defense and of "notes and memoranda of interviews and proffers to identify any potentially exculpatory material," (iii) is proceeding "cognizant of the particular considerations" that Wey has outlined in discovery correspondence, and (iv) will produce any further *Brady* material "promptly." Discovery Opp. at 8 n.7, 22.  It contends, however, that Wey's application aimed at *Giglio* material "stands on different footing" and that such material need not be disclosed until the Government produces materials under the Jencks Act, 18 U.S.C. § 3500.  *Id.* at 22.  On reply, Wey disputes the Government's distinction between *Brady* and *Giglio* material with regard to the timing of production and maintains that the latter should be disclosed as soon as it becomes known to the Government.

The Court accepts the Government's representations with respect to the *Brady* portion of Wey's motion.   It construes those representations as committing the Government to promptly producing, or flagging within its previous productions, all *Brady* material that it identifies,

including any within the memoranda and notes compiled by law enforcement during proffer sessions and interviews, and to doing so taking particular account for concerns articulated in Wey's discovery letters. At this time, the Court is satisfied that no further direction to the Government with respect to these disclosures is warranted beyond that set forth in the established law of this Circuit. Accordingly, Wey's requests regarding *Brady* material are DENIED as moot. *See, e.g., United States v. Del Rosario*, 12-cr-81, 2012 WL 538243, at *2-3. (S.D.N.Y. Feb. 17, 2012); *United States v. King*, 10-cr-122, 2011 WL 1630676, at *7 (S.D.N.Y. Apr. 27, 2011); *Earls*, 2004 WL 350725, at *8.

With respect to *Giglio* material, the Court first notes that "there is no general right of pre-trial discovery because such material ripens into evidentiary material for purposes of impeachment only if and when the witness testifies at trial." *Id.* at *8 (internal quotation marks and brackets omitted). Rather, due process requires only that *Giglio* material be disclosed "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). In keeping with requirement, it is a widely recognized customary practice in this District that *Giglio* material is "turned over at the same time as material under the Jenks Act" in "recognition of the fact that this type of *Brady* material does not ordinarily require any independent investigation to use it effectively at trial." *United States v. Espinal*, 96 F. Supp. 3d 53, 66 (S.D.N.Y. 2015) (internal quotation marks omitted). Both types of material are typically produced "a week or two before the start of trial, depending on the complexity of the case." *Id.*

Wey may be correct to note that the district court retains authority to order earlier disclosure of *Giglio* material as appropriate under the circumstances. *See, e.g., United States v. Padilla*, 94-cr-313, 1995 WL 105280, at *1 (S.D.N.Y. Mar. 13, 1995). But Wey fails to

articulate any persuasive reason why immediate disclosure is required in this case, and the Court

otherwise sees no basis to deviate so substantially from the typical practice. *See, e.g.*, *United*

*States v. Dames*, 380 F. Supp. 2d 270, 272-73 (S.D.N.Y. 2005) (defendant "failed to show" why

disclosure of *Giglio* material at least one week prior to trial "would not be in time for its effective

use at trial" and made "no special showing that demonstrates prejudice suffered in not having

immediate access to the material") (internal quotation marks omitted); *see also United States v.*

*Mohamed*, 148 F. Supp. 3d 232, 246 (E.D.N.Y. 2015) ("Courts in the Second Circuit generally

do not compel immediate disclosure of *Brady/Giglio* materials where (1) the Government

represents that it is aware of and will comply with its *Brady/Giglio* obligations, and (2) the

Defense does not provide any reason for suspecting the Government will not comply.").

Accordingly, the Court DENIES Wey's motion for immediate disclosure of *Giglio*

material. *See, e.g.*, *Earls*, 2004 WL 350725, at *8; *Trippe*, 171 F. Supp. 2d at 237-38. In view

of the complexity of this case, however, and the expected length of the Government's trial

presentation, the Court, in the exercise of its discretion, directs the Government to disclose all

*Giglio* material known to it either at the agreed-upon time that it produces its Section 3500

material or else 21 days prior to trial, whichever is earlier. *See, e.g., United States v. Barret*, 824

F. Supp. 2d 419, 456 (E.D.N.Y. 2011).

### D. Deposition of Co-Defendant Seref Dogan Erbek

Wey further moves for leave to depose his co-defendant Erbek pursuant to Federal Rule

of Criminal Procedure 15(a). Rule 15(a) authorizes a trial court to order the deposition of a

witness for use at trial "in the interest of justice" and if justified by "exceptional circumstances."

Fed. R. Crim. P. 15(a)(1). "It is well settled that, in order to establish 'exceptional

circumstances' under Rule 15, 'a movant must show that (1) the prospective witness is

unavailable for trial, (2) the witness's testimony is material, and (3) the testimony is necessary to prevent a failure of justice.'" *United States v. Vilar*, 568 F. Supp. 2d 429, 437 (S.D.N.Y. 2008) (internal brackets omitted) (quoting *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001)). Even if these requirements are satisfied, because Erbek is a defendant in this matter his deposition may only proceed with his consent. *See* Fed. R. Crim. P. 15(e)(1).

"Unavailability" is determined, for purposes of Rule 15, "according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984) (deeming witnesses who refused to travel to the U.S. unavailable). "A movant must provide specific reasons for a witness's unavailability." *United States v. Pham*, 12-cr-423, 2015 WL 7871348, at *1 (S.D.N.Y. Dec. 4, 2015). "Conclusory or speculative statements regarding unavailability are insufficient." *United States v. Little*, 12-cr-647, 2014 WL 1744824, at *1 (S.D.N.Y. Apr. 23, 2014).

Anticipated testimony is "material" within the meaning of Rule 15 if it is "highly relevant to a central issue in the case." *Vilar*, 568 F. Supp. 2d at 440 (internal quotation marks omitted). When, as here, the "Defendant requests Rule 15 depositions, the testimony sought should 'challenge central aspects of the government's allegations.'" *Pham*, 2015 WL 7871348, at *1 (quoting *United States v. Grossman*, 03-cr-1156, 2005 WL 486735, at *4 (S.D.N.Y. Mar. 2, 2005)); *see also United States v. Ismaili*, 828 F.2d 153, 161-62 (3d Cir. 1987) (testimony sought via Rule 15 motion should "negate the crux" of the government's case). A court may "properly deny [a] motion [to depose] if the proposed testimony would be cumulative." *United States v. Stein*, 482 F. Supp. 2d 360, 365 (S.D.N.Y. 2007) (internal quotation marks omitted).

Movants are not necessarily required to present affidavits from proposed witnesses or

documentation of their prior statements in order to establish either their unavailability or the materiality of their expected testimony. *See Vilar*, 568 F. Supp. 2d at 438-440 (collecting cases "overwhelmingly" rejecting arguments to the contrary). Rather, a moving party's representations, if sufficiently specific, may be enough to establish that both requirements are satisfied. *Id.;* see also *Pham*, 2015 WL 7871348, at *2 (with respect to materiality, "any proffer of testimony must alert the district court to the substance of the evidence that is at peril of being excluded") (internal quotation marks omitted).

When the first two prongs of the exceptional-circumstances test are met, the third prong, "neces[ity] to prevent a failure of justice," is "likely satisfied" if "there are no substantial countervailing factors militating against the taking of the deposition." *Vilar*, 568 F. Supp. 2d at 442-43 (internal quotation marks omitted) (citing *Grossman*, 2005 WL 486735, at *3); *see also United States v. Drogoul*, 1 F.3d 1546, 1556 (11th Cir. 1993) ("When a substantial likelihood exists that the prospective deponents will be unavailable for trial and their testimony is highly relevant to a central issue in the case, justice generally requires preservation of that testimony."). As a general matter, the discretion afforded district courts to decide Rule 15 motions is "considerable." *Pham*, 2015 WL 7871348, at *1.

Under the somewhat unusual circumstances presented here, the Court will grant Wey's motion to depose Erbek. First, as Wey points out, Erbek, who has been indicted in this matter but remains at large, is a Swiss and Turkish citizen living abroad and beyond the subpoena power of this Court. Dismissal Br. at 87; *see also* Declaration of David Siegal, Dkt. No. 46 ("Siegal Dec."), Ex. 43. Defense counsel represents that it has spoken with counsel for Erbek in a "good faith attempt to secure Mr. Erbek's testimony at Mr. Wey's trial" and has been "informed . . . that Mr. Erbek does not intend to travel to the United States to testify." *Id.*; Siegal

Dec. ¶ 61. Generally, the combination of these factors is sufficient to establish unavailability. *See, e.g., Vilar*, 568 F. Supp. 2d at 438-39; *see also Johnpoll*, 739 F.2d at 709; *Little*, 2014 WL 1744824, at *1-2. The Government summarily (and surprisingly) asserts, however, that Erbek is not unavailable within the meaning of Rule 15 because it is "prepared to offer Erbek safe passage to the United States for the limited purpose of testifying at Wey's trial."[11] The Government cites no authority – and the Court is aware of none – for the proposition that a unilateral offer of "safe passage" converts an otherwise unavailable witness into an available witness, and the Court is unpersuaded by the bare contention. *Little*, 2014 WL 1744824, at *1-4 (suspected co-conspirator unavailable under Rule 15 when unwilling to travel from Switzerland to testify in U.S. despite safe passage offer). On the record before it, the Court is satisfied that Erbek is unavailable.

The Government does not refute Wey's arguments regarding materiality, and the Court finds that this requirement, too, is met. The Government conducted a proffer session with Erbek in London in January 2016, and has produced an FBI memorandum and notes memorializing the session to Wey in discovery. *See* Siegal Dec. Exs. 43, 45. Based on these materials, Wey asserts that Erbek is likely to contradict allegations that Wey exercised transactional authority and other control over shares of SmartHeat, Deer, and CleanTech held by the Nominees and to testify that Erbek never did business with or received trading instructions or payments from Wey. Dismissal Br. at 84. Erbek may also be expected, according to Wey, to testify that email correspondence marshalled in the Indictment and alleged to be evidence of market manipulation in fact reflects legitimate limit order instructions. *Id.* at 85. Furthermore, Wey avers, Erbek will testify that certain Nominee entities were, to his knowledge, under the control of advisers based in China – rather than Wey, as the Government alleges – and that a major financial institution independently

---

[11] *See* Government's Memorandum of Law in Opposition to Defendant Benjamin Wey's Motions to Suppress Evidence, Prevent a Privilege Review, Dismiss the Indictment, Take his Co-Defendant's Deposition Abroad, and Strike References to Aliases, Dkt. No. 53 ("Dismissal Op."), at 72.

concluded, after "openly discussing" the issue, that certain pertinent stock holdings need not be disclosed under Rule 13d-1. *Id.* at 86. Although the Court expresses no view as to the admissibility or credibility of this expected testimony, there can be doubt that it is material within the meaning of Rule 15. *See Vilar*, 568 F. Supp. 2d at 440 n.10 (whether anticipated deposition testimony is "material" under Rule 15 and whether it will ultimately be deemed "material and admissible at trial" are "different matter[s]," and the Court need not pass on the latter to grant a Rule 15 motion); *see also* Fed. R. Crim. P. 15(f).

Finally, the Government makes no attempt to identify any countervailing factors that would militate against the taking of Erbek's deposition. While the Court is mindful that a deposition of this sort would not necessarily constitute common practice in this District, it notes that permitting a deposition of an at-large co-defendant living abroad is not entirely without precedent. *See United States v. Gonzalez*, 488 F.2d 833, 838-39 (2d Cir. 1973) (while testimony of "fugitive from justice is rightly suspect," the "jury is well able to weigh such testimony" and the "defendant should not be deprived of testimony which would be available by deposition" solely on the basis). Accordingly, with the first two prongs of the exceptional-circumstances test having been satisfied and a pretrial deposition evidently the only practicable means for Wey to procure potentially highly relevant testimony, the Court finds, in the absence of any argument to the contrary, that granting Erbek's deposition is necessary to prevent a failure of justice.

For these reasons, Wey's motion to take Erbek's deposition is GRANTED. As noted, however, Rule 15(e)(1) requires that Erbek consent to his deposition before it may proceed.

**E.      Motion to Strike References to Defendant's Aliases**

Finally, Wey moves pursuant to Federal Rule of Criminal Procedure 7(d) to strike from the Indictment all references to the alleged "A/K/A's" that immediately follow his name in both

the Indictment's caption and throughout the body of the instrument: "Tianbing Wei" and

"Benjamin Wei." *See, e.g.*, Indictment ¶ 2. The former is undisputedly Wey's given Chinese

name while the later is the name that Wey adopted following his arrival in the United States

from China in the early 1990s and used until legally changing its spelling to the current

"Benjamin Wey" in 2004. *See* Dismissal Br. at 89; Siegal Dec. Ex. 1.

Wey contends that the Indictment's references to his former names as alleged "A/K/A's"

"do not relate in any way" to the "the acts alleged in the Indictment" or to the "Government's

case." Dismissal Br. at 89-90. Instead, he urges, they serve no purpose but to "unfairly suggest[]

that [he] has used various names for himself, interchangeably, as an act in furtherance of the

fraudulent schemes alleged" and to "imply" that his "name change is somehow emblematic of

his purportedly fraudulent character, or worse, that persons with foreign names are somehow

inherently suspicious." Dismissal Br. at 88-90. Wey's arguments are unpersuasive.

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike

surplusage from an indictment, it has long been the policy of courts within the Southern District

to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d. 600,

621 (S.D.N.Y. 2000) (internal quotation marks, citation, and brackets omitted); *see also United

States v. Gotti*, 42 F. Supp. 2d 252, 292 (S.D.N.Y. 1999) ("Because the standard for surplusage is

exacting, only rarely is alleged surplusage stricken from an indictment."). Indeed, "[m]otions to

strike surplusage from an indictment will be granted only where the challenged allegations are

not relevant to the crime charged and are inflammatory and prejudicial." *United States v.

Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001) (internal quotation marks omitted) (citing *Scarpa*,

913 F.2d at 1013). As a general matter, "[a]liases relevant to the case and not prejudicial in

themselves may be set forth in the indictment and proved at trial." *United States v. Butler*, 351

F. Supp. 2d 121, 125 (S.D.N.Y. 2004) (citing *United States v. Dioguardi*, 428 F.2d 1033, 1040 (2d Cir. 1970)).

Notwithstanding Wey's conclusory assertions, the Court sees no basis to conclude that the inclusion in the Indictment of unadorned references to Wey's birth name and former adopted name, without more, is prejudicial. Moreover, the Government intends to offer certain evidence – including evidence of past securities dealing-related sanctions against Wey which the Government suggests may be admissible under Federal Rule of Evidence 404(b) – that makes reference to at least the name "Benjamin Wei."[12] *See* Dismissal Op. at 73; *see also* Reply Declaration of David Siegal, Dkt. No. 61, Ex. 48 (sanctions agreement between Wey and Oklahoma Department of Securities referring to "Benjamin Wei"). Should reference indeed be made to Wey by either of his former names during trial, whether in testimony or documentary evidence, the presence of those names in the Indictment may "serve to obviate jury confusion." *United States v. Rodriguez*, 734 F. Supp. 116, 128-29 (S.D.N.Y. 1990) (internal quotation marks omitted) (denying motion to strike aliases and nicknames where portions of Government's evidence would refer to defendants by such names); *see also Butler*, 351 F. Supp. 2d at 125 (denying motion to strike where aliases, including "variant spellings of [defendant's] name," would be referred to in 404(b) and other evidence); *United States v. Claytor*, 52 F.R.D. 360, 361 (S.D.N.Y. 1971) (denying motion to strike references to alleged alias that could "serve to eliminate jury confusion").

Although the Court will deny Wey's motion to strike, it should be noted that such denial may ultimately be of little, if any, practical import. As other courts in this District have

---

[12] The Court implies no view as to the whether any such evidence will ultimately prove admissible under Rule 404(b) or otherwise, and Wey may, of course, move to preclude any such evidence and/or move for the redaction of any matters deemed inadmissible from materials submitted to the jury. *See Butler*, 351 F. Supp. 2d at 125 n.2.

recognized, if it should indeed be deemed "appropriate to give copy of the [I]ndictment to the jury in connection with their deliberations" – and the Court expresses no view on that question at this time – "that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial." *Butler*, 351 F. Supp. 2d at 124 (also noting that "[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges"). Relatedly, "the possibility of any prejudice resulting from the jury's learning that [Wey] had an alias can be eliminated by the court's charge to the jury if [Wey] so requests at the proper time." *Claytor*, 52 F.R.D. at 361.

Finally, to the extent that Wey also seeks, in passing, excision from the Indictment of phrases such as "among others" and "at least" on the ground that they "impermissibly expand the charges . . . without any specific allegations of additional wrongdoing," *see* Dismissal Br. at 90-91 n.57, that portion of the motion to strike is also denied. It is well-established in this District that this type of so-called "broadening" language is only subject to removal when it "appears in a charging paragraph" within an indictment. *See, e.g.*, *United States v. Kassir*, 04-cr-356, 2009 WL 995139, at *3 (S.D.N.Y. Apr. 9 2009). Such language is permissible, however, when it appears only in sections of an indictment "alleging the means and methods by which the defendant committed the charged offense," including sections alleging "overt acts" in furtherance of a charged conspiracy. *Id.* (collecting cases). Because the phrases of which Wey complains appear only in sections of the Indictment setting forth the "means and methods" by which he allegedly committed the charged offenses and the "overt acts" allegedly undertaken in furtherance of the charged conspiracy, *see* Indictment ¶¶ 18, 26, Wey's request to strike the broadening language is without merit.

For the foregoing reasons, Wey's motion to strike purported surplusage from the Indictment is DENIED.

## III.    Conclusion

For the foregoing reasons, (i) Wey's motion to dismiss is DENIED in full; (ii) Wey's motion for a bill of particulars is GRANTED to the limited extent set forth above and otherwise DENIED; (iii) Wey's motion for immediate disclosure of *Brady* and *Giglio* material is DENIED; (iv) Wey's motion to depose Seref Dogan Erbek is GRANTED; (v) Wey's motion to strike surplusage from the Indictment is DENIED; and (vi) any remaining applications are DENIED as moot in light of agreements reached by the parties.  As noted above, the Court will resolve Wey's motions to suppress evidence and preclude a privilege review by separate order.

This resolves Dkt. No. 40 and resolves in part Dkt. No. 44.

SO ORDERED.

Dated: January 18, 2017
       New York, New York

ALISON J. NATHAN
United States District Judge