H1NMWEY1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                       15 Cr. 611 (AJN)

BENJAMIN WEY,

         Defendant.

------------------------------x

                                New York, N.Y.
                                January 23, 2017
                                10:10 a.m.

Before:

                HON. ALISON J. NATHAN,

                                District Judge

                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
MICHAEL FERRARA
AIMEE HECTOR
IAN P. McGINLEY
     Assistant United States Attorneys

HAYNES AND BOONE, LLP
     Attorneys for Defendant
DAVID M. SIEGAL
JOSEPH C. LAWLOR
BARRY McNEIL
SARAH E. JACOBSON

H1NMWEY1

1          (Case called)

2          MR. FERRARA:  Good morning, your Honor, for the

3    government, Michael Ferrara, Aimee Hector and Ian McGinley.  We

4    are also joined by paralegal specialist, Sarah Emmerich.

5          MR. SIEGAL:  Good morning, your Honor, David Siegal,

6    Joseph Lawlor, and Barry McNeil appearing at counsel table.

7    Sarah Jacobson is back in the gallery and my client, Benjamin

8    Wey, is sitting at counsel table.

9          THE COURT:  Good morning.

10          We are here on Mr. Wey's motion to suppress following

11    the parties' briefing on the matter.  I ordered this hearing to

12    address the question of good faith.

13          I am comfortable proceeding straight into testimony,

14    if that's what counsel wishes, or if you would like to make an

15    opening statement of some kind, you may do so.

16          MR. FERRARA:  Your Honor, actually sort of dovetails

17    one thing we wanted to mention before, which is, I think the

18    point is, we are happy to just jump right into the witnesses

19    because we do think it's going to be a full day and likely will

20    bleed into a second day.  We wanted to alert your Honor to that

21    in terms of scheduling.

22          THE COURT:  I have two days available for it.

23          MR. FERRARA:  Is that tomorrow, just for our witnesses

24    purposes?

25          THE COURT:  Yes, it is tomorrow.  Which doesn't mean

H1NMWEY1

1    we won't move efficiently, but I have the time.  In looking at

2    the witness list that was submitted, I presume we might need a

3    second day.

4              MR. SIEGAL:  There is one other point I think, your

5    Honor, which is, it may be that one of the witnesses we asked

6    be made available is not available tomorrow.  I think we should

7    just deal with that as the day goes along.

8              THE COURT:  You have someone who is here today who

9    will not be available tomorrow.

10             MR. FERRARA:  One of the special agents is available

11   today, but not tomorrow.  It's one of the agents that Mr.

12   Siegal would like to call.

13             THE COURT:  Have you discussed ordering to ensure that

14   we get that testimony today?

15             MR. SIEGAL:  Part of our thought process here, your

16   Honor, is that we may decide not to call him, depending on what

17   happens in the other testimony.  It wouldn't be my inclination

18   to take him out of order.  I think we should make that decision

19   later in the day when we have a better sense of what the

20   evidence looks like.

21             THE COURT:  But recognizing at some point it's fish or

22   cut bait.  Given that it sounds like he might not be here

23   tomorrow, you just need to make a decision in time today to

24   take his testimony.

25             MR. SIEGAL:  OK, your Honor.

H1NMWEY1                          Massey - direct

1          THE COURT:  Thank you.

2          MR. FERRARA:  The government calls David Massey.

3          THE COURT:  Mr. Massey may come forward.

4          MR. FERRARA:  I am going to grab him from outside,

5   your Honor.

6          THE COURT:  Thank you.

7    DAVID MASSEY,

8        called as a witness by the Government,

9        having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY MR. FERRARA:

12  Q.  Good morning, Mr. Massey.

13  A.  Good morning.

14  Q.  Where do you work?

15  A.  Richards Kibbe & Orbe.

16  Q.  You're a lawyer?

17  A.  Yes.

18  Q.  I want to call your attention to January 2012.  Where did

19  you work then?

20  A.  U.S. Attorney's Office, Southern District of New York.

21  Q.  When did you first start as an Assistant U.S. Attorney?

22  A.  November of 2004.

23  Q.  When did you leave that office?

24  A.  November of 2013.

25  Q.  To what unit were you assigned in late 2011 and early 2012?

1  A.  Securities and commodities fraud task force.

2  Q.  How long had you been an AUSA in the securities and

3  commodities fraud task force as of January 2012?

4  A.  Hard to remember.  I think around a year.

5  Q.  To the extent it's not obvious from the name, what sorts of

6  cases does that task force focus on?

7  A.  Securities commodities fraud, mail wire fraud, all sorts of

8  financial fraud.

9  Q.  Again, in this time period, late 2011, early 2012, were you

10  working on an investigation involving Ben Wey and New York

11  Global Group, among others?

12  A.  Yes, I was.

13  Q.  You have a binder next to you with some exhibits in them,

14  some things marked as exhibits.  I would ask you to take a look

15  at what's been marked as Government Exhibits 2 and 3.

16  A.  OK.

17  Q.  What are those?

18  A.  Government Exhibit 2 is the application for a search

19  warrant for the office of New York Global Group.  Government

20  Exhibit 3 is the warrant, including attachments for the search

21  of the office of New York Global Group.

22          MR. FERRARA:  Your Honor, the government offers

23  Exhibits 2 and 3.

24          MR. SIEGAL:  No objection.

25          THE COURT:  Without objection, Government's 2 and 3

1    are admitted.

2              (Government Exhibits 2 and 3 received in evidence)

3    Q.  Who took the lead in drafting those documents?

4    A.  I did.

5    Q.  Let's start with Exhibit 2, the affidavit.  Could you

6    describe for us the process that went into drafting that

7    affidavit?

8    A.  Well.

9              THE COURT:  You're directing him to what begins on the

10   second page of the exhibit?

11             MR. FERRARA:  Yes, your Honor.  I think of it as one

12   document, but I think that's right to talk about the affidavit.

13   I think of the application as sort of the first page, but, yes,

14   that's accurate.

15   A.  The process was one of collecting all the information that

16   had been assembled in the investigation from grand jury

17   subpoenas, information supplied by the SEC, interviews of

18   witnesses, information provided by the FBI, and all sorts of

19   other information.  From that information I sat in my office

20   and wrote the initial drafts and revised drafts of a lengthy

21   affidavit.

22   Q.  Does the affidavit include all of the information you had

23   in the investigation at that point?

24   A.  No.

25   Q.  I want to ask you a few questions about the affidavit.

1   Let's first turn to page 19 of Exhibit 2.

2   A.  OK.

3   Q.  Were you there?

4   A.  Almost.  Yes.

5   Q.  The affidavit spends some time discussing Mr. Wey's

6   transferring of shares to meet the NASDAQ's listing requirement

7   of 100 round lot shareholders.  Do you recall that?

8   A.  Yes.

9   Q.  Anywhere in the affidavit does it allege that NASDAQ's

10  rules forbid gifting shares to meet that listing requirement?

11  A.  Not as I recall.

12  Q.  What was the import of the affidavit's discussion of Mr.

13  Wey's distributing shares to meet the listing requirement?

14  A.   Well, it was one of many indicia of fraud, which had been

15  noticed by the SEC in the China Energy case, which is described

16  in the affidavit.  There is a NASDAQ rule -- was then the

17  NASDAQ rule for round lot shareholders to have a certain

18  threshold of round lot shareholders, round lot being a hundred

19  shareholders.

20          And the basic idea is that through a process that's

21  described at length in the affidavit with respect to a number

22  of issuers it was clear that New York Global Group and/or Ben

23  Wey or somebody operating at the premises had engaged in a sham

24  process to sort of make it appear as though there was a large

25  number of people with genuine trading interests in the stock

1  when in fact it was an individual or individuals controlling a

2  process of distribution of stock kind of again and again,

3  spinning out shareholders for the purpose of making it appear

4  that there was a larger investor base than there actually was.

5  Q.  Let's turn to page 43 of the affidavit.  Looking at

6  paragraph 25.

7  A.  OK.

8  Q.  What does that paragraph describe?

9  A.  This paragraph describes -- just give me one second, if you

10  would.

11  Q.  Take your time, sir.

12  A.  This describes the rapid rise in price of two issuers,

13  SmartHeat and Deer.

14  Q.  I think that paragraph describes a significant rise in the

15  price of that stock?

16  A.  Yes.

17  Q.  Were you aware of other information that could have

18  explained the significant increase in the share price other

19  than aggressive buying activity by the Scholander and Harris

20  brokers?

21  A.  I was not aware of any other public information that could

22  describe such a significant and rapid increase in the share

23  price.

24  Q.  Turning to the next page, does the affidavit describe the

25  buying activity as at least a part of the increase in the share

1    price?

2    A.  Yes.

3    Q.  Let's turn to page 12, the bottom of page 12, paragraph 14.

4              MR. SIEGAL:  I'm sorry.  Where are we?

5              MR. FERRARA:  Page 12 of Exhibit 2, still Exhibit 2.

6              THE COURT:  Just for clarity of record, you mean page

7    12 of the affidavit contained in Exhibit 2?

8              MR. FERRARA:  Yes, your Honor.  Thank you.

9    Q.  If everyone is there, paragraph 14 reads, in part:  As

10   described in more detail below, one of Wey's nominees, Tianyi

11   Wey, has transferred large sums of money to Wey's wife,

12   Michaela Wey, including wire transfers that were divided into

13   increments less than $10,000 to avoid raising suspicion.  I'll

14   stop there.  Let's turn in that same affidavit to page 57.

15   A.  OK.  I'm there.

16   Q.  And this little I subparagraph on 57 reads, in part:  HSBC

17   New York bank records also show other transfers from Tianyi Wey

18   to the Michaela Wey account at HSBC New York that were

19   deliberately broken into increments less than $10,000 to avoid

20   raising suspicion, given the United States currency transaction

21   reporting requirements with respect to cash transactions over

22   $10,000.

23             Did I read that right?

24   A.  Yes.

25   Q.  Were you aware, when you drafted this affidavit, that the

1   currency transaction reporting requirements with respect to

2   transactions over $10,000 did not apply to wire transfers?

3   A.   Yes.

4   Q.   What is the import of those parts of those two paragraphs I

5   just read?

6   A.   Well, it makes clear that the CTR requirement applies to

7   cash, physical currency transactions.  What it's meant to

8   convey is just another indicia of fraud which I had seen and

9   was sort of commonly known in cross-border fraud settings

10  whereby people who are transferring large sums of money into or

11  out of the United States would break the amounts into smaller

12  amounts to reduce scrutiny on the transactions.  And for some

13  reason, and I suppose it's because there is the CTR requirement

14  for cash at the level of 10,000, people appear to believe that

15  if they make the transactions less than $10,000 they will get

16  less scrutiny by the banks or by the government.

17  Q.   Let's turn to page 74 of the affidavit, paragraph 36.  This

18  paragraph I believe discusses the NASDAQ's decision to delist

19  Cleantech.  Is that right?

20  A.   Yes.

21  Q.   Do you know whether the NASDAQ's decision was ultimately

22  overturned by the SEC?

23  A.   As I sit here now, I understand it was overturned.

24  Q.   At the time you were involved in drafting the affidavit,

25  did you have information suggesting whether the SEC would

1    ultimately overturn the delisting decision?

2    A.  Not that I recall.

3    Q.  My last question about the affidavit in Government Exhibit

4    2 is at page 56 and this is footnote 8.

5    A.  I see it.

6    Q.  There is a reference in the footnote to Ms. Wey, Tianyi, An

7    Bei Lu.  Do you see that?

8    A.  Yes.

9    Q.  Am I right that the footnote suggests that's a reference to

10   one of the founders of Cleantech's China-based operating

11   company?

12   A.  Yes.

13   Q.  Do you believe that suggestion is still correct?

14   A.  As I sit here now, I have learned that Bei Lu is a street

15   name or also a street name in addition to being the name of one

16   of the founders of Cleantech.

17   Q.  Did you believe the suggestion was correct at the time you

18   drafted the affidavit?

19   A.  Yes.

20   Q.  Let's flip to Government Exhibit 3, which is the NYGG

21   warrant.

22   A.  I have it.

23          THE COURT:  My binder doesn't have the warrant.  I

24   take it back.  It does.

25   Q.  Do the statute citations to the crimes under investigation

H1NMWEY1                        Massey - direct

1   appear on the face of the warrant or its attachments?

2   A.  Not that I see.

3   Q.  Nonetheless, was it clear to you, based on the warrant and

4   its attachments, what crimes were being investigated?

5   A.  Absolutely.

6   Q.  Why is that?

7   A.  Well, it's based on the face of the warrant.  Exhibit A,

8   paragraphs starting with paragraph 1, the first types of

9   records that are called for are financial records concerning

10  various individuals, including banking and brokerage firm

11  account statements and the like.  In addition, paragraphs 1 and

12  2 for starters are all about financial transaction records,

13  records of shareholders.  That certainly indicates a financial

14  or securities fraud as opposed to narcotics or assistance to

15  terrorism or something like that.

16  Q.  Based on the affidavit, why did you believe a warrant of

17  this breadth was justified?

18  A.  Because as described in the warrant, Ben Wey --

19  Q.  You mean as described in the affidavit?

20  A.  Yes.  As described in the affidavit.  Do I mean to describe

21  it based on the warrant or based on the affidavit?

22  Q.  My question was, based on what's in the affidavit, why did

23  you believe a warrant calling for this breadth of records

24  wasn't that justified?

25  A.  In short, I thought there was a high probability that

1  subpoenas to New York Global Group and related entities would

2  not yield all of the relevant evidence of crime.  I thought

3  evidence would be withheld and/or evidence would be destroyed.

4  Q.  So that answers the question of why a warrant versus some

5  other type of process?

6  A.  Yes.

7  Q.  Now another question is, why did you believe it was

8  appropriate to seize this breadth of records that is in the

9  attachments to the warrant?

10  A.  Well, it was clear from what's described in the warrant

11  that the economic business activity of Ben Wey's operations

12  going back to the early 2000s and everything about New York

13  Global Group that I had observed and the FBI had observed

14  through a time-consuming investigation was that it was

15  essentially permeated by fraud, that each issuer that it had

16  advised had some kind -- had significant indicia of securities

17  fraud or other fraud, starting with Bodisen Biotech, which had

18  been delisted for failure to disclose its relationship to Ben

19  Wey's entity.  He had been barred from the securities industry

20  in Oklahoma.  Each issuer followed the same pattern.

21        And the way securities fraud and sort of market

22  manipulation schemes tend to work is, there is sort of a

23  playbook and it's sort of a factory.  There is a beginning,

24  middle, and end.  The playbook was being repeated issuer after

25  issuer.

H1NMWEY1                              Massey - direct

1          In addition, that showed that the fraud permeated the

2     organization.  In addition, there was a claim by Ben Wey and/or

3     his agents that his only income came from the U.S. company New

4     York Global Group USA and that New York Global Group USA's only

5     income or revenue came from its co-branded Chinese affiliate,

6     New York Global Group Asia.  That seemed completely

7     implausible, given the amount of money that we know that Ben

8     Wey was sort of generating from these schemes.  And so all the

9     records of New York Global Group, including revenue, expenses

10    and the like were in play.

11    Q.  Let's switch gears and talk about the preparation for the

12    search itself.  I guess I want to ask you, based on the nature

13    of this case in particular, what was your thinking of how to

14    prepare the agents for this particular search?  How did you

15    approach how you were going to help them prepare?

16    A.  Well, with the lead agent, the lead agent, Matt Komar, was

17    well versed in the details because he sat in my office and read

18    it, edited it and gave suggestions on it and ultimately

19    coauthored it, signed it.  That was how he understood it, and

20    he was participating in the investigation with me day to day.

21          As far as the other agents go, there was a group of

22    other agents from that squad that were participating.  And I

23    believe the way I thought about it was to think of it sort of

24    like a wiretap.  I have a recollection of thinking that the

25    affidavit was lengthy.  The agents certainly needed to

1   understand it at a certain level, at least at a very broad

2   level, and that sort of like a wiretap where the process is one

3   where an AUSA will brief the agents who are participating in

4   the wiretap by telephone or in person, I thought it made sense

5   to do something similar here, period.

6   Q.  And so what, if any, meetings did you participate in in

7   order to prepare the agents in that way?

8   A.  I have a vague recollection of going over to 26 Federal

9   Plaza, to the FBI's offices, and talking and meeting with some

10  or all of the agents who were going to participate in this

11  search, probably also including the supervisor.  I can't recall

12  who all was there.  Certainly Matt Komar was there.  And sort

13  of talking them through the affidavit and the investigation and

14  what they were looking for.

15  Q.  Does your recollection include when that was in relation to

16  the search itself?

17  A.  It doesn't because I don't have -- I can tell you based on

18  practice.  The practice would have been to do it very close in

19  time to the search.

20  Q.  You mentioned that some of the other agents participating

21  were all in the same squad.  What sorts of crimes did that

22  squad focus on?

23  A.  Securities fraud.

24  Q.  At any point during that meeting you just described did you

25  get the impression, based on what you were seeing or hearing,

1   that any of the agents of the search team did not understand

2   the crimes that were being investigated?

3   A.  No.

4   Q.  Were you present for the search of NYGG?

5   A.  No.

6   Q.  Were you communicating with agents during that search?

7   A.  With at least Agent Komar and possibly also his supervisor,

8   Agent Pisano.

9   Q.  At any point, based on what you were hearing from Agent

10  Komar, any other agent you may have communicated with, did you

11  ever worry or have any concern that the agents did not

12  understand what they were permitted to seize from the offices

13  of NYGG?

14  A.  No, I didn't.

15  Q.  At some point did you learn there might be another location

16  for which a search was warranted?

17  A.  Yes, I did.

18  Q.  What happened?

19  A.  So one of the agents, probably Agent Komar, called or

20  e-mailed to say that one of the employees of New York Global

21  Group had reported that Michaela Wey, who I knew to be Ben

22  Wey's wife and who was at least on paper the nominal owner of

23  the USA entity that was being searched, was not only an

24  employee, but also the bookkeeper and did the bookkeeping from

25  their apartment.

H1NMWEY1                        Massey - direct

1   Q.   What did you do in response to that information?

2   A.   I asked one of the agents or an agent to come over to my

3   office so that a follow-on search warrant for the apartment

4   could be drafted.

5   Q.   Let's take a look at what had been marked as Government

6   Exhibits 9 and 10.

7   A.   I see 9 and 10.

8   Q.   What are those?

9   A.   Government Exhibit 9 is the application for the search

10  warrant of the apartment.  Government Exhibit 10 is the warrant

11  for the search of the apartment.

12          MR. FERRARA:  Your Honor, the government offers

13  Exhibits 9 and 10.

14          THE COURT:  9 and 10 are admitted.

15          (Government Exhibits 9 and 10 received in evidence)

16          MR. SIEGAL:  No objection.

17  Q.   Who took the lead in drafting those documents?

18  A.   I did.

19  Q.   Let's turn to Exhibit 10.

20  A.   OK.

21  Q.   Same question that I asked earlier.  Do the statute

22  citations to the crimes under investigation appear on the face

23  of that warrant or in its attachments?

24  A.   Not that I see.

25  Q.   Nonetheless, was it clear to you, based on the warrant and

1    its attachments, what crimes were being investigated?

2    A.   Yes.

3    Q.   And if I asked you why, would it be a similar answer as you

4    gave earlier?

5    A.   Yes.

6    Q.   Why in this particular case, why was did you believe that

7    the warrant justified this breadth of documents as to the

8    residence?

9    A.   Well, Michaela Wey, the nominal or actual, didn't know

10   which, owner of New York Global Group, and the husband of the

11   chief executive officer of New York Global Group, was doing the

12   bookkeeping for a complicated entity from the apartment.  So

13   any or all financial records relating to New York Global Group,

14   at a minimum, would be within the scope, validly within the

15   scope of a search warrant because there is probable cause to

16   believe that any of those records could be evidence of a crime.

17        In addition, it was clear that there is a direct

18   connection between the personal finances of Michaela Wey, who

19   lived at that apartment, and Ben Wey; a nominee shareholder

20   named Tianyi Wey, the sister of Ben Wey.  The proceeds of the

21   crime were -- appeared to be coming from offshore back into the

22   U.S. and at least some cases in the form of wire transfers from

23   Tianyi Wey to Michaela Wey and into one or more accounts that

24   were used to pay personal expenses or credit cards.

25        And I think also there was a post office box that we

1   knew to be used to receive brokerage statements that were, I

2   think, in the name of Michaela Wey or another -- I think

3   Michaela Wey or maybe Ben Wey.  And we knew, just from a Google

4   search, that that post office box facility was very close to

5   the apartment.  That led us to believe, and I think it's in the

6   warrants, that that was a place to go get documents and

7   presumably bring them back to the apartment.

8           And there was yet another -- there was additional

9   evidence that stock certificates that were part of the round

10  lot sort of shareholder scheme that I described earlier, and

11  that is in the affidavit, where some of those stock

12  certificates were sent to and/or from the apartment.

13  Q.  Were you present for the search of the residence?

14  A.  No, I was not.

15  Q.  Were agents calling or e-mailing you during that search?

16  A.  Yes.

17  Q.  At any point, based on what you were hearing from the

18  agents, did you ever worry or have any concern that the agents

19  did not understand what the warrant permitted them to seize

20  from the residence?

21  A.  No.

22  Q.  According to the agents, and perhaps your conversations

23  with others, who was present at the residence other than FBI

24  personnel?

25  A.  I believe at least at the beginning Michaela Wey was

1   present.  I believe a lawyer named John Bostany was present at

2   one point.

3   Q.  Did you speak to Mr. Bostany during the search?

4   A.  I believe I did.

5   Q.  About what?

6   A.  Initially about whether he represented or who he

7   represented.  He also raised the question of privileged

8   documents being at the residence.

9   Q.  What was the resolution of the issue of privileged

10   documents being at the residence or potentially privileged

11   documents being as at the residence?

12   A.  The resolution, as I recall it, in part, through refreshing

13   recollection by e-mail, is that he was permitted to designate

14   or he and/or she, Michaela Wey, were permitted to identify

15   certain folders or boxes that contained potentially privileged

16   information, and I believe he was allowed to take them away.

17   And I think the purported basis for privilege is that Michaela

18   Wey, who as a lawyer had represented Ben Wey in connection with

19   his Oklahoma securities proceeding.

20   Q.  Let's talk about the handling of the electronic evidence

21   after the searches were complete.  OK?

22   A.  OK.

23   Q.  First, what happened to the electronic evidence after it

24   was seized, to the extent you know?

25   A.  It was taken by the FBI and then I believe provided to

CART, which is the computer forensics arm of the FBI.  The

first thing that happened is that copies were made of some or

all of the electronic storage devices, thumb drives, hard

drives and the like, because either Mr. Siegal or Seth Levine,

who represented New York Global Group, or both, told me

relatively quickly that they needed it back in order to perform

the continuing operations of New York Global Group.  And they

retained Stroz Friedberg who help with that process.  So I

asked the FBI to make copies of the electronic storage devices

and return either the original or a copy to New York Global

Group through Stroz Friedberg.

Q.  I'm sorry.  Why was that important to them to get those

back?

A.  Because they said that, you know, some or all of the

computers and electronic storage devices had been taken, and

they needed to resume business operations.  To respect their

need to be back in business, we gave them back copies or the

actual original devices.

Q.  What was the next step after CART imaged, made copies and

then certain things were returned?  What was the next step in

the process?

A.  CART had to process the information and put it onto their

platform in short.

Q.  Why did that need to happen?  This is basic stuff.

A.  Sort of forensic, you know, purity.  The FBI needed to

1    handle the data and handle the search process of the data so

2    that they could call a witness to offer the data into evidence

3    at the appropriate time.  But it just had to be properly

4    safeguarded and controlled and put onto a platform.  It both

5    had to be safeguarded and put on a platform in which it could

6    be searched.

7    Q.  What is CART?

8    A.  I think it stands for computer -- I don't know.  I don't

9    remember the acronym.

10   Q.  Generally, what is it?

11   A.  It's the computer forensics squad of the FBI.

12   Q.  After CART processed the documents or the electronic

13   evidence in the way you described, were you then able to begin

14   reviewing the documents or the electronic evidence?

15   A.  Not right away.

16   Q.  Why not?

17   A.  Well, a couple of things had to happen.  And one was,

18   privilege review.  We knew that New York Global Group and/or

19   Ben Wey and Michaela Wey had or believed, had a good-faith

20   basis to believe they had legal representation at various

21   points.  And at some point in the investigation I began

22   collecting a list of lawyers' names and e-mail addresses who

23   might have represented one or more of Ben Wey, Michaela Wey or

24   New York Global Group.  In addition I got lists from either

25   David Siegal, certainly also from Seth Levine, counsel for New

1   York Global Group, one or more lists from Seth Levine that

2   purported to list law firms or individual lawyers who had

3   represented one or more of the above.

4   Q.  Let's take a look at what's been marked as Government

5   Exhibit 17 and 18.

6   A.  I see 17, the list.  18.  Yes.

7   Q.  Let's take them in order.  What is 17?

8   A.  17 is a letter from Seth Levine, counsel to New York Global

9   Group to me, including a list of counsel for New York Global

10  Group, Benjamin and/or Michaela Wey.

11  Q.  What is 18?

12  A.  18 is one of the lists.  It might be -- certainly a revised

13  list, revised August 7, 2012.  I can't tell if it was the last

14  one.  But it's the list that I generated over time of lawyers

15  whose names we had identified as counsel to various entities,

16  not just Ben Wey and Michaela Wey, but also to the issuers.

17  Q.  I don't want to cut you off.

18  A.  That's it.

19          MR. FERRARA:  Your Honor, the government offers

20  Exhibits 17 and 18.

21          MR. SIEGAL:  No objection.

22          THE COURT:  Government's 17 and 18 are admitted.

23          (Government Exhibits 17 and 18 received in evidence)

24  Q.  What is the date of the letter from Mr. Levine to you,

25  Government 17?

1    A.   June 4, 2012.

2    Q.   Now, were you focused on the pace at which the review of

3    the electronic evidence was occurring?

4    A.   Yes, I was.

5    Q.   Why?

6    A.   Well, because I wanted -- various reasons, including, it

7    was important to move forward with the investigation.  Also, I

8    was aware of an opinion by Judge Irizarry and just the law in

9    general involving searching of electronic information.  Judge

10   Irizarry's opinion, I thought it was very distinguishable, but

11   it was very clear it was important for agents and prosecutors

12   to continue moving forward when they obtained electronically

13   stored data toward the search and use of that data.

14   Q.   Who was taking the lead in the privilege review?  Was it

15   the FBI, the U.S. Attorney's Office, or was it sort of both

16   jointly?

17   A.   It was really the FBI, but I was involved and aware of what

18   was happening.  We set up a wall team or wall AUSA, and I think

19   also paralegal at the U.S. Attorney's Office and there was a

20   wall team at the FBI to conduct searches.  But the -- most of

21   the work was happening at the FBI.

22   Q.   What was the next step after the privilege review was

23   complete?  Sorry.  Let me actually back up and withdraw that

24   question briefly.

25             If you can remember, was the privilege review, to your

1    mind, done all at once on a certain date or do you remember

2    receiving sort of safe, unprivileged documents on a rolling

3    basis, if you recall?

4    A.   I believe I recall receiving certain documents on a rolling

5    basis, including spreadsheets that were clearly not privileged

6    because no lawyer's name had been found in them, or at least if

7    a lawyer's name had been found, we understood it was not a

8    lawyer who represented Ben Wey, Michaela Wey, or New York

9    Global Group.  The spreadsheet was quickly reviewed by an agent

10   to see if it contained information about one of the issuers,

11   for example.  It was plainly within the scope of the warrant.

12   I believe I got access to spreadsheets like that earlier than

13   other information.

14   Q.   What was the next step after the privilege review was

15   complete or as it was being completed on a rolling basis?

16   A.   The next step was to search it for pertinence, sort of

17   responsiveness to the search warrant application and the

18   warrant itself.  And so that involved preparing a list of

19   search terms which I believe I took the lead on, to give to the

20   FBI so they could run searches through the data.  There is a

21   lot of data.  And the best way to do it was through searches so

22   they caused run searches against the data to identify data that

23   was clearly within the scope of the warrant.

24   Q.   Take a look at Government Exhibit 19.

25   A.   OK.

H1NMWEY1                          Massey - direct

1  Q.  What is that?

2  A.  That appears to be a list of search terms.  I don't know if

3  it's the final list that I believe I prepared based on the

4  search warrant application and based on additional information

5  that sort of further described individuals or entities listed

6  in this search warrant application or the warrant itself.

7          MR. SIEGAL:  I'm sorry.  Could I have that answer read

8  back, please.

9          THE COURT:  Go ahead.

10         (Record read)

11         MR. FERRARA:  Your Honor, the government offers

12 Exhibit 19.

13         THE COURT:  Without objection, 19 is admitted.

14         MR. SIEGAL:  No objection, your Honor.

15         THE COURT:  Government 19 admitted.

16         (Government Exhibit 19 received in evidence)

17 Q.  How did you come up with those search terms?

18 A.  I believe I started from the list that's in Exhibit B to

19 the warrant and then added names that I believed were tied

20 directly or tied to the names in the search warrant.  For

21 instance, by this point in the investigation we knew the e-mail

22 addresses of Robert Newman, who was a lawyer for the issuers.

23 So the two e-mail addresses for Robert Newman are included here

24 in addition to Robert Newman's name, whereas I think the search

25 warrant itself only listed his name and not his e-mail

1    addresses.

2    Q.  To whom did you provide this list?

3    A.  To the FBI.

4    Q.  I think you sort of alluded to this, but was this list at

5    times augmented?  Having refreshed your memory with the

6    e-mails, was this list at times augmented with other terms as

7    it became clear to you?  Are you able to say this is the final

8    absolute list?

9    A.  I'm not.  Without a cover e-mail and without access to the

10   system, I can't tell if it's the final list.

11              MR. FERRARA:  May I have one moment, your Honor.

12              THE COURT:  You may.

13              MR. FERRARA:  No further questions, your Honor.

14              THE COURT:  Thank you.

15              THE COURT:  Mr. Siegal.

16              MR. SIEGAL:  Thank you, your Honor.  I want to

17   apologize in advance, your Honor, because we do have a lot of

18   material here that we are going to be working with.

19              THE COURT:  So that what you say does not get lost in

20   the beauty of the room but falls on our ears, to the extent

21   you're moving around to get materials, don't talk.  Wait until

22   you are in front of the microphone.

23              MR. SIEGAL:  Thank you, your Honor.  I apologize for

24   that.  We are going to want to put, just for convenience, a set

25   of the 3500 material in front of the witness.  I think your

H1NMWEY1                      Massey - cross

1    Honor has a copy already that was provided by the government.

2              THE COURT:  This is the complete set of 3500?

3              MR. FERRARA:  Yes, your Honor.  There was one more

4    page that we didn't have three-hole punched for this witness

5    that I can hand up.

6              THE COURT:  All right.  Yes.  You may put the binder

7    in front of Mr. Massey.

8              MR. SIEGAL:  One moment, your Honor.  We are just

9    grabbing it.

10             MR. FERRARA:  We have one, your Honor.

11             MR. SIEGAL:  This is to be --

12             THE COURT:  You've already failed to follow my

13   instructions.

14             MR. SIEGAL:  I'm sorry, your Honor.

15             THE COURT:  It's all right.  You'll get used to it.

16             MR. FERRARA:  For the record, your Honor, the witness

17   now has a full binder of 3500 in front of him.

18             THE COURT:  Thank you.

19             MR. SIEGAL:  I am going to move the podium a little

20   bit, your Honor.

21   CROSS-EXAMINATION

22   BY MR. SIEGAL:

23   Q.  Good morning, Mr. Massey.

24   A.  Good morning, Mr. Siegal.

25   Q.  You said you were an Assistant U.S. Attorney in the office

1    here in the Southern District for eight or nine years?

2    A.  I think it was nine years in total.

3    Q.  Would you say, given your lengthy experience as an

4    Assistant United States Attorney and now a criminal defense

5    attorney, that it's a fairly unusual occurrence for an

6    assistant to take the witness stand in one of these hearings?

7              MR. FERRARA:  Objection to relevance, your Honor.

8              THE COURT:  I am going to sustain that.

9    Q.  In 2011, 2012, the investigation into New York Global Group

10   and Benjamin Wey was your investigation, right?

11   A.  Well, I worked with the FBI, but it was -- I was the AUSA

12   on the investigation.

13   Q.  And would you say that it was in part your responsibility

14   to ensure that the investigation complied with the

15   Constitution?

16   A.  Yes.  Certainly to make sure that I and anyone working with

17   me, any agent of the U.S. Attorney's Office was not violating

18   the Constitution.

19   Q.  And were you also responsible for knowing about legal

20   developments in the Fourth Amendment and keeping the

21   investigating agents apprised of those legal developments?

22   A.  Within reason as necessary.

23   Q.  Would it be fair to say that the responsibility extended in

24   terms of you to ensuring that the face of the search warrant

25   complied with the Fourth Amendment?

1    A.   That's fair.

2    Q.   Did you also view it as part of your job to ensure that the

3    affidavit of Agent Komar in support of the search warrant would

4    not be factually false or misleading to the magistrate judge?

5    A.   Yes.

6    Q.   And you were responsible for drafting the warrant as well

7    as the exhibits, Exhibits A, B, and C, that are attached to the

8    warrant?

9    A.   Yes.   Together with a lot of help from the FBI agent.   I

10   was the initial author and primary author.

11   Q.   Now, is it fair to say at the time you and Agent Komar made

12   the application for the warrant that the investigation had been

13   going on for several months at that point?

14   A.   I don't remember how long, but that's fair.

15   Q.   And during that time there were witnesses being interviewed

16   and documents being reviewed, subpoenas being issued.   Is that

17   fair to say?

18   A.   Yes.

19   Q.   Would it be fair to say that you had multiple conversations

20   with Agent Komar during that time frame about this

21   investigation?

22   A.   Yes.

23   Q.   Is it also fair to say that the idea to apply for a search

24   warrant was formulated some time prior to January 25, 2012?

25   A.   Yes.

H1NMWEY1                           Massey - cross

1     Q.  At least several weeks before?

2     A.  At least.

3     Q.  Perhaps even months before?

4     A.  Perhaps.

5     Q.  So there was no emergency where you suddenly needed to drop

6     everything and go prepare a search warrant overnight, right?

7     A.  It was not prepared overnight.

8     Q.  Did you feel that you had sufficient time to do all the

9     investigation you needed to make sure that the affidavit was

10    accurate and not misleading?

11    A.  I think so.  As far as I recall.

12    Q.  And I take it in January 2012 you were aware of the Fourth

13    Amendment's particularity requirement with respect to search

14    warrants?

15    A.  Yes.

16    Q.  Were you generally aware of the prohibition against general

17    warrants under the Fourth Amendment?

18    A.  Yes.

19    Q.  Now, on direct you testified that in your view New York

20    Global Group at the time you were applying for the warrant was

21    pervaded by fraud.  Was that the testimony that you gave on

22    direct?

23    A.  Yes.

24    Q.  And were you attempting to suggest in that testimony when

25    you and Agent Komar sought the warrant on January 25, 2012 that

1    you sought to take advantage of the all business records

2    exception to the Fourth Amendment's particularity requirement?

3    A.  I don't remember.  I don't remember our thinking or my

4    thinking in terms of the exception or -- I remember believing

5    that it needed to be a search warrant that was accurate and

6    with sufficient legal basis.  I don't remember the sort of

7    particular nuts and bolts of it in the way you just described.

8    It doesn't spring to mind.  It was five years ago.

9    Q.  My question to you is, were you aware of the existence of

10   the all documents or all records exception to the Fourth

11   Amendment's particularity requirement at the time that you

12   applied for the want?

13   A.  It's really hard to remember exactly what I remember or

14   knew about the law at the time.  If it was the law and I was --

15   I was, I think, sufficiently trained and versed in Fourth

16   Amendment law from having been an Assistant U.S. Attorney.  As

17   I sit here now, you are citing a very specific sort of

18   exception and rule.  If you've got a case, for me to look at

19   the case.  I don't have a clear recollection of what exactly I

20   remember.  If it's in the warrant, I don't have a clear

21   recollection.

22   Q.  Did you have an opportunity to read the government's brief

23   in opposition to our suppression motion before you took the

24   stand today?

25   A.  I read part of it, not all of it.

H1NMWEY1                          Massey – cross

Q.   Did you see in those papers that the government makes an

argument that this warrant would have been within the

all-records doctrine?

A.   I saw that argument.

Q.   What I'm trying to figure out from your testimony, sir, is

whether you are testifying that you actually made the

application pursuant to that doctrine or not.

A.   I don't recall.  I simply don't recall.

                 (Continued on next page)

1    BY MR. SIEGAL:

2    Q.   Now, you said that you believed that New York Global Group

3    was pervaded by fraud but are the words "pervaded by fraud"

4    anywhere in the 97 page application affidavit that you drafted?

5    A.   I'd have to do a search of the document to see if "pervaded

6    by fraud", those precise words are there.  I've reviewed it and

7    I've seen that it goes on for page after page about the history

8    of Ben Wei's security fraud and fraud that has taken place

9    after issuer and at great lengths I don't know if I wrote the

10   summary conclusory sort of sentence pervaded by fraud but I

11   think that's the clear import of it.

12   Q.   Sir, I'm just asking whether you wrote in the affidavit

13   that you drafted that this business was entirely illegal and

14   pervaded by fraud, did you write that in the affidavit that you

15   drafted?

16   A.   I don't recall if those words are there.  I'd have to do a

17   search.  Based on the way you are asking it, I'd assume they're

18   in there.

19   Q.   The face of the warrant, that doesn't say that you seek

20   from the magistrate judge permission to seize all records of

21   business, does it?  It goes on for 17 pages with three

22   different lists, right?

23   A.   Correct.

24   Q.   Would have been a much shorter warrant if what you were

25   applying for was a search warrant to seize all the record of

1    the business, right?

2    A.   It was a good faith attempt to delineate the categories of

3    records that were -- there was probable cause to believe may be

4    evidence of a fraud and it would be on the premises.

5    Q.   Sir, isn't it true that even Agent Komar himself

6    acknowledged in the affidavit that in fact he did not have PC

7    to suggest that the entire business was illegal?

8    A.   I don't recall that.  If you show it to me I can tell you

9    whether it's there are to not.

10   Q.   When I say "PC" I am referring to probable cause.  I'd like

11   to refer you to page 67 of the Komar affidavit note 11.

12   A.   OK.   That's Government Exhibit One, Two?

13   Q.   Government Exhibit Number Two.

14   A.   Page what?

15   Q.   67.

16   A.   I've got page 67.

17   Q.   Footnote 11 there is, says even assuming many of these

18   basic corporate documents primarily relate to legitimate

19   aspects of U.S. Global Group -- see that phrase?

20   A.   Yes, I do.

21   Q.   So, isn't it fair to say, sir, that at the time you applied

22   there this search warrant you realized you did not have PC,

23   probable cause, to assert that the entire business was

24   illegitimate; isn't that fair to say?

25   A.   Can you give me one minute.  I'm just reading the footnote.

1     OK.  Well, I mean it's a phrase as a hypothetical.  Even if

2     these documents relate to something legitimate it doesn't say

3     they do relate to anything legitimate and it's, I think it's

4     very clear from this footnote and the page that follows that

5     because of Ben Wei's assertion that he was making money only

6     through New York Global Group which in turn was only making

7     money through advisory fees of New York Global Group -- that

8     you needed to understand the entire business, even if some part

9     of the business was legitimate in order to understand what all

10    of the revenue, all of the expenses to address that claim

11    because it appeared to be clearly false.  He was making way too

12    much money to be accounted for by those types of fees.

13    Q.  So, sir, does the wording of the sentence say, even

14    assuming many of these basic corporate documents and primarily

15    relate to legitimate aspects of New York Global Group's

16    business they would provide background that is necessary to

17    fully under the nature and the scope of the business?

18              MR. FERRARI:  Objection.  It speaks for itself.  He's

19    asked the question.  It's becoming argumentative, your Honor.

20              THE COURT:  Sustained.

21    Q.  Now, you had a confidential source who was working at the

22    business at the time, right?  That was part of your

23    investigation?  There are references to information from that

24    confident source in the affidavit?

25    A.  Which one are you referring to is the confidential source

1    one?

2    Q.  I don't recall which one it is but is it fair to say that

3    you did quote at least one witness in the affidavit who was a

4    current employee of the business?

5    A.  As I sit here now I don't recall if the confidential source

6    was a current or former employee.  If you refer me to the page

7    in the affidavit I could see what it says on it.

8    Q.  You did have an employee who was at least recently employed

9    in the business, right, as a source?

10   A.  It sounds right.  I just don't remember how recently

11   employed.

12   Q.  Is it fair to say that you didn't write anything in this

13   97-page affidavit where any employee witness told you the

14   entire business is a fraud, right, that's not in this

15   affidavit, is it?

16   A.  I don't think this sentence that you just spoke is in here

17   where -- I don't think it says a current or former employee of

18   the business told us that the entire business is a fraud.  I'm

19   not sure.  I'd have to read the whole thing again to make sure.

20   Q.  In fact, you don't have any witness quoted in the affidavit

21   who says anything like that, do you?

22   A.  Not as I recall sitting here now but to confirm it I'd have

23   is to read the whole thing.

24   Q.  Now, at the time that you're saying now you believed the

25   entire business was a fraud you had the power at that time,

H1NAAWEI2                         Massey - Cross

1    didn't you, to seek probable cause to seize the assets of the

2    business if you actually had a probable cause to believe the

3    whole business was a fraud?

4              MR. FERRARI:  Objection; relevance.

5              THE COURT:  Overruled.

6    A.  Well, at that time I don't think I unilaterally had the

7    power or authority to seize assets of a business.  We had

8    done -- well --

9    Q.  Is that one of the --

10   A.  Well, let me finish explaining if I could.  I believe I had

11   the power to draft a civil -- I could have draft a civil

12   forfeiture action an interim forfeiture action, United States

13   of America versus assets, a bank account or what have you and

14   that could have included a lot of assets.  So, I believe I had

15   the power to do that but that would then be a civil action I

16   didn't have the power to seize.

17   Q.  But you didn't do any of that, did you?

18   A.  Did not draft a civil forfeiture action at the time of the

19   search.

20   Q.  And you didn't make any arrests at the time you executed

21   these seizures, correct?

22   A.  Correct.

23   Q.  In fact, no one was charged by you in connection with the

24   business in 2012, right?

25   A.  Correct.

1   Q.   Or in 2013, right?

2   A.   Correct.

3   Q.   Or really any time before you left the U.S. Attorney's

4   Office, right?

5   A.   That's right.

6   Q.   And indeed another AUSA was added to the team in the middle

7   of 2013, right?

8   A.   I don't remember exactly when she was added but she was

9   added before I left.

10  Q.   That was Antonia Apps, right?

11  A.   That's right.

12  Q.   And she stayed in the office almost a year beyond when you

13  did?

14  A.   At least.  I'm not sure exactly when they left.

15  Q.   As far as you knew during your entire and during her entire

16  tenure, the United States Attorney's Office didn't freeze or

17  seize the assets of that supposedly completely fraudulent

18  business or charge anybody in the business during that entire

19  time?

20  A.   I believe that's right.  I don't remember exactly when she

21  left.  I think she left before the charges were filed.

22  Q.   Sir, is it your understanding that under the law even if

23  you had asserted in 2012 that the entire business was a fraud

24  that gave you the right to seize every record at the home of

25  Michaela and Ben Wei?

1              MR. FERRARI:  Objection.

2              THE COURT:  Overruled.

3   A.  Could you rephrase the question?  I'm sorry.

4   Q.  The government is contending in this case that these

5   warrants would have satisfied the All Records Exception.

6   Whether or not you actually intended to seek a warrant for the

7   business in 2012 under that exception, do you believe that your

8   understanding of the business gave you the right to seize every

9   record at the home of Benjamin and Michaela Wei?

10  A.  No.  I think -- well, it depends on what was there.  I

11  didn't know what was there.  I didn't go there.  But if there

12  was evidence, for example, of child pornography that would not

13  have been within the scope of the warrant and they would not

14  have been able to take it or evidence of a material support or

15  a drug ledger or something like that.

16  Q.  Fair to say that the warrant that you drafted for the

17  apartment for Benjamin and Michaela Wei was an attempt to

18  particularize particular items that you believe were responsive

19  to the probable cause that you had to search?

20  A.  I think that's fair.

21  Q.  As opposed to a warrant that sought to seize all records at

22  their home?

23  A.  Well, the warrant is what it is.  I mean, and it doesn't

24  state the legal theory behind it but it describes the

25  categories of records that we believe to be there was records

1   that fell within the PC established by the affidavit and they

2   were particularized.

3   Q.  So, your position is that the warrant for the apartment was

4   an attempt to particularize what could be seized?

5   A.  Well, I'm not taking a legal position.  I'm just telling

6   you what we did.

7   Q.  Sir, if you could just take a look at the warrant for the

8   apartment and the warrant for the office.  Take a look at those

9   at the same time and compare them to one another.

10  A.  OK.  Those are GX what again?

11  Q.  Pardon me.  I'll just check.

12          THE COURT:  Two and three.

13  Q.  Government Exhibits Three and Ten.

14  A.  Three and ten?

15  Q.  Yes.

16  A.  I see three and ten.

17  Q.  So, preparing the warrant for the apartment, the one we

18  just discussed where you say it was an attempt to particularize

19  what could be taken, apart from the exclusion relating to the

20  office of James Baxter, is there any difference in the wording

21  of the search warrant for the apartment and the search warrant

22  for the office?

23  A.  And other than the difference in the premises we searched?

24  Q.  Yes.

25  A.  I don't know.  I'd have to do a line-by-line comparison if

1   you want me to be absolutely precise in my answer but if what

2   you are getting at is is Exhibit A largely the same, it,

3   certainly, does appear to be largely the same and Exhibit B I

4   believe as well.

5   Q.  Do you have any reason to believe that they're not

6   identical?

7   A.  I have no reason to believe they are not very, very similar

8   if not identical but I'd have to do a line-by-line comparison

9   to be absolutely sure.

10  Q.  You said in your opening testimony that you believed the

11  agents understood what the investigation was about from the

12  face of the warrant, right?

13  A.  Yes.

14  Q.  Am I properly characterizing your testimony?

15  A.  Yes.

16  Q.  And you would acknowledge though that the face of the

17  warrant doesn't list any federal criminal code sections, right?

18  A.  That's right.

19  Q.  There's it no reference to any code section for securities

20  fraud, is there?

21  A.  Not that I've seen.

22  Q.  Or wire fraud?

23  A.  No.

24  Q.  Or money laundering?

25  A.  No.  The particular statutes are not listed.

1    Q.  Now, the words "money laundering", those don't appear

2    anywhere in the warrant either, Exhibit A, B or C?

3    A.  Yeah.  I'm not sure we were particularly focused on money

4    laundering but opposed to underlying fraud for purposes of

5    search but if you say it's not in here, it's not in here.

6    Q.  Do the words "security fraud" exists together in that

7    warrant?

8    A.  No.

9    Q.  "Mail fraud"?

10   A.  No.

11   Q.  Sir, what's the federal code section for fraud?

12           MR. FERRARI:  Objection, your Honor.  There are

13   numerous code sections that's apply to fraud.

14           THE COURT:  Sustained.

15   Q.  There is no omnibus federal fraud section, is there?  There

16   are many different ones, right?

17   A.  Yes.

18   Q.  Fraud itself is not a federal crime, right?

19   A.  Well, if you take that single word you've got to have a

20   mail or wiring for securities transaction to go with it.

21   Q.  And this is a federal search warrant, right?

22   A.  Yes.

23   Q.  Being executed by federal law enforcement, right?

24   A.  Yes.

25   Q.  Supposedly investigating federal crimes, right?

1    A.  Yes, from the securities, a securities fraud squad.

2    Q.  Yet, no where on this warrant is any federal criminal

3    statute referenced or described, is there?

4    A.  No?

5            THE COURT:  Mr. Siegel, I'll let you make a summation

6    at the close of testimony.  So, please just keep the questions

7    to gathering facts.

8            MR. SIEGAL:  I'll move on, your Honor.

9    Q.  Now, you pointed to a couple of the paragraphs of Exhibit A

10   to the search warrant when you were talking about how you

11   believed that told you that the agents understood what they

12   were searching for, right?

13   A.  Which exhibit and which paragraph?  2A?

14   Q.  If you take a look at Government Exhibit Three.

15   A.  OK.

16   Q.  In your direct testimony Mr. Ferrara pointed you to

17   paragraphs one and two and you said that you believed that

18   those two passages would informed the agents that what they

19   were investigating was a financial fraud?

20           MR. FERRARI:  Objection.  I didn't point him to that,

21   your Honor.

22           THE COURT:  Sustained.

23   Q.  Sorry.  Then you pointed to those passages, did you not,

24   sir?

25   A.  I think so.  I don't know if I said that was the only way

H1NAAWEI2                        Massey - Cross

1    the agents would have been aware of it but that's certainly one

2    way.

3    Q.  But that's not the only limitation to Exhibit A, is it?

4    This Exhibit A covers, among other things, paragraph six,

5    photographs, address books, Rolodexs, diaries, income tax

6    returns and calendars; do you see that?

7    A.  Yes.

8    Q.  Also, hotel, airline, credit card receipts, reflecting the

9    dates and locations of meetings or travel to meetings.  That's

10   also there, right?

11   A.  Yes.

12   Q.  Paragraph 1 refers to identification documents and other

13   documents which may reflect the identities of persons listed in

14   Exhibit B?

15   A.  Yep, that's there.

16   Q.  Corporate documents reflecting ownership?

17           THE COURT:  Sustained.

18   Q.  Sir, is it fair to say that the warrant covers quite

19   clearly a large panoply of types of documents beyond just

20   financial records?

21   A.  That's right.

22   Q.  Now, Agent Komar's affidavit was not attached to a warrant,

23   was it?

24   A.  No.

25   Q.  That was actually placed under seal at the time of the

1  application, right?

2  A.  Correct.

3  Q.  And it was your anticipation that the searching agents

4  wouldn't each be carrying a copy of the 97-page affidavit at

5  the search, right?

6  A.  I don't know if I had an expectation as to what each of the

7  agents would be doing even that point.

8  Q.  But it is your intention that the 97-page affidavit would

9  not be given to the occupant of the office when the search

10  began, right?

11  A.  Correct.

12  Q.  That was to remain under seal?

13  A.  Correct.

14  Q.  So none of what's in the affidavit is incorporated by

15  reference into the search warrant that was being handed to the

16  occupants of --

17  A.  The affidavit was not handled to the occupants.

18  Q.  Is there a date or time limitation anywhere on the search

19  warrant as you can see it?

20  A.  In terms of you mean, certainly, it was to be done during

21  the daytime.  Do you mean the scope of the conduct?

22  Q.  To the scope of what can be seized?

23  A.  I don't believe so.

24  Q.  So, according to this warrant even if a note or a memoranda

25  or a videotape was 30 years old, this warrant gave the agents

1   the right to seize that, right?

2   A.  Well, if it related to one of the individuals or entities

3   in Exhibit B, yes, I believe so.

4   Q.  Is it fair to say, sir, that Exhibit A was an attempt by

5   you to cover basically every form or format of material that

6   could be found in a location from notes, handwritten notes,

7   scraps of paper, every form of item that could be found?

8   A.  No, that's not correct.

9   Q.  Well, it does refer to every electronic device, right?

10  A.  Refers to every electronic device that could be found.

11  Q.  Right.  And it refers to notes, memoranda?

12  A.  Yes.

13  Q.  It refers to --

14          MR. FERRARI:  Object on 403 grounds.  I think it's

15  cumulative and a waste of time.  The exhibit speaks for itself.

16          THE COURT:  Sustained.

17  Q.  Is there any type of document, sir, that you can think of

18  that isn't covered on the face of Exhibit A?  I'm not talking

19  about subject matter.  I'm talking about type?

20  A.  I don't want to have a debate with you but, yeah, I could

21  think of one thing that probably isn't covered.  If there's a

22  prescription maybe you'll find a place where it's covered but

23  certainly prescription drug medication if someone is taking

24  heart medication or something like that that would be a

25  document found prescription to a child or a parent in the

H1NAAWEI2                      Massey - Cross

1   apartment.  I don't think that would be within the scope here.

2   Q.  So, that would be outside the scope of this warrant you are

3   saying?

4   A.  I'd have to read the whole thing to figure it out but

5   certainly, the idea was or again, if child pornography had been

6   found, that would not be within the scope or a drug ledger or

7   drug paraphernalia wouldn't be within the scope.  If there's

8   writing on a packet of heroin, that wouldn't be within the

9   scope.  If there is writing on, if there was a al-Qaeda

10  manifesto, I don't think that would be within the scope.

11  Q.  Well, moving on --

12          THE COURT:  Move on.

13  Q.  Do you see how each of the paragraphs has this caveat with

14  respect to except for paragraph number seven, each of the other

15  ones refers to the list of Exhibit B that is looking at

16  paragraph number two?  Paragraph number one says financial

17  records concerning the individuals and entities listed in

18  Exhibit B; do you see that?

19  A.  Yes.

20  Q.  And that restriction so to speak is referred to in every

21  one of these paragraphs except number seven?

22  A.  I don't see it in paragraph one or two.

23  Q.  Well, one says --

24  A.  Oh, yes, I do.  You're right.  It's in one and two.  I

25  mean, I would have to read each paragraph to answer your

1  question but it does not appear to be in seven as you say.  At

2  a glance that does appear to be in the others.

3  Q.  Sorry.  With respect to number seven --

4  A.  Oh, you are right.

5  Q.  -- where it says with respect to Exhibit B is it refers to

6  electronic equipment used by or used in connection with the

7  individuals and entities listed in Exhibit B?

8  A.  Um-hmm.

9  Q.  So each of the paragraphs refers to the list in Exhibit B?

10  A.  Appears to.

11  Q.  Is it fair to say that Exhibit B was an attempt by you to

12  satisfy the particularity requirement?

13  A.  It was a good faith attempt to make sure that the

14  information taken was within the scope of the affidavit and it

15  was PC to take it.

16  Q.  It's a pretty long list, right?  It's got 200 or more pages

17  right.

18  A.  It is a long list.

19  Q.  Now, I take it you understood that the FBI agents who were

20  going to execute the search understood the office they were

21  going to search was the offices of New York Global Group,

22  right?

23  A.  Yes.

24  Q.  And that appears on the very first page of the warrant,

25  right?

1    A.  Yes.

2    Q.  But in fact, the very first name on Exhibit B that also

3    says New York Global Group Inc., right?

4    A.  Yes.

5    Q.  Was the significance of the fact that you had listed all

6    these types of documents with respect to any name on Exhibit B,

7    the fact that the owner/occupant of that location was the very

8    first name on the list or did you appreciate that that's how

9    you had drafted the search warrant at the time?

10   A.  Well, I appreciated that all financial records of New York

11   Global Group should be within the scope of the warrant.  That

12   I'll take each paragraph and go through each one.  I understood

13   that was being drafted.  But to take these other examples, if a

14   bag of heroin were found on the premises and it had writing on

15   it but it didn't say, I suppose if it said New York Global

16   Group it would be within the scope of the warrant.  But if it

17   isn't the same as it would be that none of those things if they

18   didn't say New York Global Group on them or those other names,

19   they wouldn't have been within the scope and it would have to

20   have been left behind.

21   Q.  OK.  But I'm talking about business records for a moment.

22   Is it fair to say that the document Exhibit A covers basically

23   every kind of business record you could think of?

24   A.  Well, that I can think of now or I could think of then?  I

25   mean, it covers --

1    Q.  Did you at the time seek to cover every type of conceivable

2    business record you could think of when you drafted the

3    warrant?

4    A.  I don't remember if I sought to seek every type of business

5    record I could think of.

6    Q.  Well, let me ask you this.  When you explained at the

7    briefing what the warrant meant that they couldn't take, did

8    you tell them there was any type of business records of the

9    business that they were not entitled to take?

10   A.  I don't recall.  I'm sure -- I remember that meeting

11   vaguely.  I do remember clear instructions to agents that they

12   should take what's called for in the warrant and they should

13   read it.

14   Q.  You knew at the time that Benjamin Wei was the CEO of New

15   York Global Group?

16   A.  Yes.

17   Q.  You also knew that Michaela Wei was an owner and executive?

18   A.  I knew that she was an executive officer and at least a

19   nominal owner in with at least one securities file and I found

20   out she was also a bookkeeper as well.

21   Q.  Their name too appear on Exhibit B, as well?

22   A.  Those two appear on Exhibit B, yes.

23           THE COURT:  Mr. Siegal, about how much longer with

24   this witness?

25           MR. SIEGAL:  I've got a fair amount, your Honor.

1          THE COURT:  All right.  We'll take a ten-minute break.

2          Someone has a phone pinging which is frustrating on a

3     number of levels including the fact that it shouldn't be in the

4     courtroom.  If you are going to violate that rule you ought to

5     be quieter about it.  So if I hear it again it'll be

6     confiscated.  Thank you.

7          (Recess)

8          THE COURT:  Remind Mr. Massey that he is under oath.

9     BY MR. SIEGAL:

10    Q.  Sir, we were talking earlier about how the search warrant

11    for the apartment and the search warrant for the office were

12    effectively identical and that the Exhibit B has Benjamin and

13    Michaela Wei's name on it.  Did you understand when you sent

14    the agents off to search the home of, at West Street that that

15    was the home of Benjamin and Michaela Wei and their family?

16    A.  Yes.

17    Q.  Did you know at the time they had three young children?

18    A.  I think I knew they had children.  I don't remember if I

19    knew there were three.

20    Q.  And you said earlier that you believed that the warrant

21    wouldn't cover things like, for example, prescriptions for

22    medication, right?

23    A.  Yes.  If you are asking me what I said I think I said that.

24    Q.  Would you be surprised if it turned out the agents who

25    searched Benjamin and Michaela Wei's home actually took

H1NAAWEI2                         Massey - Cross

1   multiple prescription papers?

2            MR. FERRARI:  Objection.

3            THE COURT:  Grounds?

4            MR. FERRARI:  It's irrelevant whether he would be

5   surprised or not.  This is an issue of what was called for in

6   the warrant.

7            THE COURT:  Overruled.

8            MR. SIEGAL:  Your Honor, I'm going to mark as Defense

9   Exhibit One a compilation of three or four pieces of paper.

10  May I approach, your Honor?

11           THE COURT:  You may.  Do you have copies for opposing

12  counsel?

13           MR. SIEGAL:  Your Honor, we don't because these are

14  originals and in fact we were never given copies of these in

15  the production so, we're going to have to work with the

16  originals.

17           THE COURT:  You didn't have copies?

18           MR. SIEGAL:  They just brought them today.  These are

19  documents.  Just so it's clear, your Honor, they are in folders

20  that have been in the possession of FBI since 2012.  We saw

21  them for the first time last week when we went to look at the

22  original search material and we don't have copies of these

23  anywhere.

24           MR. FERRARI:  And I apologize, your Honor, I have no

25  objection.  Just for clarity of the record, we had invited

1    Mr. Siegal over to look at the physical evidence that was of

2    course available to him.  He chose to do that as he ought to.

3    I believe it was two weeks ago that he saw it.  So, I'm OK with

4    the fact that there's no copies for us.  I simply wanted to

5    look at it before he handed it up to Mr. Massey.

6            MR. SIEGAL:  If your Honor prefers, I can mark each of

7    these as a separate exhibit.

8            THE COURT:  I do prefer.

9            MR. SIEGAL:  OK.

10           THE COURT:  Is it possible with assistance from my

11   staff at the next break to make copies of those?  It's helpful

12   to me to be able to see the document as we're talking about

13   them and potentially may need them going forward copies of them

14   that is.  So to the extent there's more of this, if you could

15   anticipate at the lunch break and make copies and have the

16   government make copies.  Failing that, ask my staff for

17   assistance.  Thank you.

18           MR. SIEGAL:  Your Honor, I just have a word about

19   these documents before we make them official parts of the

20   record which is that they contain some sensitive personal

21   information.  So, I'd ask that at least some of the documents

22   that we're going to show the witness be either kept under seal

23   or redacted.

24           THE COURT:  That's fine, given what has been indicated

25   is contained in them.

1            So, you've marked them what you've marked --

2            MR. SIEGAL:  Sorry, your Honor.  I am going to be

3    marking Exhibits One, Two -- Defense Exhibits One, Two, and

4    Three.  I'm going to try to stick this one which was shredded

5    in half as one item.

6            THE COURT:  OK.

7            MR. SIEGAL:  May I approach?

8            THE COURT:  Let me just take a quick look and then

9    we'll give them to Mr. Massey.

10           (Pause)

11           THE COURT:  OK.

12   BY MR. SIEGAL:

13   Q.  Mr. Massey, I've put in front of you Defense Exhibits One,

14   Two and Three just focusing on your attention on all three of

15   them as group.  Is it fair to say that you recognize those as

16   medication prescriptions?

17   A.  They do not appear to be medication prescriptions to me.

18   Q.  Oh, well --

19           MR. SIEGAL:  May I approach, your Honor?

20           THE COURT:  Yes.  But counsel, why don't you ask the

21   witness a question that pertains to his experience and the fact

22   that's observed in the world and if that doesn't do what you

23   are trying to do, then you'll have to do it some other way.

24           MR. SIEGAL:  I just wanted to read him what they say

25   but that's fine, your Honor.

1   Q.  Sir, looking at those documents, do those strike you as

2   documents covered by the search warrant?

3   A.  Well --

4   Q.  As you understood your investigation, as you say you

5   described it to the agent at the briefing on the 24th?

6   A.  I can, if you let me explain.  I can distinguish this from

7   what I was saying before and explain why one in particular,

8   especially in light of fact that it's ripped in half but

9   because of the name that is on it, why it would be relevant.

10  Q.  So, sir, one of those documents says Ying Mao Wei on it?

11  A.  Yes.

12  Q.  And that is one of the names on Exhibit B, right?

13  A.  Yes.

14  Q.  And is it fair to say you understood him to be a minor and

15  a relative of Benjamin and Michaela Wei?

16  A.  Yes.

17  Q.  Is it fair to say that document in front of you, whether

18  you understand it or not, is a prescription for medicine for

19  Mr. Ying Mao Wei?

20  A.  It's not a prescription.  It appears to me to be the type,

21  based on my own experience, the type of information that would

22  be included when you pick up a prescription, not the actual

23  prescription itself, that it would sort of come with the

24  medication.  It would come with other pricing information, cost

25  information, which I would argue if you are asking me for the

H1NAAWEI2                    Massey - Cross

truth, asking me whether I think it's within the scope of the

warrant information about cost of expenses like this could well

be within the scope of the warrant because the personal

expenses of Michaela and Ben Wei were brought into the scope by

the transfer of large amounts of money from Tianyi Wei the

mother of Ying Mao Wei from Hong Kong to a personal account of

hers.

Q.   So, your position is that to the extent a document in the

Wei home either refers to or suggests the expenditure of any

amount of money no matter how small, that was a document that

was seizable pursuant to the search warrant?

A.   Well, you are asking -- I mean, you are asking me

essentially for a legal opinion, I think.

Q.   I'm asking you whether or not you told the agents that this

was something that was not covered by the warrant as part of

your conversation with them on the 24th?

          MR. FERRARI:  I want to object because this document

is not in evidence.

          THE COURT:  True.

          MR. FERRARI:  And I'm not suggesting Mr. Siegal can't

get it into evidence with another witness but I don't think

this is the right moment.  So, we're now asking the witness to

explain something I'm not sure the witness is clear where it

came from.

          THE COURT:  Sustained.

1           MR. SIEGAL:  I'm going to offer the document subject

2    to connection, your Honor, into objection.  This is the --

3           THE COURT:  Sustained.

4    Q.  Sir, is it your position that a prescription for Michaela

5    Wei's birth control is something that would be seizable under

6    the warrant?

7           MR. FERRARI:  Asked and answered.

8           THE COURT:  Overruled.

9    A.  I don't want to give you a legal opinion on this.

10   Q.  I'm not asking --

11   A.  I don't know where they were found.

12          THE COURT:  Counsel and Mr. Massey, you cannot talk

13   over each other.  So Mr. Massey will be permitted to finish his

14   response and then you may ask the go ahead.

15   A.  I don't know where these were found.  I don't know what the

16   other documents were in the file.  It was late.  The agents, it

17   wouldn't --

18          THE COURT:  Actually, Mr. Massey, I am going to

19   redirect you to the question.

20          Is it your position that a prescription for Michaela

21   Wei's birth control is something that would be seizable under

22   the warrant?

23   A.  I would say, no, I think.

24   Q.  Is it your position that a report of the PSAT scores for

25   Ying Mao Wei would be seizable pursuant to the warrant?

1   A.  Does the report indicate where he would attend school.

2   Q.  I'm just asking you whether that kind of document,

3   generally speaking, would be seizable under the warrant?

4   A.  In this case it indicated where he would attend school.  I

5   would say, "yes".  If it isn't I would say "no".

6   Q.  What about chest and pelvis x-rays of Michaela Wei, would

7   those be something that you would think would be seizable under

8   the warrant?

9   A.  The contents of the x-ray I would say "no".

10  Q.  How about a child, an adolescent health examination form

11  for a five-year-old child?

12          MR. FERRARI:  Your Honor, I object.  We are prepared

13  for this line of questioning but the fact of matter is that

14  where these record came from is crucially important.  I object

15  because I think this line of questioning is on some level

16  misrepresenting what actually happened and also the opinions

17  the witness is offering are really for this Court to make at

18  the end of the day?

19          THE COURT:  Overruled.  I will allow it and take it

20  for what it's worth.  And to the extent that later when and if

21  these documents are moved into admission you can properly

22  cross-examine and tie that back in your summation.

23  Q.  Would you regard --

24          THE COURT:  You'll have redirect too, counsel.

25  Q.  Would you regard a news clipping reporting that Michaela

1    Parakova played for the tennis team of Central Oklahoma

2    University in 1999.  Would you think that would be something

3    that would be covered by the warrant?

4    A.  I think you are asking me for legal opinion.  If it's in

5    the file that contains other documents, shows that she shows

6    how he met her in Oklahoma, it contributes to that information

7    it might be relevant.

8              MR. SIEGAL:  Your Honor, we'll move on.  If I could

9    just collect those.

10             THE COURT:  You may.

11             (Pause)

12   Q.  Is there anything, sir, with respect to the x-rays that you

13   recall saying on January 24, 2012 to the search team when you

14   were briefing them for the search that would have told them

15   they were precluded from taking Michaela Wei's chest and pelvis

16   x-rays?

17   A.  The 24th is the day before the search?

18   Q.  Yes?

19   A.  I don't recall whether I mentioned the x-rays on the 24th.

20   I certainly doubt it.  I mean, I don't think I knew that there

21   were x-rays as of that time.

22   Q.  The agent never told you, did they, on that day that they

23   were seizing her x-rays, did they?

24   A.  Which day?

25   Q.  Sorry.  On the 25th when they were in the apartment.

H1NAAWEI2                          Massey - Cross

1    A.  I don't recall.  I don't believe so but I don't recall.

2    Q.  Did you ever learn during the course of your time when you

3    were an AUSA that the agents had seized Michaela Wei's chest

4    and pelvis x-rays from her home?

5    A.  I don't recall when I learned that.

6    Q.  Now, one of the things the search team seized during the

7    search of the apartment was Michaela Wei's Blackberry; are you

8    aware of that?

9    A.  Yes.

10   Q.  Are you also aware that earlier in the day when the agents

11   were searching the offices that they imaged several iPhones and

12   Blackberries?

13   A.  I don't recall if they imaged them on sight or later.

14                  (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   Q.  When I say imaged, do you know what I mean by that?

2   A.  Yes.

3   Q.  Is it fair to say that you understand imaging to be when

4   some members of the CART team has some sort of device that he

5   brings with him to make a forensic image of a handheld device

6   so that the person can keep their original handheld device

7   while the CART team actually gets to take that acknowledge with

8   them?

9   A.  I understand that's what that is.  I don't recall if images

10  were taken.

11  Q.  Can I just focus your attention on Exhibit C to the

12  warrants.  We can use the one for the apartment since that's

13  the one I am going to be talking about.

14          THE COURT:  Government exhibit?

15          MR. SIEGAL:  10, your Honor.

16          THE COURT:  Exhibit C to government 10.

17          MR. SIEGAL:  Yes.

18  A.  I see Government Exhibit 10.  Exhibit C?

19  Q.  Yes.  Do you see that it's entitled methods to be used to

20  seize and search computers and computer-related equipment?

21  A.  I see that.

22  Q.  There are multiple paragraphs of instructions here for the

23  agents as to how to treat certain electronic items found,

24  right?

25  A.  Yes.

H1NMWEY3                        Massey - cross

1    Q.  And this is the set of instructions that were presented to

2    Magistrate Judge Dolinger and that he ordered, right?

3    A.  Yes.

4    Q.  Do you see how it says:  Upon securing a premises, law

5    enforcement personnel trained in searching and seizing computer

6    data, which is then defined as the computer personnel, will

7    make an initial review of any computer equipment and storage

8    devices to determine whether these items contain contraband and

9    whether these items can be searched on site and in a reasonable

10   amount of time and without jeopardizing the ability to preserve

11   the data.  Do you see that?

12   A.  Yes, I see that.

13   Q.  What does it mean.  Can you explain what contraband means

14   in this context?

15   A.  Evidence of a crime, I think.

16   Q.  It doesn't mean, for example, things that are in and of

17   themselves illegal, like child pornography.  You are saying it

18   refers to evidence of a crime?

19   A.  I don't know.  I'd have to find the meaning of -- how

20   contraband is defined here.  I think if they found child

21   pornography they would have to get another warrant.  They would

22   know that.  It might include that.  So they are doing an

23   initial search to determine whether it contains evidence of the

24   specified crime or possibly also another crime.  I'd have -- I

25   don't recall as I sit here now how the term contraband is used

1    here.

2    Q.  If we can go on to paragraph B, maybe this will help us all

3    figure out what this means.  Paragraph B says:  If the computer

4    equipment and storage devices cannot be searched on site within

5    a reasonable amount of time and without jeopardizing the

6    ability to preserve the data and if the computer equipment and

7    storage devices do not contain contraband, then the computer

8    personnel will determine whether it is practical to copy the

9    data during the execution of the search in a reasonable amount

10   of time without jeopardizing the ability to preserve the data.

11   Do you see that?

12   A.  I see that, yes.

13   Q.  Am I correct in understanding that what this means is that

14   the CART team is going to make a couple of determinations as

15   they are on site with respect to certain electronic devices.

16   The first is whether or not they can be searched on site within

17   a reasonable amount of time and without jeopardizing the

18   ability to preserve the data.  That's essentially the first

19   inquiry they are going to make.

20   A.  That's one of the things they are supposed to do here.

21   Q.  Is it fair to say that by 2012 basically CART agents never

22   examined electronic devices on site, right?  There is too much

23   data on all these devices?

24   A.  I would not feel comfortable representing that CART agents

25   never did that.  I don't know.

1   Q.  Are you aware whether the agents determined in any

2   particular instance that they could conduct the examination of

3   the onsite iPhones and BlackBerries at the residence?

4   A.  In this case or --

5   Q.  In this case.

6   A.  You are asking me what I remember in their representation

7   to me about whether they could or they could not do it all at

8   once?

9   Q.  Yes?

10  A.  I think most, if not all, of the devices my recollection is

11  that they could not do it in sufficient time to image on site.

12  Q.  I'm sorry.  To image on site or to search on site?

13  A.  To search or -- and/or image on site.

14  Q.  You believe they didn't have time to image any of the

15  phones or BlackBerries?

16  A.  My recollection is that they made the determination, which

17  is fairly common, as you suggested, that it was impossible to

18  preserve the evidence and do the searching and imaging on site.

19  Q.  Those are two different things.  I'm actually asking you

20  whether you know sitting here today whether they searched, in

21  other words, whether they looked through the iPhones and

22  BlackBerries as opposed to just imaging them on site.

23  A.  I don't know if they did.  I wasn't there.

24  Q.  You don't recall, for example, that the logs reflect that

25  four or five iPhones or BlackBerries were actually imaged on

1   site at the office?

2   A.  As I sit here now, I don't recall that.

3   Q.  Do you recall anybody telling you from the search team that

4   there was some problems specifically with respect to Michaela

5   Wey's cell phone, that that cell phone could not be imaged on

6   site?

7   A.  I don't remember when they told me this or whether it was

8   that cell phone in particular.  But I do remember that they

9   were unable to unlock one phone that was properly seized, and I

10  think that problem persisted.  I don't remember when I learned

11  of that.

12  Q.  But you have no specific recollection of somebody from the

13  CART team telling you that Michaela Wey's BlackBerry could not

14  be imaged within the three or four or five hours that the

15  agents were at her apartment?

16  A.  I don't recall that one way or the other, as I sit here

17  now.

18  Q.  But these instructions, is it fair to say, actually say

19  that if it is practical to make an image on site that that's

20  what's supposed to happen?

21          MR. FERRARA:  I am going to renew my 403 objection,

22  your Honor.

23          THE COURT:  Mr. Siegal, there is no jury.  Get your

24  points.  Move on.  I'll let you do summation.  OK.

25          So sustained.

1  Q.  Mr. Massey, we have already established that you were not

2  at the apartment that day, right?

3  A.  That's right.

4  Q.  And you were not in a position to make a call on each and

5  every piece of material that the agents seized during the

6  course of their searches of the office and the apartment?

7  A.  That's right.

8  Q.  Indeed you actually had a number of communications with

9  Agents Komar and McGuire, some of them by e-mail that day,

10  right?

11  A.  I don't think with Agent McGuire.  I don't think he was on

12  the matter at that time, as I recall it, but I certainly had

13  communications with Agent Komar.

14  Q.  Did you have a chance to look at some of those e-mail

15  communications before today?

16  A.  I looked at a stack of them -- I looked at a stack of

17  e-mails before today.

18  Q.  Do you recall any of those e-mails relating to questions

19  specifically asking whether any particular item could be or

20  could not be seized?

21  A.  As I sit here now, I don't recall whether they addressed

22  that.  I don't recall whether the e-mails addressed that.

23  Q.  I take it sitting here today you don't have any specific

24  recollection of any questions and answers between you and the

25  agents while they were conducting the search relating to

1    whether they could take or not take any particular item?

2    A.   I have a recollection of John, this issue of potentially

3    privileged documents being segregated and taken by the attorney

4    for Michaela Wey, John Bostany.  That's all I remember as I sit

5    here now.  I guess I also remember -- I think I remember

6    learning from the agents one or more of the agents, either

7    Agent Pisano or Agent Komar, that they understood that someone

8    was taking trash out a back door at the time -- at or about the

9    time of the search and that they had some basis to believe that

10   documents were being destroyed, and I think I said they could

11   take that trash bag of documents.

12   Q.   Is it generally fair to say that with the exception of the

13   privileged documents and the trash bag issue that you

14   understood that basically it was up to the agent's discretion

15   what they did or didn't take in any particular instance, based

16   on the materials they had with them and whatever instructions

17   you had given them prior to the search?

18   A.   Yeah.  It was up to their discretion to act in good faith,

19   to follow what was in the warrant.  Yes.  Make reasonable

20   efforts to follow what was in the warrant.

21          MR. SIEGAL:  I'm just skipping some stuff, your Honor.

22   To try to move it along.  If you will just give me a moment to

23   look at my outline.

24          THE COURT:  Go ahead.

25   Q.   Now, you testified a little bit earlier about the meeting

1   on the 24th at which you recall giving a basic description to

2   the search team about what the investigation was about, right?

3   A.  It's a vague recollection of the meeting.  I have a clear

4   recollection of what I thought in advance of the meeting as it

5   happens.

6   Q.  But you don't have any recollection sitting here today

7   about what you actually said, right?

8   A.  I don't have a recollection of what I actually said.  Based

9   on my practice I can tell you almost certainly what I would

10  have said, but I don't recall the words I used.

11  Q.  You didn't write a script for that speech in advance,

12  right?

13  A.  I don't recall.

14  Q.  As far as you know, there is no notes of anything that was

15  said?

16  A.  If it hasn't been found on the system, then -- I left my

17  notes and I left -- anything I would have prepared like that

18  would have been left on the system if I prepared a special

19  script for it.

20  Q.  As far as you recall, you didn't ask anybody to take any

21  notes of what was said at the meeting, right?

22  A.  I don't recall whether I did that.  It would have been a

23  little bit unusual to tell the agents they should take notes.

24  They are adults.  And in that kind of setting I don't know

25  whether I would have said that, instructed them to take notes.

1    I tend to doubt it.

2    Q.  Other than the warrant, do you recall anything else being

3    handed out to the agents at the meeting?

4    A.  I don't recall what was handed out at the meeting.

5            THE COURT:  Mr. Massey, was it your practice generally

6    to make notes in advance of such a meeting?

7            THE WITNESS:  Your Honor, it was generally my practice

8    to make notes in preparation for meetings.  In a situation like

9    this I can well imagine that I wouldn't have felt like I really

10   needed notes because I had a search warrant application of

11   great length to talk from, and that would have essentially

12   served as kind of talking points for me to flip pages and see

13   the headings and then summarize to the agents.

14           Going back to my earlier testimony about the practice

15   in the case of a search warrant, in the case of a search

16   warrant, an actual script would be written, but I think the

17   script would be largely cut and paste from the affidavit.  So

18   in this case it may well be that I didn't need to draft notes

19   or they exist, but they can't be identified as such because I

20   didn't write at the top, notes for meeting on such and such a

21   date.

22   Q.  It's fair to say you did not read to them the 97-page

23   affidavit of Mr. Komar, right?

24   A.  I doubt that very much.  It would have taken a very long

25   time.

1   Q.  If I told you that the records seem to reflect that the

2   meeting occurred at 4 p.m. on the 24th, would that surprise

3   you?

4   A.  It doesn't surprise me.  I don't have a reaction to that

5   time.

6   Q.  The search was going to be conducted the very next morning,

7   first thing in the morning, right?

8   A.  It was conducted on the 25th and it was conducted in the

9   morning, yes.

10  Q.  Do you recall that you handed out copies of the affidavit

11  to the searching agents?

12  A.  I don't recall one way or the other.

13  Q.  Did you observe any of the agents read the 97-page

14  affidavit?

15  A.  I certainly observed Agent Komar read the affidavit.

16  Q.  Any of the other ones?

17  A.  I don't recall one way or the other.

18  Q.  As far as you know, no agent wrote an FBI 302 report about

19  what was said at the meeting, right?

20  A.  I don't believe I ever saw an FBI 302 about the meeting.

21  Q.  I take it to the extent you may have prepared a script for

22  the meeting, that's not something that you would have or did

23  show to Magistrate Judge Dolinger, right?

24  A.  I'm not assuming I did create a script.  Based on my

25  practice and the way I knew I operated at that time, I would

1   have talked from the affidavit.  So the affidavit was shown to

2   Judge Dolinger.

3   Q.  Now, you testified at some point you began to receive

4   certain of the evidence that had been seized to look at after

5   the team had done some work?

6   A.  Yes.

7   Q.  One of the agencies with whom you shared some of the seized

8   electronic evidence was the Securities and Exchange Commission,

9   right?

10  A.  Yes.

11  Q.  The SEC was jointly investigating this case with you at the

12  time?

13  A.  I wouldn't use the word joint.

14  Q.  Were they conducting an investigation at the same time into

15  similar topics?

16  A.  They were conducting their own investigation into the same

17  matters.

18  Q.  In fact, after you left the government, the SEC filed its

19  own separate case in 2015, right, relating to similar topics to

20  the indictment in this case?

21  A.  I saw that, yes.

22  Q.  Before you shared search materials with the SEC, you didn't

23  ask Mr. Wey or Mrs. Wey for their permission to do that, did

24  you?

25          MR. FERRARA:  Objection.  Relevance.

H1NMWEY3                    Massey - cross

1           THE COURT:  You want to make a proffer, counsel.

2           MR. SIEGAL:  Your Honor, I am going to ask him about

3    some communications with the SEC.

4           THE COURT:  Why?

5           MR. SIEGAL:  Part of the 3500 material.  Because it

6    goes to his understanding of the scope of the warrant.  Your

7    Honor will see when I put the documents in front of him.  So

8    I'm happy to make the proffer to your Honor.  If you want to

9    take a break, I can do it.

10          THE COURT:  You are saying you don't want to do it in

11   the hearing of the witnesses.  Is that your point?

12          MR. SIEGAL:  No.  It's fine to do it in front of the

13   witness.

14          THE COURT:  Go ahead.  Go ahead and make a proffer,

15   generally.  I'm not looking for exactly what you are going to

16   do.  As I sit here, I don't know why you would ask about that.

17          MR. SIEGAL:  Well, your Honor --

18          THE COURT:  While you are doing that, someone in the

19   courtroom has a phone that's pinging.  I'm amazed.  Does anyone

20   know whose phone it is?

21          I'll give my warning again.  Maybe everyone can just

22   take a moment and check all of their devices.  If I hear a

23   phone sound again as though it's receiving an e-mail and I can

24   determine who has that phone, it will be confiscated.

25          Go ahead, Mr. Siegal.  It's distracting.  I don't mean

1    to take it out on you, Mr. Siegal.

2              MR. SIEGAL:  Your Honor, the government's position

3    here is that the government acted in good faith in both its

4    execution of the search warrants and in treating the electronic

5    evidence after it was seized.

6              If your Honor takes a look at -- it's a little bit

7    difficult because the binders are so thick.  3504-13 is a

8    compilation of e-mails.  It's your Honor's binder relating to

9    3500 material specific to Mr. Massey.  It's quite a ways

10   through the set there.

11             THE COURT:  They are Bates --

12             MR. SIEGAL:  There are Bates numbers, your Honor, but

13   I don't know that they are consecutive.  In this particular

14   instance I'm looking at a document that's Bates number Wey

15   000310.

16             MR. FERRARA:  The numbers get lower as your Honor goes

17   further back, so it's reversed.  They are also in date order.

18   If Mr. Siegal wants to give us a date --

19             MR. SIEGAL:  It's May 3, 2013, your Honor.

20             THE COURT:  You said Wey 00315?

21             MR. SIEGAL:  I'm sorry.  310, your Honor.

22   Q.  This is a memo that Mr. Massey wrote to the file after he

23   became concerned.  I'm just summarizing, your Honor, for the

24   purposes of my proffer here.  I'm not trying to put words in

25   the witness' mouth, but I will ask him about it.  In which he

1    realizes that he has sent a disk of materials from the

2    electronic production to the SEC, although no agent, prior to

3    when he sent it, had checked to see whether everything on that

4    disk of electronic data was responsive to the warrant.  The

5    disk was at the SEC for at least a month before anybody in the

6    U.S. Attorney's Office questioned whether this was an

7    appropriate way to handle the electronic search material.

8            So the U.S. Attorney's Office attempted to get the

9    disk of data back from the SEC because in the interim an agent

10   that Mr. Massey asked to look at the disk determined that there

11   could be personal nonresponsive information on the disk.  They

12   attempted to get it back.  The SEC declined to return the disk.

13   And then Mr. Massey wrote a memo to the file in which he argues

14   effectively to himself or to the file why although the agent

15   determined that materials on the disk might not be responsive

16   to the warrant, why he believes it is.  I want to question him

17   about that.

18           MR. FERRARA:  Your Honor, I don't think this goes to

19   the actual question here, which is whether -- the good-faith

20   analysis here or the reasonableness analysis was -- I think

21   there is a couple of different potential parts.  Was the

22   government sort of just maintaining the evidence, not doing

23   anything with it.  Was the government being diligent in

24   searching the evidence, moving through the evidence in an

25   attempt to get to the bottom of what was pertinent and what was

1     not pertinent.  Did the government sort of maybe double dip, go

2     back in and look for things outside the warrant later, things

3     of that nature.  The fact that certain nonpertinent documents

4     may have been shared with the SEC, an unrelated party here, is

5     outside the scope of what the Court is being asked to decide

6     and is not part of the reasonableness analysis.

7                THE COURT:  Overruled.

8     Q.  Putting aside for a moment the question, Mr. Massey, about

9     whether you asked for permission to send electronic search data

10    to the SEC, is it fair to say that at some point it occurred to

11    you that contained in some materials you gave to the SEC there

12    might be data that might not have been responsive to the search

13    warrants but that was still at that point in possession of the

14    FBI?

15    A.  Yes.

16    Q.  And this was more than a year after the search warrants

17    were executed, right?

18    A.  May 3, 2013?

19    Q.  Yes.

20    A.  Is more than a year after the search was executed.

21    Q.  So at that point am I correct in understanding you asked

22    the FBI agent or an FBI agent to check a particular disk of

23    information you had already given to the SEC more than a month

24    earlier?

25    A.  I believe that's right.  But I don't think -- if it's Wei

H1NMWEY3                         Massey - cross

1    Mon, she was not an agent.  She was an analyst.  I believe I

2    asked them to check that.

3    Q.  And the FBI analyst reported back to you that in fact

4    documents of a personal nature were contained within that disk

5    that you had given to the SEC, right?

6    A.  I think that's right.  I have not had time to read this

7    entire memo.  Are you asking me to read it?

8    Q.  I'll help you out, if you don't mind.  If you can look at

9    the third paragraph there, do you see that it says on April 23

10   I asked the FBI analyst, who has looked at the raw FBI Excel

11   disk, whether she saw anything of a purely personal nature

12   there.  You see that?

13   A.  I see that.  I'm reading it now.

14   Q.  In fact, she had told you that there were spreadsheets

15   reflecting Wey family medical issues on that disk, right?

16   A.  Certainly says that and I wouldn't have written it if it

17   weren't true.

18   Q.  Am I correct that you actually, once you learned that,

19   tried to get the SEC to either destroy the disk or return it to

20   you, right?

21   A.  Yes.

22   Q.  And they told you they couldn't do that and wouldn't do

23   that, right?

24   A.  I think they told me that their -- I think they initially

25   agreed to do that and then they told me that their regulations

1    prevented them from destroying or returning documents, that the
2    federal regulations prohibited that.  I think they put it in a
3    box, put it in a safe, locked it away and sort of separated it
4    from their investigation.
5    Q.  But at that point it had already been in the SEC's
6    possession for a month, right?
7    A.  I don't remember the amount of time.  I'm not disputing
8    whatever their documents suggest.  I just don't recall.
9    Q.  I think the memo reflects the timeline, so I won't bother
10   you with those questions.  But is it fair to say that in the
11   memo that you wrote to the file on this issue, you wrote:
12   These two are within the scope of the warrants because Wey's
13   tax returns are relevant documents because we believe he
14   committed tax fraud and he claimed large medical deductions
15   most years.  Do you see you wrote that language?
16   A.  I see that.
17   Q.  Sir, where in Special Agent Komar's 97-page search warrant
18   affidavit is there any assertion that Ben Wey was committing
19   tax fraud by overdeducting for medical expenses?
20   A.  As I sit here now, I don't recall it saying that.  I do
21   recall some reference in it to tax information or tax returns.
22   I just don't recall what it was in relation to.
23   Q.  There is no reference on the front page of the search
24   warrant, as we established earlier, to any tax fraud, right?
25           MR. FERRARA:  Objection.  403.

1   A.   If there is no reference --

2              THE COURT:  Just a moment.

3              THE WITNESS:  I'm sorry, your Honor.

4              THE COURT:  Overruled.

5   Q.   Indeed, just taking a look for a moment at the front page

6   of Government Exhibit 2, which is the application for search

7   warrant, that's a document where you did include certain code

8   section citations, right, Mr. Massey?

9   A.   Yes.

10  Q.   And none of that is a reference to any tax fraud section,

11  is it?

12  A.   You are right, yes.  You are correct.

13  Q.   And there is nothing in Agent Komar's affidavit describing

14  probable cause to search or seize evidence of overdeductions

15  for health expenses, is there?

16  A.   I believe you are right.

17  Q.   Yet in your mind when you wrote this memo you believed that

18  the warrants covered that type of information, too?

19  A.   If I said I believed it I must have believed it.  It's an

20  internal memo.

21  Q.   Just to be clear, there is nothing about overdeductions for

22  health expenses in Mr. Garwood's affidavit seeking the search

23  warrant for the home either, right?

24  A.   No.  But in both affidavits there was a description of the

25  funds from overseas from Tianyi Wey being transferred to a

H1NMWEY3                         Massey - cross

1   personal account of Michaela Wey.

2   Q.  Sir, does that have anything at all to do with deducting

3   for health expenses?

4   A.  On its face?  If you want me to make an argument about how

5   it could, I could.  On its face it does not relate to

6   deductions for medical expenses.

7   Q.  And you made a point in your direct testimony that this was

8   a security fraud squad that was doing the investigation, right?

9   A.  Yes.

10  Q.  And that it was clear that this was, in your mind, from the

11  search warrant a securities fraud investigation, right?

12  A.  Yes.

13  Q.  Not a health care fraud related investigation, right?

14  A.  Correct.

15          THE COURT:  Are you moving this, counsel?

16          MR. SIEGAL:  Yes.  I'm going on, your Honor.

17          Mr. Ferrara has reminded me, your Honor, that I would

18  like to move just the one page, way 000310 in evidence.

19          MR. FERRARA:  It's a two-page document, your Honor.

20  No objection.

21          THE COURT:  You want to mark it, Mr. Siegal.

22          MR. SIEGAL:  Yes.  We will mark it as Defense Exhibit

23  4.

24          THE COURT:  From the 3500 material for Mr. Massey,

25  which is 3504, two-page document that begins at Wey 000310 and

1    it's two pages long will be marked as Defendant's 4 and without

2    objection admitted.

3              (Defendant's Exhibit 4 received in evidence)

4              MR. SIEGAL:  Shall I hand this to the court reporter

5    or the clerk?

6              THE COURT:  No.

7              MR. SIEGAL:  I am just trying to skip a bunch of

8    stuff, your Honor, if your Honor would give me a moment.

9              THE COURT:  OK.

10   Q.  Let's turn to the review of the electronic documents.  Am I

11   correct in understanding that the plan was at the time the

12   search was conducted that CART was going to load electronic

13   data seized from the search into a review platform?

14   A.  Yes.

15   Q.  So that the FBI could then begin conducting its review?

16   A.  Yes.

17   Q.  And are you aware that in the course of the searches of

18   both the apartment and the office that somewhere between six

19   and eight cell phones and 19 other electronic storage devices

20   were collected in the course of the search?

21   A.  As I sit here now, I don't remember the exact number.

22   Whatever the documents say I'm sure is accurate.

23   Q.  I take it you weren't surprised that the searches of the

24   office of the business and of somebody's home resulted in the

25   collection of a number of electronic devices, right?

1    A.  No, I was not surprised by that.

2    Q.  This is what you anticipated.

3            Did you also anticipate in advance of the search that

4    you would need a taint team to review electronic documents for

5    potential privilege?

6    A.  I think we probably -- I probably did assume that, but I

7    don't specifically recall.  I have to reread the application to

8    answer that question.  Typically in the application there may

9    be a need for a taint team.

10   Q.  Is it fair to say that at the time that you sent the agents

11   out to do the search you anticipated that there would be at

12   least two projects that would need to be accomplished with

13   respect to any electronic evidence?  One would be a review for

14   potential privilege and the other would be a review for

15   responsiveness to the warrant.

16   A.  I believe that's right.

17   Q.  And did you anticipate at the time the searches were

18   executed that those projects might take a significant amount of

19   time and effort?

20   A.  I don't recall whether I had a belief or view as to how

21   long it might take.  I'm sure I was aware that there are often

22   delays because the FBI had its own -- various priorities.

23   Q.  I take it that you understood at the time that neither of

24   those projects could begin until CART loaded the data onto a

25   platform, right, to a review platform?

1   A.  As to the electronic records, correct.

2   Q.  Are you aware that the electronic data was not even loaded

3   up to a platform until April of 2012?

4   A.  As I sit here now, I'm not aware of when it was uploaded.

5   Q.  After everything was finally loaded, a taint team began to

6   run searches to segregate privileged materials, correct?

7   A.  Yes.

8   Q.  That was the process that you were talking about in your

9   direct testimony about the list of attorneys?

10  A.  Yes.

11  Q.  And was it your understanding that you couldn't begin to

12  review materials for responsiveness until the taint team had

13  done its work?

14  A.  No.  It wasn't my view.  Depends what you mean by done its

15  work.  As to a particular document, for instance, a

16  spreadsheet, I have the recollection of getting spreadsheets,

17  one or more spreadsheets earlier than other information, while

18  they were probably still working on the rest of it.  Because it

19  had been cleared for privilege and cleared for responsiveness.

20  Q.  Apart from a couple of items that you received, do you

21  recall that the process of reviewing the search material for

22  responsiveness was going on in some substantial form prior to

23  May of 2013?

24  A.  We had a couple -- I don't know how many -- documents I

25  received or electronic files I filed.  I don't know if it was a

1    couple.  But, I'm sorry, the rest of your question is -- could

2    you repeat the rest of your question.

3    Q.  The taint process wasn't completed, was it, until May of

4    2013?

5    A.  I don't recall when it was completed, as I sit here now.

6    Q.  You recall that Agent Komar handed off the investigation to

7    Agent McGuire some time in early 2013?

8    A.  I do recall that happened.  I don't recall exactly when.

9    Q.  And you recall that you gave Agent McGuire that list of

10   search terms that we saw earlier.  That was some time in May of

11   2013?

12   A.  It was dated May 3, yes.

13   Q.  But you grew concerned about the pace of the taint team's

14   review at some point in the summer of 2012, didn't you?

15   A.  Whether it was summer of 2012, I don't recall.  I do

16   recall -- I don't know what you mean by concern.  I wanted

17   them -- I prefer that they move faster.  Whether it was concern

18   or not, I'm not sure.

19   Q.  Is it your recollection that the taint team wasn't even

20   briefed on how the review software worked until June of 2012?

21   A.  I don't recall the date.  I am not sure if I ever knew the

22   date.  I don't recall the date, that date.

23   Q.  As far as you're aware, do you know whether anyone on the

24   investigation team did any review of the electronic materials,

25   either for privilege or responsiveness, between January 25,

1  2012, when it was seized, and June 2012?

2  A.  As I sit here, I don't recall.

3  Q.  Now, you mentioned an opinion of Judge Irizarry in the

4  *Metter* case from May 2012.  Is it fair to say that you became

5  aware of that opinion shortly after she issued it in May?

6  A.  I don't recall when I became aware of it.

7  Q.  Let's do this by showing you the document.  If you can look

8  in your 3500 binder, please.  I am going to ask you go maybe 15

9  pages back in the binder.

10          MR. SIEGAL:  Your Honor, I'm referring now to 3504

11  Bates page, Wey 001330.

12          THE COURT:  You are saying it's about 15 pages from

13  the front of the exhibit?

14          MR. SIEGAL:  No, your Honor.

15          THE COURT:  From where we were.

16          MR. SIEGAL:  The date is August 29, 2012 and

17  Mr. Ferrara has reminded me that these are in chronological

18  order.

19          THE COURT:  You said it's Wey 01330.

20          MR. SIEGAL:  Yes, your Honor.

21  A.  I see Wey 1330.

22  Q.  This is a communication from you to Marc Berger.  Am I

23  correct in understanding that he was your supervisor at the

24  time?

25  A.  Yes.

Q.  And is it fair to say that by this time you were concerned
about the pace at which the electronic document review was
going in this investigation?

A.  I don't remember whether concern was -- I don't remember
whether I was, quote, concerned.  I remember being -- I
remember wishing that they were working faster and I remember
enlisting -- trying to enlist help from Marc Berger on that
point.

Q.  In fact, Marc Berger actually had a conversation with Agent
Komar's supervisor about the pace at which the review was
going, right?

A.  I vaguely recall that.

Q.  That's what this documentation refers to?  That's what this
set of e-mails refers to?

A.  I don't know.  I have not had time to read the whole
e-mail.

Q.  I'll just direct your attention to the bottom half of the
page.  Do you see where there is a bracketed sentence or two
that says:  As incentive to keep this process going, we have
the recent EDNY opinion suppressing 50 plus hard drives for
failure to review them quickly enough.  Do you see that?

A.  I see that.

Q.  Is that the Judge Irizarry opinion you were referring to
earlier?

A.  Yes.

1   Q.  You see where it says:  We seized the NYGG hard drives etc.

2   seven months ago and this privilege review is nowhere near

3   finished.  Do you see that?

4   A.  I do.

5   Q.  The *Metter* decision wasn't the only thing you were worried

6   about at that point in time.  There were other decisions in the

7   Southern District as well.  The *Debbi* decision, were you aware

8   of that one?

9   A.  I don't remember.  I don't remember that case by that name.

10  Q.  Despite the fact that you raised this issue with your

11  supervisor in August of 2012, it's true that in fact the

12  privilege review itself dragged on for another nine months,

13  right?

14  A.  Again, I don't recall when the privilege review had ended.

15  Again, I think I received some documents before the privilege

16  review, and we also had the hard copy documents.

17          THE COURT:  Mr. Siegal, how much longer with this

18  witness?

19          MR. SIEGAL:  Give me a moment to look, your Honor.

20  Q.  Between January of 2012 and May of 2013 --

21          THE COURT:  The question was, how much longer with

22  this witness?  And then you started to give me a year range,

23  which caused some concern, especially for Mr. Massey, I

24  suspect.

25          MR. SIEGAL:  Maybe half an hour, your Honor.

H1NMWEY3                        Massey - cross

1          THE COURT:  We will take a lunch break for about 45

2     minutes.  See if what you can do to tighten it with the

3     guidance you have been given in the morning, and we will return

4     in 45 minutes.

5          MR. SIEGAL:  Sorry, your Honor.  Before we break, your

6     Honor, I would like to move in evidence the page I was just

7     referring to.

8          MR. FERRARA:  We don't object to the entire document

9     being entered.  It's a three-page document.  We don't object to

10    the entry of the entire document.

11         THE COURT:  Marking -- Mr. Siegal, doing your work

12    here for you -- as Defendant's 5 from Mr. Massey's 3500

13    material Wey 1330, which is a three-page document.  Without

14    objection, that is admitted.

15              (Defendant's Exhibit 5 received in evidence)

16         THE COURT:  Enjoy your break.

17              (Luncheon recess)

18              (Continued on next page)

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                               1:30 p.m.

3                THE COURT:  Please be seated.

4                I'm reminding Mr. Massey that he is under oath.

5                MR. SIEGAL:  Your Honor, before we move to a different

6     topic I'd just like to show the witness one additional document

7     regarding the timeline and offered in evidence.

8     Q.  So, if I could point you, Mr. Massey, to an e-mail dated

9     January 15, 2013.  It's in that same compilation of documents

10    of the3500 material which for the record is 3504-13 and the

11    Bates number page I am referring to is Wei 000651.

12    A.  I see it.

13               THE COURT:  You are marking that as Defendant's six?

14               MR. SIEGAL:  Yes.

15               THE COURT:  For identification?

16    Q.  That's an e-mail that you wrote to your supervisor, Mark

17    Burger, right?

18    A.  Yes.

19               MR. SIEGAL:  Your Honor, I'll offer this document in

20    evidence and just ask him one question about it.

21               MR. FERRARI:  No objection.

22               THE COURT:  It's marked as Defendant's Six.  It's

23    admitted which is from the 3500 material Wei 651 and it's how

24    many pages?

25               MR. SIEGAL:  Just the one page.

1          THE COURT:  Single page, thank you.  It is admitted.

2          (Defendant's Exhibit Six received in evidence)

3   BY MR. SIEGAL:

4   Q.  Mr. Massey, do you see in that e-mail that you write the

5   FBI has now started reviewing the electronic records after a

6   long delay; do you see that?

7   A.  Yes.

8   Q.  And that was almost a year after the electronic evidence

9   had been seized?

10  A.  Yes.

11  Q.  Now, on direct you referred to a list of search terms.  I'd

12  like to direct your attention to that list, if I could.  The

13  document in evidence is Government Exhibit 19, if you could

14  look at that one, please.

15  A.  Government 19?

16  Q.  Yep.

17  A.  I have 19.

18  Q.  And that you said it was a list prepared by you in or about

19  May, the beginning of May 2013?

20  A.  I believe so, yes.

21  Q.  Am I correct in understanding that the point of this list

22  was to help Special Agent McGuire search through the electronic

23  evidence for files that were responsive to the search warrant?

24  A.  Yes, for the remaining files, yes.  I said, I think before

25  this time I had received some documents but yes.

1   Q.  But the objective, if I'm clear, is use these search terms,

2   what you are doing is trying to find any electronic evidence

3   that which is responsive to the warrants, right?

4   A.  Yes.

5   Q.  Now, is it fair to say that this list contains a number of

6   names that are not in Exhibit B to the search warrants?

7   A.  It's a longer list I think.  If you say so.  I mean, I'd

8   have to compare them side-by-side.

9   Q.  Are you aware, sir, that the name Ahmed Mohadin which is on

10  the front page of Exhibit 9, that's not among the names in

11  Exhibit B to the search warrant?

12  A.  If it -- I mean, I take your word for it.

13  Q.  And Dogan Erbek, that is another name in this list but not

14  on the list in Exhibit B to the search warrants?

15  A.  OK.

16  Q.  Would you be surprised if I told you that the number of

17  names on this list is more than a hundred longer than Exhibit

18  B?

19          MR. FERRARI:  Objection; relevance.  Objection; 403.

20          THE COURT:  Overruled.  But this will be the end of

21  the line of questioning.

22  Q.  Sir --

23          THE COURT:  Overruled.

24          You may answer, Mr. Massey.

25  A.  I am sorry.  No, I would not be surprised that the number

1    is a hundred more than the search warrant application.

2    Q.  Did you ever receive permission from the magistrate judge

3    to search the electronic data seized in 2012 with this list of

4    names as opposed to list of names in the search warrant,

5    Exhibit B?

6              MR. FERRARI:  Objection.

7              THE COURT:  Grounds?

8              MR. FERRARI:  It's misrepresenting what the

9    testimony's been.  Mr. Massey testified on direct that he

10   compiled that list based on the warrant and it was an

11   extrapolation from things in the warrant.  So, the idea that he

12   needed to get permission is simply argumentative.

13             THE COURT:  Well, as I sit here I can't recall if this

14   was the same point of comparison, but any way, overruled and

15   then you'll move on.

16   A.  I don't believe this was submitted to the magistrate judge.

17   Q.  Now, with respect to specifically Mr. Dogan Erbek, you were

18   aware of the existence of him prior to when you made the

19   application for the search warrant in January of 2012, weren't

20   you?

21   A.  It's very hard to remember when I became aware of Dogan

22   Erbek.

23   Q.  If I could direct your attention to the same collection of

24   e-mails in the 3500 material to a Bates number documented Wei

25   003395 which is an e-mail dated January 12.  Do you see that?

1   A.  Twelve of what year?

2   Q.  I am sorry.  Of 2012.

3   A.  How far back in the stack is it?

4   Q.  It is actually not very far back, 350413, but it's a long

5   way from the tab, about five pages back from the blue sheet.

6   A.  OK.  I am sorry.  January what 2012?

7   Q.  January 12, 2012, there's like a three e-mail chain.

8   A.  I see that.

9   Q.  This is an e-mail exchange between you and the case agent

10  at the time?

11  A.  What's the Bates number.

12  Q.  Sorry 003395?

13  A.  I see it.  Yes.  This is an e-mail exchange between myself

14  and Agent Komar.

15  Q.  And this specifically is discussing somebody named Dogan

16  Erbek and Sarah Dogan Erbek?

17  A.  Yes.

18  Q.  Do you know that he is a co-defendant in this case?

19  A.  I do know that.

20  Q.  So, you were aware of his existence at the time and

21  specifically you were also aware of some connection to him and

22  this investigation, right?

23  A.  Yes.

24  Q.  These e-mails are in connection with the same

25  investigation?

H1NAAWEI4                          Massey - Cross

1    A.  Yes, enough to write an e-mail about it.

2    Q.  But you didn't have probable cause to search for documents

3    relating to Dogan Erbek anywhere in the affidavit that you

4    submitted two weeks later, right?

5    A.  Well, I don't mean to quibble with you but as you asked

6    that question, I don't agree with the way you asked it.

7    Q.  Did you assert that you had probable cause in the affidavit

8    that Komar submitted relating to Dogan Erbek?

9    A.  If that name is not in there, it is not in there.

10   Q.  And he is not on the list either, is he, Exhibit B to the

11   search warrant?

12   A.  I take your word for it.  I'd have to look for it.

13   Q.  But here 15 months later you've added him to the search

14   term list, right?

15   A.  That's correct.

16   Q.  I'd like to have you look please at another e-mail chain.

17           MR. SIEGAL:  Pardon me, your Honor.  It's actually I

18   believe --

19   Q.  I'd like to direct your attention to the front of the 3500

20   binder, the section for Special Agent Komar.

21           MR. SIEGAL:  Sorry, your Honor, before I do that I'd

22   like to move into evidence the e-mail from January 12, 2012

23   that I just went through.

24           THE COURT:  Which is Bates what, counsel?  If you

25   could just in a consistent way when you start on a document

1   identify mark it for identification and then you can move in

2   that exhibit.

3           MR. SIEGAL:  Yes, your Honor.

4           THE COURT:  Thank you.

5           MR. SIEGAL:  It's Wei 003395.  That's the Bates number

6   for the January 12, 2012 exchange of e-mails.

7           THE COURT:  And you want to mark that as what?

8           MR. SIEGAL:  Defense Exhibit 7, your Honor.

9           THE COURT:  How many pages is it?

10          MR. SIEGAL:  Just the one page.

11          THE COURT:  Without objection.

12          MR. FERRARI:  Without objection.

13          THE COURT:  Been marked as Defendant's 7 is admitted.

14          (Defendant's Exhibit Seven received in evidence)

15  BY MR. SIEGAL:

16  Q.  Now, if you would look please in the front of the binder

17  there's a tab for 3500 material related as to Komar?

18  A.  I see it.

19  Q.  And within that section there's a collection of e-mails

20  that begins 350111 that's what we've marked for Komar.  And

21  then it's a collection of e-mails that starts with the

22  January 4, 2012 e-mail.

23  A.  I see the January 4, 2012 e-mail.

24  Q.  OK.  If you would go about maybe 15 or 20 pages in you

25  would find the e-mail on January 12, 2012 e-mail exchange

H1NAAWEI4                          Massey - Cross

1    between you and Special Agent Komar, then as well that has

2    Bates number 003405?

3    A.   January 12, 201 e-mail page 3405, I have that.

4              MR. SIEGAL:  I'd like to offer that, your Honor.

5              THE COURT:  I honestly don't know where we are.

6              MR. SIEGAL:  You don't have the document in front of

7    you?

8              THE COURT:  I don't know.  You need to describe it

9    again.

10             MR. SIEGAL:  Yes.

11             THE COURT:  We're in the 3500 material for Mr. Komar

12   3501 --

13             MR. SIEGAL:  11, which is a composite of a bunch of

14   e-mails for Mr. Komar.

15             THE COURT:  And the Bates are 3450, how many pages

16   3405?

17             MR. SIEGAL:  I'm not referring to that exhibit for

18   purposes of this question.  I am referring to a page 15 pages

19   in and they are in chronological order.  So this would be a set

20   of e-mails on January 12, 2012, Wei 003405.

21             THE COURT:  January 12, 2012 which begins 3410.

22             MR. FERRARI:  About five pages past that, your Honor.

23             THE COURT:  Wei 3405.

24             MR. SIEGAL:  Yes.  Are we all there together now?

25             THE COURT:  I'm there.

1              MR. SIEGAL:  I'd like to offer this, your Honor, as

2     defense eight.

3              MR. FERRARI:  I don't understand the relevance, your

4     Honor.

5              MR. SIEGAL:  Well, it's an e-mail exchange between

6     yourself and Mr. Komar, right?

7     A.  Yes.

8     Q.  And in it it references to somebody named Teresa Ungerman;

9     do you see that?  And Otakar Ungerman, do you see that?

10    A.  I see that in Agent Komar's e-mails to me.

11    Q.  Are those names that are appearing anywhere on Exhibit B of

12    the search warrant affidavit?

13    A.  I don't recall.

14    Q.  But they do appear on Government Exhibit Nine, right?

15    A.  It's not open in front of me.

16    Q.  If you could take a look please Government Exhibit Nine is

17    in alphabetical order?

18    A.  I'm not disputing it.  I just didn't see it.  I don't have

19    it in front of me.  Government Exhibit Nine is the warrant.

20             MR. FERRARI:  For the sake of time, if it's there or

21    not your Honor will have the exhibit in front of you.

22             MR. SIEGAL:  Will you take my representation?

23             MR. FERRARI:  He doesn't have to, your Honor, because

24    the exhibit is in evidence.

25             THE COURT:  Well, this one is not yet in evidence,

1   3405.  So, you withdraw your relevance objection?

2               MR. FERRARI:  That's fine, your Honor.

3               THE COURT:  I will admit Defendant's Eight Wei 3405

4   the January 12, 2012 e-mail.

5               (Defendant's Exhibit Eight received in evidence)

6   Q.  So, these are some additional names that you were aware of

7   back in January 2012 that you did not include in a search

8   warrant but yet then later added to your search term list,

9   right?

10  A.  If that's what the two lists show then you're right.

11  Q.  So, I'm sorry, Mr. Massey, was it your understanding in

12  2013 that you could have the agents search through all the

13  Weis' electronic materials for people and entities that you

14  didn't include as people and entities for whom you had probable

15  cause in the warrant?

16  A.  If they were sufficiently closely connected to the names in

17  the warrant and the PC covered it I believe, I don't honestly

18  remember my thought process exactly but there certainly had to

19  be a close tie to the warrant application and the warrant, very

20  close tie.

21  Q.  Based on who's judgment, yours?

22  A.  I think not only mine.  I think I asked the agent to review

23  that as well.

24  Q.  So, you and the agent decided in May 2013 that you were

25  just going to add names to the lists that you never

1   demonstrated probable cause for in the search warrant?

2          MR. FERRARI:  Objection; misrepresents the testimony,

3   argumentative.

4          THE COURT:  Just a second.  I'll sustain that.

5   Rephrase.

6          And again, Mr. Siegal, if we're going to get through

7   this you've got to get to the point you need and I'm giving you

8   room to, for example, note that someone whose on the later list

9   and wasn't on the earlier one and then ask your question but

10  you just don't need to do the summation and I'm not going to

11  allow it any more.

12  Q.  At the time you left the U.S. Attorney's Office in 2013,

13  Mr. Massey, were you, as far as you were aware, was the FBI

14  still in possession of all the electronic data that had been

15  seized from the Weis' apartment at the offices of New York

16  Global Group?

17  A.  I don't know if I knew that.  At some point I became

18  recused.  I recused myself from the investigation after I left

19  the office.

20  Q.  But as far as you know none of it was purged or deleted

21  during that time, right?

22  A.  During the time before I became recused?  Or before I left?

23  Q.  Before you left?

24  A.  As I sit here now I don't have any -- I don't have a

25  recollection about purging or deleting files.

1  Q.  Mr. McGuire was doing an exercise in May of 2013 to search

2  for electronic files responsive to the warrant, right?  That

3  was what you understand his exercise was?

4  A.  Yes.

5  Q.  And regarding items he determined were not responsive to

6  the warrant, did you instruct him at any time to delete or

7  purge any of that nonresponsive data?

8  A.  I don't recall giving that instruction.  I think the

9  process was -- I'm not sure if the process had ended at that

10  point.  By the time I became recused the process may have still

11  been going on.  I don't remember.

12  Q.  Sir, on direct you spoke a little bit about some of the

13  substance of what was in the affidavit of Mr. Komar.  Among the

14  things you testified about, was the passage in the affidavit --

15  and I'm going to refer you to Government Exhibit two, page 43,

16  paragraph 25.

17  A.  OK.  I see that.

18  Q.  In that the affidavit as you drafted it says I am aware of

19  no public information that could explain such a significant

20  rise in the marketplace valuation of these stocks.

21  A.  I see that.

22  Q.  And that was a reference to in particular Deer and Sparky?

23  A.  Yes.

24  Q.  Among the public information that you reviewed at the time

25  did you review any market analyst reports?

H1NAAWEI4                    Massey - Cross

A.  I don't specifically remember but I believe I did.  I

believe I would have.  That's the kind of thing that I would

have looked at or asked the SEC to look at in the usual course.

Q.  Did you see that multiple market analysts rated Deer at its

highest available rating?

A.  Sorry.  When you said "market data" I was thinking of sort

of stock carts but actual bought analyst reports probably

looked at the analyst reports as well.  I'm not -- was aware

that Deer was rated highly by certain analysts at this

particular time.  I don't recall.  I do recall getting

different ratings at different times and it wouldn't have

changed my view at all to know that some analysts have rated it

as a buyout or performed and some of such rating.

Q.  Did you review SEC filings for these companies in

connection with drafting this affidavit?

A.  I believe I did.

Q.  Did you notice the SEC filings, for example, Sparky had

recently fall of 2009 successfully completed a $75 million

public offering?

A.  I believe I was aware of the public offering history of

these companies.

Q.  Did you see SEC filings at the time that showed that Deer

had successfully done a pipe financing of $15 million in

September of 2009 and in issuance of $75 million in new shares

in November of 2009?

1   A.   I believe I knew that.  I was following the public

2   offerings.

3   Q.   Did you review the fact that the Shanghai and Shen Jeng

4   stock exchanges were up 35 percent in the fall of 2009?

5   A.   I don't specifically remember.  But as I said a minute ago,

6   I believe I would have looked at the stock charts and that

7   would include indices, which indices I don't know but I would

8   have sought to look at relevant index like China Small Cap

9   stocks or something like that.

10  Q.   But you are saying -- did you look at what the

11  institutional ownership was in these securities during the fall

12  of 2009 as part of your review of publicly available

13  information?

14  A.   I believe we looked at this sort of top institutional

15  shareholders to the extent that it was public and I think you

16  could see that you could see fidelity owned some shares and

17  with the big funds that's the type of information that we would

18  have looked at.  Do I specifically remember that at this time?

19  It's hard to remember.

20  Q.   With respect to the listing requirements --

21          MR. SIEGAL:  If I may approach, your Honor?

22          THE COURT:  Show counsel.

23          (Pause)

24  Q.   Handing you, sir, what I'm going to ask to be marked as

25  Defense Exhibit Nine.  Do you see that document?

1    A.  Dated January 2017?  I do see this document January 2017

2    NASDAQ initial listing, Exhibit 9.

3    Q.  At the time that you were putting this search warrant

4    affidavit together did you have an opportunity to review the

5    listing requirements for NASDAQ for getting an issuer listed on

6    NASDAQ?

7    A.  I certainly had the opportunity.  I don't recall whether I

8    reviewed a document like this.

9    Q.  Do you have any reason to believe that the listing

10   requirements with respect to the Round One Shareholder Exchange

11   listing requirements for NASDAQ?

12          MR. FERRARI:  Objection.

13          THE COURT:  Sustained.

14   Q.  Sir, do you recall anything in the listing requirements

15   that you might have looked at at the time that said that

16   gifting of shares was prohibited by the listing requirements?

17   A.  I don't recall that being in the NASDAQ rule one way or the

18   other.

19   Q.  And do you recall anything in the listing requirements that

20   said there is some sort of substantive test relating to trading

21   or investment interests with respect to the Round Lot

22   Shareholder requirement?

23   A.  I remember an SEC opinion on that point which is in the

24   affidavit and I remember having an understanding of the rule

25   which was not a, which had substance and meaning.  And so, I

1   think between the rule itself which was there for a reason and

2   the SEC opinion or in -- of the rule in the China Energy case I

3   believe the rule had meaning.

4   Q.  So, the China Energy Case that you are referring to has

5   filed a complaint at the time, right, by the SEC?

6   A.  It was a filed complaint.  I think it may have been

7   resolved by that time but I can't recall.

8           MR. SIEGAL:  We have nothing further for this witness,

9   your Honor.

10          THE COURT:  Thank you.  Redirect?

11          MR. FERRARI:  Thank you, your Honor.

12  REDIRECT EXAMINATION

13  BY MR. FERRARI:

14  Q.  Before I forget, Mr. Massey, I just want to -- I just want

15  to make sure your testimony is clear on one point.  On direct I

16  thought you had testified about thinking about, when I asked

17  you about thinking about preparing the agents for search you

18  had talked about thinking of it like a wiretap?

19  A.  Yes.

20  Q.  And then I believe when Mr. Siegal was asking you questions

21  you said, I thought to go back to my analogy but then you said

22  my analogy about search warrants and I would have had a script

23  with a search warrant.  I just want to make sure whatever the

24  answer is the answer, but did you typically do scripts for

25  wiretaps or did you typically do scripts for search warrants?

1    A.  For wiretaps.

2    Q.  That was just an analogy you were using for the search

3    warrants?

4    A.  Yes.  So, I misspoke when I suggested that I had previously

5    done scripts for search warrants.

6    Q.  One other thing I want to make sure is clear is your best

7    recollection of how the privilege review was conducted

8    vis-a-vis the pertinent review and I want to understand your

9    best memory of did you wait until the privilege review was

10   entirely complete or did you believe that you were getting

11   documents on a rolling basis as they had been cleared?

12   A.  My recollection is that I got some documents on a rolling

13   basis as they were cleared because it was very easy to tell

14   from certain spreadsheets for instance that they were

15   pertinent.

16   Q.  Looking at Government Exhibit 18.

17   A.  OK.  I have it.

18   Q.  There's a footnote at the bottom of that first page of that

19   exhibit?

20   A.  I see it.

21   Q.  And between that footnote and your memory were you

22   receiving names of -- did you receive names of lawyers from

23   plaintiff's counsel at all once between January and June of

24   2012 or was that also happening on a rolling basis?

25   A.  I think it was happening on a rolling basis.  I mean, the

1    footnote certainly suggests it was happening on a rolling basis

2    that I got letters on two different occasions from --

3    Q.  Based on this exhibit, can we conclude that you didn't have

4    a complete list of names from defense counsel until at least

5    the time of Mr. Levine's letter?

6    A.  Of his June 4 letter.

7    Q.  Which is government 17?

8    A.  I mean, I'd have to compare that letter to his earlier

9    letter but I think you're right.  I think this added some names

10   because you can see that in 19 -- sorry -- 18 in the

11   footnote -- yeah, I think his June letter supplemented some

12   earlier list.

13   Q.  The last topic I want to touch on in this redirect is the

14   topic of the list of search terms you drafted for agent, for

15   the FBI to search for pertinence?

16   A.  Yes.

17   Q.  Calling your attention to Government Exhibit Three.  And in

18   Government Three, Exhibit A, second page, paragraph 11, are you

19   with me?

20   A.  I am.

21   Q.  Does the warrant allow for the collection of identification

22   documents and other documents which may reflect the identities

23   of person listed in Exhibit B or persons affiliated with the

24   entities listed in Exhibit B?

25   A.  It does.

1    Q.  And I want to show you what I've marked as Government

2    Exhibit 21.

3              MR. FERRARI:  Your Honor, this is in the 3500

4    material.  This is my last sort of couple questions here.  This

5    is a May --

6              THE COURT:  If I could ask a follow-up on that last

7    one.

8              Mr. Massey, do you recall how you would make a

9    decision as to whether to list the person or just rest with it

10   being a person affiliated with the entity?

11             THE WITNESS:  At this time of drafting the warrant

12   application for the list?

13             THE COURT:  The warrant application.

14             THE WITNESS:  OK.  I don't recall my exact thought

15   process.  I mean there was a list of names that were known.  In

16   some cases we -- and I think the warrant reflects that we

17   didn't know sort of who was who completely -- there were

18   nominees being used.  There were names that were clearly part

19   of the fraud but we just didn't know how or in what way.  I'm

20   not sure if that answers your Honor's question.

21             THE COURT:  Well, I guess not quite.  So, then how

22   would you decide is the suggestion then that if individuals

23   fell into the category would -- they would be individually

24   listed in the warrant application?

25             THE WITNESS:  I think names that we knew and we knew

1   the name, the idea would be to list the name at the time of the

2   warrant application.  It may be that we left certain names out

3   when we were just aware of the name but didn't know what the

4   affiliation was.  It was very hard to remember.  It was five

5   years ago.  That's what I recall.

6              MR. FERRARI:  Your Honor, in your Honor's 3500

7   material for Mr. Massey, in that same group of e-mails towards

8   the back there's a May 3, 2013 e-mail.

9              And, Mr. Massey you'll have it too.  I'm happy to hand

10  this up.  In your 3500 material --

11             THE COURT:  Toward the back.

12             THE WITNESS:  What's the date?

13             MR. FERRARI:  May 3, 2013 and when folks are close I

14  can read the Bates.  So, May 3, 2013, and the Bates is 315 and

15  I've marked it as Government Exhibit's 21.

16             THE WITNESS:  I can't find it.

17             (Pause)

18             THE COURT:  Follows some heavy redactions.

19             (Pause)

20  A.  I'm not seeing 313, May 3, 2013.

21  Q.  Yes, it is an e-mail from Micah Smith to you.

22  A.  And they're in reverse Bates order.

23  Q.  No.  They go chronologically.

24  A.  I've got a bunch.

25  Q.  I'll hand you this one?

H1NAAWEI4                          Massey - Redirect

1    A.  OK.

2              (Pause)

3    Q.  At the bottom of that e-mail chain is an e-mail from Agent

4    Thomas McGuire to you?

5    A.  I see that.

6    Q.  And in that e-mail is that e-mail related to the case we

7    have been discussing?

8    A.  It is.

9    Q.  And does Agent MaGuire -- does Agent MaGuire explain that

10   he will make sure that the search terms actually in fact pull

11   pertinent documents from the larger, the overall set of

12   materials?

13             MR. SIEGAL:  Objection, your Honor.  I'm not sure what

14   the word "pertinent" means in this context.  Are you talking

15   about responses or pertinent or what?  There is no word

16   pertinent in any of these e-mail.

17             MR. FERRARI:  Pardon me, your Honor.  I don't have it

18   in front of me.

19             THE WITNESS:  Sorry.  I took your copy.

20             THE COURT:  Do you have a copy, Mr. Siegal?

21             MR. SIEGAL:  I do, your Honor.  I'm just looking at

22   one from my 3500 binder.

23             MR. FERRARI:  Sorry.  The word is "responsive".

24             THE COURT:  Rephrase.

25   Q.  Does Agent MaGuire tell you, is he suggesting to you in

1  that e-mail that he runs the search terms you've provided he is

2  going to be checking to see it if they return responsive

3  results?

4          MR. SIEGAL:  Objection, your Honor.  That

5  mischaracterizes the document.

6          MR. FERRARI:  The government is going to offer this

7  document.

8          THE COURT:  Any objection?

9          MR. SIEGAL:  None, your Honor.

10         THE COURT:  All right.  Government's 21.

11         (Government's Exhibit 21 received in evidence)

12         MR. FERRARI:  No further questions.

13         MR. SIEGAL:  I have a couple about this document, your

14 Honor.

15         THE COURT:  OK.

16 CROSS-EXAMINATION

17 BY MR. SIEGAL:

18 Q.  Mr. Massey, you write in your e-mail on May 3, to Thomas

19 MaGuire that the majority of the terms in the search warrant,

20 the majority of the terms are in the search warrant

21 application.  The others are directly related to items listed

22 in the search warrants.

23 A.  I don't see that e-mail that you are referring to.

24         MR. SIEGAL:  Are we on the same Bates?

25         THE COURT:  315.

1          MR. SIEGAL:  I'm looking at 313, your Honor.

2          THE COURT:  313 I don't believe has been submitted.

3          MR. SIEGAL:  They're right next to each other in the

4    binder, your Honor.

5          (Pause)

6          THE COURT:  Is everything else in the binder?  We need

7    a different limiting principle.

8          (Pause)

9          MR. SIEGAL:  I'm going to actually turn to a different

10   document, your Honor, which has the same beginning e-mail and

11   different response from Mr. Massey.  So, that is also on the

12   same day May -- or the next day May 3, 2013 and I'll offer

13   this.

14         THE COURT:  Let me ask for clarity.

15         Mr. Ferrara, when you moved as Government 21, 315 is

16   that just the two age pages or what?

17         MR. FERRARI:  Yes, I had -- I know the document

18   Mr. Siegal is referring to and we have no objection.

19         THE COURT:  OK.  So, we'll mark Wei 313 which is a

20   single page also dated May 3, 2013 as Defense Ten and it is

21   admitted.

22         (Defendant's Exhibit 10 received in evidence)

23   BY MR. SIEGAL:

24   Q.  Do you see that set of e-mails, Mr. Massey?

25   A.  I don't see 313.

1    Q.  If you are looking at 315, if you would turn two pages.  I

2    don't know it --

3    A.  I got 315 from Mr. Ferrara.  I can't find 313 in my binder.

4              MR. SIEGAL:  I can walk up and assist, your Honor.

5              THE COURT:  OK.

6              (Pause)

7    Q.  Handing you what's been marked as Defense Exhibit Ten.  Do

8    you see at the bottom that's the same e-mail that we were just

9    looking at, the one from Tom MaGuire to you on May 2nd.  And

10   then you respond on May 3rd with a one sentence e-mail.  Do you

11   see that?

12   A.  I see it, three sentence e-mail.

13             THE COURT:  So do I.

14             MR. SIEGAL:  I am sorry.  It's a three sentence

15   e-mail.

16   Q.  You write here are the list of search terms the majority of

17   terms are in the search warrant application.  The others are

18   directly related to items listed in the search warrant?

19   A.  I see that.

20   Q.  Now, when you write the others are directly related to

21   items listed in the search warrant.  Is that related as you

22   understand the world to be?

23             THE COURT:  What did you mean by "related"?

24   A.  I meant, sufficiently closely related that they were -- I

25   mean, first all it's a little bit hard to remember exactly what

1    I meant.

2               THE COURT:  If that's the answer.  That's the answer.

3    A.   That's my best answer.  I believe I meant as I testified

4    earlier that some of the terms were sort of further details and

5    on the names that were in the search warrant application; for

6    instance, the Robert Newman e-mail addresses; for instance

7    shareholders of Deer were within the scope of warrant.  And we

8    knew about additional shareholders of Deer I believe that's

9    what I meant.

10   Q.   When you wrote this e-mail it was already more than a year

11   after you had seized documents, right?

12   A.   Yes.

13   Q.   So, you had the benefit of 15 month more investigation time

14   when you wrote that list of names, didn't you?

15   A.   Yes.

16   Q.   Is it fair to say that the relatedness was based in part on

17   the investigation that had been continuing for the year and

18   three months after the search had been completed?

19   A.   Well, for instance, with Robert Newman's e-mail address I

20   might have learned that after I knew of his name.  So, in that

21   sense a further way to identify Robert Newman.  So, it may have

22   come -- I don't remember when I learned that particular fact,

23   what his e-mail address were.

24   Q.   Fair to say the expansion of the list here was in part

25   based on what you learned when you found the seized document?

1    A.  I don't know that that's the case.

2    Q.  But you're not testifying that you attempted on May 3, 2013

3    to put yourself back in the mindset of what you knew as of

4    January 25, 2012 and only used a list of terms that you knew

5    back then, right?

6    A.  I think that's right as you've just put it.  For instance,

7    a different spelling of the same person's name or an e-mail

8    address of a person in the warrant.  To the extent I learned

9    that information in the intervening period, I believe it was

10   acceptable to add that to the list.

11              MR. SIEGAL:  Nothing further, your Honor.

12              MR. FERRARI:  Nothing further, your Honor.

13              THE COURT:  All right.  Mr. Massey, you are excused.

14              THE WITNESS:  Thank you, your Honor.

15              MR. FERRARI:  Your Honor, while Mr. Massey leaves the

16   stand there's just two things to bring up before Komar.  First

17   is Agent Komar, we expect to call him second.  He has an

18   important work assignment tomorrow morning and I don't think it

19   is to much to ask Mr. Siegal to get through two witnesses

20   today.  I probably have an hour with Mr. Komar.  If we could

21   maybe go later, try to go a little later to try to get Agent

22   Komar in.

23              The second thing is that Agent Komar is a defendant in

24   the Ganek litigation in which certain assistant U.S. attorneys

25   and FBI agents have been sued by David Ganek who was at that

1    level Global fund he is alleging was an illegal search.  It's a

2    civil lawsuit.  We disclosed to Mr. Siegal that Agent Komar is

3    a defendant.  He had already known that.  And we produced

4    certain documents that sort of undergird the allegations

5    against Agent Komar, the reason he is a part of the lawsuit.

6    We think there's -- our view is there's been no wrongdoing.

7    Agent Komar had done nothing wrong.  I simply wanted to front

8    it so your Honor understands our objection during the testimony

9    depending on how far afield or into this Mr. Siegal gets.  We

10   will be objecting.

11             THE COURT:  What do you propose is the proper balance

12   of that question?

13             MR. FERRARI:  What do I propose?  I think that

14   Mr. Siegal should be -- is entitled to ask the agent if he is

15   in fact the defendant and perhaps if he wants to ask one or two

16   questions about the allegations I think the answers are going

17   to be that Agent Komar believes he has done nothing wrong.

18   Once Mr. Siegal gets those answers I don't believe he is

19   entitled to try and bring in extrinsic evidence in order to

20   further attempt to impeach Agent Komar.

21             THE COURT:  I'll hear from you, Mr. Siegal.

22             But let me understand, Mr. Ferrara, you obviously,

23   concede some relevance to articulate what the relevance is as

24   to that basic line of questioning.

25             MR. FERRARI:  Some person has alleged that Agent Komar

1    has done something untoward and inappropriate.  And I think

2    that Mr. Siegal has a good faith basis to ask whether he in

3    fact engaged in some of that in some of the conduct that's

4    alleged.  I think that when he gets the answer "no", the rules

5    prohibit him then from attempting to further impeach or use

6    extrinsic evidence or things of that nature in order no impeach

7    the witness.

8         THE COURT:  Mr. Siegal, what are you seeking to do in

9    this category, if anything?  I don't know what has been

10   described.

11        MR. SIEGAL:  If I may, your Honor, Mr. Komar is the

12   author of some notes and I believe the FBI 302 reports related

13   to debriefing of a man named Mr. Sam Ottonokus who was a

14   witness for the government in a case against other people who

15   used to work for Mr. Ganek.  But Mr. Ottonokus took the witness

16   stand at that trial.  He testified that he never told the FBI

17   that Mr. Ganek understood he had an inside source at Dell and

18   in fact another agent at the FBI who was present at the same

19   meeting that Mr. Komar took the notes at said the same thing.

20   Said he never understood Sam Ottonokus was saying in that FBI

21   proffer that Mr. Ganek was aware that Ottonokus had a source

22   within Dell.

23             (Continued on next page)

24

25

H1NMWEY5

1          MR. SIEGAL:  The 302 that Mr. Komar writes says quite

2    clearly, from what I read, that he did say that.  So there is a

3    credibility issue.  Now, I don't know.  Maybe he is going to

4    take the witness stand and say, that's not what his 302 says.

5    But what we do know is that the affidavit for the search

6    warrant in that case for the offices that Mr. Ganek's business,

7    which I understand was based on Mr. Komar's 302, asserts that

8    Mr. Ganek knew the Adondakis source was an inside source.

9          If Mr. Komar is going to say, that's what Sam

10   Adondakis says to me, that Mr. Ganek did have an inside source,

11   that's at odds with another agent on his staff and the witness

12   himself who said, we never said that.  I think there is a

13   credibility issue there and that's an issue that I intend to

14   raise, not belabor, but intend to raise as part of my

15   cross-examination of Mr. Komar whose good faith and credibility

16   are both at issue here.

17         MR. FERRARA:  I just wanted to flag for your Honor,

18   the 302.  There is a final 302, there is a draft 302, and there

19   are notes.  And we have included those in your Honor's binder

20   and I have attempted to put a little sticky note on your

21   Honor's copy of the pertinent page, so if this becomes an

22   issue, your Honor will have the ability to actually look at the

23   document as well.

24         THE COURT:  We will see how it goes.

25         In terms of just the time issue, I need to hard stop

H1NMWEY5

1   it 5:15 at the latest.  We can't go much longer.

2              when did you get the 3500 material?

3              MR. SIEGAL:  Friday evening, your Honor.

4              THE COURT:  And didn't labor over the weekend to

5   premark or put this in some way that in any way facilitated

6   this testimony.

7              MR. SIEGAL:  Your Honor, I can say that we labored all

8   weekend long, but we didn't spend time pulling apart government

9   3500 material.

10             THE COURT:  From now on, when you come into my

11  courtroom, Mr. Siegal, and you are going to certainly -- when

12  we get to the jury, you will have premarked -- and going

13  forward, you'll premark -- it's just not worth everybody's time

14  to sit here and fumble with binders like we have been doing and

15  have a record that's a mess because nobody knows what we are

16  talking about.

17             To make our time move more quickly and to make it

18  worth anything, please going forward just do the basics of

19  premarking your exhibits so that everybody is talking about the

20  same thing so the record clearly reflects that so we can move

21  on without wasting a lot of time.

22             We will stop at 5:15.  You have to get through Mr.

23  Komar by then.

24             MR. FERRARA:  Your Honor, I am just going to take some

25  things off the witness stand.

1          THE COURT:  Go ahead.

2          You may come forward.

3     MATTHEW KOMAR,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6     DIRECT EXAMINATION

7     BY MR. FERRARA:

8     Q.  Good afternoon, Agent.  Where do you work?

9     A.  The FBI.

10    Q.  What's your title?

11    A.  Special agent.

12    Q.  How long have you been an FBI special agent?

13    A.  Just over eight years.

14    Q.  What did you do before you joined the FBI?

15    A.  I was an accountant.

16    Q.  Are you currently assigned to a particular office?

17    A.  Yes.  The Cleveland division.

18    Q.  Turning your attention to late 2011, early 2012, what

19    office were you assigned to?

20    A.  New York division of the FBI.

21    Q.  To what squad in particular?

22    A.  C43, securities fraud.

23    Q.  Around when were you first assigned to C43?

24    A.  I think it was the summer of 2011, mid 2011.

25    Q.  What sorts of crimes does C43 investigate?

1   A.  Securities fraud, money laundering, sometimes corporate

2   fraud.

3   Q.  I want to call your attention to January 25, 2012.  Were

4   you involved in a search or searches that day?

5   A.  Yes, I was.

6   Q.  Of what locations?

7   A.  40 Wall Street, 38th floor, the offices of New York Global

8   Group.

9   Q.  Any other locations on that day?

10  A.  Yes.  Subsequently it was apartment 37E, 10 West Street.

11  Q.  What case were those searches in connection with?

12  A.  The investigation of Benjamin Wey and New York Global

13  Group.

14  Q.  What was your role in that investigation at that time?

15  A.  I was the case agent.

16  Q.  About how many searches had you participated in prior to

17  executing the searches on January 25, 2012?

18  A.  I'd say eight to 12.

19  Q.  How many searches have you participated in since?

20  A.  Probably 35 to 40.

21  Q.  Take a look at Government Exhibit 2 in the binder next to

22  you.  What is that?

23  A.  It's an application for a search warrant for New York

24  Global Group's offices.

25  Q.  You're the affiant, correct?

H1NMWEY5                          Komar - direct

1    A.  That's correct.

2    Q.  Who drafted that affidavit?

3    A.  It was primarily drafted by AUSA David Massey with my

4    support.  He used my reports to draft that affidavit.

5    Q.  Did you review it closely before signing it?

6    A.  Yes, I did.

7    Q.  Did you believe it was accurate at the time you signed and

8    swore to it?

9    A.  Yes, I did.

10   Q.  Take a look at Government Exhibit 3.  What is that?

11   A.  It's a search and seizure warrant for 40 Wall Street.

12   Q.  Are any statutes listed on the face of that warrant?

13   A.  No, there are not.

14   Q.  Nevertheless, what was your understanding of what evidence

15   you were permitted to seize during the search?

16   A.  Evidence of securities fraud, money laundering, and wire

17   fraud.  I'm sorry.  Securities fraud and wire fraud.

18   Q.  So those are the crimes you understood you were searching?

19   A.  Yes.

20   Q.  And how, if at all, was your understanding of what you

21   could seize from the perspective of statutes or crimes further

22   limited by the warrant, if at all?

23   A.  It was just described in the attachments to the affidavit.

24   Q.  Did you doubt the validity of this warrant in any way?

25   A.  No, I did not.

H1NMWEY5                          Komar - direct

1   Q.  How did you prepare for the search itself?

2   A.  After obtaining the search warrant on the 24th of January,

3   myself and AUSA David Massey did a briefing with the members of

4   the search team on the afternoon of the 24th.

5   Q.  Before we talk about that briefing, take a look at

6   Government Exhibit 1?

7   A.  1?

8   Q.  1.

9   A.  Yes.

10  Q.  What is that?

11  A.  That's an operations order form I was the author of.  It's

12  a document that we prepare in preparation for a search warrant.

13  Primarily, it's a document circulated to the search team to

14  make them aware of what we are searching, when, logistics, and

15  things like that.

16  Q.  This was prepared in connection with the search of New York

17  Global Group?

18  A.  Yes, it was.

19          MR. FERRARA:  Your Honor, the government offers

20  Exhibit 1.

21          THE COURT:  Government 1 is admitted without

22  objection.

23          MR. SIEGAL:  No objection, your Honor.

24          (Government Exhibit 1 received in evidence)

25  Q.  Let's take a look at the first page of Government 1.  Do

1    you see this brief synopsis of the case?

2    A.  Yes, sir.

3    Q.  Who prepared that?

4    A.  I did.

5    Q.  And then if we turn to the fifth page, after the photo, the

6    page after the photo, do you see in the middle of the page

7    description of operation?

8    A.  Yes, I do.

9    Q.  Who wrote that?

10   A.  I did.

11   Q.  What is the purpose of that?

12   A.  Just to give a brief synopsis or brief explanation of what

13   type of documents we are going to be looking for in the search

14   warrant.

15   Q.  Who saw this ops plan prior to the search?

16   A.  Every member of the search team.

17   Q.  You mentioned a meeting before the search?

18   A.  Yes.

19   Q.  I'm sorry.  Let me not ask it in a leading way.  Who was

20   present at that meeting?

21   A.  All members of the search team, if available, which was

22   pretty much everybody, as well as my supervisor and AUSA David

23   Massey.

24   Q.  About how long before the actual search on January 25 was

25   that?

1    A.  We did it late afternoon the day before the search warrant

2    was executed.

3    Q.  What was discussed?

4    A.  We basically, myself and David Massey, explained the

5    investigation.  We both agreed that it made sense for him to

6    come over to our office space in the FBI to address every

7    member that was going to be participating in the team due to

8    the complexity of the case.  It was a very long and lengthy

9    affidavit, so we wanted to make sure everybody was aware of

10   what we were truly investigating.

11   Q.  What do you remember AUSA Massey saying at the meeting?

12   A.  I remember him going into great detail going through the

13   examples of what we believed the scheme was essentially that we

14   were investigating and communicating what types of documents

15   that we were going to be looking for, expecting.

16   Q.  Did you also participate in the meeting?

17   A.  Yes, I did.

18   Q.  To what extent?

19   A.  Basically, it was led by myself and AUSA Massey.  Mr.

20   Massey handled mostly the affidavit part of it and I did as

21   well summarize some parts of the investigation, but my part was

22   more of logistics, making sure everybody had a role and

23   responsibility for that search warrant.

24   Q.  In addition to the ops plan, Government Exhibit 1, what

25   case-related materials did the search team have access to prior

H1NMWEY5                          Komar - direct

1    to and during the search?

2    A.   I made available to each member of the search team the

3    affidavit, the search warrant, and then attachment A and

4    attachment B from the application for the search warrant due to

5    the lengthy amount of types of documents and names that we were

6    looking for.

7              THE COURT:  Agent, when you say made available, what

8    does that mean?

9              THE WITNESS:  Which document, ma'am?

10             THE COURT:  You said:  I made available to each member

11   of the search team the affidavit, the search warrant and then

12   attachment A and attachment B from the application.

13             THE WITNESS:  So the affidavit, I told the team I said

14   it was a lengthy affidavit.  I would e-mail it.  You can look

15   at it if you'd like to.  But that's why we are here today, to

16   give them a briefing to understand it.  But it was made

17   available for them to read it.  I did not make sure every

18   single person read it, but it was available to them.

19             THE COURT:  And you did e-mail it to them?

20             THE WITNESS:  I can't say for sure if it was e-mailed,

21   but it was communicated that if you want to look at this

22   affidavit, it is available for you.

23             THE COURT:  I'm just trying to understand if that

24   means for them to get it they would have to approach you in

25   some way --

H1NMWEY5                         Komar - direct

1              THE WITNESS:  Yes.  But I also made it available.  I

2    had the affidavit with me the day of the search warrant as

3    well, so it was with me.  I did not hand out copies of the

4    100-page affidavit to each member of the team.

5              THE COURT:  Are you aware of any members of the team

6    looking at the affidavit?

7              THE WITNESS:  Yes, I am.

8              THE COURT:  Go ahead.

9    BY MR. FERRARA:

10   Q.  Let's turn to the day of the searches.  How did the day

11   start?

12   A.  We got together again at 26 Federal Plaza, our offices, to

13   prepare logistically how we were going to approach the offices.

14   We had a goal of going into the offices in the morning, but we

15   wanted to make sure that people were in the office, you know,

16   for us to be there when we were searching.

17   Q.  Was AUSA Massey also at those morning meetings?

18   A.  He was not.

19   Q.  Give us a sense of how the search unfolded.  What happened

20   as the team was entering NYGG's offices and just after.

21   A.  Shortly after 9:00 that morning, we went up to I believe

22   it's the 38th floor, entered the New York Global Group offices,

23   announced ourselves, and then immediately kind of sprawled, I

24   guess you could say, going through the hallways to make sure

25   that everybody was aware what was going on and that nobody was

H1NMWEY5                          Komar - direct

1   making any attempt to destroy anything.

2   Q.  Did different agents in this search have different roles to

3   sort of carry out?

4   A.  Yes.  We had different things that we wanted to accomplish.

5   Once we pulled the employees into a small conference area, we

6   had to have an agent with them, you know, just to kind of

7   supervise them.  We had -- one or two agents as well were

8   interviewing each of those employees at a time to get -- obtain

9   information from them.

10  Q.  So we had some agents with the employees.  What other

11  things were agents doing?

12  A.  They were also searching the rooms.  We also had our CART

13  or computer specialists that were working on the server room.

14  Q.  What, if anything, does your team do to sort of chronicle

15  what they are seeing in the offices itself?

16  A.  Once we clear essentially any building or office for a

17  search warrant for safety purposes, the first next step is for

18  a photographer to take photos.  While we are going through the

19  offices, and taking photographs, we are also labeling those

20  rooms so that we can say, this item came from room A or office

21  B and such.  That's kind of the first step before we actually

22  start searching.  It's just kind of preparing for it.

23  Q.  Did the search team, the agents of the search team, have

24  copies of the warrant and attachments during the search?

25  A.  Yes, absolutely.

1    Q.  What was your role during the search?

2    A.  I was designated as the team leader just because I was the

3    case agent.  I did search a portion of the office, the

4    reception area, just because that was an area where I felt was

5    a central area to make myself available to the team.  I made it

6    clear to them that if they had any questions during the warrant

7    to come ask them to me.

8    Q.  Did agents in fact take you up on that and ask you

9    questions?

10   A.  Yes, on numerous occasions.

11   Q.  Do you remember what sorts of questions the agents were

12   asking you?

13   A.  One that comes to mind, someone brought like a portfolio or

14   a glossy document with one of the company's names on it.  There

15   were multiple copies of it.  So they asked me if we are taking

16   this.  I said, just take one, that that was the reason we are

17   taking it.  There was also a letterhead that just had New York

18   Global Group on it and it wasn't relevant to anything of the

19   search warrant.  I said, we don't need to take that.

20   Q.  Let's take a look at some things that have been marked as

21   exhibits.  Let's look at 4, 5, and 8.  Take a moment and look

22   at 4, 5 and 8.  Flip through those.  I am going to do it in

23   order.  I am going to ask you what is 4, what is 5, what is 8.

24   A.  4 is a sketch that was completed of the office area of New

25   York Global Group.  It's also done -- started when we go

1    through and do photographs just so we have a layout so it can

2    be produced in something like this.

3    Q.  What is 5?

4    A.  5 is a sign-in log sheet, basically just noting who is

5    getting access to the area, at what time and what time they are

6    departing.

7    Q.  Finally, what is 8?

8    A.  8 is a disk.  It contains photographs from the search

9    warrant.

10   Q.  How do you know 8 contains those photographs?

11   A.  I reviewed this CD yesterday.

12   Q.  Did you initial it?

13   A.  Yes, I did.

14          MR. FERRARA:  Your Honor, the government offers 4, 5,

15   and 8.

16          THE COURT:  Without objection.

17          MR. SIEGAL:  No objection, your Honor.

18          THE COURT:  Government Exhibits 4, 5, and 8 are

19   admitted.

20          (Government Exhibits 4, 5, and 8 received in evidence)

21   Q.  I don't actually want to show you any photographs from 8.

22   So the record is clear, Agent, give us a sense, does 8 contain

23   what we call both entry and exit photos?

24   A.  Yes, it does.

25   Q.  What's the difference?

1   A.  Entry photos are when we enter and exit is to show the

2   condition of the office at the end.  They are both included on

3   this disk.  I think if you look at the time stamps on the

4   files, you'll be able to see around 9 a.m. is when the first

5   set of photographs are, and then at the end it's around 2,

6   2:30, I think.

7          THE COURT:  Mr. Ferrara, I want to just go back a

8   little bit.  I wanted to ask a follow-up.  You gave a specific

9   example of NYGG letterhead that was shown to you and you said

10  it's not -- are you saying it was like blank letterhead or how

11  did you make a determination --

12         THE WITNESS:  I can't recall specifically what was on

13  it.  I just remember that sometimes people will bring something

14  to you because a name is on a document that matches the

15  attachment B and I looked at it and said no.  We don't need to

16  take this.  It's not something that's in terms of the search

17  warrant.  I can't say specifically what that was, though.  It

18  was five years ago.  I'm sorry.

19         THE COURT:  If you can't remember, you can't remember.

20         In thinking, you have that example in mind.

21         THE WITNESS:  I do remember that, yes.

22         THE COURT:  You described it as letterhead.  Do you

23  mean it was something on letterhead and then you read the

24  substance to make a determination?

25         THE WITNESS:  Yes.  I agree.  There was something

H1NMWEY5                         Komar - direct

1    there.  It wasn't a blank letterhead and I read the substance

2    and evaluated and determined that we did not need to take that

3    per the search warrant.

4              THE COURT:  Do you recall why?

5              THE WITNESS:  I do not.

6              THE COURT:  Go ahead.

7    Q.  Agent Komar, if you take a look at Government Exhibit 4,

8    the diagram.

9    A.  Yes.

10   Q.  You said I think you were in the reception area as it's

11   labeled there on the diagram.  Is that right?

12   A.  Right.  That's correct.

13   Q.  Looking at government 4, were there any areas of the

14   offices that were off limits to the search team?

15   A.  Yes.  We determined that we were not going to be searching

16   James Baxter's offices, which was labeled as H.  He was the

17   general counsel for New York Global Group.  And just in an

18   abundance of caution and coming across privileged information,

19   we marked it as not searching, and you can see that on the

20   photographs actually, I believe.

21   Q.  Where were the NYGG employees during the search?

22   A.  They were located in a small conference room.  I think it's

23   like F or G.  I can't say specifically which one.

24   Q.  Was Mr. Wey present?

25   A.  I'm sorry.  I apologize.  Not F or G.  It's actually over

H1NMWEY5                          Komar - direct

1    by K, where the employees -- that's where the employees were

2    kept or they were put during the search warrant.

3    Q.  Was Mr. Wey present?

4    A.  Yes, he was.

5    Q.  Where was he?

6    A.  He was initially, when we entered the offices -- his

7    office, which was office G, and then he was put into with the

8    other employees the small conference area.

9    Q.  I think you said you searched the area of the reception?

10   A.  That's correct.

11   Q.  How did you conduct your search, your personal search?

12   A.  I opened the drawers, kind of going through documents

13   looking through folders.  I came across some Fed Ex receipts

14   and shipping information that was covered by the search

15   warrants.  I also went through the Rolodex.  There was like a

16   Rolodex of business cards that was available.

17             THE COURT:  Slow down a little bit, Agent.

18             THE WITNESS:  Sorry.

19             THE COURT:  Thank you.

20   A.  Going through the business cards and just the drawers in

21   general, just flipping through the documents and determining

22   what was relevant to the search warrant.

23   Q.  Is it in your interest as the case agent to recover

24   material outside the scope of the warrant?

25   A.  No, it's not.  It makes our job lengthy.  It is burdensome

1   to go through documents that aren't relevant to an

2   investigation.  It's just more work for us to go through it.

3   Q.  As to NYGG, were agents able to look through every page of

4   every document during the search?

5   A.  I can't say for sure about what other agents were able to

6   do, but my understanding is they went through a very detailed

7   review.  Towards the end of the search warrant I do kind of a

8   talkback review where I was going into the areas where people

9   had searched and asking them, did you look in that file

10   cabinet, did you do this?  And they were also shown the

11   documents that they wanted to take.  So I was able to kind of

12   review that with them quickly just to make sure we were

13   thorough.

14   Q.  Why was it possible in this instance, to your belief, to go

15   through every page as to this search at NYGG?

16   A.  We had the time.  The computers were taking a little bit of

17   time.  We were going to be there for a little while.  So I

18   wanted to make sure that we were organized and taking what we

19   needed and only what was relevant.

20   Q.  Were there a substantial number of paper records in the

21   offices?

22   A.  There really wasn't.  I think around 4500 pages, which is

23   the size of one case of printer paper.

24   Q.  To be clear, is that what you seized or what you found

25   total?

1    A.  That is what we seized.

2    Q.  Were all the electronics --

3          THE COURT:  How did that compare with what appeared to

4    be their total or what was examined for relevance?

5          THE WITNESS:  There wasn't a lot of documents in the

6    office.  We kind of knew that going into the offices.  That was

7    explained to us during some interviews.  There was definitely

8    documents that were left, but, overall, it was very surprising

9    because in most businesses I've been in, you see a lot more

10   paper, and this office didn't have much.  So it's hard to give

11   it a percentage or anything like that.  We didn't take every

12   single piece of paper, but there really wasn't much paper to

13   start with either.

14   Q.  Were all the electronics seized?

15   A.  Everything that was in the search warrant, yes.

16   Q.  Let me ask a better question.  Were all the electronics

17   sort of -- were the originals taken?  Were some imaged on site?

18   In other words, were some copied, were some taken?  How did

19   that work?

20   A.  The intention of trying to image on site all of the

21   computers and the server, as well as cell phones and any other

22   thumb drives, it became difficult for our forensic examiners to

23   get into the server at first and then was just determined from

24   a time perspective, it was just going to be better for us to

25   image offsite.  With that conclusion we took the hard drives

1     out of the computers, the desktop computers in the offices, and

2     took those to be imaged offsite.

3     Q.  Was anything imaged on site?

4     A.  I believe there was.  I know cell phones were.  But I can't

5     say for sure, you know, one hard drive or not.  I think there

6     was an attempt to image on site, but it was just decided that

7     we are done and we can't be here forever.

8     Q.  I think you alluded to this.  But just to be clear, were

9     there any members of the CART team as part of the search team?

10    A.  Yes.  Approximately four to five examiners that were -- we

11    had decided that bring them with us.  Sometimes we don't bring

12    that many, but we kind of knew we were going to have a lot of

13    digital evidence to go through.

14    Q.  At some point during the search of NYGG, did you learn that

15    evidence might be located at another location?

16    A.  Yes.

17    Q.  How did you learn that?

18    A.  Agent Garwood, one of the agents who was interviewing

19    employees, brought it to my attention that an employee said

20    that Ms. Wey was essentially an office manager, that he

21    described her as an office manager where she maintained records

22    for the business at her house, that she didn't have an office

23    at 40 Wall Street.  She took that responsibility and those

24    duties while she lived in her apartment in her residence.

25    Q.  What did you do after receiving that information?

H1NMWEY5                          Komar - direct

1   A.  I reached out to AUSA David Massey to let him know of the

2   information we learned, and we wanted to apply for a search

3   warrant for the residence.  And at that point in time Agent

4   Garwood left the offices to go back with AUSA David Massey to

5   draft that affidavit.

6   Q.  What other steps, if any, did you take to prepare for the

7   search of the residence?

8   A.  We had a couple of agents that were assigned to issue --

9   I'm sorry -- serve grand jury subpoenas that morning.  A couple

10  of them were to Ms. Wey at the residence.  Once they served

11  Ms. Wey with those grand jury subpoenas, I let them know that

12  they needed to stay at the location to make sure it was secure

13  because we were expecting a search warrant.

14  Q.  Take a look at Government Exhibits 9 and 10.  What are

15  those?

16  A.  Exhibit 9 is application for the search warrant for

17  apartment 37E, 10 West Street, New York, New York, and Exhibit

18  10 is the search and seizure warrant for the same location.

19  Q.  Take a look at 10.

20  A.  Um-hum.

21  Q.  Are any statutes listed on the face of the warrant?

22  A.  There are no statutes listed.

23  Q.  Nevertheless, what was your understanding of the evidence

24  you were permitted to seize during the search of the residence?

25  A.  Evidence related to securities fraud, mail fraud, and wire

1   fraud.

2   Q.  Was that limited in any other way or was that your

3   understanding?

4   A.  That was my understanding.

5   Q.  And how if at all, in your mind does the warrant influence

6   what you are allowed to seize in terms of those crimes?

7   A.  It describes what we are allowed to take in attachment A

8   and attachment B.

9   Q.  Did you doubt the validity of this warrant in any way?

10  A.  No, I did not.

11  Q.  Were you present for the search of the residence?

12  A.  Yes, I was.

13  Q.  Let's take a look at Government Exhibits 11, 12, and 15.

14  A.  OK.

15  Q.  Those have been marked as Government Exhibit as 11, 12, and

16  15.  What is 11?

17  A.  11 is a sketch of the residence.

18  Q.  What is 12?

19  A.  12 is the sign-in sheet for the location of the search

20  warrant.

21  Q.  How about 15?

22  A.  15 is a CD that contains photographs from the search

23  warrant.

24  Q.  How do you know it contains those photographs?

25  A.  I reviewed it yesterday and initialed it.

H1NMWEY5                          Komar - direct

1              MR. FERRARA:  Your Honor, the government offers 11,

2      12, and 15.

3              THE COURT:  Without objection.

4              MR. SIEGAL:  No objection.

5              THE COURT:  Government 11, 12, and 15 are admitted.

6              (Government Exhibits 11, 12, and 15 received in

7      evidence)

8      Q.   Let's start with 12.  Around what times did agents arrive

9      at and leave the residence on January 25?

10     A.   4:30 is about the time that we had word that we had a

11     warrant for the residence and then it wasn't until about 9:00,

12     just before, that we left.

13     Q.   9:00 at night?

14     A.   Yes.

15     Q.   How did that search unfold?

16     A.   The two agents that stayed on the location, it was

17     determined they communicated to us that there was actually two

18     levels, so they were each stationed outside the doors to make

19     sure that nothing was going on in terms of destruction of

20     evidence while we were waiting for that warrant.

21              Once we got word that warrant had been signed, we

22     entered the apartment.  Ms. Wey was located in the apartment

23     and then we did the same thing, went through, took photographs,

24     and labeled the rooms as well as start working on the sketch.

25     Q.   What was your role during the search of the residence?

H1NMWEY5                         Komar - direct

1   A.  I was essentially the team leader.

2   Q.  Were you asked any questions during the search?

3   A.  Yes, I was.

4   Q.  What sorts of questions?

5   A.  Just in terms of documents that -- are these relevant to

6   the search warrant again.  We came across the office area which

7   had a large amount of documents, and that was brought to my

8   attention.  So I kind of knew that that was going to be the

9   crux of the search and spent some time with agents going

10  through documents.

11  Q.  Looking at Government Exhibit 11, what area are you

12  referring to?

13  A.  That would be area D.

14  Q.  Did you participate in the search itself, in addition to

15  taking questions?

16  A.  Yes, I did.

17  Q.  What areas did you search?

18  A.  Once it was determined that we located the office with a

19  large amount of documents, we -- I made a decision that we were

20  going to quickly go through the other areas of the apartment

21  just to make sure there wasn't any evidence that we were

22  looking for.  So that included, I went through a guest room,

23  what appeared to be a guest room, helped with I think one of

24  the children's rooms, and then focused our attention on the

25  office area.

H1NMWEY5                                Komar - direct

1   Q.  Were there records, substantial number of records, found in

2   places other than this office area?

3   A.  Not substantial, no.

4   Q.  Let's take a look at some of the photos on Exhibit 15.  We

5   have marked these separately.

6           Take a look at -- let's start with 15A.  Do you have

7   it?  Is it your in your binder?

8   A.  Yes, your Honor.

9           MR. FERRARA:  Your Honor, we should have put those in

10   your binder as well.

11          THE COURT:  I have it.  Thank you.

12   Q.  If we look at 15A and then I want to take a look at 15G.

13   A.  OK.

14   Q.  What are we seeing here?  First off, what area is this that

15   we are looking at in 15A and 15G?

16   A.  That was a closet area that was part of area D, the office.

17   Q.  What is the difference between 15A and 15G?  In other

18   words, we see that there is fewer boxes and things in 15G.  Why

19   is that?  What is the difference?

20   A.  15A is when they entered and did our first photos, and then

21   our exit photos is 15G, once we left.

22   Q.  To make sure I'm understanding this, if we see something in

23   the exit photos on Exhibit 15, does that mean the FBI left it

24   there or could it have been taken later?

25   A.  No.  That would mean that those items were left in place

1   where that picture shows.

2   Q.  Those items in 15G that we are seeing, those were left

3   there?

4   A.  Correct.

5   Q.  And, again, to also be clear, if we don't see something in

6   15A, can we look at this exhibit and understand that the FBI

7   has seized that?  In other words, has it been simply moved to

8   another part of the apartment or if we don't see it in 15A,

9   then we can understand it's been seized?

10  A.  You can understand that it's been seized.

11  Q.  Let's now look at 15B and C.

12  A.  Um-hum.

13  Q.  What area is that?

14  A.  This is area D of the office area that is adjacent to that

15  closet that we just saw.

16  Q.  Let's compare those to 15E and F.

17  A.  B and C are the entry photos and E and F are the exit

18  photos for the search warrant.

19  Q.  So the items in E and F were left behind?

20  A.  Correct.

21          MR. SIEGAL:  Your Honor, can I have a minute to look

22  at these.

23          THE COURT:  When did you get exhibits?

24          MR. SIEGAL:  We were given these this morning, your

25  Honor.

1          MR. FERRARA:  Your Honor, these photos have been

2     produced a long time ago.  That is correct, that these versions

3     were handed out this morning.

4          THE COURT:  How much longer with the witness?

5          MR. FERRARA:  Your Honor, I have about maybe three

6     full pages of an outline in 14-size font.  10 minutes.

7          THE COURT:  We will break when you are done.

8          Proceed.

9          MR. FERRARA:  Thank you, your Honor.

10    Q.  Let's take a look at 15D.

11    A.  Yes.

12    Q.  What is that?

13    A.  This is spread out on the floor with the contents of a

14    kitchen trash bag that was located in a black suitcase towards

15    the rear of a closet in the apartment.

16    Q.  Did you find the documents as we see them in this photo?

17    A.  No, they were not.  So the documents were in the white

18    trash bag contained in the zipped-up suitcase.  In order to

19    have to search the contents of the trash bag, we had to empty

20    the white trash bag and then we took a photo of it.

21    Q.  The contents included documents and also what looked like

22    trash?

23    A.  Yeah.  They were elements of trash or food.

24    Q.  Take a look at 15H.

25          THE COURT:  Where was the trash bag found?

1        THE WITNESS:  The trash bag was in a zipped-up black

2   suitcase that was in the rear of a closet.

3        THE COURT:  Go ahead.

4   A.  What was your question?

5   Q.  Let's take a look at 15H.

6   A.  Um-hum.

7   Q.  What do we see in 15H?

8   A.  Group of documents that were ripped up and found in that

9   trash can right there.

10  Q.  Again, to be clear, were the documents on the floor like

11  that when you found them?

12  A.  They were not, no.

13  Q.  They were in the waste paper basket that we are seeing just

14  above them in the photograph?

15  A.  Correct.  We just pulled them out to -- we pulled them out

16  to take a picture to show where they were from and the

17  condition they were found.

18  Q.  As to the torn-up documents in 15D and 15H, what did you do

19  with those?

20  A.  Those documents were taken.  Some of the documents were in

21  English and we were able to determine that they were relevant

22  to the search warrant.  The other documents that were not,

23  there were some there that were in a foreign language that I

24  could tell.  We even had to take them back to our office to

25  just piece the puzzle together.  I couldn't make the evaluation

1   at that point in time what the contents of those pages were.

2   Q.  What did you do when you brought the ripped documents back

3   to your office?

4   A.  I basically pulled those items out and put some gloves on

5   and started piecing them together and taping them up to where I

6   could determine what type of documents we were looking at.

7   Q.  Take a look at what's been marked as Government Exhibit 20.

8   A.  20?

9   Q.  Yes.

10  A.  Um-hum.

11          MR. FERRARA:  I think all those photos are in, your

12  Honor, because they are all on that disk.  To the extent they

13  are not, I move them individually in.

14          THE COURT:  They are in and then they are in again.

15          MR. FERRARA:  Fine, your Honor.  Thank you.

16  Q.  If we look at what has been marked as Government Exhibit

17  20.

18  A.  Yes.

19  Q.  What is that?

20  A.  That is the document that we found, that we just saw in

21  15H.  It's a document that was -- with multiple pages

22  describing Mr. Wey and his different attorneys, bank accounts,

23  insurance, trusts, and things.

24  Q.  We saw this torn up.  How was it put back together?

25  A.  As you can see from the photo on page -- we started to kind

1   of have an idea of how it should have been, piece it back

2   together.  When I was back in my office, I was able to take

3   each page and essentially tape it so it could be read and

4   reviewed.

5              MR. FERRARA:  The government offers 20, your Honor.

6              THE COURT:  Without objection?

7              MR. SIEGAL:  No objection.

8              THE COURT:  Government 20 is admitted.

9              (Government Exhibit 20 received in evidence)

10  Q.  Let's come out of the exhibits for a second and talk a

11  little more about the search of the residence.

12  A.  OK.

13  Q.  Other than agents and FBI personnel and you mentioned

14  Ms. Wey, was anyone else present at any point during the search

15  of the residence?

16  A.  At one point Ms. Wey's attorney, I believe his name was

17  John Bostany, came to the apartment with one of his associates.

18  Q.  And what, if anything, did they do while they were on the

19  premises?

20  A.  They spoke with my supervisor to understand what was going

21  on.  Ms. Wey had communicated to her attorney that she -- who

22  was in fact herself an attorney and there might be some

23  privileged documents that are in the apartment.  So there was a

24  discussion made between Mr. Bostany, my supervisor, and Mr.

25  Massey to decide what to do with those potentially privileged

H1NMWEY5                        Komar - direct

1    documents.

2    Q.  How was that resolved?

3    A.  It was decided that the associate from Mr. Bostany's firm

4    would take those documents and conduct a privileged review.

5    Q.  Based on what you were doing and based on what you saw the

6    agents around you doing, do you believe that agents were

7    looking through every single piece of paper in every folder in

8    every file before deciding whether to seize boxes or files?

9    A.  If you look back at the photos of the closet, it was a

10   large amount of documents.  If we would have gone through every

11   single piece of paper in those boxes, we would have been there

12   for three to four days, probably.  We were at someone's

13   residence where her family was expected back, and there is a

14   little bit of a sense of urgency that we didn't want to disrupt

15   someone's life.  We decided to flip through a box, see if there

16   are relevant documents.  If you make that decision, you are

17   taking that box pursuant to the search warrant.

18   Q.  To be clear, not going through every single page of every

19   single document?

20   A.  Correct.

21   Q.  Give us a sense, you're flipping through different

22   documents.  How else are you orienting yourself to what is

23   pertinent versus -- what is embraced by the warrant versus what

24   is not embraced by the warrant?

25   A.  We are pulling out manila folders, looking through them,

H1NMWEY5                          Komar – direct

1    seeing if they are -- in some cases there are bank statements.

2    If you saw a folder with bank statements labeled and other

3    folders marking different dates, it was assumed that those

4    contained all those -- flipping through them quickly just to

5    make sure that they understood what we were taking.

6    Q.   I think we saw some of this in the photos.  Did you leave

7    any documents behind or did you take everything?

8    A.   No, we did not take everything.  The documents that were

9    left behind were in the exit photo -- exit photos.

10   Q.   What did the team do with the paper documents that had been

11   seized?

12   A.   We collected it and took it back to our offices.

13   Q.   How about the electronic evidence?

14   A.   The electronic evidence was taken by one of our CART

15   computer examiners and taken to Moonachie offsite to process,

16   to image those -- that digital evidence.

17   Q.   Was electronic evidence also seized from the residence?

18   A.   Yes, it was.

19        MR. FERRARA:  This is my last line of questioning,

20   your Honor.  Maybe five or so minutes on how the FBI processed

21   the electronic evidence.  OK.

22   Q.   What's the first step in processing?

23   A.   It's basically imaging it, creating a duplicate copy that's

24   pure and evidentiary so that the original is not needed.  Just

25   an evidence rule or procedure.

1   Q.   Is that something you do or is that a CART function?

2   A.   That's a CART function.  That's a forensic examiner who is

3   trained to specially do that.

4   Q.   About how long did it take CART to image the electronic

5   evidence?

6   A.   So the search warrant was the 25th of January.  They imaged

7   it through mid-February, I believe.  At that point in time I

8   was able to give back the originals from the office as well as

9   the residence with the exception of thumb drives that were

10  found.  It was decided by myself and AUSA Massey to keep the

11  thumb drives just due to the background of information we had

12  about what those thumb drives may contain.  We wanted to keep

13  those and we didn't feel that that was infringing on the

14  business or the residence.

15  Q.   After the electronic evidence is imaged, what's the next

16  step?

17  A.   Next step is for it to be processed.  I guess the best way

18  to describe it, it's basically loaded up into a review tool so

19  that searches can be done and people like myself and other

20  agents can review them.

21  Q.   Help us understand how it works.  Does chart simply process

22  it all sort of at once or are they able to process different

23  things in order, on a rolling sort of basis?

24  A.   Understood.  There was a large amount of digital evidence

25  taken from both these locations.  I think it was around the

H1NMWEY5                          Komar - direct

size of 18 terabytes.   So the CART examiner who was assigned to
load these up into the searching tool just asked me, are there
priorities.   Can you tell me what you -- what needs to be
loaded first.   I decided that room G in the office, which was
Mr. Wey's office, the server room in the office, as well as all
the thumb drives, would be separated into what we call traunch
A, which would be the priority of the CART examiner to make
available to be reviewed, and then he would eventually get to I
think traunch B and C.

Q.   Once CART had processed the evidence, were you able to look
at it?

A.   No, we weren't able to do that because of potential
privileged information contained on the digital evidence.   We
decided that we would have a group of what we call a taint team
or privilege review team to go through the documents to pull
out any potentially privileged material so that I wasn't privy
to it or anybody else I was working with on the case.   So that
took a little bit of time in terms of doing that.

          One of the other things that took a little bit of time
was accumulating a list of attorneys.   Some people only have
like one or two attorneys that they use.   It makes a privilege
review easy to pull documents.   We were told by counsel for the
defendant that there was a number of attorneys.   And between I
believe Mr. Massey and defense counsel this list was
compromised.

1    Q.  Just help us understand.  You're talking about a privilege

2    review team doing something.  What does that actually look like

3    when it happens?  Are we talking about one person?  Are we

4    talking about one agent, multiple agents?  How many computers

5    are they able to work off of?  Give us a sense of how it

6    actually happened.

7    A.  We are able to have three agents on a different squad be

8    assigned to assist us with this privilege review.  They have to

9    sit at their terminals essentially and start reviewing.  The

10   easiest way to start reviewing is by doing search terms.  The

11   reason we asked for a list of attorneys that was lengthy was to

12   run searches on law firms to make sure we were pulling the

13   right documents.

14          However, it came to my attention that some of the

15   searches weren't working effectively and some of the agents let

16   me know about that, but they ended up doing more of a detailed

17   review than just searching and then checking and pulling.  They

18   were actually looking at the documents.

19   Q.  When you say not working, do you mean technologically, that

20   is to say, the computer wasn't working, or you mean they were

21   returning a number of results or not returning results and were

22   ineffective searches?

23   A.  They were ineffective searches is what we concluded.

24   Q.  Do you recall when the filter team began its review?

25   A.  I believe it was around June 20, I think is what my

1  understanding was.

2  Q.  Of what year?

3  A.  Of 2012.

4  Q.  Do you recall around when the filter team completed its

5  review?

6  A.  The agents that were assigned rotated off to other squads

7  around July, end of July of '12.  That was brought to my

8  attention.  Myself and my supervisor spoke with those agents

9  and decided or communicated or discussed with them if they were

10  going to have time to continue their review.  They said that

11  they would be able to carve out a few hours or days in a week

12  to dedicate towards completing that review, which, to the best

13  of my knowledge, I think was completed in December of '12.

14  Q.  Why was it a better result to have the same agents stick

15  with it even if they had other responsibilities rather than

16  getting new filter agents?

17  A.  These agents had already spent a few months doing this and

18  becoming familiar with the process, the tool.  It's a tool that

19  not every agent is trained on initially, so it takes some time

20  to get familiar with it.  From an efficiently perspective, it

21  made sense to try and keep that core team together.

22  Q.  I asked you I think an imprecise question because I asked

23  you when to the best of your recollection the filter process

24  ended.  Was that happening on a rolling basis or were you

25  waiting for them to get through everything before you looked at

1    anything?

2    A.  Going back to the weighted discussion of the evidence --

3    when they asked me to weigh or prioritize parts of the digital

4    evidence, I was able to get into traunch A sooner because that

5    was what the privilege review focused on.  Just like the CART

6    examiner focused on preparing that.  They were focused on

7    reviewing traunch A first.  So I was told that traunch A was

8    completed for the privilege review some time during the fall of

9    2012, which then the CART team is able to pull all those

10   documents out that are flagged and I'm able to go in and

11   review.

12   Q.  At that point what does your review entail?

13   A.  It's similar to what a privileged team member is doing.

14   They are doing searches.  However, just learning the tool and

15   how it works, I found it more effective to kind of go through

16   the files in more detail.  One of the things that I started

17   working on was the thumb drives, so I was able to look at the

18   specific contents of each thumb drive.  Similar to Windows

19   Explorer where you see different folders and subfolders, I am

20   able to look into the contents of any of those subfolders to

21   review them substantively for the investigation.

22   Q.  What are you looking for as you are going through?  That is

23   to say, what, if anything, are you doing with the documents or

24   flagging them, etc.?

25   A.  Essentially, we are classifying them as pertinent or

1   nonpertinent.  I think there were also documents that we

2   flagged as needs translation.

3   Q.  What does it mean to be pertinent?

4   A.  Pertinence.  We believe it's evidence of the crime that we

5   are investigating.  It's giving us information about that

6   investigation or that crime.

7   Q.  How far did you get in your review?

8   A.  I didn't spend that much time on the thumb drives.  I

9   didn't get through all of traunch A.

10  Q.  How did you conduct your search?  Did you have a list of

11  search terms?  What were you using to help you decide what was

12  pertinent or what was not pertinent?

13  A.  Not search materials, but just my knowledge of the case.

14  So I was able to review documents in detail and determine

15  whether or not it was needed for this investigation.

16  Q.  How, if at all, did the warrant affect what you decided was

17  pertinent or not permanent?

18  A.  I could always review the warrant to look back at those

19  lists of attachment B to determine if things were covered by

20  the scope of the warrant.

21  Q.  I apologize.  Did I ask how far you got in your review?

22  A.  You did, yes.

23  Q.  Did you complete the review of documents for pertinence?

24  A.  No, I did not.

25  Q.  Why not?

1    A.  In February or March of 2013, I was reassigned to

2    Washington, D.C. to work on a number of international bank

3    cases with headquarters.

4    Q.  Who took over as case agent?

5    A.  Thomas McGuire.

6    Q.  What, if anything, did you do to get Agent McGuire up to

7    speed?

8    A.  I sat down with Mr. McGuire, went through my notes, my

9    working documents, to discuss what I had done to that point in

10   time so we could have a smooth transition.  Also explaining

11   where we were with the privilege review and the document review

12   and digital review.

13               MR. FERRARA:  One moment, your Honor.  My colleague

14   had thought of one thing.

15   Q.  You had mentioned that you sent agents over to the

16   residence before you had the search warrant, correct?

17   A.  Yes.

18   Q.  Did those agents enter the residence?

19   A.  No.  I communicated to those agents that they were to knock

20   on the door.  They had to serve some subpoenas to Ms. Wey

21   anyway.  When they spoke with Ms. Wey they let her know that we

22   were obtaining a search warrant for the residence and that she

23   was not to destroy anything and that we would be waiting

24   outside the doors to make sure there was no evidence of any

25   destruction of evidence until that search warrant was obtained.

H1NMWEY5                          Komar - direct

1              MR. FERRARA:  No further questions, your Honor.

2              THE COURT:  Before you sit down, one follow-up on the

3     description of the process for searching the paper documents in

4     the residence.  You said the question was basically, were you

5     able to look through every single document and you said no.

6     There was too much.  For example, with boxes you would look and

7     see, some subset of these seem responsive.  If so, then you

8     might take the entire box.  Is that a fair --

9              THE WITNESS:  That it is a fair description of the

10    subset, sampling, kind of going through and making sure you are

11    not taking anything that's outside of the scope of the warrant.

12    So you're getting a little bit of comfort, but I can't say for

13    sure that everyone is going through every single page.

14             THE COURT:  You do that box by box.

15             THE WITNESS:  Box by box.  There maybe would be a

16    number of manila folders with labels or Redwelds organizing it

17    that you can find of flip through and get an idea in substance

18    of what you're looking at.

19             THE COURT:  With respect to the picture at government

20    15D that we discussed as well as the trash can at 15H, were

21    those gone through item by item or comparable process?

22             THE WITNESS:  We did not go through those items until

23    we were able to take those items with us to take the time to

24    piece them together.  We just took it all in substance where it

25    was found, and I was able to document my subsequent review of

H1NMWEY5                          Komar - direct

1    those documents and piecing those together.

2              THE COURT:  For example, the full content of the trash

3    bag at 15D was taken?

4              THE WITNESS:  Yes.

5              THE COURT:  And the full content of the trash can at

6    15H was taken?

7              THE WITNESS:  I can honestly say, your Honor --

8              THE COURT:  I can't hear you.

9              THE WITNESS:  The one in 15H I can't say for sure if

10   that entire contents of that small trash can were taken.  I

11   think it's a smaller amount of documents, so someone was able

12   to kind of go through them, where in the preceding example we

13   had fresh food and it was kind of a mess, to be honest with

14   you, your Honor, where it didn't make sense for us to go

15   through it there.

16             THE COURT:  What's on the floor there was put back in

17   the bag and --

18             THE WITNESS:  Yes.  For that preceding example.  For

19   the small trash can on 15H, I know that we took that document

20   that the picture is taken off.  I can't say for sure if any

21   other contents of that trash can were taken.

22             THE COURT:  Thank you.

23             MR. FERRARA:  Let me ask one more question based on

24   that, your Honor.

25             THE COURT:  You may.

H1NMWEY5                      Komar - direct

1    Q.  Agent Komar, what was your impression when you saw the

2    papers in the trash bag in the suitcase in the closet?

3    A.  Our first impression is someone was trying to hide

4    something that was recent.  It doesn't make any sense for a

5    trash bag, first off, to be inside the suitcase in the back of

6    a closet --

7              THE COURT:  Is there a photo of the closet and the

8    suitcase?

9              THE WITNESS:  I can't say for sure, your Honor.

10             THE COURT:  Mr. Ferrara.

11             MR. FERRARA:  We will mark this as Government Exhibit

12   22, your Honor.

13   Q.  Do you recognize that?

14   A.  Yes.  That was the suitcase that contained the white trash

15   bag.

16             MR. FERRARA:  We will offer 22, your Honor.

17             THE COURT:  The white trash bag, the contents of which

18   and the bag itself are in 15D, were found in what's been now

19   marked as Government 22.

20             THE WITNESS:  Correct, your Honor.

21             THE COURT:  That suitcase was in the back of a closet.

22             THE WITNESS:  Yes.  So we were able to determine it

23   was fresh trash.  So that was more of a heightened scrutiny of

24   why someone would put fresh trash in a suitcase in the back of

25   a closet.

1          MR. FERRARA:  The government offers 22, your Honor.

2          THE COURT:  Without objection?

3          MR. SIEGAL:  I'm sorry.  Which is 22, the suitcase?

4    No objection to the suitcase, your Honor.

5          THE COURT:  22 is admitted.

6          (Government Exhibit 22 received in evidence)

7          THE COURT:  Mr. Ferrara, can the government make a

8    representation if there is a photo included or on the disks of

9    the closet where the suitcase was found?

10         MR. FERRARA:  We will look for that overnight, your

11   Honor.  I don't remember seeing it with the suitcase in there,

12   but we will go back and look and see if we can find one of the

13   closet itself.

14         THE COURT:  Agent, given the heightened suspicion that

15   that suggests, presumably, that's the kind of thing that would

16   have been photographed in place in the normal course?

17         THE WITNESS:  In the normal course, yes, or pulled out

18   to do that.  I believe the agent who found it, when I had come

19   across it, they had already pulled it out of the closet, so I

20   wasn't sure.

21         THE COURT:  You would expect the suitcase at least to

22   have been photographed?

23         THE WITNESS:  Yes.  That's one of the reasons we also

24   took the suitcase, your Honor, because we wanted to show -- I

25   talked to AUSA Massey and he said, take it all because

H1NMWEY5                         Komar - direct

1    essentially --

2              THE COURT:  You would typically -- tell me if this is

3    right -- before you remove objects as suggested here, but in

4    the normal practice, you take photographs of where they are

5    found.

6              THE WITNESS:  Yes.  Normal practice.

7              THE COURT:  We will take a break.  10 minutes.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Agent Komar, I remind you, you are under

2    oath.

3            Counsel, you may proceed, Mr. Siegal.

4            MR. SIEGAL:  Thank you, your Honor.  I'll just start

5    where we left off because I'm a little bit confused.

6    Q.  You were present during the apartment search; is that

7    correct?

8    A.  Correct.

9    Q.  Were you the agent who found the suitcase or was that

10   somebody else?

11   A.  Another agent.

12   Q.  So, but it is your understanding that the suitcase was

13   found in the closet in the office?

14   A.  No.  There was a closet that was further down the hallway

15   closer to like a bathroom I believe.  It's hard for me to

16   remember exactly but it was not the closet inside the office,

17   separate closet, more like a coat -- not a coat, but more not

18   office materials, I guess.

19   Q.  I'm going to ask you to look please --

20           MR. SIEGAL:  Your Honor, I'd like to mark as Exhibit

21   11 a full set of the photographs.

22           THE COURT:  So, this is really just a subset of what's

23   already been admitted as government --

24           MR. FERRARI:  15.

25           MR. SIEGAL:  One-five is the disk.  These are prints,

H1NAAWEI6                          Komar - Cross

1    I think.

2              THE COURT:  So, you want to enter the full set of hard

3    print?

4              MR. SIEGAL:  Yes, your Honor.

5              THE COURT:  All right.  So --

6              MR. FERRARI:  They're in evidence.  No objection, your

7    Honor.

8              THE COURT:  OK.

9              MR. SIEGAL:  I'm going to mark them as Defense Exhibit

10   11 and show it to them.

11             THE COURT:  I will admit again what is now the full

12   set of Defense 11.

13             MR. SIEGAL:  I am leaving it open to a particular

14   page, your Honor, which I'll make reference to.

15             THE COURT:  Can I have a copy?

16             MR. SIEGAL:  I'm sorry, your Honor.

17             (Pause)

18             THE COURT:  Thank you.

19   BY MR. SIEGAL:

20   Q.  Is it fair to say that none of the photographs you looked

21   at on your direct show a picture of that suitcase in a closet?

22             THE COURT:  Any way you can identify for the record

23   what you're pointing to?

24             MR. SIEGAL:  Sorry, your Honor, yes.  The suitcase has

25   been marked as Exhibit 22, Government Exhibit 22 that's in the

H1NAAWEI6                          Komar - Cross

1   courtroom that's sitting over there to my right.

2   Q.  Do you see that?

3   A.  Yes.

4   Q.  And Mr. Ferrara showed you several pictures during your

5   direct testimony but none of those are a closet with that

6   suitcase in it?

7   A.  That's correct.

8   Q.  If you could look please at the picture that I just put in

9   front of you which is part of --

10          THE COURT:  OK.  That's what I was asking you to

11   identify.

12   Q.  If you look now at Defense Exhibit 11 and I think you'll

13   see very small numbers and letters.

14          THE COURT:  In the lower right.

15   Q.  In the lower right, do you see there's a picture at what

16   looks like DJ 0043?

17   A.  Yes.

18   Q.  Do you see that picture?  There's a big black suitcase

19   right there in the middle of the bedroom?

20   A.  Um-hmm.

21   Q.  Is that a picture of that suitcase?

22   A.  No, it is not.

23   Q.  You are saying it's a different suitcase?

24   A.  Correct.

25   Q.  Looking at Exhibit 15-A, Government Exhibit 15-A, do you

1    see that?

2    A.  Yes, 15-A.

3    Q.  Do you see there's three boxes stacked up and then behind

4    it, does that appear to be a bag of garbage?

5    A.  There is a bag of garbage, yes.

6    Q.  Does it look to you like that bag of garbage has a sort of

7    a red string tie at the top?

8    A.  Yes, it does.

9    Q.  It's similar to the string tie white garbage bag that's in

10   Government Exhibit 15-D; do you see that?

11   A.  It's a similar bag, yes.

12   Q.  But you're saying -- do you know or do you not know that

13   there's a different garbage bag than the one?

14   A.  That's a different bag.

15   Q.  Different garbage bag?

16   A.  Yes.

17   Q.  So one garbage bag you took, the other you didn't take?

18   A.  That's correct.

19   Q.  Did you personally observe the suitcase opened with the bag

20   of garbage in it?

21   A.  Yes, I did.  Well, it was opened already to find it and

22   then they showed me where it was when I came over.

23   Q.  So, you were in some other location in the apartment?

24   A.  They brought to my attention that they had opened the

25   suitcase containing a bag full of trash.  I came over.  They

1    had not pulled the bag of trash out.  They had kept it in the

2    suitcase.  And I saw them remove that bag and place it on the

3    floor and take out the contents for photograph.

4    Q.  I don't know that I want you to do this exercise right now

5    but perhaps we'll have an opportunity to look through these

6    pictures.  Are you aware there's a photograph that exists of a

7    bag of garbage inside of the suitcase?

8    A.  I'm not sure if there's a photograph of that.

9    Q.  Your Honor, on direct Mr. Ferrara offered the suitcase in

10   evidence.  I don't know whether he intended to or not offer as

11   well the several folders of materials that are in the suitcase

12   but we would like to offer all that as a Defense Exhibit or we

13   can agree that it's part of Government Exhibit 22?

14        MR. FERRARI:  Your Honor, I don't have a problem with

15   the documents Mr. Siegal is referring to.  However, that is a

16   subset of what was found in the bag and we're happy to ask,

17   we're happy to show Agent Komar some other documents found in

18   bags.  It is important that the Court understand everything

19   that was found in the bag because it's a subset.

20        THE COURT:  So, there are, I gather, documents in the

21   bag still there and admitted presumably with Exhibit 22.

22        MR. FERRARI:  That's fine.  Mr. Siegal is right that I

23   didn't realize they were actually sitting in there at that

24   point but that's fine.  On redirect I can ask Agent Komar about

25   to few other documents that we found.

H1NAAWEI6                    Komar - Cross

1              THE COURT:  OK.  Well, Exhibit 22 has been admitted

2        and it's admitted with the set of documents that currently is

3        contained therein.

4              MR. SIEGAL:  Your Honor, I know your Honor asked us

5        this morning if we would make copies of those but during the

6        discussion we had with the government over one of the breaks,

7        it became clear that that's impractical in part because they

8        have a concern which is I think legitimate of a potential for

9        chain of custody issues with respect to those items.  So, what

10       I would like to do if I may with your Honor's permission is

11       take some of those envelopes and bring them up to the agent and

12       show them to him.

13             THE COURT:  Hang on.  Mr. Ferrara, how do you want to

14       handle this?

15             MR. FERRARI:  We don't have a problem with Mr. Siegal

16       showing those documents to the agent.  I don't think Mr. Siegal

17       intends to suggest to the Court that that's all the documents

18       that were found in the bag.  I'll work as Mr. Siegal does to

19       find those other documents as well as so we can have a complete

20       set.  And if he wants to also ask Agent Komar about those or I

21       can.  I have no problem with Mr. Siegal showing some of the

22       physical evidence to Agent Komar.

23             THE COURT:  OK.  Am I right to understand that

24       ultimately everyone will agree to the admission of the full,

25       for purposes of this hearing, to the full set of documents

1       contained in the bag?

2                  MR. FERRARI:  The government agrees to the admission

3       of what your Honor just described.

4                  THE COURT:  OK.  Mr. Siegal, there's a separate

5       question of agreeing as to what that is I suppose or

6       establishing what that is.  But, Mr. Siegal, in principle is it

7       your desire to have admitted all of the documents that were

8       found in the bag.  Again, it's a separate question of how we

9       establish what that was.

10                 MR. SIEGAL:  I don't know that I know, your Honor,

11      what other documents were found in the bag but I don't have an

12      objection to s materials that were found in the bag being

13      testified to as being part of that same set if that's what

14      actually happened.

15                 THE COURT:  All right.  So, I understand we're going

16      to be discussing the documents that were admitted along with

17      the bag in government -- what was the number, Mr. Ferrara?

18                 MR. FERRARI{:  22.

19                 THE COURT:  With the government's careful caveat that

20      what's currently in the bag is not everything that was in the

21      bag.

22                 MR. FERRARI:  That's our understanding, yes, your

23      Honor.  We're happy to do that on redirect or if Mr. Siegal

24      wants to do it.

25                 THE COURT:  You can do it on redirect.

1              MR. SIEGAL:  Should I do it up here?

2              THE COURT:  Why don't you come around, counsel.

3     BY MR. SIEGAL:

4     Q.  Special Agent Komar, I've pulled some of the materials out

5     from the bag that's been marked as Government Exhibit 22.

6     Showing you what looks like a document relating to erythromycin

7     prescription for Mr. Wei.  Would you regard that as responsive

8     to the warrant?

9     A.  No.  It's a prescription not responsive.

10    Q.  OK.  Would you regard a document regarding Michaela Wei's

11    dentist appointment responsive to the warrant?

12    A.  Not the actual appointment information.  However,

13    Ms. Michaela's Wei's address is of relevance.

14    Q.  So, is that document responsive or not responsive?  You

15    would have regarded that as responsive because her name is on

16    it?

17    A.  It is showing the use of an address we believe was used for

18    this investigation.

19    Q.  This is a document that purports to be half of a tennis

20    double schedule.  Do you regard that --

21             THE COURT:  Just so I understand the process, agent.

22    So, for example, if one of the other members of the team came

23    and said Agent Komar is this in or out, what would you have

24    said?

25             THE WITNESS:  These documents specifically, your

H1NAAWEI6                         Komar - Cross

1   Honor, this instance or in general?

2              THE COURT:  I'm using this instance to understand what

3   happened in general.

4              THE WITNESS:  Well, this was a little bit of an oddity

5   once we, the term of this was determined that this was trash

6   and such someone's attempt to potentially destroy evidence, I

7   contacted AUSA David Massey to let him know what we came

8   across.  It was his decision and my decision with my supervisor

9   that we would take all of this to review at a later point in

10  time because it was going to be a burdensome process especially

11  with the number of torn documents.

12             THE COURT:  I hadn't quite appreciated that.  So, that

13  it's your understanding that what's now contained in that

14  folder or manila envelope of material that has come in as part

15  of the Government Exhibit 22 that that's sort of is the content

16  of the trash bag sort of with the trash sorted out essentially?

17             THE WITNESS:  Yes.  So this is the series of documents

18  combined with the other series that we've pulled out to piece

19  together.  However, these were just documents that we took.  I

20  had to go through them at a later point in time to determine.

21             THE COURT:  Where in the bag, in the suitcase bag in

22  addition to the trash can, were there other documents in there?

23             THE WITNESS:  I'm sorry.

24             THE COURT:  In the black suitcase which has been

25  admitted as Government Exhibit 22 that you've testified, the

H1NAAWEI6                          Komar - Cross

1   trash back containing a variety of documents as well as trash

2   was in that bag, were there other contents, other things in the

3   black suitcase?

4            THE WITNESS:  No.  There was just the trash bag.

5            THE COURT:  So, everything that we're going through

6   now as the contents of the suitcase, Government Exhibit 22, was

7   contained in the trash bag that was contained within the

8   suitcase.

9            THE WITNESS:  These documents were contained within

10  the trash bag within the suitcase.

11           THE COURT:  Got it.

12           MR. SIEGAL:  I am going to go into another envelope

13  from the same exhibit.

14  Q.  Here is a document related to a prescription for Ben Wei

15  for Tretinoin; do you see that?

16  A.  Yes.

17  Q.  Would that have been called for by the search warrant?

18  A.  This is not relevant.

19  Q.  OK.

20           THE COURT:  All right.  Mr. Siegal, I get the point

21  and I understand the testimony as to how Agent Komar processed

22  all of the material he obtained in the trash can.

23  Q.  So, Mr. Komar, after you sorted through what was in the

24  trash as you described it, did you -- and you decided some of

25  it at least was not called for by the search warrant, did you

H1NAAWEI6                          Komar - Cross

 1   return any of that material?

 2   A.  No, we did not.

 3   Q.  To the Weis?

 4   A.  No, we did not.

 5   Q.  You kept it all?

 6   A.  Yes, we still have custody of it.

 7           THE COURT:  Just to finish the point in my head on

 8   this suitcase, we had an exhibit, Mr. Ferrara, that had a

 9   diagram of the home?

10           MR. FERRARI:  Yes.  I believe that's 11, your Honor.

11           THE COURT:  Government 11?  Do you have that, agent?

12           THE WITNESS:  Yes, your Honor.

13           THE COURT:  Mine is difficult to read but can you

14   identify on using this diagram where the suitcase was found.

15           MR. FERRARI:  Your Honor, I'm going to -- actually,

16   I'll call it object it to your Honor's question.  In a sense I

17   had planned actually to redirect the agent using a different

18   exhibit that I think will refresh his memory, so I would ask

19   that I have the opportunity --

20           THE COURT:  You don't know that his memory needs

21   refreshing.  Have a seat.

22           Now, you have lots of detailed memory of this day and

23   this search and so it's a question you will answer looking at

24   this document whether you know whether, you can recall where

25   the suitcase was found.

```
1              THE WITNESS:  I can recall it was outside of a

2      bathroom.  I can't recall if it was the first or second floor,

3      your Honor.

4              THE COURT:  So, a closet outside the bathroom.

5              THE WITNESS:  I'm just trying to take myself back to

6      that.  I'm not able to tell from the sketch, your Honor.

7              THE COURT:  OK.  You may proceed.

8              MR. SIEGAL:  Thank you.

9      Q.  You spoke on direct, Agent Komar, about how you were the

10     person responsible for the search warrant and I think that you

11     said you helped prepare Exhibits A and B.  Did you also help

12     prepare Exhibit C to the search warrant and I'll refer you to

13     Government Exhibit 3 in evidence.

14     A.  I'm sorry.  What number again?

15     Q.  Number three.

16     A.  Your question again?  I'm sorry.

17     Q.  Did you help prepare Government Exhibit Three?

18     A.  I reviewed Exhibit Three.  I didn't help prepare.  I did in

19     the --

20     Q.  Sorry.  Government Exhibit Three, Exhibit C in that is what

21     I'm asking about.

22     A.  So, Exhibit C of Government Exhibit Three, I did not

23     prepare.  However, I did review it.

24     Q.  Did you understand it at the time that you went and sought

25     that search warrant?
```

1    A.  Yes, I did.

2    Q.  Do you see in subparagraph A where it makes reference to

3    determining whether any electronic item in particular has

4    contraband on it?  Do you see that?

5    A.  Yes.

6    Q.  What did you understand that meant?  What was contraband in

7    connection with looking at electronic evidence?

8    A.  I can't say for sure what that means right there.  I mean

9    Exhibit C is a document that is utilized by our forensic

10   examiners.  I understood and discussed it with them how things

11   would be searched.  However, I don't have the training to speak

12   specifically about how all these things were going to

13   transpire.

14   Q.  Sorry.  I'm going to refer specifically to paragraphs A, B

15   and C which is about in my understanding at least what happens

16   with what you do on-site in deciding whether or not to take or

17   image or review on-site electronic items.  If you could explain

18   please, what you understood you were required to do when it

19   came to a piece of electronic evidence that you thought was

20   responsive to the warrant.  Would you review it on-site, image

21   it or take it and how would you make those determinations?

22   A.  My understanding is we would attempt to image it on-site if

23   practical but I defer to my technically trained personnel to

24   assist with that decision.  So, if they told me that with the

25   goal of initially of imaging on-site whether that was a

H1NAAWEI6                    Komar - Cross

1    practical or able to do that, I made that decision with them.

2    Q.  So, the issue in terms of whether or not it would be imaged

3    versus seized would be whether or not it was practical to image

4    it on-site?

5    A.  That and along the terms of this exhibit.

6    Q.  Well, that's what I'm asking you, Matt.

7    A.  I understand.

8    Q.  What in the exhibit says you are required to do to make the

9    determination about whether you seized or imaged something?

10   A.  I mean, basically, my understanding is that an attempt is

11   made to image and then paragraph B states within a reasonable

12   amount of time without jeopardizing the ability to preserve.

13   Q.  So, if you could image it within a reasonable amount of

14   time without damaging the data then that would be plan A; is

15   that fair to say?

16   A.  That's fair to say.

17   Q.  Taking a look at Exhibit A to Government Exhibit C -- sorry

18   Government Exhibit 3, if you could look please to paragraph 7

19   of that exhibit?

20   A.  Of Exhibit A.

21           THE COURT:  Government Three as in the Exhibit A

22   attachment.

23           MR. SIEGAL:  Exhibit A to the search warrant.

24           (Pause)

25   A.  Yes.

1    Q.  Do you see how paragraph 7 describes several different

2    types of electronic media, right?

3    A.  Um-hmm.

4    Q.  And then it has a statement that says used by or in

5    connection with the individuals and entities listed in Exhibit

6    B?

7    A.  Um-hmm.

8    Q.  Do you see that and then Exhibit B that's a list of names?

9    A.  Yes.

10   Q.  Am I correct in understanding that if a computer or device

11   was being used by a person on Exhibit B then that was something

12   you felt you could either image or seize, right?

13   A.  Yes.

14   Q.  What did it mean to say that a computer was used in

15   connection with any of those people?  What did you understand

16   that to mean?

17   A.  To have any information I guess related to.  So used in

18   connection with the individuals and entities listed in Exhibit

19   B would be used by someone directly or indirectly but you know

20   of those people.

21   Q.  How is an item used indirectly?

22   A.  I guess you could say that a person could own a computer

23   which would make sense but they could also use somebody else's

24   computer or somebody else's phone.

25   Q.  But aren't those scenarios covered by the use, by language?

1    A.  Yeah, I guess you're right, yes.

2    Q.  Well, I guess my question is was it the plan of the search

3    team to look within the files of these electronic items and

4    search on premises to see whether they were files within those

5    items relating to any of the people on the list?

6    A.  That was not the intention.  The process would be that we

7    would have to make sure we imaged it and had a pure copy to

8    where we would then be able to review it.  So, if you have

9    difficulties in imaging something then you can't review it

10   on-site.  So, that's what happened essentially was there was

11   difficulties or decisions made that imagings was not going to

12   be done on-site, so you can't really review without imaging.

13   Q.  You mean reviewing was not going to be down on-site?

14   A.  Correct.

15   Q.  Imaging was done on-site for a amount of items?

16   A.  Whenever possible, yes.

17   Q.  Now, there were a number of employees at New York Global

18   Group whose names don't appear on the Exhibit B list, right?

19   Brandon Stewart, Melinda Cruz, those peoples names are not on

20   the Exhibit B list, right?

21   A.  I'd have to look.  I can't remember.

22   Q.  They're phones were imaged though, everybody who was in the

23   office had their phones imaged that day, right?

24   A.  I believe so.

25   Q.  Including the receptionist, right?

1    A.  I can't even recall her name.

2    Q.  But no work was done to determine whether or not anything

3    in her phone was used in connection with anybody on the phone,

4    anybody on the list.  They just took her phone cause she was

5    there, right?

6    A.  Yes.

7    Q.  Now, if you would look please at Government Exhibit 7.

8              MR. SIEGAL:  I'm not sure that's been offered but I

9    would like to offer that, your Honor, if it isn't?

10             MR. FERRARI:  No objection your Honor.

11             THE COURT:  Government's 7 is admitted.

12             (Government's Exhibit Seven received in evidence)

13   Q.  Do you see how near the bottom of that exhibit it lists --

14   well, am I correct in understanding that this is part of the

15   log of what was seized from the 40 Wall Street office of New

16   York Global Group?

17   A.  That's correct.

18   Q.  Do you see that there's a reference to near the bottom one

19   two blackberries followed by two iPhones; do you see that?

20   A.  Yes.

21   Q.  And do you see how four out of those five says "imaged" and

22   one says "image" which is then crossed out and says "seized"?

23   A.  Um-hmm.

24   Q.  Do you know which the seized blackberry was, who that

25   belonged to?

1    A.  It was Mr. Wei.

2    Q.  Was there some logical problem why Mr. Wei's phone could

3    not be imaged on-site as opposed to seized?

4    A.  Yeah, I believe there was difficulties with the seize of

5    it.  So, I was told they weren't going to be able to finish

6    on-site.  It was going to take a long period of time.

7    Q.  Did you tell Mr. Wei that your machine was broken?  Is that

8    why you told him his phone had been seized while everybody

9    else's got imaged?

10   A.  I don't recall ever telling him that.

11   Q.  But you're saying that in the four hours that you were at

12   the offices of New York Global Group his phone had to be seized

13   while everybody else's was imaged?

14   A.  It was my understanding that it would take -- it was a

15   lengthy process because of the size of the phone, so it was

16   taken.

17   Q.  Now, Mr. Wei never got his phone back, did he?

18   A.  I can't speak to that.  I did not return it to him.

19   Q.  Did you tell him he was going to get it back the next day?

20   A.  I don't recall telling him that.

21   Q.  You don't recall?

22   A.  No.

23   Q.  How long do you think it would take to image somebody's

24   Blackberry once you got it back to FBI offices?

25   A.  I've seen phones take anywhere from a day or two to

1   download.

2   Q.  But it was never returned, was it, not one day, not two

3   days later?

4   A.  I did not return the phone.

5   Q.  Now, with respect to the electronic seize of the apartment

6   is it your understanding that the SD cards, the -- any thumb

7   drives, all computers in that location that they were just

8   going to be seized, was that what you understood?

9   A.  Yeah.  We had lost, initially, during the first search

10  warrant of the office we had four card examiners.  We only had

11  one card examiner on location at the residence to the time of

12  search so he was not able to image on-site.

13  Q.  He was not able to image anybody's phone on-site?

14  A.  I can't recall if he did attempt it or not but I remember

15  we took a lot of things because we had difficulty with only one

16  person.

17  Q.  Now, Michaela Wei, her phone was seized also from the

18  apartment?

19  A.  I believe so but I can't say for sure.

20  Q.  Was there some reason why you couldn't get more card agents

21  to go to the apartment of Mr. and Mrs. Wei?

22  A.  It was just a resource issue that we lost people.  People

23  had other things to do, other cases.

24  Q.  So, Mrs. Wei had to look up the phone numbers of her

25  babysitters and then hand over the phone?

 1   A.  I believe that was what was done but I wasn't there.

 2   Q.  And all the other electronic data from her house was also

 3   taken pursuant to those warrants that day, right?

 4   A.  Yes.

 5   Q.  So she was left then without her appointment calendar,

 6   right?

 7   A.  If it was contained on electronic evidence that was

 8   relevant to the search warrant.

 9   Q.  Had all of her contacts, right, those would have been on

10   her phone just like most people these days?

11   A.  Yes.

12   Q.  And any memos or notes to herself that might have been

13   included on her phone, that was all information that she no

14   longer had access to, right?

15   A.  If they were on her phone I guess, yes.

16   Q.  Family photographs on her phone?

17           MR. FERRARI:  Objection on 403 grounds, your Honor.

18           THE COURT:  Her whole phone was taken?

19   Q.  Are you familiar with the fact that her data wasn't

20   returned to her in any form for three weeks?

21   A.  The data from her phone wasn't returned?

22   Q.  The data from the entire apartment, all the --

23   A.  I returned the data.  I returned the original digital

24   evidence from the residence to counsel for Mr. Wei once it was

25   imaged.

H1NAAWEI6                          Komar - Cross

1  Q.  So, you're not familiar with the fact that she didn't get

2  that back until February 20?

3  A.  I believe that was -- I'm aware of that, yes.

4  Q.  Now, Agent Komar, do you see those boxes of files and

5  materials over there?

6  A.  Yes, I do.

7  Q.  Is it your understanding that that's the entire set of

8  physical materials that were seized from the office and the

9  apartment on January 25, 2012?

10 A.  Yes, that's my understanding.

11 Q.  Are you aware whether any hard copy materials were ever

12 returned to the Weis?

13 A.  I'm not aware of returning those myself or aware of anybody

14 else.

15 Q.  With regard to the computer evidence that was seized, the

16 electronic evidence that was seized are you aware of any of

17 that evidence either being purged or returned to the Weis out

18 of the FBI's files?

19 A.  So, are you saying the originals returned or the

20 information deleted from our files?

21 Q.  The information deleted from our files?

22 A.  I'll not aware of any of that occurring.

23 Q.  You never asked for any of that?

24 A.  No, I did not.

25 Q.  And you were reassigned off of this investigation in about

H1NAAWEI6                          Komar - Cross

1    February of 2013, right?

2    A.  That's correct.

3    Q.  So as far as you know do you have any idea how many times

4    employees of FBI may have gone in and searched through the

5    electronic evidence between 2013 and today in 2017?

6    A.  I'm not aware of how many times people have accessed that.

7    Q.  So, the original search of the office took about four or

8    five hours; is that about correct?

9    A.  That's fair.

10   Q.  At the time you sought the search warrant you were for the

11   office, you were aware that there might be some documents

12   relating to the business at the apartment of Mr. and Mrs. Wei,

13   right?

14   A.  When I sought the search warrant?

15   Q.  When you originally sought the search warrant for the

16   office -- pardon me -- on January 25th and when you were

17   drafting that affidavit in anticipation of it, you actually

18   understood that you had some evidence that suggested that maybe

19   there's some business related evidence at the apartment of

20   Mr. and Mrs. Wei, right?

21   A.  I don't recall becoming aware of documents, records being

22   at the residence until the day of the search which was

23   January 25.

24   Q.  Can I just direct your attention to your affidavit of

25   January 24 and paragraph 19D of that affidavit which is

H1NAAWEI6                        Komar - Cross

1    marked -- sorry -- the exhibit itself is marked Government

2    Exhibit Two.  Do you see there on page 31, actually, that

3    there's reference to the notion that certificates may have been

4    sent to the West Street apartment?

5    A.  Yes, I was aware of the fact that certificates had been

6    sent to that location.  However, I had no reason to believe

7    that they were still there.

8    Q.  OK.  So you didn't apply for a search warrant originally

9    for the apartment until after you were at least most of the way

10   through the search of the office, right?

11   A.  In the early stages but that's when we found out.

12   Q.  Is it fair to say that one of the things you were looking

13   for when you went to the offices of New York Global Group were

14   stock certificates relating to certain of the entities you

15   associated with Mr. Wei?

16   A.  Yeah, I believe that was Covering Attachment A of the

17   search warrant.

18   Q.  And when you spent four or five hours -- and that's because

19   you had a theory that Mr. Wei was having these companies

20   suggest that there were shareholders out there who supposedly

21   held stock in these companies but who never actually got the

22   stock; that was your case theory in part?

23   A.  That's correct.

24   Q.  So, you expected to find that Mr. Wei himself was retaining

25   all these stock certificates to some of them?

1   A.  That was a possibility, yes.

2   Q.  So when you went to the offices of New York Global Group

3   and you looked for those, right?

4   A.  That was covered in Attachment A, yes.

5   Q.  And in fact some of the agents on your team asked Mr. Wei

6   whether or not the stock certificates might be contained within

7   the sheetrock walls of the office, right?

8   A.  I'm not aware of an agent asking that question.

9   Q.  There was some thought perhaps of ripping open the walls in

10  office, right?

11  A.  I'm not aware of ever transpiring.

12  Q.  But that's how important the stock certificates were to

13  your investigation, right?

14  A.  They were important but we'd never expressed any type of

15  threats to open walls to Mr. Wei.

16  Q.  Whether you did or didn't you never found any stock

17  certificates at the offices of New York Global Group, did you?

18  A.  I don't believe so.

19  Q.  Is it fair to say that part of the reason you got a new

20  search warrant to go to the home of Benjamin and Michaela Wei

21  was to find those supposed stock certificates?

22  A.  Yes.  They were also covered in the attaching for the

23  search warrant of the residents.

24  Q.  Did you find any stock certificates at the home of Mr. Wei?

25  A.  I don't believe we did.

1   Q.  You went so far as to ask Michaela Wei to open up a safe in

2   the apartment, right?

3   A.  That's correct.

4   Q.  There were no stock certificates there either, were there?

5   A.  Not to my knowledge.

6   Q.  And do you have no recollection of anybody suggesting that

7   maybe the walls of the apartment should be ripped open looking

8   for the stock certificates?

9   A.  No, I'm not aware of making that communication.

10  Q.  If you could take a look please at Government Exhibit One

11  which is at ops plan you referred to earlier.

12  A.  Yes.

13  Q.  Do you see on the second page of the op plan there is a

14  reference.  It says at the top of the page there it says on

15  Monday, January 23 a search warrant was issued by the Southern

16  District of New York.  Do you see that?

17  A.  Yes, I'm ware of that.

18  Q.  That is not correct?

19  A.  That's incorrect.

20  Q.  Incorrect.  This is written in the past tensed as if it's

21  happened already, right?

22  A.  I'm not entirely.  Are you referring to that sentence?

23  Q.  That sentence says a search warrant was issued on

24  January 23rd, right?

25  A.  That sentence is written in the past, yes.

H1NAAWEI6                          Komar - Cross

1    Q.  Did you write this ops plan before or after you got the

2    warrant?

3    A.  I can't recall.

4    Q.  Did you originally intend to get the warrant on the 23rd

5    and then ultimately not get it until the 24th?

6    A.  I can't recall.

7    Q.  One of the things you said on direct was that you offered

8    at the ops meeting or the debriefing the day before the

9    execution of search warrant to e-mail the search warrant

10   affidavit to your colleagues, right?

11   A.  That's correct.

12   Q.  And you said you believed somebody asked for it?

13   A.  Yes, I'm aware of that.  A few agents asking for it.

14   Q.  You aware that any of the agents actually read the 97 page

15   affidavit that you e-mailed them that evening before the search

16   warrant before executing warrant?

17   A.  I'm aware of at least one agent, yes.

18   Q.  Of the 20 agents who did the search, you are aware of one

19   who read it?

20   A.  There were 15, but yes.

21   Q.  When you say "15" is that because some people you are not

22   counting as agents?

23   A.  I think 20 was a little bit large.  There is an exhibit

24   with everybody's title.

25   Q.  Would you agree that that exhibit would control the number

H1NAAWEI6                    Komar - Cross

1    of people who were there?

2    A.   That's the control log of the premise so, yes.

3    Q.   Now, you have, as the case agent, control over when

4    actually you had the search executed, right?

5    A.   That's correct.

6    Q.   You had a ten day window after obtaining the search warrant

7    within which to actually execute it, right?

8    A.   I believe it was ten days yes.

9    Q.   But you opted to have the search warrant executed first

10   thing in the morning the day after the four p.m. briefing

11   session, right?

12   A.   That's correct.

13   Q.   So, you didn't really expect all those agents to read a 97

14   page search warrant affidavit between four or five o'clock p.m.

15   the night before a search execution and the following morning,

16   right?

17   A.   Some did it.  So, my expectation is that people would

18   prepare themselves for the search warrant.

19   Q.   You could have if you wanted to set the search for several

20   days after the briefing to give everybody a chance to read the

21   affidavit for the search warrant?

22   A.   Could have.

23   Q.   You elected not to?

24   A.   We elected to do it the date we had chosen for certain

25   reasons.

H1NAAWEI6                    Komar - Cross

1   Q.  You didn't create any 302 report of what was said in the

2   briefing, did you?

3   A.  That wouldn't be in normal course.

4   Q.  Would it be normal course that no such memo was written?

5   A.  We would not take notes and memorialize what was said

6   during that meeting.

7   Q.  Why was that?

8   A.  It is an internal meeting.  It's nothing that I would

9   memorialize in the report.

10  Q.  Well, in this case you had a warrant that's on its face was

11  a search warrant for the offices of New York Global Group,

12  right?

13  A.  Correct.

14  Q.  And if you look at Exhibit A to the search warrant -- and

15  again, I'll refer you to Government Exhibit Three.  If you

16  would take a look for a moment please at the 12 single-spaced

17  passages of Exhibit A and tell me whether or not there was any

18  format or type of data or record that is not in your mind

19  covered by the passages in Exhibit A, just format, not content?

20  A.  And I'm not sure I understand the question.

21  Q.  Would you agree that Exhibit A is a very broad list of

22  types of things?

23  A.  I wouldn't necessarily categorize it as "broad".  I would

24  say it's detailed.

25  Q.  And nevertheless each of those paragraphs refers to looking

H1NAAWEI6                    Komar - Cross

1   for things like photographs, address books, personal financial

2   records, computers, flash drives, videotapes, audiotapes,

3   identification documents, all sorts of types of documents,

4   right?

5   A.   Correct.

6   Q.   Relating to New York Global Group, right?

7   A.   And the other persons in Exhibit B.

8   Q.   Right.  But New York Global Group is right at the top of

9   that list.

10  A.   Yes, it is at the top.

11  Q.   Did you have a concern, sir, that the face of that warrant

12  said effectively take every kind of material I can think of

13  relating to the business regarding search, did you have a

14  concern about that issue?

15  A.   No, I did not.

16  Q.   Never occurred to you that that might be a warrant that

17  covered everything in the office?

18  A.   I don't feel it covered everything in the office.

19  Q.   So, it wasn't a concern for you that at the briefing you

20  should further particularize or specify what it was that they

21  were looking to seize at the searches?

22  A.   Can you -- I just don't understand your question.  Sorry.

23  Q.   Is it your testimony that it was not important to make it

24  clearer than the warrant itself what was seizable at the

25  pre-search briefing that you and Mr. Massey did?

1  A.  We discussed Attachment A.  I can't say we -- that was what

2  was discussed.  I can't recall how level of detail we got into.

3  Q.  So, it wasn't important to you that you should take notes

4  on what it was precisely what was said at the pre-search

5  briefing that was supposedly used to help the agents understand

6  better what they were supposed to be seizing?

7  A.  No, notes were taken.

8  Q.  Sir, before you searched the offices of New York Global

9  Group were you aware that there was an in-house lawyer at New

10  York Global Group?

11  A.  Yes, they were aware of that.

12  Q.  And you specifically excluded his office from the search,

13  right?

14  A.  That's correct.

15  Q.  Now --

16      THE COURT:  Sorry.  Just apologize for interrupting

17  the flow again, but just to follow-up on an earlier point.

18      Was it your view, Agent Komar, that on the face of the

19  warrant and taking into account the exhibits that this would

20  provide sufficient guidance to the agents without one?

21      THE WITNESS:  Yes, I do.  It's very typical to -- what

22  other search warrants I have been involved in I'd received.

23  So, it's a very typical format and detail that I have been

24  given on numerous search warrants.

25      THE COURT:  So, without the meeting and without the

1    affidavit, no concerns about clarity?

2           THE WITNESS:  I wanted -- I guess, I understand.  Let

3    me explain that the affidavit is 90 pages long and it's a very

4    detailed affidavit.  So, it's not normal course for AUSA Massey

5    to come over and attend a logistical safety previous going for

6    a search warrant.  So, we thought it was a good opportunity for

7    him to come over and make him self available to explain what

8    was going on and the type of things we were taking, as well as

9    just to go over it with him cause it's just very detailed, just

10   to help communicate and answer any questions and make himself

11   available to other members of the team.

12          THE COURT:  OK.

13   Q.  Do you recall Mr. Massey or yourself saying anything at the

14   meeting about anything of any nature that the agents should not

15   be seizing or taking?

16   A.  I don't recall anything discussed at that.

17   Q.  Sir, the day of the search -- let me step back.  Before you

18   went to search I think you just testified that you were aware

19   that there was a man named Jim Baxter who was a lawyer for New

20   York Global Group?

21   A.  Correct.

22   Q.  You had actually met Mr. Baxter eight or nine months

23   earlier, right?

24   A.  I can't say exact time but, yes, I had met him before.

25   Q.  You were aware that normally Mr. Baxter worked in the

1   office.  He had his own office space within the offices, New

2   York Global Group?

3   A.  That is my understanding.

4   Q.  Was one of your sources of information for your search

5   warrant application was a current employee of New York Global

6   Group at the time, a confidential source?

7   A.  Yes.

8   Q.  So, he was working there everyday, right?

9   A.  There that day?

10  Q.  He was working in the offices of New York Global Group

11  everyday during the timeframe leading up to when you executed

12  the search warrants?

13  A.  I can't say if he was there every day but my understanding

14  he was still employed by New York Global Group.

15  Q.  Did he tell you that Mr. Baxter would not be at the office

16  on January 25, 2012?

17  A.  I don't recall learning that information.

18  Q.  You don't recall knowing that Mr. Baxter was going to be

19  out at a FINRA hearing all day, the day you executed the search

20  warrant?

21  A.  I can't say for sure.  I don't recall.

22  Q.  So, it's your testimony, sir, that you don't remember one

23  way or another whether you knew before you selected the date to

24  execute the search that the in-house lawyer for the company

25  wouldn't be there the day you executed the search?

H1NAAWEI6                          Komar – Cross

1    A.  Yeah, I can't say one way or the other.  I just don't

2    recall.

3    Q.  So you are saying it is possible or you just don't

4    remember?

5    A.  Yeah, it's possible.  I just don't remember.

6    Q.  You were also as a part of your investigation speaking with

7    people at FINRA, right?

8    A.  That's correct.

9    Q.  They were conducting some separate investigations related

10   to the brokers who you describe in the affidavit?

11   A.  Yes.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Do you recall whether any of those FINRA employees told you

2   that Jim Baxter would be at a FINRA hearing the day you

3   executed the search?

4   A.  I just don't recall.

5   Q.  Did you make a strategic choice to execute the search on a

6   day when you knew the lawyer for the company would be out of

7   the office?

8   A.  I don't recall that being a factor in our decision of when

9   we executed the warrant.

10  Q.  You don't recall one way or the other?

11  A.  I don't recall it coming up.  I don't remember it being

12  discussed.

13  Q.  You're saying that was just coincidence?

14          MR. FERRARA:  Objection, your Honor.

15          THE COURT:  Sustained.

16          MR. SIEGAL:  I'm trying to move it along, your Honor,

17  if you give me a moment.

18  Q.  You testified on direct about the electronic evidence, that

19  you were not able to begin review of the electronic evidence

20  yourself for some time after the searches, right?

21  A.  That's correct.

22  Q.  And is that in part because the evidence had to be loaded

23  into a search platform?

24  A.  That's part of the reason, yes.

25  Q.  And also because the taint team had to do some of its work?

H1NMWEY7                          Komar - cross

1    A.  That's correct.

2    Q.  When I say a taint team, I'm referring to a team of agents

3    or lawyers who were looking to make sure that the

4    attorney-client privilege wasn't invaded, right?

5    A.  That's correct.

6    Q.  You knew before you went to the offices that it was a

7    business office with a lawyer who worked there, right?

8    A.  I was aware it was a business office that had a lawyer that

9    worked in-house, yes.

10   Q.  And was it fair to say that you had a belief that at least

11   some of the electronic evidence seized at the house and the

12   apartment might contain attorney-client privileged

13   communications?

14   A.  It was later brought to our attention that's a possibility.

15   Q.  So you could anticipate fairly before you executed the

16   search warrants that a taint team might be needed, right?

17   A.  It's possible to expect that, but we had no idea what we

18   were going to incur until we did.

19   Q.  You didn't look through the electronic evidence to decide

20   whether there was attorney-client privileged communication on

21   it before you assembled the taint team, right?

22   A.  No.  I thought you were asking me if I had a taint team set

23   up prior to the search warrant.  I thought that was the

24   question.

25   Q.  I'll ask you that question.  Did you?

H1NMWEY7                              Komar - cross

1    A.  No, I did not.

2    Q.  There wasn't one assembled until after the search was

3    conducted, right?

4    A.  That's correct.

5    Q.  And indeed a taint team didn't even get started doing its

6    work until June 2012?

7    A.  That's correct.

8    Q.  You say in your affidavit that you submitted in opposition

9    to this motion that you were involved, at least for a short

10   period of time, in reviewing some of the search evidence in the

11   fall of 2012.  Is that accurate?

12   A.  The digital evidence?

13   Q.  Yes.

14   A.  Yes.

15   Q.  Where did you conduct that review?  At your offices or

16   someplace else?

17   A.  At my offices at 26 Federal Plaza.

18   Q.  Did you keep any log of your reviews of the electronic

19   search evidence for the work that you did in the fall of 2012?

20   A.  We were -- I was marking things as pertinent or

21   nonpertinent, if that's what you mean by a log.  Or do you mean

22   something else by a log?

23   Q.  When you say you were marking things as pertinent or not

24   pertinent, you were actually leaving some sort of trace of what

25   your work was within what you were reviewing?

1    A.   Yeah.   That was my understanding.

2    Q.   How were you doing that?

3    A.   How was I flagging them?

4    Q.   Yes.

5    A.   Essentially, it's a screen and you are able to categorize a

6    document you are reviewing or a file you are reviewing as

7    pertinent/nonpertinent or another category that's been

8    developed to be used for the categorization of evidence.

9    Q.   You keep using the word pertinent and that's a confusing

10   word to me because I want to understand, do you mean you were

11   flagging the documents because you thought they were helpful to

12   your investigation or because you thought they were responsive

13   to the search warrant?

14   A.   I would say both.

15   Q.   Both.   Did you have two different boxes in the system to

16   check?

17   A.   No.

18   Q.   So it was an all-or-nothing sort of indication, meaning

19   either it was pertinent/responsive or nothing?

20   A.   That was the categories that were used, yes.

21   Q.   Let me ask this.   I take it that given the length of the

22   list of names on the search warrant that the number of

23   documents that were responsive to the search warrant would have

24   been greater than the number of those documents that would have

25   been either useful or helpful to your investigation, right?

1    A.   Number --

2    Q.   Maybe we should look at the search warrant.  The search

3    warrant says that you could, for example, take any document

4    that related to Yingmao Wei, right.  That's one of the names on

5    the list?

6    A.   Yes.

7    Q.   If there was an electronic document either at the home or

8    at the office that had the words Yingmao Wei in it, that would

9    be, in your view, responsive to the warrant?

10   A.   It had to be pertinent to the search warrant and the

11   violations that we were investigating.

12   Q.   Sorry.  Now I'm very confused.  If a document had Yingmao

13   Wei's name on it and it was on the computer, you are saying you

14   would have not necessarily flagged that as a responsive

15   document or a pertinent document?

16   A.   Correct.  So it would be a pertinent document if his name

17   was on it and if it fell into attachment A or relevant to the

18   violations that we were investigating.  If it was, for example,

19   his name with something irrelevant, then I would not mark that

20   as pertinent.

21   Q.   Does the system that you're working with actually have the

22   word pertinent on it or what -- I don't have a sense of what --

23   A.   I believe so.  It's been -- last time I used this tool was

24   for this review.  So we are talking four plus years, I guess.

25   Q.   Was it your view if you looked at a document in the

1    electronic system and none of the names on this list appeared

2    in the document, could you mark that pertinent or not?

3    A.  You have the ability to, but it wouldn't be pertinent

4    because it wouldn't be under the terms of the search warrant.

5    Q.  So it sounds to me like you first, in your mind, had to

6    decide whether a name on the Exhibit B was in the document and

7    then make a second-level determination about whether or not it

8    was pertinent?

9    A.  I would say that's accurate.

10   Q.  Now, you said in your affidavit you didn't get very far

11   with the review.  How much?

12   A.  When you say affidavit, I'm sorry.  I'm confused.

13   Q.  You submitted an affidavit in connection with this motion

14   in opposition to this motion?

15   A.  Correct.

16   Q.  I'm sorry.  There are many affidavits.

17   A.  I just wanted to clarify.

18   Q.  In that affidavit you said that you were able to do some

19   review of the electronic documents but you weren't able to

20   proceed very far with it, is that right?

21   A.  That's correct.

22   Q.  And you were reassigned in February of 2013, right?

23   A.  That's right.

24   Q.  What percentage of the electronic materials do you estimate

25   you were able to get through before you left and were

H1NMWEY7                              Komar - cross

1    reassigned?

2    A.  Hard for me to say for sure.  Not much.  At the time I

3    was -- I had other prioritized cases that took my time up.

4    Q.  So it wasn't just this case you were working on; you were

5    working on several other cases at the time, right?

6    A.  Yes, a number of cases.

7    Q.  By the time you left in February of 2013, not very much of

8    the electronic evidence had been reviewed by you, correct?

9    A.  I can't say a percentage or anything like that, but I felt

10   that I didn't get through as much as I wish I would have by

11   that time.

12   Q.  Did it ever occur to you to add other people to the

13   electronic review team beside yourself, one single agent, in

14   that year-long period?

15   A.  Yes.

16   Q.  And how many other agents did you add to the electronic

17   evidence review team beyond yourself before you left the

18   investigation?

19   A.  Zero.

20   Q.  Zero in an entire year of having that material?

21   A.  We were a very busy squad that didn't have the resources.

22   You can only do what you can do with what you have.

23   Q.  You were able to get 20 agents to come do the search, but

24   you couldn't get even one or two other bodies to help you go

25   through these hundreds of thousands of electronic documents you

1    had seized from Mr. Wey's business?

2    A.   That's true.

3    Q.   Did anybody ever give you a deadline by which the

4    electronic documents ought to be finished being reviewed?

5    A.   No.   There was never a deadline.

6    Q.   So was it your understanding that it was reasonable for the

7    FBI to have one solo agent looking through more than 100,000

8    electronic files and just take as long as it took to get

9    through that documentation?

10   A.   I'm not in a position to assess the reasonableness of that.

11   I'm not a boss.   I'm not a supervisor.   I'm doing the job that

12   I was told to do.

13   Q.   Did you at any point in the year-long period that you were

14   in charge of the investigation after the search run any search

15   terms within the documents?

16   A.   Yes.

17   Q.   Do you have a list of those search terms that you used?

18   A.   I don't think there was anything put formally down in terms

19   of search terms.   It was based upon my knowledge of the

20   investigation.   I'm sure it's fair to say there is probably

21   companies that were listed in Exhibit B that were searched, but

22   I'm sure there is other things that I searched based upon my

23   knowledge of the investigation.

24   Q.   You are saying that the electronic search terms you ran may

25   have included names of entities or people that were not on

1    Exhibit B?

2    A.   That were on Exhibit B.

3    Q.   Sorry.  Are you saying that you limited your use of search

4    terms only to terms on Exhibit B?

5    A.   I used Exhibit B to conduct my searches, yes.

6    Q.   So we are clear, you are saying you used Exhibit B as a

7    reference for conducting your search term searches in the

8    electronic database?

9    A.   Yes.  I used Exhibit B.

10   Q.   Did you include in your search terms that you used any

11   terms not on Exhibit B?

12   A.   Not sure.  That's not -- it's not logged down or written

13   down, the terms that I searched, so it's very well possible,

14   yes.

15   Q.   When you left the investigation and you handed the case

16   over to Agent McGuire, did you have any way of showing him

17   which electronic files you had reviewed and which ones you

18   hadn't?

19   A.   He would be privy to that by accessing the system.

20   Q.   So the system would have told him that?

21   A.   Yes.

22   Q.   That's how he would have avoided doing duplication?

23   A.   That is my understanding of how the system works.

24   Q.   When you ran search terms through the electronic media, did

25   you run those search terms across all the electronic media at

H1NMWEY7                          Komar – cross

1    once or only in parts of it?

2    A.  Well, it was only tranche A that I was reviewing, so that

3    would have been the contents of Mr. Wey's office, the server

4    and the thumb drives.

5            MR. SIEGAL:  Your Honor, give me one minute, please.

6            Your Honor, they took my watch when I entered the

7    building, so I don't know what time it is.  I'm wondering.

8            THE COURT:  It's 4:43.

9            MR. SIEGAL:  I am going to press through then.

10   Q.  You were involved at some level, Agent Komar, in an

11   investigation relating to a hedge fund called Level Global, is

12   that correct?

13   A.  I was not -- I had a minimal role with that investigation.

14   Q.  You took notes at a proffer given by a cooperating witness

15   in that case?

16   A.  Yes.  I was asked by the case agents to take notes.

17   Q.  That's a separate investigation completely from this one,

18   right?

19   A.  Correct.

20   Q.  Insider trading investigation?

21   A.  Yes.

22   Q.  The Level Global hedge fund, that was a $4 billion hedge

23   fund, right?

24   A.  I can't really speak to that.

25   Q.  There has been a lawsuit that's been brought about that

1    investigation.  You're aware of that, right?

2    A.  Yes.  I've been named in the lawsuit.

3    Q.  You're named in the lawsuit?

4    A.  Yes.

5    Q.  But you are not the only one named.  A bunch of AUSAs and

6    law enforcement agents have been named as defendants in that

7    case?

8    A.  Correct.  There is a number of people.

9    Q.  You're aware in that case that there was a search warrant

10   that was conducted at the offices of Level Global?

11   A.  Yes, I'm aware of the search warrant.

12   Q.  And there was an affidavit sworn to by another agent, a

13   Holly Trask of the FBI, is that right?

14   A.  I believe she is the one who is the affiant, yes.

15   Q.  She is one of your colleagues.  Do you know her?

16   A.  I know of her.  We are not in the same squad.  I was

17   assisting in another squad.

18   Q.  You're aware that that affidavit supporting that search

19   warrant is based in part on information that supposedly came

20   from a confidential witness who has now been revealed to be a

21   man named Sam Adondakis?

22   A.  I was never privy to the affidavit, drafting, reviewing.  I

23   have never to this day -- maybe once seen it, but I was not

24   involved in the drafting of it.

25   Q.  You met with Mr. Adondakis on at least one occasion?

1   A.  I was present for the proffer session, yes.

2   Q.  That was on November 2, 2010?

3   A.  Yes, I guess.  I am not sure of the exact date.

4   Q.  Do you have any recollection at all of the substance of

5   that interview?

6   A.  No, I do not.

7   Q.  If I asked you whether or not you have any recollection of

8   Mr. Adondakis saying anything about who his sources were for

9   inside information relating to Dell to a man named David Ganek,

10  you don't have any independent recollection sitting here today

11  of that conversation?

12  A.  I have no independent recollection.

13           MR. SIEGAL:  I think I have to do this by just showing

14  him the documents, your Honor.  Pardon me one moment, your

15  Honor.

16           THE COURT:  I do have some concerns about time, Mr.

17  Siegal.  It's 4:47.

18           MR. SIEGAL:  I understand, your Honor.  I am going to

19  move quickly through this.

20           If I may approach.  I am going to mark this as defense

21  Exhibit 12.

22           THE COURT:  Do you have a copy?

23           MR. FERRARA:  In your Honor's binder this is 3501-34

24  in Agent Komar's 3500.  Your Honor, I tried to flag for your

25  Honor at the top --

1                THE COURT:  I recall.

2                MR. FERRARA:  Mr. Siegal is actually -- there was a

3      draft and there was a final.  This is the draft that Mr. Siegal

4      is showing.  I think it's a little bit after what I had flagged

5      for your Honor.

6                THE COURT:  No objection to showing it.

7                MR. SIEGAL:  Sorry, your Honor, my 3500 doesn't

8      seem -- I am going to use this and mark this as Government

9      Exhibit 12 and not the other one.  Defense Exhibit 12.

10               THE COURT:  Not really helpful what you are saying

11     there.

12               MR. FERRARA:  Your Honor, Mr. Siegal is now using

13     3501-33, which is the final version of the document, which is

14     the one I flagged for your Honor.

15               THE COURT:  Mr. Siegal, are you saying that you are

16     withdrawing what you earlier marked as Defendant's 12, and you

17     are now marking for identification 3501-33 as Defendant's 12?

18               MR. SIEGAL:  Yes, your Honor.

19               THE COURT:  You may show it to the witness.

20     Q.  Sir, if you can take a look at that item, do you recognize

21     generally speaking what it is?

22     A.  The form is a CHS reporting document.

23     Q.  Is that an official FBI report?

24     A.  Yes, it is.

25     Q.  Is it often referred to as a 302 or this is not a 302?

1    A.  This is not a 302.

2    Q.  But this is the final version of the report that relates to

3    the proffer with Mr. Adondakis that we were just talking about?

4    A.  I believe so.

5    Q.  Do you see on the first page -- did you write this report?

6    A.  You -- there was a unique situation where I drafted

7    something and provided it to the case agent who then completed

8    this report.

9    Q.  I see.  Well, taking a look at page -- your name is on the

10   front of the report, right?

11   A.  As being an attendee, yes.

12   Q.  You are the one who took the notes for the meeting, right?

13   A.  That's correct.

14   Q.  If you can look, after the typewritten pages you'll see a

15   bunch of notes there, handwritten notes.  This is a copy,

16   beginning with Bates FBI 00012.

17           THE COURT:  Where is that?

18           MR. FERRARA:  Your Honor, I apologize.  This is partly

19   my fault.  I had originally given this to Mr. Siegal about a

20   week ago so he could start to look at it.  We had broke it up

21   by 3500 number.  So the notes are 3501-35.  But that confusion

22   is mine because I did give it to Mr. Siegal together about a

23   week ago.  I didn't want to spring it on him.

24           But now we have broken it up.  Now we have 3501-35 are

25   the notes Mr. Siegal is now referring to.

1          THE COURT:  Why don't we just include the notes as

2     part of what's been marked for identification as Defendant's

3     12.  Those are the notes, again, just for the record

4     identification, 3501-35 with the Bates FBI 12 through 31?

5          MR. SIEGAL:  Yes, your Honor.

6     Q.  Are those your handwritten notes, sir?

7     A.  Yes, they are.

8     Q.  I am just going to ask you is to direct your attention to

9     the sixth page of the exhibit, which is the typewritten

10    portion.  So FBI -- not the sixth page, but the page Bates

11    stamped FBI 000006.  Do you see the third full paragraph down

12    the page begins with the words Chiasson and Ganek?

13    A.  Yes.

14    Q.  Do you see where it reads Chiasson and Ganek were both

15    interested in the Dell information when CHS told them because

16    the information came directly from contacts at Dell.  Do you

17    see that?

18    A.  Yes.

19    Q.  And is it your understanding that that sentence means that

20    Mr. Adondakis told Mr. Ganek that his information was coming

21    from a contact within Dell?

22          MR. FERRARA:  I object to this question.  I don't

23    think his understanding is relevant.  The question is, does Mr.

24    Siegal want to ask a few questions about his memorialization,

25    accuracy of it, etc?  I think this is outside of the

H1NMWEY7                          Komar - cross

1   impeachment purpose.  Whatever limited impeachment purpose this

2   is might be proper.

3          THE COURT:  Sustained.

4   Q.  Does that sentence accurately reflect your notes, sir?

5   A.  I have to take some time to go through my notes.  This is

6   six years ago.

7   Q.  I dogeared the page for you there, sir.  For everybody

8   else's benefit, if you could look at Bates page FBI 000018.  Do

9   you see that?

10  A.  Yes.

11  Q.  Those are your notes?

12  A.  Yes.

13  Q.  Right there at the top where it says Anthony and David and

14  then there is some other handwriting.  You see with the arrows?

15  A.  Um-hum.  You are telling me that is what the basis is of

16  that statement.

17  Q.  You tell me.  I'm not the one who took the notes.

18  A.  This report is the best recollection of the occurrence of

19  that meeting.  I can't -- I wrote this report out for the best

20  recollection of what I observed at a meeting.

21  Q.  So it's fair to say that what's in the typewritten portion

22  is your best recollection of what you understood happened at

23  the meeting?

24  A.  No.  What I wrote up was not this document.  I wrote up a

25  document that was provided to a case agent who reviewed it and

H1NMWEY7                        Komar - cross

1    signed it, so that's all I know.

2    Q.  I'm sorry.  Maybe I'm misunderstanding what I was given.

3           MR. SIEGAL:  I am going to mark the draft, your Honor.

4    I'm sorry.  I am going to ask that this be marked.  I lost my

5    exhibit stickers.  I am just going to write it on here.

6    Defense Exhibit 13.

7           THE COURT:  What is this?

8           MR. FERRARA:  3501-34, your Honor.

9           THE COURT:  Thank you.

10   Q.  Sir, taking a look at Defense Exhibit 13, is that your

11   report, the one you're talking about?

12   A.  Yes, this is the draft report I'm referring to.

13   Q.  So this would be your wording from your notes?

14   A.  This is the document that I drafted from what I've heard

15   during that meeting.

16   Q.  And if you look at the third page of that document, do you

17   see that in the middle of the page there there is a paragraph

18   that begins with the same words, Chiasson and Ganek.  You see

19   that?

20   A.  Yes, I see it.

21   Q.  Were both interested in the Dell information when CHS told

22   them because the information came directly from contacts at

23   Dell.  You see that wording?

24   A.  Yes, I see that wording.

25   Q.  Is that, in your mind, an accurate transcription of your

1   own notes?

2   A.  That's an accurate transcription of what occurred during

3   that meeting.  My notes are used to write a report to help my

4   recollection.  They don't need to be exactly what is written

5   into a report.  They are used for my recollection to write a

6   report, what occurred at a meeting.

7   Q.  So you sitting here today believe that what occurred in the

8   meeting is what you wrote in that sentence?

9   A.  Yes.  That's the report that I drafted.

10  Q.  Are you aware that both Mr. Adondakis and your colleague,

11  Mr. David Makol from the FBI, say that Mr. Adondakis never said

12  to Mr. Ganek, he had an inside source at Dell?

13          MR. FERRARA:  Objection.

14          THE COURT:  Mr. Ferrara, I can see not going beyond

15  this question, but why not this question?

16          MR. FERRARA:  Because what would be impeachment for

17  this witness is whether he took some steps or did something

18  inappropriate, etc., whether one of his colleagues has a

19  different view.  This is the sort of thing where this is a

20  classic question at a trial where someone says, and if so and

21  so said something else, they would be lying.  This is

22  objectionable.  It's speculative to ask this witness to weigh

23  in on competing versions of memories and interpretation.

24          THE COURT:  Your objection -- I just want to make sure

25  I understand --

H1NMWEY7                          Komar - redirect

1          MR. FERRARA:  This witness is not in a position to

2     opine on what other people may or may not think this means.

3          THE COURT:  That may be true, but isn't that the

4     question that's been asked?  Are you aware?  You said he's not

5     in a position to.  The question is, are you aware of that?

6          MR. FERRARA:  Fair enough, your Honor.  If it's just

7     his awareness, I will reserve my objection to a different

8     question.  That's fair.

9          THE COURT:  You want to repeat the question.

10          MR. SIEGAL:  If we could have it read back.

11          THE COURT:  Read it back, please.

12          (Record read)

13     A.  It was brought to my attention that that came up when I was

14     named in this lawsuit, yes.

15          MR. SIEGAL:  Give me one moment, your Honor.

16          Nothing further, your Honor.

17          THE COURT:  Redirect.  We have got 16 minutes.

18          MR. FERRARA:  I have four areas, your Honor, that I

19     think will each be brief.  Call it five areas.

20     REDIRECT EXAMINATION

21     BY MR. FERRARA:

22     Q.  Agent Komar, just to pick up where we left off, I believe

23     you said you had a limited role in that Ganek investigation, is

24     that right?

25     A.  That's correct.

1   Q.   Which was what?

2   A.   I took notes in one or two proffers.

3   Q.   And did you do your best to do that accurately?

4   A.   Absolutely.

5   Q.   Did you deliberately falsify any document in that

6   investigation?

7   A.   No, I did not.

8   Q.   Would you ever do such a thing?

9   A.   No, I would never.

10  Q.   Did you ever review the search warrant that is part of the

11  basis of that investigation?

12  A.   In conjunction with that search warrant I did review it,

13  yes.  I don't think I've reviewed the affidavit in detail.

14  Q.   Let's switch gears.  Could you look at what's been marked

15  for identification as Government Exhibits 6 and 13.

16  A.   Yes.

17  Q.   What are those?

18  A.   Evidence recovery logs.

19  Q.   For the locations we have been discussing?

20  A.   Yes.  For 40 Wall Street and for 10 West Street, apartment

21  37.

22          MR. FERRARA:  Your Honor, the government offers

23  Exhibits 6 and 13.

24          THE COURT:  Without objection?

25          MR. SIEGAL:  No objection, your Honor.

1          THE COURT:  Government 6 and 13 are admitted.

2          (Government Exhibits 6 and 13 received in evidence)

3   Q.  In Government 13, Agent Komar, could you take a look at

4   item 22.

5   A.  Yes.  It's labeled as one black suitcase.

6   Q.  Do you know or do you remember whether that's the black

7   suitcase we have been referring to as Government Exhibit 21?

8   A.  I believe it was, yes.

9   Q.  Pardon me.  I think it's Government Exhibit 22 is that

10  suitcase.  Pardon me.

11         And then if we could look, Agent Komar, at Exhibit 11,

12  and this goes to the Court's question earlier.  I'm sorry.

13  Before you flip, did you see where it was recovered based on

14  the log?

15  A.  It says area F.

16  Q.  If we could look at Government Exhibit 11, towards the

17  bottom of the first page of that exhibit.  It's sort of cut

18  off.  Do you see the F at the bottom?

19  A.  I don't see it on this copy.

20         MR. FERRARA:  May I approach, your Honor.

21         THE COURT:  You may.

22  Q.  It's light, but is there a sort of a cutoff F at the bottom

23  there?

24  A.  Yes.

25  Q.  Would that F correspond to the log that we just looked at

H1NMWEY7                        Komar - redirect

1    in Government Exhibit 13?

2    A.   That's correct.

3          THE COURT:  My letter is cut off, but I think after E

4    it says it's F, bedroom and bathroom.  Is that what you are

5    referring to?

6          MR. FERRARA:  Yes, I believe it is.

7          THE COURT:  I can't see where F is on the map on this

8    copy.

9          This is the first floor key and F is bedroom and

10   bathroom.  Do you have a memory of whether that's where the

11   suitcase was found?

12         THE WITNESS:  That seems accurate to my recollection,

13   yes.

14         THE COURT:  But that's different than the photo that

15   was shown earlier of a black suitcase in a bedroom?

16         THE WITNESS:  Correct.  That's a different suitcase.

17   I believe the photo we saw earlier of the trash spread out was

18   in the doorway -- was placed in the doorway of that bedroom, is

19   my understanding.  The agent is listed on there who collected

20   that.

21   Q.   Now, let's take a look at -- Mr. Siegal showed you

22   Government's 15A.  Let's take a look at that.

23   A.   OK.  Yes.

24   Q.   Are you there?

25   A.   Yes.

1          MR. FERRARA:  When the Court is ready --

2          THE COURT:  Ready.

3    Q.  Mr. Siegal asked you about what appears to be a plastic

4    trash bag behind the boxes towards the back of that photograph.

5    Do you see that?

6    A.  Yes.  You can see the top of the bag, yes.

7    Q.  Correct.  And we have established that's the entry photo,

8    correct?

9    A.  Correct.

10   Q.  Take a look at 15G.

11   A.  Yes.

12   Q.  I think you testified this is the exit photo of the same

13   location?

14   A.  Yes, this is the exit photo.

15   Q.  Do you see the trash bag there?

16   A.  Yes, I do.

17   Q.  Does that mean it was taken or left?

18   A.  It was left.

19   Q.  I've marked this Redweld as Government's 22A.  I want to

20   show you this.  Just take a second and orient yourself.

21          THE COURT:  Agent, do you recall what was in the trash

22   bag that was left?

23          THE WITNESS:  These are the documents --

24          THE COURT:  Before you turn to his question, do you

25   recall what was in the trash bag that was left?

1          THE WITNESS:  I don't recall what was in that trash

2     bag.  I just know that it was searched, your Honor.

3          THE COURT:  Was it similarly opened and put on the

4     floor like the other trash bag?

5          THE WITNESS:  I can't recall if they emptied that

6     trash bag or not.  I do recall going through as normal practice

7     of myself to ask if things were searched, and I think I would

8     have asked that question if that would have been searched.

9     Q.  What are the documents contained in this Redweld?

10         THE COURT:  Just remind me what we are looking at now.

11         MR. FERRARA:  I am showing the agent what I've marked

12    as Government 22A.  I was just asking what is in this Redweld.

13         MR. SIEGAL:  Sorry.  This is a bit of confusion that I

14    had earlier, your Honor.  The AUSAs have represented that those

15    folders were also associated with the things that were in the

16    suitcase.  I don't know that he has testified to that yet.

17         THE COURT:  He is asking him.

18         MR. FERRARA:  That's exactly what I'm asking him, your

19    Honor.

20         THE COURT:  We have discussed them or we have

21    discussed some documents that came from the suitcase before.  I

22    don't know if these are the same or not, but they have been

23    marked now for identification as 22A.  We will find out.

24    Q.  What is 22A, Agent Komar?

25    A.  These are -- I guess you could describe them as manila

1    envelopes that are the paper that was ripped up that was found

2    in the white trash bag inside the suitcase.  This is after I

3    had gone through in my office and tried, attempted to piece

4    these together to identify information on it or try and piece

5    it together to where we could review it, as well as if it was

6    in a foreign language, try and figure out what language and try

7    to get it translated.

Q.  Let's just use --

9          MR. FERRARA:  Your Honor, the government offers 22A as

10   part of 22.

11         THE COURT:  For my clarification, Mr. Ferrara, do you

12   know and can you represent, is this different than the

13   documents we were looking at in 22 before?

14         MR. FERRARA:  I can represent that, yes, but I also

15   have not asked the agent.  I was going to ask the agent a

16   couple of questions about that as well, your Honor.

17         THE COURT:  Go ahead.

18         I presume no objection.

19         MR. SIEGAL:  No objection, your Honor.

20         THE COURT:  22A is admitted.

21         (Government Exhibit 22A received in evidence)

Q.  I want to understand what was original stuff that you found

23   versus what was your work product after.  These are in folders,

24   as you said.

25   A.  Yes.

H1NMWEY7                          Komar - redirect

1   Q.  If you wouldn't mind showing the Court.  You have notes on

2   the outside of that envelope, is that correct?

3   A.  That's correct.

4   Q.  Those are your notes that you took during your review?

5   A.  Yes.

6   Q.  Let's just show the Court an example of the originals of

7   what it was you were piecing back together.

8   A.  One second.

9   Q.  Again, just to be clear, were the manila folders in the

10  trash?

11  A.  These manila folders were not in the trash.  They are just

12  used to organize.  My work product, basically.

13  Q.  Earlier Mr. Siegal showed you some documents that he took

14  out of this black suitcase in front of you, Government's 22?

15  A.  Yes.

16  Q.  Is 22A additional documents found in Government's 22?

17  A.  Yes, these are additional documents.

18          MR. FERRARA:  I have nothing further, your Honor.

19          THE COURT:  But they were also found in the trash bag

20  contained in Government 22?

21          THE WITNESS:  Yes.

22  Q.  All of the ones that Mr. Siegal showed you and the ones I

23  have now showed you, 22A, were all in the trash bag which was

24  in the suitcase which was in the closet?

25  A.  Correct.

1              MR. FERRARA:  Nothing further.

2              MR. SIEGAL:  I just have a few questions about these

3     set of documents, your Honor.

4     RECROSS EXAMINATION

5     BY MR. SIEGAL:

6     Q.  You're saying those documents as well as the documents in

7     those loose envelopes are in this suitcase over here.  That was

8     all part of 1B24?

9     A.  It was all inside the white trash bag, yes.

10    Q.  At some point in 2012 you were tasked to make photocopies

11    for Mr. Wey and NYGG of the hard-copy documents that were

12    seized at both locations, right?

13    A.  I believe so, yes.

14    Q.  So it would have been your job to do the laborious task of

15    taking every one of these pieces of paper and photocopying them

16    or scanning them for purposes of putting it on a disk to give

17    to Mr. Wey?

18    A.  Correct.

19    Q.  Did you photocopy or scan everything in 1B24 at a time?

20             THE COURT:  What are you referring to?  I'm missing

21    the 1B24 reference.

22             MR. SIEGAL:  Exhibit 22, your Honor, the suitcase and

23    the tag on it.  I'm sorry.  This was confusing.  That has a

24    control number that ends in 1B24.

25    Q.  Do you see that, sir?

1    A.   I can't see from here.  1B is a term that we use with a lot

2    of evidence.

3    Q.   Is it fair to say that each of the boxes of evidence over

4    there have a control number that begins 1B and then the numbers

5    are 1 through some other number beyond that?

6    A.   That's correct.

7    Q.   Did you make a conscious decision not to photocopy for

8    Mr. and Mrs. Wey the documents that were supposedly found

9    inside the suitcase?

10   A.   No.  To my best recollection, these were copied and

11   provided to counsel, to AUSA Massey, to provide.

12   Q.   You would be surprised if in fact the disk of scans of the

13   hard-copy items was missing copies --

14   A.   The disk would not contain these documents because it was

15   produced by -- scanned by our resources in Quantico and were

16   able to send a large amount of paper to be done.  These were

17   copies, however, and provided to AUSA Massey.

18   Q.   When?

19   A.   I don't know.  But during the course of the investigation.

20   This is something that he wanted to see and I provided these to

21   him.

22   Q.   So your testimony is, as far as you understood, copies of

23   everything in that suitcase were supposed to be returned to

24   Mr. Wey?

25   A.   I'm deciphering between return to Mr. Wey and provided to

1   AUSA Massey.  I provided them to AUSA Massey to evaluate what

2   needed to be done with that, whether they were considered

3   discovery or not.  I was not privy to that decision.

4   Q.  So you would be surprised to find that no copies of the

5   documents that were supposedly found within the trash were

6   provided to Mr. Wey back in 2012?

7   A.  Yeah.  My best understanding was I provided copies of these

8   documents.

9   Q.  Would you be surprised to learn that no copies were

10  produced to the defense in this case after indictment?

11          MR. FERRARA:  Objection.

12          THE COURT:  Sustained.

13  Q.  You don't know either way?

14  A.  I have no idea.

15          MR. FERRARA:  Your Honor, may I have redirect for one

16  more question.  I apologize.

17          THE COURT:  Hurry up.

18  REDIRECT EXAMINATION

19  BY MR. FERRARA:

20  Q.  Agent Komar, regarding the search terms you ran in order to

21  search the electronic records, were your search terms limited

22  to what you believed you were entitled to seize under the

23  warrant?

24  A.  Yes.

25          MR. FERRARA:  Nothing further, your Honor.

H1NMWEY7

1              MR. SIEGAL:  Done.

2              THE COURT:  Thank you, Agent Komar.  You are excused.

3              (Witness excused)

4              THE COURT:  It's 5:13.  As I've said, I have a hard

5      stop at 5:15.

6              Couple of housekeeping.  Obviously, for tomorrow

7      everybody is going to come prepared with premarked exhibits.  I

8      will ask at the end of the hearing ultimately what counsel will

9      do is put together an agreed-upon binder of what the admitted

10     exhibits are so they can have them in one place.  And I'll ask

11     if you could work through some agreement on whether, for

12     example, the suitcase could be substituted for a photograph, I

13     presume, and how you want to handle the documents internal to

14     that that have been admitted for purposes of ultimately a

15     useable record here.  Just discuss it and come to an agreement.

16     But at the end of the hearing tomorrow I will ask you to put

17     together for the Court an agreed-upon binder of admitted

18     exhibits.

19             MR. FERRARA:  Does your Honor want argument tomorrow

20     at the end of the hearing or were you going to ask for

21     written --

22             THE COURT:  What I think would be most useful is to do

23     a written submission and then bring you in for argument.

24     Written submission that's tied to the evidentiary record in the

25     case, and then after I have received that I'll bring you in for

H1NMWEY7

1     argument.  But it's going to be a short time frame.  I think

2     that would be most useful.  I'm open, depending what time we

3     end tomorrow, some brief summation in advance of that.  But I'm

4     going to want a written submission and I tend to think argument

5     afterwards is I think what's most useful.

6          MR. FERRARA:  If your Honor wants written submissions

7     with arguments, then the government would not ask for argument

8     directly after the close of tomorrow's proceeding.

9          MR. SIEGAL:  That's fine with us, your Honor.  We

10    would like some time to digest the record as well.

11         THE COURT:  In addition, I will ask for a proposal on

12    a schedule for submission.  Again, for this to be fresh and

13    useful and given the overall time frame of the case, it's going

14    to be very short amount of time to put in a brief written

15    submission.  See if you can come to an agreement on that.

16         Anything else to address?

17         MR. FERRARA:  Not from the government.

18         THE COURT:  Are we concerned about time?  I think, for

19    example, we could start at 9:30 tomorrow.

20         MR. SIEGAL:  Your Honor, I don't think we are going to

21    have a concern about the time.  I think 10:00 would be fine.

22         THE COURT:  OK.

23         MR. SIEGAL:  In terms of the briefing, your Honor, is

24    your Honor going to want simultaneous briefs from both sides or

25    are you going to want a brief from us in terms of agreeing to a

H1NMWEY7

1    schedule?

2         THE COURT:  I am going to think about it.  Probably

3    not simultaneous.  I think we will stagger.  Again, very short.

4    Why don't you see if you can come to an agreement.  My

5    inclination is to get briefs that respond to each other.

6         MR. SIEGAL:  Just in terms of housekeeping in the

7    literal sense, your Honor, we brought a bunch of boxes of

8    materials here.  Is it all right if we leave them in the

9    courtroom overnight?

10        THE COURT:  Yes.  Work it through with Ms. Nunez.

11        Anything else?

12        MR. FERRARA:  Nothing.  Thank you.

13        THE COURT:  We are adjourned for the night.

14        (Adjourned to January 24, 2017, at 10:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    DAVID MASSEY

4    Direct By Mr. Ferrara  . . . . . . . . . . . 6

5    Cross By Mr. Siegal  . . . . . . . . . . . .30

6    Redirect By Mr. Ferrari  . . . . . . . . . 106

7    Cross By Mr. Siegal  . . . . . . . . . . . 112

8    MATTHEW KOMAR

9    Direct By Mr. Ferrara  . . . . . . . . . . 121

10   Redirect By Mr. Ferrara  . . . . . . . . . 213

11   Recross By Mr. Siegal  . . . . . . . . . . 221

12   Redirect By Mr. Ferrara  . . . . . . . . . 223

13                        GOVERNMENT EXHIBITS

14   Exhibit No.                              Received

15    2 and 3   . . . . . . . . . . . . . . . . . 8

16    9 and 10  . . . . . . . . . . . . . . . . .19

17    17 and 18  . . . . . . . . . . . . . . . . .25

18    19   . . . . . . . . . . . . . . . . . . . .28

19    21   . . . . . . . . . . . . . . . . . . . 112

20    1   . . . . . . . . . . . . . . . . . . . 124

21    4, 5, and 8  . . . . . . . . . . . . . . . 131

22    11, 12, and 15  . . . . . . . . . . . . . 140

23    20   . . . . . . . . . . . . . . . . . . . 147

24    22   . . . . . . . . . . . . . . . . . . . 160

25    Seven   . . . . . . . . . . . . . . . . . 178

 1   6 and 13 . . . . . . . . . . . . . . . . 215

 2   22A  . . . . . . . . . . . . . . . . . . 219

 3                       DEFENDANT EXHIBITS

 4   Exhibit No.                              Received

 5   4  . . . . . . . . . . . . . . . . . . . .83

 6   5  . . . . . . . . . . . . . . . . . . . .90

 7   Six  . . . . . . . . . . . . . . . . . . .92

 8   Seven  . . . . . . . . . . . . . . . . . .97

 9   Eight  . . . . . . . . . . . . . . . . . 100

10   10  . . . . . . . . . . . . . . . . . . . 113

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25