H1OMWEY1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          15 Cr. 611 (AJN)

5  BENJAMIN WEY,

6            Defendant.

7  ------------------------------x

8                                      New York, N.Y.
                                       January 24, 2017
9                                      10:20 a.m.

10

   Before:
11
                     HON. ALISON J. NATHAN,
12
                                        District Judge
13

14                       APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    MICHAEL FERRARA
17  AIMEE HECTOR
    IAN P. McGINLEY
18       Assistant United States Attorneys

19  HAYNES AND BOONE, LLP
         Attorneys for Defendant
20  DAVID M. SIEGAL
    JOSEPH C. LAWLOR
21  BARRY McNEIL
    SARAH E. JACOBSON
22

23

24

25

H1OMWEY1

1           THE COURT:  Counsel, I think just as to housekeeping

2    matters, I believe you've agreed upon and conferred with my

3    deputy regarding an admitted exhibit list.  Is that correct?

4           MS. HECTOR:  Yes, your Honor.

5           THE COURT:  As of today.

6           MR. SIEGAL:  Yes, your Honor.

7           THE COURT:  Thank you.  And we will go through that

8    process again at the end of the day, make sure there is

9    agreement.  We can enter the list as a court exhibit and as I

10   requested, if you would just, for ease, consolidate all the

11   admitted exhibits into an exhibit binder that you will submit

12   to me.

13          Other housekeeping matters before we --

14          MR. SIEGAL:  I have two, your Honor.  I discussed this

15   with the government already.

16          Yesterday as part of Mr. Komar's testimony he

17   testified that either he did or he may have sent an e-mail to

18   some members of his team containing a copy of the search

19   warrant affidavit, and we have again confirmed this morning

20   with the government, we have not been provided a copy of any

21   e-mails as part of the 3500 for Mr. Komar and the government

22   has represented that they have made a search for any such

23   e-mails and were unable to locate any.  So I propose just a

24   stipulated fact on the record to the effect of what I just

25   said.

1          MR. FERRARA:  We are not prepared to stipulate that it

2     doesn't exist, your Honor.  We are prepared to stipulate that,

3     yes, we did attempt to search for it.  The FBI has had some

4     e-mail problems.  Yes, we could not find such an e-mail.  To

5     the extent that that's relevant to your Honor, that's the fact.

6          THE COURT:  The stipulation is that Mr. Komar had

7     testified that he sent an e-mail to the investigators who would

8     take part in the search advising them -- if we could pull up

9     the testimony.

10         MR. FERRARA:  I don't think it's that clear, your

11    Honor.  It's OK.  The record speaks for itself.  What we are

12    prepared to agree is that we searched our internal files and we

13    asked the FBI agents to search theirs.  Agent McGuire --

14         THE COURT:  I just want to clarify.  What did you

15    search for?

16         MR. FERRARA:  We asked for all relevant e-mails that

17    might touch on anything regarding this hearing and that Agent

18    McGuire could actually testify about some problems he had with

19    his e-mail.  But, yes, Agent Komar was not able to find any

20    such e-mail and we were not able to find any on our system.

21         THE COURT:  Such e-mail.  Define that term.

22         MR. FERRARA:  An e-mail in which Agent Komar sent to

23    the search team an attachment, including the affidavit, to the

24    search warrant.

25         MR. SIEGAL:  Or any individual members of the search

1    team, I assume.

2              MR. FERRARA:  Yes, right.  That's correct.

3              THE COURT:  I'll take that as a stipulation.  Thank

4    you.

5              MR. SIEGAL:  And the second housekeeping point, your

6    Honor, is, we made reference yesterday to a letter and an

7    attached disk that contained what was represented to us to be

8    photocopies of the hard copy search materials.  We are going to

9    offer the letter and the actual disk itself so that for your

10   Honor's purposes your Honor can look at any of the search

11   material in an electronic form, and we can reference those

12   materials in our submission as well.

13             THE COURT:  What does it include?

14             MR. SIEGAL:  Well, as I understand it, your Honor, it

15   was intended to include a photocopy of everything that's over

16   there.

17             THE COURT:  That's my question.  By over there, you

18   mean that was contained in Exhibit 22?

19             MR. SIEGAL:  No.  Sorry.  Over there meaning all those

20   boxes, including Exhibit 22, but as well the rest of the boxes

21   that are sitting over there, the full hard copy take from both

22   searches.

23             THE COURT:  It does include the various documents that

24   were discussed yesterday that were contained in Exhibit 22 and

25   based on the testimony found in a trash bag that was found in

H1OMWEY1

Exhibit 22?

MR. SIEGAL:  No.  It does not include that.  But it includes other stuff that we would like to reference as part of our motions.  We have already referenced as part of our motions as well that it is in the other boxes outside of Exhibit No. 22.

THE COURT:  Ms. Hector.

MS. HECTOR:  May I have one moment, your Honor.

THE COURT:  Yes.

Mr. Siegal, you're seeking to enter it in electronically, essentially, but not all of the paper that was obtained in the search.

MR. SIEGAL:  Well, I'm trying to enter, your Honor, what was represented to us in August of 2012 to be all the hard copy materials from the search.

THE COURT:  Let me hear from the government.

MR. FERRARA:  Thank you, your Honor.  It appears that we had intended for that disk to include all of the seized material from the search.  It appears that some of the material from 22, from the suitcase, was not included on that disk. That was an error.  And it's those ripped-up scraps of paper that your Honor saw.  We believe that the disk does contain the pieced-back-together documents that we then later offered through Agent Komar, I believe, on redirect.

It will take some time, but if your Honor wants

H1OMWEY1

1     copies, photocopies of those ripped-up pieces of paper, we are

2     happy to provide them.  We also have no objection to this disk

3     coming into evidence with the caveat that we think it's very

4     important that your Honor see how these documents actually were

5     maintained and what the agents were actually confronted with.

6     We think it's important to the reasonable analysis in this

7     case.  So we are happy to have this disk be in evidence and

8     your Honor can of course look through it and it's organized by

9     box.

10          But we would also like to have in evidence, I believe

11    without objection, having spoken to Mr. Siegal, these very

12    boxes.  If your Honor wants us to, as you think about and

13    consider this motion, we are happy to bring these boxes over,

14    or some of them so your Honor can just flip through and get a

15    sense of how they were maintained and what the agents actually

16    were confronted with.  We think it's very important, as your

17    Honor is a fact finder, to get a sense of what the agents

18    actually had in front of them when they were attempting to

19    execute the search.

20          THE COURT:  That's fine.  But I won't have in front of

21    me what the agents had when they were executing the search.  I

22    will only have what was seized.

23          MR. FERRARA:  That's fair, your Honor.  It's still

24    better --

25          THE COURT:  Your opposing counsel wants to say that

H1OMWEY1

1    those two are basically equivalent, but you've argued

2    otherwise.

3           MR. FERRARA:  That's fair, your Honor.  And, you are

4    right, it's imperfect in that sense.  But it's better than a

5    computer disk in the sense of -- look, I don't want to make an

6    argument right now.  There is going to be time for that.  The

7    idea is, it's a very different thing if your Honor thinks that

8    the x-rays were sitting on a desk and the agents grabbed them

9    off the desk versus the x-rays being in sort of a box

10   containing financial records.  We think that's an important

11   difference.

12          THE COURT:  How would I know that they were in a box

13   containing financial records?

14          MR. FERRARA:  Well, because the boxes have been

15   maintained the way they were seized.

16          THE COURT:  Am I yet to get that testimony?

17          MR. FERRARA:  Yes.

18          THE COURT:  Because I didn't get that from either

19   Komar or Massey.

20          MR. FERRARA:  Yes, your Honor.  Agent Komar has been

21   gone for several years.  We are going to have an agent come up

22   and talk about the maintenance of the boxes.

23          Between that testimony and the actual state of the

24   boxes, we think it's going to be important for your Honor as

25   you consider the good-faith analysis here.

H1OMWEY1

```
 1              THE COURT:  I think in terms of applications I have in
 2     front of me the government agrees, Mr. Siegal, to the entry of
 3     the disk.  You want to identify it and mark it.
 4              MR. SIEGAL:  Your Honor.  We have marked the cover
 5     letter and the disk together as Defendant's Exhibit 15.
 6              THE COURT:  What's the date of the cover letter?
 7              MR. SIEGAL:  August 7, 2012, from someone named Jeremy
 8     Schiffres at the U.S. Attorney's Office to both myself and
 9     attorneys for New York Global Group at the time, Seth Levine
10     Scott Klugman.
11              THE COURT:  Without objection, Exhibit 15 is admitted.
12              (Defendant's Exhibit 15 received in evidence)
13              THE COURT:  I think it remains the question of whether
14     that will be supplemented to be a complete set of what was
15     seized in terms of paper documents or not, right?  That's one
16     open question.
17              MR. FERRARA:  Yes, your Honor.  Obviously, we will do
18     what the Court prefers.  We will make a production to Mr.
19     Siegal.
20              THE COURT:  Make the production.  If Mr. Siegal wants
21     to move it into evidence, you will let me know.
22              MR. FERRARA:  The other issue is, this is highly time
23     intensive.  These are scraps of paper.
24              THE COURT:  Mr. Siegal, do you care?
25              MR. SIEGAL:  Your Honor, I think it would be fair if
```

1    before we submit our opposition papers to their brief on this

2    that we have copies of those, but it doesn't have to be today,

3    and we can stipulate here that once they have made that copy

4    that it becomes part of the record as well.  I'm fine with

5    that.

6             MR. FERRARA:  Yes.  We could try to get --

7             THE COURT:  You all are looking to me to tell you.  It

8    is your hearing, since I ordered it.  Tell me what you want

9    entered into the record.  I don't care.  You tell me if it's

10   being entered or not.

11            MR. FERRARA:  Understood.  We will confer with Mr.

12   Siegal during a break and we will have an answer.

13            THE COURT:  Thank you.  I appreciate that.

14            Mr. Siegal, the government's application is to

15   actually enter -- you'll move that with appropriate testimony?

16            MR. FERRARA:  Yes.  That's fine.  We had planned to do

17   that.

18            THE COURT:  I have no idea as I sit here whether those

19   boxes represent anything other than what was brought over from

20   your office.

21            MR. FERRARA:  Totally fair, your Honor.  We are happy

22   to do it that way.  Yes.

23            THE COURT:  What else, housekeeping?

24            MR. SIEGAL:  Nothing further for the defense, your

25   Honor.

1           THE COURT:  Ms. Hector, you may call your witness.

2           MS. HECTOR:  Yes.  The government calls Special Agent

3    Thomas McGuire.

4           THE COURT:  Agent McGuire may be brought in.

5     THOMAS McGUIRE,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MS. HECTOR:

10   Q.  Good morning, Agent McGuire.

11   A.  Good morning.

12   Q.  Where do you work?

13   A.  I work for the FBI.

14   Q.  What is your title there?

15   A.  I'm a special agent.

16   Q.  How long have you worked with the FBI?

17   A.  Approximately 14 years.

18   Q.  What were you doing before you joined the Federal Bureau of

19   Investigation?

20   A.  I worked as a tax attorney and briefly as a defense

21   attorney.

22   Q.  Are you currently assigned to a particular squad within the

23   FBI?

24   A.  Yes.  I'm assigned to squad C43.

25   Q.  Is C43 assigned to investigate particular kinds of criminal

1    offenses?

2    A.  That is correct.  The focus for C43 is securities fraud.

3    Q.  How long have you been a member of C43?

4    A.  Since September 2009.

5    Q.  Were you with a different squad before that?

6    A.  Yeah.  The first six or seven years of my career with the

7    FBI was assigned to a white collar squad investigating public

8    corruption and environmental crimes.

9    Q.  Focusing on your current work on the white collar

10   securities fraud squad, what are your general duties and

11   responsibilities?

12   A.  As an agent my responsibility is to investigate cases.

13   That involves initiating cases, reviewing documents, conducting

14   interviews, operating sources, executing search warrants, and

15   also presenting cases to grand juries and at times testifying

16   in court.

17   Q.  You mentioned that one of your responsibilities is

18   executing search warrants.  Approximately how many search

19   warrants have you executed during the course of your career?

20   A.  I would estimate about 40.

21        THE COURT:  Pull the microphone a little bit closer.

22   Thank you.

23   Q.  And at the time of the particular incident that we are here

24   for today, January 2012, approximately how many search warrants

25   had you executed?

H1OMWEY1                        McGuire - direct

1   A.  I would estimate about 25.

2   Q.  Did you participate in the search of the offices of New

3   York Global Group and an apartment belonging to Ben Wey on

4   January 25, 2012?

5   A.  Yes, I did.

6   Q.  I am going to ask you some questions about that search.

7   But before I do that I want to focus on the days leading up to

8   the search.

9           Now, at that time, January 2012, were you the lead

10  case agent on the Wey New York Global Group investigation?

11  A.  No, I was not.

12  Q.  Who was the lead case agent on the case?

13  A.  Special Agent Matt Komar.

14  Q.  Approximately when did you learn that a search was going to

15  be conducted?

16  A.  It would have been a few days before the search.

17  Q.  And were you asked to participate on that search?

18  A.  Yes.

19  Q.  How did you prepare for the search in advance of the

20  execution?

21  A.  Well, a day or two before the search there was a briefing

22  at our office.  We have a little lunch room off the squad area

23  and there was a briefing by AUSA -- by the AUSA and by Matt

24  Komar.

25  Q.  Who participated in that briefing?

1    A.   I think it was -- I don't remember the individual people,

2    but I think it was the entire squad.   Whoever was scheduled to

3    participate in the search.

4    Q.   To the best of your recollection, what kinds of information

5    did Agent Komar and AUSA Massey provide to the group during the

6    presentation?

7    A.   They provided an overview of the case and the alleged

8    criminal activities, and then we discussed some logistics for

9    the search.   For example, where we would meet the day of the

10   search, who we would contact if we had questions.   I

11   specifically remember there was conversation or briefings about

12   one area we are not allowed to search because it involved an

13   attorney.

14   Q.   What, if anything, do you remember about the content of

15   that presentation with respect to the investigation and the

16   kind of crimes that were at issue?

17   A.   It was a big-picture overview.   We were told that it was a

18   securities fraud investigation that involved pump and dump

19   schemes, reverse mergers with Chinese companies, concealed

20   ownership interests, market manipulation.   This way it was a

21   fairly typical securities fraud case.

22   Q.   You said you were given specific instructions with respect

23   to the presence of a lawyer at the office.   What were those

24   instructions?

25   A.   We were told that one lawyer had an office or was working

1    within the offices of New York Global and that area was not

2    allowed to be searched.

3    Q.  Do you remember being given any other specific guidance

4    during that meeting with respect to any particularities about

5    the search that was going to be conducted?

6    A.  Well, we were provided with an ops plan that contained a

7    one-paragraph overview of the case and then all these

8    administrative details.

9    Q.  There is a binder in front of you with exhibits in it.  And

10   could you look at Government Exhibit 1, which has already been

11   admitted into evidence.  What is that?

12   A.  That is an operations order form or we would refer to it as

13   an ops plan.

14   Q.  Is that the operations overview that you just mentioned

15   being provided with during the course of that briefing?

16   A.  Yes.

17   Q.  And in your experience is it typical for AUSAs to present

18   information to agents during the course of a presearch briefing

19   as you described?

20   A.  No.

21   Q.  Now, did you review this operations plan in connection with

22   the briefing or before the search?

23   A.  I did.

24   Q.  Approximately how long did that briefing last?

25   A.  I would estimate about 45 minutes to an hour.

1  Q.  Following the presentation did you feel that you had an

2  understanding of the particular crimes that were being

3  investigated and for which you were going to be searching for

4  evidence during the search?

5  A.  Yes.

6  Q.  And what was your understanding of those crimes?

7  A.  As I mentioned, we were looking for evidence of securities

8  fraud.  There were certain companies involved -- there were

9  certain companies involved in the fraud.  We are looking for

10  evidence relating to these companies and then we are looking

11  for evidence of the securities fraud of financial transactions,

12  of concealed ownership.  I also remember there was a long list

13  of names and this related to the issue of round lot

14  shareholders.  So part of the investigation focused on all

15  these shareholders and what their connection was, so documents

16  related to these many shareholders is also something we are

17  looking for.

18  Q.  To the best of your recollection, were you provided with

19  access to any other documents prior to the search?

20  A.  So, it's difficult to answer.  I remember specifically

21  reviewing the affidavits, an electronic copy that was e-mailed

22  to me.  Because later on I became the case agent.  I'm just not

23  certain if I read it before the search warrant or when I took

24  over as the case agent.

25  Q.  Would it be your general practice to review a search

1    warrant affidavit prior to a search?

2    A.  It depends on the search and my involvement with the case.

3    Q.  Let's turn to the morning of January 25, 2012.

4            THE COURT:  Just a moment.  You do specifically

5    remember being e-mailed a copy of the affidavit?  Is that the

6    testimony?

7            THE WITNESS:  I believe we were e-mailed a copy of the

8    affidavit and I believe that I sort of reviewed it quickly

9    before.  But since so much time has passed, I saw this image of

10   me sitting in front of the computer reading the affidavit.  I

11   am just not certain if that happened in 2012 or 2013.

12   Q.  Let's turn to the morning of January 25, 2012.  What was

13   the first thing you did that morning in reference to this

14   search?

15   A.  Well, there was a staging area, typically before a search.

16   I think around 7:30 we met near the search location.

17   Q.  And prior to entering the search location, what was the

18   plan as far as what steps were going to be needed to be taken

19   as soon as the agents entered?

20   A.  So the plan was similar to all other search warrants.  The

21   first step is, when the agents enter the search area we have to

22   secure the area.  We have to make sure that there is no

23   threats, nobody with weapons.  The second priority is to make

24   sure that nobody can destroy evidence.  So we have to tell any

25   employees, for example, to step away from the computers.

1          The first step is to secure the area.  If there are

2     any employees we would typically ask them to go to a conference

3     room.  So once it's announced that the area is secured, then a

4     photographer would take photos of every room.  Typically we add

5     letters from A through Z, take photos of all the areas.  And

6     then once we are told that the photos are done, then we

7     initiate the search.

8          In this case it was a little bit different.  We were

9     also tasked with interviewing any employees at New York Global

10    Group.

11    Q.  Now, could you describe just in general terms what the

12    interior of the office space looked like?

13    A.  I remember there was a reception area, there were

14    conference rooms, there was a small kitchen, and there were a

15    number of individual offices.  It looked like a typical

16    Manhattan office space.

17    Q.  After you all entered the office, what was your first task?

18    A.  So I was assigned as one of the agents to conduct the

19    interviews, and I remember I conducted two or three interviews

20    of New York Global Group employees.  They were fairly short.

21    Their purpose was to get the name, address, contact information

22    and sort of a brief background about what their role was at New

23    York Global.

24    Q.  After you completed a couple interviews, what was your next

25    job?

1    A.   I would report to my supervisor, to Matt Komar, I'm done,

2    I'm free, what needs to be done.  And then I assisted with the

3    search.  Specifically I remember searching one of the larger

4    offices.

5    Q.   Were you alone in searching that office or was another

6    agent with you?

7    A.   So I think other agents might have come in to help, but I

8    sort of took this task on myself and said, I will search this

9    office and make sure the search of that office is completed.

10   Q.   At the time you entered that office to conduct the search,

11   did you have any particular documents with you to aid in your

12   search?

13   A.   Yes.  We had a copy of either the complete search warrant

14   or at least Exhibit A and B.  As I mentioned, the case was

15   somewhat unusual because it was a very long list of names.  So

16   when we do the search and we find documents, we have to match

17   them up with the names on the search warrant.  So I had a copy

18   of that list with me as I was conducting the searches.

19   Q.   Agent McGuire, just so the record is clear, can you flip in

20   your book to Government Exhibit 3.  And could you tell me if

21   the Exhibit A and B that are within that exhibit are the A and

22   B that you were just referring to?

23   A.   That is correct.

24   Q.   Now, could you describe for us how you proceeded to go

25   about the search of that particular office?

1  A.  So if you search a room, you want to pick one corner and

2  then work clockwise or counterclockwise and just make sure you

3  open every door, look in every folder to make sure you don't

4  miss anything.  You are looking for documents and electronic

5  media.  So I just systematically walked myself through the

6  office to find whatever documents were responsive to the search

7  warrant.

8  Q.  If you opened a drawer that had documents in it, did that

9  occur?

10 A.  That did occur.

11 Q.  Can you walk us through how you went through that drawer.

12 A.  If you open that drawer and you see file folders in there,

13 you look through the documents to determine whether they are

14 responsive to the search warrant.  And if we find documents

15 that are responsive, then we would take typically like the

16 folder, Redweld, with the documents.  And if they are not

17 responsive, we would continue the search.

18 Q.  Sitting here today, what, if anything, do you recall about

19 the specific documents you saw in that office space?

20 A.  So I remember that in the drawer there were some résumés

21 and so I was reviewing the résumés and I was looking at the

22 long list of names.  And then after looking at some résumés it

23 became clear these were people applying for jobs at New York

24 Global, so they were not on the list.  They were not pertinent

25 to the investigation.  And so I did not seize those documents.

1  Q.  Do you recall any other particular documents that you came

2  across in the office?

3  A.  Yes.  I remember there was a big large binder, I think it

4  was blue, and it contained corporate records relating to one of

5  the companies that was listed on the search warrant.

6  Q.  And what did you do when you came across that particular

7  binder?

8  A.  I set it aside and then later I made sure that it would be

9  put into evidence.

10  Q.  In general, as you are undertaking this process, if you had

11  a question about whether a particular document fell within the

12  scope of the warrant and weren't sure, what would be your

13  typical practice of how to handle that situation?

14  A.  So either you ask another agent who is searching with you

15  and sort of get a second opinion.  And if the answer cannot be

16  resolved, then it would ask the case agent.  And if it's a very

17  complicated issue, then I would probably ask the prosecutor.

18  Q.  After you completed your review of that office, were there

19  some documents that you left behind as not responsive to the

20  warrant?

21  A.  Yes.

22  Q.  And some documents that you took?

23  A.  Correct.

24          THE COURT:  Sorry.  In answering that, Agent, your

25  grammatical tense I wanted to ask you about.  You said:  You

1    ask another agent and if the answer cannot be resolved then I

2    would ask the case agent, etc.  Are you saying those are sort

3    of general practices or that's what happened here?  If you had

4    uncertainty about a particular document, you asked a fellow

5    agent.  Is your testimony that's what you generally do or that

6    happened here?

7          THE WITNESS:  That was a general statement.  I don't

8    remember in this specific search whether I asked another agent.

9    I think that binder I found related to one of the companies on

10   the search warrant.  So it was a pretty simple determination

11   that we would seize that binder with the documents.  I don't

12   remember coming across documents where I had a difficult time

13   determining whether it was covered by the search warrant or

14   not.

15         THE COURT:  Did you come across documents that were

16   let's say corporate documents but of an entity that was not on

17   the list?

18         THE WITNESS:  I just remember coming across some

19   documents like these résumés that I decided we would not seize.

20         THE COURT:  So you don't recall whether you came

21   across any sort of financial business records of entities not

22   on the list.  You have no memory of that?

23         THE WITNESS:  That is correct.

24   Q.  Agent McGuire, just so we are clear, do you have a specific

25   recollection of all of the documents that you looked through in

H1OMWEY1                        McGuire - direct

1   that office in 2012?

2   A.  No.  I just remember what I took, which was a binder, and

3   then there were maybe 20 pages of loose documents which were

4   either in the binder or were sort of seized together with the

5   binder.

6   Q.  Your recollection is that you took approximately a binder

7   and maybe 20 or so additional documents in that entire office

8   space?

9   A.  That is correct.

10  Q.  And is it your recollection that you left behind some

11  documents as well?

12  A.  That is correct.

13          THE COURT:  You've testified you left the résumés

14  behind.  Were there other documents that were left behind?

15          THE WITNESS:  Yes.  Because I know the search took

16  time.  I would estimate maybe 45 minutes.  If there only been a

17  binder, it would have been very easy.  I remember spending

18  quite some time in that office reviewing documents and sort of

19  making that determination.

20  Q.  Now, during the time that you were in the New York Global

21  office during the search, did you have occasion to observe

22  other law enforcement agents who were also conducting searches?

23  A.  Yes.

24  Q.  And could you describe generally what you were observing

25  while you were there?

1   A.  Well, I would see agents in other offices doing the same

2   thing I did.  You sit down, you review document by document.

3   It was a fairly large office.  And we realized this would take

4   several hours.

5   Q.  Agent McGuire, are the results of the search of the office

6   in the courtroom here today?

7   A.  Yes.

8   Q.  Could you point out for us?  And I know you may, with your

9   Honor's permission, need to get up.  Could you point out for us

10  which of the materials on the side of the courtroom is the

11  entirety of the materials seized from the New York Global

12  office that day?

13  A.  I can try.  I know there is one.

14           THE COURT:  You may stand.

15           MR. SIEGAL:  Should we all walk over there?

16           THE COURT:  We can.  If anybody is going to talk, then

17  they should be in front of a microphone.

18  A.  So these are the documents searched at the office, one

19  white bankers box.  The Fed Ex box contained the binder I

20  seized.  Then approximately six Redwelds with documents.

21           THE COURT:  The Redwelds were loose or were in other

22  boxes?

23           THE WITNESS:  These Redwelds are FBI Redwelds and then

24  documents are put in the Redwelds.

25           THE COURT:  Those documents that are in those Redwelds

H1OMWEY1                      McGuire - direct

1       came from?

2               THE WITNESS:  From the New York Global offices.

3               THE COURT:  They were in boxes are or they were loose

4       or a combination?

5               THE WITNESS:  That I don't know.

6               MS. HECTOR:  What I would suggest doing is the

7       government is going to sort of mark this group as a separate

8       exhibit so that there is a record of which items were seized

9       from New York Global.  That's No. 26, Government Exhibit 26.

10              THE COURT:  I'm sorry.  Give me your testimony again.

11      This set of documents here, the box and the Redwelds represents

12      all of the papers seized from New York Global?

13              THE WITNESS:  That's correct.

14              THE COURT:  From the office search.

15              THE WITNESS:  Correct.

16              THE COURT:  From that particular office that you were

17      involved in or its entirety?

18              THE WITNESS:  The entire office.  This Fed Ex box

19      contains the items I seized from room G, which is the blue

20      binder and the 20 pages of documents.  And everything else was

21      seized from other parts of the offices.  But not by me.

22      Q.  Just to be clear, this material that we are discussing here

23      today is the entirety of the materials seized from the offices

24      of New York Global Group on January 25, 2012?

25      A.  All the paper documents, correct.

1          THE COURT:  Any objection?

2          MR. SIEGAL:  Can I make a suggestion.  Since there are

3     not that many of them, that we read the control numbers into

4     the record for each of those files.  I think it will be a

5     little bit clearer.

6          THE WITNESS:  There is 1B10, 1B15, 1B28, 1B25, 1B39,

7     1B35, 1B33, and 1B44.

8          MR. SIEGAL:  Sorry.  Just for purposes of the record,

9     is it correct, sir, for people who may be looking at this

10    sometime down the road that there are lots of numbers that are

11    written in a long line, but you have just read out the last

12    four digits of combination letters and numbers in each of those

13    lengthier numbers.

14         THE WITNESS:  The first part is a case number.  It's

15    always the same.  318C New York 306442.

16         THE COURT:  Do you know, Agent, approximately how many

17    documents are contained in this pile?

18         THE WITNESS:  No.  I know this box -- the Fed Ex box

19    with the binder is pretty full and then this box I would say is

20    about two-thirds full.

21         THE COURT:  So the bankers box which we have

22    identified as --

23         THE WITNESS:  1B25.

24         THE COURT:  Is about two-thirds full with some papers

25    and folders and booklets and the like.  And then we have 1B28,

1   which is a binder.

2            THE WITNESS:  Correct.

3            THE COURT:  Large binder full of documents.  And then

4   we have separately six Redwelds.

5            MS. HECTOR:  Could we agree this is about 12 inches of

6   Redwelds, if my estimate --

7            MR. SIEGAL:  I am not sure I would agree to that.

8   Maybe eight.

9            THE COURT:  That's how I measure fish.

10           MS. HECTOR:  There is a record.

11           THE WITNESS:  I think if we put all these documents we

12  could all fit them in two bankers boxes.  If I took everything

13  out of the Redwelds and removed the packages, I think I could

14  put them in two bankers boxes.

15           THE COURT:  Mr. Siegal, you agree with that

16  description?

17           MR. SIEGAL:  It's his testimony.  I'm not objecting to

18  his testimony.

19           THE COURT:  I agree.

20           MS. HECTOR:  Your Honor, I would offer Government

21  Exhibit 26, which is how we marked that pile of materials.

22           THE COURT:  Thank you.

23           MR. SIEGAL:  No objection.

24           THE COURT:  Government 26 is admitted.

25           (Government Exhibit 26 received in evidence)

1   Q.  Agent McGuire, after you completed the search of that

2   particular office within New York Global, what did you do next?

3   A.  I completed one task, check in with the team leader, it was

4   either Matt Komar or my supervisor, and say, I'm available,

5   what needs to be done.  And at that time I was told that my new

6   assignment would be to go to 10 West Street where Mr. Wey had

7   an apartment and to assist other agents to secure that

8   location.

9   Q.  Approximately what time did you leave the offices of New

10  York Global?

11  A.  I think between 1 and 2:00.

12  Q.  Did you go alone or with another agent to the apartment?

13  A.  I don't remember how I got there.  We all sort of had cars.

14  I remember that once I arrived at the location there was a

15  total of four agents to secure the apartment because the

16  apartment was actually on two floors.  So there were two

17  entrances and we wanted two agents on each floor.

18  Q.  At the time that you left to go over to the apartment, had

19  a warrant yet been secured for the apartment?

20  A.  No.

21  Q.  What did you do when you got there?

22  A.  So my assignment was to stand in front of the door.  I went

23  to the building.  We talked to the doorman.  The doorman said

24  we were allowed to go up to the 37th floor.  We stood in front

25  of the apartment.  Since we didn't have a warrant we are not

1    allowed to enter yet.  But we wanted to make sure that nobody,

2    for example, would remove documents from the apartment.  So if

3    I had seen somebody come out with documents, I would have

4    alerted the prosecutor and asked for instructions on what to

5    do.

6    Q.  But did that happen?

7    A.  It did not.

8    Q.  Did you eventually receive a warrant for the apartment?

9    A.  Yes.  About two or two and a half hours later an agent came

10   over with a warrant, and then we executed the search warrant at

11   the apartment.

12   Q.  Did you review the contents of that warrant before

13   executing that search warrant?

14   A.  I reviewed it briefly and the items to be seized on the

15   list that is the same as the list for the office.

16   Q.  Do you remember approximately what time you all actually

17   entered the apartment?

18   A.  It would be around 4:30.

19   Q.  What did you do after entering the apartment in terms of

20   what was your first assignment?

21   A.  So I was one of the agents who, as I said before, the first

22   task is to secure the location.  It was a very large apartment

23   spread out on two floors.  So we walked quickly through the

24   apartment to make sure there was nobody there, no threats, no

25   knives, no guns.  And once that was completed, my main task was

1    to interact with Michaela Wey.  She was at the apartment.  I

2    sort of explained to her what is going on.  I also had to sort

3    of make sure that I'm with her at all times so that she

4    wouldn't remove any evidence or change anything.  And I

5    remember she was -- understandably, she was upset about this

6    search and she was very concerned about her kids coming home

7    soon.  I sort of talked to her about making arrangements for

8    the kids.

9    Q.  Was anyone else at the apartment when you entered besides

10   Michaela Wey?

11   A.  Yes.  There were a number of agents.  I know we would not

12   enter the apartment without six agents.  I think a lot of

13   agents had come over from the office search.

14   Q.  Besides the agents, was anyone in the apartment when you

15   entered besides Michaela, to the best of your recollection?

16   A.  I remember there were one or two attorneys at the

17   apartment.  I am not sure if they were present at the time we

18   entered.  I think they came maybe a little bit later.

19   Q.  And could you describe generally your interactions with

20   Michaela Wey and the arrangements for her children?

21   A.  So her concern was that the nanny would bring the kids home

22   shortly and she didn't want the kids to be scared or

23   traumatized with all of the agents searching the apartment.

24   And there was a fairly simple solution.  One part of the

25   apartment had the kids' rooms and the play area.  So we made

1    sure that the agents searched that area quickly.  And then when

2    the nanny came home, the kids could just go to that area and

3    sort of be segregated and be separated from all the search

4    activity and all the agents.

5    Q.  Did you also deal with Michaela Wey with respect to a safe

6    located in the apartment?

7    A.  Yes.  We located a safe in one of the bedrooms.  Typical

8    practice is, we don't want to break the safe, so we would ask

9    for a password.  I was told prior to the search that we are not

10   allowed to talk to Michaela Wey substantively about the

11   investigation because she was represented by an attorney, so

12   there is sort of a fine balance.  I told her that we would like

13   to get the combination for the safe so we don't have to break

14   it.  And I think what happened, that she called her attorney.

15   I then spoke with the attorney.  The attorney said he didn't

16   want to talk to me.  He wanted to talk to the supervisor.  And

17   I think then the issue was resolved in a manner where Michaela

18   opened the safe.  We searched it, we closed it, and we didn't

19   have to break the safe.

20   Q.  Do you recall if anything was seized from within the safe?

21   A.  Nothing was seized from the safe.

22   Q.  And who was present when the safe was opened?

23   A.  It was Michaela, it was one of the attorneys, my

24   supervisor, Mario Pisano, and myself.

25   Q.  Meaning one of the attorneys for Michaela Wey?

1    A.   Correct.

2    Q.   Besides your interactions with Michaela Wey with respect to

3    her children and the safe, did you participate in any of the

4    actual searching of the apartment?

5    A.   Only very limited when we did initial walk-through where we

6    are sort of looking for areas that contained documents or

7    computers.   And I might have told other agents there is a

8    closet with boxes, but I did not conduct the sort of careful

9    search for individual items.

10   Q.   Approximately what time of the search of the apartment

11   conclude?

12   A.   It was around 9:00.

13   Q.   At any point did any of the residents or attorneys for the

14   residents of the apartment express frustration with respect to

15   the pace?

16   A.   Yes.   Michaela was upset about the search because it's a

17   very slow process.   We have to do the search, the inventory.

18   And towards the end of the search there was some tension

19   because she wanted the search to wrap up.   Understandably, she

20   wanted us out of her apartment.

21   Q.   Agent McGuire, are you familiar with the particular

22   materials that were seized from the apartment as opposed to the

23   New York Global office?

24   A.   I'm familiar with both, yes.

25   Q.   Again, drawing your attention to the boxes on the side of

H1OMWEY1                      McGuire – direct

1   the courtroom, there are numerous boxes separated from the

2   boxes we just discussed in Government Exhibit 26 being the

3   contents of the materials seized from the office.  Were the

4   other boxes the materials and the entirety of the materials

5   that were seized from the apartment?

6   A.  Yes.  That is the entirety of all hard copy materials

7   seized from the apartment.

8   Q.  And so I think we probably should proceed the same way we

9   did with the office.  Just read into the record the 1B numbers

10  for those boxes and the total number.

11          THE COURT:  OK.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. HECTOR:

2   Q.   Agent Maguire, would you mind reading for us the 1-B

3   numbers meaning the number following the case number for each

4   of the boxes here that we have as the contents of the materials

5   seized from the apartment?

6   A.   There's one box 1-B 232, one of box 1-B-36-T, one box

7   1-B-40, one box 1-B-23, there's one envelope, 1-B-1, an

8   envelope 1-B-17, a Redweld 1-B-22, a Redweld 1-B-31, a Redweld

9   1-B-42, a box 1-B-34, one box 1-B-38, one box 1-B-19, one box

10  1-B-43, one box 1-B-29, one box 1-B-45.  There's a black

11  suitcase 1-B-24, a Redweld 1-B-6, one box is 1-B-20, one box

12  1-B-36, one box 1-B-37, one box 1-B-32, one box 1-B-30, one box

13  1-B-21 and one box 1-B-27.

14          MS. HECTOR:  OK.  The government would mark this as

15  Government Exhibit 23 and move its admission?

16          THE COURT:  Mr. Siegal.

17          MR. SIEGAL:  Can I just ask a couple questions of the

18  agent in connection with this?

19  VOIR DIRE EXAMINATION

20  BY MR. SIEGAL:

21  Q.   Are these the original boxes that all this stuff was

22  contained in or are some of these FBI boxes and some of these

23  the Weis' boxes?

24  A.   The outside all FBI boxes, some of the boxes when you open

25  them you see the original box.

H1OAAWEI2                        Maguire - Direct

1   BY MS. HECTOR:

2   Q.  Agent Maguire, may I just ask you, the outside of all of

3   these boxes are FBI boxes or only some of them are FBI boxes?

4   A.  I misspoke.  Some boxes are FBI boxes.  Some boxes are

5   original boxes.  Some boxes are FBI boxes containing the

6   original box.

7   BY MR. SIEGAL:

8   Q.  Perhaps, you could go box-by-box and tell us which one is

9   which so that we know.

10  A.  So, I can tell that these boxes that have the number on it

11  03325 are from Staples.  Those are not the FBI boxes.  So that

12  would be one, two, three, four, five, not this one, six, seven,

13  eight, nine, ten, 11, 12 Staples boxes.

14  Q.  So, the Staples boxes are the boxes that were from the

15  apartment and the other boxes are FBI boxes.

16  A.  Right.  But some of the other boxes may contain within them

17  a statements box.  It depends sort of how good the box was,

18  whether we could seize it or put it in a different box.

19              THE COURT:  I'm going to admit -- what was the number

20  again?

21              MS. HECTOR:  Government Exhibit 23.

22              THE COURT:  Government Exhibit 23.

23              MR. SIEGAL:  No objection.

24              (Government's Exhibit 23 received in evidence)

25              THE COURT:  If you want to keep it orderly, if you

1   want to ask further questions and I may have some, but just for

2   clarity this is still direct examination.  So, I think I

3   counted it's approximately 17 boxes.  Not all of them are

4   bankers boxes.

5           I presume not all of them are full; is that right,

6   agent?

7           THE WITNESS:  That is correct.

8           THE COURT:  And then some additional manila envelopes

9   just to give a sense of the quantity.

10          MR. SIEGAL:  And the suitcase.

11          THE COURT:  Which, of course, the suitcase which has a

12  few manila folders of material as we discussed yesterday.  OK.

13          (Pause)

14          THE COURT:  You may proceed.

15  Q.  Agent Maguire, could you describe generally the process by

16  which these materials are maintained in the custody of the FBI

17  after seizure.

18  A.  The first step is that one of the agents would transfer all

19  of the evidence to the FBI office in New York.  Then there's

20  some paperwork submissions given to the evidence unit of the

21  FBI.  They then transport it to a warehouse and then if we need

22  it we can make request for the evidence when it comes from the

23  warehouse to the evidence unit and from the evidence unit back

24  to the agents.

25  Q.  And so are these materials maintained in the same condition

1    as they were when they were seized from the apartment and the

2    office?

3    A.   That is correct.

4    Q.   Now, Agent Maguire, you are aware that the defense has

5    identified certain items that according to the defense were

6    seized improperly.  You are aware of those claims?

7    A.   Yes.

8    Q.   Prior to testifying today did you go back to some of these

9    original boxes and try to locate where certain of those

10   materials came from within the original boxes?

11   A.   I did.

12   Q.   OK.  And what based on your training and experience as an

13   agent is the relevance of understanding where a particular item

14   was located within the seized materials?

15   A.   Well, at times it matters where an item is located because

16   then it might help us link this item to a specific person or to

17   another document.

18   Q.   So, Agent Maguire, I'm going to start with the box that

19   is --

20           MS. HECTOR:  Your Honor, just for the record, I have

21   labeled three boxes within Government Exhibit 23 as Government

22   Exhibit 23-A, 23-B and 3-C because I'm going to ask some

23   specific questions about the contents of those.

24           THE COURT:  You want to identify by box what is A, B

25   and C.

1          MS. HECTOR:  I will.  So Government Exhibit 23-A is

2    1-B-43, 23-B is 1-B-29 and 3-C is 1-B-49.

3          THE COURT:  Thank you.

4    Q.  Now, Agent Maguire, I am going to hand you what's marked as

5    Government Exhibit 23-A 1-B-43.  Now, could you describe

6    generally approximately how full is that box?

7    A.  It's about half full.

8    Q.  OK.  And is that one of the boxes that you indicated is an

9    original box from the apartment or is it an FBI packaged box?

10   A.  This appears to be an FBI packaged box.

11   Q.  OK.  And --

12         MR. SIEGAL:  I'm sorry.  Which box is this 1-B-43?

13   Q.  Could you flip through some of the contents of that box and

14   just describe for us how is the material packaged within the

15   box?

16   A.  I see two larger Redwelds about two or three inches thick

17   and then some thinner yellow folders and some loose sheets of

18   paper.

19   Q.  To the best of your knowledge is that the way the material

20   was packaged when it was seized?

21   A.  Yes.

22   Q.  Now, flipping through some of those materials, could you

23   describe generally the contents of this box by sort of

24   categories of information?

25   A.  So there's some tax records in here, a payroll records, a

H1OAAWEI2                    Maguire - Direct

1    brokerage account statement.  I see more tax records.  There's

2    some real estate records.  This looks like another tax record.

3    Q.  And so the record is clear, those descriptions you just

4    provided are within one Redweld, correct?

5    A.  That is correct.

6             THE COURT:  Is that Redweld the original that those

7    documents were found in or that's an FBI supplied Redweld?

8             THE WITNESS:  I believe it is an original Redweld.

9    It's hard to say for certain.

10            THE COURT:  You don't know for certain.  Do you know

11   where these documents were found?  You know they were in the

12   apartment?

13            THE WITNESS:  Right.  I would have to check the log.

14   I did not seize these records.

15   Q.  Right.  Agent Maguire, just to answer the judge's question,

16   I can refer you to the log which is in the Government Exhibit

17   binder that's in front of you.  Would that enable you to tell

18   us where that was seized from?

19   A.  Yes.  I also see on the box's actual label that says

20   recovered from area "D" by desk.

21   Q.  And I didn't understand.  Was that "E" or "D"?

22   A.  "D" as in "delta".

23   Q.  OK.  And if you look at Government Exhibit 11, is area D

24   indicated on the sketch of the first floor of the apartment?

25   A.  Yes.

1    Q.  OK.  And what is it labeled?

2    A.  "D" is labeled office.

3    Q.  OK.  So does it indicate on that box that this material was

4    recovered from that area of the apartment?

5    A.  Yes, it does.

6    Q.  So you went through a Redweld, are there other materials in

7    that box?

8    A.  Yes.  There's another Redweld.  Next document is a yellow

9    manila folder which is labeled -- it has "real estate records

10   and tax records".

11          THE COURT:  Do you know whether that manila folder was

12   original or supplied by the FBI?

13          THE WITNESS:  That was definitely an original folder

14   because there's some handwriting on it.

15   Q.  What's the handwriting?

16   A.  It says Kitter Offshore Fund Statement and Fees.  There's

17   another folder that says Kitter Fund $1.3 million loan to Noba,

18   N-O-B-A, and it also contains a loan agreement and some

19   handwritten notes.  There are some loose documents.  I would

20   say about 15 pages with a TD Ameritrade brokerage account

21   statement from Michaela Wei.  And then there's a large Redweld

22   maybe four or five inches containing several manila folders

23   containing more financial records.

24   Q.  OK.  Now, Agent Maguire, have you placed tabs on some of

25   the materials within that box that the defense has alleged were

1  improperly taken?

2  A.  I have.

3  Q.  OK.  And could you just pull out some of those documents

4  starting maybe with the first one?

5  A.  So, in the very fist manila folder, first Redweld we talked

6  about, for example, the very first page is a American Express

7  Business centurion and travel statement for Michaela Wei.

8  Q.  OK.  Now, Agent Maguire, you testified that you are not the

9  particular agent who seized these materials, correct?

10  A.  That is correct.

11  Q.  OK.  But, nevertheless, sitting here today would you have

12  seized that material as within the scope, that document was

13  within the scope of the warrant?

14  A.  Yes, I would.

15  Q.  And why is that?

16  A.  Well, the American Express statement would help us identify

17  financial records and also the specific statement has travel

18  information.  There's a Delta Airlines flight.  And travel

19  information was something that was both covered by the search

20  warrant and important to the investigation.

21  Q.  All right.  Now, moving to the second tab that you placed

22  within that Redweld, what kinds of documents are contained at

23  that tab?

24  A.  So, there are copies of passports for about eight or nine

25  individuals.

1  Q.  And who are those individuals?

2  A.  So, there's Michaela Wei, Jimmy Wei, Tommy Wei, Ying Mao

3  Wei, Ming Lee, Tianya Wei, Michaela Wei and Jimmy Wei.  There's

4  one more, Tommy Wei and Emma Wei.

5  Q.  Now, again, you said that you weren't the particular agent

6  who seized that set of -- oh, are those passports within that

7  Redweld, the passport photo copies?

8  A.  Yes.  And the document right behind it is a check, then

9  there's insurance card and more brokerage account statements.

10          THE COURT:  I want to make sure I'm clear.  I believe

11  your testimony was that you don't know if that Redweld was

12  original or supplied by the FBI; is that correct?

13          THE WITNESS:  That is correct.

14          THE COURT:  So, you don't know if those documents were

15  together, the whole set of documents that are in that Redweld

16  were all together in some way.  We just know that they were in

17  the office, right?  Do we know anything more than that based on

18  your knowledge?

19          THE WITNESS:  Yes.  What is clear is the way they're

20  folded and all these passports were together, all these copies

21  of the passports, all eight or ten of them were together.

22          THE COURT:  Fair enough.

23  Q.  OK.  Now, sitting here today if you had come across that

24  set of passports all together, would you have seized those as

25  within the scope of the warrant?

1    A.  Yes, I would.

2    Q.  Why is that?

3    A.  Well, some of them relate directly to Mr. Wei and Michaela

4    Wei but I also understood at the time that part of the

5    investigation related to concealed ownership and ownership of

6    documents by relatives of Mr. Wei, and some of these names on

7    the passports were specifically mentioned in the search

8    warrant.

9    Q.  And finally, there's another set of documents that you've

10   tabbed in there?

11   A.  Yes.  They're sort of a purple paper folder that's titled

12   Ying Mao Wei, Mr. and Mrs.~Benjamin Wei.

13   Q.  Okay.  An if you open that folder could you describe for us

14   the kinds of documents that you see within there?

15   A.  So, on the left side there's one page with driving

16   directions.  The next page says "settlement agreement".  Then

17   on the back of the settlement agreement it's something, a

18   document titled "Position Yourself for Good Recommendation" and

19   then there's a resume or what looks like a school record for a

20   child.

21   Q.  So, the record clear within the folder that contains some

22   school record printed on the back of one of those records

23   regarding, I think you said an interview, is a settlement

24   agreement?

25   A.  That is correct.

1   Q.  OK.  And looking at settlement agreement document, what do

2   you understand a settlement agreement to be?

3   A.  So, this looks like some contract relating to a financial

4   transaction.

5   Q.  So, it's clear that's printed on the back of the -- what's

6   on the flip side of that page?

7   A.  It's like an outline on how to get good recommendations

8   from a teacher.

9   Q.  On the same document?

10  A.  Correct.

11  Q.  Now, sitting here today if you came across this folder

12  during the course of a search, would you have seized that

13  material?

14  A.  I would say yes.

15  Q.  Why is that?

16  A.  Because it contains some financial records.  And one thing

17  we don't do during a search is we don't want to pull out

18  folders from -- sorry -- pull out documents from a folder

19  because then we sort of destroy the integrity of a document.

20  So, if I had a folder like this and find a pertinent document

21  it in there I think the proper approach to take would be to

22  take this folder.

23  Q.  Agent Maguire, I am going to hand you what's been marked as

24  Government Exhibit 23-B which is the box marked 1-B-29.

25          Now, Agent Maguire, is there a bankers box within that

1    box?

2    A.  Yes.  And this is -- there's a Staples box within the FBI

3    box and the Staples box was seized at the search location.

4    Q.  OK.  Could you pull that out of the outer box for a moment.

5    This is a box, Agent Maguire, that was taken in this -- this

6    box itself was taken out of the apartment?

7    A.  Correct.  And there's a label on the boxes as item 10

8    recovered from area "D" closet.

9    Q.  So, is it your understanding that the contents of that box

10   is as it appeared the day of the search?

11   A.  Correct.

12   Q.  And could you read for us -- is there any handwriting on

13   the outside of the box?

14   A.  Yes.  It says "spend old personal files".

15   Q.  And is that handwriting that was on the box at the time or

16   that the FBI wrote on the box?

17   A.  That was on the box at the time of the search.

18   Q.  And could you give us a sense of how full that box is?

19   A.  It's about half full.

20   Q.  And once again, could you just describe for us the kinds of

21   contents meaning, like how they are contained within the box,

22   Redwelds or folders or loose?

23   A.  So, there are one, two, three Redwelds and within the

24   Redwelds there are approximately five folders each.

25   Q.  And could you just walk us through at a high level the

1     kinds of folders and materials that are contained within those

2     Redwelds?

3     A.  So, the first one contains divorce records.  The second

4     one, real estate records relating to a house.  There are some

5     education records.  There are tax records, more tax records,

6     more tax records.  This looks like a New York Global capital

7     LLC general ledger.  I see here bank statements and copies of

8     checks, a Chase bank statement, a credit card statement, a

9     brokerage account statement from Seaboard Securities Inc.

10    There are bank statements or checks.  That's what's in the box.

11    Q.  Okay.  Have you tabbed a particular document that the

12    defense has indicated or in this case was seized outside of the

13    scope of the warrant?

14    A.  I have.

15    Q.  And what is that document?

16    A.  It is a letter dated February 15, 1992.

17    Q.  OK.  And looking at this letter and where it was located

18    within the folders of this box, if you had been the agent that

19    had reviewed this box of materials on the day of the search,

20    would you have seized that within the scope of this warrant?

21    A.  Yes.

22    Q.  And why is that?

23    A.  Well, we would have seized either the entire box or at

24    least this Redweld because it contains financial records, real

25    estate records and we don't want to separate documents within a

1    Redweld.  I also know that on that letter there's a reference

2    to Ben Wei and a $10,000 payment.

3    Q.  OK.  And now, final box, Agent Maguire, that I'd like to

4    direct your attention to is Government Exhibit 3-C which is

5    marked on the outsides as with 1-B-49.  And once again, I'm

6    just going to place it next to you and ask is there a bankers

7    box within that box?

8    A.  Yes, there is.

9    Q.  And if you could pull that out.  Is that bankers box an

10   original box that was located within the apartment as opposed

11   to something that the FBI created?

12   A.  Yes.  This is another Staples box.

13   Q.  Oak.  Is there handwriting on the outside of that box?

14   A.  Yes.  It says Michaela, old personal files, immigration,

15   school, other.

16   Q.  And if you could turn to the other side of that bos.  Is

17   there additional handwriting on other side?

18   A.  It says:  Michaela, old personal files, immigration, U.S.

19   citizenship, schools, car, car insurance, Flex Jet, other

20   personal documents.

21   Q.  And now just flipping again or looking inside that box once

22   again, could you tell us approximately how full that box is.

23   A.  Also about half full.

24   Q.  And how are the materials within that box packaged?

25   A.  So, that two Redwelds one, about one inch, about two inches

1    containing smaller folders.  Then there are some smaller

2    folders, one more Redweld and then some larger envelopes with

3    documents.

4    Q.  Could you once again just sort of flip through generally

5    and tell us the kinds of material that you see within that box?

6    A.  So, there's some divorce papers in here.  I see a passport,

7    some I.D.s, some immigration records.  There is a folder called

8    P and B Travel.  There is a management agreement what looks

9    like some financial statements, some Flex Jet records.

10   Q.  Flex Jet?

11   A.  Flex Jet.

12   Q.  Do you know what Flex Jet is?

13   A.  I don't.  I assume it's a jet service that you can charter

14   but I don't know.

15   Q.  OK.

16   A.  There's a corporate resolution.  I see a copy of a check.

17   I see a binder with about two inches of phone records from

18   AT&T, some insurance records, some records relating to a car.

19   I see some a bill.  I see a copy of a check.  There is about 30

20   copies of payroll statements.  I see more copies of checks and

21   payroll statements, travel records, tax returns.  This looks --

22   an income statement for P and B Travel Inc.  I see more tax

23   returns.  There's a large envelope with a law review

24   certificate, a Bank of Texas statement, some school records and

25   then two gray envelopes with medical records.

1   Q.  OK.  Now, have you within this box also tabbed certain

2   materials that the defense has alleged were taken outside the

3   scope of the warrant?

4   A.  Yes.

5   Q.  OK.  Now, putting aside, the medical one for now, the

6   first --

7          THE COURT:  Your description of that, counsel, you're

8   saying those are --

9          And, Mr. Siegal, you can weigh in.

10         They have been identified repeatedly as what defense

11  marked is outside the scope of the warrant.

12         MS. HECTOR:  Your Honor, just so the record is clear.

13  Q.  Agent Maguire, prior to your testimony here today did you

14  go through some of these boxes with the prosecutors and for

15  ease of reference during your testimony were tabs placed on

16  some of the items that the defense had identified in its moving

17  papers as improperly seized so that you could testify as to

18  where they were located within the boxes?

19  A.  That is correct.

20         THE COURT:  But defense didn't sign on to that project

21  I presume and it's not meant to be exhaustive of what the

22  defense has identified?

23         MS. HECTOR:  It's not necessarily exhaustive of what

24  the defense has identified.

25         THE COURT:  All right.  Go ahead.

1    Q.  So, Agent Maguire, the tab that you placed, what kinds of

2    records are located on the tab?

3    A.  So, I tabbed this one Redweld and it looks like it contains

4    Michaela Wei's school records.  And there's a document related

5    to Haynes and Boone Retirement Plan Master Trust.  There is a

6    resume in here and then some University of Central Oklahoma

7    records.

8    Q.  Now, Agent Maguire, I know you have said that you were not

9    the person, the agent who seized this material.  But sitting

10   here today if you had been the agent to review this box of

11   materials, would you have seized the education related records

12   that are within this box?

13   A.  So, to be honest I think it's a judgment call that the

14   education records itself would not be covered by the warrant.

15   For example, if we had found the education records on the

16   coffee table I would definitely not have seized them.  If they

17   are in box with financial records it's more complicated and I

18   think they're also within this Redweld, there are some

19   financial records.  So, I think this is sort of a question

20   where ideally you would ask the case agent or maybe the

21   prosecutor.

22   Q.  And you noted that there were two --

23           THE COURT:  I'm sorry.  You would ask because they're

24   with the financial records are school records and the like?

25           THE WITNESS:  Right.  And it's not an exact science.

1      It sort of depends on how many there are.  If I had a Redweld

2      with all tax returns and one school record, I think the best

3      practice is to take the Redweld.  If it's a Redweld with mostly

4      school records and one financial it becomes more difficult.

5      And in this case where there's a box with a lot of financial

6      records, the best practice would probably be to seize the box

7      sort of to preserve the evidence in the way they were found.

8      And if we remove things -- exposures so the allegation that

9      maybe we changed evidence.  But in this sense the educational

10     records themselves are not covered by the search warrant.  It's

11     sort of a difficult judgment call.

12             THE COURT:  With respect to the financial records, any

13     financial records pertaining to the ways you would presume?

14             THE WITNESS:  Absolutely.  I think the warrant was

15     very.  Clear financial records as understanding from the

16     investigations done at the time, the financial arrangements for

17     the Wei family was very complex, involved a lot of off shore

18     trust, a lot of components.  So, any record we would find

19     relating to way finances would be very important for the

20     investigation.

21     Q.  Now --

22             MR. SIEGAL:  I'm sorry, your Honor.  Could I hear that

23     last answer read back.

24             THE COURT:  Sure.

25             (Testimony read back)

1         THE COURT:  You may proceed, counsel.

2    BY MS. HECTOR:

3    Q.  Agent Maguire, you indicated that these boxes were

4    preserved in the state they were when they were -- oh, sorry.

5    Actually.  Let me strike that.

6         You mentioned there were two gray envelopes within

7    that box, correct?

8    A.  Correct.

9    Q.  What is within those two gray envelopes?

10   A.  There is a cover letter and then two pages of x-rays in one

11   and also two pages of x-rays in the other.

12   Q.  Now, same question with respect to those two gray

13   envelopes.  If you had been the agent to go through this box of

14   materials, would you have seized those gray envelopes as within

15   the scope of the warrant?

16   A.  I would have not.

17   Q.  Why not?

18   A.  The medical records were not covered by the warrant.  So,

19   we wouldn't seize them.

20   Q.  Are they separately contained within that box in those gray

21   envelopes?

22   A.  Yes.

23   Q.  Now, you indicated that these boxes are preserved in the

24   state that they were when they were seized.  How do you know

25   that?

1    A.  Well, the way we transport and handle evidence and have a

2    chain of custody, we make sure that evidence doesn't get

3    changed.  I guess, the order of the folders within the box that

4    could have been changed while, whether it was reviewed by the

5    agent or reviewed later on but the documents in this box were

6    all the way they were originally when we found them.

7    Q.  When you say order of documents within the box you mean the

8    order that the particular Redwelds or files are placed in the

9    box may have switched.  So, for instance, manila folder may

10   have been the first and it may have been the second but the

11   contents would have been preserved?

12   A.  Correct.  And also the contents of each Redweld or each

13   folder would have been preserved.

14   Q.  OK.  We can put aside that box.  I'm going to move on to

15   another topic area.

16          MR. SIEGAL:  Perhaps a good time, your Honor, for a

17   morning break?

18          THE COURT:  Not yet, unless there's some urgency of

19   some kind.

20          MR. SIEGAL:  I'll be fine, your Honor.

21          THE COURT:  If I take requests for everybody it

22   gets -- all right.  Go ahead.

23   BY MS. HECTOR:

24   Q.  At the time of the search of New York Global Group and the

25   Wei apartment in January of 2012, you were not the case agent

1   on the case, correct?

2   A.  I was not.

3   Q.  At some point did you become the lead case agent on this

4   investigation?

5   A.  Yes, in early 2013.

6   Q.  When you became the lead case agent, besides your

7   participation in the searches we just described had you had any

8   other role in connection with the investigation?

9   A.  No.

10  Q.  And when you became the lead case agent what were the steps

11  that you took to get yourself up to speed and familiarize

12  yourself with the investigation?

13  A.  Once I knew that Special Agent Matt Komar received his

14  transfer and I would become the new case agent, I spoke with

15  him and he gave me an update on the case.  We also transferred

16  some of the evidence that was in his custody into my custody.

17  I met with the prosecutor to also get an update and talk about

18  investigative strategies.  I reviewed the case file and very

19  carefully read the search warrant affidavits.

20  Q.  At the time you took over, do you know what the status of

21  the electronic review of the materials seized from electronic

22  devices at the apartment and the office was?

23  A.  Yes.  In early 2013 I was told that the taint review had

24  not yet been completed so I was not allowed to review the

25  electronic evidence yet.

1    Q.  What do you mean by taint review had not been completed?

2    A.  So, we learned in the course of the investigation that some

3    of the documents seized might be attorney/client privilege

4    documents or other privilege documents.  And to understand the

5    procedure in that case the investigating agents and prosecutors

6    do not review the evidence until it's cleared by tainting so

7    that agents and prosecutors assigned to the taint team would

8    review the evidence, pull out anything potentially privileged

9    and once that review is completed, then investigative team can

10   review the documents.

11   Q.  Did you have a sense of the volume of the entire electronic

12   evidence poll was from the office and the apartment?

13   A.  I knew that it was a very large in part because numerous

14   computers were imaged, phones were imaged, thumb drives were

15   imaged and also a server was imaged.  So it was a large volume

16   of electronic records.

17   Q.  What is your understanding of the steps that needed to be

18   taken to complete the privilege or taint review as you describe

19   it prior to your access to review of the electronic material?

20   A.  Well, I know there was a list with attorney names.  My

21   understanding is that somebody reviewed the electronic phone

22   book found on Ben Wei's cellphone and identified in the

23   attorney in his phone book, I think other attorneys were added

24   as the government became aware of other attorneys.  And there

25   was a big list of attorneys.  I think it might be 100 or 200

1   names.  And then the taint agents were tasked with accessing

2   the electronic record to a server and tagging any

3   communications that related to any of these one or two hundred

4   attorneys.  Once they tag it a system is set up that I cannot

5   view those records.

6   Q.  Do you know approximately how many files were tagged and

7   segregated as potentially privileged?

8   A.  I was told it was 1295.

9   Q.  And do you know approximately when that exercise was

10  completed?

11  A.  It was in early 2013.  I know that in March 2013, I

12  initiated the review and so at that time I had gotten the green

13  light that the taint review was completed.  I was now allowed

14  to access electronic records.

15  Q.  To be clear, did you ever access those materials that were

16  segregated as potentially privileged?

17  A.  No.

18  Q.  And to your knowledge, did anyone on the prosecution team

19  separate and apart from people assigned to the privilege review

20  access those materials?

21  A.  No.

22          THE COURT:  Counsel, let's take Mr. Siegal up on his

23  application for a break.  Ten minutes please.

24          (Recess)

25          THE COURT:  Agent Maguire is under oath and counsel

1    you may proceed.

2              MS. HECTOR:  Thank you, your Honor.

3    Q.  Agent Maguire, what was the plan -- after the privilege

4    review was completed and those items were segregated, what was

5    the plan for how you were going to go about conducting a

6    substantive review of the electronic evidence?

7    A.  Well, one of the steps was that I was provided with a list

8    of search terms about the prosecutor and the plan was to search

9    each of the search terms within the electronic evidence and use

10   that as a way to find responsive documents.

11   Q.  And just to sort of further describe that plan, if you

12   found responsive documents what were you to do?

13   A.  Responsive documents, we tagged them basically as

14   pertinent.  Once we're done with the review, we tell the

15   commuter team I completed the review of this evidence, please

16   make a copy of all tagged documents.  And that sort of then

17   gets separated and then continue throughout the investigation

18   we work off those tagged documents.

19   Q.  Agent Maguire, if you could turn in your binder to what's

20   been marked for identification as Government Exhibit 19.  Oh,

21   sorry.  I believe this is in actually.

22             THE COURT:  Nineteen is in.

23   Q.  Nineteen.

24   A.  OK.

25   Q.  Do you recognize that document?

1    A.  I do.

2    Q.  What is it?

3    A.  This is a list of search terms that was provided to me by

4    AUSA David Massey.

5    Q.  Now, were those search terms identical to the list of

6    individuals and entities listed on Exhibit B to the warrant?

7    A.  No.

8    Q.  Did you notice that when you received the list?

9    A.  I did.

10   Q.  And what, if anything, did you do given that that list

11   included materials that wasn't on Exhibit B?

12   A.  Well, the AUSA had told me that he had compiled that list

13   based on names in the search warrant and then had added some

14   names that would likely lead to documents covered by the search

15   warrant.  For example, there are the some names of "Bing" was

16   added if I know that, if I search for the "Bing" and I find a

17   document with the "Bing" and it this would likely lead to

18   records leading to Ben Wei and New York Global.

19   Q.  And after you reviewed the search terms list what, if any

20   conclusion did you reach regarding whether these search terms

21   would be fairly designed to attempt to locate materials

22   responsive to the warrant?

23   A.  Well, for the banks, I think it was pretty clear.  I know

24   there were some addresses added.  And then as I would do the

25   review I see what the search results are.  So, I can make sure

that the search results are covered by the warrant.  My

understanding was that I can tag all the documents covered by

the search warrant and just because on the list that's not good

enough it has to be on the search warrant but that this list

would help us locate those documents.  The computer evidence

has a lot of records so, we can't really look at them

one-by-one because they're too many.  So, we use the search

terms to sort of find the pertinent documents.

Q.  Approximately, when did your search term review of the

electronic evidence begin?

A.  A few days after I got this e-mail in early May.

Q.  And just so the record's clear, is there a date on this

list of search terms that you were provided?

A.  Yes.  The list says as of May 3, 2013 and I think I started

this search on May 8.

Q.  And where did your search term review take place?

A.  So, first I tried doing the search from my desk because we

have remote access to the server that contains all electronic

documents but it was extremely slow and I talked to the

computer team and they told me that it would be faster if I

went to the office in New Jersey where the server's located and

did the review from New Jersey.

Q.  And so to be clear, when you say your desk, are you talking

about your desk over at 26 Federal Plaza?

A.  Correct.

1   Q.  And so did you do that, travel to the offices in New Jersey

2   to conduct this search?

3   A.  Yes.  I would drive my car from my apartment in New Jersey

4   an then spend all day in New Jersey doing really only one

5   thing.  That is a review of the electronic records.

6   Q.  Agent Maguire, I'd like to call your attention to what has

7   been marked for identification as Government Exhibit 16 in your

8   binder.

9   A.  OK.

10  Q.  Do you recognize that document?

11  A.  I do.

12  Q.  What is it?

13  A.  So, the printed portion's a list that I was provided with

14  by the prosecutor.  And all the handwriting is mine and I will

15  jot down, for example, the dates I did the review.  I would

16  sort of check off the names I was able to search and then make

17  annotations to my searches.

18          MS. HECTOR:  The government offers Government Exhibit

19  16.

20          MR. SIEGAL:  No objection, your Honor.

21          THE COURT:  Government 16 is admitted.

22          (Government's Exhibit 16 received in evidence)

23          MS. HECTOR:  Thank you, your Honor.

24  Q.  Now, Agent Maguire, let's just walk through this document

25  in a little more detail to what you just described.  Could you

1    walk us through and explain to the Court just starting with the

2    first page what the handwriting on this list indicates,

3    beginning with the notation to the right side of the page that

4    says 5/8/613, what was that?

5    A.   That's the date I conducted the search.

6    Q.   Was your practice to jot down the date throughout this

7    document when you went and conducted the search term review?

8    A.   I wrote down some dates.  It's possible that it's searches

9    the dates I did not write down but if this date is on this

10   document that would be a date I did the search.

11   Q.   And approximately, how many times did you travel to the

12   office in New Jersey to conduct this search term review?

13   A.   About ten times and then I would spend all day at the

14   office in New Jersey to conduct the search, so ten days.

15   Q.   Now, looking at additional handwriting on this, we see some

16   notations both to the left of the terms and then to the right

17   just starting to the left, what are those notations, the

18   checkmarks or zeros?

19   A.   So, the checkmarks indicate that I finished this search

20   term.  I don't really remember the zeros.  Seems something I

21   jotted down and then stopped doing.

22   Q.   Then to the right of each search term there's often

23   initials and numbers.  Could you describe for us what those

24   notations indicate?

25   A.   Right.  So, the way the data was processed I couldn't, for

example, search for a combination of search terms so I had to

search for individual words with the hand operator.  So, the

first one I would check for R-U-E, Ferdinand-H-O-D-L-E-R and so

I wrote down "R" plus "F" plus "H" meaning I search add the

word "Rue" and "Ferdinand" and "Hodler" and got 43 responsive

documents.

Q.  OK.  And so does that description of the meaning of the

letters and the plus marks and numbers, is that consistent

throughout this document?

A.  Yes.

Q.  OK.  And then we see sometimes that words are circled.

What does that mean?

A.  So, some search terms had a lot of responsive documents and

I determined might not be responsive to the search warrant.

For example, the first one that's circled is "Alex" and "Lee",

two very common names.  If I do a search for "Alex" and "Lee" I

got a large number of hits because any document that contained

both "Alex" and "Lee" but not necessarily "Alex Lee".  So I

reviewed them and said these are too many false positives.  And

so, I determined that was not a good search word and I wouldn't

tag any of the results as pertinent.

Q.  So, if there's a circle around a phrase or a word, that

means you did not tag documents because you determined that

search term to be basically a bad search term in terms of

resulting in responsive hits?

1    A.  Correct.

2    Q.  And just turning the page sometimes in addition to circles,

3    words are crossed out.  What does that mean?  So, for instance,

4    on the third page "Finchly International Investments" there's

5    line through "international investments" and then a dash one.

6    What would you mean when you'd cross out words?

7    A.  So, I would just do a search for "Finchly" by itself.

8    That's a unique name and I only had one result, so there was no

9    need to search for "Finchly International Investment" because I

10   saw that one response to "Finchly" was a responsive document.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And now, when you would get hits, so turning back to the

2   first page, let's just pick something, for instance.  Alexis

3   Rittereiser.  The 63, does that indicate that there are 63 hits

4   when you search the ward Alexis plus Rittereiser?

5   A.  Correct.

6   Q.  What would you do with respect to those 63 documents?

7   What's the next part of the process?

8   A.  Then I have to review -- skip the 63 documents and I was

9   looking for what type of documents do I receive and, most

10  importantly, do they relate to really Alexis Rittereiser or

11  there might be an Alexis with a different name and a different

12  Rittereiser, so that I get a false positive.  I determined that

13  the search leads to documents related to Alexis Rittereiser and

14  it would tag all 63 documents as pertinent.

15  Q.  Does the number indicate the amount that the search terms

16  resulted in or the number that you tagged as responsive to the

17  warrant?

18  A.  I think with few exceptions if I determine that it was a

19  good search term and that the documents were responsive to that

20  search term, I would tag all of them.

21        The reason I wrote down the numbers is I was trying to

22  get an idea of like how many documents would this result in,

23  and I also tried to find out how long the search would take

24  over time.  That's why I jotted down these results.

25  Q.  How long was it taking to run each of these search terms?

1    A.  Each search term took about two or three minutes.  You did
2    the search and then you had to wait for the system to process.
3    Then I would get the -- in this case the 63 results.  I would
4    review those quickly to make sure they are actually responsive
5    to the search, and then I would move on to the next process.
6    Conducting the searches the entire search took about 10 full
7    workdays.
8    Q.  Why was it taking two to three minutes to run each search
9    term through this database?
10   A.  I think partially there were sort of technical issues.  My
11   understanding is the main issue is, there was a large amount of
12   data that has been seized, that some of the individual files
13   were very large.  Every time I did the search, the computer has
14   to run through all these documents and that's why it's taking a
15   lot of time.
16   Q.  Now, were there more than one database that you were
17   running these searches through or is it all in one database?
18   A.  So I had to do all of the searches twice, once for all the
19   evidence seized from the office and once for all the evidence
20   seized from the home.
21   Q.  They were contained in two separate databases?
22   A.  Correct.
23   Q.  To your knowledge, the time that you're describing as it
24   taking you to run these search terms, is that kind of time lag
25   applicable to running the privilege review terms as well?

1   A.  I believe it would be the same.

2   Q.  And did anyone else assist you in your search term review?

3   A.  I was the only agent doing the review and the CART guy, the

4   computer person, would help with technical issues, but he did

5   not do any of the review.

6   Q.  Approximately when did you complete the process of the

7   search term review?

8   A.  I think it was in early September.

9   Q.  And what did you do with the materials that you had tagged

10  as responsive to the warrant at that point?

11  A.  So by June or July I had finished a review of the

12  apartment, which the smaller set of documents.  And once I was

13  done I would contact the CART team and say, I'm done with this

14  review.  I tagged it in a certain way.  I think it was called

15  search word 1.  And then they could then export all those

16  documents that I had tagged and make a copy.  The copy was then

17  provided to me and I gave it to their prosecutor.

18  Q.  And so you said that happened in the summer for the

19  apartment electronic materials?

20  A.  Right.  Once that was done, I then sort of started the

21  whole process over and did the same review for the office.

22  Q.  And to the best of your recollection, what was the

23  approximate volume of responsive materials from your electronic

24  review?

25  A.  I think for the apartment it was a little bit over 14,000

H1OMWEY3                         McGuire - direct

1    documents and for the office it was a little over 90,000

2    documents.

3    Q.  Now, to your knowledge, after you completed that process of

4    running those search terms and then handing that material over

5    to the prosecutors, have you or anyone else on the prosecution

6    team gone back to that original electronic material to rerun

7    new searches?

8    A.  No.

9              THE COURT:  Could I get clarity.  You described the

10   process of running the search terms and then sort of a

11   second-level analysis of whether it was responsive to the

12   warrant.  Am I understanding that right?

13             THE WITNESS:  That is correct.

14             THE COURT:  What was that like?

15             THE WITNESS:  Well, I couldn't review every individual

16   document.  So the first set was to see whether it was

17   responsive to the search term, whether they were used together,

18   and then you get a good sense of what types of documents they

19   are.  Really, most of the documents were financial records

20   relating to stocks.  So then I would make that determination

21   whether this is covered by the warrant or not.

22             THE COURT:  So, for example, I don't know if this

23   occurred, but tell me if it did; and if it didn't how you would

24   have approached it.  If there are individual names on this list

25   that were not on Exhibit B to the search warrant, and you

1    searched for that and came upon financial records pertaining to

2    that individual.

3             THE WITNESS:  Well, the names on the list because I

4    looked over those names and I had this conversation also with

5    the prosecutor that I need to know that these names are leading

6    to other names or other documents on the search warrant.  For

7    example, if I search a bank, I would make sure these are New

8    York Global records.  By searching for the bank I would find

9    financial records related to New York Global which I knew was

10   covered by the search warrant.

11            THE COURT:  And what about with individuals?

12            THE WITNESS:  If I searched the individuals -- the

13   reason I'm hesitating is if there are like 60 or 80 results, I

14   can't say that I reviewed each of the 60 or 80 results.  I

15   would look at the first 10 or 15 and then you would have a good

16   idea that these are bank statements or e-mails with New York

17   Global.  So I would say no.  Those are the type of pertinent

18   documents.  I am going to tag them as pertinent.  Sometimes I

19   would do a search.  I remember a lot with the Chinese names

20   where other stuff came up.  So I know one set of names had a

21   lot of dictionary entries.  I was like that is not pertinent.

22   That is not covered by the search warrant.

23            And if the first 10 or 15 hits looked to me like they

24   were not covered by the search warrant, I would kick out the

25   whole search term.  I sort of did this search term by search

1   term review and then within each search term I would sort of

2   review the first results to make an assessment if these were

3   covered by the warrant or not.

4              THE COURT:  Go ahead.

5   BY MS. HECTOR:

6   Q.  Now, you previously testified that certain materials were

7   segregated as potentially privileged, correct?

8   A.  Correct.

9   Q.  To your knowledge, has the government engaged in a

10  substantive review of those segregated materials at this point?

11  A.  I don't think so.

12  Q.  And why not?  Do you know?

13  A.  I know that at some time after the indictment motions were

14  filed and the defense has asked that the government cease the

15  review of the potentially tainted privileged documents.  And I

16  think the government had agreed to that request and no review

17  had been done.

18             MS. HECTOR:  May I have one moment, your Honor.

19             No further questions.

20             THE COURT:  Mr. Siegal.

21             Whenever you are ready, Mr. Siegal, you may proceed.

22             MR. SIEGAL:  Thank you, your Honor.

23             Before I start I would like to approach the witness

24  and give him a binder of the defense exhibits I am going to use

25  today.

1              THE COURT:  With the Court's thanks.

2              MR. SIEGAL:  I have already given a copy set to the

3      government and to your Honor, I believe.

4              I also will probably use the government exhibits, so

5      you want to keep that binder nearby, too.

6      CROSS-EXAMINATION

7      BY MR. SIEGAL:

8      Q.  The first thing I would ask you to do, Special Agent

9      McGuire, if you could look in the defense exhibit binder I just

10     gave you at tab 14, please.  You see the multipage document.

11     Do you see that?

12     A.  I do.

13     Q.  And do you see that the document, as you page through it,

14     is a log that appears to be several different types of logs

15     relating to the searches in this case?

16     A.  Yes.

17     Q.  Do you recall about a week and a half ago my colleague,

18     Joseph Lawlor and I, visited the offices of 26 Federal Plaza,

19     your offices, to come look at the boxes that are here in the

20     courtroom that are the original search material?

21     A.  Yes.

22     Q.  And do you remember you assisted us in getting access to

23     those documents?

24     A.  I did.

25     Q.  Now, before when the original exhibits were admitted in

1    evidence, part of that exercise that we did on the record was

2    you were reading out what I'll call the box control numbers,

3    the ones that begin 1B so and so for each of them.

4    A.  Yes.

5    Q.  And do you recall that when we were at the offices you did

6    us the favor of writing down the box control numbers that

7    corresponded to particular pages of this search log at the time

8    in your own handwriting?

9    A.  I did.

10   Q.  I would like to ask you to flip through several pages of

11   this document.  If you go past the diagrams and then past the

12   first set of logs that are written sort of in landscape form

13   and past the digital photographic logs.  It's a lot of pages.

14   I know.  Do you see that there are some pages that begin:

15   Receipt for property received or/returned/released?

16   A.  I do.

17   Q.  I ask you to keep paging through until you come to a page

18   with the numbers 1B17 written in the upper-right-hand corner of

19   the page.  Talking about a page that looks like it corresponds

20   to something called area O.  Do you see that?

21   A.  I do.

22   Q.  Is that your handwriting that wrote 1B17?

23   A.  That is my handwriting.

24   Q.  On the next page do you see in a similar location 1B18?

25   A.  I do.

1  Q.  Is that your handwriting, too?

2  A.  Yes.

3  Q.  And then just keep going a couple more pages.  Do you see

4  on one of these pages there is a number of similar type codes

5  that are written in the margin on the right-hand side?

6  A.  I do.

7  Q.  It's fair to say that's all your handwriting as well?

8  A.  Yes.

9  Q.  It's also fair to say that these 1B control numbers were

10  not on the logs as they were originally written.  You added

11  those in your offices a couple of weeks ago, when we were

12  present?

13  A.  Correct.

14        MR. SIEGAL:  Your Honor, I would like to just offer

15  Defense Exhibit 14.

16        MS. HECTOR:  Your Honor, Defense Exhibit 14 includes a

17  lot of materials, some of which are already in evidence, but we

18  have no objection.

19        THE COURT:  There will be some redundancy.

20  Defendant's 14 is admitted.

21        (Defendant's Exhibit 14 received in evidence)

22  Q.  Is it your testimony, just to make it clear, that the

23  notations you made on the logs that we just saw in Defense

24  Exhibit 14, that's your best understanding of which boxes

25  correspond to which original handwritten logs of the search?

1    A.   It's correct.  I did it fairly quickly.  I know you had the

2    log and I had all the boxes.  I have located the boxes, gave it

3    to you, wrote down the numbers.  I think this is correct.  I

4    can't say I double-checked it all, but generally that's how the

5    1B numbers match up to the item numbers, yes.

6    Q.   I am not going to spend too much time on this, but let me

7    just ask you a few questions about what you testified on direct

8    about those boxes.  In your participation in the search of the

9    office at some point you came across a stack of résumés for

10   people in the office during the office search that you

11   participated in?

12   A.   Correct.

13   Q.   And you determined that those résumés were not responsive

14   to the search warrant?

15   A.   Correct.

16   Q.   And you decided not to take them?

17   A.   Correct.

18   Q.   And you didn't ask anybody to weigh in on that decision,

19   right?

20   A.   That's correct.

21   Q.   And you didn't check with the case agent or AUSA Massey

22   either whether that was the right decision?

23   A.   That's correct.

24   Q.   In your mind that was a clear decision, those are not

25   responsive?

1   A.  Correct.

2   Q.  We have in the courtroom the hard copy materials that were

3   seized.  We don't have in the courtroom the electronic

4   materials that were seized, right?

5   A.  Correct.

6   Q.  Is it your understanding that in addition to the hard copy

7   materials here that some 19 computers and five plus cell phones

8   or BlackBerries were seized at the time of the office search?

9   A.  I don't know the exact number, but that sounds right, yes.

10  Q.  And from the apartment some 21 electronic devices were

11  seized?

12  A.  Just to be correct, some items were physically seized and

13  some items were imaged.  So the data was seized, but the

14  devices I think were left behind.

15  Q.  Was anything imaged at the apartment as opposed to seized,

16  in your recollection?

17  A.  I don't know.

18  Q.  Now, you described the presearch briefing that AUSA Massey

19  and Special Agent Komar gave the day before the search that

20  took place the morning of the 25th of January 2012.

21          MR. SIEGAL:  Is there an objection?

22          MS. HECTOR:  I was going to let you finish your

23  question, but it misstates his testimony because I don't think

24  he testified that it was the day before he said.  At some time

25  prior.

1           THE COURT:  Mr. Siegal.

2    Q.  At the briefing that you described, whenever it took place,

3    was there any discussion by either AUSA Massey or Agent Komar

4    about a possible search of the Weys' home during that briefing?

5    A.  I don't remember.  I knew we had a search warrant before

6    the briefing.  The search warrant was approved for the office.

7    I don't remember if there was sort of a plan to maybe get a

8    follow-up search warrant.  I don't remember.

9    Q.  Is it your understanding that there was a search warrant

10   application made some time in the middle of the day on the

11   25th, which was the day of the office search, for a warrant for

12   the apartment?

13   A.  Yes.

14   Q.  So is it your understanding that at the time of the

15   presearch briefing there wasn't even a warrant in existence yet

16   for the home?

17   A.  That's correct.

18   Q.  Was there a separate briefing that took place by the AUSA

19   or Agent Komar in advance of the apartment search?

20   A.  No.

21   Q.  You were the case agent, as you testified, at this time,

22   but you were the agent who served the apartment warrant on

23   Michaela Wey at the time the apartment warrant was executed?

24   A.  That's correct.

25   Q.  And you're also the agent who did the initial walk-through

1    of the apartment or one of them?

2    A.   Correct.

3    Q.   When you commenced that search, were you given the

4    affidavit in support of the application for the apartment

5    search warrant?

6    A.   No.

7    Q.   Did you see anybody else at the apartment in possession of

8    the affidavit in support of the search warrant for the

9    apartment?

10   A.   No.

11   Q.   If you could just take a look, please, at Defense Exhibit

12   16 in your binder.  It's another composite document.

13   A.   OK.

14   Q.   Do you see on the front page of that document there is a

15   number and then word sequence that says:  3501-8 Komar.  Do you

16   see that at the bottom there, bottom right-hand corner?

17   A.   I do.

18            MR. SIEGAL:  Your Honor, I'll represent that this is a

19   copy of a part of a 3500.  We have separately marked it and put

20   it in our binders for sentence, but it's one item that was in

21   the government's 3500 materials as 3501-8.  We are going to

22   mark it for these purposes as Defense Exhibit 16.

23            THE COURT:  So marked.

24   Q.   If you flip through the exhibit you'll see that it's a 302

25   report from the FBI, a number of e-mails, and then again a copy

1    of the logs.  But at the very back there is something here that

2    I want to talk to you about.  If you see the very last page, it

3    looks like the end of a spreadsheet list.  You see that?  And

4    then if you page back through the document, that spreadsheet

5    list looks like it's about seven or eight pages long.

6    A.  OK.

7    Q.  I'd like you to flip back until you get to the first page

8    of the spreadsheet where it says entity/company names.  Do you

9    see that?

10   A.  I do.

11   Q.  Speaking about the entirety of those pages I just had you

12   look at, do you recognize that set of materials?

13   A.  I do not.

14   Q.  You have never seen that before?

15   A.  I might have seen it when I reviewed the case file, but I

16   don't think I generated this document or worked with it.

17   Q.  And you don't remember anybody having this alphabetical

18   list of companies and alphabetical list of names handed out or

19   being used at the search of the apartment?

20   A.  I didn't do any searching at the apartment and I don't know

21   if somebody else got a list like this.

22   Q.  Do you have any idea as the case agent why the set of

23   spreadsheets was attached to or associated in any way with the

24   logs for the apartment search for the 302, for the apartment

25   search?

1    A.  I know that the original list of names was not in

2    alphabetical order, which made the searching more difficult.

3    Maybe somebody made a list in alphabetical order, but I don't

4    know.

5    Q.  Have you ever seen that spreadsheet before I just showed it

6    to you?

7    A.  I think I might have seen it when I reviewed the case file.

8    Q.  Is it fair to say that it's part of the case file?

9    A.  Yes.

10        MR. SIEGAL:  Your Honor, I am going to offer the

11   document anyway, given that it was given to us by the

12   government as 3500 material.

13        MS. HECTOR:  Your Honor, I am going to object.  This

14   agent has said that he does not recognize this document.  He

15   doesn't know who made this document.

16        THE COURT:  I presume that's what Mr. Siegal's anyway

17   was attempting to address, and I agree with the government that

18   it doesn't hold up to analytical rigor, that anyway.

19        Sustained.  If you'd like to make an argument grounded

20   in something other than anyway, I'm all ears.

21        MR. SIEGAL:  I'm going to think about it over the

22   break, your Honor.

23        THE COURT:  Fair enough.

24        MR. SIEGAL:  And give it a try.

25   Q.  So just one final question about it, sir.  Sitting here

1  today you don't know one way or another whether those

2  spreadsheets I just showed you were used by the agent as a

3  reference guide for the searches they conducted on that day?

4  A.  That's right.  I don't know.

5  Q.  Now, on direct you testified about some of the boxes that

6  the prosecution put in front of you there when you were looking

7  through the original material.  And one of the boxes that you

8  were looking at included financial records for Benjamin Wey and

9  a divorce file for Benjamin Wey.  Do you remember that?

10 A.  Yes.

11 Q.  Is it your testimony that any financial record of Benjamin

12 Wey, regardless of date or time frame, in Benjamin Wey's

13 apartment was seizable under the warrant?

14 A.  Yes.

15 Q.  And any documents that happened to be in a box with it?

16 A.  No.

17 Q.  Just the documents that happened to be in the box that you

18 looked at?

19 A.  For example I said the medical records were in the box with

20 the financial records and I don't think they should have been

21 taken.

22 Q.  They were taken though, right?

23 A.  Correct.

24 Q.  The divorce records from Mr. Wey's 1998 divorce, you

25 consider those also to be seizable under the warrant?

1    A.  I would have to look at them.  If they talk about the

2    financial arrangements, then they would relate to financial

3    records, yes.

4    Q.  And is it also your testimony that all financial records of

5    Mrs. Michaela Wey found in her apartment, regardless of date,

6    were seizable under the warrants?

7    A.  It's really speculation.  When you look at the document you

8    make that determination.  For example, I think if we had found

9    a box with records from the 1970s, we might have determined

10   that they are not pertinent to the investigation.  Whether we

11   can seize them or not, we wouldn't take them because the goal

12   is to seize evidence of the illegal activity.

13   Q.  Are you saying that you recall any documents not seized

14   from the apartment based on a date or date range?

15   A.  I did not --

16           MS. HECTOR:  Objection, your Honor.  I believe his

17   testimony on direct was he didn't go through the documents in

18   the apartment, so I don't know that he can testify as to what

19   was not seized in the apartment.

20           THE COURT:  You want to rephrase.

21           MR. SIEGAL:  I think I asked him if he was aware of

22   any and not whether he seized them.

23           THE COURT:  You said recall.

24   Q.  Are you aware, sir, that any financial records of Michaela

25   Wey were not seized from the apartment due to their age?

1    A.  I don't know one way or the other.

2              THE COURT:  I just want clarity because I thought

3    there was no ambiguity.  You answered my question.  You said,

4    are any personal financial records of the Weys, would those

5    have been seizable.  And you said clearly yes, because it was

6    within the warrant.  I just want to know the answer to that

7    question, open-ended.

8              THE WITNESS:  The reason -- I think there is a very

9    fine distinction.  There is a warrant authorized to take

10   certain described records, but we execute the warrant to seize

11   evidence of criminal activity.  There might be documents, you

12   look at them and say, look, they are sort of covered under

13   warrant, but we are not going to take them.  A simple example

14   is business cards of a specific person were recovered by the

15   warrant.  But if I see 10 identical business cards, I would

16   only take one.  Could we seize all 10?  Probably.  But we would

17   typically seize less than is described by the warrant.  And so

18   this is why I'm hesitating.  I think if they are financial

19   records, they are clearly covered by the warrant, but there is

20   also sort of a determination made, are these documents we want

21   to seize.

22   Q.  I'll just ask this question in particular.  Do you recall

23   leaving any financial records of Michaela Wey behind that you

24   saw?

25   A.  I don't remember seeing financial records at the office --

1   at the apartment because I didn't do the search so I don't know

2   what was left behind.

3   Q.  After the search was complete I think your testimony was

4   you basically were done with your role in the investigation

5   until 2013.  That was your testimony?

6   A.  That's correct.

7   Q.  And then when Special Agent Komar was transitioned to

8   Washington, D.C. he transitioned the case filed to you.  That's

9   your testimony?

10  A.  Correct.  I don't know if he went to Washington, D.C.  I

11  know he left the office.

12  Q.  He left the New York office, you mean?

13  A.  Correct.

14  Q.  And you became the case agent in February 2013?

15  A.  That sounds right, yes.

16  Q.  When he handed over the investigation to you did he show

17  you in the computer system the work he had already done with

18  respect to electronic file review?

19  A.  I don't think he had done any file review because it wasn't

20  cleared by the taint team yet.  So the first bigger project I

21  took off was to initiate the review of the electronic data

22  after the interview was completed.

23  Q.  So it wasn't as if you didn't conduct your search of

24  electronic files in certain groups or tranches of electronic

25  documents because you understood somebody else had already done

1    that.  You searched through everything, right?

2    A.  Yes.  I think there might have been some of the phone data,

3    so that was sort of separate.  All the computers, all the thumb

4    drives were uploaded in the system, and I did all the

5    electronic searches of that data.

6    Q.  So I take it your testimony then is Special Agent Komar

7    never indicated to you that he had set aside any electronic

8    files as nonresponsive, for example?

9    A.  The only thing Agent Komar told me, this came up later,

10   that there were some cell phones seized and he had done some

11   initial review and very early found that there could be

12   potential privileged documents, so he seized that whole review

13   and that was sort of set aside.  I don't think that Agent Komar

14   did any of the review that I did through -- when I reviewed the

15   electronic records.  I started from scratch and I did a

16   complete review.

17   Q.  And I think you said on direct that the first real project

18   that you did, apart from getting up to speed on the

19   investigation, was to execute the searches based on the list of

20   terms that AUSA Massey gave to you.  Is that correct?

21   A.  Yes.  The list of terms in conjunction with the search

22   warrant.  Yes.

23   Q.  Did you participate with him in creating the list or did he

24   just give you the list?

25   A.  He sent me the list and then I reviewed it.  I think we had

H1OMWEY3                          McGuire - cross

1   a brief conversation about it.  And then I initialed it at the

2   review.

3   Q.  Using his list?

4   A.  Correct.

5   Q.  And you said you began to do that in May 2013 because

6   that's when you understood the taint review had been completed?

7   A.  Correct.  It was shortly after taint review was completed.

8   Then I had to get access to the computer system.  And then I

9   would initiate that review.

10  Q.  Did you have any role in the taint review of the materials?

11  A.  No.

12  Q.  Ms. Hector asked you on direct whether the timeline for the

13  taint review was affected by some of the same computer problems

14  you experienced and you said yes.  How would you know that?

15  A.  I don't think that was the exact question.  We used the

16  same -- my understanding is the taint team used the same system

17  that I used.  The data is on a server, you access it and you

18  run the searches.  So I didn't participate in the searches, but

19  my assumption is that the system was just as slow for them that

20  it was for me.

21  Q.  But it's not based on any of your own personal experience?

22  A.  No.

23  Q.  Are you familiar with Judge Irizarry's opinion in the case

24  of *United States v. Metter* from May 2012?

25  A.  I am.

1   Q.  You're familiar with it because you were actually the case

2   agent in that case, right?

3   A.  That is correct.

4   Q.  And you're personally named in that opinion a few times,

5   right?

6   A.  Yes.

7   Q.  Is it fair to say you became aware of that ruling some time

8   around the time when the opinion was released in May of 2012?

9   A.  Correct.

10  Q.  I'd like to draw your attention, please, in the defense

11  exhibit binder to Defense Exhibit No. 19.  Could you take a

12  look at that, please.

13  A.  OK.

14  Q.  Now, do you recognize the first page of this exhibit?

15  A.  Yes.  It's an e-mail exchange between me and AUSA Massey.

16  Q.  And do you see that the last e-mail in the chain appears to

17  reference an attachment titled

18  search.terms.4.all.devices.2013.3.XLXS.

19          Do you see that?

20  A.  I do.

21  Q.  Can you take a look at the pages that follow.

22  A.  OK.

23  Q.  You see that spreadsheet?

24  A.  OK.

25  Q.  Is it your recollection that that was the list that was

1   sent to you by Mr. Massey on May 3, 2013?

2   A.  Correct.

3           MR. SIEGAL:  Your Honor, I'm offering Defense Exhibit

4   19.  I will just state for the record that I think we offered

5   just the cover page e-mail yesterday, but I'm marking it here

6   as a separate exhibit along with the attachment.

7           MS. HECTOR:  No objection.

8           THE COURT:  Defendant's Exhibit 19 is admitted.

9           (Defendant's Exhibit 19 received in evidence)

10  Q.  If you could flip to the last page of Defendant's Exhibit

11  19.  Do you see how the numbers go up to 415?

12  A.  Correct.

13  Q.  Now, if you could just compare that, please, to the binder

14  of government exhibits in front of you.  Government Exhibit 19.

15  A.  OK.

16  Q.  You see how that is a list of names as well?

17  A.  Correct.

18  Q.  And it's also entitled search terms for electronic devices

19  seized in January 2012, searches of Wey office and apartment?

20  A.  That's correct.

21  Q.  Do you know sitting here today whether these two lists are

22  the name, meaning, do they contain the same names on them?

23  A.  Well, I would assume so because the list in Government

24  Exhibit 19 is a list I printed off an e-mail from Dave Massey.

25  Q.  As far as you know, it's the same list?

1    A.   Correct.

2    Q.   Before we turn to the list of names, do you see in your

3    e-mail back on Defense Exhibit 19 --

4    A.   OK.

5    Q.   -- you see you had a request there -- first of all, you

6    wrote it to David and Antonia.   Do you know who Antonia is?

7    A.   She was another AUSA assigned to the investigation at the

8    time.

9              MS. HECTOR:   What exhibit are you on?

10             MR. SIEGAL:   I'm on Defense Exhibit 19.

11   Q.   And do you see in the second paragraph there you wrote:

12   Also, don't forget to send me a list of search terms and the

13   top five illegal acts we should be focusing on for now.

14   A.   Correct.

15   Q.   And am I fair to understand that the search terms he sent

16   you were in response to you asking him for that?

17   A.   Yes.   The issue of the search rooms had been discussed

18   leading up to this e-mail, so I don't think this was my first

19   request for that list.   There was some conversation about

20   Massey would make a list and I said, reminder, make sure you

21   send me that list.

22   Q.   Did Mr. Massey ever send you a communication including the

23   top five illegal acts that you were --

24             MS. HECTOR:   Objection, relevance.

25             THE COURT:   Overruled.

1   A.  Yes, he did.

2   Q.  Well, do you recall what he wrote to you about that?

3            MS. HECTOR:  Same objection.

4   A.  It was a lengthy --

5            THE COURT:  Just a second.  Let me hear your argument.

6            MS. HECTOR:  I'm not sure if the request for these top

7   five illegal acts has anything to do with the search of this

8   electronic material or if this is just a discussion between an

9   agent and an AUSA regarding sort of where they are focusing on

10  the investigation, which I don't know is relevant to the

11  question we are here for today.  That's the basis.

12           THE COURT:  Overruled.  You may answer.

13  A.  It was a lengthy summary of the theory of the case.  And

14  the reason I requested it was a very broad investigation.  And

15  I wanted to know what is the most critical evidence we should

16  be looking for.

17  Q.  So you were going to use those quote/unquote top five

18  illegal acts list to help you conduct your search through the

19  electronic evidence?

20  A.  Yes.  But I would like to clarify this.  Two things.  When

21  I conduct the search of electronic evidence, one task is, find

22  all responsive records.  That's sort of just separating and

23  responsive and nonresponsive.  But I'm also the case agent.

24  I'm investigating the case.  I'm spending a lot of time looking

25  at this.  And I want to know from the prosecutor what are sort

1    of the really -- the more important records.  What are the key

2    documents I should be looking for so I have a better

3    understanding so I can spot them.

4           The other thing is, we also reviewed the documents

5    primarily through the search terms.  But when I access the

6    computer system I can also review documents.  So I wanted to

7    have a better understanding of what is the evidence we need for

8    the case.

9           MR. SIEGAL:  Your Honor, I don't think we have been

10   provided with that.  I think that would be part of the 3500

11   material that we ought to have seen in connection with this

12   hearing.  So I'm just going to put on the record my request for

13   that communication from Mr. Massey to Mr. McGuire.

14          MS. HECTOR:  Your Honor, we certainly have reviewed

15   the e-mails from Mr. Massey from this time frame that are still

16   on the government system.  I don't recall seeing that e-mail,

17   but we certainly will go back and double-check and provide it

18   to Mr. Siegal if it exists and has not been provided.

19          THE COURT:  Do that by when, counsel?

20          MS. HECTOR:  We certainly can do that this evening for

21   tomorrow.

22          THE COURT:  By tomorrow.

23   Q.  Back to your e-mail of May 2.

24          THE COURT:  How much longer in this sequence and how

25   much longer with this witness?

1              MR. SIEGAL:  Well, I am going to want to go through

2      the checkmark document with him, your Honor.  I can ask a few

3      more questions and maybe we will take a break for lunch.  The

4      answer to the other question, I can't tell you.  It's not going

5      to be that long.

6              THE COURT:  With the witness in total you mean?

7              MR. SIEGAL:  Yes.

8              THE COURT:  In this sequence.

9              MR. SIEGAL:  Fifteen minutes maybe, maybe not even.

10     Maybe five.

11             THE COURT:  All right.  We will break in five.  We are

12     either at a breaking point or we are not.

13     Q.  Just focusing on the last paragraph of the e-mail here,

14     sir, that you sent to David Massey, you said:  Before running

15     the search terms I will reread the search warrant and make sure

16     all search terms are designed to locate responsive documents.

17             Do you see that?

18     A.  I do.

19     Q.  Did you do that exercise in May of 2013 before running the

20     search terms?

21     A.  I did reread the search warrant.

22     Q.  I take it you noticed at the time you did that exercise

23     that the two lists didn't match, that is, the list that Mr.

24     Massey provided you and the list in Exhibit B to the search

25     warrants?

H1OMWEY3                          McGuire -- cross

1   A.   Right.  My understanding was that the list provided would

2   include other names that would help me locate documents covered

3   by the search warrant.

4   Q.   Did you ever consider, before using the search term list

5   that Mr. Massey gave you, starting with using the search names

6   in Exhibit B to the search warrant as your search term list?

7   A.   I don't know -- I don't think I considered that.  That

8   would seem very inefficient to work off two lists.

9   Q.   So you never went through the exercise of doing electronic

10  searches based simply on the Exhibit B list of names?

11  A.   That is correct.

12         MR. SIEGAL:  I think this would be a good time for a

13  break.

14         THE COURT:  Let's break.  45 minutes.  See you then.

15         (Luncheon recess)

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

                            AFTERNOON SESSION

                               1:35 p.m.

1          MR. FERRARI:  Your Honor, I had handed up -- the

2   witness is not present.  I handed up a document and I had

3   rushed it over.  I didn't have time to mark it.  We're now

4   going to call it 3504-14 which would be part of Mr. Massey's

5   3500 material.  And so it is now sitting here now, as clearly I

6   made a mistake in not including this document but I wanted the

7   Court to understand why I had failed to produce this and it was

8   me going through these documents.  So, I just want -- this

9   document is dated May 16.  And given Agent Maguire's testimony

10  we just heard, it is reasonable to infer that this is the

11  response to the, whatever it was he said about the five illegal

12  things we were investigating.  I'm not sure of that but it's

13  certainly reasonable to think that this is that.  If your Honor

14  notes, it is not a response to that e-mail.  This is a new

15  independent e-mail that Mr. Massey has sent to the agent.  For

16  what it's worth, it doesn't cure the fact that it's been

17  produced late.

18          But so the Court understands, another thing influenced

19  my decision was that I was reviewing these in reverse

20  chronological order.  So, I would have seen this before I

21  sawing Agent Maguire's.  And of course, your Honor, I won't

22  pretend that this is something that we wanted to produce, that

23  is to say this is a detailed outlined theory of our case and

1   Mr. Massey's discussions of it, I would think of sort of a

2   privileged government work product.  But in these

3   circumstances, given what Agent Maguire said, we thought it was

4   appropriate to produce it.

5          I now realize I should have produced it before and it

6   could have been responsive to that e-mail.  So, I wanted to

7   make a record why it was done now rather than then.  So, at

8   this point, defense counsel has it and we'll precede but I

9   wanted the Court to understand why it wasn't produced prior to

10  Mr. Massey's testimony.

11         THE COURT:  Why wasn't it?  In other words, did you

12  see it and --

13         MR. FERRARI:  I did see it, your Honor.  And to me it

14  was not responsive to the search warrant.  I read this document

15  as being Mr. Massey sort of educating Agent Maguire and an

16  analyst at the FBI about the case generally.  It didn't occur

17  to me that it related to the search warrant, the conduct of the

18  search warrant or the reasonableness of the maintenance and

19  review of the electronic evidence.  I look at this is a

20  prosecutor talking to a new agent about the theory of the case.

21  That's why I decided that this was not part of Mr. Massey's

22  testimony.  That was my thinking.

23         THE COURT:  Ms. Hector, am I right?  You probably had

24  this in mind when you objected to, cause you objected to the

25  question about the top five legal theories and I think in doing

1   so suggested to the witness that maybe that was in a different

2   context or the like.

3            MS. HECTOR:  No, your Honor.  Actually, I didn't have

4   that e-mail in mind because I hadn't seen that e-mail.

5            MR. FERRARI:  It was only me, your Honor.

6            MS. HECTOR:  We divided up Massey's e-mails.  So, I

7   hadn't reviewed that section.  My objection was based frankly

8   on the pure leading of the e-mail that was shown to the witness

9   where I think is unclear whether his request for information

10  about the five -- I don't remember off the top of my head --

11  top five illegal acts was necessarily related to his

12  performance of the electronic search versus the kinds of

13  conversations that happen all the time between prosecutors and

14  agents when focusing on investigations which is why I objected

15  as I did.

16           THE COURT:  OK.  Thank you.

17           MR. SIEGAL:  Your Honor, I certainly take

18  Mr. Ferrara's representations about his state of mind and his

19  intentions as made in good faith.

20           THE COURT:  As do I.

21           MR. SIEGAL:  What I would like to request though,

22  given the agent's testimony on direct about his thought process

23  and his process of going through these electronic searches and

24  then making some sort of substantive decision about whether or

25  not hits with that search list were responsive to the warrants,

1   we would request that the government make another review of

2   communications back and forth between Mr. Massey and

3   Mr. Maguire in the timeframe when he was running these

4   electronic searches as similarly related to the issues in this

5   hearing.  And I'm talking about the period between May 2013 and

6   I think the testimony is September 2013 but I'll make sure that

7   the timeline is clear with the witness on cross.

8           THE COURT:  OK.

9           MR. FERRARI:  Your Honor, we don't think that every

10  communication between Agent Maguire and Agent Massey --

11  sorry -- between Mr. Massey and Agent Maguire during that time

12  period a proper to the extent that Mr. Siegal is not asking for

13  sort of all of that.  We had, I did include things that go to

14  Mr. Massey and Agent Maguire discussing the search of the

15  electronic review.  For instance, towards the very end of

16  Mr. Massey's 3500, in fact, the last e-mail in Mr. Massey's

17  3500 which is the Way 30, for instance there's a June 2013

18  e-mail from Mr. Massey to Agent Maguire in which Mr. Massey

19  said following up on our conversation just now there are three

20  categories of documents and then he goes into some areas in

21  which he would like the agent to look for.  And there's other

22  examples of those sorts of things.  We've produced that.  That

23  is obviously relevant to the conduct of the search.

24          I'm happy to go back and make sure that now having the

25  benefit of Agent Maguire's testimony as I've just done, I'll

1    continue to look through it and I in fact did as over the lunch

2    break when I found this.  I will of course triple check.  It's

3    been shown that there was something I missed, so I don't want

4    that error to persist in nay way.  But I do want to make it

5    clear to the Court that communications between those two during

6    this time period were very much on my mind and I tried to pull

7    those ones that were related to the search, the conduct of the

8    search, running the search terms, maintaining electronic

9    evidence and so forth.

10           THE COURT:  All right.  Mr. Siegal, sufficient?

11   You're not taking the position that every communication between

12   Massey and Maguire is -- Well, are you taking the position that

13   any communication between Massey and Maguire during that

14   timeframe is relevant?

15           MR. SIEGAL:  Your Honor, I think I am taking that

16   position and that's because my view is what the agent has

17   testified to is not just simply doing a term search hit.  He is

18   looking as terms as they hit and then making some of the

19   substantive judgments whether or not they're responsive to the

20   warrant.

21           THE COURT:  He also testified that the investigation

22   is happening precisely at this moment and communication between

23   the investigator and the assistant, this does not open up all

24   of that.

25           MR. SIEGAL:  Well, your Honor, so it's clear, my

1   argument is in part that this is all inappropriate because

2   understand --

3              THE COURT:  What is all inappropriate, communication

4   between Massey --

5              MR. SIEGAL:  No.  What's inappropriate is we revising

6   the parameters of the search warrant a year and a half after

7   the search warrant was supposed to have been executed and the

8   documents responsive to the search warrants were supposed to

9   have been isolated and those documents not responsive to the

10  search warrant were supposed to have been set aside or purged.

11             The position of the government as I understand it is

12  they had a search warrant.  It allowed them to take things that

13  were responsive to the search warrant as of the date of the

14  search warrant as issued and executed.  They seemed to be now

15  taking the position that they can take all the electronic

16  evidence and continue to research through it and with changed

17  theories, changed search terms for as long as they had it and

18  then they kept it for five years.

19             THE COURT:  I understand your argument.  That's not a

20  fair characterization of the testimony.  I understand your

21  argument but Maguire twice testified that he understood the

22  additional search terms to be ways of finding documents

23  responsive to the warrant.  Now, you could question that.  I

24  understand that.  But I may not do and what you may not do is

25  simply ignore that unhelpful testimony.

1          MR. SIEGAL:  I don't think I'm ignoring it, your

2     Honor, and I apologize.  What I think I understand them to be

3     saying is he is not simply looking for names.  He's making a

4     substantive judgment about whether they're related.

5          THE COURT:  Anyway, you've now turned the -- some

6     sports analogy here -- but you've not shifted to making an

7     overall argument about the good faith here.  The question is

8     about what you've -- the application you made was for the

9     government to go back in light of this admitted error and

10    excluding this document from the 3500 material is to go back

11    and look and make sure that all documents pertaining to the

12    search -- and I think it's fair to say and, Mr. Ferrara, tell

13    me if you disagree -- to the extent any documents that may

14    pertain to Agent Maguire's understanding of the crimes for

15    purposes of the search.

16         MR. FERRARI:  Your Honor, let me put it this way, your

17    Honor.  Let me look for things like that and then if we have a

18    problem we could bring it to the Court's attention.

19         THE COURT:  Let's say there's an e-mail that says by

20    the way, Tom, while you're at it, see if you could find

21    anything in there about child pornography.  Is that OK?

22         MR. FERRARI:  We would absolutely have produced that

23    and there are similar e-mails that cover things we believe are

24    covered by the search warrant.  Those e-mails we would agree

25    that's part of the 3500 that we would produce.  And if there's

1    anything like that I missed we absolutely will produce that.

2              THE COURT:  So, included in what you are looking for

3    are any communication that would pertain to Agent Maguire's

4    understanding of the charges --

5              MR. FERRARI:  I understand.

6              THE COURT:  -- with respect to the searches.

7              MR. FERRARI:  I understand what you are saying, your

8    Honor.  And I'm going to look for things like that that I may

9    not have produced already.  I will either produce them or I

10   will bring them to the Court's attention why we think it

11   shouldn't be produced.

12             THE COURT:  Any further application?

13             MR. SIEGAL:  No.  That's fine, your Honor.

14             THE COURT:  Thank you.  Bring back in the witness.

15             (Witness present)

16             THE COURT:  Mr. Siegal, you may proceed with the

17   cross.

18             MR. SIEGAL:  I only have one copy of the document,

19   your Honor.

20             THE COURT:  So I've handed the witness my copy of what

21   was just produced as 3504-14, and you want to mark that?

22             MR. SIEGAL:  I'd like to mark it as Defendant's 22,

23   please.

24             THE COURT:  OK.

25             (Pause)

1    THE COURT:  Go ahead.

2    BY MR. SIEGAL:

3    Q.  Special Agent Maguire, once you have had a moment to affix

4    that sticker, could you take a look at that document, the four

5    page document.  Do you see that?

6    A.  I do.

7    Q.  When we were discussing at the break, before the break, the

8    e-mail where you had asked Mr. Massey to send you the top five

9    list of crimes.  And you said that you do believe you received

10   a response of such a list.  Is this what you were describing?

11   And when I say -- yeah, is this e-mail from Mr. Massey to you

12   what you were describing when you gave that answer?

13   A.  Yes.

14        MR. SIEGAL:  I would like to offer Defendant's Exhibit

15   22 in evidence, your Honor.

16        MS. HECTOR:  We object, your Honor.  It's not this

17   witness' e-mail.  I think it is an e-mail to Mr. Massey to this

18   witness.  I think this witness can testify --

19        THE COURT:  What's the objection?

20        MS. HECTOR:  Hearsay.

21        THE COURT:  Overruled.

22   Q.  When you received this e-mail, did you reed it?

23   A.  I did.

24   Q.  I want to point a couple things out to you to see how on

25   the last page of the document there's a passive relating to

1    alternative fraud theory tax evasion; do you see that?

2    A.   I do.

3    Q.   Also, you were -- at this point you had been the case

4    ailing for three or four months; is that fair to say?

5    A.   Correct.

6    Q.   And is one of the things you would have done in getting up

7    to speed, would you have read the FBI 302 reports on witness

8    proffers?

9    A.   Yes.

10   Q.   It makes reference to a gentleman named Robert Newman.  Do

11   you see that on the first page?

12   A.   Where on the first page?

13   Q.   On the very first page of the exhibit there's a sentence

14   that begins "important" somewhere in the middle of page,

15   "important note much of the evidence"; do you see that?

16   A.   OK.  I see that.

17   Q.   Much of the evidence for what follows comes from proffers

18   of Robert Newman; do you see that?

19   A.   I do.

20   Q.   Do you know who Robert Newman is?

21   A.   I know him as a witness in the case.  He was interviewed.

22   I don't recall the details.

23   Q.   Are you familiar with the fact that he is an attorney?

24   A.   That sounds right.

25   Q.   And are you familiar with the fact that Robert Newman was

1   interviewed after the search warrants were executed?

2   A.  I don't think we did a lot of interviews before the search

3   warrant but I wasn't the case agent at the time so, probably,

4   yes.  I don't know.

5   Q.  OK.  I'll move on.  If I could ask you to take a look at

6   Government Exhibit 16 which is the list of search terms with

7   your handwritten notations on them, please.

8   A.  OK.

9   Q.  Do you see on the side of the page, on the right-hand side

10  of the first page there there's 5/8 and 6/13?

11  A.  Correct.

12  Q.  Am I to understand that designates two separate dates on

13  which you were running these term searches?

14  A.  Yes.

15  Q.  That would have been May8th and June 13?

16  A.  Correct.

17  Q.  If you could just flip through the pages, I'll tell you

18  when to stop.  If you get to about page six -- I'm saying page

19  six cause there's some numbers down to the bottom?

20  A.  I do.

21  Q.  Do you see next to that number six in the circle there's a

22  handwritten notation there?

23  A.  I do.

24  Q.  What is that?  What does that say?

25  A.  It seems to say 150R17.

1   Q.  Do you know what that refers to?

2   A.  I don't.  It looks like my handwriting.

3   Q.  Am I correct in understanding that all the handwriting in

4   this document is yours?

5   A.  That's correct.

6   Q.  As we page through do you see that around page nine the

7   list ends before the bottom of the page?

8   A.  Correct.

9   Q.  Am I to understand that that represents one run-through of

10  the search terms by you?

11  A.  So, there are more than two lists in here because what

12  happened, I had one list I would take with me one search -- I

13  left my home and went to Jersey directly.  So, it would print a

14  fresh list.  So, I think there are about four or five copies of

15  the list but there are more than multiple lists and I would

16  just keep continuing the search.

17  Q.  Do you think -- Well, given the notations for the first

18  nine pages, would you say that you had at least this version of

19  the list with you for the first run-through of the searches as

20  opposed to using --

21  A.  This is possible.

22  Q.  So, if we could go to the page after the one circled by

23  nine, do you see at the top of that page there's a date

24  6/27/13?

25  A.  Correct.

1    Q.  Fair to say that that's June 27, 2013?

2    A.  Correct.

3    Q.  Is this another round of searching you are doing with the

4    same search terms?

5    A.  Yes.

6    Q.  So for example -- and another round, why is it another

7    database you are searching through?

8    A.  Yes.  One search was for the apartment and one search was

9    for the office.

10   Q.  So, are you saying you began the office search on June 27,

11   2013?  When I say "the office search" I'm referring to the

12   search of the electronic data from the office?

13   A.  I understand.  So the searches at the lower numbers, that's

14   from the apartment.  The one with the higher number is from the

15   office and my notes don't say which set I searched first.  So,

16   let me check the numbers here.  So, it looks to me I did the

17   searches for the office first and then for the apartment

18   because the results are smaller numbers.  I'm not sure which

19   one I searched first.

20   Q.  You don't know?

21   A.  But I know I had the list.  I did one set through and also

22   I think around June or July we, I told the computer person, I'm

23   done with this for the first set.  He copied, made a copy.  We

24   provided that to the prosecutor.  That was sort of half my work

25   was done.  Then I would go back and continue on the other set.

H1OAAWEI4                        Maguire - Cross

1    Q.   OK.  So, let's page through that set right there.  And as

2    we get to the end of that second set, do you see how it ends

3    before the end of the page with a handwritten line item there

4    at the bottom?

5    A.   Correct.  The one that says user CN?

6    Q.   Yes.  Is that your handwriting?

7    A.   Yes.

8    Q.   Is that a search term you ran?

9    A.   Yes.

10   Q.   Who came up with that search term?

11   A.   I think that search term was provided by the AUSA Dave

12   Massey and I was told that this search term may help us

13   identify e-mails sent either by Ben Wey or Tianyi Wey.

14   Q.   And it's fair to say that he provided you with that search

15   term sometime after May 3rd, 2013, but sometime before

16   June 27th or you can't tell?

17   A.   I think that's correct.

18   Q.   Do you have any idea from looking at the notes or from your

19   memory how long this second round of searching took you to

20   accomplish?

21   A.   Well, I know that on September 8 I was doing some searches

22   and I think I completed, I think that's about the time that I

23   completed the searches in early September.

24   Q.   You think you completed your work using the search terms

25   through the electronic evidence in around September 2013?

H1OAAWEI4                    Maguire - Cross

1   A.  Right.  But then also the review.  So, some of the review

2   was done by reviewing documents but there were so many to

3   really focus on the search terms.  So when we were done in

4   September the serial list search warrant would be the same

5   thing.  I would have told the clutch person and -- export a

6   copy and at that point the search was concluded and then we

7   would only work with the documents that I had tacked and not go

8   back and search for additional documents.

9   Q.  I think you don't have a recollection what point in time

10  you added user C and the searches or Mr. Massey did, I mean.

11  A.  No, but I also know that while I was doing the search you

12  would see documents and they might lead you to like other

13  search terms.  So, I might see a name with an address and then

14  I might run that address to find other documents related to

15  that name.  There were a lot of search terms.  I wasn't really

16  looking for more search terms.  For example, I might have done

17  a search for like tax records because the documenting financial

18  records I might have done a search for the word fraud, for

19  example.  So, there were some other search terms I would have

20  used to identify documents responsive to the search warrant.

21  Q.  Sorry just in reference to an answer you just gave, is

22  there an itemization of tax records in either of the search

23  warrants?

24  A.  Well, there are financial records.  I know that if I see a

25  tax document it will be a financial record.

1   Q.  So, you're understanding was financial records includes tax

2   records?

3   A.  Correct.

4   Q.  If you continue to flip through the documents pages --

5   actually, the page just following the one we were looking at

6   there's a date up at the top right-hand corner.  Do you see

7   that 8-22-13?  Have I lost you?

8   A.  Yes.

9   Q.  If you look at the page with user CN in handwriting at the

10  bottom then you go to the next page.

11  A.  How many pages is it from the back to the front?

12  Q.  Well, only the first nine pages have pages on them.  So, if

13  you go to page nine then you can count from there.

14  A.  Okay.  So, I'm on the page with user CN.

15  Q.  Go to the very next page.

16  A.  OK.

17  Q.  See the date on that?

18  A.  8-22-13.

19  Q.  Do you see the top of the page there seems to begin again

20  with the beginning of the list?

21  A.  Correct.

22  Q.  Is this a third round of searching that you're doing?

23  A.  No.

24  Q.  No.  Well, if you go back through the pages we just looked

25  at, are there any terms there that weren't run in this

1   investigation of the list?

2   A.   There's only one list.  Let me look at this.

3   Q.   So, as you read it, the 8/22/13 list is the same as the

4   6/27/13 list in terms of the second round of searching you were

5   doing?

6   A.   Right.  And so the names are the same and the results are

7   the same.  The only thing I could imagine is maybe I made a

8   mistake and redid a part of the search but the plan was to do

9   the search once on one server and then do all searches on the

10  next server and then be done with it.

11  Q.   OK.

12  A.   The other thing is I might also have sort of, I see the

13  second list has nicer handwriting so, I wonder if I maybe just

14  sort of copied it over so I have cleaner numbers.

15  Q.   All right.  If you can go to the last page of the document.

16  A.   OK.

17  Q.   Do you see there's some handwriting there on the right-hand

18  side?

19  A.   Yes.  It says 9/7/2013.

20  Q.   With an arrow pointing up?

21  A.   Correct.

22  Q.   What does that designate, if you know?

23  A.   I think the search terms above that line, the top two

24  thirds of the line were searches I conducted on 9/7/13.

25  Q.   So, you are still running these searches into

1    September 2013?

2    A.  Correct.

3    Q.  If you go back a few pages, this one you'll see has a three

4    and a circle at the bottom of the page?

5    A.  OK.

6    Q.  Do you see there is names Matisa, Rex, Ludvig; do you see

7    that handwriting?

8    A.  I do.

9    Q.  What is that?

10   A.  So, at the time I had found out that we're going to have a

11   boy and I was looking for names for the boy and I had some free

12   time because the searches were so slow.  So, these names are

13   totally unrelated to the investigation.

14   Q.  OK.  I think you testified earlier that the total number of

15   documents you tagged through this process was about 105,000?

16   A.  Correct.

17   Q.  That was a subset of all the electronic data in the

18   database, correct?

19   A.  Correct.

20   Q.  After you finished your work going through that process,

21   did you take any steps to purge the nonresponsive electronic

22   data from the FBI systems?

23   A.  No.  I only took steps to separate the responsive documents

24   so that I would only review the responsive documents but I'm

25   not aware of a way to purge the other documents.

H1OAAWEI4                    Maguire - Cross

1   Q.  As far as you know, all those nonresponsive documents are

2   still sitting in an FBI server somewhere?

3   A.  Correct.

4   Q.  With respect to the hard copy materials, at some point you

5   as case agent returned a few empty checkbooks to the defense,

6   right?

7   A.  I did.

8   Q.  Other than that, are you aware of any of the hard copy

9   material seized from either the home or the office being

10  returned to the Weys or the business of New York Global?

11  A.  No.

12  Q.  Did you have any role, Special Agent Maguire, in searches

13  run --

14          THE COURT:  What about the electronics that were

15  seized, the devices themselves?

16          THE WITNESS:  I think a lot of the evidence was imaged

17  on-site.  So, there's sort of nothing to return because the

18  original remains --

19          THE COURT:  The ones that were seized.

20          THE WITNESS:  I don't think anything has been returned

21  but I'm not sure.

22  Q.  Did you have any role in searches run through the

23  electronic evidence in 2015?

24  A.  So, I might have reviewed the pertinent subset of

25  documents.  We had that separated and we would then among those

H1OAAWEI4                      Maguire - Cross

1    documents look and review those.

2    Q.  If I could just direct your attention to Defense Exhibit 20

3    in the binder?

4    A.  OK.

5    Q.  This is an e-mail from you to Micah Smith and Elizabeth

6    Miller; do you see that?

7    A.  Correct.

8    Q.  And that's CC'ing some of the other AUSAs on the case as

9    well?

10   A.  Correct.

11   Q.  Do you see it says "Micah"?

12           THE COURT:  Is this in?

13           MR. SIEGAL:  I'd like to offer this.

14           MS. HECTOR:  No objection.

15           THE COURT:  Exhibit 20 is admitted.

16           (Defendant's Exhibit 20 received in evidence)

17   Q.  Do you see how it says we are creating evidence that the

18   pertinent document was seized in 2012?

19   A.  Yes.

20   Q.  To make sure the case agents don't review any privileged

21   items, SA Elizabeth Miller is acting as taint agent; do you see

22   that?

23   A.  Yes.

24   Q.  As a final step she needs to run the list of taint

25   names/search terms against the about 150 documents she located;

H1OAAWEI4                    Maguire - Cross

1   do you see that?

2   A.  I do.

3   Q.  I thought before you started doing your search through the

4   electronic materials in 2013 those documents had already been

5   taint cleared?

6   A.  Correct.  So, that will be a longer answer to explain this.

7   What had happened in 2013 we completed the search or we

8   bookmarked them as search warrant.  When it came time for

9   discovery the computer team said that because the server had

10  been copied over they had lost one of the bookmark sets so that

11  one of the sets was no longer bookmarked and they couldn't

12  quickly identify whichever the documents where, had been marked

13  pertinent.  So, this was a concern for us because I couldn't go

14  back and redo all those searches.

15        We had at the time among the previously identified

16  pertinent documents found some documents that we wanted to use

17  as grand jury exhibits.  And so the purpose was for Elizabeth

18  Miller, she would then go and just locate this specific

19  document in the original set of the documents.

20        Later, so we were trying to find a way to get the

21  original copy of the server of a document identified in 2013

22  and I couldn't do it because they had lost its privilege

23  bookmarks.  So, I couldn't touch this universe of documents.

24  Later on it turned out to fix that issue the bookmarks were all

25  along, so they exported it based on the original bookmark.  But

1   there was a time period where Elizabeth Miller helped locate

2   some documents and I couldn't do it because we weren't sure

3   that the privileged documents were walled off.

4   Q.  When you were referring to the bookmarks, is that normally

5   referred to tags that you talked about?

6   A.  Correct.

7            THE COURT:  Tags for pertinence.

8            THE WITNESS:  For pertinence and also maybe for

9   privilege.

10  Q.  Am I to understand that you understood that Agent Miller

11  was running search terms through the entire set of search

12  documents under these circumstances?

13  A.  Well, I think what's in this e-mail is her -- because I

14  remember we had a conversation about this.  We decided that in

15  2015 we could not continue to do searches, right?  So Agent

16  Miller we had printed some documents from the 2013 search that

17  we decided are pertinent, we might want to use for the grand

18  jury, for example.  And her task was to find those exact

19  documents on that original server.  So she wasn't look for any

20  new documents.  She was looking for those specific documents.

21  Q.  In the full set of the electronic materials?

22  A.  Correct.  But she would only find documents that we had

23  already found.  So, this was a matter of finding the electronic

24  original of a document we had already identified.  So,

25  typically, I could just look them up.  I would just take the

1    set of, tag the bookmark documents and look for this document.

2    And the cart agent at the time said either the privilege tags

3    had been lost or the pertinent tags had been lost, so I

4    couldn't go back and do it.  There was really no good way of

5    fixing this problem and then I think maybe two months later I

6    found out this was just a software issue and all the tags were

7    there all along and so we worked on those originally tagged

8    documents.

9    Q.  I take it you didn't yourself participate with Ms. Miller

10   in doing the search she was doing, did you?

11   A.  No.  So, specifically, because we weren't sure what the

12   status of the privilege tagging was in that set, I wouldn't

13   have reviewed.  So, I sat down with her.  I said, I think there

14   may be like a hundred documents.  Here is a document we

15   identified back in 2013 as pertinent and responsive to the

16   document.  We need you to find that exact same document

17   electronic copy in sort of the original set.

18   Q.  You weren't sitting with here when she did that?

19   A.  I didn't.

20   Q.  Do you know whether she was opening up

21   document-by-documents running search terms?  Do you know how

22   she went about this process?

23   A.  Because I told her how to do it.  I said you have a hard

24   copy of the document, so you need to search for this document

25   with search terms that will help you find this specific

1    document.  So, for example, we would take a quote from the

2    document or like a number and so, specifically, you can't find

3    new documents.  Your job is limited to find the original copy

4    of a document we already found.

5    Q.  Is there any record as far as you know of how she went

6    about doing that search other than what you --

7    A.  Well, she was to report back to me.  She was like its very

8    hard to find this document and then she had found some and then

9    we had to make sure that none of these documents are

10   privileged.  Later on we solved that issue by finding out that

11   these original tags were all there any way.

12   Q.  But not until after she had done search --

13   A.  I think the equivalent would be if you gave me a copy of a

14   document and said find it in the original boxes.  And then

15   somebody will go back and find it in the original boxes and if

16   I knew that potentially there are some privileged documents in

17   the boxes, then I would ask an agent like Elizabeth Miller and

18   say here's a document.  Go look at the document.  Find an

19   original copy of this document.  But I can't search for it

20   because I could maybe run into some privilege documents.

21   Q.  The process you had just described would entail looking

22   through perhaps every piece paper in the physical items.  So my

23   question to you is, do you know what she did in order to try

24   and locate the copies of the document you are talking about?

25   A.  Yes.  She used snippets from those documents to generate a

1    search.  For example, if a document had a number in there and a

2    unique name she would search for that unique name.  So she

3    would find that document and her assignment was to only tag

4    that specific document.

5    Q.  I take it you haven't seen the electronic tracing

6    documentation relating to what work she did, right?

7    A.  I have not.

8            MR. SIEGAL:  Your Honor, I would request that the

9    government show us what was done to the extent there are

10   records of that.

11           MS. HECTOR:  Your Honor, I don't know what the

12   relevance of that is.  It's already been established that this

13   is an agent, a different agent.  She was trying to find

14   document that had already been tagged in the system by Agent

15   Maguire as both pertinent under the search warrant or

16   responsive to the search warrant and not privileged, had

17   already been printed.  She is trying to find them because of a

18   computer glitch where tags had been lost.  She started that

19   process separate and apart from any of the case agents and

20   started to under take that.  So, yes, she ran searches to do

21   it, but then it was determined that this computer glitch in

22   fact never happened.

23           THE COURT:  I was here.

24           MS. HECTOR:  So, this is completely irrelevant.  The

25   agent has said there were no new documents found as part of

1    that effort.  Nothing new was added.  So it's really a complete

2    aside.  It has no relevance to the issues before this Court.

3              THE COURT:  Are you calling --

4              THE WITNESS:  Elizabeth Miller.

5              THE COURT:  Is she a witness?

6              MS. HECTOR:  We haven't been asked to produce her.

7              THE COURT:  Mr. Siegal, if you could put in words what

8    exactly it is you are looking for and then tell me.

9              MR. SIEGAL:  Your Honor, all due respect to

10   Ms. Hector.

11             THE COURT:  You don't want to take them at their word.

12             MR. SIEGAL:  Is she testifying from her knowledge or

13   guessing?  I don't think Mr. Maguire knows what was done.

14             THE COURT:  He did describe his understanding of what

15   happened.  You have reason to --

16             MR. SIEGAL:  Well, he described what he asked her to

17   do.  I don't think he knows what she did.  He said he doesn't

18   know.  She's a taint agent.  So they wouldn't necessarily be

19   sharing documents about this.  Look, this goes to our concern

20   about the government continuing to go back to the well.

21   Somehow now they say that they were, the instructions were only

22   to bring back copies of the exact same documents but we don't

23   know what they looked at.

24             THE COURT:  Are you calling Ms. Miller?

25             MR. SIEGAL:  No.  It's not our burden.  I'm not

1  planning on calling Ms. Miller.  But I have a document here

2  that establishes that additional searches were being done

3  beyond the tagged responsive documents in 2015.  I'm making

4  that point.  To the extent they have a record of that being

5  done, I think we're entitled to that.  If they don't have a

6  record then we're not entitled to it.

7            MS. HECTOR:  Your Honor, again, I don't see the

8  relevance of it.  The case agent is on the stand.

9            THE COURT:  Here is a parallel.  Let's say that the

10  case agent testified that the search terms that were entered in

11  were precisely the search terms contained in Exhibit B and he

12  says, well, I want to see if there are any records that show

13  what the search terms were.  If you said to me the case agent

14  is just testifying.  The records would show something else.

15  Now, it's a made up example but here we are.

16            Evidence as to, or documentation as to what the

17  handling and searching of this long held electronic material is

18  what this hearing is about and I think to just repeat what his

19  testimony isn't persuasive.

20            MS. HECTOR:  Your Honor, the defense counsel,

21  obviously, could have called and asked for this agent.  We

22  could go back and talk to this agent and find out if there's

23  any documentation of the search she performed.

24            THE COURT:  All right.  Let's do that.

25            MS. HECTOR:  OK.

1             MR. SIEGAL:  I'll move on, your Honor.

2             THE COURT:  OK.

3    BY MR. SIEGAL:

4    Q.  Special Agent Maguire, could you just take a look at

5    Defense Exhibit 21.

6             THE COURT:  I will say, Mr. Siegal, it's just

7    Ms. Hector started to get on to something which is troubling

8    which is you didn't intend to have and aren't calling this

9    witness.  You have a lot of material you have because it's 3500

10   material.  You certainly knew of 3503-14 well before today and

11   so at some point it does get to be too much.

12            MR. SIEGAL:  Your Honor, just to be clear, I was given

13   3503-14 on Friday evening.

14            THE COURT:  That was a long time ago.

15            MR. SIEGAL:  We gave our witness lists on the 14th,

16   your Honor.  And frankly, I didn't know -- I had no idea what

17   he was going to say about what happened here.  This is a

18   request from him.  I don't know what happened.

19            THE COURT:  I think what I'll ask the government to do

20   is to look and see if -- how about if there's anything, any

21   documentation of Ms. Miller's searching of the material that is

22   anything other than attempt to find documents that had already

23   been identified --

24            MR. SIEGAL:  Your Honor, I understand that I'm trying

25   the Court's patience here a little bit on this but I think the

1    request ought to be that if there's any record of electronic

2    searches done by Ms. Miller in response to this request in 2015

3    and there's documentation of it, we ought to be able to see

4    that documentation and makes argument to your Honor.  I'm not

5    asking for her testimony.  I'm just asking to see the

6    documents.

7            THE COURT:  Anything further, Ms. Hector?

8            MS. HECTOR:  Your Honor, not knowing what those

9    documents are it's a little hard.  But at the same time if he

10   is going to be making arguments whatever they are then she

11   ought to take the witness stand and he ought to question her

12   about that.  I don't want to be in the position where

13   Mr. Siegal is making argument about documents without the

14   benefit of if it's going to sort of not be a complete record.

15   I think he could have called this witness.  He could have

16   alerted the Court and us that he was going to call this witness

17   and he has not and so the record is what it is at this point.

18           MR. SIEGAL:  Your Honor, first of all, we're still on

19   their burden, half of this case.  We haven't gotten to mine

20   yet.  I may not call witnesses but given this issue I still

21   have the right to do that.  I was unaware of the existence and

22   importance of this witness until Friday night.  It's Tuesday.

23   So, I'm going to reserve the right to call her if I think there

24   are documents relevant to this issue and reserve to keep the

25   record open on this issue.  I don't have any --

```
 1              THE COURT:  I'm going to think about it.  You had an
 2     opportunity to list witnesses.  You had an opportunity to make
 3     requests.  I don't think the government -- do you think that
 4     there's anything that the government has failed to turnover
 5     that they were obligated to turnover up to this point?
 6              MR. SIEGAL:  Yes, that's what I'm suggesting.
 7              THE COURT:  But based on what?
 8              MR. SIEGAL:  Based on this e-mail and Mr. Maguire's
 9     testimony.  There is documentation -- our motion quite clearly
10     on its face is there were searches done in these documents long
11     after they ought not have been done.  We have been given
12     searches 2013 and perhaps they have explanations for those.
13     Perhaps, they don't.  But they knew this was an issue.  These
14     documents are relevant.  We haven't seen them yet.  We gave
15     notice on the 16th about who we understood our witnesses were
16     going to be given the knowledge we have as of that date.
17     There's no prejudice to the government here.  Trial isn't until
18     October.  It's not inappropriate for me to ask for the
19     document.  I'm not asking for the testimony right now until I
20     see some documents.  If there's no documents, there's nothing
21     to talk about.
22              THE COURT:  I'm going to think about it.  This is a
23     two-day hearing.  The hearing ends today, right?
24              MR. SIEGAL:  Fine.  I'll call her.  We'll do without
25     the documents.  I'll just ask her what she did.
```

1        THE COURT:  OK.  Anything wrong with that, counsel?

2        MS. HECTOR:  We can try to contact her.  I have no

3   idea where she is right now.  We can try to contact her and see

4   where she is today.

5        THE COURT:  All right.  Go ahead.

6   BY MR. SIEGAL:

7   Q.  Special Agent Maguire, can you take a look at Defense

8   Exhibit 21 please.

9   A.  OK.

10  Q.  Are you familiar with this document?  It's a one-page

11  document that says FTK case report on its face.

12  A.  I'm not sure.  I've not seen it in a printed version.  It

13  looks to me like some -- I see what it is.  I'm not sure I've

14  seen this document before.  So, when I reviewed the evidence in

15  the server I see the document and I make bookmarks, I recognize

16  the contents of this document.  I just don't know this specific

17  document.

18  Q.  Sorry.  It says Thomas Maguire on the second page under

19  "investigative name" but you are saying that you didn't run

20  this report?

21  A.  I did not generate this report.  What happens is I do

22  bookmark and I recognize some of the bookmarked names here.

23  For example, 0HD Erbek, so I would make that bookmark and then

24  the cart agent would run this report based on my bookmark, but

25  I don't run that report.

1  Q.  And you haven't gone over this report with the cart agent

2  or its results?

3  A.  Well, I see the documents that I bookmark.  So, I see the

4  results.  So, this is a sort of technical.  I guess this is

5  sort of like -- I'm not sure.  I bookmark the documents and

6  then they generate a report containing those documents,

7  information about those documents.

8  Q.  So, then you don't know, for example, what it means on the

9  third page where it says "documents 485,323"?

10 A.  Where do you see that number, on that third page you said?

11 Q.  About halfway down are the word --

12          THE COURT:  This is not in evidence, right?

13          MR. SIEGAL:  No, it's not, your Honor.

14          THE COURT:  So far the witness has said that --

15          MR. SIEGAL:  Doesn't know what it is.

16 Q.  Do you see, sir, that it says report created September 2,

17 2015?  That's on the second page?

18 A.  Yes.

19 Q.  That's about a week before the indictment in this case?

20 A.  Correct.

21          MR. SIEGAL:  I guess we're going to have to call a

22 different witness, your Honor, for this document.  I thought

23 Mr. Maguire was going to be testifying about the electronic

24 evidence but we're perhaps going to have to speak to a cart

25 agent on it.

1           THE COURT:  OK.

2           MR. SIEGAL:  One moment, your Honor?

3           THE COURT:  Yes.

4           MR. SIEGAL:  I have nothing further for this witness,

5    your Honor.

6           THE COURT:  I just want to follow-up.  Going back,

7    agent, to Defendant's Exhibit 20, I think I understand your

8    testimony about what happened.  I'm just curious how you

9    understand that is consistent with the language that says your

10   language in the e-mail against the about 150 documents she

11   looked at.  I thought what you were saying is that you located

12   these documents.  You are basically giving them to her to

13   re-fined them in the original copies?

14          THE WITNESS:  Correct.  Yes, I remember that for in

15   preparation for the indictment documents relating to Doban

16   Erbek were important and we had asked her to find documents

17   related to Doban Erbek.  And this is one of the searches I had

18   done in 2013 and because it was very difficult to match up

19   these document, I think her task was to find all the Doban

20   Erbek documents.  There was like the number, the 46 hits or

21   something and so the idea was if she would then look for all

22   the Doban documents she would replicate exactly my search

23   results from 2013.

24   BY MR. SIEGAL:

25   Q.  She is supposed to run that search through the entire

H1OAAWEI4                          Maguire - Cross

1     search database?

2     A.  I think she would have had to, yes.  So, I remember the

3     discussion with her and the prosecutor at the time.  We were

4     aware of this issue.  I was under the impression that in 2015

5     we could not do new searches.  I could not now, the new name

6     came up.  I couldn't just go and run the search.  We wanted to

7     be very careful with the privilege that I didn't pull up an old

8     document and see a potentially privileged document.  And so we

9     were looking for ways for her to find.

10    Any old search results and only my old search results.  That

11    was her assignment and that is what she found.

12    Q.  Well, then I have another question for you going back to

13    Government Exhibit 16.

14              THE COURT:  Just before you do, were all Doban

15    documents deemed responsive to the warrant?

16              THE WITNESS:  I do, yes.

17              THE COURT:  I'm sorry?

18              THE WITNESS:  I do, yes, because I learned through the

19    investigation in review of the documents that Doban Erbek and

20    EST are set up accounts in facilitated financial transactions

21    related to Ben Wey and Tianyi Wey so there would be financial

22    records relating to Benjamin Wey.

23    Q.  Any document relating to Doban and EST on it?

24    A.  At the time that was sort of one focus of the investigation

25    leading up to --

1    Q.  Sorry.  Let me make sure I get my question answered which

2    is, are you saying that the searches that you did in 2013 would

3    have marked, tagged as responsive any document that had the

4    words "Doban Erbek" or "EST" in them?

5    A.  Well, no.  For example, EST is one of the circled terms.

6    But I ran a search for EST and it was like EST and SA, two very

7    common letter combinations.  An I determined even looking for

8    stuff or EST there were too many results, so I didn't tag EST.

9    Erbek is a very unique name.  So, I tagged, I see here under 54

10   documents related to Erbek, when I did the search I got the

11   results.  I looked at them.  Those are all the Dobans who

12   arranged for this financial documents or accounts to be set up.

13   So, I deemed that this would all be within the search warrant.

14   I still think that is true today.

15   Q.  OK.  So, just so I'm clear, you tagged every document with

16   "Erbek" in this as responsive to the warrant?

17   A.  After looking at them, yes.

18   Q.  OK.  And then what about -- so that you were referring to

19   the 154 number right next to the e-mail address Erbek at EST --

20   A.  Right.  And I wrote in Erbek and I think that would be mean

21   that just writing "Erbek" that was sufficient because that's a

22   unique name to generate this 154 hits.  I looked at them.

23   They're all Doban Erbek.  They're all pertinent.

24   Q.  On page two.  Do you see there's a separate entry for Doban

25   Erbek himself or just to that name there's a number 131 there?

1    A.  Correct.

2    Q.  For were those 131 had been tagged responsive to?

3    A.  Yes.

4    Q.  What about Shawn Calsulium, did you have an understanding

5    that that name was show related to Doban Erbek or EST?

6    A.  Which page?

7    Q.  Same page, little bit further up.

8            MS. HECTOR:  Mr. Siegal, I've lost the page.

9            MR. SIEGAL:  I am on the second page of Government

10   Exhibit 16.

11           MS. HECTOR:  The one with the two at the bottom?

12           MR. SIEGAL:  Yes.

13           MS. HECTOR:  OK.

14   Q.  Do you see it says Shawn Calsulium?

15   A.  I do.

16   Q.  At EMT?

17   A.  Correct.

18   Q.  You are saying every document with that person's name would

19   have been tagged as responsive?

20   A.  Yes.  So I ran the search.  I had 82 hits.  I look at the

21   hits and I decided they're all pertinent.

22   Q.  Was it your understanding that Shawn Calsulium was somehow

23   related to Doban Erbek; is that why she is on the list?

24   A.  I mean, I don't remember now three years later.  It sounds

25   right but I knew she was related to one of the other names on

1    the list of the search warrant.

2              MR. SIEGAL:  I'm sorry, your Honor.  I think I'm done

3    but Mr. Ferrara would like to say something to me.

4              MR. FERRARI:  Sorry, your Honor, one moment.

5              (Pause)

6    BY MR. SIEGAL:

7    Q.   Did there come a time, Special Agent Maguire, when you

8    began working with an agent from the IRS on an IRS

9    investigation as well?

10   A.   Correct.

11   Q.   When did the IRS get involved in the investigation with you

12   relating to New York Global Group or Ben Wey?

13   A.   I think it would have been around 2013 when I took over but

14   the involvement was very minor initially.  I work a lot with

15   this agent.  I said this is, these are good with financial

16   analysis, so I wanted to bring him in on the case.  And he has

17   done some work on the case.  He has not done any of the

18   computer review but he is the IRS agent assigned to the

19   investigation.

20   Q.   And have you provided that agent with access to any of the

21   search materials in connection with that agency's

22   investigation?

23   A.   With the search results or with the sort of access to the

24   document.

25   Q.   Have you provided him with access to the hard copy

1    documents?  Let's do that fist.

2    A.  I mean, I don't think he ever came over and looked at it.

3    I think we identified some documents which we thought were very

4    important and those might have been provided to Agent Komar.

5    So some of search results documents probably were shared with

6    Agent Komar.

7    Q.  Did he participate with you in developing the search term

8    lists?

9    A.  No.  There was one -- we were looking for tax documents and

10   I couldn't really search the word tax because it's like too

11   general and I talked to him about there was a gift tax form and

12   he had reviewed some gift tax forms that represented transfers

13   from Tianyi Wey to Michaela Wey.  And that form has a number

14   and I remember trying to number as a search term and it was too

15   generic and that was not a way to identify any documents, so

16   nothing was tagged on that number.  I think that was his only

17   contribution.

18   Q.  Did that IRS agent have access himself to access the

19   electronic databases and search through?

20   A.  His access would be the same as the prosecutor.  So, I

21   access it.  I do the searching.  I do the tagging then

22   documents are exported and some of his exported documents might

23   have been shared with him but this database is like an FBI

24   internal system and he would not have access to that.

25                    (Continued on next page)

H1OMWEY5                        McGuire - cross

1   Q.  You said the name of the tax agent and I totally missed it.

2   A.  Special Agent John Carrano.

3   Q.  And did he explain to you what his tax investigation was

4   about?

5   A.  Well, to be correct, it's a money laundering investigation.

6   He has not initiated -- IRS investigate tax fraud and money

7   laundering.  And he is assisting as part of a money laundering

8   investigation.  I know they don't have -- I don't think the IRS

9   has a tax investigation open against Ben Wey.  I guess I am not

10  sure.

11  Q.  Could you just refer, please, to Defense Exhibit 22, again,

12  for a moment.  That's the single document that was added this

13  afternoon.  Do you see on the last page there is an alternative

14  theory tax evasion there?

15  A.  Correct.

16  Q.  Is that a description of either all of or part of Agent

17  Carrano's investigation?

18  A.  No.  I think this was something I had suggested to the

19  prosecutor.  They might have thought about this on their own.

20  I used to be a tax attorney.  When I took over the case I saw

21  there is securities fraud, there is money laundering.  I got

22  the impression that there is also massive tax fraud involved.

23  And I talked to the prosecutors and I said, maybe that is

24  something that should be considered.

25  Q.  And your understanding is that's why Mr. Massey added it to

1    this list of possible case theories?

2    A.   I believe --

3             MS. HECTOR:  Objection.  Calls for speculation.

4             THE COURT:  I'll sustain on that ground.  You can

5    rephrase.

6    Q.   I'm asking what his understanding is about how that piece

7    of the e-mail from Mr. Massey was generated.  I'm asking him

8    about his understanding.  That's not speculation I'm asking

9    for.

10            MS. HECTOR:  Your Honor, I also think it's asked and

11   answered because I believe the witness just said, I suggested

12   that to Massey.  I don't know if they were also were

13   considering it.

14            THE COURT:  Let's get clarity.  Ask the question again

15   from the perspective of the witness' awareness.

16   Q.   Was this tax theory solely your idea or was it also

17   somebody else's idea?

18   A.   It was my idea before the IRS agent was involved, but I

19   don't know if this was also something Massey considered before

20   I -- when I took over the case, one thing I sat down with the

21   prosecutors and I said, I read the search warrants.  We are

22   developing evidence.  We want to sort of -- what direction is

23   the investigation moving on, what are your charging theories,

24   what is sort of the strategy.  I suggested that in addition to

25   the money laundering and securities frauds, all these

1   transactions that I see may also constitute tax fraud.  And

2   then the way this works is, I'm not the prosecutor.  I suggest

3   a theory and then the prosecutor evaluates it and they make a

4   decision.

5   Q.  So are you saying that this passage at the back end of

6   Defense Exhibit 22 captures your idea of what the tax fraud

7   theory might be?

8   A.  Can you ask the question again.

9           MR. SIEGAL:  I'd like the question read back, please.

10          THE COURT:  Yes, please.  Thank you.

11          (Record read)

12  A.  That is correct.

13  Q.  And you are saying Agent Carrano of the IRS had a different

14  investigation theory from this one?

15  A.  No.  He sort of got in afterwards.  When I took over the

16  case I was thinking, there is --

17  Q.  Sorry.  I just want an answer to my precise question, which

18  is, are you saying that the theory -- that you understand

19  Mr. Carrano was investigating this theory or a different

20  theory?

21  A.  Agent Carrano, to my understanding is investigating money

22  laundering.  And because he has knowledge, I know I had a

23  conversation with him about whether this would be a good

24  theory.  My understanding is that he has a money laundering

25  investigation, which is separate from a tax investigation.

H1OMWEY5                         McGuire - redirect

1    Q.  And he became involved some time in the middle of 2013 with

2    you in this investigation?

3    A.  Correct.

4              MR. SIEGAL:  That's all, your Honor, for this witness.

5              THE COURT:  Thank you.

6    REDIRECT EXAMINATION

7    BY MR. FERRARA:

8    Q.  Agent McGuire, I just have a few additional questions.

9    First off, did you have an opportunity to go back through your

10   e-mail from the relevant time frame to try to locate e-mails

11   concerning your involvement in the searches at issue in this

12   hearing, or was there a problem with your e-mail?

13   A.  Some time ago I was asked by the prior prosecutor to

14   provide any relevant e-mails, and I conducted a search.  I

15   think some of these e-mails were provided of the day of the

16   search.  And it was e-mails relating to the search and the

17   execution of the search, and so I copied those e-mails.  I

18   provided them to the prosecutor.

19             And then maybe six or eight months ago I had some

20   problems with the computers and the computer tech guy says

21   there is too much data on my computer, so we tried to delete a

22   lot of old documents, and in that process a lot of my old

23   e-mails were deleted.  But that was sort of a separate concern.

24   For this case when I do the searches, I know before any e-mails

25   were deleted I did conduct that search and I provided 10, 15,

1    20 e-mails to the prosecutor.

2    Q.   Going back to Defense Exhibit 20, just for a moment, and I

3    don't want to belabor this, but I just want to make sure the

4    record is clear.  Elizabeth Miller, is she an agent at the FBI?

5    A.   She is.

6    Q.   Was she ever a case agent on the Ben Wey NYGG

7    investigation?

8    A.   No.

9    Q.   Besides being tasked with this responsibility that we have

10   discussed in relation to Defense Exhibit 20, did she have other

11   case-related roles on this case?

12   A.   No.  She was specifically selected for -- she was selected

13   to be an otherwise involved agent.  She was told she would help

14   with this taint review and never touch the case again.

15   Q.   Is it accurate to say that her task was to try to recreate

16   what had been lost, given this computer glitch where the

17   tagging had been eliminated to some extent?

18   A.   Correct.  And one -- yes.  So her job was to locate the

19   evidence copies of these documents, because there are working

20   copies and there are evidence copies.  So her task was

21   specifically -- I explained it to her, that her job was to find

22   exactly documents that we had already found and nothing else

23   and that she would do it separately so there is no issue about

24   taint reviews.  And the end result of what she was supposed to

25   provide to the investigative team was just an evidence copy of

1   documents I had previously tagged.

2   Q.  What do you mean when you say evidence copy versus working

3   copy?

4   A.  The way CART processes original evidence that go in the

5   server, I can access the server, I can review the documents, I

6   can tag them.  At some point when I completed the search we,

7   for example, downloaded a working copy for the prosecutors.

8   But CART has a specific process for the evidence copy.  It has

9   to be downloaded directly by a CART agent.  There is some

10  paperwork involved.  It gets put into evidence.  And I think at

11  the time for grand jury we wanted to make sure we are working

12  off an evidence copy and not just a working copy.

13  Q.  So you were trying to locate the evidence copy of materials

14  that were now part of your working copies?

15  A.  Correct.  Because we had those documents.  For example, we

16  had printouts, but we wanted to get the original evidence copy

17  of documents I had previously found.

18  Q.  To be clear, did Agent Miller provide any additional

19  documents that resulted from her efforts that were not

20  previously identified by you in your searches?

21  A.  No.  And those were specifically her instructions that she

22  would only provide exactly what we already gave her.  She would

23  just give us an evidence copy.  And the way she would do it,

24  she would then tag them and then the CART agent could go in and

25  have her tagged, create an evidence copy of exactly what we

1    have previously tagged.

2    Q.  And once it was determined that this glitch in fact did not

3    exist and that those tags had been maintained, what happened to

4    her work, to your knowledge?

5    A.  Then she was no longer involved with the case.

6    Q.  Flipping back to Defense Exhibit 19 for a moment, at the

7    time you wrote this e-mail to David Massey and Antonia Apps --

8    and I'm referring to the e-mail at the bottom of the page on

9    May 2, 2013 -- had you become generally familiar with the

10   investigation as the case agent at that time?

11   A.  Yes.

12   Q.  And had you engaged in your own review of the case file and

13   conversations with the prosecutors about the investigation and

14   the state of the case?

15   A.  Yes.

16   Q.  And were you generally familiar with the crimes that were

17   being investigated and the legal theories that were circulating

18   amongst the prosecution team in terms of where the

19   investigation was going?

20   A.  Yes.

21   Q.  And so when you asked Mr. Massey and Ms. Apps to provide

22   you with the top five illegal acts, what was it that you were

23   looking for?

24   A.  Well, when I conduct the review of the evidence we are

25   really doing two things.  One is to identify all pertinent

1   documents responsive to the search warrant.  But as the case

2   progresses, you also focus in on specific subjects, specific

3   charges.  So since I was rereading all these documents I was

4   separately looking for what we referred to as the hot docs.

5   These would be documents -- maybe would anticipate might be

6   trial exhibits later on.  That's a much smaller subset.

7              And so I had read the warrant.  I know what was

8   covered by the warrant.  I had the search terms.  So that

9   process was clear.  But at the same time I also wanted to,

10  since I was spending so much time with it, identify the hot

11  docs.  For that I needed to know what is the current charging

12  theory.

13  Q.  And what you are looking for as hot docs, is that a subset

14  within documents that are responsive to the search warrant?

15  A.  Yes.  I think sort of looking at maybe the top 100

16  documents.  What are the potential trial exhibits or grand jury

17  exhibits, which is a much smaller -- it's a small subset of the

18  responsive documents.

19  Q.  Agent McGuire, regardless of the legal theories that were

20  circulating in your own head and amongst the prosecution team

21  with respect to charging and how to further the investigation,

22  when you reviewed the electronic materials, did you tag only

23  those materials that you reasonably believed were within the

24  scope of the warrant?

25  A.  Correct.

1    Q.  Just one final area that I'd like to turn your attention

2    to.  Defense counsel asked you various questions about the

3    search term lists that you utilized as you were going through

4    the electronic databases, and I think that's Government Exhibit

5    15.  16.  I'm sorry, your Honor.  Government Exhibit 16.

6    A.  OK.

7    Q.  How many databases did you have to run these through?

8    A.  Two.

9    Q.  And to the best of your recollection, did you endeavor to

10   run each of these terms once through each database or did you

11   duplicate your efforts several times?

12   A.  The plan was to run the list through the database once,

13   each database once.

14   Q.  And is that what you tried to do?

15   A.  Correct.

16   Q.  And to the best of your recollection, is that what you did

17   do?

18   A.  Correct.

19           MS. HECTOR:  One moment, your Honor.

20           That's all I have.  Thank you.

21           THE COURT:  Anything?

22           MR. SIEGAL:  Your Honor, I think perhaps it would be

23   good to take a break so I can converse with the prosecution to

24   figure out what the next witness situation is.

25           THE COURT:  One question that popped in my head that's

1    sort of left over from yesterday, and the agent did testify

2    about the evidence.  I had a question of whether there is a

3    photograph of where the suitcase was taken, and Mr. Ferrara

4    said that you would look overnight.  I just wondered if you had

5    an opportunity to do that and if there is one.

6            MS. HECTOR:  Your Honor, we do not see the suitcase in

7    the photographs, this particular suitcase, in the photographs.

8    There are photographs of area F, which is I believe where the

9    testimony is that the suitcase was found, but we have not

10   located a picture of the suitcase itself in that set.

11           THE COURT:  Anything further with this witness?

12           MS. HECTOR:  Your Honor, one second.

13           THE COURT:  Go ahead.

14           MR. SIEGAL:  We should take a break, your Honor.

15           MS. HECTOR:  Nothing further, your Honor.

16           THE COURT:  I am deciding whether we can excuse this

17   witness.

18           MR. SIEGAL:  As far as I'm concerned, you can.

19           THE COURT:  Thank you, Agent.  You are excused.  We

20   will take a 10-minute break.

21           (Recess)

22           THE COURT:  What's next?

23           MS. HECTOR:  Your Honor, we are currently trying to

24   locate a CART person because defense counsel has indicated to

25   us now that he does wish to call a CART person who could

1    testify regarding that particular CART document, and so we are

2    endeavoring to do that.  We have not.  We have been trying

3    since the break and have not been able to reach that person

4    yet, but we hopefully will soon.

5            With respect to Agent Miller, she was in the Chelsea

6    office and she just arrived apparently, so she is here in the

7    building.  We would like a moment just to chat with her.  She

8    doesn't even sort of know why she is here besides the fact that

9    her testimony may be required.  If we could have a few minutes

10   just to chat with her, I think we would be able to then just

11   put her on the stand.

12           THE COURT:  Mr. Siegal.

13           MR. SIEGAL:  Yes, your Honor.  I expect that my exam

14   of the CART agent will be very quick.  I just want to deal with

15   that one document.  But it may be that we can't have a CART

16   agent here today, although they were on the joint witness list.

17   That would be the only witness I would call in my case.  I

18   released the other agent witnesses.  I don't imagine that

19   testimony will take more than half an hour at most.  But if we

20   can't get him here today, maybe we could do it tomorrow

21   morning.

22           THE COURT:  No, we can't.  Unless you can do it

23   without me.  We scheduled this for two days.  We are going to

24   do what we can to get it done in two days.  We will take a

25   break.  About how long you need, five minutes?

H1OMWEY5                          Miller - direct

1              MS. HECTOR:  10 minutes, your Honor.

2              THE COURT:  10 minutes, and you will keep working on

3    the CART agent.

4              (Recess)

5              MS. HECTOR:  Your Honor, the government rests.  We are

6    no longer calling any additional witnesses.

7              MR. SIEGAL:  Your Honor --

8              THE COURT:  Your client is not here.

9              MR. SIEGAL:  Pardon me.  I'll go grab him.

10             THE COURT:  Go ahead, Mr. Siegal.

11             MR. SIEGAL:  Your Honor, I'm calling Special Agent

12   Elizabeth Miller to the witness stand.

13             THE COURT:  Agent Miller may come forward.

14             MR. FERRARA:  Just to make a record, the government

15   had spoken to Ms. Miller for about maybe five minutes prior to

16   this.  We had took some notes and we produced the original of

17   those notes.  Mr. Siegal has the original of our notes in front

18   of him during this examination.

19             THE COURT:  Thank you.

20             Ms. Miller, you may come forward.

21    ELIZABETH MILLER,

22        called as a witness by the Defendant,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. SIEGAL:

1    Q.   Good to meet you, Special Agent Miller.   I take it you're

2    an FBI agent?

3    A.   Yes.

4    Q.   How long have you been with the FBI?

5    A.   I've been with the FBI for approximately two years.

6    Q.   And did you have a career prior to joining the FBI?

7    A.   Yes.

8    Q.   In what?

9    A.   Social work.

10   Q.   I'm going to dispense with background information.   I have

11   not met you before.   That's right?

12   A.   Yes.

13   Q.   It's fair to say that you were called here to testify with

14   no more notice than just a phone call this afternoon?

15   A.   Yes.

16   Q.   I am going to ask you a few questions about some stuff that

17   happened about a year and a half ago.   And if you don't mind,

18   part of it is going to relate to a document in the binder

19   that's sitting on the lecturn next to you there.   Can you to me

20   a favor, please, if you would and just open up to tab No. 20.

21              THE COURT:   It's Defendant's 20?

22              MR. SIEGAL:   Yes, your Honor, Defendant's 20.   I think

23   that's the defendant's binder.

24   Q.   Do you see there that there is an e-mail from Thomas

25   McGuire to you and Micah Smith, who appears to be from the U.S.

1    Attorney's Office, on August 20, 2015?

2    A.  Yes.

3    Q.  Do you have a recollection of this e-mail communication?

4    A.  Yes.

5    Q.  Do you have a more general recollection of the substance of

6    what was actually going on in connection with the e-mail?

7    A.  Yes.

8    Q.  That's what I'm going to ask you about.

9            Were you substantively involved in the investigation

10   of Benjamin Wey or New York Global Group in or about August of

11   2015?

12   A.  Yes.

13   Q.  Tell me what your role was, if you can explain it.

14   A.  My role was to be the taint agent for the case.

15   Q.  Can you explain what that means?

16   A.  Sure.  So the taint agent comes in and does not have any, I

17   guess, interaction per se with any of the people who are

18   working the case.  And you are there to look at evidence that

19   they are not necessarily allowed to have access to.  And your

20   job is to pull out and ensure that any of the privileged

21   evidence that might have been seized is not given to the actual

22   case agents working on the case.

23   Q.  And is this August 20, 2015 e-mail an e-mail in connection

24   with that role that you had back then?

25   A.  Yes.

1    Q.  Do you recall, generally speaking, what you were asked to

2    do by Mr. McGuire in connection with the subject matter of the

3    e-mail?

4    A.  Yes.

5    Q.  Please explain what you recall.

6    A.  What I recall that I was asked to do was to search

7    different terms in some of the files that they had obtained

8    from previous search warrants that involved some computers.

9    And from there to, if I was able to find any of those documents

10   or any e-mails, etc. on the computers that had been obtained,

11   to then proceed to look to ensure that they were not

12   privileged, meaning that they were not in connection with any

13   lawyers or with the subject's wife.

14   Q.  So you were asked to run certain search terms through the

15   search electronic database.  Is that what you are saying?

16   A.  Yes.

17   Q.  And do you have a sense of what the database was that you

18   were searching in?

19   A.  The data base was part of our CART team that we have set

20   up.  We have a special system for digital evidence review.

21   Q.  And is it your understanding that the evidence you were

22   looking at was the entire set of electronic evidence that was

23   seized by the FBI in 2012 from the home and office of Mr. Wey?

24   A.  Yes.

25   Q.  Do you recall what the search terms you were asked to run

H1OMWEY5                         Miller - direct

1    were?

2    A.   I do not recall specifically what the search terms were at

3    this time.

4    Q.   Do you recall any of them?

5    A.   I believe some of them were company names, but I do not

6    recall what they were right now.

7    Q.   Do you recall perhaps the name Dogan Erbek?

8    A.   That does sound familiar.

9    Q.   As one of the names you might have searched?

10   A.   Yes.

11   Q.   Do you recall an entity called ESTSA as one of the names?

12   A.   That does not ring a bell right now.

13   Q.   Do you recall Mary Shontal?

14   A.   I do not recall that name right now.

15            MR. SIEGAL:   Now, I am just trying to read some

16   handwriting here I've been given.   I am going to just ask some

17   leading questions off of the notes here of the brief prep

18   session that Ms. Miller had with the AUSAs.

19            MS. HECTOR:   Objection.   This is direct.

20            THE COURT:   If you want to set something up briefly,

21   OK to move us along, but otherwise sustained.

22   Q.   What were you supposed to do, as you understood it, as you

23   ran the search terms through the search database?

24   A.   So once I ran the various terms through the database I was

25   marking them.   Once I was done marking them I was then going

1   through them to see if any of them were privileged or not.  And

2   if they were, then I was marking those specifically as

3   privileged.

4            THE COURT:  Just before you proceed, Agent Miller, do

5   you remember approximately how long the list of search terms

6   you were provided?

7            THE WITNESS:  From what I recall, I would say it was

8   anywhere between five to 10 search terms.

9            THE COURT:  And were they sort of short terms like the

10  name example or were they block quotes?  What was the nature of

11  the terms?

12           THE WITNESS:  They were more short.  They weren't --

13           THE COURT:  One or two words.

14           THE WITNESS:  Yes, one or two words.

15  Q.  By the way, do you have any record of the searches that you

16  ran in your files?  Would you have any if you had an

17  opportunity to look?  I understand it's been short notice, so

18  you have not had a chance yet.  If you had an opportunity,

19  would you have records showing what you searched?

20  A.  I honestly do not know.  CART would be better able to

21  answer that.  I'm sure that I could log in and potentially have

22  access, but I don't know if my name was taken off or not

23  because I had completed what my role was as a taint agent for

24  the case, so I cannot honestly answer that question.  I do not

25  know.

1   Q.  Beyond being given search terms, were you also shown

2   documents in connection with preparing your searches?

3   A.  There were a couple of documents that were shown to me, and

4   I was told if I found something similar that that was something

5   that they were looking for.

6   Q.  Who gave you the search terms?

7   A.  Agent McGuire.

8   Q.  Did he also give you the documents he asked you to find or

9   find documents like that?

10  A.  Yes.  He showed me the examples.

11  Q.  How long did the process take for you to run these searches

12  and pull the documents that were responsive?

13  A.  It took me, from what I can recall, probably about two

14  weeks or so.

15  Q.  And would you have a record anywhere of the results of that

16  process in your files?

17  A.  I would not know.  That's still all maintained within the

18  CART system with the digital evidence.

19  Q.  So those results may be sitting someplace in the FBI CART

20  office, but you don't know?

21  A.  I don't know.  I don't know how they -- I'm sure they have

22  it somewhere.  I'm not privy to their process.

23  Q.  After you found whatever you found in the course of the

24  searches that you ran, did you determine that any of the

25  documents you found were privileged?

1    A.  Yes.  Some of the documents I found were privileged and

2    they were marked accordingly.

3    Q.  And for the documents that you found during your searches

4    but you determined weren't privileged, what did you do with

5    those documents?

6    A.  Those documents were then pulled because they were allowed

7    to be seen by the case agent.  So CART was able to pull those

8    separately away from the privileged documents.

9    Q.  And did you give those to Agent McGuire?

10   A.  I did not, no.

11   Q.  Did anybody else give them to Agent McGuire, as far as you

12   know?

13   A.  I would believe that CART would have done that.

14   Q.  But you don't personally know?

15   A.  No.

16           MR. SIEGAL:  If you give me a moment, your Honor.

17           THE COURT:  Um-hum.  Yes.

18   Q.  Special Agent Miller, I think you said earlier that you

19   were given not just the terms but also some documents to look

20   at substantively and you looked those documents.  Am I correct

21   in understanding this, in your decision-making process about

22   which documents you included in your review set?

23           MR. SIEGAL:  That was a horrible question.  Let me try

24   that again.

25           THE COURT:  Everyone in the courtroom shook their head

1    in agreement with you.

2    Q.  So there were two sets of information you got from Special

3    Agent McGuire in connection with the work you were going to do.

4    One was a set of search terms, right?

5    A.  Correct.

6    Q.  And the other were a set of documents he wanted you to

7    find, either those documents or documents like those?

8    A.  Yes.

9    Q.  How many documents did he give you, if you recall?

10   A.  They were only a few.  I would say two, three, at the most.

11   He just showed them to me as examples of things that could

12   potentially have information that they would want.

13   Q.  So when you pulled documents out of the system pursuant to

14   those searches you were doing, is it fair to say you pulled

15   more than two or three documents?

16   A.  Yes.

17   Q.  And is it fair to say that the set of documents that you

18   ultimately cleared as not privileged were greater than one or

19   two documents?

20   A.  I'm sorry.  Can you repeat the question.

21   Q.  When you did your searches and you pulled documents from

22   the electronic search material, approximately how many

23   documents did you say that you were able to identify either by

24   the search terms or similar to the ones Mr. McGuire had given

25   you?

1    A.  I did not say how many I had pulled.

2    Q.  Approximately how many do you think you pulled?

3    A.  I would have to honestly guess because I do not recall and

     I don't want to guess and be wrong.

5    Q.  Was it more than five?

6    A.  Yes.

7    Q.  Was it more than 10?

8    A.  Yes.

9    Q.  Was it more than 50?

10   A.  Possibly.  I honestly do not recall.

11   Q.  And do you recall what percentage of those documents were

12   privileged as opposed to not privileged?

13   A.  No.

14   Q.  Small percentage?

15   A.  I honestly do not recall.

16   Q.  In terms of the documents you ultimately cleared to be

17   given to Special Agent McGuire, would you say it was more than

18   five?

19   A.  Yes.

20   Q.  More than 10?

21   A.  Yes.

22   Q.  Somewhere around 50, maybe?

23   A.  Possibly.  Again, I do not recall.

24           MR. SIEGAL:  Nothing further for this witness.

25           THE COURT:  One more from me, Agent Miller.

1          Were you given any guidance as to the scope of the

2    search warrant in this case or just here are search materials,

3    find those documents, here are some documents, see if you can

4    find similar documents?

5          THE WITNESS:  I was given just a very brief summary of

6    the case, so I just had some knowledge of what I could --

7    should be looking for.  But I was not given a full scope of

8    what the search warrant entailed.

9          THE COURT:  Thank you.

10   CROSS-EXAMINATION

11   BY MS. HECTOR:

12   Q.  Good afternoon, Agent Miller.

13   A.  Good afternoon.

14   Q.  Were you on the same squad as Agent McGuire when you were

15   tasked with this job?

16   A.  No.

17   Q.  Are you on the same squad as Agent McGuire now?

18   A.  No.

19   Q.  What squad are you on?

20   A.  I'm currently on CT26, which is a counterterrorism squad.

21   Q.  Now, sitting here today, do you know what precipitated your

22   being given this task?

23   A.  I volunteered for the task.

24   Q.  But do you know why the task needed to be done in terms of

25   what was going on in the investigation or the review of

1    materials that necessitated bringing you on to do it?

2    A.  Not fully, no.

3    Q.  Now, you testified that as part of this task you were given

4    search terms and you were also shown some documents to help

5    guide your search through the database?

6    A.  Yes.

7    Q.  And was part of your instruction to try to find some

8    documents that were like the documents that you were shown?

9    A.  Yes.

10   Q.  And as you went through the database what actually were you

11   doing when you would find a document that hit the search term

12   or was like these documents that you had been shown?

13   A.  I would mark them.

14   Q.  Mark them electronically?

15   A.  Yes.

16   Q.  And then you said after marking them electronically you

17   went to also now to conduct a second level of review, which was

18   the privilege review?

19   A.  Correct.

20   Q.  Were you given a list of attorneys to help guide that

21   review?

22   A.  Yes.

23   Q.  Who gave you that list?

24   A.  Agent McGuire.

25   Q.  And do you remember approximately how many attorneys were

1    on that list?

2    A.  To the best of my recollection, there were, I would say at

3    least three, but I do not recall the definitive number.

4    Q.  To the best of your recollection sitting here today you

5    think there were about three attorneys?

6    A.  Yes.

7    Q.  And when you went through the privilege review are you now

8    looking at the documents that you have now tagged based on the

9    search terms?

10   A.  Yes.

11   Q.  And now are you actually also tagging whether those had one

12   of these attorney's names that looked to you to be privileged?

13   A.  Yes.

14   Q.  And after you concluded tagging the documents in this

15   system, was your job over?

16   A.  Once I had gone through and determined if things were

17   privileged or not, then my job was concluded at that point.

18   Q.  And was any part of your job to now deliver any of these

19   materials to anyone on the case team?

20   A.  No.

21   Q.  When you sort of completed this task, the documents were

22   located in the computer system, right?

23   A.  Yes.

24   Q.  Did you have any more involvement in this case in any way

25   after you completed tagging the documents in the computer

1    system?

2    A.  No.

3    Q.  And where were you when you were doing this review?  Where

4    would you be sitting?

5    A.  I would be sitting in 26 Federal Plaza, either in a CART

6    analysis-specific room or at a desk.

7    Q.  Sitting here today, do you know if anyone actually ever

8    looked at, anyone on the investigation or prosecution team ever

9    actually looked at the documents that you tagged?

10   A.  No.

11   Q.  Did you deliver any of those materials, print them out and

12   deliver them to anyone on either the prosecution team or the

13   investigative team?

14   A.  No.

15   Q.  As you were going through your review, were you e-mailing

16   the material or sending updates to Agent McGuire any of the

17   prosecutors with the documents that you were finding attached?

18   A.  No.

19            MS. HECTOR:  May I have one moment, your Honor.

20            THE COURT:  You may.

21            MS. HECTOR:  Nothing further.

22            THE COURT:  Mr. Siegal.

23            MR. SIEGAL:  Nothing further for this witness, your

24   Honor.

25            THE COURT:  Ms. Miller, I know this wasn't how you

H1OMWEY5

1    anticipated spending your afternoon, but with the Court's

2    thanks, you are excused.

3              THE WITNESS:  Thank you, your Honor.

4              (Witness excused)

5              MS. HECTOR:  Your Honor, my understanding is that

6    someone from CART has just arrived.  I don't even know sitting

7    here right now who that person is, whether it is someone who is

8    actually involved in this case or someone who could testify

9    about what that document means.  If we could have a brief break

10   to sort of figure that out and come back and put that witness

11   on, if the defense intends to call him.

12             THE COURT:  I suppose he probably wants to know who it

13   is.

14             MS. HECTOR:  I assume so, too.

15             THE COURT:  Mr. Siegal, anything else?

16             MR. SIEGAL:  Other than the CART agent, your Honor,

17   who I actually may decide not to call, depending on what he has

18   to say, nothing.  Maybe we could wrap it up and be done.

19             (Recess)

20             THE COURT:  Who do we have here?

21             MR. SIEGAL:  Sir, I don't even know your name.  My

22   name is David Siegal.  Welcome to the courtroom.

23             THE COURT:  Find out his name, call your witness, I'll

24   swear him in, and we will pretend like this is a courtroom.

25             MR. SIEGAL:  Defense calls Mr. Brian Booth, please,

1   your Honor.

2    BRIAN SCOTT BOOTH,

3        called as a witness by the Defendant,

4        having been duly sworn, testified as follows:

5   DIRECT EXAMINATION

6   BY MR. SIEGAL:

7   Q.  Good afternoon, Brian.  Thank you for coming today on short

8   notice.  Where do you work?

9   A.  I work at the Federal Bureau of Investigation.

10  Q.  In any particular unit within the FBI?

11  A.  I work for the CART unit.

12  Q.  What is the CART unit?

13  A.  Computer analysis and response team.

14  Q.  And how long have you been a member of the CART team?

15  A.  Since 2006.

16  Q.  Sir, we have asked you to come to court today to explain a

17  document that we understand is a document created by the CART

18  team at some point.  I'd like you to take a look, please, in

19  the binder that's sitting next to you there on the lecturn, if

20  you don't mind, and take a look at what's at tab 21 in the

21  binder.

22        MR. SIEGAL:  I'll just say for the record, that's

23  Defense Exhibit 21.

24        THE COURT:  What's been marked for identification.

25        MR. SIEGAL:  That's right, your Honor.

1    Q.  Mr. Booth, have you seen that document some time recently?

2    A.  Yes, I have.

3    Q.  You were shown a copy of that just outside the courtroom

     here today?

4

5    A.  Yes, sir.

6    Q.  Are you familiar with this form of document?

7    A.  Yes, I am, sir.

8    Q.  Is this a kind of document that you're familiar with,

     generally speaking, from your job in CART?

9

10   A.  Yes.

11   Q.  What do you recognize it to be?

12   A.  This is a summary report from an AD lab, access data lab.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SIEGAL:

2    Q.  And what is it?

3          MR. SIEGAL:  Your Honor, at this point I'll offer the

4    document.

5          MR. FERRARI:  Without objection.

6          THE COURT:  All right.  Defendant's Exhibit 21 is

7    admitted.

8          (Defendant's Exhibit 21 received in evidence)

9    Q.  Can you just give us a brief explanation of what this

10   report is meant to say?

11   A.  During a review of a case in the AD Lab software an agent

12   can bookmark items that they deem to be relevant for their

13   case.  At the conclusion of finding their review finished what

14   they do is request the card examiner to create a report that

15   details all these bookmarks or things that they've deemed to be

16   bookmarked in the case.

17   Q.  So, am I clear in understanding that this is a report

18   generated to effectively tell the reader here are all items

19   that have been tagged within a larger database?

20   A.  Yes.  I would say it is in a database form.  It's actually

21   gone through items as they find an item that they find of

22   interest, what they do is place it in into what's called a

23   bookmark.  In case all the bookmarks have been presented here

24   from what I see at least the ones that are under the shared tab

25   is considered bookmarked.

H1OAAWEI6                         Booth - Direct

1   Q.  Now, from time to time did you generate these types of

2   reports on your job?

3   A.  Yes.

4   Q.  Do you do that often at the request of an FBI agent on some

5   other spot?

6   A.  Yes.

7   Q.  Does it appear to you from this that this report in

8   particular was requested by a law enforcement agent not in the

9   cart team?

10  A.  I have no way of determining that.

11  Q.  OK.  But can you take a look at page number two, please.

12  Do you see where it says "investigator's name Thomas Maguire"?

13  A.  Yes.

14  Q.  What would you in your job and custom understand to be a

15  reference to?

16  A.  Well, when a case is originally generated or actually

17  created in AD Lab an investigator's name is usually put into

18  the database.  During the final generation of the report it

19  pulls that name and puts it into the report.

20  Q.  And do you know sitting here today know what investigation

21  this report is in connection with?

22  A.  No, I do not.

23  Q.  Have you ever heard of the Benjamin Wey investigation?

24  A.  No.

25  Q.  You are not familiar and you are not participating yourself

1   in that investigation?

2   A.  No, I'm not.

3   Q.  If I could just direct your attention to pages are not

4   really numbered one, two, three, four, the fifth page of the

5   document.

6   A.  OK.

7   Q.  Do you see where it says near the top of the page there's a

8   date 9/2/2015; do you see that?

9   A.  Yes.

10  Q.  Do you know what that date is intended to reflect?

11  A.  That reflects when the actual report was generated.

12  Q.  OK.  Not when the bookmark were placed in the database?

13  A.  No, no, sir.

14  Q.  And do you see where it says "evidence path" and then it

15  says New York cart and a bunch of letters and numbers winding

16  up with 40 Wall Street; do you see that?

17          THE COURT:  On the same page?

18          MR. SIEGAL:  Yes, same page, your Honor, just two

19  lines below the September 2, 2015 date.

20  A.  I don't see "evidence path".

21          MR. SIEGAL:  Maybe we're not all looking at the same

22  page.  I'm looking at a page that has a heading at the top that

23  has evidence list.

24          THE COURT:  And it says "page two of two".

25          MR. SIEGAL:  No, "one of two" is what I'm looking at.

1          THE WITNESS:  I'm on that page now.

2     Q.  Do you see where it says that evidence path thing and then

3     it sort of winds up with 40 Wall Street/room?

4          MR. SIEGAL:  May I approach, your Honor, to show him

5     what I'm talking about?

6          THE COURT:  Yes.

7          (Pause)

8     Q.  Do you see here evidence path and then there's what looks

9     like a URL, do you see that and then it says 40 Wall Street

10    room?

11    A.  OK.

12    Q.  Can you just explain what that field is describing?

13    A.  When a forensic examiner makes a forensic image of an item

14    they have a shared resource that we use within our laboratory.

15    That is the file path data of where that evidence is being

16    stored, that AD Lab is pulling information from.

17    Q.  And then do you see that there are little groupings of, for

18    lack of a better word, information that look like they're

19    almost repetitive, three of those on that page and then some

20    more on the next page?

21    A.  Yes, I do.

22    Q.  Am I correct that each of those groupings refer to a

23    separate item that's been booked marked within the database, 40

24    Wall Street --

25    A.  No, this has nothing to do with bookmark.  What this has to

1    deal with is the actual evidence items that had been reviewed

2    and then sequentially when you look under the evidence item

3    bookmarks those are actually items from this evidence.  So, all

4    the evidence in this case is going to be presented here and

5    that's what you're seeing.  All the evidence that's been

6    reviewed for this AD Lab report.  Regardless of whether or not

7    of whether or not he bookmarked anything in particular from

8    these pieces of evidence, it's showing all the evidence that is

9    actually in this AD review section.

10   Q.  Well, why don't we take a look if you would please at the

11   first page of the document?

12            THE COURT:  First page of defendant's 21?

13            MR. SIEGAL:  Yes, your Honor.

14   Q.  Do you see there it says bookmark shared HD Erbek HD other?

15   A.  Yes, I do.

16   Q.  What does that tell us?

17   A.  When an agent decides to create a bookmark he has to give

18   the bookmark a name.  He can call it whatever he likes.  These

19   are two bookmarks that have been created.  Multiple files can

20   be placed under each bookmarks and this is what he calls each

21   of these.

22   Q.  Am I correct in understanding that this entire document

23   relates to the bookmark "Erbek" and the bookmark "other"?

24   A.  Plus the evidence lists, plus the file overview and the

25   other things here on the front of the page.

1    Q.  All of which somehow relate to Erbek?

2    A.  I'm not privy to the case information, so.

3    Q.  Well, just as a matter of tagging or bookmarking, that's

4    what I'm asking.  Is it fair to say that this report is

5    intended to reflect those documents that somebody at some point

6    tagged with the bookmark either "Erbek" or "other" or both?

7    A.  Yes, someone has deemed it necessary to put files under

8    that bookmark.

9    Q.  On the second page of the document do you see where it says

10   "report created September 2, 2015"?

11   A.  Yes, I see it, sir.

12   Q.  Am I correct in understanding that is when this entire

13   document was created?

14   A.  Yes.

15   Q.  Then do you see on the third page there's a bunch of fields

16   and about halfway down the page, do you see where it says

17   unchecked items 315226?

18   A.  Yes, I see.

19   Q.  Sorry.  2226, what does that mean?

20   A.  When an agent or support person goes and reviews the

21   bookmark items they can actually put checkmarks next to the

22   file names so they can go back and find those checked items.

23   That's whether or not the person wants to use these little

24   check boxes next to the file fields to actually keep track of

25   what items they're looking at.

H1OAAWEI6                         Booth - Direct

 1           So, in this case I see there are no checked items and

 2      unchecked items.  There's a large number there.  It just to me

 3      that means that they didn't use the check boxes.  They just

 4      decided what they needed and then put it under bookmark.

 5      Q.  Well, let's start with evidence items.  Is that, it says

 6      seven.  Does that mean that there are seven different devices

 7      that were imaged that make up the --

 8      A.  No.  It means that there are seven different possible

 9      images that were chosen to be placed into this report.

10      Q.  OK.  And then am I correct in understanding that 3,152,226

11      number that that's somehow a tally of all the separate items

12      that are within the database?

13      A.  You have to understand that an item doesn't exactly mean

14      the file.  One file which could be a Zip file could have

15      multiple subfiles within it.  And then in each of those files

16      save it to Word file with a photo.  That's another item.  So

17      you could have multiple items under one file.  So, items could

18      be quite big.

19      Q.  So you are saying the actual number in the database could

20      be bigger than the three million here?

21      A.  Yeah.

22      Q.  Is it fair to say that it's at least three million?

23      A.  From these logs I would say yes.

24      Q.  So this report was run over a database that includes at

25      least three million items?

1    A.  Yes.

2    Q.  And reports those items within that database that have been

3    tagged by somebody at some point with either "Erbek" or

4    "other", right?

5    A.  From what I can see, yes.

6    Q.  Does the report reflect who tagged items or when they

7    tagged them?

8    A.  No, it does not.

9    Q.  It would just give you a report of any item in the database

10   that anybody had flagged with that bookmark from the beginning

11   of the database till the date of the report?

12   A.  Right.

13   Q.  I'm going to page through if you don't mind to one other

14   page.  They're not numbered sequentially as we said but I'm

15   counting three, four, five, six, seven, the eight page?

16           MR. FERRARI:  What's it say at the top?

17           MR. SIEGAL:  So at the top of the page it says

18   "bookmark" and then in between some lines that says bookmark.

19           THE COURT:  Does it say bookmark page one of seven?

20           MR. SIEGAL:  One of seven, your Honor.

21           THE COURT:  All right.  Thank you.

22   Q.  Do you see that page, sir?

23   A.  Yes, I do.

24   Q.  Do you see where it says Erbek or EST Geneva within

25   SWDOCCS; do you see that?

 1   A.  Yes, I do.

 2   Q.  And do you see where it says "E. Miller 2, creator"?

 3   A.  Yes, I do.

 4   Q.  Do you know who E. Miller 2 is?

 5   A.  No, I do not.

 6   Q.  It says file count 127; do you see that?

 7   A.  Yes.

 8   Q.  Am I correct in understanding that the pages that follow

 9   are simply a listing of each of the items that were bookmarked?

10   A.  Correct.

11              MR. SIEGAL:  I have nothing further, your Honor.

12              THE COURT:  OK.

13              MR. FERRARI:  Your Honor, for the record, we had

14   spoken to --

15              pardon me, sir, what's your title?

16              THE WITNESS:  Information technology specialist and

17   forensic examiner.

18              MR. FERRARI:  We had talked to Examiner Booth before

19   his testimony and gotten handwritten notes which we had

20   provided to Mr. Siegal.

21              THE COURT:  Thank you.

22              MR. FERRARI:  May I inquire?

23              THE COURT:  You may.

24   CROSS-EXAMINATION

25   BY MR. FERRARI:

Q.  OK.  Sir, I want to if we could stick with Defense Exhibit

21.  On the second page of that it says, it reads September 2,

2015.  There's that date report created; do you see that?

A.  Yes, I do.

Q.  To the extent you haven't already said this, that is the

date this report was run, not necessarily when any documents

were bookmarked, correct?

A.  Correct.

Q.  Let's take a quick look at where we left off.  And I

believe this is the document, it starts at the top "bookmark

one of seven".  There's about eight pages in; do you see that?

A.  Yes, I do.

Q.  Mr. Siegal had called your attention to this field creator

and it says e-mail or two; do you see that?

A.  Yes.

Q.  What does that field tell us?

A.  Well, in the creator as far as creation name depending on

when the bookmarks were generated, there are multiple different

versions of AD Lab that were used.  Sometimes when we use an

older version of AD Lab, it could be moved from an older

version to a newer version because we have more usage in the

tool.  When a person creates a bookmark it creates a user name

that gets associated with that bookmark.  When a database gets

moved from one place to another, that bookmark name can

sometimes move up towards the newer bookmark along with it.

1    Associated should normally be with the agent's name that has

2    created bookmark but necessarily that isn't so.

3    Q.  You lost me at that last part.  Maybe we'll break it down a

4    little bit.  So, if we're looking at -- so we're on this page

5    right now.  First off, just to orient ourselves, it says page

6    one of six.  Now ignore the upper right hand header for a

7    second and focus, you have the date 9/2/2015 to the left and

8    then just to the right of the date it says page one of six; do

9    you see that?

10   A.  Yes, sir.

11   Q.  All right.  Am I right that this, for instance, this is all

12   sort of one page as the report is printed; is that accurate?

13   A.  Yeah, the page is an HTML page, so it runs completely.  It

14   doesn't go from, you know breaks separate pages.  It just

15   continues to run until its done.

16   Q.  On this page, the HTML page which runs approximately seven

17   printed letter size pages, we see -- let's say I count one,

18   two, three, four, five, six, seven, eight, nine, ten, 11, 12,

19   13, 14, 15, 16, 17, 18, 19, 20, about 21 separate bookmarks

20   give or take; does that sound fair?

21   A.  That sounds accurate.

22   Q.  What does each bookmark refer to?  Each bookmark is

23   referring to what type of thing?

24   A.  A bookmark can pertain to any type of item that can be

25   chosen with an AD Lab whether or not that be a graphic, a file

H1OAAWEI6                          Booth - Cross

1   type, a graphic within a file.  It's an item.  Could be an

2   e-mail, could be a piece of an e-mail, could be stuff that's

3   carved out of an e-mail.  Each of these things could be given

4   item.

5   Q.  So, this page suggests that -- now, so within this page,

6   this HTML page --

7   A.  Yes.

8   Q.  Within this page that runs again about seven printed letter

9   size pages, 21 separate items is reflecting the bookmarking of

10  21 separate items; is that correct?

11  A.  Correct.

12  Q.  Does this report -- so, for instance, in this page that

13  we're referring to, does the creator field tell us, if you

14  know, that E. Miller 2 has bookmarked all of these items, can

15  you tell that from this document?

16  A.  No.

17  Q.  Why not?

18  A.  Essentially, when you first start a bookmark it tags a user

19  for creating the bookmark.  As another person wants to add to a

20  bookmark they can.  It doesn't save that information.  It just

21  builds to it.  It's mostly because it's under a shared folder.

22  So, if multiple people want to review a case they can sit down

23  and review this stuff and bookmark separate items themselves

24  that they deem necessary to be placed under that bookmark.

25  Q.  Again, help me understand.  So, is it telling us that E.

1    Miller 2 what was the last person in this to bookmark?

2    A.  There's a problem with AD Lab when it creates these

3    reports.  This E. Miller that you are referring to, as it

4    creates this reports depending on whether or not the database

5    has been moved from like a lower version to a higher version,

6    that information gets passed from one database to another.

7    Sometimes they don't always sync.  So E. Miller, I can't say

8    definitively unless I look at the database I can't say that he

9    is one who actually created that initial bookmark.

10   Q.  I am going to try to summarize your testimony E. Miller 2

11   created at least one of these bookmarks?

12   A.  I can't be sure.

13   Q.  Even that you cannot be necessarily sure?

14   A.  Correct.

15   Q.  So, it's possible that E. Miller 2 accessed this database

16   but bookmarked nothing?

17   A.  What happens is that everybody who connects to the database

18   gets an ID number.  And this can go from one to a thousand

19   depending on how many users connect to this database for AD

20   Lab.  This gets spread across all of our cases.  Now, when we

21   get a new version of AD Lab, those numbers don't get ported

22   directly to the new database.  So, sometimes those database

23   numbers for E. Miller might not be referenced to the same name

24   when it prints out this database here.  So, this name it might

25   be pulling from a different number.  That is why you can be

1   100 percent sure that E. Miller created this bookmark.  I could

2   go into the system probably and do some analysis on the system

3   to be able to find definitively if he was the one that actually

4   created it but I can't do that at this juncture.

5   Q.  So, let's take a look at -- now we talked about bookmarks,

6   right?

7   A.  Correct.

8   Q.  Now, if we is stayed on this page, this one of seven on the

9   up her right-hand corner but one of six toward the left, you

10  see there's this thing, it says "label"?

11  A.  Correct.

12  Q.  How is that label different than a bookmark?

13  A.  A label is a tool for an examiner or for an agent that's

14  reviewing to place notes for referencing later, whether or not

15  you reviewed it, if you want to flag it for more analysis by a

16  cart agent, if you want to deem it necessarily for translation.

17  These are just they're quick labels just to help you out like a

18  Post-It note to refer to something.

19  Q.  A label a can be anything a reviewing agent wants it to be?

20  A.  Whatever he wants to call it.

21  Q.  So, here it says "needs review", correct?

22  A.  Correct.

23  Q.  Does that mean that no one has looked at this item?

24  A.  No.

25  Q.  In fact, in order to bookmark it it had to have been looked

1    at, correct?

2    A.  Yes.

3    Q.  Do you know what "needs review" means in this context?

4    A.  No.  I would have to ask the agent.

5           MR. FERRARI:  If I could just have one moment, your

6    Honor?

7           THE COURT:  Yes.

8           MR. FERRARI:  Nothing further, your Honor.

9           MR. SIEGAL:  Nothing further for the witness, your

10   Honor.

11          THE COURT:  Thank you, sir.  You may step down.  You

12   are excused.

13          (Witness not present)

14          THE COURT:  Mr. Siegal.

15          MR. SIEGAL:  The defense rests its part of the

16   presentation, your Honor.

17          THE COURT:  OK.  So, I have two questions about open

18   or not open items.  There had been a request made following

19   among the late production of what's in evidence as Defendant's

20   22 to go back and look again at the, to make sure that all

21   relevant communications have been identified and turned over.

22   Is that a pending request and if so what are we doing with

23   that?

24          MR. FERRARI:  Yes, it is, your Honor.  And again, we

25   plan to go back to that this evening to see if there's anything

H1OAAWEI6                           Booth - Cross

1    else that we ought to produce.

2            THE COURT:  So, Mr. Siegal, I'll hear from you by some

3    time as to whether you are seeking, you have any further

4    application with regard to that?

5            MR. SIEGAL:  You will, your Honor, within 24 hours of

6    seeing whatever it is that Mr. Ferrara sends to me, I will let

7    your Honor know whether I have an application to reopen the

8    record to this.

9            THE COURT:  Mr. Ferrara, you'll do that by tomorrow

10   and within a day of that I'll hear from Mr. Siegal if he has

11   any applications.

12           And then I just want to confirm if there's no

13   applications pending.  You had asked Mr. Siegal for search of

14   material pertaining to Ms. Miller, the solution was her

15   testimony.  No further applications?

16           MR. SIEGAL:  Yeah, we're satisfied with that, your

17   Honor.

18           THE COURT:  Anything else in terms of the evidentiary

19   record then?

20           MR. FERRARI:  Not from the government, your Honor.

21           MR. SIEGAL:  One moment while I consult, your Honor.

22           THE COURT:  OK.

23           MR. SIEGAL:  Nothing, your Honor.

24           THE COURT:  So, the record, the evidentiary record for

25   the hearing is closed with the one remaining caveat that I'll

1    hear from Mr. Siegal within about two days if there's anything

2    further requested.

3            So, let's turn to logistics of briefing.  Did you have

4    an opportunity to discuss a basic proposal?

5            MR. FERRARI:  Your Honor, we had discussed one thing

6    with defense because we have a burden we would put in a brief

7    first.  We were going to ask for two weeks from when the

8    evidence is closed, your Honor.  That's due, your Honor, to one

9    of the members of the team has vacation planned.  I apologize.

10   There's other significant briefing in an unrelated case I'm

11   trying to finish and so that's why we're asking for two weeks.

12   It could be two weeks from Friday.

13           THE COURT:  Here's my concern.  On February 13 I start

14   a three to four-week trial, and I certainly, don't want to wait

15   until after that to bring you in for argument following

16   briefing.  I think that's too long.  So, you are talking two

17   weeks, two weeks presumably.  Then, so a month to get the

18   briefing?

19           MR. SIEGAL:  I'm sorry, your Honor.  I'm just looking

20   at the calendar.  So, today is the 24th.  Strikes me, your

21   Honor, we can start the clock today in terms of two weeks.

22   Whatever it is that ends up happening with respect to any

23   addition to the record, I think would be minor.

24           THE COURT:  I guess bottom line is I was hoping to

25   have you come in post briefing and argue it before I entered

1    into a month long trial.

2              MR. SIEGAL:  I obviously have no objection to that,

3    your Honor.  Let's look at the briefing.  When would it be.

4    When is Mr. Ferrara suggesting to file a brief?

5              MR. FERRARI:  I was asking for two weeks.  If the

6    clock ran from today we could do that.  I'd ask for two weeks

7    from Friday but I understand if the Court is unwilling to do

8    that.

9              THE COURT:  It won't work.  I'm not going to wait a

10   month.  Otherwise, my experience is if these two days -- we've

11   all spent today didn't happen because I want to read these

12   briefs soon.  It's like hearing summation at the end of a trial

13   and I want to get my questions asked quickly.

14             MR. SIEGAL:  Can I propose the following schedule?

15   How about you guys get your brief in on the third and we get

16   ours in on the -- then we can have argument --

17             THE COURT:  One option is to pick, I think I could

18   probably the first Friday of that trial if I reschedule eight

19   sentencings I could hear argument on that Friday.

20             MR. SIEGAL:  The 17th.

21             THE COURT:  Seventeenth.

22             MR. SIEGAL:  Can we work with that?  We can, your

23   Honor.

24             MR. FERRARI:  Yes, your Honor.

25             THE COURT:  All right.

1          MR. SIEGAL:  One brief from each of us?

2          THE COURT:  I do.  There is not time for reply but I

3     still need time to read the briefs.  I think the way to do this

4     is to say one week each which ends us on the 7th.  How about

5     this?  If we have the argument on the 17th, if you finish

6     briefing by the 14th, that gives me two evenings to read your

7     briefs.  So that would mean -- well, why don't you just split

8     that time.

9          MR. SIEGAL:  We'll do that, your Honor.

10          THE COURT:  OK.  I think I'd like it -- I'd like the

11     final brief by I'll say noon on the 14th.  I recognize it's

12     tight but short of making, you do oral argument tomorrow.

13     That's what we'll do.

14          MR. SIEGAL:  Thank you, your Honor.

15          THE COURT:  OK?

16          MR. FERRARI:  Yes, your Honor.

17          THE COURT:  You tell me.  You split that time in half.

18          MR. FERRARI:  It sounds like a third for us is that

19     Friday would be about ten days and they would have 11 days but

20     I'll talk to him.

21          THE COURT:  Yeah, that's fine.  And Mr. Siegal might

22     give the government a little more room since you've got the

23     time for their brief plus yours --

24          MR. SIEGAL:  Mike and I have never had any problem

25     working together.

H1OAAWEI6                    Booth - Cross

1        THE COURT:  You'll obviously get the transcripts

2   quickly and we'll set for the oral argument for the 17th.  I

3   don't know how long I'll need, so we'll set if for ten a.m. OK?

4        Suppose we should talk about page length.  Did you

5   discuss that?

6        MR. SIEGAL:  We did not, your Honor.

7        THE COURT:  I suppose something like 20 pages each.

8        MR. FERRARI:  I think that's fine, your Honor.  I

9   think we can focus on the factual analysis and get it done in a

10  brief -- way.

11       MR. SIEGAL:  That will be fine for us, your Honor.

12       THE COURT:  Great.  And obviously, any factual

13  contentions will be substantiated with cites from the

14  evidentiary record.

15       Anything else?

16       MR. FERRARI:  Should we plan to get your Honor a joint

17  exhibit binder by Friday?

18       THE COURT:  That's fine.  And why don't you just if

19  you would, finalize and when you put that in put it in if you

20  could confer with Ms. Nunez after you've agreed on an admitted

21  exhibit list and she can check her records and when you put the

22  binder in with a cover admitted exhibit list, I can enter that

23  as a court exhibit.  OK?

24       MR. FERRARI:  Very good.

25       THE COURT:  Anything else?

1              MR. FERRARI:  Not from the government.

2              MR. SIEGAL:  Nothing from the defense.

3              THE COURT:  Thank you.  We're adjourned.

4                        (Adjourned)

```
1                      INDEX OF EXAMINATION

2    Examination of:                              Page

3    THOMAS McGUIRE

4    Direct By Ms. Hector . . . . . . . . . . . . 237

5    Cross By Mr. Siegal  . . . . . . . . . . . . 296

6    Redirect By Mr. Ferrara  . . . . . . . . . . 359

7    ELIZABETH MILLER

8    Direct By Mr. Siegal . . . . . . . . . . . . 367

9    Cross By Ms. Hector  . . . . . . . . . . . . 377

10   BRIAN SCOTT BOOTH

11   Direct By Mr. Siegal . . . . . . . . . . . . 382

12   Cross By Mr. Ferrari . . . . . . . . . . . . 392

13                    GOVERNMENT EXHIBITS

14   Exhibit No.                               Received

15     26    . . . . . . . . . . . . . . . . . . 253

16     23    . . . . . . . . . . . . . . . . . . 261

17     16    . . . . . . . . . . . . . . . . . . 286

18                     DEFENDANT EXHIBITS

19   Exhibit No.                               Received

20     15    . . . . . . . . . . . . . . . . . . 235

21     14    . . . . . . . . . . . . . . . . . . 298

22     19    . . . . . . . . . . . . . . . . . . 312

23     20    . . . . . . . . . . . . . . . . . . 337

24     21    . . . . . . . . . . . . . . . . . . 384

25
```