```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                  v.                          15 Cr. 611 (AJN)

 5   BENJAMIN WEY,

 6                  Defendant.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          February 17, 2017
 9                                        10:10 a.m.

10
     Before:
11
                          HON. ALISON J. NATHAN,
12
                                          District Judge
13

14                           APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     MICHAEL FERRARA
17   AIMEE HECTOR
     IAN P. McGINLEY
18        Assistant United States Attorneys

19   HAYNES AND BOONE, LLP
          Attorneys for Defendant
20   DAVID M. SIEGAL
     JOSEPH C. LAWLOR
21   SARAH E. JACOBSON

22

23

24

25
```

 1                  (Case called)

 2             THE COURT:  We are here for oral argument or summation

 3      argument following the evidentiary hearing we had on Mr. Wey's

 4      motion to suppress.  I did receive post hearing briefing from

 5      counsel and I thank you for that.  I think how I would like to

 6      proceed, I do have time.  I have the morning set aside for

 7      this.  I don't know that we will need it.  I do in part because

 8      the briefs just came in and I'm in trial.  I think I'm not as

 9      laser focused on what I need to get out, so I am going to give

10      you a little bit more room to talk and lay out the structure of

11      your argument.  I think we will do 45 minutes per side and I

12      think the government, I'll have the government go first, though

13      it is Mr. Wey's motion on the question of good faith is the

14      government's burden.  My suggestion, unless anyone requests

15      otherwise, is to have the government go first and you can

16      reserve some time, Mr. Ferrara.

17             MR. FERRARA:  Thank you, your Honor.  I'll reserve

18      some time.  I don't think I am going to need all the 45

19      minutes.  With the Court's permission, I will speak from the

20      lecturn at the court reporter's request.

21             THE COURT:  I do what they say and so should you.

22             MR. FERRARA:  Your Honor, as your Honor knows, the

23      touchstone of the Fourth Amendment is reasonableness.  The

24      purpose of the exclusionary rule is to deter government

25      misconduct and that's why we have the good-faith exception, and

1    here the government acted in good faith.

2         There was a 97-page affidavit that laid out in detail

3    the fraud that was occurring at NYGG.  It detailed the

4    investigation and of course the affidavit listed the statutes

5    under investigation.  There was an opposite plan that described

6    the investigation that was circulated to the search team.  And

7    nevertheless the Assistant United States Attorney took the

8    extraordinary step of going and personally meeting with the

9    search team prior to the search to ensure they understood the

10   investigation and the scope of the warrant.

11        Moreover, the case agent was on the premises at all

12   times, both premises, taking questions and attempting to

13   doublecheck the work of the other agents.

14        Any errors in this search were not the sort of

15   sufficiently deliberate conduct that exclusion can meaningfully

16   deter, nor are they sufficiently culpable that such deterrence

17   is worth the price paid by the justice system and that's

18   *Herring.*  There are other remedies Mr. Wey can pursue if he

19   believes his rights were violated.  We don't think those are

20   warranted, but this is not a case that warrants suppression.

21        The way I would like to proceed, your Honor, I would

22   like to first point out a few liberties that the defense takes

23   in their brief, and I'll sort of jump around in doing that a

24   little bit, and then I would like to talk a little bit about

25   the physical search and then move into the electronic search

 1    and the handling of that material.

 2         THE COURT:  A preliminary remark.  Obviously, based on

 3    the order of the hearing and what I just said, this is

 4    structured around the good-faith question.  As a preliminary

 5    matter, in your opening briefs prehearing you had made an

 6    all-records argument.  I want to know whether the government

 7    maintains that argument or not.

 8         MR. FERRARA:  Yes, your Honor, we do.  We think that

 9    in this context the all-records exception, that law applies

10    here because, again, though the affidavit does not go so far as

11    to say that everything NYGG did was fraudulent, it goes far

12    enough that essentially we believe the agents could have gone

13    in and taken almost everything.  They didn't, your Honor.  You

14    heard them say that they attempted -- they were looking through

15    documents.

16         THE COURT:  Help me understand the sort of way in

17    which the all-records law applies.  In other words, doesn't the

18    government need to go to the magistrate judge and say, here is

19    probable cause and necessity of an all-records search and the

20    agents understand that that's the nature of the search.  In

21    other words, analytically are you saying sort of, no matter

22    whether we thought there was reason to go for an all-records

23    search here, no matter what the officers thought, post hoc if

24    we can establish -- help me understand how you want to impose

25    the all-records exception here, given that the testimony of the

1   agents was no, no, we couldn't take everything.  We were

2   constrained.  There was narrowness, etc.

3          MR. FERRARA:  I think the argument we are making here,

4   your Honor, is that this warrant did not suffer from sort of

5   overbreadth or lack of particularity in this case.  I think

6   that is where we are citing -- in large part relying on the

7   all-records exception.  Here the all-records doctrine --

8          THE COURT:  I understood what you just said to be the

9   opposite --

10          MR. FERRARA:  What I'm trying to say, your Honor, is

11  if a business is permeated by fraud, then the all-records

12  exception will allow a search -- a search warrant will not

13  offend the particularity requirement by calling for a very,

14  very broad range of records.  And I think that's the idea --

15          THE COURT:  Wouldn't the theory of that be that the

16  search warrant is authorizing a search of all records?

17          MR. FERRARA:  Your Honor, I apologize.  I don't have a

18  case.  My understanding is not so much that the warrant says,

19  you are authorized to seize all records.  My understanding of

20  the way this exception works is that it is a very, very broad

21  warrant that otherwise might appear out of bounds or overbroad

22  or lack particularity, will be held to be reasonable under the

23  Fourth Amendment because the business -- there is so much fraud

24  baked into the business that we are going to allow a broader

25  warrant than we otherwise might.  And that is my understanding

 1    of the law and we believe that applies here to this warrant.

 2         Your Honor is correct, the agents did not understand

 3    they were doing that.  That's not what they testified to.  We

 4    don't have a situation here where either AUSA Massey or the

 5    agents believed they were writing a warrant or executing a

 6    warrant that allowed the government to take everything,

 7    absolutely right.

 8         We were, I think, advancing the all-records exception

 9    for the proposition that the warrant itself is not overbroad

10    and it goes to this idea, your Honor, that it's hard to imagine

11    how AUSA Massey and Agent Komar would write an affidavit and a

12    warrant for a business like this if this warrant is overbroad.

13    If the Court finds this to be overbroad or that the agents

14    unreasonably seized too broad a range of documents, it's hard

15    to know how the government could execute a search like this if

16    a business is so permeated with fraud.

17         Taking the defense argument to sort of its logical

18    conclusion, how does one write a warrant where you think a

19    business is a fraud.  And AUSA Massey attempted to do that

20    here.  You are right, he did not say, we are entitled to take

21    all the records.  But what we think this law stands for is the

22    idea that this warrant was not overbroad because of the nature

23    of this business.  That's why we are citing that law.

24         Your Honor, let me turn back then to some points that

25    are made in the defense brief that I just want to correct

1    certain liberties.  First, your Honor, I wanted to flag, the

2    defense cites this case *People v. Thompson*.  It's a New York

3    Supreme Court case from 2016.  I want to flag that.  At 722 and

4    723 of that opinion, the Court actually declined to order

5    blanket suppression, essentially making a good-faith finding

6    under New York law.  I wanted to flag that.  Thompson, for what

7    it's worth, relied on *Ganias I*, which of course the Second

8    Circuit vacated in an en banc decision.  In fact, defense

9    counsel himself cites *Ganias I*.  That case is simply not good

10   law, as the Court is aware.  I think it's inappropriate to cite

11   *Ganias I*.  He does that at 16 of his brief.

12            Defense counsel suggests that it was inappropriate for

13   the government to retain a full set of the electronic evidence

14   seized and this is where *Ganias* comes in because *Ganias II*

15   speaks to that.  And your Honor is of course familiar with the

16   discussion of not thinking about electronic media and files as

17   paper files.  *Ganias* has a lengthy dicta discussion of that.

18   And *Ganias* sort of comes out in dicta saying, it's important to

19   maintain everything for authentication purposes, for instance,

20   and to allow the defense to sort of see what's been done and

21   allow them to redo it or do their own thing with it.  We don't

22   think there is anything inappropriate for us maintaining all of

23   this material for the period we have.  In fact, we think it

24   would be inappropriate for us to have not maintained it.

25            Also with the facts, your Honor --

 1          THE COURT:  Just a moment.  It would have been

 2    inappropriate.  Why is that?

 3          MR. FERRARA:  Let me make a finer point.

 4          THE COURT:  Let me ask, is there nonresponsive

 5    material on what's been obtained?

 6          MR. FERRARA:  For instance, your Honor, let me talk

 7    about electronic material and the physical material to make

 8    sure I'm not conflating.

 9          THE COURT:  I thought you were on electronic.

10          MR. FERRARA:  I am.  But I don't want the Court to

11    misunderstand what I'm saying.

12          As to the physical material, for instance, I don't

13    think it would have been inappropriate for us to say to defense

14    counsel back in 2012 or 2013, we have these x-rays of Mrs. Wey.

15    If you want those back, we will give them to you back.  We

16    should not have seized them, for instance, and create some sort

17    of record to show that we had because, of course, we want Mr.

18    Siegal to be able to make this motion.  It's important it

19    doesn't look like we are trying to hide it.  It would not have

20    been inappropriate for us to say, would you like these back.

21    And we are, of course, prepared to return those.

22          On the other hand, in the electronic evidence, yes,

23    your Honor, I think it would have been inappropriate for us to

24    have given back sort of our copies of it.  It's appropriate to

25    give back originals, as long as we have an image, or to give an

 1    image, as long as we have an original.

 2           Once we have it, this is what *Ganias II* talks about.

 3    We ought to keep an entire copy of what we have and there is a

 4    couple different reasons for that.  One is that this isn't like

 5    handing back a piece of paper.  If we take the x-ray out of the

 6    box and hand it back, we can put a piece of paper in there that

 7    says, there was an x-ray here if anyone wants to know where it

 8    came from or where it was found.  But electronic files consist

 9    in various places across the scope of a hard drive, of a

10    database.  There is metadata stored in one spot.  I wish I knew

11    more about it and, of course, *Ganias II* sort of very

12    thoughtfully talks about this.  It's not as easy as simply

13    giving back a file.  If you take files out of a hard drive or

14    off of a hard drive, you have changed the nature of the file,

15    you have changed the nature of the hard drive in multiple

16    different ways that a forensic examiner would be able to

17    identify and describe.

18           So that's what we don't want to do.  We won't don't

19    want to do it because we don't want to suggest that we have

20    tampered with anything, that when we tried to offer a document,

21    we don't want to suggest that we have tampered with it somehow.

22    For instance, your Honor, an obvious example of this is if, for

23    instance, you were to click open a Word file.  You might change

24    the date viewed, for instance.  That would be metadata that you

25    might change.  That's sort of a very easy one.  It starts to

1    get very complicated when you talk about deleted files and

2    slack space.  That starts to get super complicated.

3        No. 1, we want to make sure that it doesn't appear

4    that we have tampered with something.  Of course, we actually

5    don't want to tamper with something.

6        No. 2, we want defense counsel to come in and be able

7    to say, well, I want to run my own searches.  I want a clean

8    version to run my own searches.  I want to see what the

9    metadata says.  I want to look in different places, different

10    sort of slack space, interstices of different files and

11    metadata that are beyond my comprehension but that to computer

12    people is a very important part of electronic files.  If we had

13    started deleting files, removing files, we are changing the

14    very nature of the hard drive in ways that *Ganias II* suggests

15    are inappropriate.  That's why we believe we needed to maintain

16    the entirety of those electronic files.

17        THE COURT:  Extrapolating that the government's theory

18    is that with any seizure of electronic devices the government

19    not just can but must indefinitely retain all electronic files,

20    regardless of degree of responsiveness to the warrant?

21        MR. FERRARA:  I don't think indefinitely.  I would say

22    that once the case is concluded, that ought to be returned or

23    destroyed.

24        THE COURT:  For the life of the case, no matter how

25    long from seizure to indictment and trial?

1          MR. FERRARA:  I think that's absolutely right.  But

2     *Ganias II* speaks to the idea that there are remedies for a

3     defendant who believes something is being held and wants it

4     back.  I believe it's Rule 35, off the top of my head.  Motion

5     for return of property could be appropriate.  *Ganias II* speaks

6     to that as well.  Yes, your Honor.

7          I believe had we started manipulating those hard

8     drives in ways that deleted things and removed things that we

9     would have a different motion here that we had tampered with

10    evidence.  I think it's absolutely appropriate for us to

11    maintain a complete version.

12         THE COURT:  Is that contingent upon having provided

13    copies of, in some cases, originals but in some cases copies of

14    the data, or is it separate and aside from that?

15         MR. FERRARA:  I don't know that it's contingent, your

16    Honor, to be honest.  I can think of cases where it might be

17    inappropriate, for instance, for safety reasons to return

18    certain things.  It might be that you have a case where you

19    seize a cell phone from someone who is accused of harassment or

20    stalking or assault of some type and the victim's information

21    is on the cell phone, and I can see a situation where you do

22    not return that, for instance.  So I'm not prepared to say that

23    we would always return something, but, again, I don't think the

24    Court has to reach that here because in fact we did return

25    originals or images.  And here there were legitimate reasons to

1    do that, including allowing NYGG to continue to run, to the

2    extent it had legitimate business to do.

3          Your Honor, since we are talking about it, maybe I'll

4    reverse course a little bit and keep talking about the

5    electronic evidence a little bit and maybe we will go back to

6    the search, since we are on this topic.  There are a few things

7    I want to point out about some assertions the defense makes in

8    the context of the electronic evidence.

9          First, I want to talk about the search terms, this

10   idea, this argument that the search terms somehow expanded the

11   scope of the warrant because I think it's a misleading way for

12   defense counsel to talk about how the search is done.  There is

13   nothing inappropriate about the search term list and I think

14   what the defense is doing is confusing searching and seizing.

15   This is basic, but I want to say it.  Agents could have gone

16   through every single electronic item in those computers to see

17   if a document was captured by the warrant.  Instead, for

18   efficiency, they ran search terms, and the search terms do not

19   have to be tied to what is in the warrant rider.

20         Let me use an easier example which I think is

21   analogous and helpful which would be a warrant that would call

22   for evidence of heroin trafficking, and you seize a computer

23   from a suspected drug trafficker and the warrant says you can

24   seize information related to heroin trafficking.  You are going

25   to run searches on that computer appropriately for words like

1    brick, dope, kilo.  Those are going to be appropriate words to

2    search for and they may never have appeared in the warrant.

3    But no one would suggest that you couldn't search for those

4    things.

5            Now, if you searched for dope and you got an e-mail

6    where the suspected drug trafficker says, calls his brother a

7    dope for waking up too late, you are not going to seize that

8    because that's not the dope you are looking for.  But those

9    searches are not in and of themselves inappropriate or unlawful

10   or unreasonable simply because they are outside the scope of

11   the warrant.  That's what happened here.

12           In fact, Agent McGuire made clear that that was his

13   understanding of how that would work and, for instance, there

14   is Government Exhibit 21, which is his e-mail, which he says to

15   AUSA Massey, I'll make sure these terms return responsive

16   material, and your Honor saw his meticulous notes where he is

17   trying to go through and see what he's actually getting in

18   response to these different search terms.  Again, I wanted to

19   start by clearing up this idea that somehow a list that goes

20   beyond the search warrant itself is somehow inappropriate.

21           THE COURT:  Wouldn't it turn on what those words were?

22   In other words, in your hypothetical you said heroin

23   trafficking was the crime for which the government goes to the

24   magistrate and says there is probable cause.  Can the search

25   terms be expanded to include searching for -- let's start with

1   other drugs.  So marijuana.

2        MR. FERRARA:  Yes.  Any word your Honor says I am

3   going to say yes, I'll tell you.

4        THE COURT:  That's helpful.  Pornography.

5        MR. FERRARA:  Yes.  Now, let me just get right to the

6   heart of that.  If you search for pornography and you were to

7   find something that says pornography, you cannot seize it.  You

8   have to go get another warrant to seize that.  That's the law.

9        THE COURT:  I'll keep trying.  How about Ferrara?

10       MR. FERRARA:  They could search for any word because,

11  again, they have the authority to go through every single file.

12  So no word could return something that they would not be

13  allowed to look at because they could simply go through every

14  single file.

15       THE COURT:  But there is a temporal issue.  Let's say

16  you do look through every file, based on the scope of the

17  warrant, and that you put it aside.  And then three years later

18  you're suspicious of something else.  You then go back for what

19  you've already determined is nonresponsive material, in effect,

20  and look for something which is beyond the scope of the

21  warrant.  Is that permissible?

22       MR. FERRARA:  The law is unsettled.  The government's

23  position is that would be permissible.  There is no law to the

24  contrary on that, at least that I'm aware of, and this is

25  something we have talked a lot about.  I'm not prepared to say

1    that that's inappropriate.  We are not conceding that would be

2    inappropriate.  We don't think that's what happened here.  I'm

3    prepared to talk about what happened with Agent Miller.

4              THE COURT:  I'd have to say, it's surprising.  Maybe I

5    had not appreciated the scope of the argument.  Let's say we

6    have an exceedingly particularized warrant, the results of

7    which includes electronic devices which, as we know and as the

8    Supreme Court has said, may contain as vast and personal and

9    significant information as anything we might keep just in our

10   homes.  And the government's theory, as I'm appreciating it,

11   is, we can keep that and we can go back to it for anything,

12   entirely unwarranted to the original warrant and search it and

13   only if we get a hit do we then need to go back --

14             MR. FERRARA:  I don't know, your Honor.  Maybe the

15   words entirely unmoored get us too far away.

16             THE COURT:  You answered any word I threw at you with

17   a yes.  Do you regret that answer?

18             MR. FERRARA:  No, I don't.

19             THE COURT:  Entirely unmoored.

20             MR. FERRARA:  Again, the case law just isn't really

21   great on this.

22             THE COURT:  We do have an amendment that we have in

23   mind.  You don't need a case law to suggest that we can't

24   entirely undo the protections of the Fourth Amendment.

25             MR. FERRARA:  I am uncomfortable saying, standing

1    here.  I'm not prepared to concede anything, but I'm

2    uncomfortable saying that if your purpose is to go back into

3    the electronic media for something you know is outside the

4    warrant, I'm uncomfortable saying that is necessarily

5    reasonable.  I have to think more about it.

6            What I said to your Honor about yes to everything, you

7    are right, I shouldn't assume.  What I was assuming in that

8    question was the idea that the agents are acting with the idea

9    of, we are going back to try to find something responsive to

10   this warrant.

11           THE COURT:  But it's a problem the way you set it up.

12   Because you want to set it up by saying, they can look through

13   everything.

14           MR. FERRARA:  They could.

15           THE COURT:  If they do that, then they are making a

16   determination based on the warrant as to what's responsive and

17   what's nonresponsive and then whether physically or mentally

18   there needs to be a distinction, I think, between responsive

19   and nonresponsive such that you can't then search with any term

20   unmoored, entirely unmoored or even a little bit unmoored from

21   the warrant, which I think is what you're proposing.  In other

22   words, it doesn't help, I don't think, to your argument to sort

23   of this point which you want to put a lot on, which is that the

24   government could look through it all, but it only must look

25   through it all with the idea of searching for and ultimately

1    seizing responsive documents.

2          MR. FERRARA:  Your Honor, that might be right.  That's

3    what happened here.  And the point about going through every

4    single record is an attempt to respond to what defense counsel

5    suggests must be inappropriate because the terms were outside

6    the scope of the attachment to the warrant.  And so, your

7    Honor, I appreciate the hypotheticals and it has tested the

8    limits of my argument.  But my argument really is an attempt to

9    respond to the idea that it is not necessarily inappropriate to

10   use search terms outside the warrant itself.  And that's what,

11   your Honor, was done here.

12         THE COURT:  I think then to move back down to the

13   ground and out of the atmosphere which we are speaking, then I

14   think we have to contend with the inconsistent testimony

15   between Miller and McGuire.

16         MR. FERRARA:  I'm happy to turn to that, your Honor.

17         THE COURT:  I don't know how to read it other than

18   inconsistent.  Then my question to you is, who should I

19   believe?  I'm not suggesting misdirection, but sometimes people

20   recall events differently and these two people did.

21         MR. FERRARA:  I agree.  I think your Honor heard two

22   different witnesses, who neither of whom was super well prepped

23   on this particular point.

24         THE COURT:  One, presumably, was prepped.

25         MR. FERRARA:  Your Honor, this did not come up in the

1    direct.  Your Honor will recall this did not come up in the

2    direct.  Again, my observations of Agent McGuire --

3          THE COURT:  Agent McGuire was prepped.  He had a set

4    of responses which is consistent with the argument that you're

5    putting forward.  Ms. Miller was not prepped.  She had no idea

6    she was going to show up and it wasn't a fog of memory.  It was

7    a specific memory that was inconsistent with what Agent McGuire

8    had testified to.

9          MR. FERRARA:  This sort of cuts both ways because on

10   the same -- obviously your Honor controls, but I saw Agent

11   McGuire trying to think through what had happened and

12   re-creating his memory.  I think the record reflects that on

13   this point.  To your Honor's point about being prepped, he had

14   a better opportunity to think about this than did Agent Miller

15   and she is coming in having thought about it for five minutes

16   and reviewing one e-mail about it.

17          But I guess I want to lead on this with, again, we are

18   not conceding there was necessarily any problem with what Agent

19   Miller -- we are not conceding there was a problem with what

20   she did.

21          THE COURT:  The government is not walking away from

22   any of her testimony.  I should assume her testimony to be true

23   and accurate.

24          MR. FERRARA:  Your Honor, I don't want to make myself

25   a witness.

1          THE COURT:  No.  That's not the question.  The

2     question is whether your argument essentially requires me not

3     to credit, not because of a lack of credibility, but for other

4     reasons, to not credit aspects of her testimony.

5          MR. FERRARA:  The government's position is that as

6     between the two recollections your Honor should credit Agent

7     McGuire's because he had more of an opportunity to think about

8     this and was the case agent.  No.  Our argument is not that

9     your Honor has to credit one or the other.  Either version

10     supports our argument that at the end of the day there was no

11     prejudice to Mr. Wey from this research.

12          THE COURT:  And where doctrinally am I thinking about

13     prejudice?

14          MR. FERRARA:  For instance, defense counsel wants to

15     argue that these documents were used in various ways, etc.  And

16     the record --

17          THE COURT:  Maybe.  Is that the question?  Is the

18     question ultimately how they were used?

19          MR. FERRARA:  I think it goes --

20          THE COURT:  Maybe there are.  My skepticism is not

21     heartfelt.  I don't know.  But as I sit here, I can't sort of

22     think analytical structure, here is where I'm concerned about

23     prejudice.

24          MR. FERRARA:  Let me put it this way.  Let me attack

25     it from sort of a reasonableness perspective.  The government

1    had a situation where it could not access its evidence,

2    essentially, where a review had been done and pertinent

3    documents had been found and we were left with a situation

4    where we had none of that due to a technological problem.

5           The Fourth Amendment can't require exclusion when the

6    government confronts a problem, not of its making, a problem

7    that is entirely technological and attempts, in good faith and

8    reasonably, to address that problem the best way it can.

9           And what your Honor heard here was that Agent McGuire,

10   in order to deal with this problem, and in order to find a

11   subset of documents, asked Agent Miller to run these searches.

12   Now, that's reasonable in the first instance because Agent

13   McGuire himself wanted to separate himself from this search and

14   that's in part because he didn't want to expose himself to

15   privileged information and because he had this idea that he did

16   not want to research or search through everything.

17          Defense counsel calls that -- I believe what he says

18   is that McGuire testified -- this is defense brief at 14:  The

19   way defense characterizes it is McGuire testified he understood

20   clearly in 2015 that the FBI was no longer permitted to search

21   the entire database.  That's not what the record shows.  What

22   McGuire testified was that, that's at Defense 14, at the

23   transcript at 338.

24          THE COURT:  Tell me what sentences you're pointing to

25   in the brief.

1          MR. FERRARA:  That McGuire understood clearly in 2015

2     that the FBI was no longer permitted to search the entire

3     database.

4          THE COURT:  And the quote of the parenthetical is:  We

5     decided that in 2015 we could not continue to do searches.

6          MR. FERRARA:  Right.  The record isn't entirely clear

7     why that is.  I think the record has other places the Court can

8     infer.  Number one, there were privileged documents in that.

9     As the Court knows, as a practical matter, the government does

10    things in an abundance of caution frequently.  And so this is,

11    again, evidence -- this is not evidence of agents doing

12    something improperly.  It's evidence that the government did

13    not want to go farther than it had to go in trying to rectify a

14    problem not of its own making.  That is to say, we did not want

15    to have our investigative agent run roughshod through the

16    entirety of the electronic tapes.  As your Honor said earlier,

17    the law is unsettled.  That could have been construed to be a

18    problem.  There were privileged materials in the entire

19    universe.  Remember, your Honor, those bookmarks also had been

20    lost.  All of the bookmarks had been lost.

21          THE COURT:  I have not reread the transcript.  I do

22    want to understand your argument as to the context of that

23    because in my memory it was a case had come down about length

24    of time of retention.  Wasn't that part of the testimony here?

25    There was a specific district court case in mind from the

1    Eastern District.

2              MR. FERRARA:  There was *Metter*.  I don't remember and

3    I know that Agent McGuire was asked about *Metter*.  I don't

4    believe he was asked about *Ganias* in this.

5              THE COURT:  I don't mean *Ganias*.

6              MR. FERRARA:  *Metter* he was certainly asked about.

7    *Metter* doesn't speak to --

8              THE COURT:  Whose opinion is that?  Because it was

9    referred to by the judge's name.

10             MR. FERRARA:  It was *Irizarry*.

11             THE COURT:  Then I have the same case in mind.

12             MR. FERRARA:  And so defense wants to call this bad

13   faith.  We believe it was good faith because we were taking the

14   most limited steps we could to address a problem that we did

15   not create, so we wanted a filter agent to look through it.

16   Both McGuire and Miller agreed that she was given documents to

17   look for.  McGuire says it was a much larger number and he says

18   that she was asked to find just those documents where as Miller

19   says it was a smaller number that were examples.

20             THE COURT:  His testimony was that he sort of showed

21   her documents and said, find comparable documents.

22             MR. FERRARA:  Absolutely right and Miller was not that

23   specific.

24             THE COURT:  She was given search terms and told to

25   search for those terms, including, and correct me if I'm wrong

1    again -- I have not reread the transcript -- including I think

2    we asked or someone asked the specific, for example, searching

3    for air bag and she remembered searching for Dogan Erbek.

4    That's not even close to Agent McGuire's testimony as to what

5    happened.

6              MR. FERRARA:  Your Honor, we are happy to try to find

7    the page where she says she was given some documents as

8    examples, but on the Erbek point, I believe McGuire also had

9    testified that one of the things that they did want her to look

10   for was Dogan Erbek's e-mails, the fact that she heard that

11   name.  She construed it as a search term whereas Agent McGuire

12   seemed to put it in the context of, he was showing her Dogan

13   Erbek e-mails.  I agree it's inconsistent in the sense of how

14   exactly the search was done, but I think there is an

15   explanation for why she remembered the name Erbek.  She

16   remembers it as a search term.  I think McGuire also said that

17   he did mention Erbek or at least showed her Erbek e-mails.  So

18   she would have had that name in her head.

19             Agent Miller does the search.  Now, defense counsel

20   at -- I believe it's his brief at 14 says that Miller delivered

21   the balance of the search materials to McGuire.  The word is

22   delivering, which I've called delivered.  But in fact she

23   explicitly said she did not deliver the documents she found to

24   anyone on the prosecution team and that's at 379 of the

25   transcript.

1     I'm not going to stand here, your Honor, and suggest

2     that Agent McGuire could not necessarily have looked at those

3     documents that he didn't have access to the database.  But what

4     Agent McGuire did say was that her work was not used.  He

5     didn't say that explicitly.  What he said was that documents

6     were exported based on the original bookmarks and that's at

7     transcript 337.

8          What I'm arguing here, your Honor, is that at all

9     times during this period of time where there was this problem,

10    which was about a two-month period, the government was taking

11    the most limited steps it could to address that problem.  And

12    when the bookmarks turned out to have been restored, and it was

13    a glitch, the government did not use what Agent Miller had

14    relied upon.

15         And the Fourth Amendment simply cannot require the

16    exclusion of evidence because the government attempted, in a

17    limited way, to deal with a technological problem.  This is not

18    the sort of bad faith that can be deterred.  Technological

19    errors cannot be deterred from exclusion and the government has

20    to be able to look at evidence and prepare its case if there is

21    a technological glitch like this.  This just can't be the

22    purpose of the Fourth Amendment.

23         Your Honor, my colleague, Ms. Hector, found --

24         THE COURT:  For example, could one deterrence be

25    successful if, for example, in the face of after the length of

1    time the technological glitch happens, what was recovered that

2    to the extent that the investigation expanded over that time

3    beyond the original scope of the warrant, you can go back and

4    get another warrant or with respect to an agent who comes in in

5    the context of a tamper -- what did you call it?

6              MR. FERRARA:  Filter team, your Honor.

7              THE COURT:  Filter team that could be trained on the

8    scope of the warrant.  Which testimony was, there was no such

9    training.  In other words, I don't know that a technical glitch

10   that seems to me the longer the government maintains

11   information from the time of search, the process that happened

12   here, the sort of chronology of what occurred, it's almost, I

13   don't want to say inevitably, but it's not surprising that

14   something happens that leads, in a sense, to a starting over or

15   a restarting.

16             But the question then is, what steps must the

17   government take consistent with the Fourth Amendment?  I don't

18   know that it's right to say or it seems problematic to say that

19   you could bring someone in who has no training on the scope of

20   the warrant, give them search terms that were beyond the scope

21   of the itemized scope within a very, very broad warrant and

22   kind of let them have at it.  Again, it seems like even in the

23   face of a technical glitch there has to be some protection from

24   the government just rummaging an untrained, unnarrowed person

25   sort of rummaging through, right?

1          MR. FERRARA:  Fair enough, your Honor.  I just have to

2     push back because the record belies that.  Your Honor is

3     correct there was not testimony that there was an extensive

4     training for Ms. Miller on the nature of this investigation.

5     However, I believe they both said that they explained the

6     investigation to her.  They gave her, at the very least -- at

7     best for the government Agent McGuire says they gave her

8     specific e-mails and asked her to find them.  At worst for the

9     government, she was given examples of e-mails.  And that's at

10    transcript 372.  She was shown documents in connection -- there

11    were a couple of documents that were shown to me.  I was told

12    if I found something similar, that's something they were

13    looking for.  She did have this name Erbek.

14          Your Honor, just to be clear, Agent McGuire had

15    already determined that search terms relating to Dogan Erbek

16    were captured by the warrant.  AUSA Massey and Agent McGuire

17    had worked together on that.  Giving Ms. Miller the search term

18    Erbek was not sort of rummaging that your Honor is describing.

19    They had a sense of what they were looking for.  Ms. Miller

20    says they had a sense of what they were looking for.  Agent

21    McGuire said they had a sense of what they were looking for.

22    Again, Agent McGuire said, she found nothing new.

23          THE COURT:  Just to go back, you say there is

24    testimony that they had concluded that Erbek -- let's just

25    focus on this point because it's a helpful example -- was

1    captured.  He said captured by the warrant.

2         MR. FERRARA:  Yes, your Honor.  I don't mean to say

3    that one of them necessarily testified to that exactly, but

4    that was the import of their testimony, was that Erbek was a

5    search term that, yeah, had returned relevant documents.

6         It's hard to imagine how Erbek is not showing e-mails

7    between Mr. Wey and Tianyi Wey and Mr. Erbek discussing the

8    movement of money, financial matters, stocks, how that is not

9    captured by the warrant.  So the idea that giving Ms. Miller

10   that name was somehow rummaging I want to push back on because

11   that's not what was happening.  It's in Government Exhibit 16

12   where your Honor can see McGuire's handwritten notes as to what

13   sort of responsive documents that would have found.  The idea

14   is, Agent McGuire had looked at it.  He had looked at the

15   results for Erbek.  This isn't the idea that he's saying, have

16   at it, rummage.

17        In fact, and this is what I was sort of thinking is

18   prejudice, but I think goes into the reasonableness argument,

19   was this idea, she didn't find anything new, so it worked.  The

20   government's procedure actually worked here, and it didn't

21   result in the prosecution team learning something they hadn't.

22        If I may, your Honor, I also want to turn to this idea

23   of expanding the scope of the investigation.  There was

24   testimony and there is evidence that there was discussion, for

25   instance, about tax violations and some e-mails between AUSA

1    Massey and Agent McGuire on that point.

2         First off, again, just to go back, whatever was in

3    Agent McGuire's head when he was searching, what is clear from

4    his testimony is that he was attempting to find documents

5    responsive to this warrant. And at the end of the day there

6    are no tax charges here. The charges here are securities fraud

7    and wire fraud. And so to the extent that there would be a

8    remedy for, for instance, seizing documents that related only

9    to tax fraud -- and I'll come back to that in one second -- the

10    remedy would be if suppressing those documents vis-a-vis a tax

11    fraud violation or the idea that the government had brought

12    some case that it couldn't otherwise have brought because it

13    violated the warrant. That's not what happened here. What

14    happened here was we ended up charging the securities fraud and

15    wire fraud and money laundering and the documents we seized are

16    evidence of those things.

17         Now, that's not to say they couldn't also be evidence

18    of a tax violation and we couldn't properly bring a tax

19    violation in this case. Of course your Honor can see a

20    situation in these sort of financial and fraud crimes where you

21    properly seize a document that is evidence of securities fraud

22    and it also happens to show a tax violation. OK. The

23    government got a two-for-one on that. But that doesn't make it

24    improper.

25         But what I am flagging here is all this talk about the

 1    theory of the tax case, etc., etc.  There is no tax charge.  So

 2    whatever remedy might exist would be inapplicable because we

 3    are not going to be introducing evidence of tax violations.  We

 4    are not charging it, etc.  So the documents that are going to

 5    be relevant are going to be securities fraud and wire fraud

 6    documents.

 7            Your Honor, I was going to turn briefly -- this is

 8    just a minor point on good faith, but I wanted to make it.  I

 9    think your Honor, in holding this hearing, the government would

10    like to read into that the idea that your Honor understands

11    that good faith can still apply, even if the warrant on its

12    face does not list the statutes.

13            THE COURT:  That's unresolved.

14            MR. FERRARA:  I think that's *Romain*.

15            THE COURT:  I understand.  I have read *Romain* and I

16    have read *Rosa*.

17            MR. FERRARA:  Defense counsel distinguishes *Romain*.

18    No one is suggesting *Romain* controls this or that there isn't a

19    factual analysis that has to happen.  It's simply the idea,

20    there were no statutes on the face of that warrant, and the

21    Second Circuit said we are still engaged in a good-faith

22    analysis.

23            I've covered most of what I wanted to talk about

24    regarding the electronic search and I was going to turn, unless

25    the Court has other questions, I was going to turn just to a

few points on the physical search.

THE COURT:  Go ahead.

MR. FERRARA:  Defense in its brief asserts that the government called the wrong witnesses --

THE COURT:  Just a question.  Take you back just one moment.  On the question, that sort of initial step in the analysis as to whether the Court ought to proceed to a good-faith analysis, is it the government's view that that's a pure legal analysis or could there be evidence from the hearing that would help make -- I don't mean pure legal analysis.  Obviously, I have to look at the warrant.  But could there be evidence from the hearing that helps resolve the question as to whether or not to engage in the good-faith analysis?

MR. FERRARA:  I apologize if I'm misunderstanding the Court's question.  I think as a legal matter, what *Romain* stands for and *Rosa* stands for is the idea that the Court ought to engage in a good-faith analysis, regardless of the fact that the statutes don't appear on the face of the warrant.

THE COURT:  There is still the question of whether it's so clearly facially invalid.  In other words, you are saying the absence --

MR. FERRARA:  We are not prepared to say it's clearly facially invalid.  That's not actually our argument.  We believe that the warrant from the attachments, etc., would make it clear to a searching agent what the crimes that they were

1       arguing.

2               We understand there is law against us that says that

3       it has to be -- on the face we believe that the warrant and its

4       attachments as a whole would make it clear that this was a

5       securities fraud search.  But I believe, yes, your Honor, that

6       good faith goes into your Honor's thinking about to what extent

7       the agents relied on the warrant, understood the warrant,

8       despite the fact that the statutes were not listed.  And we

9       think in answering that question the Court --

10              THE COURT:  I guess maybe I'm thinking of it that

11      there is -- the facial validity question has two components.

12      There is the undisputed absence of the statutes on the face of

13      the warrant itself, on the face of the warrant or included in

14      the attachments.

15              MR. FERRARA:  That's correct.  100 percent, yes.

16              THE COURT:  Then there is also the question of whether

17      the warrant is so lacking in particularity or overbreadth as to

18      whether or not one could still engage in a good-faith analysis.

19      I think those are separate things.

20              MR. FERRARA:  Yes, I think those are separate things.

21      We are pointing to -- just on the reliance on the warrant, we

22      are pointing to things like that the statutes were listed in

23      accompanying documents, which cases talk about.  The things

24      like the briefing, the idea that these were securities fraud

25      agents executing the search.  That's what we are talking about.

1   That's what we are relying on for the good-faith reliance on

2   the warrant itself.

3           In terms of the execution of the search, this is where

4   defense counsel points to the idea that we --

5           THE COURT:  You are at 45.

6           MR. FERRARA:  I apologize, your Honor.

7           THE COURT:  I want you to do the physical and I'll

8   give extra time to the other side.

9           MR. FERRARA:  Very good.  Thank you, your Honor.

10          We called the case agent.  We called the AUSA who

11  prepared the warrant.  We called the case agent at the time of

12  the search, who was also the search team leader, and we called

13  the current case agent, who is primarily responsible for

14  searching electronic evidence.  What we are arguing from those

15  witnesses is that the FBI, the government, the team, as a

16  whole, were operating in good faith.  We are, of course, not

17  suggesting that some mistakes were made or certain things

18  weren't seized.  We conceded certain things, like the x-rays.

19          What we are arguing is that those are good-faith

20  mistakes that we had a situation where the team did everything

21  it could to try to avoid mistakes like that in a context of a

22  appropriately broad warrant.

23          So, again, I don't want to go through all of these

24  things.  Just the idea that the case agent was on the scene

25  taking questions, trying to look at what agents had taken, that

 1   the AUSA goes over and explains it, takes that extraordinary

 2   step.  This isn't the sort of conduct we want to deter.  We

 3   want to encourage all of those things.  In a case where there

 4   is appropriately a very broad warrant, the government was going

 5   above and beyond to try to make sure that the search was done

 6   appropriately.

 7            That's all I have, your Honor.

 8            THE COURT:  Thank you.

 9            MR. SIEGAL:  Good morning, your Honor.

10            THE COURT:  Good morning, Mr. Siegal.  We will give

11   you 50 minutes.

12            MR. SIEGAL:  Thank you very much, your Honor.

13            THE COURT:  If you need it.

14            MR. SIEGAL:  I'm sure that I will, your Honor.

15            THE COURT:  I've come to know you.

16            MR. SIEGAL:  Yes.

17            Your Honor, I have three large points to make, large

18   buckets to make.  I am going to start where your Honor and

19   Mr. Ferrara started which is with what we learned almost by

20   accident from Agent Miller on the witness stand on the second

21   day of the hearing which, in our view, is the clearest

22   demonstration that good faith cannot save -- no argument for

23   good faith can save these warrants.

24            The government wants to make an argument, which I'll

25   get back to, that good faith is demonstrated by the fact that

1    the agents were from a securities fraud squad.  They had been

2    briefed on what the affidavit said.

3             THE COURT:  The operational plan.

4             MR. SIEGAL:  All of that totally goes out the window

5    when Agent Miller comes onto the scene in 2015, three years

6    after these searches or three and a half years after these

7    searches.  She hasn't read the warrant.  She wasn't at the

8    briefing.  She is not on the securities fraud squad.

9             And what does she do at the instruction of Agent

10   McGuire two weeks before they present the case to the grand

11   jury?  She does wide-sweeping searches for a number of search

12   terms.  She doesn't remember all of them.  There appears to be

13   no record of what searches she ran.  We do know she included

14   Dogan Erbek as one of those searches.  We know she was also

15   asked to find documents similar to two or three examples she

16   was shown by Agent McGuire.  And she ran that search through

17   the entire electronic database, not through the 105,000

18   documents that Agent McGuire had marked as responsive to the

19   warrant in 2013, but rather through 3 million items.  You can

20   see that on the FTK report and she said that.  She read it

21   across the entire database.  There is really no dispute about

22   that fact.

23            And that is the harm that is identified in the first

24   *Ganias* opinion of Judge Chin which, by the way, the Second

25   Circuit didn't reverse all that logic or throw all that logic

1     out.  What the Second Circuit said was, because in *Ganias* the

2     agents actually went back and got a new fresh warrant and acted

3     upon that fresh warrant that wasn't attacked for its lack of

4     particularity, that was effectively the intervening event that

5     gave them good faith to act.

6           Now, there is a large portion in *Ganias II* of dicta

7     that describes a theory on which the government can hold onto

8     the entirety of electronic evidence seized, and Mr. Ferrara is

9     asserting that analysis as fact in this case.

10         Let's start off with the first thing, which is, they

11    didn't put any evidence on before your Honor in this case about

12    what the reasons were for keeping all that data that they

13    thought about that reasoning.  *Ganias* actually itself says, we

14    can't rule on this issue because none of that is in the record

15    below.

16         But let's put all that aside and let's give the

17    government the credit here and say, let's assume they made a

18    presentation that you could retain the entirety of the

19    electronic seizure for purposes of maintaining evidentiary

20    purity and the ability to do some sort of chain of custody

21    analysis if you had to on the back end.

22         That isn't what the problem is here, your Honor, and

23    nothing in *Ganias* says that you can keep 27 hard drives until

24    the end of time to fix technological glitches you might come up

25    with five years later.  *Ganias* doesn't say anything like that,

 1   assuming that's all that happened here, is that they were

 2   fixing technological glitches which frankly I think is not

 3   clear on the record at all.  That's what Mr. McGuire said.  We

 4   only know that what Mr. McGuire says and what Ms. Miller say

 5   are two different things.  And Mr. McGuire quite frankly --

 6            THE COURT:  Not on the question of the

 7   inaccessibility --

 8            MR. SIEGAL:  No.  I agree.  That was the impetus for

 9   doing the search.  She doesn't seem to contest that and she

10   doesn't testify to that at all.

11            But what we do know she ran these blanket searches.

12   She is an agent that didn't have any of the supposed good-faith

13   basis.

14            THE COURT:  Their response is, but she ran searches

15   that were given to her by an agent fully versed in the

16   limitations of the warrant and the specific crimes under

17   investigation.  What's your response to that?

18            MR. SIEGAL:  I have two responses to that.

19            First of all, our position, of course, is that the

20   warrant didn't allow them to search for items related to Dogan

21   Erbek.  We don't know what else they searched for because she

22   can't recall and there is no record of it.

23            Second of all, it's not just search terms that he gave

24   her.  He told her to find documents similar to this, according

25   to her, according to what she did.  We have no idea what she

1   found based on that, where she found it, or what items were

2   marked by her versus by Mr. McGuire two years earlier.  In

3   fact, although Mr. Ferrara asserts that she found the same

4   items, in fact, we have no idea and the CART agent, Mr. Blum,

5   testified on the witness stand that he would be unable to

6   figure out which items had been marked by Agent Miller versus

7   by Agent McGuire because the system just doesn't allow for that

8   kind of data integrity at this stage.  What we have here is the

9   full-blown vision of what *Ganias* 1 said was a constitutional

10  problem experienced in this case.

11        Now, it's just not simple enough to say, well, she was

12  just acting as a proxy for McGuire.  Even if she was, McGuire

13  knew because *Ganias* had been decided in 2014, the original

14  *Ganias* opinion.  He knew that.  He said it on the witness

15  stand.  He knew we couldn't be doing the searches.  In fact,

16  that's basically why he had her do the searches.

17        THE COURT:  What do I look for in the record for that

18  proposition?  Wasn't his testimony a taint question?

19        MR. SIEGAL:  There was that concern, yes, but he knew

20  she had to search through the whole database to do that.

21        THE COURT:  You are saying that the record supports a

22  finding that he specifically put her to the task of kind of

23  rummaging through these documents because he knows he can't do

24  it, but she and the -- what's the theory?

25        MR. SIEGAL:  I'm saying clearly he was concerned about

1   him being the person doing the search and, yes, there was a

2   concern about privilege.  But *Ganias* existed at the time.  It

3   was a Second Circuit case.  It says you can't be running new

4   searches.  I think it's extrapolatable from the testimony that

5   that was part of the concern here.

6        Now, we don't know definitively, but the agents are

7   charged with knowledge of a Second Circuit case that you can't

8   go doing new searches three years after you seized these items

9   and two years after you've done your initial cut of what is or

10  is not supposedly responsive to the warrant.

11       The law is, and this is why we cite *Thompson* and

12  several other cases that effectively say this, you get a search

13  warrant to go into somebody's house and somebody's office and

14  you take what is responsive to that search warrant.  Now, there

15  is an exception made for electronic materials that are so

16  voluminous that you can't realistically do that on site.

17       So what the law allows is you get to take that

18  electronic stuff back and then decide what is and what is not

19  responsive.  Once you have done that you don't get to keep that

20  stuff for the rest of time to continue to do new searches any

21  more than they could decide in 2015, you know what, we lost all

22  the documents that we made but we made copies in your

23  apartment, so we have the search warrant from 2012.  We are

24  going to come back to your apartment, get those originals again

25  and research them.  They would never be able to be allowed to

1    do that.  They would need to get a fresh warrant.

2            Mr. Ferrara argues that they did everything reasonably

3    that they could to deal with a problem that they encountered in

4    2015 except the one thing they didn't do was the thing that the

5    law requires them to do, which is go get a fresh warrant.  Go

6    get a warrant.  Say, we have the stuff.  That's what they did

7    in *Ganias*, which --

8            THE COURT:  Let me play with the hypo.  If you do a

9    physical search, take responsive documents, you leave, you lose

10   those documents.  Say you lose them the next day.  You have to

11   get a new warrant or go back with the same warrant?

12           MR. SIEGAL:  All warrants get 10 days.

13           THE COURT:  Set for a period of time.

14           MR. SIEGAL:  They give 10 days to do that search.  My

15   answer to that is, if you lose your search materials after six

16   months or whatever, yeah, you got to get a new warrant.  You

17   can't go back to somebody's house.  Frankly, I think it would

18   probably be a constitutional problem to do a search, take what

19   you think is responsive, and then go back the next day to see

20   if there is anything more.  I think that would be the problem.

21   But that's not the case we are facing anyway.

22           What I'm saying is, this is three and a half years

23   later and they are going back to the well to solve their

24   technological problem, even if that's all that they were doing.

25   It's not all that they were doing.

1        The proof in this case is simply not that she did what

2   McGuire wanted to believe happened.  I don't know why their

3   testimony diverges.  What we do know is, you are right, he was

4   prepped.  He understood what the issues were and what the

5   dangers were in this hearing, and she didn't.  We found out

6   what she had to say almost by accident.

7        And what she says is, no.  What I was asked to do, I

8   was asked to run a bunch of searches of terms.  I don't

9   remember what they were.  There is no record anymore of what

10  they were.  Somewhere between 50 and 150 documents come back as

11  a result of her searches that she flags.  And that includes not

12  just running search terms, but also find me documents that are

13  similar to these two or three.  That could be anything.

14        We have an FTK report that has both her name on it and

15  his name on it that counts, I think, 127 or 172 items that the

16  government cannot discern which ones were flagged by her, which

17  ones weren't.  That's dated September 2.  That's six days

18  before they present this case to the grand jury.  We know that

19  the reason that McGuire sent her to do that exercise was to

20  gather materials for the grand jury.

21        Even the notion that there is no taint here, no

22  prejudice is absurd because we know from the record that there

23  clearly is.  Even if we didn't know that, it doesn't matter.

24  What matters is the harm of the government going in and doing

25  those searches in 2015 without getting a new warrant.

1          A, that's a harm.

2          THE COURT:  Let me ask two questions.  One, McGuire's

3     testimony is, look, yes, these are new terms, take the name.

4     We learned in the course of the investigations things that led

5     us to believe rationally and reasonably that if his name shows

6     up it will be responsive with information to the original

7     warrant, right?  That tells a story about why a expansion in

8     fact is a kind of narrowing.  We are able, with the information

9     we have, to be able to search in a way that's going to get us

10    to documents that go to the story of the crime that's told in

11    the attachments to the warrant.  What's wrong with that?

12         MR. SIEGAL:  This requires me to step back in time a

13    little bit to 2013 and to talk more specifically about Agent

14    McGuire's testimony on this issue because remember that McGuire

15    is adding the search term Dogan Erbek and a bunch of other ones

16    that are not on the original Exhibit B list at the direction of

17    AUSA Massey, who although McGuire wasn't the case agent during

18    the ensuing year and five-month period, AUSA Massey was.

19         In the interim, AUSA Massey is conducting proffers.

20    He is expanding his theories of investigation.  He is issuing

21    and getting subpoenas returned.  He is having all sorts of new

22    information that he's importing into his thought process about

23    what is or is not going to be interesting or important to him

24    from this trove of electronic materials that hasn't yet been

25    looked at.

1          So McGuire doesn't testify, does not testify that he

2     looked at each and every one of the documents that hit on, for

3     example, Dogan Erbek or Amare Shantal or EST and determined

4     that each of those otherwise had terms in it that are covered

5     by the original warrant.  What he testifies to is --

6          THE COURT:  What page?

7          MR. SIEGAL:  This is on page 289.

8          THE COURT:  OK.

9          MR. SIEGAL:  He says:  I think with few exceptions.

10         THE COURT:  Line 18?

11         MR. SIEGAL:  I'm sorry.  Line 18, your Honor.

12         THE COURT:  Go ahead.

13         MR. SIEGAL:  I think, with few exceptions, if I

14    determine that it was a good search term and that the documents

15    were responsive to that search term, I would tag all of them.

16         What he testified to was, he put Dogan plus Erbek in

17    the system and if he looked at those documents and the document

18    said Dogan Erbek together in some way that was clearly

19    responsive to the search, the search term he just ran, they

20    marked all 72 documents that were a hit and is responsive.  He

21    said specifically, I can't say that I looked through every one

22    of them.

23         Later in his testimony he said, I looked to see if

24    they were responsive to the warrant.  But in this context that

25    phraseology really has no meaning because what does it mean to

be responsive to the warrant?  The agents have testified to

many different things about what was responsive to the warrant.

Is it just the list in Exhibit B?  They didn't really testify

to that, and they took plenty of things -- unless you say they

happened to be in Ben Wey's apartment, the agent testified we

were looking for things related to securities fraud, or we had

a general sense of what the investigation was about.

In this particular case, before McGuire even begins

doing these search terms, he asks for a top five list of legal

theories and gets a very lengthy digest from David Massey about

what this investigation is about.  When McGuire says, I was

looking for things that were responsive to the warrant, does he

mean, I was looking for things that fit into one of the

theories that David Massey was saying to me in that e-mail of

top five theories?  Was he saying things that might be

responsive to a tax fraud theory?  Was he saying things that

might be responsive to things that Robert Newlin had said in

his proffers in the fall of 2012, six months after these

searches?

This is part of the problem we have here, your Honor,

which is, they don't get to start doing the culling of what is

or what is not quote/unquote responsive to these warrants until

15 months afterwards.

And you would never be able, again, to go back into

somebody's apartment 15 months later after your investigation

1    has developed and say, you know what, now we are going to

2    decide what's responsive to the warrants and we are going to

3    get to look for things with a hundred terms beyond what were in

4    our Exhibit B.  If there is any limitation at all to the

5    warrants, and we don't think really there are, it has to be

6    what's in Exhibit B.  It has to be that that's the limitation.

7         David Massey tried to soften this a little bit by

8    saying, you know, we added e-mail addresses for some of these

9    names, but that's not the issue.  The issue is, they added a

10   whole bunch of names of people.  And, remember, Exhibit B is

11   not just a list of every name they could possibly think of at

12   the time they issued that warrant.  We know from the record

13   that David Massey and Matthew Komar were discussing the

14   Ungermans, they were discussing Erbek in e-mails two weeks

15   before they get the search warrant.  And they did not include

16   those names on Exhibit B.  Why?  Because they knew they didn't

17   have probable cause.  They didn't know what that had to do with

18   anything.

19        And here they are in 2013 saying, you know what, throw

20   these names into the mix, too.  That's the problem, your Honor.

21   The problem here is that the AUSA and the agents had a

22   curiosity and they got all this stuff and they wanted to throw

23   everything in there to see what they could find.  And adding

24   100 or 150 search terms -- and Mr. Ferrara is correct, your

25   Honor.  The law doesn't require one to use search terms or not

1   use search terms.  And, yes, could they have looked at every

2   single document?  They could have.  The problem is, what are

3   they marking as responsive?  Sitting here today, all we know is

4   is that Agent McGuire said he marked things as responsive if

5   the search term was a valid search term.  So that means the

6   105,000 documents that are responsive to the warrant could very

7   likely include all sorts of documents that don't have any other

8   name from Exhibit B on it.

9           The exercise that Mr. Ferrara is assuming happened,

10  which is not demonstrated in the record, we don't know if

11  that's what happened at all.  And the problem is, that list,

12  David Massey has expanded that list to cover all sorts of

13  things that he didn't have PC for.  They just added them.  And

14  they would never have been able to do that if they didn't take

15  and keep these computers and electronic materials for 15

16  months.

17          THE COURT:  Are we still in bucket 1?

18          MR. SIEGAL:  Sort of.  I've mixed my buckets.  Yes, we

19  are in bucket 1.  I'll move on to bucket 2, which is the whole

20  notion of good faith here.  Your Honor has not had a chance to

21  read our brief.  And obviously --

22          THE COURT:  I did read your brief.

23          MR. SIEGAL:  Our first point in the brief is -- I

24  apologize, your Honor.

25          THE COURT:  I just said that I usually limit oral

1    argument to sort of precise questions I have.  But given that

2    the briefs just came in and I'm on trial, I wanted to give you

3    some more room to speak to kind of allow me to develop those

4    more precise questions.

5         MR. SIEGAL:  Let me talk a little bit more about the

6    point that I make in my brief about why good faith doesn't

7    really even make sense in this context.  I'll come back to *Rosa*

8    and *Romain* in a minute.

9         What the cases say is that when you have a warrant

10   that on its face is facially unparticularized, no reasonable

11   agent can rely on that warrant and, therefore, you can't have a

12   good-faith analysis.  George says this.

13        THE COURT:  The facial flaw that you're pointing to,

14   you heard the colloquy with the government.  There is the

15   undisputed absence of the crime, right?

16        MR. SIEGAL:  That's right, your Honor.  There are

17   multiple reasons.  Basically, every box you could tick on what

18   suggests a lack of particularity is present in these warrants.

19   So it isn't just the fact that the code sections are not

20   listed.

21        This warrant says on its face, go search the offices

22   of New York Global Group and you can take any of these

23   multitude of these types of records as long as they relate to,

24   concern, or were used by or used in connection with New York

25   Global Group, Inc.  How is that not a warrant to take

everything?

I'll talk in a minute about the whole issue of the all-records exception. One thing we do know is, that all-records exception doesn't apply to a home. And they go to the home of Benjamin Wey and Michaela Wey, and the warrants say the same thing. Go to this home. They know it's the home of Benjamin and Michaela Wey. Whose names are on that list? Benjamin and Michaela Wey, two of the first five names. That right there doesn't cabin the discretion of these agents at all with respect to what they can take from Benjamin and Michaela Wey's home. That is our primary argument on why these warrants on their face failed the Fourth Amendment --

THE COURT: Wasn't that a primary argument while the warrant of the home fails on its face? Isn't that an argument for why the warrant for the home fails on its face? Don't they need to be analyzed distinctly?

MR. SIEGAL: They do, your Honor. But I think so far the argument applies with equal force to both of them. Again, there is this all-records exception that I'll get to with respect to the offers, but I'm saying, that doesn't apply to the home at all. Even assuming that argument has any merit, which I will argue it does not, it's not even in play with respect to the home search.

My point is, you have this, go search and seize any documents of the occupants of the places you are going. They

1    have no time frame limitation at all in them.  They don't say

2    the code sections.  They don't describe any type of conduct

3    that these agents ought to be relating their seizing of

4    evidence to.  They include blanket language like including but

5    not limited to in several of those passages relating to types

6    of records they can seize.

7            You see in the case law, your Honor, cases that deal

8    with each of these types of flaws and find that warrants --

9    they failed for particularity on each of those issues.  But we

10   have got them all.  Every way in which you could look at these

11   warrants tells you that they fail for particularity for each of

12   those reasons.  So our argument is not as it was in *Rosa* and

13   *Romain*.  They failed to put the statute code sections on the

14   face of the warrant and this is some technical glitch that they

15   messed up on and therefore -- this is a core fundamental

16   problem with these warrants from top to bottom.

17           And what *George* says and what *Zemlyansky* and frankly

18   *Rosa* and all the other cases say is, good faith can't overcome

19   that.  But let's assume for a moment that good faith could

20   overcome that.  Our first argument is good faith doesn't really

21   play here.  But as I thought about this, and I say this in our

22   brief, but I am going to say it a different way here, what does

23   good faith mean in this context?  The test in *Ganias* says that

24   agents act in good faith when they perform searches in, quote,

25   objectively reasonable reliance on binding appellate precedent.

1          So the question is, what binding appellate precedent

2    have these agents testified to or did Mr. Ferrara argue they

3    were relying on in terms of going ahead with this warrant?

4    Were they relying on some binding precedent that says, you can

5    rely on the affidavit for particularization in place of the

6    warrant?  No.

7          They clearly couldn't have been relying on that

8    because *Groh v. Ramirez*, United States Supreme Court, says you

9    can't do that.  Were they relying on the notion that a

10   generalized briefing could suffice with particularity?  No.

11   Because the law doesn't say that either.

12         *Groh* or *Zemlyansky*, were they relying on the notion

13   that because they were in a securities fraud squad that

14   presented them with sufficient definition of what these

15   warrants allowed?  Of course not.  There is no case that says

16   anything like that.  Were they relying on the fact that the

17   word fraud appears in paragraph 9 of the 12 enumerated

18   paragraphs?  They couldn't have been relying on settled

19   appellate law that says that's appropriate because all the

20   cases say the opposite.

21         In fact, if you look at *Vilar*, Judge Karas rejects

22   that same argument.  There was a reference to fraud schemes in

23   the *Vilar* warrant.  That's totally insufficient.  The *Roche*

24   case says reference to mail fraud is totally insufficient to

25   provide particularity.  The *Cioffi* case out of the Eastern

1    District rejects this argument out of hand.  They are clearly

2    not relying on that.

3           What are they really saying is their good-faith

4    argument.  What they are saying is, we relied on the notion

5    that we got this briefing and there was an affidavit that was

6    detailed.  What they are trying to do, your Honor, is

7    effectively reargue *Groh*.  There is a case *Bianco* that said the

8    law in the Second Circuit used to be that you could refer to

9    specifics in an affidavit that weren't incorporated into the

10   warrant and *Groh* throws that out.  And all the cases subsequent

11   to that basically say that *Groh* has been abrogated.

12          What they are trying to do is re-enable them to use

13   the argument that was rejected in *Groh* by couching it in this

14   rubric of good faith.  That's just not what the law allows.

15   The law doesn't allow them to supply the particularity that is

16   missing in the warrant itself, which is frankly what the

17   Constitution says and that is one of the reasons why *Groh* ruled

18   the way it did and they are trying to say, we get the benefit

19   of the argument that's been rejected in this circuit.  It's

20   gone.  They can't make that argument just by back-dooring it

21   through the rubric of good faith.

22          THE COURT:  You said you would address *Rosa* and

23   *Romain*.

24          MR. SIEGAL:  I sort of already have.  *Rosa* and *Romain*.

25   One thing I would say, your Honor, is when you go back and you

1    read these cases, this case has everything to do with

2    *Zemlyansky* and *Vilar* and *Cioffi* and nothing to do with *Romain*

3    and *Rosa*.

4         *Rosa* is a case where they are investigating a child

5    porn situation.  They have to run and get a search warrant

6    overnight between 2 and 5 in the morning, and they failed to

7    put the statutes on the face of the warrant.  The Court

8    basically rules, that was an inadvertent bit of momentary

9    negligence.  In fact, I think it's *Vilar*, but it might be

10   *Zemlyansky*, they say *Rosa* is distinguishable for this very

11   reason.  Here, we asked the agent and the AUSA and they told us

12   they had months and months and months to prepare this warrant.

13   This was not a situation of some overnight glitch.

14        In addition, both *Rosa* and *Romain* are situations where

15   one agent is the same person who wrote the affidavit, knew what

16   the investigation was about, and was the person who did the

17   execution of the search.  That's just not the case here.

18        Was Agent Komar on the scene?  Yes.  Was he available

19   to answer questions?  I suppose he was.  Did he answer any

20   questions?  It's not clear that he answered any or maybe he

21   answered one where somebody said, should I take these duplicate

22   letterheads or these duplicate pamphlets?  That's hardly the

23   same thing as saying, the agent who swore out the warrant for

24   child porn and is looking through some computers for child porn

25   knows that's what he's doing and acting appropriately.  Here,

1    they didn't put on any of the other 19 agents who did the

2    searching or, frankly, who seized almost all the stuff that was

3    seized.  We don't know what any of those people were thinking.

4    We don't know --

5              THE COURT:  This is off point.  Do we know from the

6    record if the agents who searched the office are the same

7    agents who searched the home?

8              MR. SIEGAL:  I think it's significant overlap.  There

9    is 20 agents who searched the office and 15 who go to the home.

10             THE COURT:  Is that 15 a subset of the 20?

11             MR. SIEGAL:  I think so.  I have not done that

12   one-to-one comparison, but it looks like it.

13             THE COURT:  It was a digression.  Go ahead.

14             Is that the end of bucket 2?

15             MR. SIEGAL:  Well, let me think about that for a

16   second, your Honor.  No, it isn't and here is why.  This is

17   part of the theme of my brief which is, this is the fundamental

18   problem with trying to have a good-faith analysis in the face

19   of an unparticularized warrant, which is, what does it mean?

20   What does it mean to be acting in good faith under these

21   circumstances?

22             The point of the Fourth Amendment particularity

23   requirement is that there is a judge who has made an objective

24   judgment about what there is PC to be searching for and has set

25   guidelines and parameters that cabin the discretion of a bunch

1    of agents.

2              This whole notion of a good-faith analysis in the way

3    that the government has presented it here allows them to define

4    on their own what the scope of the search is; and not only do

5    to do that, but to do it five years later with the perfection

6    of hindsight to justify what they took.

7              And so that's why we have testimony where the agents

8    are saying things like, well, sure, we can seize a document

9    showing Michaela Wey was on the tennis team at Oklahoma

10   Methodist University because it shows where, how she and Ben

11   Wey met.  Where was that on the search warrant?  That's just

12   rank post hoc justification for what they seized because they

13   were interested in it.

14             Or an argument that we can seize any piece of paper

15   that shows an expenditure of money because we didn't know where

16   their money was going.  Or to say, you know, their finances

17   were a matter of interest to us because it was unclear.  David

18   Massey effectively acknowledges what was going on here, which

19   is, Mr. Wey was making a lot of money.  We didn't know where it

20   was coming from.  And this is infused through the testimony.

21             THE COURT:  The other argument you're making is, don't

22   look at those post hoc rationalizations as evidence of a lack

23   of good faith.  What that does is expose why good faith ought

24   not be the lens in the face of this level of lack of

25   particularity and breadth.  Is that bracket 2?

1    MR. SIEGAL:  Yeah.  That's the reason why I'm raising

2    it here, your Honor, that's right.  In other words, that just

3    show why a good-faith analysis of this sort doesn't make any

4    sense.

5    THE COURT:  I asked the government this question.  In

6    a sense you are saying I should look to evidence that emerged

7    from the hearing in part to make this sort of preliminary

8    conclusion.  You think it's appropriate to look at the evidence

9    from the hearing to make a preliminary conclusion under *Groh*?

10    MR. SIEGAL:  I think that's right, your Honor.

11    THE COURT:  That's what are you are arguing from.  You

12    are arguing from evidence from the hearing.  I think you are

13    making an argument from the evidence from the hearing as to why

14    under *Groh* I ought not engage in a good-faith analysis.

15    MR. SIEGAL:  That's right, your Honor.  That's one of

16    my points.  I have a separate point.

17    THE COURT:  We have a bucket to go.

18    MR. SIEGAL:  My point is, good faith makes no sense in

19    the way that the government has presented it here.  There are

20    certain instances where good faith can be an issue where you

21    can say, well, as was said in *Leon*, we have a warrant that was

22    found to be technically defective because it used any and all

23    language and these agents couldn't have known that a warrant

24    would fail for that weirdo technical reason, so we are not

25    going to penalize them.  But that's not what they are arguing

1    here and they can't argue that here because this warrant fails

2    for every conceivable reason that a warrant could fail.

3            Now I'll move --

4            THE COURT:  Bucket 3.

5            MR. SIEGAL:  Let me find it, your Honor, please, for a

6    moment.

7            So the third point is, let's take their argument on

8    its merit, which is that there could be a good-faith concept

9    here where although *Groh* and *Rosa* and *George* say you can't take

10   what's in an affidavit and say, well, the knowledge of that

11   somehow saves us from the particularity problem.  Their point

12   is, they all had the affidavit.  They knew what it said.  They

13   knew what the investigation was about.  That fails for a number

14   of reasons.

15           First of all, there is no evidence that 20 agents read

16   that affidavit.  There is no evidence that anybody other than

17   Komar himself read that affidavit before they did the search.

18   Even McGuire, who testifies he read the affidavit, can't say

19   whether he read it in 2012 or, more likely, 2013, when he takes

20   over the case.

21           THE COURT:  Isn't the idea of the operation plan in

22   the briefing to basically distill the information in the

23   affidavit?

24           MR. SIEGAL:  Well, I suppose it could be, your Honor,

25   but David Massey doesn't recall what he said.  It's a 97-page

 1    affidavit.  He didn't read that affidavit to them in 45

 2    minutes.  And all the agents testified that there was about a

 3    45-minute meeting.  In addition, they are talking about

 4    logistics for some portion of that meeting.  Who knows.

 5          And there is no evidence that it was even e-mailed to

 6    people, even though Agent Komar suggests he might have done

 7    that.  He doesn't actually say he did do that.  He said he

 8    might have e-mailed it to people.  In fact, the record reflects

 9    that they were unable to find any such e-mail.  So the notion

10    that 20 agents understood from the affidavit is out the window.

11          So your Honor points out, there is an ops briefing.

12    Look at that ops memo.  Most of it is about logistics, about

13    who is going to what when.  There is like three sentences in

14    there about what this is about.  If you say, OK, fine, that's

15    what this search is about, it's about securities fraud, pump

16    and dump, and reverse mergers of Chinese companies, how does

17    that justify half of the stuff we talked about and half of the

18    stuff that was sitting in this courtroom?  How does it justify

19    adding to the search concept in 2013 tax fraud issues, an IRS

20    agent into the mix, issues relating to Dogan Erbek that are

21    clearly excluded.  There is a prescription for erythromycin.

22    I'll go back to this.  He said that was an expenditure.

23    Benjamin Wey's 1998 divorce papers.  How does that relate to a

24    pump and dump of a handful of companies between 2007 and 2012?

25    It doesn't.  On their own theory this falls apart.  We

 1    understood this was a securities fraud case by a securities

 2    fraud squad.  How does that match up with taking photos of farm

 3    animals?

 4              THE COURT:  Isn't the structure there and the law --

 5    there can be some overbreadth.  There can be mistakes.  Some of

 6    it was explained as mistakes.  Some of it was rationalized, was

 7    within the scope.  But the emphasis here is sort of what

 8    processes were in place on an admittedly broad warrant, so they

 9    are pointing to the processes as evidence of the good faith.

10    There was this operation plan.  There was this training.  There

11    was the agent who recalls e-mailing the affidavit.  There was

12    his presence on the scene answering questions, being

13    responsive.  Letterhead, no.  So they are pointing to these

14    processes and, yes, you'll be able to point to examples of

15    overbreadth, some of which, again, there is rationalizations,

16    materials contained in the trash can, for example.  Yes, you

17    are going to find prescriptions, for example, but it was --

18    they took it all because it was food and torn documents and the

19    like.  In that light, each of the pieces -- I don't know -- add

20    up.  I think your argument is that it's all of them.  But there

21    is stories to be told about each of them.

22              MR. SIEGAL:  Let's talk about the process.  I'm going

23    to put aside the garbage issue because, as your Honor may see,

24    we have binders here of examples that are not --

25              THE COURT:  That's your supplemental.

1          MR. SIEGAL:  We have hundreds of pages here that are

2     not from the garbage that include photographs of open fields,

3     they include PSAT scores, they include all sorts of random

4     stuff.  Some of the decisions --

5          THE COURT:  From the home.

6          MR. SIEGAL:  From the home.  Some of the decisions

7     talk about the fact that although there is a potential for

8     overseizure, there wasn't any in this case.  But in this case

9     there clearly was.  Let's talk about one of the excuses they

10    gave which is that Michaela Wey was supposedly complaining that

11    they need to get out of there quickly.

12          As we point out in our brief, your Honor, and you can

13    see this in the photographs, there is really one closet that

14    has any documents, and that closet had 15 or 16 boxes of

15    documents.  And then there is another room that has maybe three

16    or four and you can see from the before and after photos that

17    basically they take every one of the boxes.  They leave one or

18    two.  Just think about the timing.

19          THE COURT:  You calculate in your brief the number of

20    agents and the time that they are there.

21          MR. SIEGAL:  They had 15 agents there.  And most of

22    those boxes are not full.  They had 15 agents.  And they are

23    saying to your Honor they can just take the entire box because

24    they found a document in there that has some financial records

25    in it.

1          THE COURT:  I suppose that nobody wants agents

2     searching their home for too long.  I'm presuming most home

3     searches where people are present, that sort of creation of

4     exigency exists.

5          MR. SIEGAL:  But they were there for four and a half

6     hours, your Honor.  They weren't in a big hurry to get out of

7     there.  They wanted to get home because it was 9:00, I'm sure.

8     But four and a half hours is plenty of time to look through 15

9     boxes with 15 agents and to just grab a box.  They grabbed

10    everything and they sifted through it and they still have it

11    all.  They still have Michaela Wey's x-rays.  That's one of the

12    few things they agreed they shouldn't have.

13         THE COURT:  Have you made an application for the

14    return of the x-rays or other materials?

15         MR. SIEGAL:  We asked for stuff back, your Honor, in

16    letters that were written to the prosecutors back in 2012.  The

17    case frankly went dry, but I can tell you that Michaela and Ben

18    Wey would have loved to have their family photographs back.

19    They don't have them.  What they have now are images that

20    aren't really useable.

21         THE COURT:  You did ask for those materials.

22         MR. SIEGAL:  They are in the record, those requests.

23         The other thing they try to say in sort of their

24    good-faith argument is, well, at the very least, it was clear

25    this was not a narcotics investigation, this was not a child

1     porn investigation.  Yet, they are taking materials in a way

2     that shows that they have the desire to take everything.  If

3     this isn't a child porn case, why are they taking every SD card

4     that's got every photograph of his family from his apartment?

5     What are they doing taking a Betamax videotape format cassette

6     which Betamax went out of style 20 years ago?  Those machines

7     don't even exist anymore.  Yet they take that tape.

8            What does it mean to say, we knew this was not a child

9     porn investigation if that doesn't cabin what you are taking in

10    any way?  They say, we knew this wasn't a narcotics

11    investigation, but David Massey sat up here and said, if it had

12    NYGG printed on it, they could take a heroin baggy.  That's

13    completely incoherent testimony.

14            THE COURT:  Are you out of buckets?

15            MR. SIEGAL:  No.  But I'm getting there.  I would like

16    an opportunity to respond to some of Mr. Ferrara's other

17    arguments.

18            He refers to the *Herring* case and whether or not this

19    is the kind of activity that's deterrable.  First of all,

20    *Herring* is a completely different case.  That is a case about

21    whether or not an agent could execute an arrest warrant that

22    appeared in a computer system database that appeared to show

23    that arrest warrant was still pending from a neighboring county

24    and he goes and executes that search warrant.

25            And what they said was, you know, he had a right to

 1    rely effectively on that database being accurate to make that

 2    arrest and therefore the arrest wasn't inappropriate.  That's

 3    *Herring*, which, by the way, is distinguished in some of the

 4    other cases we have cited.  I think *Zemlyansky* and *Cioffi* are

 5    among them.  That's a good-faith analysis.  Again, it relates

 6    to a technical issue that shouldn't overween somebody's acting

 7    reasonably in the face of something they are seeing on a screen

 8    in front of them.

 9          We also know from *George* and *Zemlyansky* and *Vilar* that

10    executing a facially invalid search warrant is deterrable and

11    important to deter.  And that's all your Honor needs to know

12    about whether or not this is the type of activity that is

13    subject to the exclusionary rule.  *Herring* is just totally

14    inapplicable to this situation.

15          THE COURT:  Let me ask, and I will give the government

16    some rebuttal time.  You could think of these as remedial

17    questions.  Question No. 1.  If I were to think there is a

18    distinction between the office search warrant and the home

19    warrant and search, what then remedy wise?

20          MR. SIEGAL:  Look.  Obviously, our point is everything

21    ought to be --

22          THE COURT:  Understood.

23          MR. SIEGAL:  I think your Honor can rule that even if

24    the search warrant for the office was valid, the search warrant

25    for the home was not and everything from the home ought to be

 1    suppressed.

 2            THE COURT:  Somewhat relatedly, if you harken back to

 3    bucket No. 1, you started by saying, sort of focusing on what

 4    happened with Agent Miller is critical.  Let's say I agree with

 5    you.  Here is an instance that demonstrates some lack of good

 6    faith.  How do I think remedially about the question -- you

 7    have shown one instance of bad faith.  What then follows from

 8    it?

 9            MR. SIEGAL:  Well, I certainly think anything relating

10    to Dogan Erbek ought to be suppressed.

11            THE COURT:  There needs to be some sort of remedy

12    analysis that did what?  And how would it proceed?

13            MR. SIEGAL:  Our point, your Honor, is, the execution

14    of a facially unparticularized warrant that seized all sorts of

15    things that are not covered by the warrant means the whole

16    search has to be suppressed.

17            THE COURT:  I understand that.  I went back to bucket

18    No. 1, which I think is actually a subset of bucket No. 3, if I

19    track it.  That's an argument about lack of good faith,

20    pointing to *Miller* and what happened there, right?

21            MR. SIEGAL:  Yes.

22            THE COURT:  If I agree, if I think that's an instance

23    of a problem, it's tied to the length of time of maintenance of

24    the electronic data, but maybe I'm unwilling to come to any

25    sort of comparable conclusion.  What is the process for

1    determining the remedy in that instance or is it your argument

2    that that somehow infuses -- that that's alone -- that's the

3    question.  You understand my question?

4              MR. SIEGAL:  I think I understand where you are going

5    with this.  Your Honor, you can view these as two distinct

6    areas of the world and say perhaps they acted in good faith in

7    2012 and 2013 but clearly they didn't act in good faith in

8    2015, so I can certainly suppress what happens in 2015 then,

9    and we are in this difficult position of trying to somehow

10   discern what the evidence was in 2015 as opposed to what it was

11   in 2013 and where that taint goes.  I think you can quite

12   clearly be looking at that taint by infusing the grand jury

13   process itself, and we will be making -- if it goes that way,

14   we will be making a motion to dismiss the indictment because

15   the whole grand jury process was poisoned.

16             I'm not saying what she did in 2015 washes away

17   everything that happened in 2013 and 2012.  What I'm saying is,

18   the whole concept of good faith, as the government is arguing,

19   it doesn't make any sense anyway.  And even if it does, there

20   is all sorts of ways you can look at what happened in 2012 and

21   2013 as a lack of good faith.  It's not our burden to prove

22   good faith.  It's the government's burden to prove good faith.

23   And I honestly don't understand what the good-faith argument is

24   other than, we ought to get to do what *Groh* says we can't do --

25             THE COURT:  I understand.  You've resisted my

1    question.

2          MR. SIEGAL:  I don't know how to answer it better.

3    I'm not saying that what Ms. Miller did in 2015 means they

4    intended in 2013 to do that or in 2012 to do that.

5          THE COURT:  Under this hypothetical I've disagreed

6    with you as to the sort of threshold question.  I'm into a

7    good-faith analysis.  And under my hypothetical you have

8    persuaded me that there is this one instance which is

9    problematic around the retention and use of the electronic data

10   and you have evidenced that, the absence of evidence around

11   what happened with the search in 2015.  What then, as a

12   practical matter, is your position should happen?

13         MR. SIEGAL:  I say your Honor needs to suppress

14   anything that was marked by Agent Miller in 2015.

15         THE COURT:  Could there be some further hearing to

16   assess that?  Is that what you're suggesting?  It's a very

17   practical question.

18         MR. SIEGAL:  I think we have to do that.  I don't know

19   that it can be done because of what --

20         THE COURT:  In other words, it's not your argument

21   that the sort of, OK, there is an absence of good faith;

22   therefore, it's all suppressed.  That's not your contention.

23         MR. SIEGAL:  Hold on one second, your Honor.

24         Your Honor, I can't argue that what Agent Miller did

25   in 2015 on its own means the government's arguments with

1    respect to what happened in 2012 lacked good faith.  I think

2    those are two --

3         THE COURT:  This was your lead point.  It's important

4    to you.  If I agree with you on your lead point and your lead

5    point alone, what then happens?

6         MR. SIEGAL:  My lead point, your Honor, is, that's the

7    best example of the absence of good faith here.  And it what

8    happens because of that means or whatever she did in 2015 needs

9    to be suppressed.  Yes, we have to have a separate analysis of

10   where that goes.  And I think the testimony shows that they may

11   be totally indistinguishable at this point.  But I also think

12   that because of what she is asked to do in 2015 relates to a

13   serious problem that exists in 2013, when Agent McGuire is

14   running terms that are not on the Exhibit B list.  I think that

15   shows both of those things are tainted together.

16        I want to quickly just address Mr. Ferrara's argument

17   about --

18        THE COURT:  For fairness, we are now at the 45 mark.

19   I'll give you another five minutes and then Mr. Ferrara five

20   minutes for rebuttal.

21        MR. SIEGAL:  I find it strange that they are

22   persisting with this argument, your Honor, because, frankly the

23   affidavit doesn't --

24        THE COURT:  What's your argument?

25        MR. SIEGAL:  The argument that the all-documents

exception or the all-records exception applies.  Of course, as
we said multiple times, that doctrine doesn't even apply to the
home.  Frankly, I think that undermines the argument with
respect to the office as well because the warrants are the same
and they suffer the same infirmities.  The government didn't
apply to Magistrate Judge Dolinger for an all-records warrant.
The agents don't testify.  They perceived this to --

            THE COURT:  You heard me ask about that.  I have not
gone back and looked at those cases.  But the government's
response was, the way to understand it is, what would otherwise
appear to be a nonparticularized warrant, you can analyze that
under an exception for all records.  Is that your understanding
of the law?

            MR. SIEGAL:  First of all, *Vilar* deals with this.
They made the same argument in *Vilar*.  Judge Karas said:  You
didn't even ask for that in your warrant.  How can I be
granting you post hoc an all-documents exception warrant when
you didn't even ask for it?  It goes against the testimony,
your Honor, is that the agents didn't think of it that way.
Frankly, what it shows is, effectively, the government here is
conceding that these warrants covered everything.  Why would
they be making that argument if they didn't?  The truth is,
these warrants did cover everything and they really have no
other way of justifying them.

            THE COURT:  How would you answer Mr. Ferrara's

1    challenge, where you have a financial crime or series of

2    suspected financial crimes and you have a business that they

3    think is infused?  What practically should they do?

4           MR. SIEGAL:  They should have made a showing to

5    Magistrate Judge Dolinger, which, by the way, they didn't.  If

6    you look at that affidavit, and I can get into a little bit

7    some of the various theories they have, which I think are

8    pretty flimsy for this case in general and in terms of the

9    NASDAQ --

10          THE COURT:  I don't want you to go down those.

11          MR. SIEGAL:  My point is, they list some very specific

12   things that they think are fishy that are going on here and

13   they list five or six transactions.  But they don't say

14   anywhere in that warrant, the whole business is a fraud.  Not

15   even their insider confidential informants are saying that to

16   them.  They had people who were informing -- who were then

17   working at the New York Global Group and those people aren't

18   saying this whole thing is a sham.  You would think those

19   people would say that and it would be in the affidavit if those

20   people were saying that.  But they don't.

21          How would they go about doing that if it was?  I think

22   you would have to say, the business model itself is a fraud and

23   everything that's going on there is a fraud, and we are

24   entitled to take all the records of the business, and they

25   don't say any of that.

1          THE COURT:  Maybe setting the all-records question

2     aside, if they don't think it's the whole business, what would

3     a particularized warrant look like in the instance in which

4     you're investigating at least broad financial crimes, setting

5     the home aside, but what would the warrant look like for the

6     office?

7          MR. SIEGAL:  Again, you can look for guidance for this

8     issue in all the cases we have cited, in *Cioffi*, in *Zemlyansky*

9     and in *Vilar* and in Judge Rakoff's opinion in *Debbi*.

10         The point is, you can't just say they are engaged in

11    wire fraud.  They have some legal theories about what was going

12    on here.  They relayed it to, is Benjamin Wey handing out stock

13    certificates?  You have to put something in the warrant that

14    says what is -- the fraud theory that you are looking for has

15    to be somehow embodied in the warrant, for a couple of reasons.

16    One, because you have to direct the agents on what to look for.

17    Are they looking for stock certificates or are they looking for

18    tax returns that take deductions for health care costs?  Those

19    are two very difference type of things.

20         THE COURT:  Obviously different from the information

21    that's included in the affidavit but also the information

22    that's included in the operations plan?

23         MR. SIEGAL:  Look, the operation plan is only two

24    sentences long.  Would that be sufficient?  I don't know the

25    answer to that question.  But certainly that would give them a

1   lot more guidance than they have here, which is none.

2          I'll point out this, too, your Honor, which is a

3   number of the cases, including *Groh*, say this.  The purpose of

4   the particularity requirement is not just to inform the agents

5   about what they are supposed to seize.  It's also to inform the

6   recipients of the warrant what's permissible and not

7   permissible to be taken.

8          Benjamin Wey should have been on notice based on what

9   the warrant said, what the warrant covered.  There is no way he

10  could have looked at that warrant and known what they could

11  take and what they could not take.  That's a part of the

12  constitutional analysis here.  And they don't even attempt to

13  address that.  That's another reason why I think the good-faith

14  argument doesn't really work because you are not satisfying the

15  searchee's need to know what it is that's being seized.

16         Back to your question, your Honor, what would a proper

17  warrant look like?  You certainly might say, we are searching

18  for evidence of pump and dump securities fraud.  We are

19  searching for evidence relating to reverse merger transactions.

20  We are searching for evidence relating to satisfying NASDAQ

21  listing requirements.  It would have to say something like

22  that, in addition to saying, 18 U.S.C. 1341 or 18 U.S.C. 1343

23  or 15 U.S.C. 78jd, something describing what evidence they are

24  looking for.  Otherwise, they could take any piece of paper

25  that has a dollar sign on it, which was effectually what the

 1   testimony was.

 2            THE COURT:  Thank you.

 3        Mr. Ferrara.

 4            MR. FERRARA:  Thank you, your Honor.

 5        Let me pick up with the question of remedy, your

 6   Honor.  As your Honor's hypothetical about Agent Miller, the

 7   government's position is, whatever the remedy is, it's not

 8   suppression because at the end of the day Agent McGuire was

 9   clear that the documents, the files were exported based on

10   those original bookmarks and those are the files we will use at

11   trial, is everything that came from the original search.  So we

12   don't think there was any harm, again, in what Agent Miller

13   did.  But those documents simply were not used.  That's not

14   going to be what we are going to be introducing at trial.

15            THE COURT:  How do I know that from the record?

16            MR. FERRARA:  Agent McGuire testified that the

17   documents were exported based on the original bookmarks.

18   That's at 337.

19        To the extent that your Honor thought that some

20   suppression was appropriate, then it would be something that we

21   think would be something that Agent McGuire had not already

22   found and, again, Agent McGuire is clear that Agent Miller

23   found no additional documents.

24        To the extent there was a different case where we were

25   going to introduce something at trial, to the extent there was

1   a different case where we found additional documents, new

2   documents in that second search, maybe suppression might be

3   appropriate there, but that is not this case.  That's not what

4   happened here.

5          Just to further, as your Honor thinks and asked some

6   questions about the difference between the two searches, Mr.

7   Siegal has brought up that there was no urgency in getting the

8   NYGG warrant.  Your Honor, it is not the same analysis for the

9   residence warrant because there was urgency in getting the

10  residence warrant.  That was something that was done more on

11  the fly, as Mr. Siegal sort of describes --

12         THE COURT:  I don't think there was testimony that

13  there was urgency, was there?

14         MR. FERRARA:  The testimony was that while at NYGG,

15  agents learned that Michaela Wey kept NYGG's records at the

16  house.  And that then the warrant was obtained in the middle of

17  the day.  So they could get into the apartment which they got

18  into around 4 or 5:00.  Again, the residence warrant was not a

19  situation where there were weeks and months to prepare that

20  particular warrant.  Again, to the extent we are thinking about

21  these differently, that is a difference in obtaining those two

22  warrants.

23         THE COURT:  Is it also a difference that the training

24  and the operations plan, all of that testimony was about the

25  NYGG office and there was no intervening good-faith process put

1    in place with respect to the home warrant?

2            MR. FERRARA:  No.  Because, to your Honor's point, it

3    was the same search team, largely the same search team.  That

4    is in the exhibits, your Honor.

5            THE COURT:  I trust that it wasn't.  It is a separate

6    question, even if it's the same people, presumably.  You've

7    just said that the need to go search the home developed in the

8    moment and obviously the home is different than the office.

9    And so, therefore, why should I consider the evidence that's in

10   with respect to the carefulness and reasonableness of what

11   occurred in the office to the home?

12           MR. FERRARA:  Because, again, the question that the

13   Court is being asked or the challenge is that the agents could

14   not have known or would not have known from the face of the

15   warrant what it was they were looking for.  And that's in part

16   because Mr. Siegal is pointing to the idea that there was no

17   statute listed on the face.

18           But in fact the agents understood from the briefing,

19   from the ops plan, from the availability of the affidavit --

20   again, that's unclear who read that.  But the same agents who

21   went at NYGG and were asking those questions of Agent Komar,

22   getting advice from NYGG, are then the same folks.  The idea

23   is, they understand the search is in relation to the same

24   investigation, that this is sort of a continuation of this

25   investigation.  They are looking for the same sorts of things.

1    Komar is still on the scene.  He is still answering those

2    questions.  It's not as if those agents have forgotten it.

3         So when the Court asks, could these agents in good

4    faith have relied on this warrant and looked at this warrant,

5    understood what they were supposed to be looking for, the

6    answer has to be yes because those were the same agents who

7    have been educated and then in fact got more education in the

8    course of searching NYGG, getting a better sense of exactly

9    what they were looking for from Agent Komar.

10        THE COURT:  Back to the original point, you think it's

11   sufficient in the record for me to conclude exigency just sort

12   of by the chronology that developed.  That is to say, the

13   government, having searched the office -- yes.  The next step

14   was to get a warrant based on what they learned.  Their next

15   step was to get the warrant with respect to the home.  I can

16   make some conclusions, inferences about exigency, a fear of

17   destruction of documents and the like, but I don't know that

18   there is any testimony about that.

19        MR. FERRARA:  I think, your Honor, for instance, will

20   find in the record that agents were concerned, for instance,

21   about the destruction of evidence at the residence, that

22   once -- I don't want to go overboard.

23        THE COURT:  I don't recall it.  If you can point to

24   it.

25        MR. FERRARA:  I think what your Honor will see, and I

1    can flip through and Ms. Hector is flipping through.  There was

2    testimony that agents were sent -- I believe Agent Komar

3    testified that agents were sent to the residence to sort of

4    secure the residence.

5              THE COURT:  I do recall that, that they waited

6    outside.

7              MR. FERRARA:  They did wait outside.  They didn't have

8    permission to go in, of course.  What I'm worried about, your

9    Honor, is, I have some sort of prep in my head that I'm

10   thinking of in terms of -- what I want to say is, did they

11   serve a subpoena --

12             THE COURT:  Ms. Hector can look.

13             MR. FERRARA:  In any event, your Honor, I think based

14   on the fact that from the testimony that they learned it on the

15   scene, that they sent agents to the residence before they had

16   obtained the warrant.  And from, again, what are logical

17   inferences that the Court can make about how investigations

18   work if you now have a defendant or a target who is now aware

19   of the investigation, spoliation issues, obstruction issues

20   that agents could be reasonably concerned about if you wait

21   two, three days.  And so in light of that I think there was

22   more urgency than as to the NYGG warrant.

23             For what it's worth, your Honor, I want to make sure

24   your Honor knows or has this cite.  Mr. Siegal has talked about

25   the number of search terms that Agent Miller used.  I believe

1    she testified it was five to 10.  And I think that's at

2    transcript 371.

3            THE COURT:  He said 150 or something.

4            MR. FERRARA:  There was a number of documents that

5    were returned and I think she did testify about the number of

6    documents that were returned.  But as to search terms, it

7    was --

8            THE COURT:  She didn't remember and he did date

9    ranges.  Is that where we ended, at five to 10?  I can't

10   recall.

11           MR. FERRARA:  At transcript 371 you asked:  Do you

12   remember approximately how long the list of search terms you

13   were provided?  Agent Miller responded:  From what I recall, I

14   would say it was anywhere between five to 10 search terms.

15           Your Honor, two more points I would briefly make.  I

16   think your Honor understands.  When agents go into a residence

17   to search for documents, this is not a situation where you can

18   sort of do math and say 15 boxes divided by 10 agents times 60,

19   etc.  It's a large apartment.  Your Honor has the photos of the

20   apartment.  Documents can be anywhere.  The agents had found

21   documents in a trash bag in a suitcase in a closet.  They are

22   going to check drawers.  They are going to check maybe under

23   bed mattresses.  They are going to look everywhere for

24   potentially hidden documents.  It takes time.  They were not

25   all focused on this room.  These sorts of searches take time.

1    Children were out of the apartment.  They were hoping to get

2    them in.  Mrs. Wey reasonably was saying, I need to get my kids

3    back here.  When are you leaving?  Under these circumstances,

4    this is not the sort of sufficiently culpable conduct that we

5    are looking to deter.

6            The last point I would make, your Honor, is this.

7    Defense has said over and over that these search terms

8    inappropriately expanded the search, but, as far as I know,

9    have not pointed to, for instance, one document with Dogan

10   Erbek's name on it that they are suggesting is outside the

11   scope of the warrant.  We have not seen that because it doesn't

12   exist because communications between Mr. Wey, Tianyi Wey, and

13   Mr. Erbek are at the heart of this matter, for instance.  I

14   just wanted to flag that we have not seen where those

15   electronic files are that were captured that were outside the

16   scope of the warrant.

17           And the cites that Ms. Hector has helpfully found.

18   Your Honor, we would cite for that proposition transcript at

19   136, which is Agent Komar's testimony, and transcript 253 to 54

20   at Agent McGuire's testimony.

21           THE COURT:  Just on your first point, which I think is

22   sort of a prejudice point, you cited the record at 337 for

23   Agent McGuire, testimony about, in the end, not using any

24   documents from the Miller search that had not been originally

25   tagged once the original tags were recovered.  There is

1    something common sensible about that.  I'm just wondering if

2    you have authority for the idea that that is an appropriate

3    component of the analysis.

4           MR. FERRARA:  I guess I don't have a specific case at

5    my fingertips.  But I think what we see courts do in this space

6    is try to find reasonable approaches, reasonable remedies or

7    limited remedies that sort of go to the harm itself.

8           And so I don't think it's legally unsound for me to

9    suggest that this Court can take an approach that says, you

10   know, I find that the best practice is not to -- for instance,

11   would be to train the agent in this way.  However, given the

12   circumstances of this case, suppression would be too severe a

13   remedy.  Given that additional documents were not found, the

14   documents at trial will not flow from what Agent Miller found,

15   etc.  The shaping of remedies like that, I think the Court has

16   discretion and the Court has exercised that discretion.  What

17   I'm suggesting is, given what we know about how that search

18   went and what was used, it would be too severe a remedy for the

19   Court to suppress, wholesale suppress the electronic evidence.

20          THE COURT:  Let me ask you another remedy question

21   which I think would be something more at the front-end

22   analysis.  If I think there are aspects of the warrant that are

23   nonparticularized, is there any authority for severability with

24   respect to other aspects of the warrant?

25          MR. FERRARA:  Well, your Honor has asked about

 1   severability.  I don't know in terms of severability of the

 2   warrant.  Certainly there are cases where courts have

 3   suppressed more or less or suppressed specific documents,

 4   allowed other things.  Again, I think that's within the Court's

 5   discretion.  We don't think any suppression is appropriate.

 6   But certainly wholesale suppression, we would argue, would be

 7   too severe and we would ask if there is going to be suppression

 8   that it be limited to where the Court believes the government

 9   sort of went too far or acted unreasonably and limit the remedy

10   to that.

11             THE COURT:  Thank you, counsel.

12             MR. SIEGAL:  Couple of points, your Honor, quickly

13   just to respond --

14             THE COURT:  At some point it has to end because what

15   if he wants to respond to what you say and then you want to

16   respond to what he says.  I'll give you two minutes and then we

17   are done.

18             MR. SIEGAL:  Thank you very much, your Honor.  I

19   appreciate your indulgence.

20             Just on the issue of what your Honor was sort of

21   asking before and Mr. Ferrara was sort of addressing damages,

22   this notion that Mr. McGuire testified that no new documents

23   were found, we simply actually don't know that.

24             I think what the testimony is is that Agent Miller ran

25   five to 10, at least, search terms plus, don't forget, did

1   list, find me documents that are like this and the agent says

2   there is no way to tell what was tagged by her versus what was

3   tagged by Mr. McGuire back in 2013.  Her actions put a taint to

4   the entire electronic review.

5         And, in fact, although Mr. McGuire says it was never

6   actually used, what he testified to is that the technological

7   glitch wasn't fixed for a couple of months after they realized

8   the problem which would have been well after the indictment was

9   obtained based on Agent Miller's work.  The notion that there

10  is no issue here or nothing to see here is just contrary to the

11  record.

12        On the issue of severability, this gets a little bit

13  to Mr. Ferrara's argument that we are not going to find any

14  items that are not responsive to the warrant.  Again, it goes

15  to what is responsive to a proper warrant here.

16        Their argument is, well, if there are documents that

17  say Dogan Erbek on them, but also say Benjamin Wey or NYGG,

18  therefore, those documents are responsive.  My answer to that

19  is, only if you view a warrant that says go to Benjamin Wey's

20  office and take everything related to Benjamin Wey and go to

21  Benjamin Wey's home and take everything related to Benjamin

22  Wey, there is no severability opportunity for these warrants.

23  Because you would have to say, we are kicking out the search

24  term or the idea that the offices of NYGG and Ben and Michaela

25  Wey and the home of Ben and Michaela Wey are not valid concepts

1    because that is what makes this a general warrant.

2              THE COURT:  Thank you.

3              Motion is submitted.

4              We are adjourned.  Thank you, counsel.  Have a good

5    day.

6                                 o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25