UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__MAY 0 1 2017

United States of America,

—v—

Benjamin Wey,

               Defendant.

15-CR-611 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Before the Court is a motion by non-party Nasdaq, Inc. ("Nasdaq") to quash a subpoena *duces tecum* issued pursuant to Federal Rule of Criminal Procedure 17(c) upon the *ex parte* application of Defendant Benjamin Wey. For the reasons set forth below, Nasdaq's motion is DENIED.

## I. Background

Defendant Wey is charged in an eight-count indictment returned on September 8, 2015. Dkt. No. 2 (the "Indictment"). The Indictment alleges that between approximately 2007 and 2011 Wey, along with co-Defendant Seref Dogan Erbek and unindicted co-conspirators known and unknown, orchestrated a scheme by which Wey – through various non-party entities, family members, and associates (the "Nominees") – covertly amassed beneficial ownership of substantial portions of the equity stock of several publicly traded companies (the "Issuers"), manipulated the market price of the Issuers' stock, liquidated his holdings at artificially inflated prices, and then laundered millions of dollars in ill-gotten proceeds. *See, e.g.*, Indictment ¶¶ 7, 13, 18-22.

Specifically, the Indictment alleges that Wey caused the Nominees to acquire on his

1

behalf substantial portions of the shares of certain U.S.-based over-the-counter-traded shell companies and then, through his consulting firm New York Global Group, Inc. and its alleged affiliate in Beijing, facilitated "reverse merger" transactions whereby China-based operating companies merged into those shell companies, thus forming new publicly traded corporations – the Issuers. *Id.* ¶¶ 8-12. According to the Indictment, the Nominees acquired and retained, for Wey's undisclosed benefit, stock in the Issuers by virtue of their ownership of the target shell companies, with these Wey-controlled holdings together constituting more than five percent of the Issuers' outstanding shares. *Id.* ¶¶ 7, 11-14.

Wey then proceeded, the Indictment alleges, to manipulate the demand for and price of Issuer stock. *Id.* ¶¶ 15-19. Critical to that purported manipulation scheme – and pertinent to the instant motion – was an effort, allegedly directed or otherwise orchestrated by Wey, to secure listings on the Nasdaq Stock Market (a U.S.-based securities exchange owned and operated by movant Nasdaq) for several of the Issuers, including SmartHeat, Inc. ("SmartHeat"), Deer Consumer Products, Inc. ("Deer"), and CleanTech Innovations, Inc. ("CleanTech"), so that their shares could be traded in greater volumes and in more liquid markets. *Id.* ¶ 15. As part of that effort, Wey allegedly engaged in "deception" of Nasdaq, facilitating the Issuers' satisfaction of Nasdaq's 300 "round-lot" shareholder requirement – that is, the requirement that all listed issuers have at least 300 shareholders owning at least 100 shares of common stock each – by artificially inflating the Issuers' investor bases through stock giveaways from Nominees to other Wey confederates and issuances of round-lot share blocks to individuals who never actually received shares or were otherwise unaware of their ownership. *Id.* ¶¶ 15-17. According to the Indictment, Wey persisted in this "deceptive" scheme despite Nasdaq "repeatedly inform[ing] attorneys for the Issuers, with whom Wey was in frequent contact about the 300 round-lot

2

shareholder requirement, that gifted shares could not contribute to the minimum shareholder requirement for listing on its exchange because such shares did not establish 'sufficient public float, investor base, and trading interest' in the company." *Id.* ¶ 17. Nasdaq ultimately approved the Issuers' listing applications. *Id.*

Wey is scheduled for trial in October 2017 on charges of securities fraud, wire fraud, conspiracy to commit securities and wire fraud, failure to disclose beneficial ownership of Deer and CleanTech, and money laundering. *Id.* ¶¶ 23-40. In September 2016, Wey submitted an *ex parte* application for the issuance, pursuant to Federal Rule of Criminal Procedure 17(c), of subpoenas *duces tecum* directed to several non-parties, including Nasdaq. The proposed subpoena to Nasdaq sought:

> All emails and records related to the listing applications and approvals for [SmartHeat], [Deer], and [CleanTech], including in particular, any communications regarding, or interpretation or application of, the 300 round-lot shareholder requirement.

September 2, 2016 Declaration of David M. Siegal, Ex. C Att. A. In a Sealed *Ex Parte* Order dated September 20, 2016 (the "September 20 Order"), the Court denied Wey's application, concluding, as to the requested Nasdaq subpoena, that Wey had not identified the documents sought with the requisite specificity and had failed to make the necessary showing that all requested documents would be admissible at trial. September 20 Order at 5-7. The September 20 Order did, however, afford Wey leave to renew his application and make a proper showing that each requirement for issuing a Rule 17(c) subpoena was satisfied. *Id.* at 8. It also granted Wey's request to allow the application to proceed *ex parte*, citing its disclosure of certain elements of the defense's trial strategy. *Id.* at 2.

On December 7, 2016, Wey, again proceeding *ex parte*, renewed his motion. The

revised application substantially narrowed the set of documents sought, limiting it to:

> All correspondence and records sent or received by Keely Walter, William Slattery, or Andrew Hall relating to, interpreting or applying NASDAQ's 300 round-lot shareholder requirement, with respect to the listing applications of:
>
> 1. [SmartHeat], during the period of June 20, 2008 through January 27, 2009;
>
> 2. [Deer], during the period of May 4, 2009 through July 16, 2010; and
>
> 3. [CleanTech], during the period July 13, 2010 through December 10, 2010.

December 7, 2016 Declaration of David M. Siegal, Ex. C, Att. A. It also set forth anticipated bases for admission of the documents at trial through several specific exceptions to the hearsay rule. *See* Memorandum of Law in Support of Defendant Benjamin Wey's Renewed *Ex Parte* Motion for the Issuance of Rule 17(c) Subpoenas at 25. In another Sealed *Ex Parte* Order dated December 15, 2016 (the "December 15 Order"), the Court granted the renewed motion, concluding that Wey had "address[ed] and allay[ed]" the concerns, articulated in the September 20 Order, regarding the specific identification and likely admissibility of the targeted Nasdaq documents. December 15 Order at 2-3. Wey's renewed proposed subpoena to Nasdaq (the "Subpoena") issued the same day.

On February 3, 2017, Nasdaq filed the instant motion to quash. Dkt. Nos. 89-90. Nasdaq represents in its moving papers that it is "ready and willing to produce many of the requested documents as a compromise," including "all documents responsive to the [S]ubpoena that Nasdaq sent to, or received from, the Issuers," but otherwise "objects to the [S]ubpoena because it seeks disclosure of confidential investigative and deliberative records related to particular issuers' applications for listing on Nasdaq's exchange." Memorandum in Support of Motion to

Quash Third-Party Subpoena Directed to Nasdaq, Inc., Dkt. No. 90 ("Br."), at 1, 3 n.1. Wey opposes Nasdaq's motion. Dkt. No. 98. The Government has made no submission concerning this dispute.

## II. Discussion

Nasdaq asserts three arguments in support of its motion to quash. First, it contends that its subsidiary Nasdaq Stock Market, which owns and controls the documents at issue, is a self-regulatory organization, and, accordingly, enjoys absolute immunity from discovery. Second, it avers that the documents are protected from disclosure by the deliberative process, law enforcement, and investigative privileges. And third, it argues that the Subpoena, even in its revised form, fails to satisfy the requirements of Rule 17(c). Br. at 3-4. The Court will address each argument in turn.

### A. Nasdaq and Its Subsidiary SRO Do Not Enjoy Absolute Immunity from Third-Party Subpoenas in Criminal Cases

Nasdaq Stock Market is undisputedly a national stock exchange registered with the Securities Exchange Commission ("SEC") and thus, by statute, a self-regulatory organization ("SRO") with attendant regulatory, enforcement, and adjudicatory authority subject to SEC approval and oversight. *See In the Matter of the Application of Nasdaq Stock Market LLC for Registration as a National Securities Exchange*, Exchange Act Release No. 34-53128, 2006 WL 92913 (Jan. 13, 2006); 15 U.S.C. §§ 78c(a)(26), 78f, 78s(b); *see also Lanier v. Bats Exchange, Inc.*, 838 F.3d 139, 143 (2d Cir. 2016) (recognizing "considerable authority" of SROs like Nasdaq Stock Market). Nasdaq asserts that by virtue of its subsidiary's status as an SRO, it enjoys "'absolute immunity'" when "'acting under the aegis of [its] regulatory duties.'" Br. at 4 (additional internal quotation marks and emphasis omitted) (quoting *DL Capital Grp., LLC v.*

*Nasdaq Stock Market, Inc.*, 409 F.3d 93, 97 (2d Cir. 2005)). That immunity, Nasdaq contends, broadly shields it from the "'burdens of litigation, including discovery,'" and thus excuses it altogether from compliance with subpoenas, including the one at issue. Br. at 4 (quoting *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 355 (S.D.N.Y. 2015)). Such protection is particularly appropriate here, according to Nasdaq, because Wey "seeks disclosure of records and communications concerning Nasdaq's enforcement of a listing standard" – "material at the heart of Nasdaq's regulatory responsibilities." Br. at 5. The Court is not persuaded.

There is no question that SROs are generally "entitled to absolute immunity from private damages suits in connection with discharge of their responsibilities." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011). That immunity, as characterized by the Court of Appeals, is analogous to – but independent of – the "sovereign immunity from all suits for money damages" enjoyed by "government agencies, including the SEC." *Barbara v. N.Y. Stock Exch.*, 99 F.3d 49, 59 (2d Cir. 1996) (noting that "the [SRO] does not share in the SEC's sovereign immunity, but its special status and connection to the SEC influences our decision to recognize an absolute immunity from suits for money damages with respect to the [SRO's] conduct of disciplinary proceedings"), *abrogated in part on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016). Judicial recognition of the immunity reflects the functional reality that SROs, especially in the context of the securities markets, "perform[] a variety of regulatory functions that would, in other circumstances, be performed by a government agency." *Id.*; *see also D'Alessio v. N.Y. Stock Exch.*, 258 F.3d 93, 105 (2d Cir. 2001) (because a stock exchange SRO "stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring

compliance with those laws," it "should be entitled to the same immunity enjoyed by the SEC when it is performing functions delegated to it under the SEC's broad oversight authority"). Indeed, the doctrine of absolute immunity for SROs has been characterized as a matter of simple "fairness" in light of their "quasi-governmental powers." *DL Capital*, 409 F.3d at 97-98 (internal quotation marks omitted).

It is further beyond dispute that at least the sovereign immunity enjoyed in the first instance by government agencies themselves has been recognized as shielding them – absent waiver of the sort found in the Administrative Procedure Act ("APA") – from enforcement of subpoenas *duces tecum* in civil suits to which the United States is not a party. *See U.S. Envtl. Prot. Agency v. Gen. Elec. Co.*, 197 F.3d 592, 597-99 (2d Cir. 1999) (recognizing that enforcement of third-party subpoena issued by civil defendant would "compel" federal agency "to act" and would therefore be "barred by sovereign immunity" but for the express waiver set forth in the APA), *opinion amended in part on rehearing*, 212 F.3d 689 (2000).

But it does not necessarily follow from either premise – that is, from SROs' quasi-sovereign immunity to civil suits for damages or from federal agencies' sovereign immunity to third-party civil subpoenas – that Nasdaq is, as it urges, categorically excused from compliance with defense subpoenas endorsed by federal courts in the far different context of *criminal* proceedings. The latter is a proposition for which Nasdaq offers **_zero_** direct authority, whether from this Circuit or beyond, and, indeed, the Court is aware of no federal decision recognizing the purported immunity of SROs from Rule 17(c) subpoenas. Federal governmental agencies themselves are frequently served with, and respond to, federal criminal subpoenas without asserting immunity claims. *See, e.g.*, *United States v. Tucker*, 249 F.R.D. 58, 60, 66-67 (S.D.N.Y. 2008) (declining to quash defense's Rule 17(c) subpoenas issued to Bureau of Prisons

where only defenses asserted concerned scope of requests);[1] *United States v. James*, 02-cv-0778, 2007 WL 914242, at \*1-2, 27-30 (E.D.N.Y. Mar. 21, 2007) (denying motion to quash subpoenas issued to Bureau of Prisons, with only disputes concerning compliance with Rule 17(c) requirements and personal privacy implications). And in the absence of direct authority for the absolute immunity from similar subpoenas of *quasi*-governmental entities like SROs, the Court finds compelling reasons to decline to recognize such immunity here.

The Court of Appeals has expressly "cautioned" that the doctrine of absolute immunity for SROs "'is of a rare and exceptional character,'" and, accordingly, that "courts must examine the invocation of absolute immunity on a case by case basis," with the "party asserting immunity bear[ing] the burden of demonstrating its entitlement." *Standard Inv. Chartered*, 637 F.3d at 115-116 (internal citation omitted) (quoting *Barrett v. United States*, 798 F.2d 565, 571 2d Cir. 1986)). Nasdaq fails to carry its burden in this case. In contrast to civil lawsuits, "[t]he right to the production of all evidence at a criminal trial," as the Supreme Court recognized more than forty years ago, "has constitutional dimensions" under the Fifth and Sixth Amendments, and it "is the manifest duty of the courts to vindicate those guarantees" by ensuring "that all relevant and admissible evidence be produced." *United States v. Nixon*, 418 U.S. 683, 711 (1974). In light of those principles, the Supreme Court has (famously) held that executive privilege – a protection that, while distinct from SRO immunity, shares in part its basis in concern for the "effective discharge" of government powers – "cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice," at least when the assertion of privilege is "based only on the generalized interest in confidentiality." *Id.* at 711-13.

---

[1] For the sake of clarity, the Court notes that *Tucker* analyzed the subpoena at issue under a less restrictive interpretation of the Rule 17(c) standard than is typically applied in this Circuit, 249 F.R.D. at 66 – one that this Court has expressly declined to adopt, notwithstanding Wey's endorsement. *See* December 15 Order at 1 n.1.

Accordingly, even the President of United States is not entirely shielded from compliance with criminal subpoenas that satisfy the requirements of Rule 17(c). *Id.* at 707-13 (noting that "it is imperative to the function of the courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense" and that "the ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts").

Similarly, and with perhaps even closer parallels to the instant scenario, several courts have responded to claims of sovereign immunity from subpoenas asserted by third-party Indian tribes by recognizing judicial "discretion not to apply the [immunity] doctrine" – which is "largely" a matter of "comity" – if "it would conflict with more important federal interests, such as the constitutional rights of criminal defendants." *Alltel Commc'ns, LLC v. DeJordy*, 675 F.3d 1100, 1105 (8th Cir. 2012) (considering tribal immunity claim and contrasting question in criminal context with the "question [of] whether the [sovereign immunity] doctrine applies to non-party subpoenas served in . . . private civil litigation," where no "competing federal interests are present other than the general benefits of discovery"); *see also United States v. Juvenile Male 1*, 431 F. Supp. 2d 1012, 1016-19 (D. Ariz. 2006) (denying motion to quash criminal defendant's subpoena because court could not permit "tribe's immunity from civil actions" to "interfer[e] with the defendant's right to compulsory process"); *United States v. Velarde*, 40 F. Supp. 2d 1314, 1316-17 (D.N.M. 1999) ("I also conclude that the Court's interest in protecting Defendant's constitutional rights justifies an intrusion upon tribal sovereignty in order to enforce a subpoena on behalf of Defendant."), *conviction vacated on other grounds*, 214 F.3d 1204 (10th Cir. 2000); *United States v. Snowden*, 879 F. Supp. 1054, 1057-58 (D. Or. 1995) (concluding that criminal defendant's "constitutional rights of due process, fair trial, confrontation, and

9

compulsory process outweigh [Indian tribe's] claim of immunity" from defendant's subpoena).

Here, Wey seeks to counter at least one substantive component of the Government's case with evidence that Nasdaq was not "deceived" by a "ruse" on the part of Wey to secure listings for the Issuers by artificially inflating their investor bases through share transfers and gifts, but rather had actual knowledge of Wey's activities and approved the listings in any event. He has made a preliminary *ex parte* showing to the Court that such evidence may well exist and secured the Subpoena on the strength of that showing. Nasdaq would have the Court frustrate the vindication of Wey's constitutional rights to pursue that evidence by endorsing a sweeping immunity claim imported from the civil litigation sphere and unsupported factually by anything more than vague and generalized assertions that disclosure of Nasdaq's internal communications would do unspecified harm to its quasi-governmental regulatory mission. Under the circumstances, such a step would be unwarranted.

Nor do the few cases relied upon by Nasdaq convince the Court otherwise. Nasdaq cites the Second Circuit's decision in *D'Alessio* for, it would seem, the proposition that an SRO is absolutely immune even from an action initiated by a "criminal defendant." Reply in Support of Motion to Quash Third-Party Subpoena Directed to Nasdaq, Inc., Dkt. No. 102 ("Reply"), at 4-5. The plaintiff in *D'Alessio* had indeed been indicted on charges stemming from a trading scheme executed during his time as a floor broker on the New York Stock Exchange. 258 F.3d at 97. But those charges had been dismissed before the plaintiff brought the lawsuit from which the Exchange was ultimately adjudged immune: a *civil* tort suit for compensatory and punitive damages, with none of the Fifth or Sixth Amendment implications present here. *Id.* at 97-98. And the Court of Appeals held only that the absolute immunity doctrine is not, as the plaintiff would have it, "limit[ed] . . . to cases involving [an SRO's] misconduct in connection with

disciplinary proceedings" but shields SROs from any "*suit* for conduct falling within the scope of [their] regulatory and general oversight functions." *Id.* at 105-06 (also noting that, as a result, "absolute immunity precludes D'Alessio *from recovering money damages* in connection with his *claims*") (all emphasis added). Nasdaq's immunity from civil suit, or burdens associated with civil litigation, is simply not at issue in this case.

*Smith v. Cromer*, 159 F.3d 875 (4th Cir. 1998), a Fourth Circuit decision, is invoked for the somewhat blithe assertion that "courts regularly quash subpoenas in criminal cases on sovereign immunity grounds." Reply at 5. *Smith*, and the cases it discusses, do make clear that sovereign immunity precludes *state courts*, and, correspondingly, federal courts *sitting in removal jurisdiction*, from compelling federal agencies to produce documents or witnesses in violation of their own duly promulgated regulations. *See* 159 F.3d at 879-81. The cases make equally clear, however, that because the APA includes a waiver of the federal government's sovereign immunity to requests for non-damages relief in *federal court*, "federal-court litigant[s]" can, under certain circumstances, "seek to obtain documents from a federal agency by means of a federal subpoena." *See Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency, U.S. Dep't of the Treasury*, 86 F.3d 1208, 1211-12 (D.C. Cir. 1996) (explaining that "[w]hen a litigant seeks to obtain documents from a non-party federal government agency, the procedure varies depending on whether the underlying litigation is in federal or in state court" and that while sovereign immunity divests both state courts and federal courts following removal of subject matter jurisdiction to compel production, in "federal court, the federal government has waived its sovereign immunity"); *see also In re S.E.C. ex rel. Glotzer*, 374 F.3d 184, 190 (2d Cir. 2004) ("the federal government, in enacting the APA, waived its immunity with respect to those 'action[s] in a court of the United States' which seek review of 'agency

action,'" and "a motion to compel agency compliance with a subpoena qualifie[s]" as such an

"'action'" and therefore does "not violate sovereign immunity") (quoting 5 U.S.C. § 702); *Gen. Elec. Co.*, 197 F.3d at 597, 599 (because of "express waiver of immunity" provided in APA, civil litigant could move in federal court to enforce subpoena *duces tecum* issued to federal agency).[2] In the Court's view, these principles, if anything, militate *against* according Nasdaq absolute immunity from the Subpoena. To be sure, Nasdaq is not a federal agency and thus not directly subject to the provisions of the APA, including its waiver provision. *Cf. North v. Smarsh, Inc.*, 160 F. Supp. 3d 63, 78 (D.D.C. 2015) ("[T]he APA does not apply to SROs such as [the Financial Industry Regulatory Authority ('FINRA')] because FINRA is not an 'agency' within the meaning of the statute."). But insofar as the doctrine of SRO immunity is predicated upon "fairness" to SROs in recognition of their delegated, quasi-governmental responsibilities and authority, *DL Capital*, 409 F.3d at 97-98, it is no less "fair" to impose conceptually similar limitations on that immunity as those that apply to the federal agencies themselves. Thus, even assuming that Nasdaq's claim of blanket immunity as an SRO were not simply outweighed by Wey's constitutional rights as a criminal defendant – as the Court believes it is – there would be every reason to conclude that such immunity does not extend (at least not categorically) to applications, like Wey's Subpoena application, made in federal court and seeking non-damages relief.

Finally, there is *United States v. James*, a 1992 decision from the Ninth Circuit. The *James* court did recognize that an Indian tribe enjoyed sovereign immunity, based on "its status as a dependent domestic nation," from a third-party subpoena issued on the application of a

---

[2] Under Second Circuit law, a civil litigant seeking to compel a federal agency to comply with a subpoena must ordinarily exhaust his or her administrative remedies under the APA before applying for relief in federal court. *Glotzer*, 374 F.3d at 192.

criminal defendant (before noting that, at least to certain categories of requested documents, the tribe had waived that immunity). 980 F.2d 1314, 1319-20 (9th Cir. 1992). But, as several courts both inside and outside of the Ninth Circuit have since recognized, *James*' abbreviated discussion of the issue failed even to acknowledge the constitutional interests at stake given the posture of the underlying matter. *See, e.g., Alltel*, 675 F.3d at 1105 (recognizing that *James* has been "criticized and distinguished in district court opinions" that have "concluded that the Sixth Amendment rights of criminal defendants," among other things, "counsel against such a broad interpretation of tribal immunity"); *Velarde*, 40 F. Supp. 2d at 1315-17 ("I reject the overly simplistic analysis of *James*."); *Snowden*, 879 F. Supp. at 1056-58 (denying tribe's motion to quash and noting that "*James* does not control because the defendant did not raise constitutional challenges to the claim of immunity"). The Court is aware of no decision from this Circuit relying on *James* to quash a third-party subpoena issued by a criminal defendant to any entity – sovereign, quasi-sovereign, or otherwise – and it sees no reason to do so here.

There is no doubt that quashing the Subpoena under the circumstances presented would, at least to some degree, impair Wey's Fifth and Sixth Amendment rights. In the absence of authoritative legal precedent, the Court will not grant such relief based on Nasdaq's claim of immunity as an SRO. Accordingly, Nasdaq's motion to quash, to the extent it is based on absolute immunity, is denied.

### B. Nasdaq and Its Subsidiary SRO Fail to Properly Invoke the Deliberative Process, Law Enforcement, and Investigative Privileges

Nasdaq next argues that the documents targeted by the Subpoena are privileged and therefore protected from disclosure. Specifically, Nasdaq invokes the deliberative process, law

enforcement, and investigative privileges.[3] As discussed further below, the Court concludes that Nasdaq's invocation of these privileges is procedurally and substantively deficient and, accordingly, that Nasdaq fails to carry its burden of showing that the application of any privilege is appropriate under the circumstances.

### 1. Legal Standards

The deliberative process, law enforcement, and investigative privileges share certain features, particularly with respect to the procedural requirements for their formal assertion.

### a. Deliberative Process Privilege

"The deliberative process privilege protects from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.* ("*In re MTBE*"), 643 F. Supp. 2d 439, 441 (S.D.N.Y. 2009) (additional internal quotation marks omitted) (quoting *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005)). "[A] sub-species of work-product privilege," it exists "to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (internal quotation marks omitted). The deliberative process privilege "does not provide a blanket basis upon which to withhold documents that an agency has created during its decision-making process," because such a rule "would provide an exemption from the discovery rules for decision-making agencies generally," which, "of course, is not the law." *Toney-Dick v. Doar*,

---

[3] Nasdaq and Wey quibble over whether the law enforcement and investigative privileges are appropriately analyzed as essentially two sides of the same coin or as "separate but related privileges." Benjamin Wey's Memorandum of Law in Opposition to Nasdaq, Inc.'s Motion to Quash, Dkt. No. 98 ("Opp."), at 5. The Court does not view this distinction as in any way material to its resolution of Nasdaq's motion, but, for the sake analytic thoroughness, it will consider these privileges independently of one another.

12-cv-9162, 2013 WL 5549921, at *1 (S.D.N.Y. Oct. 3, 2013). Rather, the privilege applies only "when a document is '(1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated.'" *Schomburg v. N.Y.C. Police Dep't*, 298 F.R.D. 138, 144 (S.D.N.Y. 2014) (internal alterations omitted) (quoting *La Raza*, 411 F.3d at 356). It does not extend to "purely factual information regarding, for example, investigative matters or factual observations." *MacNamara v. City of N.Y.*, 249 F.R.D. 70, 78 (S.D.N.Y. 2008) (internal quotation marks omitted) (citing, *inter alia*, *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)). "Thus, factual findings and conclusions, as opposed to opinions and recommendations, are not protected." *E.B. v. N.Y.C. Bd. of Educ.*, 233 F.R.D. 289, 292 (E.D.N.Y. 2005) (internal quotation marks and citation omitted).

Importantly, it is well-established that "[t]he claim of deliberative-process privilege must be lodged by the head of the agency after personal consideration of the allegedly privileged material or by a subordinate with high authority pursuant to guidelines on the use of the privilege issued by the head of the agency." *In re MTBE*, 643 F. Supp. 2d at 443 (internal quotation marks omitted); *see also Martin v. N.Y.C. Transit Auth.*, 148 F.R.D. 56, 59-60 (E.D.N.Y. 1993) (explaining that the "deliberative process privilege must be properly invoked" by "the head of the agency which seeks to prevent the disclosure" or a delegated "subordinate with high authority," either of whom must have "personally reviewed the purported privileged matter") (internal quotation marks omitted). These requirements are "not . . . mere formalit[ies]," as the "assertion of the deliberative process privilege reflects a deviation from the norm of full transparency in litigation" and thus "should only be exercised by the head of an agency or through tightly controlled delegation." *In re MTBE*, 643 F. Supp. 2d at 443. In addition, if the

privilege is to be properly asserted, the "documents to be protected must be identified and described," *In re Grand Jury Subpoena dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 552 (S.D.N.Y. 2002), and the "agency must provide precise and certain reasons for preserving the confidentiality of the information." *Martin*, 148 F.RD. at 59 (internal quotation marks omitted) (citing *Resolution Trust Corp. v. Diamond*, 137 F.R.D. 634, 641 (S.D.N.Y. 1991). In light of these principles, "[t]he assertion of the privilege by an attorney" – absent factual support submitted by the owner of the information itself – is "improper." *Id.* at 442 (internal quotation marks omitted).

The deliberative process privilege is a qualified privilege, and, as such, "when the existence of the privilege is established, there is a need to balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information." *In re MTBE*, 643 F. Supp. 2d at 442 (internal quotation marks and brackets omitted).

### b.    Law Enforcement Privilege

The purpose of the law enforcement privilege is "'to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.'" *In re the City of N.Y.*, 607 F.3d 923, 940-42 (2d Cir. 2010) (quoting *In re Dep't of Investigation of City of N.Y.*, 856 F.2d 481, 484 (2d Cir. 1988)). The Court of Appeals has expressly "adopt[ed] the holding of the District of Columbia Circuit that the party asserting the law enforcement privilege bears the burden of showing that the privilege applies to the documents in question." *In re the City of N.Y.*, 607 F.3d at 944 (citing *In re Sealed Case*, 856 F.2d 268, 271-72 (D.C. Cir. 1988)). To carry that burden, the asserting party must meet three procedural requirements substantially

similar to those applicable to the deliberative process privilege: "(1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege." *In re Sealed Case*, 856 F.2d at 271-72. With the respect to third prong, "the party asserting the law enforcement privilege must show that the documents contain information that the law enforcement privilege is intended to protect." *In re the City of N.Y.*, 607 F.3d at 944. "Such protected information includes information pertaining to 'law enforcement techniques and procedures,' information that would undermine 'the confidentiality of sources,' information that would endanger 'witness and law enforcement personnel [or] the privacy of individuals involved in an investigation,' and information that would 'otherwise ... interfere[ ] with an investigation.'" *Id.* (alterations in original) (quoting *Dep't of Investigation*, 856 F.2d at 484). It is clear, however, that an investigation "'need not be ongoing for the law enforcement privilege to apply as the ability of a law enforcement agency to conduct future investigations may be seriously impaired if certain information is revealed to the public.'" *Id.* at 944 (additional internal quotation marks omitted) (quoting *Nat'l Congress for P.R. Rights ex rel. Perez v. City of N.Y.*, 194 F.R.D. 88, 95 (S.D.N.Y. 2000)). The asserting party may not discharge its burden with "'mere conclusory or *ipse dixit* assertions,'" but rather must "present[] 'those facts that are the essential elements of the privileged relationship.'" *MacNamara*, 249 F.R.D. at 79 (additional internal quotation marks omitted) (quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984)).

The law enforcement privilege, like the deliberative process privilege, is not absolute, but "[o]nce a court has determined that the law enforcement privilege applies . . . 'there ought to be a

pretty strong presumption against lifting the privilege.'" *In re the City of N.Y.*, 607 F.3d at 945 (quoting *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997)). "To rebut that presumption, the party seeking disclosure must show (1) that its suit is 'non-frivolous and brought in good faith,' (2) that 'the information sought is [not] available through other discovery or from other sources,' and (3) that the information sought is 'importan[t]' to the party's case." *Id.* (brackets in original) (quoting *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1343 (D.C. Cir. 1984)). In assessing "both the applicability of the privilege and the need for the documents," the district court must ordinarily review the documents in question." *Id.* at 948.

### c. SRO Investigative Privilege

Finally, to the extent that it constitutes a privilege distinct from the related law enforcement privilege, several courts in this District have recognized that the "investigatory materials of . . . non-governmental self-regulating bodies may, in some respects, be subject to a qualified privilege upon competent proof of harm if the documents are disclosed." *S.E.C. v. Thrasher*, 92-cv-6987, 1995 WL 46681, at *12 (S.D.N.Y. Feb. 7, 1995). The basis for that privilege is "the public interest in preserving the ability of self-regulatory bodies to function effectively." *DGM Invs., Inc. v. N.Y. Futures Exch.*, 224 F.R.D. 133, 140 (S.D.N.Y. 2004). The privilege has been applied, for example, to investigatory materials pertaining to "ongoing disciplinary proceeding[s] by a non-governmental entity," *DGM Invs.*, 224 F.R.D. at 138-141, as well as to materials whose protection is deemed "necessary to encourage both members and non-members of [an SRO] to cooperate with its statutorily required internal investigations," *Appex Oil Co. v. DiMauro*, 110 F.R.D. 490, 496-97 (S.D.N.Y. 1985); *see also Ross v. Bolton*, 106 F.R.D. 22, 23-25 (S.D.N.Y. 1985).

As with the privileges discussed above, "[t]here are three prerequisites to the assertion of

the [investigatory] privilege: (i) the head of the department having control over the information requested must assert the privilege; (ii) the official in question must do so based on actual personal consideration; and (iii) he or she must specify the information purportedly covered by the privilege, and accompany the request with an explanation as to why such information falls within the scope of the privilege." *In re Adler, Coleman, Clearing Corp.*, 95–cv-8203, 1999 WL 1747410, at *3 (Bankr. S.D.N.Y. Dec. 8, 1999).[4] Also like the privileges already examined, the investigative privilege may be overcome if "the party seeking discovery . . . establishe[s] a need for the privileged information that outweighs the competing interest in non-disclosure." *DGM Invs.*, 224 F.R.D. at 140.

With relevance to each of these three privileges, the Supreme Court has generally recognized that "evidentiary privileges must be construed narrowly because [they] impede the search for truth." *Pierce Cty., Wash v. Guillen*, 537 U.S. 129, 144-45 (2003); *see also Nixon*, 418 U.S. at 709-10 ("privileges against forced disclosure," whether "established in the Constitution, by statute, or at common law," are "exceptions to the demand for every man's evidence" and "are not lightly created nor expansively construed, for they are in derogation of the search for truth"); *United States v. Int'l Bd. of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997) (a privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle") (internal quotation marks omitted). "The party asserting the privilege"

---

[4] The Court is aware of Judge Sweet's observation in *DGM Invs.* that while district courts have strictly applied these procedural requirements to "governmental department[s] or bod[ies] such as the SEC" asserting the investigatory privilege, they have in practice – and for reasons unclear – tended to apply them to "non-governmental self-regulatory entit[ies]" somewhat "less rigorously, if at all." *DGM Invs.*, 224 F.R.D. at 139-140. That observation may well be correct as an empirical matter. But the Court sees no legal or practical basis for holding SROs seeking to benefit, by virtue of their quasi-governmental status, from what are essentially governmental privileges to anything less than the same invocation requirements applicable to the government itself. *Cf. Ross*, 106 F.R.D. at 23 (noting that while SRO was not technically entitled to formal governmental privilege, its asserted "interests . . . in encouraging witness cooperation and maintaining the integrity of its investigative techniques and files are similar to those of a governmental regulatory agency").

generally "bears the burden of proof" as to the propriety of its application. *In re Grand Jury Subpoena*, 218 F. Supp. 2d at 553.

## 2. Application

Nasdaq's assertion of each of these privileges is both procedurally improper and substantively lacking. Nasdaq has not even attempted to make an evidentiary showing of its need to invoke any privilege with respect to the materials at issue. It has submitted no supporting affidavits or other competent proof, instead relying entirely on *ipse dixit* assertions – all by counsel – that disclosure of the documents targeted by the Subpoena would work vague and generalized harm on Nasdaq's ability to enforce its listing requirements, investigate delinquent issuers, and generally "discharg[e] [its] regulatory responsibilities." Br. at 7-9. Such assertions, somewhat surprisingly, are submitted without any accompanying description of the documents themselves (or offer of submission for *in camera* review), without any specific explanation of the need for their protection, and without any indication that they have been personally reviewed – and their privilege status considered – by the head of the SRO or a duly designated subordinate. Quite simply, on the record (or lack thereof) before it, the Court cannot make appropriate privilege determinations and thus cannot quash the Subpoena on privilege grounds.[5]

---

[5] *See Micillo v. Liddle & Robinson LLP*, 15-cv-6141, 2016 WL 2997507, at *4 (S.D.N.Y. May 23, 2016) (city agency could not invoke law enforcement privilege based on "conclusory or *ipse dixit* assertions"); *S.E.C. v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 163 (S.D.N.Y. 2014) (where "SEC asserted deliberative process privilege on a blanket basis over single document," it was "clearly not the manner in which the privilege ought to have been asserted and [it] raise[d] serious concerns . . . as to the *bona fides* of the SEC's assertion of privilege claims"); *In re MTBE*, 643 F. Supp. 2d at 442-444 (deeming assertion of deliberative process privilege insufficient where only general counsel and high-level agency official lacking expressly delegated authority submitted supporting affidavits); *Miller v. Mehltretter*, 478 F. Supp. 2d 415, 425 (W.D.N.Y. 2007) (Department of Justice official failed to properly invoke law enforcement privilege where she made only "vague and conclusory statements without any specific or particularized facts to support her claim" that testimony would be privileged and "did not explain how disclosure [would] undermine law enforcement efforts and reveal law enforcement techniques") (internal quotation marks omitted); *Kaufman v. City of N.Y.*, 98-cv-2648, 1999 WL 239698, at *4-5 (S.D.N.Y. Apr. 22, 1999) ("blanket

Accordingly, Nasdaq's motion to quash, to the extent it is based on assertions of privilege, is denied.

## C.    The Subpoena Comports With Rule 17(c)

Finally, Nasdaq urges that the Subpoena contravenes Rule 17(c) because the documents that it seeks are insufficiently relevant to warrant admission at trial and, in any event, are procurable through means other than the Subpoena. Br. at 9-11. The Court disagrees.

As discussed in the September 20 and December 15 Orders, a party seeking the issuance of a subpoena under Rule 17(c) must satisfy the requirements set forth by the Supreme Court in *Nixon*. In particular, the party must demonstrate the materials targeted by the subpoena are (i) relevant, (ii) admissible, and (iii) specifically identified. *Nixon*, 418 U.S. at 700; *see also United States v. Yudong Zhu*, 13-cr-761, 2014 WL 5366107, at *2-3 (S.D.N.Y. Oct. 14, 2014) (recognizing *Nixon*'s continuing applicability to defense subpoenas issued to third parties); *United States v. Binday*, 12-cr-152, 2013 WL 4494659, at *1 (S.D.N.Y. Aug. 15, 2013) (same). The materials sought by subpoena must also be "'not otherwise procurable reasonably in advance of trial by exercise of due diligence.'" *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 322 (S.D.N.Y. 2011) (quoting *Nixon*, 418 U.S. at 699-700).

To satisfy these requirements, "[t]he items sought cannot merely be potentially relevant or admissible. Rather, they must be shown to be relevant and admissible at the time the subpoena is sought." *United States v. Barnes*, 04-cr-186, 2008 WL 9359654, at *3 (S.D.N.Y. Apr. 2, 2008). What is more, the targeted "materials must themselves be admissible evidence"; that they merely "contain information which could be admissible" is insufficient. *United States*

---

approach to asserting" deliberative process privilege, absent affidavit from head of agency or any other "competent proof," is "unacceptable and is itself grounds for denying the invocation of privilege"); *cf. United States v. O'Neil*, 619 F.2d 222, 226-27 (3d Cir. 1980) ("wholesale" and "indiscriminate" claims of privilege may be denied because the court "cannot make a just or reasonable determination of [their] validity").

*v. Cherry*, 876 F. Supp. 547, 552 (S.D.N.Y. 1995). "Rule 17(c) subpoenas are not tools of discovery in criminal cases," *United States v. Nektalov*, 03-cr-828, 2004 WL 1574721, at *2 (S.D.N.Y. Jul. 14, 2004) (citing *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951)), and, accordingly, they are not to be used as "general fishing expedition[s]," *Nixon*, 418 U.S. at 700 (internal quotation marks omitted); *see also United States v. Ferguson*, 3:06-cr-137, 2008 WL 113663, at *1 (D. Conn. Jan. 2, 2008) (Rule 17(c) subpoena "may not be used to obtain broad discovery in the hopes that useful evidence will surface"); *United States v. Rich*, 83-cr-579, 1984 WL 845, at *3 (S.D.N.Y. Sept. 7, 1984) (Rule 17(c) subpoena "cannot be used as a device to gain understanding or explanation").

As noted above, the Court has already determined in *ex parte* proceedings that the Subpoena – as modified in light of the overbreadth and admissibility concerns articulated upon Wey's original application – satisfies the requirements of Rule 17(c). *See* December 15 Order. Nasdaq's limited objections in this regard do not move the Court to reconsider that conclusion. Nasdaq contends primarily that the information Wey requests is irrelevant (and thus inadmissible) because, while "Nasdaq's consideration and handling of the Issuers' listing applications may be part of the narrative of this case . . . there is no reason to think that Wey's guilt or innocence could turn on the details of Nasdaq's decision-making." Br. at 10-11. It also urges that that many of the documents at issue are "likely already in the possession of the Issuers," which Wey himself purportedly controls, or available from the SEC, to which Nasdaq submitted records in connection with two of the Issuers' appeals of subsequent de-listing decisions. As such, Nasdaq avers, they are procurable by means other than the Subpoena. The Court disagrees on both counts.

"Generally, relevant evidence – that which has any tendency to make the existence of any

fact that is of consequence to the determination of the action more probable or less probable – is admissible for all purposes except as provided otherwise by the Constitution or by Act of Congress." *United States v. Griffith*, 385 F.3d 124, 126 (2d Cir. 2004) (internal quotation marks, citation and brackets omitted) (citing Fed. R. Evid. 401-402). The Indictment, as discussed above, alleges that Wey, as part of a scheme to manipulate the demand for and price of Issuer stock, successfully deceived Nasdaq into concluding that the Issuers satisfied the 300 round-lot shareholder requirement by, among other things, gifting shares to confederates in order to artificially inflate investor bases. The Court has no difficulty concluding that evidence potentially suggesting that Nasdaq had actual knowledge that Wey was facilitating satisfaction of listing standards in this manner could be "of consequence" to a determination as to whether Wey engaged in deceptive conduct and thus whether he may be guilty of, for example, securities fraud. It would thus be admissible under the general standard set forth above. The Court is aware of no authority for the proposition that, to be admissible in a criminal case, evidence must be of such variety that the defendant's "guilt or innocence could turn on" it, Br. at 10-11, and it will not impose such a restrictive requirement here.

Finally, notwithstanding Nasdaq's speculative suggestion to the contrary, the Court sees no reason to conclude on the record before it that the materials that Nasdaq specifically objects to producing – which, as Wey notes in opposition, are largely "*internal* Nasdaq communications," Opp. at 14 (emphasis added) – would be reasonably available from the Issuers or from the SEC. Indeed, Nasdaq's only representations on this issue stop well short of credibly suggesting as much, noting without elaboration that Nasdaq submitted unspecified "records" to the SEC in the course of the de-listing appeals and that "many" of those records are "presumably" available to Wey. Br. at 11.

The Court concludes that quashing the Subpoena for failure to satisfy Rule 17(c) is unwarranted.

## III. Conclusion

For the reasons set forth above, Nasdaq's motion to quash is DENIED. Nasdaq shall respond to the Subpoena within 30 days of this Order, or on any such date to which Nasdaq and Wey may agree.

This resolves Dkt. No. 89.


SO ORDERED.

Dated: ~~April~~ May 1 _____, 2017
New York, New York

ALISON J. NATHAN
United States District Judge